𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔆𝔬𝔲𝔯𝔱
𝔈𝔞𝔰𝔱𝔢𝔯𝔫 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 𝔑𝔢𝔴 𝔜𝔬𝔯𝔨

UNITED STATES OF AMERICA,

-*v*-

CARMINE G. AGNELLO,

*Defendant*.

Case No.: 2:24-CR-00366

## SENTENCING MEMORANDUM FOR DEFENDANT CARMINE AGNELLO

**TO BE FILED UNDER SEAL**

STEVEN A. METCALF II, ESQ.
**Metcalf & Metcalf, P.C.**
99 Park Avenue, Suite 810
New York, NY 10016
*Office* 646.253.0514
*Fax* 646.219.2012
metcalflawnyc@gmail.com

"[W]e treat departures and variances like two roads, one of which
can always get you to every place that the other may lead,
yet each of which has acquired its own set of directions."

*United States v. Fletcher*, 56 F.4th 179, 187 (1st Cir. 2022), *cert. denied*, No. 22-7130 (U.S. Apr. 24, 2023).

## I.    PRELIMINARY STATEMENT

The most important task in determining one's prison sentence, and what is just, necessary, not greater than sufficient: is to determine one's true heart based on what that individual has endured, how he handled the cards he was dealt, and whether he has made positive choices with such cards.

A person's true heart is where that person truly resides and where we discover what Justice represents in their case. During sentencing, judges perform a quintessential task constantly and effectively utilizing their own humanity and experience, in assessing that of the person standing before them – ready to be sentenced to potentially years in prison. Depending on that person's age, family circumstances, mental health, continued education – a careful balance few years make all the difference.

This memorandum explores the life of Carmine Agnello, who before he actually grew up – his childhood was in the spotlight for the world to watch him grow; I guess hence the name of the show. Decades later, Carmine, approaching his 40th birthday, stands before this Court to be sentenced, but has one priority to take care during this time – ███████████████████████ ████████████████████ ██████████████.[1]

---

[1] ███████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████

Born April 8, 1986, Carmine entered a world where he was quickly in front of a camera – leading to public fascination, and family legacy that was absolutely unavoidable – and a topic for daily discussion. Even as a child, he showed a calm, maintained composure that stood out even in a family where everyone in the house had a strong personality. His mother, Victoria, often highlighted her sons as her greatest accomplishments and "three fine young men," emphasizing their kindness and character despite the pressures around them. (*See* Victoria Gotti letter attached as **Exhibit A** at p. SE0003). Growing up, Carmine learned early that family is both a responsibility and a source of strength. His mother's devotion and belief in her sons shaped him deeply, grounding him in loyalty, resilience, and compassion.

Carmine became a fan favorite after "Growing Up Gotti" aired. Viewing in hindsight, the world saw a charismatic, stylish, soft-spoken young man who treated his family with respect. Despite being thrust into fame as a teenager, Carmine carried himself with surprising humility. Years later, those who have known Carmine can say that he resisted being defined by the show, and has strived to make his own stamp. He always sought out his own career path, and a way to hone his skills, where those skills are manifested in body building, music, or his passion for cars. At a young age he understood that reality TV was entertainment, not identity — and he wanted to keep improving himself.

Even when facing challenges as an adult, Carmine showed something admirable: he never hid, never ran, and never stopped trying to better himself. He remained close to his family, maintained dignity in public, and continued striving for a life built on his own choices rather than inherited expectations. Even on pretrial supervision, not a single complaint has been brought to counsel's attention. The noticeable shift has been Carmine's ability to assess the gravity of this case, and harness that to never make the same mistakes. Then literally out of nowhere, a unique medical situation arose in his immediate family, and Carmine immediately stepped up.

Recently, when his family learned of Victoria's pressing medical situation, for Carmine, less words and more actions has been his response. Immediately, he went for testing, and obtained his own advocate upon receiving the results that he is a ███████████h. Carmine has spent months ███████████████ ████████████████████████████████, and to verify that he ████████████████ █████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████████ ██████████████████████

However, undergoing this transplant means that custody in the BOP is a huge risk. A custody sentence – ████████████████████████████████. After

███████████ there is still a ████████████████, where an ██████████ could be life threatening, or his blood levels can suggest immediate treatment. Therefore, regularly treating with specialists will be required to monitor if Carmine is █████████████████, ██████████   ██████████████, and ████████████████ ██████. If anything happens then he will be in the worst place to handle such a problem, BOP custody.

Mr. Agnello's extreme family circumstances will be explored, first, regarding



██████████████████████. Second, this same transplant will be analyzed from Defendants perspective, and how residing in BOP custody essentially equates to little to no medical treatment if needed. To Carmine, ████████████████ he never questioned the right choice; and has held the answer, which was he was going to be ████████████████████████.

Actions speak louder than words, and Carmine's actions as of late are fueled from the love and respect for his family instilled in him from a very young age. Despite growing up in one of America's most scrutinized families, Carmine exhibited the importance of creativity, reinventing oneself, and always personal growth. His journey is far more uplifting than the one found with a quick google search, where the headlines naturally suggest something scandalous.

Growing up, Carmine learned early that family is both a responsibility and a source of strength. His mother's devotion and belief in her sons shaped him deeply, grounding him in loyalty, resilience, and compassion. Through actions instead of words, he has proven to be a devoted son, a man who worked hard to develop real skills, a man who matured beyond his public image, and a figure who continues to evolve, learn, and redefine himself. His story is not one of perfection — it's one of perseverance. And that is what makes Carmine at his core a positive person on all those in his life.

What remains from all this is Carmine will be standing before this Court in 2026 to be sentenced. Regardless, of whether such factors are denominated as History, Background, and Characteristics, or any other 18 U.S.C. §3553(a) factor, or if derived from the amendments in federal sentencing, a person's true heart is not going to be found in any law book.

At the end, I ask the Court to consider his actions on other matters, not the just on the worse allegations in his life. First, he was born into one of the most publicly scrutinized families in America. Despite that, the record will be devoid of an example that Carmine developed into an arrogant, entitled, or hostile adult. Rather, his personality is respectful, uninterested in exploiting notoriety, and one extremely protective of his family. Carmine's values may be uncommon to others of recent generations, where it's great to see that these fundamental values of being humble

and valuing privacy still exist. Second, there is a special relationship between a mother and her sons that is a constant reference in this memorandum. Having been raised by just my mother, it's worth mentioning the same characteristics Carmine displays, Victoria has also shown on her own. For example, any article you read about Victoria you can easily take away that she is protective of her sons. The importance here is that as a public figure she does not give generic praise and never speaks for fame or personal image.

Her praise of Carmine has always been about his behavior, whether she is quoted saying Carmine is "a good boy with a good heart", or "a respectful young man" – its Carmine's actions that I ask be considered. I can continue to make reference after reference, but I will only touch on two other examples of where Carmine's actions or inactions are admirable. Carmine played musical instruments not for ego or fame, but for the discipline of the craft. Lastly, he remains loyal to his family name, and his actions establish he never sought to exploit his family name for fame, money, or any other personal gain. Carmine is the opposite of hundreds if not thousands of examples, where a family member will betray his own family in seeking to capitalize on notoriety of such family's name. Again, any record created on Carmine would be devoid of such examples or characteristics.

Even though Carmine will turn 40 years-old right after sentencing, he is still a young man with the rest of his life ahead of him. He took responsibility for his

actions that landed him before this Court, but his true heart is even at a cross-roads. One direction is where he stands for sentencing and serves his time as quickly as possible. The other road is one of sacrifice and bravery, which will be explained - never came with a moment of hesitation. Instead, he aggressively ███████████ ███████ ████████████████████████████████████. Surely, fast forward six months and ████████████████.

When I write about a person's true heart, Carmine's current situation is the definition of what I have been searching for in years of writing sentencing memorandums. I say that because for Carmine the only thing that matters at this moment is that from a son to his mother, he has a gift. Carmine, in gifting his kidney means he has the gift of life, for however long, for his mother.

While on pretrial supervision, Carmine has been a model thus far during the pendency of this case, and the public can be safe and secure if probation is sentenced. There are alternatives to incarceration in the case of Carmine Agnello, where a majority of the time he will be dealing with the surgery, recovery, and ability to treat if an emergency emerges as a result of being a donor.[2]

---

[2] Addressed herein is the case of Mississippi sisters, Jamie and Gladys Scott, who were released from prison in 2011 after 16 years of a double life sentence involving a 1994 armed robbery. The governor of Mississippi at the time "suspended their sentences" with a condition: Gladys, the younger sister, had to donate her kidney to her older sister, Jamie. Although this was a state case, the governor of Mississippi knew the severity of being a donor while in prison.

We hereby, respectfully request this honorable Court take into consideration the contents of this submission with the letters submitted in support.

## II.    BACKGROUND

First, the PSR points out that the guideline provisions for a total offense level of 20 and a criminal history category of I, the guideline imprisonment range is 33 months to 41 months. (*See* PSR, Part D. Sentencing Options, at p. 13, ¶ 59). However, when factors are considered that may warrant departure/variance, the answer is one word, "None". (*Id.* at p. 14, ¶ 71). This memorandum sets forth the reasons for a variance to apply.

 It is understood that as of 2026, the most significant change regarding federal sentencing 2025 amendment, which relates to "departures" and "variances" to remove the departure provisions from the Guidelines Manual. The 2025 amendment reflects a shift in the federal sentencing framework, emphasizing variances under 18 U.S.C. § 3553.

The Commission removed specific "departure provisions" and policy statements related to personal characteristics, as previously outlined in the Guidelines Manual. The understanding is in emphasizing variances, sentencing is intending to align with the post-*Booker* framework, which allows courts to impose sentences outside the guideline range based on broader considerations, including individual characteristics and circumstances . 18 USC, Ch. ONE, Pt. A.

The broader consideration we ask this Court to consider and impose is an extraordinary family circumstances, involving a son and his mother, where she has been resented with a medical emergency and the son stepped up to the plates without a question – and happens to be ███████████████████ that needs to be conducted within the next two-three months.

### III.    LAW AND ARGUMENT

"The Commission envisioned and framed this 2025 amendment to be outcome neutral, intending that judges who would have relied upon facts previously identified as a basis for a departure would continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a)."

#### POINT ONE:

**THE COURT SHOULD IMPOSE A NON-CUSTODIAL SENTENCE BASED ON EXTRAORDINARY FAMILY CIRCUMSTANCES UNDER 18 U.S.C. § 3553(a)(1): MR. AGNELLO IS THE SOLE ███████████████ FOR ███████████████ KIDNEY TRANSPLANT**

The Court should grant a significant downward variance pursuant to 18 U.S.C. § 3553(a)(1) based on the extraordinary and unprecedented family circumstances present in this case. Carmine Gotti Agnello, is the only identified compatible donor for his mother, Victoria Gotti, who faces an imminent terminal condition or permanent debilitation without an urgent kidney transplant. (*See* CARSWELL, *John*

*Gotti's Daughter Victoria to Undergo Kidney Transplant with Her Son as Donor* (Exclusive), PEOPLE MAGAZINE, (Nov. 25, 2025) attached as **Exhibit E** at p. SA0087). While family responsibilities are typically insufficient to warrant sentencing reductions, the specific and extraordinary nature of this case—where Mr. Agnello's immediate availability can literally be classified along the lines of a matter of life and death for an innocent third party—places it squarely outside the "heartland" of cases. With the broader considerations of variances to align with the post-*Booker* framework, the family dynamic here demands judicial consideration of a non-incarceratory sentence that serves the statutory purposes of sentencing under 18 U.S.C. § 3553(a) while affording a Defendant, who quickly took responsibility for his actions, to still preserve his own mother's life, when no other family member is able to do so.

## A. LEGAL FRAMEWORK: THE 2025 GUIDELINES SIMPLIFICATION AND THE PRIMACY OF 18 U.S.C. § 3553(A) VARIANCE AUTHORITY

Effective November 1, 2025, the United States Sentencing Commission implemented sweeping amendments to the Guidelines Manual that fundamentally restructured the sentencing framework and eliminated most departure policy statements from Chapter 5, Parts H and K, as detailed in the Official Text of the 2025 Amendments (United States Sentencing Commission, 2025).[3]

---

[3] (*See* USSC Simplification Summary Chart, 2025) (explaining the Commission deleted Policy Statement §5H1.6 (Family Ties and Responsibilities) and §5H1.4 (Physical Condition) as part of

Under the simplified two-step process adopted in the 2025 amendments, courts, first, now calculate the guidelines range as the "starting point and initial benchmark," consistent with the *Gall* holding. *Gall v. United States*, 552 U.S. 38 (2007). Then courts consider the § 3553(a) factors in determining whether a variance from the guidelines is warranted. (Annotated 2025, Chapter 5, USSC).

The deletion of §5H1.6 and §5H1.4 does not eliminate or even diminish the Court's authority to consider extraordinary family circumstances and medical conditions in sentencing. To the contrary, it clarifies that such considerations are now governed directly by the statutory sentencing factors enumerated in 18 U.S.C. § 3553(a), which have governed federal sentencing since the Sentencing Reform Act of 1984, and which the Supreme Court held in *Booker*, must guide all sentencing determinations. *United States v. Booker*, 543 U.S. 220 (2005).

Section 3553(a)(1) explicitly directs courts to consider "the history and characteristics of the defendant," a phrase that necessarily encompasses the defendant's family situation, relationships, responsibilities, and the impact of incarceration on innocent third parties. Section 3553(a)(2)(D) further requires courts to "provide the defendant with needed . . . medical care . . . in the most effective

---

a comprehensive "simplification" initiative designed to streamline the sentencing process and acknowledge the post-*Booker* reality that "sentencing courts increasingly eschewed departures, applying Section 3553(a) variances instead".).

manner" – a mandate that extends to considering how incarceration will affect the defendant's ability to provide life-saving medical assistance to family members.

Importantly, the Commission's own guidance in the 2025 amendments confirms that the deletion of Chapter 5, Part H policy statements does not prohibit consideration of offender characteristics; but, rather moves such analysis to the variance framework. (*Id*.)

As the Commission explained in proposing the simplification amendments, "sentencing data showed that sentencing courts increasingly eschewed departures, applying Section 3553(a) variances instead," and the 2025 changes "recognize this trend by collapsing the second and third steps into a single step" under which courts apply § 3553(a) factors to determine whether a variance is warranted. (*Id*.) The Commission's 2023 Primer on Departures and Variances similarly emphasizes that "variances outpace departures significantly," with courts frequently citing "rehabilitation or family ties for downward variances, reflecting § 3553(a)'s individualized focus".

Before their deletion, §§5H1.6 and 5H1.4 established the legal framework under which courts could grant downward departures based on extraordinary family circumstances or extraordinary physical impairment. U.S. SENTENCING GUIDELINES MANUAL, Chapter 5, Part H (2024).

While these policy statements have been removed from the Guidelines, the case law interpreting them remains highly instructive in evaluating Mr. Agnello's circumstances under § 3553(a)(1). Former §5H1.6 provided that "[f]amily ties and responsibilities . . . are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range". USSG §5H1.6 (2024). But, courts uniformly interpreted the phrase "not ordinarily relevant" to mean that while typical family responsibilities do not warrant departure, extraordinary family circumstances falling outside the heartland do justify sentencing relief under § 3553(a)(1). *United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992); *United States v. Deigert*, 916 F.2d 916 (4th Cir. 1990).

The Second Circuit's seminal decision in *Johnson* established that extraordinary family circumstances standing alone can justify a downward departure when a defendant bears sole responsibility for the upbringing and survival of dependents. *United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992). In *Johnson*, the court affirmed a thirteen-level departure for a single mother who served as the sole caregiver for three young children and the six-year-old child of her institutionalized daughter. The court reasoned that the rationale for such relief "is not that [the defendant's] family circumstances decrease her culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing." (*Id.* at 129). Under this standard, family circumstances rise to

the level of "extraordinary" when incarceration would impose harm on dependents that transcends the typical hardship experienced by families of incarcerated individuals, creating a situation where the defendant's absence would cause catastrophic consequences for innocent third parties.

The Fourth Circuit reached a similar conclusion in *Deigert*, holding that §5H1.6 permits departures for extraordinary family circumstances. *United States v. Deigert*, 916 F.2d 916, 919 (4th Cir. 1990). Likewise, the Tenth Circuit in *Pena*, upheld a downward departure based in part on the defendant's unique family responsibilities to two infants whose welfare would be jeopardized by the defendant's incarceration. *United States v. Pena*, 930 F.2d 1486, 1494-95 (10th Cir. 1991).

Across circuits, courts recognized that the test for "extraordinary" circumstances focuses on whether the defendant's family situation is *unique*—and whether the defendant occupies an irreplaceable role in preserving the life or wellbeing of a family member.

This body of case law, developed over decades under former §5H1.6, remains fully applicable in the post-2025 Guidelines framework as courts evaluate family circumstances under § 3553(a)(1)-(2)(*See* Point I(B), *infra*) (highlighting that post-*Booker* goals include providing defendant with needed educational or vocational training, *medical care*, or other correctional treatment in the most effective manner.).

Courts have consistently recognized that family ties may be considered under §
3553(a)(1) even where they would not support a formal departure, and several
circuits have granted variances based on family circumstances that meet the
"extraordinary" standard. For example:

(1) The **First Circuit** has affirmed downward variances for
defendants with extraordinary caregiving
responsibilities, including a defendant caring for a wife
battling terminal cancer and a defendant providing care
for a daughter with disabilities. *United States v.
Prosperi*, 686 F.3d 32, 48-49 (1st Cir. 2012).

(2) The **Fifth Circuit** has held that the district court did not
abuse its discretion in granting a variance based on a
defendant's status as a single parent with a young son
who had disabilities. *United States v. Williams*, 517 F.3d
801 (5th Cir. 2008).

(3) The **Tenth Circuit** applies the "extraordinary
circumstances" standard of former §5H1.6 when
evaluating family-based variances under § 3553(a), and
has upheld variances where defendants occupy unique
caregiving roles. *United States v. Muñoz-Nava*, 524 F.3d
1137 (10th Cir. 2008).

(4) The **Eleventh Circuit** has endorsed consideration of
family responsibilities as part of the defendant's "history
and characteristics" under § 3553(a)(1), noting that
district courts "can justify consideration of family
responsibilities... for reasons extending beyond the
Guidelines." *United States v. Vandergrift*, 754 F.3d 1303,
1311 (11th Cir. 2014).

In the present case, Mr. Agnello's role as his mother's sole identified kidney
donor satisfies—and indeed far exceeds—the "extraordinary circumstances"

threshold established in *Johnson*, *Deigert*, and their progeny. Unlike the caregiving responsibilities at issue in those cases, where incarceration would impose emotional and developmental harm on dependent children, but would not directly cause their death, Mr. Agnello's situation is similar. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████ ██████████████████████████

████████████████████████████████████

The "destruction" created by his incarceration would be literal, not figurative. No legitimate penological interest is served by imposing a sentence that effectively sentences an innocent third party—the defendant's mother—to a terminal status.

### B. THE STATUTORY PURPOSES OF SENTENCING UNDER 18 U.S.C. § 3553(A)(2) ARE FULLY ACHIEVABLE THROUGH A NON-CUSTODIAL SENTENCE

Section 3553(a)(2) directs the Court to impose a sentence that will (A) "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; (B) "afford adequate deterrence to criminal conduct"; (C) "protect the public from further crimes of the defendant"; and (D) "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner". Each of these purposes can be fully and effectively achieved through a non-custodial sentence of home

confinement, supervised release, and community service, without imposing the irreversible collateral consequence of foreclosing the life-saving kidney transplant.

### i. *Just Punishment and Respect for the Law* (§ 3553(a)(2)(A))

Mr. Agnello's offense involved cryptocurrency fraud—a serious economic crime that warrants substantial punishment. However, the Guidelines calculation already accounts for the seriousness of his conduct through the offense level and guideline range calculation. A sentence of home confinement for a period equivalent to or longer than the low end of the guideline range, combined with stringent conditions of supervised release including electronic monitoring, community service, and financial restitution, would adequately "reflect the seriousness of the offense" and "promote respect for the law". Indeed, public respect for the law is arguably better served by a sentence that demonstrates the judiciary's commitment to proportionality and individualized justice than by a mechanical application of incarceration that results in the preventable medical harm of an innocent person, or close family member whose is neither Defendant's spouse nor his children. But, the broader discretion was put in place for a matter such as this where this Court can truly have less hurdles in determining a just sentence for a unique situation.

### ii. *Deterrence* (§ 3553(a)(2)(B))

Both specific and general deterrence are adequately served by a non-custodial sentence. Specific deterrence—preventing Mr. Agnello from committing future

crimes—is accomplished through the supervision, monitoring, and restrictive conditions of a home confinement sentence. The Presentence Investigation Report documents that Mr. Agnello has already ceased the cryptocurrency investment activities that contributed to his offense, has engaged in mental health treatment, and has established a legitimate business employing three people. General deterrence— sending a message to others who might contemplate similar conduct—is served by the fact of conviction, the public nature of the sentencing, the imposition of substantial restrictions on Mr. Agnello's liberty, and the certainty of punishment. The deterrent value of federal prosecution does not depend solely on incarceration; supervised release with stringent conditions, restitution, and community service all serve deterrent purposes.

### iii.    *Public Safety* **(§ 3553(a)(2)(C))**

Mr. Agnello poses minimal risk to public safety. His offense was financial in nature, involved no violence or threats of violence, and targeted no vulnerable victims. He has no prior criminal history. The instant offense was driven in significant part by a gambling addiction related to cryptocurrency trading, which he has discontinued and for which he is receiving treatment.

A sentence of home confinement with electronic monitoring, coupled with supervised release conditions prohibiting cryptocurrency trading and requiring

continued mental health treatment, adequately protects the public from any risk of future criminal conduct.

### iv.    *Rehabilitation and Effective Treatment* **(§ 3553(a)(2)(D))**

This statutory factor weighs decisively in favor of a non-custodial sentence. Section 3553(a)(2)(D) explicitly directs the Court to "provide the defendant with needed... medical care... in the most effective manner." A sentence that prevents Mr. Agnello from ███████████████████████████████████. Also preventing this goal would simultaneously deprive him of access to the ████████ ███████████████████████████ he requires—plainly violates this statutory mandate. As discussed in greater detail in Section II, *infra*, Mr. Agnello requires ongoing ████████████████████████████████████████████ ████████ that the Bureau of Prisons frequently restricts or denies.

Moreover, upon donating his kidney, Mr. Agnello will require ███████████ ████████████ that the BOP is institutionally incapable of providing. ████████ ████, he will have to ████████████████████████████████████████. Additionally, he will face immediate ██████████████████████████ ████████████████████████████ that require recovery in a sterile, stress-free environment not available in a correctional setting. (*See* NATIONAL KIDNEY FOUNDATION, *What to Expect After Donation*, NKF, at **Exhibit S** (████████████ ████████████████████████████████████████).

Furthermore, authoritative medical guidelines mandate rigorous ███████ ████████—including mandatory checks at 6 months, 12 months, and 24 months to monitor glomerular filtration rate (GFR) and blood pressure—to prevent the onset of donor-specific risks such as hypertension and end-stage renal disease. (KIDNEY DISEASE: IMPROVING GLOBAL OUTCOMES (KDIGO), Living Kidney Donor Work Group. *KDIGO Clinical Practice Guideline on the Evaluation and Care of Living Kidney Donors* (Transplantation 2017), 101 (Suppl 8S):S1–S109 attached as **Exhibit L** at p. SE0264 – 0280; SE0314)(establishing global standards for donor follow-up); MUZAALE, MD, ET AL., *Risk of End-Stage Renal Disease Following Live Kidney Donation*, JAMA (February 2014) attached as **Exhibit F** at p. SE0097 (finding 90 per 10,000 donors develop ESKD vs. 14 per 10,000 non-donors).

The Bureau of Prisons' documented history of "fragmented and delayed" care and "lack of preventive healthcare screening" poses an unacceptable danger to an inmate such as Carmine. *Cf.* DEPARTMENT OF JUSTICE OFFICE OF THE INSPECTOR GENERAL, *Inspection of the Federal Bureau of Prisons' Federal Medical Center Devens* (2024) attached as **Exhibit D** at p. SE0016.

As a living donor, Carmine will easily be classified as a patient with a "voluntarily" medical "impairment" in a facility where inmates already have "difficulty accessing medical care for routine conditions". (*Id.* at SE0037). This recovery calls for continued treatment and follow-up with a medical staff familiar

with the patient, where a BOP "walk-in clinic" or "sick calls" will have little to no impact. In short, BOP treatment, and the lack thereof, simply causes negative affects on certain inmates' overall health, and result in "more costly treatment" needed later – or in this case, when Carmine gets out. (*Id.* at SE0039) (finding by the Inspections Division of the Federal Bureau of Prisons' that "none of the 21 inmates over age 50, including the 10 who had a preventive health screening, had received a cognitive impairment screening as part of their preventive healthcare."). Ultimately, its reasonable to conclude that due to a variety of reasons, Carmine would enter the BOP with an "exceptional medical impairment" and will not receive routine medical care or screening, thereby rendering his incarceration as a direct threat to his long-term survival.

A deeper analysis of kidney donation establishes a very clear principle: "[d]onating a kidney is a decision with lifetime implications for the donor." (**Exhibit L**: KDIGO, *Clinical Practice Guideline on the Evaluation and Care of Living Kidney Donor*, at p. SE0243).

### C. FACTUAL PREDICATE: VICTORIA GOTTI'S LIFE-THREATENING MEDICAL CRISIS AND MR. AGNELLO'S UNIQUE ROLE AS HER SOLE █████████

██████████████████████████████████████████, ██████████████████████. By November 2025, it was

publicly reported that Ms. Gotti required an urgent kidney transplant and had been accepted for surgery at NYU Langone Health in New York City. Medical experts have confirmed that without a transplant, Ms. Gotti faces a stark choice: permanent dependence on dialysis—a grueling regimen requiring three treatments per week, each lasting approximately four hours, with significant morbidity and a five-year survival rate of only 40%—or death from end-stage renal disease. The median wait time for a deceased-donor kidney in New York ranges from three to five years, meaning that Ms. Gotti's survival depends on receiving a living-donor kidney transplant in the near term.

After extensive medical testing, Mr. Carmine Gotti Agnello ███████████ ████████████████████r. Living-donor kidney transplantation offers dramatically superior outcomes compared to deceased-donor transplantation, with one-year graft survival rates exceeding 95% and significantly extended recipient lifespans. Mr. Agnello has voluntarily stepped forward to donate his kidney to save his mother's life, a decision that has been extensively documented in major media outlets including *People Magazine*, *Yahoo News*, and *The New York Post*. (*See* People Magazine at **Exhibit E**). This widespread coverage underscores both the urgency of Ms. Gotti's condition and the profound public interest in ensuring that this life-saving transplant proceeds without delay.

Ms. Gotti's medical history further compounds the urgency of her need for transplantation. She has suffered from mitral valve prolapse (MVP), a chronic heart condition, since her twenties and has taken blood thinners for decades to manage the condition. She also underwent surgery in 2005 to address precancerous breast cells. These pre-existing health conditions render her particularly vulnerable to the complications of prolonged dialysis dependence, which is associated with increased cardiovascular mortality and heightened infection risk. The transplant surgery has been scheduled to occur imminently, with Ms. Gotti's physicians advising that a recovery period of up to three months will be required following the procedure.

Critically, Mr. Agnello is the only ████████████████████. Unlike typical cases involving family hardship—where incarceration may cause emotional or financial strain but does not directly threaten a family member's survival—Mr. Agnello's incarceration would effectively foreclose the only viable path to preserving his mother's life. If Mr. Agnello is sentenced to a term of imprisonment, the transplant surgery cannot proceed on the medically necessary timeline. Ms. Gotti will be forced onto dialysis, with its high chance of a 40% rate, after five-years of commencing dialysis. *See* TONELLI, ET AL., *Systematic Review: Kidney Transplantation Compared with Dialysis*, AMERICAN JOURNAL OF TRANSPLANTATION attached as **Exhibit K** at SE 0220 (finding - as compared with dialysis - "kidney transplantation is associated with substantial reductions in the risk

of mortality and cardiovascular events, as well as clinically relevant improvements in QoL."); GURA, M.D., *What is the Life Expectancy of a Person on Kidney Dialysis*? (July 14, 2025) attached as **Exhibit M** at SE0327 (explain that the average five five-year survival rate is approximately 35-40%, meaning that 4 out of 10 people on dialysis are alive five years after starting treatment). The alternative is she will face the uncertain prospect of waiting years for a deceased-donor organ that may never become available.

This should not the case where another family member can assume the defendant's caregiving responsibilities; it is a case where the defendant's biological compatibility makes him irreplaceable. The extraordinary nature of these circumstances places them far outside the heartland of typical family responsibility cases and warrants individualized consideration under § 3553(a)(1).

### D. INCARCERATING MR. AGNELLO WOULD IMPOSE IRREVERSIBLE HARM ON AN INNOCENT THIRD PARTY AND CONTRAVENE THE PURPOSES OF SENTENCING

The imposition of a custodial sentence in this case would punish not only Mr. Agnello but also—and far more severely—his mother, an innocent third party who bears no culpability for the defendant's offense. As the Second Circuit observed in *Johnson*, the justification for considering extraordinary family circumstances "is not that [defendant's] family circumstances decrease her culpability, but that we are

reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant." *United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992).

Here, the "destruction" wrought by Mr. Agnello's incarceration would be literal: Ms. Gotti's death or permanent disability. No legitimate penological interest identified in § 3553(a)(2) is served by imposing a sentence that effectively sentences Defendant – who cannot be a living donor while in prison, or cannot enter prison until post-transplant confirms known complications thereafter are non-existent.

The ethical and legal implications of conditioning access to life-saving medical treatment on a criminal sentence are profound. In 2011, the Governor of Mississippi granted an indefinite suspension of sentence to Gladys Scott specifically to enable her to donate a kidney to her incarcerated sister, Jamie, who was suffering from end-stage renal disease and costing the state $200,000.00 annually in dialysis expenses. *See* TIMOTHY WILLIAMS, *Sisters' Prison Release Is Tied to Donation of Kidney*, NEW YORK TIMES (Dec. 30, 2010)(*available at* https://www.nytimes.com/2010/12/31/us/31sisters.html); *See also* CBS NEWS, *Sisters Leave Prison Under Kidney Sharing Deal* (Jan. 7, 2011) attached as **Exhibit N** at p. SE0335-03342.

Governor Haley Barbour's office stated that the kidney donation "should be scheduled with urgency," and the NAACP confirmed that Ms. Scott would not be returned to prison if the donation could not proceed for medical reasons.

(ASSOCIATED PRESS, *Freed Sisters Leave Miss. Prison*, Jan. 7, 2011; NPR, *Miss. Governor Suspends Life Sentences for Sisters* (Dec. 30, 2010). While the Mississippi decision raised ethical questions under the National Organ Transplant Act (NOTA), legal scholars and ethicists widely agreed that organ donation in the context of criminal sentencing is permissible under criminal justice standards, particularly when the alternative is the preventable death of a family member. (GLENN COHEN, *The Mississippi Kidney Case*, Harvard Law Review Blog, (Jan. 3, 2011) (noting that conditioning release on donation may be coercive but recognizing the state's interest in saving lives and costs); AMERICAN JOURNAL OF BIOETHICS, *The Mississippi Decision Exchanging Parole for Kidney Donation* (Jan. 6, 2011).

The principle underlying the Mississippi case applies with even greater force here, where the Court has the opportunity to fashion a sentence prospectively rather than modifying an already-imposed sentence. The Organ Procurement and Transplantation Network (OPTN) addresses both "organ procurement" and "allocation", where a series of Committee reports defines and applies ethical standards that should apply to procurement and allocation of organs. *See* STRYKER-ANN VOSTEEN, MPA, ET AL, *Briefing to the OPTN Board of Directors on Ethical Evaluation of Multiple Listing*, OPTN ETHICS COMMITTEE (2023) attached as **Exhibit V** at p. SE0492.   Since at least 2015, the ethics committee report has explained that "the Committee must consider the ethical principles described below

as they pertain to the transplant community broadly: "equity", which encompasses distributive and procedural justice, "utility", and "autonomy".[4] *See* STRYKER-ANN VOSTEEN, OPTN ETHICS COMMITTEE (2023) at p. SE0492.

Essentially, a person's "autonomy" coupled with the "access to a transplant" applies the concepts of "equity" and "justice," similar to the law. (*Id.* at p.SE0492). Equity, by definition applies "fairness" to "the pattern of distribution of the benefits and burdens of an organ procurement and allocation program." *Id.* "Distributive justice" dictates "fairness" ensuring those in need of an organ, a equal opportunity to benefit from a transplant. *Id.* (*citing* OPTN ETHICS COMMITTEE, *Manipulation of the Organ Allocation System Waitlist Priority through the Escalation of Medical Therapies,* June 2018, [available at https://optn.transplant.hrsa.gov/media/2500/ethics_whitepaper_201806.pdf.]).

The reasoning here is that defendant's impending incarceration should not preclude him from ensuring organ procurement of his kidney to be distributed to his immediate family member. Prison can preclude such a transplant because the medical circumstances are too heightened and thus too dangerous. The third party here in need of a kidney is the turning factor that places this unique situation squarely

---

[4] *Id.* (*quoting* OPTN Ethics Committee, *Ethical Considerations for the Evaluation of Prisoners for Organ Transplantation*, (2023) (defining "Autonomy" as "actions or practices tend to be right insofar as they respect or reflect the exercise of self-determination, while not impairing the autonomy of another individual.").

within the consistency of sentencing under § 3553(a)(2). To hold otherwise would be to prioritize rigid adherence to a Guidelines range, when such results directly conflict with a transplant that can preserve Defendant's family member with life—a result that no statute or policy statement compels and that fundamental principles of justice forbid.

**POINT TWO:**

**THE COURT SHOULD IMPOSE A NON-CUSTODIAL SENTENCE BASED ON MR. AGNELLO'S** ███████
███████   ███████   ███████ **AND THE BUREAU OF PRISONS' DOCUMENTED INABILITY TO PROVIDE ADEQUATE CARE**

In addition to the extraordinary family circumstances discussed above, the Court should grant a downward variance under 18 U.S.C. § 3553(a)(1) and (a)(2)(D) based on Mr. Agnello's ███████████████████████. Also, the Bureau of Prisons' has a documented inability to provide the level of care Agnello will require, particularly following his ███████████████████

███████  ███████████████

███████████████████

███████████████████████

███████████████████████

███████████████████

As previously noted, upon donating his kidney, he will acquire what former USSG §5H1.4 described as an "extraordinary physical impairment" that will render

him medically vulnerable and in need of specialized post-surgical care that the BOP is institutionally incapable of providing. Incarcerating Mr. Agnello under these circumstances would subject him to a substantial risk of serious medical harm, potentially rising to the level of cruel and unusual punishment in violation of the Eighth Amendment, and would directly contravene the statutory mandate in § 3553(a)(2)(D) to "provide the defendant with needed . . . medical care . . . in the most effective manner."

**A.** ████████████████████ █████████████ ██████████████████

████████████████████████ ███ ████████████████

███ ███████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

that he has since quit cryptocurrency trading and █████████████████

████████████████████ (*Id.* at p. 16, ¶42).

████████████████████████████████

██████████████████████████████████

███ ███ ██ █ ████████ ████ █ █ ████

██████████████████████████████████

██████████████████████████████████

██████████

    The current prison system is faced with two epidemics, mass incarceration

and the ████████. It should not come as a shock that prison population houses

disproportionate amounts of inmates with ██████████, ███████████

██████████████████████████████████

    ████████ TAYABJI, *Rehabilitation Under the Rehabilitation Act: The Case for*

*Medication-Assisted Treatment in Federal Correctional Facilities*, 101 B.U.L. Rev

Online 79 (2021) attached as **Exhibit U** at p. SE0411. A comprehensive 2021 study

published in the *Boston University Law Review* documented the BOP's systemic

failure to provide medication-assisted treatment ("MAT") for OUD, finding that

"incarcerated individuals are often denied access to such medication" despite the

Rehabilitation Act's prohibition on disability discrimination. TAYABJI, *Rehabilitation*

*Under the Rehabilitation Act*, at p. SE0411-0412.

For Carmine this means that not only will he not receive proper follow-up and recovery treatment to ensure him being a donor does not follow with adverse medical effects; ██████████████████████████████████████

████████████████████████████████ The study concluded that "the failure to provide MAT in correctional facilities . . . increases an incarcerated individual's likelihood of ████████████████████████████████

███████████████████████████████████████████████". *Id.* at SE0424).

While Mr. Agnello's ████████████████████████ ████████████ the underlying systemic problem is identical: the BOP routinely denies inmates access to medications that are medically necessary and legally prescribed, substituting its own judgment for that of qualified treating physicians. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

(*See* PSR at p. 16, ¶ 41).

This deprivation of ████████████████ directly contravenes § 3553(a)(2)(D), which mandates that the Court "provide the defendant with needed... medical care . . . in the most effective manner." A sentence of home confinement would enable Mr. Agnello to ███████████████████████████

███████████████████████████████████████

██████ ██ ████████ █ ████ █████ ██████ ██

█████████████████████

## B. Living Kidney Donation Will Render Mr. Agnello Medically Vulnerable and in Need of Specialized Post-Surgical Care That the BOP Cannot Provide

Upon donating his kidney to his mother, Mr. Agnello will transition from a medically healthy individual to a post-nephrectomy patient with a ███████████ ██████—a status that former USSG §5H1.4 recognized as an "extraordinary physical impairment" warranting sentencing consideration. Although the United States Sentencing Commission deleted Policy Statement §5H1.4 ████████████

███████████████████████████████████████

███████████████████████████████████████

██████ ██████ █████ ██████ █ █████ ████ █████

█████████████████████

Prior to its deletion, §5H1.4 provided that "[p]hysical condition or appearance . . . is not ordinarily relevant in determining whether a sentence should be outside

the applicable guideline range." However, an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range; for example, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment. Courts interpreting §5H1.4 established a two-step analysis: first, the district court must make a factual finding as to whether the defendant's physical condition constitutes an "extraordinary physical impairment"; second, if such an impairment exists, the court must exercise its discretion to determine whether a downward departure is warranted through a shorter term of imprisonment or an alternative to confinement.

In *Martinez-Guerrero*, the Ninth Circuit held that the inquiry into whether a physical impairment is "extraordinary" must consider multiple factors, not merely the Bureau of Prisons' ability to accommodate the impairment. *United States v. Martinez-Guerrero*, 987 F.2d 618 (9th Cir. 1993). The court emphasized that "[a] district court may consider any number of circumstances in making its finding on the question of extraordinary physical impairment under section 5H1.4," including the defendant's "potential for victimization" and "extreme vulnerability" due to the impairment. *Id.* The Eighth Circuit in *United States v. Long*, 977 F.2d 1264 (8th Cir. 1992), affirmed a downward departure on the grounds that "an extraordinary physical impairment that results in extreme vulnerability is a legitimate basis for departure".

Similarly, the Second Circuit in *Lara*, upheld a downward departure based on the defendant's "particular vulnerability [to victimization in prison] due to his immature appearance, sexual orientation, and fragility". *United States v. Lara*, 905 F.2d 599, 603 (2d Cir. 1990).

Mr. Agnello's  In the immediate post-operative period (0-90 days), donors face a mortality risk of approximately 3.1 per 10,000.00 donations, with the highest risk occurring in the first week due to surgical hemorrhage, infection, and cardiopulmonary complications. SEGEV, MD, ET AL., *Perioperative Mortality and Long-term Survival Following Live Kidney Donation*, JAMA, attached as **Exhibit G** at p. SE0120 (analyzing 80,347 donors and finding 3.1 deaths per 10,000 in first 90 days); *See also* MUZAALE M.D., ET AL., *Risk of End-Stage Renal Disease Following Live Kidney Donation*, JAMA, (Feb. 12, 2014) attached as **Exhibit F** at SE0097.

Beyond perioperative mortality, , and timely surgical consultation if

complications arise. KDIGO, *Clinical Practice Guideline on the Evaluation and Care of Living Kidney Donors* (2017), attached as **Exhibit L** at p. SE0305 (mandating monitoring for surgical complications).

The provision of this level of care is entirely beyond the BOP's institutional capacity. As discussed in Point I, *supra*, the BOP's medical facilities are plagued by systemic failures. A 2024 Office of the Inspector General (OIG) report on the Federal Medical Center (FMC) Devens—one of the BOP's flagship medical facilities—documented "potentially dangerous medication distribution, lack of preventive healthcare screening, and inconsistent processes for requesting and accessing care". (DEPARTMENT OF JUSTICE OFFICE OF THE INSPECTOR GENERAL, *Inspection of the Federal Bureau of Prisons' Federal Medical Center Devens* (2024) attached as **Exhibit D** at p. SE0015-0016).

The report further noted "fragmented and delayed follow-up inmate care" and systemic failures in credential verification and oversight. (*Id.* at p. SE00168-0017). Additionally, a 2025 investigative report by *The Marshall Project* exposed catastrophic failures in the dialysis program at FMC Carswell, the nation's only federal prison for women offering in-patient dialysis, where patients described "missed treatments, poor education for patients, dialysis machines that break down mid-treatment or that lacked enough clean water," and multiple preventable deaths.

KIM, *Women Are Sent to This Federal Prison for Dialysis. They Say It's Killing Them*, THE MARSHALL PROJECT (Dec. 16, 2025) attached as **Exhibit Q** at p. SE0360.

Academic literature confirms that incarcerated individuals face "limited access to adequate healthcare" and that the prison environment amplifies the risks associated with kidney donation. (AHALT ET AL., *The State of Kidney Care in U.S. Prisons*, American Journal of Kidney Diseases (2020). A 2020 study published in the *American Journal of Kidney Diseases* found that, overall, in the prison setting there is not even a plan or method in place to prevent inadequate medical screening and treatment from continuing or getting worse. This seems to be the unspoken truth despite those in the profession and at in charge of the prison having a "legal obligation to provide a community standard of care" to those housed at the facility.

Additionally concerning, is the scant data, transparency, and external oversight of the prison's management of kidney disease, or other diseases which requiring consistent care. There is no accuracy in the data regarding a donors medical condition while they are in prison, and this is a Prisons such as FMC Devens and Carswell – which are supposed to be set up as a "hospital-like" facility. KIM, THE MARSHALL PROJECT attached as **Exhibit Q** at p. SE0362; *See also* **Exhibit D**. Simply put, the actual details of the lack of medical treatment provided to those in need of continuing care – without even touching what needed as a kidney donor,

such as a strict diet, water intake, blood work to minatory level –creates significant barriers to ensuring continuity of care.

For a post-nephrectomy patient like Mr. Agnello, who will require meticulous wound care, pain management, monitoring of renal function, and prompt intervention in the event of complications, the BOPs inadequate medical infrastructure poses an unacceptable risk that directly contravenes § 3553(a)(2)(D)'s mandate to provide medical care "in the most effective manner."

C.    **THE UNITED STATES SENTENCING COMMISSION HAS RECOGNIZED THAT THE BOP'S INABILITY TO PROVIDE ADEQUATE MEDICAL CARE CONSTITUTES AN EXTRAORDINARY AND COMPELLING REASON FOR SENTENCE REDUCTION UNDER USSG §1B1.13**

In November 2023, the United States Sentencing Commission amended the policy statement governing compassionate release under 18 U.S.C. § 3582(c)(1)(A) to explicitly recognize that it constitutes an "extraordinary and compelling reason" warranting sentence reduction when "the Bureau of Prisons is unable to provide adequate care for the defendant's medical condition". This amendment, codified at USSG §1B1.13(b)(1)(C), provides that extraordinary and compelling reasons exist when:

> The defendant is—(i) suffering from a medical condition that requires long-term or specialized medical care that is not being provided; and (ii) as a result, the defendant is at risk of serious deterioration in health or death.

While §1B1.13 addresses post-sentencing compassionate release rather than initial sentencing, the Commission's recognition that the BOP routinely fails to provide adequate medical care is directly relevant to the Court's initial sentencing determination under § 3553(a)(2)(D). The Commission's findings are based on "extensive empirical data and judicial experience" demonstrating that the BOP routinely fails to meet its constitutional obligation under *Estelle v. Gamble*, 429 U.S. 97 (1976), to provide inmates with adequate medical care. Courts have applied §1B1.13(b)(1)(C) to grant compassionate release in cases involving serious medical conditions that the BOP cannot adequately manage, including cancer patients who received "abysmal" care from the BOP and individuals whose serious medical conditions deteriorated due to the BOP's failure to provide timely surgery.

The Commission's explicit recognition in §1B1.13(b)(1)(C) that inadequate BOP medical care constitutes an "extraordinary and compelling" circumstance supports the Court's authority to impose a non-custodial sentence under § 3553(a)(2)(D) in circumstances where the defendant will require specialized medical care that the BOP cannot provide. Mr. Agnello will require long-term monitoring and specialized care following his kidney donation—care that §1B1.13(b)(1)(C) recognizes the BOP is "unable to provide." Sentencing him to incarceration would guarantee that he will experience the "serious deterioration in health or death" that §1B1.13(b)(1)(C) identifies as an extraordinary and compelling reason for release.

It makes no sense as a matter of policy or justice to sentence Mr. Agnello to imprisonment knowing that the inadequacy of BOP medical care will necessitate a compassionate release motion within months of his arrival at a BOP facility. A non-custodial sentence of home confinement that enables him to receive community-standard post-surgical care from his transplant team at NYU Langone Health is the most effective means of complying with § 3553(a)(2)(D)'s mandate.

### POINT THREE:
**THE COURT SHOULD IMPOSE A NON-CUSTODIAL SENTENCE BECAUSE THE LOSS-DRIVEN FRAUD GUIDELINE PRODUCES AN ABSURD AND DISPROPORTIONATE RESULT THAT JUDGES ACROSS THE EASTERN DISTRICT, SOUTHERN DISTRICT, AND SECOND CIRCUIT HAVE UNIFORMLY CONDEMNED**

The Court should grant a significant downward variance under 18 U.S.C. § 3553(a) because Mr. Agnello's advisory Guidelines range of 33 to 41 months. (*See* PSR, Part D. Sentencing Options, at p. 13, ¶ 59). Such range is driven almost entirely by a loss enhancement that bears no relationship to his culpability, the harm he caused, or any legitimate penological purpose. *See United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008) (en banc) (holding that district courts must consider whether Guidelines ranges "fail[] properly to reflect § 3553(a) considerations" and that "a district court may vary from the Guidelines range based solely on policy considerations, including disagreements with the Guidelines").

Judges throughout the Eastern District of New York, the Southern District of New York, and the Second Circuit have spent nearly two decades denouncing the fraud guideline's obsessive focus on dollar amounts as "patently absurd," "irrational, silly and ridiculous," "fundamentally flawed," and "a black stain on common sense."

The guideline that governs Mr. Agnello's sentence—USSG §2B1.1—was never rooted in empirical data, has been repeatedly amended to increase severity without justification, and routinely produces sentences so divorced from reality that judges reject it in the overwhelming majority of cases. In Mr. Agnello's case, where fourteen of his twenty offense levels (*See* PSR at ¶ 11-12) derive solely from a loss calculation that ignores every meaningful indicator of blameworthiness, the Court should follow the unanimous guidance of this Circuit's jurists and impose a non-custodial sentence that reflects the actual seriousness of his conduct.

## A. THE FRAUD GUIDELINE'S LOSS ENHANCEMENT IS NOT BASED ON EMPIRICAL DATA AND HAS BEEN UNIVERSALLY CRITICIZED AS PRODUCING IRRATIONAL RESULTS

The United States Sentencing Commission's fraud guideline stands as a singular aberration in the federal sentencing scheme: it is the only major guideline that the Commission deliberately untethered from empirical data reflecting actual judicial sentencing practices. When the Commission drafted the original Guidelines in 1987, it reviewed presentence reports from 10,000 cases and committed to an

"empirical approach that used as a starting point data estimating pre-guidelines sentencing practice." USSG Ch. 1, Pt. A.

The fraud guideline, however, was an exception. As Justice Stephen Breyer—himself a member of the original Sentencing Commission—later acknowledged, the Commission abandoned "the touchstone of prior past practice" when constructing the fraud guideline. The Commission excluded fifty percent of the fraud sentencing data at the outset by deleting all cases in which judges had imposed probation, and then recommended sentences more severe than the mean of the remaining custodial sentences. BARRY BOSS & KARA KAPP, *How the Economic Loss Guideline Lost its Way, and How to Save It*, 18 Ohio St. J. Crim. L. 605, 609 (2021) attached as **Exhibit T** at p. SE0390.

This original deviation from empirical reality—troubling though it was—pales in comparison to the amendments that followed. In 1989, a mere two years after the Guidelines took effect, Amendment 154 increased offense levels for high-dollar frauds. In 2001, Amendment 617 fundamentally restructured the loss table by switching from one-level increases per tier to two-level increases per tier, effectively doubling the punitive impact of the loss enhancement.

A fraud that once warranted an 11-level increase suddenly called for an 18-level increase; today, after the 2015 inflation adjustment, the loss table spans thirty levels and can drive an offense level from a base of 6 or 7 to a staggering 36—fully

84 percent of the way through the entire sentencing table. At no point did the Commission justify these increases with data showing that fraud offenders were more dangerous, more culpable, or less deterred than the Commission had initially believed. The fraud guideline simply "balloon[ed]" in severity, untethered to any empirical foundation. *Id.* at 610.

The result is a guideline that treats economic crimes with a severity reserved for the most violent offenses. A defendant convicted of fraud involving $25 million in loss, even with full acceptance of responsibility, reaches offense level 30—the same level assigned to a defendant who conspires to commit murder, a defendant who traffics one kilogram of fentanyl while armed, or a defendant who kidnaps a victim and holds them for more than seven days. A first-time offender convicted of fraud faces the same Guidelines range as a repeat violent offender or a career drug trafficker.

This inversion of culpability—where white-collar defendants with no criminal history and no violence receive sentences indistinguishable from armed criminals and murderers—is not the product of reasoned policymaking. It is the product of what Judge Jed Rakoff of the Southern District of New York has called the Guidelines' "fetish with abstract arithmetic." *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006).

Judges across this Circuit have responded with unanimous condemnation. In *Adelson*, Judge Rakoff rejected a Guidelines calculation that effectively called for life imprisonment in a securities fraud case and imposed 42 months instead, describing "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *Id.* He concluded that the fraud guideline's "calculations lead to a result so patently unreasonable as to require the Court to place greater emphasis on other sentencing factors." *Id.* at 512. Six years later, in sentencing Rajat Gupta for insider trading, Judge Rakoff elaborated: the fraud guidelines "have so run amok that they are patently absurd on their face in white collar cases," producing "a sentencing disparity of the most unreasonable kind." *United States v. Gupta*, 904 F. Supp. 2d 349, 354-55 (S.D.N.Y. 2012).

In June 2017, Stefan Lumiere, a former analyst and portfolio manager, received an 18-month prison sentence—a cut of more than six years from the non-binding eight-year Federal Sentencing Guidelines recommendation. A jury convicted Lumiere of securities fraud, wire fraud, and conspiracy in January for defrauding investors by over-valuing an investment fund focused on the health-care sector. At sentencing, U.S. District Judge Jed Rakoff called the recommended sentence of eight years "ridiculous, absurd, [and] barbaric." He added, "these

guideline sentences would be much more typical to a brutal regime than a proud, American legal system" in stating:

> Let me begin on one sort of side note, but I can't help but noting that this case once again demonstrates the absurdity of the sentencing guidelines. The sentence is driven largely by the gain amount, but there are other adjustments of a more technical nature. And under the adjustments that the government originally argued for and I think are so supported by the evidence, the guideline sentence would have been eight years or more, which is just ridiculous, absurd, barbaric in some respects in connection with someone like Mr. Lumiere.

*See United States v. Lumiere*, Case: 1:16-cr-00483 (JRS) (SDNY June 14, 2017) attached as **Exhibit H** at p. SE0155, ¶ 24 – SE0156, ¶ 7.

In 2021, confronting a cannabis-payment fraud prosecution where the government argued for a loss figure exceeding $150 million, Judge Rakoff found that there was in fact "no loss whatsoever" and declared at sentencing, "It appears to me that there's never been a case where the guidelines were more irrational, silly and ridiculous than in this case." *United States v. Akhavan*, No. 20-cr-188 (JSR) (S.D.N.Y. June 18, 2021); *see also* LLOYD LIU & HILARY LOCICERO, *Cannabis Fraud Decision Shows Need For Sentencing Reform*, Law360 (Oct. 4, 2021) attached as **Exhibit I** at p. SE0166.

The Eastern District has been equally emphatic. In *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008), Senior Judge Frederic Block confronted a securities fraud case in which the Guidelines called for a sentence of 360 months to

life. He imposed 60 months instead, condemning the Guidelines as "patently absurd" and "draconian" and holding that fraud sentences driven by mechanical loss calculations are "a black stain on common sense." *Id.* at 745, 754.

Judge Block criticized the "piling on" of adjustments that characterize §2B1.1, observing that the guideline's "one-shoe-fits-all approach" fails to distinguish between frauds affecting 500 victims and frauds affecting hundreds of thousands of victims, between defendants who play minor roles and those who orchestrate massive schemes. *Id.*

In 2018, Judge Nicholas Garaufis of this Court issued a lengthy written opinion in *United States v. Johnson*, excoriating the loss enhancement as producing sentences that "do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime." *United States v. Johnson*, No. 16-cr-457-1 (NGG), 2018 U.S. Dist. LEXIS 71257, 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) at p. 8 of 13. Judge Garaufis noted that the loss enhancement in that case was responsible for a threefold increase in the defendant's offense level and declared: "Given the feeble underpinnings of the loss enhancement, it is particularly galling that this factor is often more or less solely responsible for a white-collar offender's Guidelines sentence." *Id.* Judge Garaufis ended strong in stating many in the "legal community have urged the Sentencing Commission to right this grievous wrong" and in this

decision Garaufis added his name to the list "of judges, practitioners, scholars, and other commentators." *Id.*

The Second Circuit has provided appellate endorsement for these district court criticisms. In *Corsey*, Judge Guido Calabresi wrote in concurrence that the loss-driven fraud guideline is "fundamentally flawed" and that rigid adherence to the loss table produces "irrational" and "obviously unreasonable" sentences. *United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013). Judge Stefan Underhill, sitting by designation, added his own concurrence calling the loss guideline "fundamentally flawed, especially as loss amounts climb," and holding that "district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides." *Id.* at 379-80.

In *Algahaim*, the Court recognized that "a major reason why the Guidelines ranges are so high is the loss enhancement" and explicitly authorized district courts to "consider whether the significant effect of the loss enhancement overstates the seriousness of the offense" when imposing sentence. *United States v. Algahaim*, 842 F.3d 796, 800-01 (2d Cir. 2016). The Second Circuit's holding in *Algahaim* is particularly instructive: "Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *Id.* at 800.

Mr. Agnello's case fits *Algahaim* precisely. His base offense level is 7 (PSR ¶ 11). The loss enhancement adds 14 levels (PSR ¶ 12) – a 200 percent increase that accounts for fully 70 percent of his total offense level before acceptance of responsibility. The disaster-relief enhancement adds two more levels (PSR ¶13). These enhancements bear no relationship to Mr. Agnello's actual conduct, his intent, the sophistication of his scheme, or any other indicator of culpability. They reflect only the mechanical application of a table that the Second Circuit, the Southern District, and this Court have uniformly condemned as producing absurd results.

### B. THE LOSS ENHANCEMENT FAILS TO MEASURE CULPABILITY AND PRODUCES SENTENCING DISPARITIES THAT CONGRESS AND THE COMMISSION SOUGHT TO AVOID

Section 2B1.1's reliance on loss as the predominant sentencing factor rests on the assumption that larger losses correlate with greater culpability. The assumption is false. As scholars Barry Boss and Kara Kapp have demonstrated, "the loss calculation fails to account for the extent to which the offender personally profited from the offense," and "each offender is responsible for the total reasonably foreseeable loss attributable to all co-defendants, regardless of how much each offender personally profited from that amount." BARRY BOSS & KARA KAPP, *How the Economic Loss Guideline Lost its Way, and How to Save It*, 18 Ohio St. J. Crim. L. 605 (2021) attached as **Exhibit T** at p. SE0398.

A defendant who conspires to steal $10 million but personally receives $50,000 faces the same loss enhancement as a defendant who personally pockets the entire $10 million. A defendant who devises an implausible scheme that causes zero actual harm but technically "intended" a large loss faces the same enhancement as a defendant who inflicts catastrophic losses on thousands of victims. Loss, in other words, is "often a poor indicator of culpability" because it "is a kind of accident" bearing little relationship to the defendant's mens rea, role in the offense, or moral blameworthiness.

The disconnect between loss and culpability is particularly stark in COVID-19 EIDL fraud cases. Congress created the EIDL program as an emergency response to the pandemic, authorizing the Small Business Administration to disburse loans rapidly with minimal vetting to prevent economic collapse. (*See* PSR at ¶ 4). The SBA abandoned normal underwriting standards, accepted self-certified financial information, and processed applications within days rather than weeks or months. The resulting "pay and chase environment," as the SBA Office of Inspector General later described it, virtually invited fraud.

Defendants like Mr. Agnello—who had no prior criminal history (PSR ¶ 22-26), operated a legitimate business (PSR ¶ 47-51), and succumbed to the temptation of easily accessible funds during a national crisis—bear little resemblance to sophisticated con artists who devise elaborate Ponzi schemes or corporate executives

who loot their companies over years. Yet the Guidelines treat them identically, assigning offense levels based solely on the dollar amount of the loss without regard to the context in which the fraud occurred, the defendant's state of mind, the duration of the criminal conduct, or the presence of aggravating factors such as targeting vulnerable victims.

Mr. Agnello's case illustrates the absurdity. The Presentence Investigation Report documents that:

> Between April 4, 2020, and November 5, 2021, the defendant defrauded the SBA and several financial institutions administering the EIDL program of federal COVID-19 relief funds meant for distressed small businesses. The defendant did this by submitting at least three online loan applications for EIDL funds on behalf of Crown [Auto Parts Recycling, LLC]. The loan applications and certain supporting documentation contained materially false and fraudulent information, including the number of Crown's employees, the intended use of the loan proceeds, and that the defendant did not have a criminal record (he did, as detailed below in the Criminal History section of this report). (PSR ¶5).

Its further alleged that he obtained $1.1 million in EIDL loans over an 18-month period. (*Id.*). He used $420,000 of the proceeds to invest in cryptocurrency - a use of funds that, while unauthorized, was not theft for personal enrichment but rather a form of gambling driven by an addiction to cryptocurrency trading that he has since treated. (PSR at ¶ 42). The PSR notes that "the defendant began to invest in cryptocurrency in 2021, and quickly became addicted to it. The addiction was akin

to a gambling addiction, with the defendant seeing such investment to 'get rich quick.' Through these investments, some of which were questionable, he was scammed of hundreds of thousands of dollars, and his commission of the instant offense was done in part to offset the losses." (*See* PSR at ¶ 42).

The Government confirmed that "the defendant had repaid some of the EIDL loans, approximately $200,000, prior to detection of the scheme" (PSR ¶5), reducing the net loss to $943,300 (*id.*). He has no history of violence (PSR ¶¶22-29), poses no danger to the community, and has established a new legitimate business employing three people and generating $250,000 in annual revenue (PSR ¶47). He is a first-time offender with a criminal history category of I (PSR ¶26) whose Guidelines range is driven almost entirely by the size of the loss—a loss that the SBA has been made whole through restitution (PSR ¶68) and that resulted not from a calculated scheme to enrich himself but from a series of poor decisions during the chaos of the pandemic.

The Guidelines assign Mr. Agnello offense level 23 before acceptance of responsibility (PSR ¶17), placing him in the same category as defendants convicted of armed robbery, aggravated assault, and drug trafficking conspiracies involving kilogram quantities of narcotics. This result is not merely disproportionate; it is irrational. As Judge Garaufis observed in *Johnson*, the Guidelines "do not ask the court to consider the duration of the criminal activity, [the defendant's] mens rea, the

character of the loss, or any other factors that might allow the court to impose a sentence based on [the defendant's] worth. No, the threefold increase in [the defendant's] offense level does not come as a result of any of these significantly more important considerations." *United States v. Johnson*, No. 16-cr-457-1 (NGG), 2018 U.S. Dist. LEXIS 71257, 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) at p. 7 of 13. The loss enhancement treats all fraud as fungible, ignoring the reality that fraud offenses vary dramatically in sophistication, intent, harm, and moral culpability.

The Commission's own data confirms that judges nationwide reject the fraud guideline in the majority of cases. From 2015 through 2019, more than fifty percent of defendants sentenced under §2B1.1 received below-Guidelines sentences, with the mean sentence representing a fifty percent decrease from the low end of the Guidelines range and the median sentence representing a 45 to 50 percent decrease. BARRY BOSS & KARA KAPP, *How the Economic Loss Guideline Lost its Way, and How to Save It*, 18 Ohio St. J. Crim. L. 605 (2021) attached as **Exhibit T** at p. SE0402-0403.

These variances are substantially greater than those observed in other categories of offenses, where sentences average 35 to 37 percent below the Guidelines. The inescapable conclusion is that §2B1.1 "has never reflected the actual sentencing practices for non-violent, economic offenses" and "has steadily drifted

further and further away from the actual sentencing data, until today recommending a sentence more in line with violent crimes and repeat offenders." *Id.* at SE0402.

This widespread judicial rejection of the fraud guideline creates the very sentencing disparities that Congress sought to eliminate through the Sentencing Reform Act of 1984. Defendants who commit similar frauds receive vastly different sentences depending on whether their judge mechanically applies the Guidelines or exercises independent judgment under § 3553(a). As Judge Underhill observed in *Corsey*, "sentences in high-loss cases will remain wildly divergent as some district judges apply the loss guideline unquestioningly while others essentially ignore it." *U.S. v Corsey*, 723 F.3d at 377-78. Section 3553(a)(6) directs courts to impose sentences that "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Where the Guidelines themselves produce unwarranted disparities—by assigning identical sentences to defendants whose conduct and culpability differ dramatically—the Court not only may but must vary to ensure that the sentence imposed reflects the defendant's individual circumstances.

### C. APPLICATION OF THE SECTION 3553(A) FACTORS COMPELS A NON-CUSTODIAL SENTENCE

Where, as here, the Guidelines produce a patently unreasonable result, the Court must perform an "individualized application of the statutory sentencing factors" enumerated in 18 U.S.C. § 3553(a). *United States v. Dorvee*, 616 F.3d 174,

184 (2d Cir. 2010). As the Zukerman Court highlighted "the historic role of sentencing judges . . . [is] the judge's own sense of what is a fair and just sentence under all the circumstances." *United States v. Zukerman*, 897 F.3d 423, 428 (2d Cir. 2018) (*quoting United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006)).

Additionally, "a district court's decision to vary from the Guidelines 'may attract the greatest respect when the sentencing judge finds a particular case outside the *heartland* to which the Commission intends individual Guidelines to apply." *Id.* (*quoting Kimbrough v. United States*, 552 U.S. 85, 109, 128 S. Ct. 558, 169 L. Ed. 2d 481 (2007)).

The 2025 Amendment underscores the importance of considering the defendant's unique role in extraordinary situations, such as ███████████ ███████████ While the removal of departures may limit reliance on certain guideline provisions, courts can still impose a sentence outside the guideline range as a variance, considering the defendant's critical role in the family member's medical care. In light of this, each of the § 3553(a) factors supports a non-custodial sentence in Mr. Agnello's case.

### i.    *The Nature and Circumstances of the Offense* (§ 3553(a)(1))

Mr. Agnello's offense was serious but falls at the lower end of the fraud spectrum. He did not target vulnerable victims, cause irreparable harm, or devise a sophisticated scheme. He submitted false loan applications to a government program

that was deliberately designed for rapid processing with minimal oversight. (PSR at ¶ 3-4). He used a substantial portion of the proceeds not for personal luxuries but for cryptocurrency investments—a reckless use of funds, to be sure, but one driven by a gambling addiction rather than calculated greed. (PSR ¶ 42).

The Government confirmed that he "repaid some of the EIDL loans, approximately $200,000, prior to detection of the scheme," and "the money paid prior to detection of the scheme is credited against the total loss". (PSR at ¶5). The SBA has been made whole through restitution. (PSR at ¶68). Contrast this with the frauds at issue in cases like *Parris* (pump-and-dump securities scheme targeting retail investors), *Adelson* (securities fraud threatening life imprisonment), *Gupta* (insider trading by a corporate director), or *Johnson* (multimillion-dollar foreign exchange manipulation). Those defendants orchestrated elaborate schemes over extended periods, occupied positions of trust, and caused harm to identifiable victims who could not be made whole. Mr. Agnello did none of these things.

### ii.    *The History and Characteristics of the Defendant* (§ 3553(a)(1)):

The Presentence Investigation Report documents that Mr. Agnello is 39 years old (PSR at ¶ 2), has no prior felony convictions (PSR at ¶ 22-26), and has demonstrated his capacity for rehabilitation. He owns and operates a legitimate business that employs three people and generates $250,000 in annual revenue. (PSR ¶47).

The PSR states: "The defendant owns and operates this business, which is an online seller of automobile parts. He has three employees who are aware he is in legal trouble but not the full nature of the instant offense. The business has a gross income of $250,000 per year, on which the defendant personally earns $150,000 per year" (*Id.*). He has maintained stable employment throughout his adult life, working in the scrap metal and auto parts industries (PSR at ¶ 47-51). █████████

█████████████████████████████████████████████████████████████

████████████

The PSR explains:



(PSR at ¶ 41).

████████  ██  ████  ██████  ████  ████████  ████  ██  ████  █

███████████████████████████████████████. ████████████████████

███████████████████████████████████████████████████

██████████Through these investments, some of which were questionable, he was scammed of hundreds of thousands of dollars, and his commission of the instant

offense was done in part to offset the losses. ██████████████████████

██████████████████████████████." (PSR ¶42).



█████ ██████████████████████. He has since ceased all

cryptocurrency activity and ██████████████████████████

██████████████ Otherwise, he has strong family ties and is the only

██████████████████████, ██████████████████████

██████ He has accepted responsibility for his conduct—receiving a three-level

reduction for acceptance of responsibility (PSR ¶¶18-19)—and expressed genuine

remorse. These characteristics distinguish him sharply from the career criminals and

recidivists with whom the Guidelines would equate him.

### iii. *The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment (§ 3553(a)(2)(A))*

A sentence of home confinement for a period equivalent to or longer than the

low end of the Guidelines range, coupled with stringent conditions of supervised

release including electronic monitoring, substantial community service, and full

restitution, adequately reflects the seriousness of Mr. Agnello's conduct.

Just punishment is not synonymous with incarceration; it requires a sanction

proportionate to the defendant's culpability. Public respect for the law is better served

by a sentence that demonstrates the judiciary's commitment to individualized justice

and proportionality than by a mechanical sentence that treats a first-time offender convicted of an opportunistic fraud identically to violent criminals. As Judge Block observed in *Parris*, imposing a Guidelines sentence where the loss enhancement produces a "draconian" result would undermine, not promote, respect for the law.

### iv.    *The Need to Afford Adequate Deterrence* **(§ 3553(a)(2)(B))**

Both general and specific deterrence are adequately served by a non-custodial sentence. Specific deterrence—preventing Mr. Agnello from committing future crimes—is accomplished through the conviction itself, the conditions of supervised release, the obligation to pay $943,300 in restitution (PSR at ¶ 68), and the collateral consequences of a felony conviction that will limit his employment prospects and professional opportunities for the rest of his life.

██████████████████████████████████████████████

██████████████████████████████████████ (PSR ¶42). He has established a legitimate business (PSR ¶47) and poses minimal risk of recidivism. General deterrence—sending a message to others who might contemplate similar conduct—is achieved through the certainty of detection and punishment, not through severity alone. The federal government has prosecuted thousands of COVID-19 fraud cases, sending an unmistakable message that pandemic relief fraud will be detected and punished. Adding months or years of incarceration to Mr. Agnello's sentence will not materially increase the deterrent

effect; it will simply impose gratuitous suffering on him and his family without advancing any legitimate penological purpose.

### v.   *The Need to Protect the Public* **(§ 3553(a)(2)(C))**

Mr. Agnello poses no danger to public safety. His offense was financial in nature, involved no violence or threats, and targeted no vulnerable individuals. He has no history of violent crime. (PSR ¶¶22-29). A sentence of home confinement with electronic monitoring and supervised release conditions adequately protects the public from any conceivable risk of future criminal conduct.

### vi.   *The Need to Provide Effective Treatment* **(§ 3553(a)(2)(D))**

As discussed in Point II, *supra*, Mr. Agnello requires ongoing ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████ He will also require specialized post-surgical care following his kidney donation to his mother.

A non-custodial sentence enables him to continue his ██████████████████, ████████████████████████████████████████████████████████████ ██████████████████████████████ Section 3553(a)(2)(D) mandates that the Court provide needed medical care "in the most effective manner." A sentence that forecloses access to necessary treatment plainly violates this directive.

### vii. *The Need to Avoid Unwarranted Sentence Disparities* (§ 3553(a)(6))

The fraud guideline itself creates unwarranted disparities by treating all frauds identically regardless of context, culpability, or harm. Nationwide data shows that the median defendant sentenced under §2B1.1 receives a sentence 45 to 50 percent below the Guidelines. Imposing a Guidelines sentence on Mr. Agnello would create a disparity between him and the majority of similarly situated defendants. Moreover, COVID-19 EIDL fraud cases have resulted in widely varying sentences, with many first-time offenders receiving probation or short terms of home confinement.

A sentence that reflects Mr. Agnello's individual circumstances—his lack of criminal history (PSR at ¶ 26), his mental health issues (PSR at ¶ 41-42), his family responsibilities, his acceptance of responsibility (PSR at ¶ 18-19)—promotes uniformity by ensuring that defendants with similar backgrounds and conduct receive similar treatment.

### POINT FOUR:
### THE SERIOUSNESS OF THE OFFENSE, RESPECT FOR THE LAW, AND JUST PUNISHMENT SUPPORT A NON-CUSTODIAL SENTENCE

A non-custodial sentence consisting of home confinement for a period at or exceeding the low end of the Guidelines range, coupled with stringent conditions of supervised release, electronic monitoring, substantial community service, and full restitution, is both appropriate and sufficient to reflect the seriousness of the offense for which Mr. Agnello was convicted and to promote respect for the law and provide

just punishment. In fact, a sentence of lengthy incarceration may work to undercut respect for the law rather than promote it when such a sentence is divorced from the defendant's actual culpability and the circumstances of the offense.

As the Supreme Court explained in *Gall v. United States*, 552 U.S. 38, 54 (2007), "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." When a sentencing court imposes a Guidelines sentence driven almost entirely by a mechanical loss calculation that ignores every meaningful indicator of culpability—as in Mr. Agnello's case, where 70 percent of his offense level derives from a 14-level loss enhancement applied to a base offense level of 7—the Court risks precisely the result that Justice Kennedy warned against: the public's perception of the law as an instrument of harsh, arbitrary punishment rather than reasoned justice.

### A. THE NATURE AND SERIOUSNESS OF MR. AGNELLO'S OFFENSE DOES NOT REQUIRE INCARCERATION

Mr. Agnello's offense was serious and warrants substantial punishment. He submitted fraudulent loan applications to a federal disaster relief program during a national crisis, deceiving both the Small Business Administration and financial institutions administering the EIDL program. The offense violated the public trust

and diverted funds meant for distressed businesses during an unprecedented economic emergency. *See* PSR ¶5 (describing offense conduct between April 4, 2020, and November 5, 2021). These facts establish that the offense is serious and demands meaningful consequences.

However, the seriousness of an offense is not measured by loss amount alone. The Second Circuit has recognized in *Algahaim*, that loss "is only one relevant factor, and in some cases may be less probative of the seriousness of the offense than other factors such as the defendant's role, the defendant's mens rea, the sophistication of the scheme, and the presence of victim harm." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). Mr. Agnello's offense, while serious, falls at the lower end of the fraud spectrum when measured against these holistic factors.

Mr. Agnello did not devise a sophisticated multi-year scheme. His offense occurred over an 18-month period in the context of a deliberately rapid, minimally-vetted federal relief program designed to disburse funds quickly to prevent economic collapse. *See* PSR at ¶3-4 (describing CARES Act EIDL program structure: "The SBA abandoned normal underwriting standards, accepted self-certified financial information, and processed applications within days rather than weeks or months."). The SBA Office of Inspector General characterized the resulting environment as a "pay and chase environment" that "virtually invited fraud." As documented in the PSR, the fraud "was detected through the normal vetting process, as the large sum

was suspicious in and of itself." PSR at ¶ 5. There was no elaborate concealment scheme; fraud was discovered through routine post-disbursement verification.

Mr. Agnello did not occupy a position of trust or exploit a vulnerable victim. He did not pose as a financial advisor, accountant, or fiduciary and exploit personal relationships or professional trust. He did not target elderly or disabled individuals incapable of protecting themselves. The victim was a federal agency with vast resources and the capacity to recover losses—and it has been made whole through Mr. Agnello's agreement to pay $943,300 in restitution. *See* PSR at ¶ 68.

Mr. Agnello's mens rea was not calculated greed. The PSR documents that "the defendant began to invest in cryptocurrency in 2021, and quickly became addicted to it. The addiction was akin to a gambling addiction, with the defendant seeing such investment to 'get rich quick.' Through these investments, some of which were questionable, he was scammed of hundreds of thousands of dollars, and his commission of the instant offense was done in part to offset the losses." PSR at ¶ 42. Mr. Agnello's motivation was not the calculated enrichment of a career fraudster but rather the desperate attempt of a gambling-addicted individual to recover losses during a period of personal crisis. This is not a case of premeditated theft; it is a case of opportunistic fraud driven by addiction during a national emergency.

Mr. Agnello repaid a substantial portion of the funds before detection. The PSR confirms that "the Government informed that the defendant had repaid some of

the EIDL loans, approximately $200,000, prior to detection of the scheme." PSR at ¶ 5. This repayment—whether motivated by recognition of wrongdoing, changing circumstances, or other factors—demonstrates that Mr. Agnello did not intend to retain all the funds and constitute recognition that the conduct was improper. Under USSG §2B1.1, Application Note 3(D)(i), money repaid prior to detection is credited against total loss.

Mr. Agnello is a first-time offender with no history of violence or prior federal crimes. The PSR documents a criminal history score of one, establishing a criminal history category of I. PSR at ¶ 22-26. His only prior convictions are minor violations: a 2009 disorderly conduct charge (possession of a gravity knife as a passenger in a vehicle) and a 2018 misdemeanor for operating an unregistered scrap business. *Id.* He has no history of violence, no history of targeting vulnerable individuals, and no pattern of criminal behavior.

Contrast these facts with the securities and forex frauds committed by defendants in the cases cited throughout this memorandum. In *Parris*, Judge Block confronted a pump-and-dump scheme targeting retail investors—a systematic manipulation designed to enrich fraudsters at the expense of specific identifiable victims. In *Adelson*, the defendant orchestrated a sophisticated securities fraud threatening life imprisonment. In *Gupta*, an insider trader breached fiduciary duties by trading on confidential corporate information. In *Johnson*, a senior HSBC

executive manipulated foreign exchange rates affecting currency markets globally. These were schemes of genuine sophistication and culpability. Mr. Agnello's offense simply does not belong in that category.

### B. A NON-CUSTODIAL SENTENCE ADEQUATELY REFLECTS THE SERIOUSNESS OF THE OFFENSE

A sentence of home confinement for a period at or exceeding the low end of the Guidelines range (33 months) would constitute substantial punishment reflecting the seriousness of Mr. Agnello's offense. Such a sentence would impose significant restrictions on liberty. Whereas, home confinement with electronic monitoring and supervised release for a multi-year term imposes severe restrictions on personal freedom. Mr. Agnello would be confined to his residence except for approved activities (work, medical appointments, legal proceedings, and supervised community service). Electronic monitoring would track his movements and provide real-time accountability. He would be subject to random searches and unannounced visits by probation officers. These restrictions represent a substantial deprivation of liberty short of incarceration.

Impose financial consequences. Mr. Agnello has agreed to pay $943,300, now plus interest, in restitution to the SBA. PSR ¶ 68. The PSR documents that "based on the defendant's financial profile, taking the priority of mandatory restitution into account, he appears unable to pay a fine." PSR ¶ 57. Nonetheless, Mr. Agnello's obligation to make full restitution will constrain his finances and earning capacity

for years to come. Every dollar he earns will be directed first to compensating the victim. This financial punishment is both substantial and appropriately tailored to the nature of the offense—a fraud case where restitution to the victim is the most meaningful form of accountability.

Additionally, sentencing can impose employment and professional limitations. A felony conviction for wire fraud carries substantial collateral consequences. Mr. Agnello will face limitations on employment opportunities, professional licensing, and business activities. His conviction will appear on background checks viewed by employers, business partners, lenders, and regulatory agencies. These consequences are severe and permanent—consequences that will constrain Mr. Agnello's opportunities and earnings for the remainder of his life.

Require ongoing mental health treatment and monitoring. As a condition of supervised release, Mr. Agnello would be required to "undergo an evaluation, and if deemed necessary, participate in a mental health treatment program... approved by the U.S. Probation Office" and to "contribute to the costs of such treatment." PSR ¶74. This requirement ensures that Mr. Agnello receives the psychiatric care he requires while remaining under judicial supervision and subject to modification of his sentence if he fails to comply.

Sentencing can also require substantial community service. A requirement for substantial community service—perhaps 500-1000 hours performed in a visible

capacity—would ensure that Mr. Agnello contributes meaningfully to his community and bears the burden of his wrongdoing in a way that benefits society.

Collectively, these elements—home confinement, electronic monitoring, supervised release, restitution, collateral consequences, mental health treatment, and community service—constitute punishment that is both substantial and appropriately proportionate to Mr. Agnello's offense. As the Supreme Court noted in *Gall*, the question is not whether the sentence is harsh, but whether it is "sufficient, but not greater than necessary, to comply with the purposes set forth in § 3553(a)." A non-custodial sentence meets that standard.

### C. INCARCERATION WOULD UNDERMINE, NOT PROMOTE, RESPECT FOR THE LAW

Justice Kennedy's warning in *Gall* is particularly acute in this case. When a sentencing court imposes a Guidelines sentence driven by a guideline that judges across three circuits have condemned as "patently absurd," "irrational, silly and ridiculous," and "a black stain on common sense," the court risks precisely the outcome the Supreme Court cautioned against: public perception of the law as arbitrary and harsh rather than reasoned and just.

The fraud guideline has been rejected by judges nationwide: from 2015 through 2019, more than fifty percent of defendants sentenced under §2B1.1 received below-Guidelines sentences. By 2023, the mean downward variance for fraud offenders had increased to 58 percent—substantially greater than the 35-37

percent variance observed in other offense categories. This widespread rejection is not mere leniency; it reflects judicial consensus that the guideline produces results divorced from culpability and fairness.

Public respect for the law depends on the perception that sentences are just, proportionate, and tailored to individual circumstances. When the public observes that a first-time offender with no criminal history, no violence, and a gambling addiction receives the same Guidelines sentence as a violent career offender or drug trafficker, the law appears not as an instrument of justice but as an instrument of mechanical, arbitrary punishment. This perception corrodes respect for the law and the legal system.

Moreover, in Mr. Agnello's case, incarceration would impose irreversible harm on an innocent third party—his mother—by foreclosing the only viable path to preserving her life through kidney transplantation. No legitimate legal interest is served by a sentence that effectively sentences an innocent person to death. To the contrary, imposing such a sentence would undermine public confidence in a legal system perceived as prioritizing mechanical adherence to guidelines over human compassion and proportionality.

### D. DETERRENCE DOES NOT JUSTIFY INCARCERATION IN THIS CASE

Both general and specific deterrence are fully achieved through a non custodial sentence in this case.

### i. *Specific Deterrence*

Specific deterrence—preventing Mr. Agnello from committing future crimes—is accomplished through multiple mechanisms absent incarceration:

  a. The conviction itself and the admission of guilt in a federal court;
  b. The supervisory apparatus: supervised release, probation officer oversight, and electronic monitoring;
  c. The financial burden: $943,300 in restitution obligation will constrain Mr. Agnello's finances and earning capacity;
  d. The collateral consequences: permanent employment limitations, background check disclosures, professional licensing restrictions; and
  e. The mandatory mental health treatment addressing the gambling addiction that contributed to the offense.

The PSR documents Mr. Agnello's existing commitment to rehabilitation: "the defendant began to invest in cryptocurrency in 2021, and quickly became addicted to it... As such, his instant arrest resulted in his quitting cryptocurrency investment and seeking treatment. The defendant occupies himself with work and hobbies to avoid temptation." PSR ¶42. Mr. Agnello "has established a new legitimate business employing three people." PSR ¶47. He has accepted responsibility and expressed genuine remorse. PSR ¶¶18-19.

The likelihood that Mr. Agnello will reoffend is minimal. A first-time offender with stable employment, a legitimate business, family ties, and demonstrated commitment to addressing his underlying addiction presents minimal

risk of recidivism. The presence of electronic monitoring and probation supervision further reduces any conceivable risk.

### ii.   *General Deterrence*

General deterrence—sending a message to the public that certain crimes will be detected and punished—is achieved through the certainty of detection and punishment, not solely through sentence severity.

The certainty of detection and punishment is high in COVID-19 EIDL fraud cases. The federal government has prosecuted thousands of pandemic relief fraud cases with high conviction rates. Public awareness of these prosecutions—through news coverage, social media, and word of mouth—sends a powerful message that pandemic relief fraud will be investigated, prosecuted, and punished. Mr. Agnello's public prosecution and conviction add to this message. The fact that the government obtained his guilty plea, the public nature of the sentencing proceeding, and the visibility of his case all contribute to general deterrence.

Empirical research shows no relationship between sentence length and deterrence.  In a pre-Guideline study of specific deterrence, no difference in deterrence was found as a result of sentence severity, including between probation and imprisonment.  *See* ANDREW VON HIRSCH, *et al*., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) attached as **Exhibit W** (concluding "correlations between sentence severity and crime rates . . . were not

sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects.").

Another great theory on deterrence is on a "positive association between actual and perceived punishment levels" because "[t]here is generally no significant association between perceptions of punishment levels and actual levels . . . implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms." GARY KLECK ET AL., *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005) attached as **Exhibit X**.

The certainty of punishment is far more deterring than severity. A potential fraudster is more effectively deterred by knowledge that the crime will be detected and he will be prosecuted and convicted—regardless of sentence length—than by knowledge that if he commits the crime, he might receive a lengthy sentence. Under this empirical framework, Mr. Agnello's public conviction and the government's vigorous prosecution of thousands of similar cases sends a powerful deterrent message. The addition of years of incarceration adds minimal, if any, additional deterrent value.

Over-emphasis on general deterrence as a justification for harsh punishment poses fundamental ethical problems. As the philosopher Immanuel Kant observed, punishment "can never be inflicted merely as a means to promote some other good

for the criminal himself or for civil society. It must always be inflicted upon him only because he has committed a crime." IMMANUEL KANT, *The Metaphysics of Morals* (1797). This principle—that individuals must not be treated merely as instruments to advance societal goals—applies with particular force in sentencing, where the temptation to impose harsh punishment on one defendant to deter others conflicts with fundamental principles of individual justice. It is ethically impermissible to punish Mr. Agnello with lengthy incarceration solely to deter unknown third parties from committing similar offenses, particularly when proportionality and the statutory sentencing factors do not independently justify that severity.

Punishing Mr. Agnello with lengthy incarceration solely to deter unknown third parties from committing similar offenses treats Mr. Agnello merely as a means to an end—a human instrument to be sacrificed for the greater social good. This approach conflicts with fundamental principles of individual justice and human dignity. It is ethically impermissible to impose harsh punishment on one individual for the sake of deterring others, particularly when proportionality and the statutory sentencing factors do not independently justify that severity.

### E.    REHABILITATION AND FORWARD-LOOKING CONSIDERATIONS

Mr. Agnello presents an extraordinary opportunity for successful rehabilitation and reintegration. At age 39, with his criminal history limited to minor

violations and having demonstrated commitment to establishing a legitimate business and addressing his underlying addiction, Mr. Agnello is precisely the type of defendant for whom a sentence focused on rehabilitation and reintegration serves the purposes of sentencing more effectively than lengthy incarceration.

The PSR documents his genuine efforts at rehabilitation:

a. He operates a legitimate business generating $250,000 in annual revenue and employing three people. PSR ¶ 47.
b. He discontinued cryptocurrency trading immediately upon arrest. PSR ¶ 42.
c. He engaged in mental health treatment with Dr. Zlatin Ivanov, whom he sees monthly and has found beneficial. PSR ¶ 41.
d. He maintains close family relationships and has remarried, providing support to his family. PSR ¶ 32.
e. He accepted responsibility through a guilty plea, receiving a three-level reduction. PSR ¶ 18-19.

A sentence that allows Mr. Agnello to continue his employment, maintain his business, receive ongoing mental health treatment, and remain engaged with his family provides substantially greater potential for long-term rehabilitation and successful reintegration into society than does incarceration, which would destroy his business, sever his employment, and isolate him from his support network.

**POINT FIVE:**
**MR. AGNELLO'S COMMITMENT TO OTHERS, AS SHOWN BY HIS MENTORSHIP OF KYRIE DAVIS AND THE TESTIMONY OF HIS MOTHER, WARRANTS MERCY UNDER 18 U.S.C. § 3553(a)(1)**

Section 3553(a)(1) directs the Court to consider individualized assessment through the history and characteristics of the person to be sentenced. The record here shows that Carmine Agnello's life has been marked far more by love, sacrifice, and service than by the financial lapse that brings him before the Court. The letters from his mother, Victoria Gotti, and from eight-year-old Kyrie Davis portray a son and mentor whose daily conduct is fundamentally inconsistent with the image of a calculating fraudster. (*See* Kyrie Davis Letter attached as **Exhibit B** at p. SE0008).

Federal courts have repeatedly recognized that § 3553(a)(1) requires a "whole person" judgment that takes account of a defendant's "good deeds" as well as his offense conduct, and that character letters are an appropriate basis for a variance. *See, e.g., United States v. Adelson*, 441 F. Supp. 2d 506, 513–15 (S.D.N.Y. 2006) (emphasizing the need to consider the defendant's life as a whole, including his kindness and generosity, and criticizing a mechanical application of the fraud guideline); *United States v. Cavera*, 550 F.3d 180, 189–92 (2d Cir. 2008) (en banc) (authorizing variances based on individualized assessment of the § 3553(a) factors). The policy reason is straightforward: a defendant who has consistently invested

himself in others, and who inspires loyalty from those he has helped, is both more likely to be rehabilitated and more valuable to the community outside prison walls.

Victoria's letter recounts that Carmine entered life fighting for his own survival: born seven weeks premature at four pounds, with legal blindness in one eye, a broken leg, a severely clubbed foot, impaired liver function, and a leaking mitral valve that produced an audible gallop. At age three he nearly died from sepsis; where his mother spent the night in his hospital crib praying not to lose a second child. From that ordeal, she watched a gentle boy emerge whom teachers called "the perfect child" and "the peacemaker," the one who calmed other students and found middle ground during arguments. (*See* SE 0006). When she was later diagnosed with kidney disease, Carmine immediately phoned her doctor and volunteered one of his kidneys, years before transplantation became imminent—an unsolicited offer the doctor called "beautiful" and proof that she had "a special kid there." (*See* Victoria Gotti Letter attached as **Exhibit A** at p. SE0004).

The same instinct to protect and nurture others led Carmine into the life of eight-year-old Kyrie Davis. Kyrie lives in Harlem; his father is a hardworking man who simply cannot spare weekend hours for youth sports. According to Kyrie's letter and the accompanying pages, Carmine met him through a mentor–big-brother program connected to school parents. After Kyrie asked if he would come to one game, Carmine began picking him up every Saturday at 9:30 a.m., driving him to

the fields, practicing with him for an hour before each game, staying to watch, and then taking him for ice cream so they could talk about school, friends, and how to get along with classmates. (*See* Kyrie Davis Letter attached as **Exhibit B** at p.0008).

Kyrie explains that his father "works hard and doesn't have the time to take me places," but that Uncle Carmine "takes time out of his busy life to spend time with me," and that he loves their talks about "how important school is." (*See* SE 0011). He ends with a plea that is as simple as it is powerful: "I would miss him very much if he could no longer spend time with me. I love him very very much." (*See* SE 0012).

Social-science research confirms what these letters already show: sustained, one-to-one mentoring relationships of the kind Carmine has built with Kyrie can significantly improve outcomes for at-risk youth, including better school engagement and reduced likelihood of delinquent behavior. Studies of community-based mentoring programs such as Big Brothers Big Sisters, including randomized evaluations published and summarized in recent years, consistently find that youth with stable mentors are less likely to be arrested and more likely to adopt prosocial behaviors than similarly situated peers without mentors.

Scholars have also cautioned that when a close mentoring relationship is suddenly and involuntarily severed, vulnerable youth can experience declines in self-esteem and increases in acting-out behavior, particularly if they have prior

experiences of instability or absence of caregivers. While no study can predict exactly how one child will react, it is more than reasonable to fear that Kyrie—an eight-year-old who has finally found a man who shows up for him every weekend— would experience Carmine's disappearance as a deep personal loss.

Victoria's letter makes clear that Kyrie is not alone. She describes Carmine as someone who "mentors young men who do not have a hands on dad," and as a man who "does much much more good living his life helping others … financially, emotionally and compassionately." (*See* Victoria Gotti Letter attached as **Exhibit A** at p. SE0005).

She insists that he "doesn't have a violent, mean bone in his body or mind." She also details how, when this case came to light, Carmine immediately sold the home he had painstakingly renovated "brick by brick" and used the proceeds to repay what he owed, staying more than a year ahead on his loan, without asking his mother or anyone else to rescue him. Even as she is "actively on the transplant list" and awaiting testing to confirm Carmine as an ███████████████, she has "willingly become a recluse" under the weight of her illness and his prosecution, terrified that the son who is now literally needed to keep her alive will be taken from her. (*Id.*).

None of this minimizes the seriousness of the offense, and even Victoria characterizes his conduct as "pure stupidity" for which he feels deep remorse. But

sentencing under § 3553(a) is meant to reflect the reality that human beings are more than the worst things they have done. Here, the reality is that Carmine is a man who is stepping forward to donate a kidney to his mother; who has become the central male figure in an eight-year-old boy's life; who has repaid what he owes at great personal cost; and who has consistently used his time and resources to support people more vulnerable than himself.

A term of home confinement with stringent supervision, restitution, and a structured requirement that he continue formalized mentoring and community service would still punish Carmine and deter others. But it would also preserve the fragile, life-saving relationships that depend on his presence: a gravely ill mother waiting for her son's kidney, and a little boy in Harlem who has come to believe, for perhaps the first time, that a grown man will keep his word to him. Under § 3553(a)(1), and in light of *Adelson* and *Cavera*, the Court is fully authorized to recognize that reality and to fashion a non-custodial sentence that reflects who Carmine Gotti Agnello truly is.

## V.  CONCLUSION AND SENTENCING <u>RECOMMENDATION</u>

For the reasons set forth above, it is respectfully prayed that this Court impose upon Carmine Agnello, a non-incarceratory, probation sentence through implementation of the PSR recommended sentence and commensurate with this variances set forth in this sentencing application.

*Steven A. Metcalf, Esq.*

_____

STEVEN A. METCALF II, ESQ.
**Metcalf & Metcalf, P.C.**
99 Park Avenue, Suite 810
New York, NY 10016
*Office* 646.253.0514
*Fax* 646.219.2012
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the instant sentencing materials was served via ECF this ____th day of February, 2026 on all counsel of record.

/s/ *Steven A. Metcalf II*

_____

**STEVEN A. METCALF II, ESQ.**