# TABLE OF EXHIBITS

### *US v. Agnello*, 2:24-CR-00366

**Exhibit A**……………………………………………… Victoria Gotti Statement

**Exhibit B**……………………………………………… Kyrie Davis Statement

**Exhibit C**……………………………………………… Gary Davis Statement

**Exhibit D**……………………………………………… Inspection of the Federal Bureau of Prisons' Federal Medical Center Devens

**Exhibit E**……………………………………………… Sue Carswell, People: John Gotti's Daughter Victoria to Undergo Kidney Transplant with Her Son as Donor, (11.25.2025)

**Exhibit F**……………………………………………… Author Manuscript PMC: Risk of End Stage Renal Disease Following Live Kidney Donation, (2.12.2014)

**Exhibit G**……………………………………………… JAMA: Perioperative Mortality and Long-term Survival of Live Kidney Donation, (3.10.2010)

**Exhibit H**……………………………………………… *US v. Lumiere,* June 14, 2017 Minutes

**Exhibit I**……………………………………………… Law360: Risk of End Stage Renal Disease Following Live Kidney Donation

**Exhibit J**……………………………………………… PMC: Risks of Living Kidney Donation, (3.11.2019)

**Exhibit K**…………………………………………… American Journal of Transplantation, M. Tonelli: Systemic Review Kidney Transplantation Compared with Dialysis, (6.14.2011)

**Exhibit L**…………………………………………… KDIGO 2017 Clinical Practice Guideline on the Evaluation and Care of Living Kidney Donors

**Exhibit M**…………………………………………… Dr. Victor Gura, What is the Life Expectancy of a Person on Kidney Dialysis, (7.14.2025)

**Exhibit N**…………………………………………… CBS News: Sisters Leave Prison Under Kidney Sharing Deal, (1.7.2011)

**Exhibit O**…………………………………………… Christopher Burkle MD, Mayo Clinic Proceedings: Mississippi Decision Changing Parole for Kidney Donation, (May 2011)

**Exhibit P**…………………………………………… Melissa Nelson Gabriel, AP News: Women Released from Mississippi Prison Make Life in Florida, (7.23.2018)

**Exhibit Q**…………………………………………… Kaley Johnson, The Marshall Project: At a Federal Prison in Texas, Women Say Dialysis Is Killing Them, (12.16.2025)

**Exhibit R**................................................. Mark Memmott, NCPR News: Barbour was Moving on Sisters' Case Before Controversial Comments, (12.30.2010)

**Exhibit S**................................................. National Kidney Foundation: Kidney Donation_ Recovery, Health, and Life After Surgery, (12.16.2024)

**Exhibit T**................................................. Barry Boss and Kara Kapp, Ohio State Journal of Criminal State: How the Economic Loss Guideline Lost its Way, (2021)

**Exhibit U**................................................. Jaclyn Tayabji, Boston University Law Review: Rehabilitation Under the Rehabilitation Act, (2021)

**Exhibit V**................................................. OPTN Ethics: Ethical Evaluation of Multiple Listing, (June 2023)

**Exhibit W**................................................. A. von Hirsch, A. E. Bottoms, E. Burney and P-O. Wikström, Alberta Law Review: Criminal Deterrence and Sentence Severity_ An Analysis of Recent Research, (1999)

**Exhibit X**................................................. Gary Kleck et al., The Missing Link In General Deterrence Research (2005)



# EXHIBIT A

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

C.Agnello    SE 0001

Honorable Judge Nasret Chudury
U.S. District Court Judge for the Eastern District of New York
100 Federal Plaza
Central Islip, NY 11722

Dear Honorable Nasret Chudury,

I am writing to you with a heavy heart—given the circumstances.

At twenty years of age I gave birth to my daughter, Justine. She died shortly after birth. Doctors told my husband and I, "the chances of conceiving a child were slim and none—even after an operation to clear my left tube (my right was lost to an ectopic pregnancy just before Justines death)."

After the death of my daughter,  I went into a DEEP depression. I wouldn't leave my home, unplugged my phones and locked the room door and slept on the floor of what would have been her nursery. In what I STILL deem a miracle—I was taken to the hospital by ambulance for "severe dehydration." Imagine my surprise and joy when the doctor came out to announce I WAS yet again pregnant. I spent the entire seven months on complete bedrest—as per my doctors orders and  my own fear something would again go wrong.

Carmine, premature by seven weeks, at a mere four pounds and a bevy of serious ailments, was born. Underweight, born with strabismus (an eye condition infants are born with where all nerves are detached from his eye, a broken leg and severely clubbed foot, his liver function severely impaired and underdeveloped and his heart impacted by a highly audible gallop—later diagnosed as leakage of his mitral valve. After two unsuccessful (one nearly killed him) surgeries of his eye he was deemed "legally blind in that eye. His right leg was broken several times and reset with only a slight improvement. His liver was carefully watched over the next few years as was his heart. For these two conditions there was little they could do to improve. At three years old Carmine developed strep throat and given the usual course of antibiotics, fever reducing medications and bedrest Day three he was rushed to the hospital at 3am with "sepsis,"—a life threatening illness that nearly killed him. For fourteen hours I laid in the infant hospital crib with him—praying throughout the night. Narrowly, I was spared the horror of losing him. Within two weeks he was back home, but under a pediatric cardiologists cautious care until he was eighteen years of age and then moved to an adult cardiologist.

Through ALL of his ailments he fought and fought, while I prayed. I deemed him "My Miracle Child" from that point on.

As a single mother of three sons the most difficult part of raising them was to sacrifice EVERY dream and ideal I had for myself, to be sure each would grow up to be intelligent, kind, compassionate respectful and hardworking men.  I sacrificed my life, socially and somewhat professionally at a young age, 37 to give raising my boys my ALL. Three jobs as a newspaper columnist, Author and editor, took over so my sons could thrive. I have absolutely no regrets

Not one son has ever given me trouble—mainly Carmine. He was as most teachers and peers would say, "The perfect child—The teachers pet."

As an infant till the age of seven, Carmine never left my side. In a crowded room with other children he would constantly look up for me—constantly needing reassurance I was nearby. His teachers referred to Carmine as "The peacemaker—The perfect student who had a pensity for calming down other arguing students by coming up with a desirable middle ground."



Your honor, you want to know what kind of a young man Carmine is?  I am sure every parent would say that if asked about their child, "oh, he or she is the best." —but on my life, my upcoming transplant, THAT is the kind of young man my son is. He is there to help anyone. He is kind and generous to a fault. He is giving me the GIFT OF LIFE. He will give his last dollar to anyone in need. This entire event never made much sense to me from the start. My son, Carmine would never do anything he KNEW was wrong. He did not fill out the application this seems to revolve around—a professional did it for him. Carmine answered ALL questions via text and phone to the best of his knowledge. There was NO attempt to defraud anyone or any institution on his part. He was in trouble only once in his entire life—and it was MY fault. It had to do with work and business records filed. I owned the property Carmine and his brothers had their business on. At MY property lawyers suggestion, then  he asked "why are ALL your investment properties in one LLC?" I was just learning Myself, so I had each property changed to a different LLC. I did not know it was imperative I change all leases to each new LLC. Carmine renewed his business license in the old entity.

The day all of that happened I was utterly sick inside! Getting back to defrauding—he did not. He did not know back then and that small blunder turned into a fine and sealed. Filling out an application recently—again he answered every question honestly and openly and has texts and phone records to prove such. The loan was to pay the DEC (department of environmental conservation) for a business matter—a work order passed down to the then operating business(as a result it is no longer in operation)  the cost of re cementing the work space was 96 thousand

dollars alone—not counting other work the DEC wanted done; Ripping up an old scale from underground, hauling away barrels of soil, testing of such soil and clean-up of anything underground. Total cost so far, 496 thousand dollars. Carmine was desperately trying to save a business, that he and his brothers started 14 years earlier during covid. Of course also keeping his workers paid and all overhead paid. I KNOW I am the person that lent him the money before he even knew about any such loan. I am SURE, he is MOST remorseful of ANY wrongdoing on his part. He is not made that way to be deliberately deceitful or fraudulent.  I, and many others notated that in court the day he took a plea. That's always been his way. If something points out a mistake he has made he will owe up to it and he does have much remorse.

Carmine is a NON violent person, respectful to women, family and his peers. He would never willingly harm anyone or do anything he believes is wrong. To be perfectly honest, your honor, I don't even believe my son knows what's been done here? We speak about it everyday and quite frankly, there was no  malice or criminal intent—he simply would NOT know how.

I am a mother, absolutely sick and devastated my son is in this position. This is NOT the way he was raised! Carmine walks around since this has happened in a literal "fog." My loving, helpful, giving son has been replaced by a young man filled with confusion and MUCH remorse for something he is trying to figure out. I, as his parent, am MOST disturbed at all the promises he was made by the U.S. "Pay back all the money and all will go away" Later I was told "NO That was never said or promised." Being a Journalist for nearly 27 years with my own front page cover every Sunday—and the most popular weekly column at the NYPost, I have the proof of this conversation. I was just a bit confused when my son was asked if he was promised anything in return? To which he replied "No." Confused? I was mystified to say the least. Carmine later informed me, "He was instructed to say this"  As I told my son, "You NEVER say anything you do not understand especially if not written and signed in a plea agreement." I had absolutely no knowledge of this your honor. Though I make it my business to not advise those I love of something I would have to live with—I would NOT have let him get into something he did not "fully understand" especially when he had ALL bills and worksheets to prove all?

I recall the day we stood in front of you your honor and just by YOUR expression and kind yet thorough and professional demeanor it seemed as though you too were confused as to "why Carmine waived his right to a grand jury—and was pleading on an information." I do not know much about the law, but three semesters of St Johns Law school taught me the basics. (I dropped out shortly after my doctor informed me to start a family asap if I ever intended to have one as by age 25 I would require a full hysterectomy" I chose family and suffered much heartache and while lying bedridden for 6 months decided to write legal thrillers—6 all of which became NYTimes bestsellers. I followed up with writing a medical text about women and heart disease as I was suffering from it and two family oriented cookbooks while traveling through Italy with my children.

out of his own stupidity. (This Was Not acceptable to me) My kids ALWAYS came first—and with much deliberation and considering the kids upbringing, I came to my decision. His money and success meant nothing to me. I worked my way back on my own with the help of NO ONE.

It wasn't until a year before my divorce I learned my ex-husband had been teaching my sons to gamble—"a recreational hobby" he'd later explain to have "a common bond he would share with the boys then barely teens to help them grow closer." Naturally I flipped. It was the beginning of the end. I had a few close members of my family who were gamblers one or two lost all including their happy marriages and families. I would NOT stand for it! It caused MUCH trouble and after the divorce I believed all of that stopped; football games, and horse racing and other sports. To my dismay I was wrong. Unfortunately Carmine had taken the habit and exchanged it for a connection to his dad. Sadly, once I divorced his father, my ex, in turn was so upset about the divorce he took it out on our three young sons, then just teens. Working hard and always on top of his bills Carmine kept all his finances in check. I had NO reason to suspect ANY gambling was still going on—especially horse racing, a favorite past time of his Fathers. But as God as my witness when all this came to light I put my foot down immediately and enrolled him in a program. He has been diligent and extremely serious about the program and I can see he learned a VERY valuable lesson. He, as I mentioned sold his house/home, he practically renovated by himself brick by brick. He used ALL profit to pay back what he owes and this he did of his own volition. He didn't come crying to mommy or anyone and to date he is well over a year paid in advance re loan.



Yes, I would do anything for my son. A gift from God I will always treasure. To say Carmine does much much more good living his life; helping others, mentoring young men who do not have a hands on dad, helping anyone he can financially, emotionally and compassionately is an understatement. If my son Carmine was to be detained in a facility, I fear ALL I did raising,

teaching and instilling in him would do more harm than good. This young man doesn't have a violent, mean bone in his body or mind.

Fondly,

Victoria Gotti



# EXHIBIT B

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

# TO JUDGE NUSRAT J CHUDHURY;

My name is Kyrie Davis. I am 8 years old.  I live in Harlem. I love to play baseball and sports like basketball. I go to

The after school program at my school a few days a week. On weekends I play ball with my mentoring big brother, Carmine Agnello.

My dad works hard and does not have time to take me on the weekends to the school yard or fields. My big brother, Carmine who I call Uncle Carmine,

Picks me up on weekends and takes me to the fields. I met Uncle Carmine through a friends dad at my school. There was a mentor-big brother program at

My school. I asked Carmine if he would come to a weekend game. He did and has been taking me every weekend for over a year. Uncle Carmine has

Become my Big brother. I met him when my dad, Gary Davis, did some work at Miss Victorias house a few years ago. Uncle Carmine has come to many

Baseball and basketball games and has taught me how to be a better player.. Carmine picks me up every Saturday at 9;30am and takes me to the field and

Practices with me for an hour before every game. He watches my games and coaches me through them. After we go to eat ice cream. I love Uncle Carmine

Very very much. He takes time out of his busy life to spend time with me. I love our talks about how important school is and how to get along with my

Classmates  I love my dad and I love Uncle Carmine because they both love me. My dad works hard and doesn't have the time to take me places

And spend time with me for sports. Uncle Carmine helps me very much and I love him.very much. My dad is a great man. He works hard and pays for things like rent. Uncle Carmine helps by spending time with me and teaching me lessons about life. Like school, sports, girls and friends. I would miss him very much

C.Agnello  SE 0008



If he could no longer spend time with me. I love him very very much

Kyrie Davis

Scanned with
CamScanner



# EXHIBIT C

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

C.Agnello   SE 0010

**GARY T DAVIS**
**JULY 01, 2025**

# TO JUDGE HONORABLE CHUDHURY

I, Gary T Davis, am the father of Kyrie Davis. I met the Agnello family a few years ago while doing work on their home. I found them all to be very affable, honest and hospitable. My family and I have had our struggles for a few years financially and the Agnello family gave me more than my fair share of work during covid. For that I am humbly grateful. The minute/day, I brought my son Kyrie to work with me the family instantly made him feel welcome—inviting us even to Christmas Eve dinner.

In less than one month Carmine a then engaged but childless man took to my son incredibly. He looked forward to visits when I would stop by to do work so that he and Ky could play ball, go to the ice cream shop or spend time swimming. Ky looked up to him like an older brother–until I corrected him to refer to Carmine as "Uncle Carmine." Carmine, I have known for 5 years. In the five years, he has shown my son more kindness and taught him more lessons in respect, sportsmanship and socializing than any relative Ky has. I am and always was so grateful to Carmine for treating my son like he was his own. He has taught Ky many lessons towards growing into a fine young man. I am a single father and have a great relationship with my son. I just wish I had more time to spend with him but work often calls at the wrong time or day and the bills must be paid. I have noticed a marked improvement in Kys relationships at school and around our home and for this I am also grateful for all Carmine has done for my son. He has mentored him, spent time with him playing sports, taking him to ballgames and interacting with other children Kys age. Weekends are most busy for me work-wise. Yet, Carmine always took Ky out and kept him busy and learning—for this I am most grateful for. Carmine and I often speak and he has always expressed the desire to have children of his own one day. I applaud him as I remind him, "no one will make a better dad"

Your honor, for as long as I have known Carmine he has shown nothing but kindness to me and my family. I was pleasantly surprised and I am in awe at how much patience he has for his nieces and nephews—as well as my son Ky.

Most Sincerely

Gary T Davis

Scanned with
CamScanner



# EXHIBIT D

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

C.Agnello    SE 0013



# Inspection of the Federal Bureau of Prisons' Federal Medical Center Devens

★ ★ ★

EVALUATION AND INSPECTIONS DIVISION

25-009

DECEMBER 2024

# Executive Summary



**The DOJ OIG's Inspections Program**

Between Monday, April 22, and Friday April 26, 2024, the U.S. Department of Justice (DOJ) Office of the Inspector General (OIG) conducted an unannounced, on-site inspection of Federal Medical Center (FMC) Devens, an administrative-security medical center housing inmates with serious medical or mental health conditions, in Massachusetts. The institution is composed of two sub-facilities: a federal medical center and a minimum-security prison camp. Both facilities house male inmates.

This was the fifth unannounced inspection of a Federal Bureau of Prisons (BOP) institution under the OIG's on-site inspections program. The first four institutions we inspected, FCI Waseca, FCI Tallahassee, FCI Sheridan, and FCI Lewisburg, did not have a medical mission. We selected FMC Devens as the site of our fifth inspection to better understand and assess the conditions of confinement at an FMC.

In this report, we make 11 recommendations to the BOP to ensure effective operations at FMC Devens and safe conditions of confinement for the inmates housed there. Ten recommendations relate to the quality of healthcare provided to inmates and the medical care issues we identified, and one addresses issues at FMC Devens that we also identified in prior BOP oversight and for which we have made BOP-wide recommendations.

Our unannounced inspection identified several serious issues at FMC Devens related to staffing, inmate healthcare quality, infrastructure, inmate programming, failure to complete rounds, and radio system deficiencies. Notably, substantial shortages of healthcare employees and Correctional Officers—which is an issue at many BOP institutions but particularly problematic for a medical institution—have created widespread and troubling operational challenges at FMC Devens that substantially affect the health, welfare, and safety of employees and inmates.

Particularly concerning, we found that FMC Devens's Correctional Services Department had only 161 of 201 authorized positions filled (80 percent) and the Health Services Department had only 113 of 149 positions filled (about 76 percent) at the time of our inspection. Also concerning, during the on-site portion of our inspection and shortly thereafter, the medical institution had only 1 physician and the Clinical Director (who is also a physician) to manage the care of the entire inmate population of approximately 941 inmates: 2 of the institution's 6 physicians were on extended leave without pay, and 3 other physician positions were vacant. The Clinical Director, who leads the provision of preventive health services and provides standing orders for nurses, retired in June 2024; the position remained vacant as of October 5, leaving FMC Devens without this critical medical role filled and only one physician at the institution to provide daily patient care. Other vacancies within the Health Services Department included approximately half of the institution's pharmacy positions, approximately a quarter of its nursing positions, and its Chief Dental Officer and Deputy Chief Psychologist positions. Only 20 of 33 positions (61 percent) in the Psychology Services Department were filled. We are concerned that the staffing crisis at FMC Devens has cascading effects on its ability to care for its inmates and limits the quality and quantity of medical services it can provide, including for inmates who were transferred there expressly for its specific medical programs.

We also identified concerns related to the quality of healthcare provided to inmates, including potentially dangerous medication distribution, lack of preventive healthcare screening, inappropriate placement of inmates in the Memory Disorder Unit (MDU), and inconsistent processes for requesting and accessing care. Specifically, we observed BOP employees providing buprenorphine and naloxone—controlled substances for which the BOP requires direct supervision for the duration of medication administration and consumption to prevent diversion—to Camp

C.Agnello   SE 0015

inmates without directly supervising them.  We also found that 57 outside medical appointments for inmates were yet to be scheduled and were on average 53 days overdue at the time of our inspection due to outside medical providers canceling appointments and a lack of FMC Devens employees to escort inmates to scheduled appointments while maintaining coverage of necessary posts.  We also were concerned to find that FMC Devens lacked oversight of its contracted company that manages outside medical records.  This resulted in delays in outside medical records being submitted to FMC Devens following outside office visits and caused a significant discrepancy between the number of pending outside medical records that the company indicated it needed to send to FMC Devens and the number of outside medical records that FMC Devens was waiting to receive.  This lack of oversight could lead to fragmented and delayed follow-up inmate care and could exacerbate conditions that inmates were sent to outside providers to address.

We found inconsistencies regarding inmates' access to medical care and routine screening of inmates over age 50 for preventive healthcare and cognitive impairment, including an apparent inconsistency in how FMC Devens nursing employees determined what constituted a need for sick call and how that need was tracked. This inconsistency may limit an inmate's ability to be seen and receive medication in a timely manner, which could negatively affect their overall health.  Additionally, we reviewed the medical records of a random sample of 21 inmates over age 50 to determine whether they were receiving preventive healthcare screenings; less than half had received a preventive health screening, and none had received a cognitive impairment screening as part of their preventive healthcare during the previous year.  Further, not all inmates with a diabetes diagnosis were tested within required BOP guidelines and not all healthcare provider credential files were verified as directed by BOP policy.  We also found that a quarter of the inmates were not appropriately housed in the MDU, the BOP's only unit designed specifically for inmates with dementia.  Finally, we found that some inmates serving as medical companions were not eligible to participate in the program and some performed duties that were both outside the scope of the program and prohibited by the BOP.  These concerns cumulatively carry multiple risks for the institution's ability to provide adequate, continuous, and follow-up care to inmates with medical needs.

We also identified concerning issues affecting safety and security, inmate programming, and infrastructure. First, Correctional Officers failed to complete about half of the required inmate-monitoring rounds in the housing units that hold vulnerable inmates at the highest medical and mental health care levels, many of whom are at increased risk for medical-related emergencies, self-harm, and suicide.  Second, we found multiple deficiencies in the institution's radio system, including "dead zones" where employee radios do not receive radio signals, namely in the hospital areas, and some radios were beyond their serviceable dates. Nonworking radios impede employees' response to medical and nonmedical emergencies, thus jeopardizing inmates' and employees' safety.  Regarding inmate programming, because of staffing shortages, many psychology and education-based programs offered to inmates have large waitlists, with over 100 inmates, and only 1 skills-based vocational program with 10 inmates enrolled and 70 inmates on the waitlist was offered to inmates at the time of our inspection.  Additionally, due to lack of staffing, the FMC Devens LifeSkills Laboratory, a space designed for inmates with serious mental illnesses to practice routine skills—which received $150,000 in FIRST STEP Act (FSA) funds—had yet to be used for programming since its construction 3 years prior to our inspection.  Lastly, FMC Devens had serious infrastructure issues with many unfunded repair projects, including roof repairs and replacement of cooling and heating systems, which it estimated would cost $15 million.  The OIG noted the effects of water intrusion throughout the institution, including within housing units, employee offices, and rooms with optometry and dialysis equipment.  If repairs are not made soon, equipment and infrastructure failures could exacerbate repair costs and negatively affect inmates' conditions of confinement.

C.Agnello   SE 0016

## Report Highlights

**We found serious issues with FMC Devens's provision of healthcare to its inmates:**

- Significant and widespread staffing shortages in the Health Services Department compromise FMC Devens's ability to provide adequate healthcare to inmates.

- Concerning healthcare practices include:



**Inmate Healthcare**

  - ➢ potentially dangerous practices related to the distribution of buprenorphine and naloxone;

  - ➢ a backlog of outside medical visits that had yet to be scheduled and a discrepancy in the number of pending inmate medical records;

  - ➢ inconsistent access to medical care for routine conditions;

  - ➢ inconsistent routine screening of inmates over age 50 for preventive healthcare or cognitive impairment;

  - ➢ not all inmates with a diabetes diagnosis being tested within required timeframes;

  - ➢ not all healthcare provider credential files being verified according to BOP policy;

  - ➢ improper placement of some inmates in the MDU; and

  - ➢ some medical inmate companions not meeting the BOP's eligibility criteria and some performing duties outside the scope of a medical inmate companion, which is prohibited by the BOP.



**Safety and Security**

**Two safety and security issues affect the safety of institution operations:**

- Correctional Officers did not complete all inmate-monitoring rounds as required by policy, leaving vulnerable inmates unobserved for multiple hours each night.

- Employee radios did not receive a signal in some parts of the institution, namely the hospital and areas below ground, and radios were beyond their serviceable dates, rendering many radios unrepairable.




**Inmate Programming**

**Staffing shortages limit opportunities for inmates to participate in programs designed to prepare them for successful reentry:**

- Psychology Services Department employees must prioritize programming for inmates with higher mental health care levels, leaving inmates with lower mental health care levels with a lack of programming and resources.

- Shortages of Education Department employees limited FMC Devens from offering General Education Diploma courses, the Commercial Driver's License program at the Camp, and the Certified Nursing Assistant program at the FMC.

- In fiscal year (FY) 2021, FMC Devens received $150,000 in FSA funds as one of three BOP institutions selected to pilot the initial implementation of the FSA LifeSkills Laboratory program. However, as of FY 2025, FMC Devens had yet to enroll inmates in this program.



**Infrastructure**

**FMC Devens has several unfunded major infrastructure and equipment repair projects that present safety and security issues:**

- Many of the institution's systems are approaching the end of their projected lifespan, and the roofs need repair.

- Officials estimated the cost of this work to be $15 million.

# Table of Contents

Introduction ........................................................................................................................ 1

    FMC Devens ................................................................................................................ 2

    FMC Devens Medical and Mental Health Missions ................................................... 2

Inspection Results .............................................................................................................. 7

    Staffing Challenges ..................................................................................................... 7

    Inmate Healthcare .................................................................................................... 15

    Safety and Security ................................................................................................... 25

    Inmate Programming ................................................................................................ 27

    Physical Conditions and Infrastructure ................................................................... 30

Conclusion and Recommendations ................................................................................. 35

    Conclusion ................................................................................................................ 35

    Recommendations .................................................................................................... 37

Appendix 1:  Purpose, Scope, and Methodology ........................................................... 39

    Standards .................................................................................................................. 39

    Purpose and Scope ................................................................................................... 39

    Inspection Methodology ........................................................................................... 39

Appendix 2:  DOJ OIG and Other Oversight Agency Related Work .............................. 41

Appendix 3:  BOP Policies and Clinical Guidance Cited ................................................ 43

Appendix 4:  The BOP's Response to the Draft Report ................................................. 45

Appendix 5:  OIG Analysis of the BOP's Response ....................................................... 57

C.Agnello  SE 0018

# Introduction

This report details the results of the U.S. Department of Justice (DOJ) Office of the Inspector General's (OIG) unannounced inspection of a Federal Bureau of Prisons (BOP) prison, Federal Medical Center (FMC) Devens, located in the town of Ayer, Massachusetts, which is approximately 39 miles west of Boston. FMC Devens is within the BOP's Northeast Region and is composed of two facilities, an administrative-security medical center, housing inmates with serious medical or mental health conditions, and an adjacent minimum-security prison camp. In this report, we refer to the overall institution as "FMC Devens," the administrative-security prison as the "FMC," and the minimum-security prison camp as the "Camp."

> **Federal Prison Oversight Act**
>
> On July 25, 2024, the Federal Prison Oversight Act (FPOA) was signed into law. The FPOA requires the OIG to conduct periodic inspections of BOP facilities based on the OIG's assessment of risk factors at BOP facilities. Prior to the FPOA's enactment, the OIG identified FMC Devens for inspection based on our assessment of risk factors at the institution. Consistent with the FPOA's requirements, we are reporting the findings from our inspection of FMC Devens, and our recommendations to the BOP, publicly and to the U.S. Congress.
>
> **Source:** Federal Prison Oversight Act, Pub. L. No. 118-71, 138 Stat. 1492 (2024) (codified at 5 U.S.C. § 101 (note))

This is the fifth report of an unannounced inspection the OIG has conducted of a BOP institution pursuant to its on-site inspections program. We previously issued separate reports detailing our inspections of Federal Correctional Institution (FCI) Waseca and FCI Tallahassee, both of which housed female inmates. The former is in the BOP's North Central Region; the latter is in the BOP's Southeast Region. We also issued our report on the inspection of FCI Sheridan, an institution housing male inmates, which is in the BOP's Western Region. Most recently, we issued a report on the inspection of FCI Lewisburg, an institution housing male inmates in the BOP's Northeast Region. We selected FMC Devens as the site of our fifth inspection to better understand and assess the conditions of confinement for male inmates at a Federal Medical Center.



FMC Devens Main Entrance
**Source:** OIG, April 2024

The OIG conducted its inspection of FMC Devens between Monday, April 22, and Friday, April 26, 2024. While on site, we made physical observations; interviewed employees and inmates; reviewed security camera footage; and collected records related to inmate medical and mental healthcare, inmate programming and education, institution staffing levels, conditions of confinement, and allegations of employee and inmate misconduct. We also made follow-up requests for additional data, interviews, and documents from the institution and the BOP's Central Office, which we used to further inform our inspection (see Appendix 1 for more details on the methodology).

C.Agnello   SE 0019

## FMC Devens

As of April 22, 2024, the FMC housed 861 inmates, about 76 percent of its physical capacity of 1,137.  It has six general population housing units, four mental health units, four medical (hospital) units, and one Special Housing Unit (SHU).  The general population housing units are a combination of cells and open-concept living spaces with inmate bunk beds and communal areas for bathrooms, showers, and recreation.  The mental health units vary based on the mental healthcare needs of inmates.  Generally, the mental health units have single- and double-occupancy cells containing single beds with a sink and toilet.  Showers may be located in single-occupancy cells or in communal bathroom areas.  Similarly, the hospital units vary based on the medical care needs of inmates.  Within the medical housing units, there are inmate patient beds separated by curtains or walls, as well as inmate patient rooms containing up to four beds.  The SHU houses inmates who need to be separated from the general population, and it generally contains double-occupancy cells with a shower, sink, and toilet.  Inmates remain locked in SHU cells except when they are escorted to recreation areas, medical appointments, visitation, and the law library.

At the time of our inspection, the Camp housed 80 inmates, approximately 66 percent of its physical capacity of 122.  Camp inmates live in one housing building that has open-concept living spaces.  Each living space contains bays with inmate bunk beds, as well as communal areas for bathrooms, showers, and recreation.

| FMC Devens:  Institution Profile | |
|---|---|
| **Location** | |
| Ayer, MA | |
| **Medical Care Level** | |
| 4 of 4 | |
| **Mental Health Care Level** | |
| 4 of 4 | |
| **Employees** | |
| Total Positions:  533 | |
| On Board:  432 | |
| *101 Vacancies* | |
| **FMC** Population | **Camp** Population |
| Physical Capacity: 1,137 | Physical Capacity: 122 |
| Actual Headcount: 861 | Actual Headcount: 80 |
| *~76% Capacity* | *~66% Capacity* |
| **Security Level** | **Security Level** |
| Administrative | Minimum |
| **Housing Units** | **Housing Units** |
| 6 General Population Units, 4 Mental Health Units, 4 Medical Units, and 1 SHU | 1 Building with Open-Concept Living Spaces |

Employee totals are as of April 21, 2024.  Inmate population totals are as of April 22, 2024.

**Source:**  FMC Devens documentation

## FMC Devens Medical and Mental Health Missions

FMC Devens is one of seven BOP Federal Medical Centers that house inmates of all medical and mental health care levels.  Similar to other BOP institutions, FMC Devens provides 24-hour, 7-day medical services, such as suicide prevention, and individualized treatment plans and medication.  As a Federal Medical Center, FMC Devens also has several ongoing medical and mental health missions to provide specialized inmate patient care, such as inpatient services, dialysis treatment, behavioral monitoring, and specialized

C. Agnello   SE 0020

psychiatric care to inmates with the most severe needs.  Inmate medical and mental health care levels are determined by the inmate's medical and mental health needs and are based primarily on chronicity, complexity, intensity, and frequency of interventions and services that are required, as well as an inmate's functional capability (see Table 1 below).  Medical and mental health care levels are not synonymous and can increase or decrease over time based on the inmate's medical and mental health conditions.  For example, an inmate could have cancer that is in partial remission (Medical Health Care Level 3) and show no significant level of functional mental impairment (Mental Health Care Level 1).

## Table 1

### BOP Medical and Mental Health Care Levels

| | Medical Health Care Level Descriptions and Examples | Mental Health Care Level Descriptions |
|---|---|---|
| 1 | Inmates are less than 70 years of age and are generally healthy; they may have limited medical needs that can be easily managed by clinicians every 6–12 months. Mild asthma, diet-controlled diabetes, well-controlled hypertension, etc. | Inmates show no significant level of functional impairment associated with mental illness and demonstrate no need for regular mental health interventions. |
| 2 | Inmates require clinical evaluations monthly to every 6 months; their medical conditions can be managed through routine, regularly scheduled appointments. Medication-controlled diabetes, epilepsy, or emphysema | Inmates require routine outpatient mental healthcare on an ongoing basis and/or brief, crisis-oriented mental healthcare of significant intensity (e.g., placement on suicide watch or behavioral observation status). |
| 3 | Inmates have complex, and usually chronic, medical conditions and require frequent clinical contact to maintain control or stability of their conditions or to prevent hospitalizations or complications; inmates may require assistance with some activities of daily living that can be accomplished with inmate companions.[a] Cancer in partial remission, advanced human immunodeficiency virus disease, severe mental illnesses, or end-stage liver disease | Inmates require enhanced outpatient mental healthcare (i.e., weekly mental health interventions) or residential mental healthcare (i.e., placement in a residential Psychology Treatment Program). |
| 4 | Inmates have acute medical or chronic mental health conditions, may be severely impaired, and may require 24-hour skilled nursing care or nursing assistance. Cancer on active treatment, dialysis, quadriplegia, stroke, major surgical treatment | Inmates require acute care in a psychiatric hospital, are gravely disabled, and cannot function in general population in an enhanced outpatient environment. |

[a]  An inmate companion is part of the inmate work program and receives specialized training to assist and support other inmates unable to independently perform one or more activities of daily living.

Note:  Conditions generally classified as serious mental illnesses include schizophrenia spectrum and other psychotic disorders, bipolar and related disorders, major depressive disorder, anxiety disorders, obsessive-compulsive and related disorders, trauma and stressor-related disorders, intellectual disabilities and autism spectrum disorders, major neurocognitive disorders, personality disorders.

Source:  BOP Care Level Classification for Medical and Mental Health Conditions or Disabilities, May 2019

As stated above, inmates can be assigned a medical care level independent of their mental health care level, and vice versa, as the two are not always synonymous.  At the time of our inspection, FMC Devens had the inmate composition depicted in Figure 1 below.

### Figure 1

**Percentages of FMC Devens Inmates by Medical Care Level and Mental Health Care Level, April 2024**



**Source:**  FMC Devens documentation

As a Federal Medical Center, FMC Devens has several ongoing medical missions to provide specialized inmate patient care:

- **Inpatient Services:**  The inpatient medical unit has a 12-bed capacity, including 1 airborne isolation room.  This unit provides health and personal care services to chronically ill, aged, physically disabled, or developmentally disabled inmates on a long-term basis, including 24-hour, 7-day nursing care.  Additionally, this unit may provide short-term care for inmate patients who require medical care beyond the capabilities of the outpatient clinic but do not meet requirements for transfer to an outside hospital.

- **Outpatient Services:**  FMC Devens is responsible for addressing urgent care needs, as they arise, for all inmates in the institution, as well as for providing routine care through clinics and separate preventive health services based on policy requirements, risk profiles, recommended screening intervals, and results of screening tests.  Such services may include physical examinations, infectious disease screening, cancer screening, chronic disease screening, and immunizations.

- **Dialysis Unit:**  The Dialysis Treatment Center provides treatment for inmates with end-stage renal failure.  The BOP has only four institutions with a dialysis unit:  FMC Devens, FMC Butner, FMC Carswell, and U.S. Medical Center for Federal Prisoners Springfield.

- **Transplant Coordination Services:**  FMC Devens provides access to organ transplants, including liver and kidney transplants, through its comprehensive medical contract with a community transplant center.  FMC Devens was the first BOP institution to provide its inmates donor transplant services.

- **Rehabilitation Services:**  The Physical Therapy Department provides a full range of services for inmates referred with orthopedic, neurologic, and general medical conditions.

- **Memory Disorder Unit (MDU):**  The MDU provides 24-hour nursing care to inmates who have dementia.  FMC Devens maintains the only MDU within the BOP.[1]

FMC Devens also has several primary mental health missions:

- **Forensic Evaluation Site:**  In accordance with 18 U.S.C. §§ 4241–4248, FMC Devens conducts court-ordered psychological evaluations and direct psychological care for defendants and inmates referred from all parts of the United States.  Specifically, psychological evaluations can be conducted to assess and restore competency for criminal proceedings; weigh criminal responsibility in light of mitigating and aggravating mental or behavioral disorders; and monitor persons found to be dangerous, sexually or otherwise.

- **Restorative Care:**  FMC Devens provides specialized, limited inpatient evaluation and psychiatric care—including the involuntary administration of psychiatric medication—to pretrial detainees who have been judged incompetent to stand trial.  The limit on initial commitment for a pretrial detainee who has been court ordered to undergo restorative care is not to exceed 4 months; however, additional time can be ordered if it is likely that the individual will be restored to competency.

- **Civil Commitments:**  FMC Devens provides inpatient psychiatric care for pretrial and sentenced inmates who have been civilly committed due to incompetence, assignment as sexually dangerous under the Sex Offender Registration and Notification Act, or through a determination by the institution's Risk Assessment Panel, which reviews all mentally ill inmates (convicted or not guilty by reason of insanity) annually and prior to their release.[2]

- **Serious Mental Illness:**  FMC Devens provides continuous care for inmates with severe mental illnesses, such as schizophrenia spectrum disorders, bipolar disorder, major depressive disorder,

---

[1]  Dementia is a condition characterized by the loss of cognitive function—the ability to think, remember, or reason—to the extent that it interferes with memory, language skills, visual perception, problem solving, self-management, and basic activities of daily living.  See National Institute of Neurological Disorders and Stroke, "Dementias," www.ninds.nih.gov/health-information/disorders/dementias?search-term=dementia#toc-the-basics-of-dementia-and-cognitive-impairment (accessed October 2, 2024).

[2]  See Appendix 3 (Certification and Civil Commitment of Sexually Dangerous Persons).

C. Agnello    SE 0023

and other psychotic disorders. Inmates experiencing serious mental illness are housed in either the Secure Mental Health Unit (SMHU) or a transitional Mental Health Unit. Inmates may be admitted to the SMHU if they have a severe mental illness and a significant history of violence or are at heightened risk for suicide. The SMHU has 24-hour, 7-day care and offers treatment plans that include interventions and services from various departments at FMC Devens, with the goal of moving SMHU inmates to a transitional Mental Health Unit. The transitional Mental Health Units are considered step-down units from the SMHU and offer intermediate levels of care for inmates with serious mental illness. The goal of the transitional Mental Health Units is to minimize relapse and to prepare inmates for integration into general population housing units and society at large.

- **Sex Offender Management Program (SOMP) and Residential Sex Offender Treatment Program (SOTP-R):** The SOMP is a moderate-intensity management program designed for low-to-moderate-risk sexual offenders. The program includes psychoeducational groups and individual psychotherapy. Within the SOMP, FMC Devens facilitates the SOTP-R, a voluntary, high-intensity program designed for high-risk sexual offenders in a residential treatment unit. The program includes cognitive-behavioral based psychotherapy groups.

- **Substance Abuse Treatment:** FMC Devens provides a Non-Residential Drug Abuse Program that is a moderate-intensity cognitive-behavioral treatment program. FMC Devens also provides Medication Assisted Treatment, which is the use of medication in combination with drug education classes, counseling, and/or behavioral therapy to treat inmates diagnosed with Opioid Use Disorder.

In addition to the mental health missions at FMC Devens, the institution participates in a predoctoral internship program, accredited by the American Psychological Association, through which students assist with the mental healthcare of inmates at the institution while completing their doctorate.

# Inspection Results

## Staffing Challenges

As described extensively in previous OIG oversight products, staffing shortages and employee allocations are among the chief and long-standing operational challenges facing the BOP enterprise-wide.  Our inspection of FMC Devens found significant staffing shortages at the institution, as well as substantial disparities in BOP estimates of the staffing levels necessary for the institution to execute its missions successfully.  FMC Devens employees noted that many of its existing positions were vacant, which they believed hampered their ability to achieve effective operations.  As described in greater detail below, FMC Devens Executive Leadership's perspective about additional staffing needs is in contrast with estimates developed by an outside contractor hired by the BOP to calculate appropriate staffing levels for each institution through a recently deployed staffing projection tool.

At the time of our inspection, FMC Devens had a total of 533 positions composed of 506 BOP positions authorized specifically for FMC Devens in the Departments of Correctional Services, Health Services, Psychology Services, and others; 24 positions supported through the U.S. Public Health Service; and 3 supplemental staffing allocations from DOJ.  We found that 81 percent (432 of 533) of FMC Devens' total positions were filled.  Specifically, there were 40 vacancies in the Correctional Services Department, 36 vacancies in the Health Services Department, and 13 vacancies

Figure 2

### FMC Devens Staffing Level Overview



**Notes:**  Here and throughout the report, "Health Services" includes BOP Health Services employees and employees of the U.S. Public Health Service, a branch of the uniformed services that supports public health and helps fill health services roles within federal agencies and programs.  "Psychology Services" includes Psychology Services employees, employees from the Drug Abuse Program, and employees from the Sex Offender Management Program.

**Source:**  FMC Devens staffing data as of April 2024

C.Agnello   SE 0025

in the Psychology Services Department.[3]  To alleviate staffing shortages, the BOP spent approximately $4 million on retention bonuses; $176,000 on recruitment incentives; and $60,000 on student loan repayments at FMC Devens.  Yet, we found these incentives to be somewhat ineffective due to the high cost of living and better paying jobs across the state of Massachusetts, which some employees left FMC Devens to attain.  BOP Director Colette Peters testified before the U.S. House of Representatives' Subcommittee on Crime and Federal Government Surveillance that a Correctional Officer left their position at FMC Devens for a position with a better wage at a local grocery store.  According to the BOP and the Department of Justice, physicians at FMC Devens earn approximately $282,480 per year whereas a physician at a nearby hospital emergency department earns about $415,300.  Similarly, mid-level practitioners at FMC Devens earn a salary between $72,182 and $123,528 whereas mid-level practitioners at a nearby hospital earn an average salary of $141,120.[4]  Additionally, we found that the annual median wage for Correctional Officers in state and local prisons across the state of Massachusetts was $78,810 and the annual median wage for nurses was $99,730.  These discrepancies illustrate that positions at FMC Devens are not competitive within the surrounding area, which could hinder FMC Devens's ability to retain and hire qualified employees.[5]

We also found that upcoming retirements of employees may exacerbate FMC Devens's staffing crisis.  At the time of our inspection, at least 70 employees were eligible for retirement and an additional 11 employees were scheduled to retire by the end of calendar year 2024.  Of the 70 employees eligible to retire, 41 percent (29) worked in the Correctional Services Department.

### Relevant Prior OIG Work and Related Recommendations:  BOP Staffing Levels

A 2021 Government Accountability Office (GAO) report recommended that the BOP develop and implement a reliable method for calculating staffing levels at BOP institutions.  The DOJ OIG made a similar recommendation in a 2023 report examining the BOP's strategies to identify, communicate, and remedy operational issues.  In response to these recommendations, the BOP hired an outside contractor in 2021 to help it calculate staffing levels for each BOP institution, using a staffing projection tool.

Both the GAO's and the OIG's recommendations remain open, but we note that the BOP has made progress in developing the staffing projection tool, which we discuss in greater detail in the sections below.

See Appendix 2, Items V and XIV, for more information about these reports.

---

[3]  We report these vacancies as reflected on the BOP's internal staffing report; however, the BOP's count of vacancies differs.  The BOP considers five Health Services Department positions to be "aligned" under the Psychology Services Department.

[4]  This data is included in a document submitted by DOJ to the U.S. Senate Committee on the Judiciary on November 7, 2024, titled "A Funding Proposal to Address Critical Safety Needs Across the Federal Prison System."

[5]  At the time of our inspection, at FMC Devens the entry-level salaries were $55,138 for Correctional Officers and $62,672 for nurses.  After receiving a draft of this report, the BOP noted that not all Correctional Officers and nurses were paid at the minimum entry-level rate.  In addition, the BOP told us that it submitted two nationwide Special Salary Rate requests to the U.S. Office of Personnel Management for Correctional Officer and nursing positions in an effort to offer more competitive salaries.  The BOP discusses these Special Salary Rate requests in its response to the draft report (Appendix 4), and the OIG mentions the requests in its analysis of the BOP's response (Appendix 5).

C. Agnello   SE 0026

## Correctional Services Staffing Shortages

Staffing shortages at FMC Devens have particularly affected the Correctional Services Department, which is composed primarily of Correctional Officer positions.  Correctional Officers are vital to the safety and security of the institution, as they are responsible for providing round-the-clock supervision of inmates.  Specifically, FMC Devens had only 80 percent of its Correctional Services positions filled at the time of our inspection (see Figure 2 above).  To compensate for vacancies in these critical positions, institution management has adopted two stopgap measures used widely across the BOP to maintain coverage of correctional posts:  (1) mandated and voluntary overtime and (2) temporary assignment of non-Correctional Officer personnel into Correctional Officer positions, a practice known as augmentation.[6]  Through these measures, FMC Devens employees performed about 98,000 hours of work covering Correctional Officer posts—equivalent to approximately 47 full-time positions—from January 2023 through April 2024.  The BOP noted that the majority of the 98,000 hours includes the use of an FMC Devens mutual agreement whereby Correctional Officers can earn and utilize compensatory time within their 40-hour work week.[7]

Even if the FMC Devens Correctional Services Department filled all of its vacancies, we question whether it would be able to appropriately staff the FMC and the Camp without the continued use of overtime and/or augmentation.  At the time of our inspection, 161 of 201 Correctional Services Department positions had been filled, which amounts to 40 vacancies.  However, in the year prior to our inspection, FMC Devens management used overtime, augmentation, and compensatory time to fill the equivalent of approximately 47 of these full-time positions.[8]  Given that the extent of staffing gaps the institution covered through overtime, augmentation, and compensatory time represents 7 positions greater than its official number of vacancies less than a year later, we believe that the 201 positions officially allocated to the Correctional Services Department may be too low.

When we discussed staffing levels with the FMC Devens Warden, he believed that 201 authorized positions for the Correctional Services Department was sufficient.  However, this figure differs significantly from the calculation produced by the BOP contractor's staffing projection tool, which as of July 2024 projected that FMC Devens needed only 189 authorized positions in its Correctional Services Department.  Moreover, the staffing projection tool estimate of 189 employees is below the number of Correctional Services employees

---

[6]  The OIG described the BOP's use of mandatory overtime and augmentation in our inspection reports of FCI Sheridan and FCI Lewisburg and in broader OIG work on BOP inmate deaths in custody.  In the latter report, we found that all three BOP sites we visited (U.S. Penitentiary Thomson, Federal Transfer Center Oklahoma City, and Federal Correctional Complex Hazelton) used mandatory overtime to compensate for staffing shortages.  See Appendix 2, Items III, IV, and VI, for more information on these reports and Item VII for our 2020 Management Advisory Memorandum on the BOP's use of overtime in 2019.

[7]  After receiving a draft of this report, the BOP told us that overtime, augmentation, and compensatory time do not directly correlate to workforce needs.

[8]  The U.S. Office of Management and Budget calculates the total number of work and leave hours that a full-time equivalent employee records during a year at 2,080.  Because those 2,080 hours include annual, sick, and other leave that an employee may use during the year, our calculation understates the number of full-time employees that would be needed to cover those 98,000 hours of overtime.  However, because annual leave granted to an employee each year is based on the employee's seniority, it would be impracticable for us to calculate with precision the number of full-time equivalent employees that the 98,000 hours of overtime represents.

See past OIG work on the BOP's use of overtime at Appendix 2, Item VII.

C.Agnello   SE 0027

currently on board combined with the OIG's calculation of the amount of overtime and augmentation FMC Devens employees worked to cover Correctional Services needs.  Table 2 below depicts the differences in current and projected staffing needs in the Correctional Services Department.

Table 2

FMC Devens Correctional Services Department Position Totals and Projected Needs, April 2024

| Filled Positions | Authorized Positions | Filled Positions Plus Positions Filled via Overtime, Compensatory Time Earned, or Augmentation | Estimate of Necessary Positions Made by FMC Devens's Warden | Staffing Projection Tool Estimate of Necessary Positions |
|---|---|---|---|---|
| 161 | 201 | 208 (161+47) | 201 | 189 |

**Notes:**  The OIG calculated positions filled via overtime for FMC Devens's Correctional Services Department by dividing employee overtime, compensatory time, and augmentation hours worked in Correctional Services (approximately 98,000) by the total number of work and leave hours (2,080) the U.S. Office of Management and Budget calculates that a full-time equivalent employee records during a year.  Positions filled via overtime numbers are rounded.

**Sources:**  FMC Devens staffing data, FMC Devens Executive Leadership, and the BOP contractor's staffing projection tool

---

**Relevant Prior OIG Work and Related Recommendations:  Correctional Officer Shortages Affecting Safety and Security**

The OIG's June 2023 report on its investigation and review of the BOP's custody, care, and supervision of Jeffrey Epstein at Metropolitan Correctional Center New York found that staffing deficiencies at the institution contributed to the failure of its employees to perform inmate-monitoring rounds during the evening of Epstein's death.  A 2024 OIG report on inmate deaths in custody also found that the failure to appropriately complete inmate-monitoring rounds was a factor contributing to 86 BOP inmate deaths, including Epstein's, between 2014 and 2021.

To address the effects of staffing shortages on institution safety, in the Epstein report the OIG recommended that the BOP continue to develop and implement plans to address staffing shortages at its prisons.  As of the publication of this report on FMC Devens, this recommendation remains open.

See Appendix 2, Items VI and VIII, for more information about these reports.

---

## Health Services Staffing Shortages

At the time of our inspection, FMC Devens's Health Services Department was staffed at 76 percent, with 113 of 149 positions filled.  However, this low staffing percentage does not reflect the true staffing crisis the Health Services Department is experiencing.  We provide examples below:

- Two of the institution's six physicians were on extended leave without pay, and three physician positions were vacant, leaving one physician and the Clinical Director (who is also a physician) to

manage the care of the entire inmate population.  The Clinical Director retired in June 2024; the position remained vacant as of October 5, 2024, leaving FMC Devens without this critical medical role filled and only one physician at the institution.

- The Chief Pharmacist, the Chief Psychiatrist, and the Director of Nursing have also retired since our inspection; these positions remained vacant as of October 5, 2024.  Further, both the Chief Dental Officer and Deputy Chief Psychologist positions were vacant.

- Other vacancies at the time of our inspection include 24 percent of nurse positions (10 of 42 filled) and 45 percent of pharmacist positions (5 of 11 filled).

- During calendar year 2024, eight additional employees, including medical records employees, technicians, and nurses, became eligible to retire.

Yet, despite the substantial number of vacancies, some employees in the FMC Devens Health Services Department are required to participate in augmentation.[9]  Of the 113 employees in the department, 38 percent (43) are required to participate in augmentation to Correctional Officer posts or nursing posts. At the time of our inspection, 33 employees, including administrative employees, health information technicians, dietitians, and laboratory employees, were augmented to Correctional Officer posts and 10 Health Services Department employees with a nursing background were augmented to nursing posts. We believe that FMC Devens's Health Services Department is in a staffing crisis due to the overall staffing numbers and the augmentation requirements of employees within this department.  We are concerned that the staffing crisis could limit medical services provided to inmates and negatively affect the institution's ability to care for inmates, including inmates who may have been transferred to FMC Devens expressly for specific medical programs, such as dialysis, transplant, or the Memory Disorder Unit (MDU).

Illustrative of our concerns, due to the systemic shortage of nurses and physical therapists, FMC Devens had to limit the transfers of inmates from other BOP institutions for placement in the MDU or for orthopedic care.  In January 2024, the FMC Devens Warden requested a pause in inmate admissions to the MDU until October 25, 2024; the request was granted in April 2024, during our inspection.  As stated in the Medical and Mental Health Missions section of this report, the MDU at FMC Devens is the only MDU within the BOP to provide the specialized care those inmates need.  Similarly, FMC Devens paused accepting new orthopedic cases from March 13 until December 3, 2024, because only one physical therapist and one occupational therapist were treating the large inmate population with orthopedic needs.  According to the Chief Physical Therapist, the institution had been operating with only one physical therapist since August 2023 and there was a growing waitlist of inmates needing physical therapy services.  We believe that the pause in accepting inmates from other institutions into the MDU and for orthopedic care could negatively affect the continuity of inmate care; could require inmates to stay at institutions without necessary memory disorder or orthopedic care, which

---

[9]  After receiving a draft of this report, the BOP told us that Health Services employees who provide direct patient care are not augmented to Correctional Officer posts.  However, some FMC Devens employees, including mental health and medical social workers, who provide one-on-one care for inmates, were augmented to Correctional Officer posts during the prior year.  FMC Devens Executive Leadership explained that the Health Services and Correctional Services Departments collaborate to ensure that augmentation does not result in a Health Services Department closure or a delay in medical services; specific employees may be exempt from augmentation.

may exacerbate these conditions; and could lead to costly placement in community care facilities if proper care is not available within the BOP.

Further, on May 10, 2024, FMC Devens requested a temporary pause in accepting Medical Care Level 4 inmates, who require advanced medical care and daily living assistance, from other BOP institutions due to the Health Services Department staffing crisis.  According to the Warden, any more inmates requiring advanced medical care and daily living assistance without adequate employee coverage would leave the already high-risk inmate population at a greater risk of medical-related emergencies.  On June 5, the BOP's Central Office reviewed and approved FMC Devens's request, granting a moratorium for Medical Care Level 4 inmates who require assistance with activities of daily living until December 3, 2024.  We find this pause in accepting Medical Care Level 4 inmates concerning because restricting the transfer of inmates with advanced medical care needs to a Federal Medical Center could negatively affect the health and care of those inmates.  Those inmates may be required to remain at an institution that lacks advanced medical care, which could exacerbate an inmate's medical condition and require the BOP to incur significant costs for outside care.

In addition to their concern with the institution's Correctional Services staffing levels, Executive Leadership expressed concern about their ability to meet mission needs with the current medical and mental healthcare staffing levels.  They also expressed concerns related to their ability to hire qualified medical and mental health employees, noting that the state of Massachusetts has an abundance of medical and mental health employment opportunities and that those positions pay more than FMC Devens can.  They believed that more competitive pay would help them recruit and hire qualified candidates, and, in order to address FMC Devens's responsibilities as a Federal Medical Center, the Warden reported that FMC Devens would need approximately 250 employees in the Health Services Department.  In addition, Health Services Department employees told us that morale within the department is low, due to the low staffing levels, as the department struggles to manage its daily responsibilities.  Low morale within the department may cause employees to leave FMC Devens to work elsewhere, which would exacerbate the effects of low staffing.

In contrast to the reduced Correctional Officer staffing estimate produced by the BOP contractor's staffing projection tool, discussed above, the tool recommended increasing the number of positions for the Health Services Department.  The tool recommended 304 positions for the Health Services Department, a far greater number than Institution management told us they could use.  Specifically, although FMC Devens's Executive Leadership believed that they needed far more than the current 149 positions, they said that the institution did not have the space or equipment to accommodate 304 employees and that it would be difficult to fill over 100 vacancies.  Table 3 below shows the differences in current and projected staffing needs for the Health Services Department.

C.Agnello    SE 0030

**Table 3**

**FMC Devens Health Services Department Position Totals and Projected Needs, April 2024**

| Filled Positions | Authorized Positions | Actual Filled Positions and Positions Covered by Overtime, Compensatory Time Earned, and Augmentation | Estimate of Necessary Positions Made by FMC Devens's Warden | Staffing Projection Tool Estimate of Necessary Positions |
|---|---|---|---|---|
| 113 | 149 | N/A | 250 | 304 |

**Notes:**  We included one supplemental staffing allocation in the Health Services Department authorized positions.

Although some Health Services employees are eligible to earn compensatory time and overtime, not all Health Services employees are augmented to Correctional Officer posts; therefore, the OIG did not include in this calculation positions filled via compensatory time, overtime, and augmentation.

**Sources:**  FMC Devens staffing data, FMC Devens Executive Leadership, and the BOP contractor's staffing projection tool

When we discussed discrepancies between FMC Devens's and the staffing projection tool's estimates with the BOP's Assistant Director for the Human Resource Management Division at Central Office and the contract employees who developed the tool, they explained that the staffing projection tool includes a variety of factors in its algorithm to generate staffing estimates for institutions and that those estimates reflect the needs of an institution under ideal circumstances.  However, the contract employees told us that the existing infrastructure within the institution and its square footage were not considered when the tool recommended increasing the number of positions within FMC Devens's Health Services Department.

> **Relevant Prior OIG Work:  Medical Personnel Shortages**
>
> Medical personnel shortages have been a long-standing challenge for the BOP.  In a March 2016 report, we found that medical personnel positions were filled at only 83 percent across the BOP.  As we observed during our inspection of FMC Devens, the BOP's medical personnel shortages persist.  According to a September 2023 Pandemic Response and Accountability Committee report to which the DOJ OIG contributed, at that time the BOP's medical personnel shortage stood at 69 percent.  That report detailed a variety of contributing factors, including noncompetitive pay, limited career advancement opportunities, and the additional stressors and responsibilities associated with working in a correctional setting compared to those associated with working in the community.  The report also detailed how these shortages contributed to decreases in patient satisfaction and delays in routine and preventive care during the coronavirus disease 2019 pandemic.  As noted previously in this report, the OIG's Epstein report recommended that the BOP continue to develop and implement plans to address staffing shortages at its prisons, including medical staffing shortages, and, as of the publication of this report on FMC Devens, that recommendation remains open.
>
> See Appendix 2, Items VIII, XI, and XII, for more information about these reports.

## Psychology Services Staffing Shortages

At the time of our inspection, FMC Devens's Psychology Services Department was staffed at only 61 percent (20 filled positions out of 33), with vacancies including the only authorized staff psychologist; both advanced

C. Agnello    SE 0031

care psychologists; two sex offender program psychologists; and all three specialty treatment program specialists, who provide individual and group therapy to inmates.  Because BOP policy requires the institution to prioritize the treatment of inmates with higher mental health care levels over the needs of inmates with lower mental health care levels, FMC Devens's Psychology Services Department devotes much of its staff resources to its varied inmate specialty groups like the Sex Offender Treatment Program and inmates with serious mental illness, as the Medical and Mental Health Missions section of this report described.  Consequently, Psychology Services Department staffing shortages exacerbate the issue of limited treatment, such as individual or group treatment and psychology-led programming, available to inmates without a serious mental disorder.  In the Inmate Programming section of this report, we further discuss how staffing issues affect inmate programming.

Additionally, at the time of our inspection, only one employee was overseeing both the Drug Abuse Program and the Medication Assisted Treatment (MAT) program.  Psychology Services Department employees told us that, without a MAT-focused psychologist, their ability to screen inmates and begin MAT programming was limited.  Similarly, at the time of our inspection, while both Forensics Unit psychologist positions were filled, as of June 2024, one of the Forensics Unit psychologists went on extended leave, leaving the institution with only one Forensics Unit psychologist.  Due to the volume and demands of the Forensics Unit psychologists' caseloads at FMC Devens, during the summer of 2024 the BOP's Central Office dispatched temporary evaluators to assist with the caseloads and prepare for incoming inmates who require forensic psychologist review.  Psychology Services Department management expressed that, while these efforts helped the institution avoid delays in completing forensic evaluations, they were concerned that the day-to-day care and oversight of the 52 forensic evaluation inmates at FMC Devens fell on one Forensics Unit psychologist.  We believe that the use of temporary employees is a provisional solution to the more systemic staffing crisis that FMC Devens faces.

At the time of our inspection in April 2024, the BOP's contractor was still developing the staffing projection tool's recommended number of positions for FMC Devens's Psychology Services Department and, therefore, did not have a recommended staffing number.  When the tool was finalized and released on October 1, 2024, after our fieldwork ended, it recommended increasing the total number of positions from 34 to 45 for the Psychology Services Department.  We note that the staffing tool references 34 rather than 33 positions (as we described above) because it included in its count a staff psychologist position that is listed under the Health Services Department on the FMC Devens staffing report.  Since the Psychology Services Department projection was not available during our inspection, we report these numbers for informational purposes; we did not discuss the Psychology Services Department recommendation with FMC Devens employees or Executive Leadership.  After receiving a draft of this report, the Warden stated that FMC Devens would need 48 positions in the Psychology Services Department, which differs from the staffing projection tool's recommended 45 positions.

Given the long-standing challenges the BOP has experienced in determining appropriate staffing levels for institutions, and the efforts it has thus far taken to align staffing levels with mission needs, we are concerned that FMC Devens Executive Leadership's assessment of the institution's staffing needs differs significantly with preliminary staffing projection tool estimates.  Therefore, we recommend that the BOP:

1. Ensure that FMC Devens Executive Leadership and the Central Office's Human Resource Management Division discuss the staffing projection tool methodology and how it compares with

FMC Devens Executive Leadership's understanding of its current and potential future mission needs to ensure greater alignment between stakeholder staffing projections.

## Inmate Healthcare

In addition to the Health Services and Psychology Services Department staffing challenges discussed in the Staffing Challenges section above, we identified eight other areas of concern related to the provision of healthcare to FMC Devens inmates:

1. potentially dangerous practices related to the distribution of buprenorphine and naloxone when we observed the distribution of medication to inmates at the Camp;

2. a backlog of outside medical visits that had yet to be scheduled and a discrepancy in the number of pending medical records between a company contracted by FMC Devens to facilitate outside medical records and FMC Devens;

3. inconsistencies in inmates' access to medical care for routine conditions;

4. inconsistencies in routine screening of inmates over age 50 for preventive healthcare or cognitive impairment;

5. not all inmates with a diabetes diagnosis being tested within the required timeframes;

6. not all healthcare provider credential files being verified according to BOP policy;

7. improper placement of some inmates in the MDU; and

8. some medical inmate companions not meeting the BOP's eligibility criteria and some performing duties outside the scope of a medical inmate companion and prohibited by the BOP.

### Potentially Dangerous Medication Distribution Practices

We identified a number of potentially dangerous practices, in violation of BOP policy and guidance, when we observed the distribution of buprenorphine and naloxone medication to inmates at the Camp; the process of distributing medications to inmates is known as "pill line." Buprenorphine and naloxone are controlled substances for which the BOP requires direct supervision for the duration of medication administration and consumption. According to the BOP's Opioid Use Disorder Guidance, institutions should consider how to reduce diversion of controlled substances during pill line operations, which may include establishing separate pill lines for observations of controlled substances.[10] To minimize the risk of diversion, BOP clinical guidance states that the pill line for buprenorphine and naloxone should include direct supervision for the duration of medication administration and consumption and a mouth check prior to administration and at

---

[10] BOP Opioid Use Disorder Guidance, January 2024. The BOP does not make this clinical guidance publicly available. See Appendix 3 for the BOP policies and clinical guidance cited in this report.

the conclusion of the medication observation period.  Diversion, which is defined as the illicit transfer or sharing of controlled medications with others to whom the medication was not prescribed or dispensed, can be particularly dangerous in a correctional setting:  these medications have contraband value, as they can sometimes result in a high.  Diversion of these medications can also lead to altercations and violence when the redistributed medications do not have the sought-after effects.

We found the following concerning pill line practices for controlled substances among Health Services Department employees at the Camp:

- They administered buprenorphine and naloxone to inmates during the routine morning medication administration, along with other inmates receiving daily medications, without directly supervising inmates who received buprenorphine and naloxone for the duration of the medication administration and consumption.

- They did not conduct mouth checks before or after administering buprenorphine and naloxone to ensure that diversion did not occur or that the strip had fully dissolved.

> **Medications Used to Treat Opioid Use Disorder**
>
> Buprenorphine and naloxone are medications that can be combined and ingested orally through pills or dissolvable strips.  When used appropriately, they can help treat opioid use disorder by helping patients manage withdrawal symptoms and reduce cravings.  Though the "high" is less intense than the high from opioids, the medication can still produce a euphoric effect, as it still acts on the same opioid receptors in the brain and creates a flood of dopamine in the brain.
>
> **Sources:**  BOP Opioid Use Disorder Guidance and National Institutes of Health

We determined that buprenorphine and naloxone administration issues were neither limited to the period of our inspection nor unknown to Health Services Department management.  We reviewed quarterly reports generated by department employees and circulated to department leadership and found that, between January 2023 and April 2024, the department self-identified multiple medication administration errors, including an inmate receiving a buprenorphine and naloxone sublingual film and a buprenorphine injection on the same day.

In addition to noncompliance with policy and guidance, we observed a serious security concern during medication administration at the Camp.  Specifically, we observed that the door to enter the medication room was not secured during medication administration.  When the door is left unsecured, inmates may gain access to prescription medications, which could endanger the safety and security of employees and inmates at the institution.  Further, we observed an employee administering medications permitting inmates to enter the medication room to weigh themselves with little to no direct supervision from a BOP employee, increasing the safety and security concerns.

To minimize the risk of medication errors, we recommend that the BOP:

2. Ensure that FMC Devens follows BOP guidance for buprenorphine and naloxone administration and observation and that all FMC Devens employees who administer medication receive training on BOP guidance and policies for medication administration.

C. Agnello   SC 0034

## Backlog of Outside Medical Visits and Medical Records

When inmates require nonemergency medical treatment in areas such as ophthalmology, neurology, and radiology, which cannot be performed at FMC Devens, or they are admitted to an outside hospital, they must be scheduled to see an outside medical provider.  To help schedule and manage medical treatment for inmates outside FMC Devens, the institution has a contract with a comprehensive medical services company.  Once a medical visit is scheduled by the contracted comprehensive medical services company, FMC Devens employees escort the inmate to and from the appointment and supervise the inmate during the appointment.  After an outside medical visit or hospital stay is complete, the company is responsible for securing the inmate's medical records and, pursuant to the contract, submitting the records to FMC Devens within 10 business days of the medical appointment or hospital discharge.  When FMC Devens receives the medical records, Health Services Department employees upload the records to the Bureau Electronic Medical Records System (BEMR).  Medical records typically include details regarding the circumstances of the visit, the treatment plan, and follow-up care.

At the time of our inspection, BOP medical records indicated that 57 outside medical appointments that had been ordered for inmates were yet to be scheduled; these outside medical appointments were overdue by an average of 53 days.  We also found a significant backlog in the number of outside medical records pending receipt from the contracted company, as well as a discrepancy between the BOP and the contracted company on the number of outside medical records that remained outstanding.  The lack of timely receipt of medical records can negatively affect physicians' ability to provide necessary follow-up care and could lead to serious health implications if FMC Devens medical employees do not know the recommended treatment for inmates.

We identified two contributing factors for the scheduling backlog for outside medical trips:  first, outside medical providers canceled appointments; second, FMC Devens lacked enough employees to escort inmates to scheduled appointments while maintaining coverage of necessary posts at the institution.  While inmate medical escort responsibilities are not reserved exclusively for Correctional Officers, they are the employees at FMC Devens who are most commonly assigned to serve as medical escorts.  FMC Devens employees repeatedly expressed the strain that medical trips place on the Correctional Services Department and the broader institution as the institution must use mandated overtime and augmentation to fill vacant custody posts for Correctional Officers serving as medical escorts.  In an effort to ease the staffing challenges of outside hospital trips, FMC Devens established an agreement with a separate contracted company that can accompany minimum- and low-security inmates to outside hospital admissions.  We found that, in March 2024, 43 of these contracted employees provided 3,095 total hours of services at a cost of over $125,000 to the institution.  This need to use contract employees as a temporary and more costly solution further demonstrates the importance of addressing the systemic staffing crisis that FMC Devens faces.

We also found a significant backlog in the number of pending medical records that the contracted company indicated it needed to send to FMC Devens.  According to the contract terms, outside medical records should be provided to FMC Devens within 10 days of the outside medical appointment.  As of September 2024, the contracted company's backlog totaled 397 medical records that had not been sent to the BOP within 10 days for inclusion in inmates' medical files.  In contrast, FMC Devens's backlog totaled 237 medical records.  Of the contracted company's 397 backlogged medical records; 6 were from 2019; 85 were from 2020; 18 were from 2021; 22 were from 2022; 71 were from 2023; and 195 were from January 2024 to September 2024.  The types of medical records that had yet to be entered into BEMR included outside medical visits such as emergency room visits, transplant care, oncology consultations, and radiology

C.Agnello   SE 0035

consultations.  We found that the discrepancy in the medical record backlog was attributable to different tracking methods and systems.  Additionally, we believe that FMC Devens contract management employees had not had consistent communication with the contracted company.  As of September 30, 2024, FMC Devens contract management employees had not reconciled the backlog with the contracted company.  A physician at FMC Devens expressed frustration with the backlog of medical records, explaining that delayed medical records hinder their ability to provide adequate, continuous, and follow-up care to inmates with medical needs.

Lastly, we reviewed 53 inmate medical files that were listed by FMC Devens as backlogged and found that 72 percent (38 of 53) contained the outside medical record in the inmate files.  FMC Devens employees had not properly indicated that the medical record had been received during its upload into BEMR, which caused the record to remain on FMC Devens's backlog list even though the record was in the inmate's file and accessible by physicians and nurses.  Additionally, FMC Devens Health Services Department management had not completed quality control checks of the inmate medical record receipt and upload process as of September 30, 2024.  We believe that the lack of oversight of outside medical records could lead to fragmented inmate care and could exacerbate conditions that inmates were sent to outside providers to address.

---

**Relevant Prior OIG Work and Related Recommendations:  Canceling and Rescheduling Outside Medical Visits**

In a March 2022 audit report on the BOP's use of comprehensive medical services contracts to facilitate outside medical care for inmates, we found that, due to the limited availability of employees to escort inmates, the BOP was not always able to transport inmates to scheduled outside medical appointments.  BOP officials also told us that appointments are rescheduled for other, unanticipated reasons, such as inmate refusal to attend the appointment, illness of the inmate, or rescheduling required by the medical provider.  During our audit, we found that the BOP does not adequately track canceled or rescheduled inmate appointments, and we were unable to determine the effect these cancelations and rescheduling had on the delivery of timely medical care to inmates.  As a result, we recommended that the BOP implement a reliable, consistent process throughout all BOP facilities to monitor and analyze wait times for outside inmate appointments and the causes for canceled or rescheduled appointments in order to ensure that inmates receive timely medical care.  As of the publication of this report, this recommendation remains open.

See Appendix 2, Item XIII, for more information about this report.

---

To ensure that medical records are received in a timely manner and to assist medical providers with diagnosing and treating their patients, we recommend that the BOP:

3.  Implement a plan to address the medical record backlog at FMC Devens.

4.  Ensure that FMC Devens develops a consistent and accurate medical record tracking procedure with the contracted company that includes regular and recurring reconciliation of outside inmate medical records between FMC Devens and the contracted company.

## Inconsistent Processes for Requesting and Accessing Care

We found that, due to a variety of reasons, FMC Devens inmates may have difficulty accessing medical care for routine conditions. The most common way FMC inmates access medical care is by visiting the walk-in clinic; Camp inmates submit a request-to-be-seen form. Both processes are known as "sick call." BOP policy dictates that all medical processes, including sick call and patient care, treatment, and services, be logged and tracked within BEMR. At the time of our inspection, we found that FMC Devens was not always following BOP policy regarding the use of BEMR. For example, we found that many nursing employees were using a paper logbook or paper forms to document and track sick call, whereby they entered an inmate's name, register number, complaint, and appointment date and time. We also learned that paper forms were not entered into BEMR and were later shredded, making it difficult to track sick call records. When we discussed this inconsistency with FMC Devens Health Services Department management, we were told that all nursing employees should use BEMR and that nurses used the tracking logbook only as a back-up. We believe that there is a lack of communication between Health Services Department management and nursing employees and that a lack of direct supervision of nursing duties by nursing supervisors caused this discrepancy, which we believe is concerning and creates a risk that inmate care will be delayed.

Additionally, there appeared to be inconsistency in how FMC Devens nursing employees determined what constituted a need for sick call. According to BOP policy, "Sick call is defined as an inmate-initiated request for care." One inmate told us that when they went to sick call they were turned away by nursing employees because their request for care did not comport with how the nurse defined a sick call visit. We found that this issue also related to the lack of communication and oversight by FMC Devens's Health Services Department management. More alarming, we found that not all nurse managers at FMC Devens knew what constituted a need for sick call. One nurse manager told us that inmates who show up for medication refills should not report to sick call; rather, they should talk to Health Services Department supervisors during meal services, email the Health Services Department, or stop by the pharmacy to have their issues addressed. However, the FMC Devens Admission and Orientation Handbook given to inmates upon admission states that, "if there are no refills remaining, it is the inmate's responsibility to sign up for sick call to have the prescription renewed in adequate time." The inconsistency between actual practice and inmate guidance may limit an inmate's ability to be seen and receive medication in a timely manner, which could negatively affect their overall health.

Further, we found, through our review of inmate medical records, that 13 percent (2 of the 16 inmates who were evaluated for sick call complaints) did not have a sick call or triage note documented in BEMR. FMC Devens procedures require the nurse, licensed practical nurse, or medic to complete a triage or sick call note in BEMR to include inmate complaint, history, vital signs, physical findings, and disposition. Triage allows truly urgent conditions to be addressed adequately on the same day, while also allowing more routine conditions or concerns to be addressed at a scheduled appointment. Failure to triage inmates may limit FMC Devens's ability to prioritize inmate healthcare and further diagnose and treat urgent conditions.

To ensure that all inmates can request and have access to care, we recommend that the BOP:

5. Ensure that FMC Devens follows the BOP Patient Care Policy for sick call and provides training to all FMC Devens Health Services Department employees on the policy, as well as on FMC Devens sick call procedures.

## Lack of Preventive Healthcare Screenings

The BOP Clinical Practice Guidelines (CPG) for Preventive Healthcare Screening states that periodic prevention visits are an effective way to provide preventive healthcare services for all inmate patients but especially those that are not routinely seen for other medical needs such as chronic medical conditions.[11]  The BOP encourages prevention visits annually for inmates 50 years and older.  According to the BOP CPG for Preventive Health Care Screening:

> **Preventive Healthcare Screening Requirements for Inmates Over Age 50**
>
> The BOP CPG for Preventive Healthcare Screening states that preventive healthcare services for inmate patients incorporates targeted patient counseling and immunizations, as well as screening for infectious diseases, cancer, cognitive impairment, and chronic diseases.  It also includes recommendations for disease screening based on age, sex, clinical indication, and risk factors.  Current preventive health requirements for male inmates over age 50, based on risk factors, include colon cancer, lung cancer, diabetes, hypertension, cholesterol, cardiovascular disease, abdominal aortic aneurysm, and cognitive screening. Additionally, the BOP encourages annual prevention visits for inmate patients 50 years and older.
>
> **Source:** Appendix 3 (Preventive Health Care, Colorectal Cancer, and Cognitive Impairment Screening)

- Clinical Directors are responsible for serving as role models and leaders in delivering preventive health services; providing standing orders for nurses; providing staff education; developing Improving Organizational Performance measures; and working with the Health Services Administrator to ensure that adequate staffing, supplies, and materials are available for successful implementation of the local preventive healthcare program.

- All members of the healthcare team should take part in preventive healthcare in some capacity, under the collaborative leadership of the Health Services Administrator and the Clinical Director.

- Health Service Administrators, Clinical Directors, and the Director of Nursing should develop a process and outline the implementation of a local preventive healthcare program.

At the time of our inspection, we found that a senior medical official was not using the CPG for Preventive Healthcare Screening and was not instructing the physicians at FMC Devens to use the CPG for Preventive Healthcare Screening.  A physician told us that he had not received training or guidance related to preventive health.  We also found no evidence that FMC Devens had established a local preventive healthcare program.  We find it concerning that a Federal Medical Center does not have a local preventive healthcare program and that a senior medical official was not using the CPG for Preventive Healthcare Screening.

To determine whether inmates over age 50 were receiving preventive healthcare screenings, we reviewed a random sample of 5 percent (21 of 413) of the medical records for inmates over age 50.  We found that only 48 percent (10 of 21) of the inmates had received a preventive health screening during the previous year.  We further determined that all 48 percent of inmates who had received a preventive health screening received their screening in conjunction with a chronic care clinic, for which they were already enrolled, and

---

[11]  Appendix 3 (Preventive Health Care, Colorectal Cancer, and Cognitive Impairment Screening).

*C. Agnello   SE 0038*

the screening was performed by a physician.  Chronic care clinics are defined as a means for inmates with ongoing medical needs to be tracked and seen by a healthcare provider at clinically appropriate intervals.  For the 52 percent of inmates whose records we reviewed who had not received a preventive health screening during the previous year, 73 percent (8 of 11) were enrolled in a chronic care clinic but had not received a preventive health screening and 27 percent (3 of 11) were not enrolled in any chronic care clinics.  Regarding preventive health screenings, a physician told us, "If a person is not in a chronic care clinic, they could be here for years and never be seen."[12]  We find this concerning because the lack of preventive healthcare screening could potentially delay the care of inmates over age 50, which could negatively affect their overall health and result in the need for more costly treatment.

Further, we found that none of the 21 inmates over age 50, including the 10 who had a preventive health screening, had received a cognitive impairment screening as part of their preventive healthcare.  According to the BOP CPG for Preventive Healthcare Screening, inmates 50 years old or older, without recognized signs or symptoms of cognitive impairment, should be screened for cognitive impairment using a "Mini-Cog" screening tool.  The BOP uses the Mini-Cog tool as a fast and simple screening test to help detect dementia in its early stages.  We find the lack of cognitive impairment screening at FMC Devens concerning because, at the time of our inspection, 44 percent of its inmate population was over age 50 and should receive this screening for appropriate healthcare monitoring.  FMC Devens is one of only seven Federal Medical Centers and, as such, should prioritize inmate healthcare.  In addition, because FMC Devens houses the BOP's only MDU, it should be properly screening inmates for cognitive impairment (discussed in the Memory Disorder Unit section below).

Additionally, the BOP CPG for Preventive Healthcare Screening states that inmates between ages 45 and 75 at average risk for colorectal cancer should receive an annual screening to detect potential signs of colon cancer.[13]  If the results of that screening indicate potential signs of colon cancer, the BOP CPG for Preventive Healthcare Screening states that the inmate should receive a colonoscopy.[14]  As of April 2024, FMC Devens had 371 inmates at average risk for colorectal cancer, 93 percent of whom were offered screening (the scope of this inspection did not include analyzing the institution's compliance in providing colonoscopies to eligible inmates).  Preventive colorectal cancer screenings are important because early disease detection can improve health outcomes and mitigate the need for more costly treatments.  Given the importance of ensuring that inmates at risk of colon cancer have access to preventive screenings, in April 2024 we initiated

---

[12]  After receiving a draft of this report, the BOP noted that it educates inmates about how to access medical care for chronic care diagnoses and preventive health visits for routine, age-appropriate assessments and screenings and informs inmates that they are entitled to no-cost preventive health visits at appropriate intervals (recommended to occur every 3–5 years but as often as annually based on age and health risk factors) but the onus is on the inmates to seek and request this care.  The BOP added that some inmates may elect to not request medical services or to refuse medical services.

[13]  Appendix 3 (Preventive Health Care, Colorectal Cancer, and Cognitive Impairment Screening).

[14]  If an inmate is determined to be at increased risk for colorectal cancer, the BOP's CPG for Preventive Healthcare Screening (see Appendix 3 (Preventive Health Care, Colorectal Cancer, and Cognitive Impairment Screening)) refers providers to cancer prevention organizations' recommendations for colorectal cancer early detection.  Factors that increase an individual's risk for colon cancer include a history of polyps, past diagnosis of colorectal cancer, family history of and genetic predisposition to colon cancer, and inflammatory bowel disease.

C. Agnello   SE 0039

a broader evaluation of inmate colorectal cancer screening practices and clinical follow-up on colorectal cancer screening results across the BOP.

To ensure that inmates receive appropriate preventive healthcare screenings, we recommend that the BOP:

6. Ensure that FMC Devens follows the BOP's Clinical Practice Guidelines for Preventive Healthcare Screening to establish a local preventive healthcare program and utilize all members of the healthcare team in preventive healthcare.

7. Ensure that all FMC Devens inmates over age 50 are receiving preventive healthcare screenings, including cognitive impairment screening.

## Management of Diabetes

According to the BOP CPG for Preventive Healthcare Screening, an A1C level should be obtained every 3 months for a diabetic inmate with an A1C level above their individualized target, which is generally 7–7.5 percent.[15]  The guidelines further provide that an A1C level should be obtained every 6 months for a diabetic inmate with an A1C level below 7 percent.  We reviewed the medical records of 20 FMC Devens inmates with a diabetes diagnosis and found that all 20 were enrolled in a diabetes chronic care clinic and had been evaluated by a physician annually.  However, we found that 5 of the 20 diabetic inmates (25 percent) we reviewed with A1C levels above 7.5 percent had not had an A1C test every 3 months, as outlined by the BOP CPG for Preventive Healthcare Screening, preceding our inspection; the remaining 15 inmates did have A1C testing as provided for in the guidelines.

### A1C Testing

An A1C level is obtained by testing an individual's blood to determine the average amount of sugar in their blood over the preceding 3 months.

A1C testing helps clinicians and patients manage diabetes effectively by providing clinicians information to make timely adjustments to patient treatment plans and to recommend lifestyle modifications and prevention strategies.

**Source:** Appendix 3 (Management of Diabetes)

## Insufficient Oversight of Healthcare Provider Credential Files

According to BOP policy, each Health Services Unit should verify the professional credentials of all institution healthcare providers.[16]  Providers include BOP employees, Public Health Service employees, part-time employees, contract and consultant employees, and those who provide a diagnosis or treatment using telehealth.  BOP policy also requires those who are working under a practice agreement (or a collaborative practice agreement for pharmacists) to have at least one routine peer review every 2 years, which may be conducted by a peer reviewer at a BOP institution.[17]  (See the text box below for definitions of these terms.)

---

[15] Appendix 3 (Management of Diabetes).

[16] Appendix 3 (Credential Verification and Peer Review).

[17] Appendix 3 (Credential Verification and Peer Review).

C. Agnello    SE 0040

We reviewed 23 credential files (17 percent) of the 138 employees at FMC Devens required to have credentials, which included physicians, nurses, advance practice providers, a pharmacist, a physical therapist, and a psychiatrist.[18]  We found that FMC Devens failed to verify a credential file for the psychiatrist and to conduct a peer review of the pharmacist providing inmate care through a collaborative practice agreement.  The credential file reviewer at FMC Devens told us that they were unaware that the psychiatrist was providing telepsychiatry services to FMC Devens inmates.

Therefore, the credential file reviewer had not verified the psychiatrist's credential file prior to the psychiatrist providing telepsychiatry services.  We have concerns with FMC Devens's credential file accountability and verification given that the credential file reviewer was unaware of who was practicing telehealth and whether their credentials were valid.  We believe that, without verifying a provider's license, knowledge, or skills, FMC Devens is unable to ensure the quality and efficiency of care delivered to inmates.

> **Peer Review, Practice Agreements, and Collaborative Practice Agreements**
>
> **Peer review** is the routine function used to review the current knowledge and skills of BOP healthcare providers.  A peer review includes evaluating the professional care the provider gives and providing comment on areas such as clinical performance, appropriate utilization of resources, clinical judgment, and technical skills.
>
> **Practice agreements** detail specific clinical or dental duties for employees who work under a licensed independent practitioner within BOP institutions.
>
> A **collaborative practice agreement** describes a specific plan or arrangement or a specific sequence of orders, steps, or procedures to be followed in providing patient care services.
>
> **Source:** Appendix 3 (Credential Verification and Peer Review)

Similarly, the BOP requires routine peer reviews to ensure that healthcare providers have the appropriate knowledge and skills to offer healthcare to inmates.  We believe that the failure to conduct peer reviews in accordance with BOP policy could compromise the quality of healthcare delivered to inmates at FMC Devens and could also increase safety and liability risks for the BOP.

To ensure that the professional credentials of all FMC Devens healthcare providers meet BOP requirements, we recommend that the BOP:

8. Ensure that FMC Devens verifies the credential files of all providers prior to allowing them to administer care to inmates, and ensure that FMC Devens completes peer reviews in accordance with BOP policy.

## Inappropriate Inmate Placement in the Memory Disorder Unit

We reviewed the medical records of all 16 inmate patients in the MDU at the time of our inspection and determined that 25 percent (4 of 16) of those inmates were not appropriately housed in the MDU based on the criteria established by FMC Devens.  The criteria state that inmates admitted to the MDU must have been diagnosed with dementia and not be prone to violence.  We identified one inmate without a dementia diagnosis, one inmate who both lacked a dementia diagnosis and was prone to violence, and two inmates who

---

[18]  As of August 2024, FMC Devens maintained eight credential files for employees who were working there as a temporary duty location.  We did not include those eight files in our review.

C.Agnello   SE 0041

had a dementia diagnosis but were prone to violence.  Specifically, one inmate had a diagnosis of Huntington's disease, which may result in dementia; but at the time of the inspection he did not have a dementia diagnosis.[19] The second inmate had a non-dementia neurocognitive diagnosis and was also prone to violence.  He had been approved for transfer to another institution in February 2024 due to violent behavior but remained at FMC Devens at the time of our inspection.  Additionally, two inmates in the MDU had a dementia diagnosis but were prone to violence.  FMC Devens employees expressed concern with the appropriateness of inmates receiving care in the unit.  Those employees told us that, at times, FMC Devens uses the MDU as a housing unit for inmates who have behavioral issues and cannot be housed elsewhere in the institution, further stating that some of those inmates are incredibly violent and aggressive toward other inmates and MDU employees.

Housing inmates without a dementia diagnosis in the MDU results in the misuse of the bed space in this unit and limits the BOP's ability to house inmates with dementia at FMC Devens (the only MDU within the BOP).  As described in the Health Services Staffing Shortages section of this report, due to the shortage of healthcare staff, FMC Devens requested a pause in inmate admissions to the MDU, which BOP Central Office approved in April 2024.  Additionally, housing violent inmates in the MDU poses a safety risk to other MDU inmates and employees, potentially exacerbates staffing issues, and can create liability issues for the BOP.

To ensure that the BOP's only MDU houses only those inmates who meet FMC Devens's criteria, we recommend that the BOP:

9.  Ensure that inmates admitted to and housed in the Memory Disorder Unit are appropriately placed in accordance with FMC Devens's established criteria.

## Potentially Dangerous Medical Inmate Companion Program Practices

FMC Devens operates a medical inmate companion program to assist and support inmates who are unable to independently perform one or more activities of daily living, such as brushing teeth, combing hair, or putting on shoes.  Inmate companions also assist with escorting inmates to medical appointments and pill lines and encourage compliance with medical treatment.  The BOP prohibits medical inmate companions from assisting with toileting, bathing, and changing undergarments and incontinence products; viewing or touching genitalia; and performing certain medical activities such as taking vital signs and administering medications.  To become a medical inmate companion, "inmates must apply, and, if hired, are trained by institution employees.  According to BOP eligibility criteria, medical inmate companions must not have had a significant incident report in the prior 12 months; a history of perpetrating sexual abuse, predatory behaviors, and violent crimes; medical restrictions; or physical limitations that could impede their ability to complete inmate companion tasks.  At the time of our inspection, FMC Devens had 22 medical inmate companions working in the medical housing units.

We found that some medical inmate companions at FMC Devens did not meet the BOP's eligibility criteria and some were performing prohibited duties.  Of the 22 medical inmate companions at FMC Devens, we found that 14 percent (3 of 22) had committed a sexual offense, 36 percent (8 of 22) had committed a violent offense,

---

[19] Huntington's disease is an inherited disorder that causes nerve cells in parts of the brain to gradually break down and die.  National Institute of Neurological Disorders and Stroke, "Huntington's Disease," www.ninds.nih.gov/health-information/disorders/huntingtons-disease#:~:text=What%20is%20Huntington's%20disease%3F,as%20well%20as%20other%20areas (accessed July 19, 2024).

C.Agnello   SE 0042

and 27 percent (6 of 22) were Medical Care Level 4 inmates with medical restrictions. These companions should have been prohibited from becoming a medical inmate companion based on the BOP's eligibility criteria. When we asked Health Services Department employees what duties medical inmate companions were performing at FMC Devens, they said that some medical inmate companions were performing duties outside the roles and responsibilities of an inmate companion due to the Health Services Department staffing crisis and nurse shortages. These duties included assisting with showers and cleaning genitalia because they were told by Health Services Department employees that they needed to perform those duties due to nursing vacancies. We are concerned that FMC Devens is not following the BOP's medical inmate companion program criteria, which we believe may place inmates requiring companion assistance at an increased risk for violence, abuse, victimization, or improper medical care; may put employees at increased safety and liability risks; and may have medical inmate companions performing duties that they are not qualified to perform or being placed in situations that could expose them to allegations of abuse and misconduct.

To ensure that medical inmate companions are appropriately selected for their roles and not engaging in prohibited duties, we recommend that the BOP:

10. Ensure that FMC Devens adheres to BOP policy on medical inmate companion screening and hiring and that FMC Devens employees screening and hiring these companions are trained on the policies and procedures.

11. Ensure that FMC Devens evaluates the roles and responsibilities of medical inmate companions to ensure that they are not performing duties outside the scope of the inmate companion program.

## Safety and Security

In addition to our concerns about staff availability and the effect that low staffing can have on the safety of institution operations, as described in the Staffing Challenges section of this report, we identified two other safety and security issues at FMC Devens during our inspection. First, we found that Correctional Officers failed to complete about half of the required inmate-monitoring rounds in the housing units that hold inmates at the highest medical and mental health care levels. Second, we found multiple deficiencies in the institution's radio system, including "dead zone" areas that lack adequate radio reception, as well as outdated radios. We describe both of these safety and security issues in greater detail below.

### Failure to Complete Rounds

FMC Devens Correctional Officers are required to adhere to housing unit-monitoring instructions, also known as post orders, which state that Correctional Officers must complete irregularly timed rounds within each 30-minute block of time while working a post in a housing unit. However, after reviewing 280 hours of overnight security camera footage, we found that collectively only half of the required rounds (53 percent) were completed in the MDU, hospital unit, and transitional mental health step-down unit, leaving vulnerable inmates unobserved for multiple hours each night. This is a significant concern because inmates housed in these units pose an increased risk not only for self-harm and suicide, but also for medical-related emergencies such as seizures and falls. Given that rounds are essential checks to verify inmate well-being, a manager in FMC Devens's Correctional Services Department expressed frustration at the lack of rounds completed by Correctional Officers we observed during the portion of the video footage we reviewed while

on site.  Our observations of incomplete inmate-monitoring rounds are consistent with findings in prior work, including two of our previous inspections (see the text box below).

---

**Relevant Prior OIG Work and Related Recommendations:  Inmate-Monitoring Rounds**

The OIG's June 2023 report on its investigation and review of the BOP's custody, care, and supervision of Jeffrey Epstein at Metropolitan Correctional Center New York found many inmate-accountability deficiencies.  For example, the OIG's investigation determined that staff failed to conduct mandatory rounds and inmate counts, resulting in Epstein being unobserved for hours before his death.  As such, the OIG recommended that the BOP evaluate its methods of accounting for inmate whereabouts and well-being and make changes, as appropriate, to improve those methods through policy, training, or other measures.  As of the publication of this report on FMC Devens, this recommendation remains open.

Our February 2024 report that evaluated issues surrounding BOP inmate homicide, suicide, accidental, and unknown deaths found that BOP staff did not sufficiently conduct required rounds or counts of inmates, which are important opportunities to monitor inmate well-being, in over a third of the inmate suicides during the scope of the evaluation.  Such deficiencies helped foster conditions in which inmates were able to advance their suicidal ideations and created increased opportunities for them to die by suicide.  The number of inmate suicides increased each year from fiscal year (FY) 2019 to FY 2021, the most recent years in the evaluation scope, and FY 2021 had the highest number (31) of suicides in a single year during the scope.  While this report did not make any recommendations regarding inmate-monitoring rounds, it did encourage the BOP to take swift action to address our 2023 Epstein report recommendations to evaluate inmate-accountability methods.

Our inspections of FCI Tallahassee and FCI Sheridan found that Correctional Officers did not always conduct inmate-monitoring rounds in housing units.  At FCI Tallahassee, during our on-site review of video footage, we found that a staff member failed to make required rounds during two consecutive overnight shifts in the male detention center, leaving inmates unobserved for multiple hours each night.  Our finding was consistent with findings of the BOP Program Review Division's August 2022 Correctional Services program review, conducted by staff external to FCI Tallahassee, which found that staff were not always conducting rounds in the Special Housing Units consistent with BOP policy.  At FCI Sheridan, we found that, during an evening just prior to our inspection, Correctional Officers conducted less than half of the required twice-hourly rounds in three housing units between 9:30 p.m. and 6 a.m.  Further, we learned that on certain evenings the sole employee assigned to supervise the Camp at FCI Sheridan may need to respond to the medium-security prison or detention center in the event of an emergency.  When this happens, Camp inmates are left unsupervised.  Although we did not collect evidence to determine the exact number of times this has occurred, FCI Sheridan employees told us that it happens regularly.

See Appendix 2, Items II, III, VI, and VIII, for more information about these reports.

---

## Ongoing Camera Upgrades and Persistent Radio Deficiencies

The OIG has repeatedly identified deficiencies in the BOP's security camera system that affect institutional safety and security across the BOP.  Our previous findings related to security camera deficiencies (see Appendix 2, Items IX and X) contributed to the Prison Camera Reform Act of 2021, which required the BOP to address these deficiencies and make necessary upgrades to security camera systems BOP-wide.  Additionally, as described in the text box below, the Prison Camera Reform Act required the BOP to address radio system deficiencies at all BOP institutions.  At the time of our inspection, fiberoptic cable was being installed at FMC Devens to upgrade analog security cameras to digital and 100 additional security cameras were being installed to cover blind spots.

However, we are concerned that radio system deficiencies were not being addressed at FMC Devens.  At the time of our inspection, we found the following deficiencies with FMC Devens's radio system:

- Employee radios did not receive radio signals in some parts of the institution, namely the hospital and areas below ground.  The lack of radio reception in the hospital areas could impede the medical team's ability to respond to a medical emergency and call for additional assistance, if needed, and could inhibit the response of Correctional Officers during nonmedical emergencies, jeopardizing the safety of employees and inmates.

- Employee radios were beyond their serviceable dates, rendering many radios unrepairable.  Institution management told us that the battery life of the radios has degraded to the point that radios lack sufficient battery life to last the length of an employee's shift.  The outdated radios also lack a "man down" function, as described in the text box.

---

**Prison Camera Reform Act of 2021:  Radio System Upgrades**

The Prison Camera Reform Act of 2021 required the BOP Director to address deficiencies and make necessary upgrades to radio systems to ensure the health and safety of employees and inmates.  Specifically, the Act required the BOP to identify and plan how to address radios that lack an emergency notification feature, known as a "man down" function, which automatically sends an alert and transmits the location of that radio in the event the wearer is in a prone position.  Additionally, the Prison Camera Reform Act required the BOP Director to ensure that BOP facilities have security camera coverage and capabilities necessary to ensure the documentation and accessibility of video evidence pertaining to misconduct, maltreatment, or criminal activity within correctional facilities.

**Source:**  Prison Camera Reform Act of 2021

---

FMC Devens employees repeatedly expressed concern and frustration with the radios, informing us that these deficiencies are a life safety risk.  After receiving a draft of this report, the BOP told us that repairs were made to FMC Devens's radio signal system to improve radio reception in the hospital building.  We did not return to FMC Devens to assess the updates to the system.

## Inmate Programming

As required by the FIRST STEP Act of 2018 (FSA), BOP institutions conduct a needs assessment on all sentenced inmates entering their custody to identify specific Evidence-Based Recidivism Reduction programs and Productive Activities that will best prepare the inmates for their reentry into society.[20]  We found that FMC Devens offered various psychology-based and educational programs to its inmates.  However, employee shortages in the Psychology Services and Education Departments, as well as the augmentation of non-custody employees into Correctional Officer posts, created significant backlogs for these programs.  As a cumulative result of these issues, waitlists for many inmate programs exceeded 100 names, only 1 skills-based vocational program was offered, and the FSA-funded LifeSkills Laboratory program was completely unused.

On average, FSA programs offered by the Psychology Services Department had the longest waitlists across the institution, with the waitlist for the Anger Management course holding 237 inmates (25 percent of FMC Devens's inmate population) at the time of our inspection.  Psychology Services Department employees attributed the long waitlists to staffing challenges and the lack of available psychologists to facilitate programs at FMC Devens (as described in the Psychology Services Staffing Shortages section of this report).

---

[20]  18 U.S.C. § 3632(a).

C.Agnello    SE 0045

Due to staffing challenges, the Psychology Services Department also had to prioritize programming for inmates with higher mental health care levels, leaving inmates with lower mental health care levels with a lack of programming and resources.

Similarly, insufficient staffing levels in the Education Department limited FMC Devens from offering General Education Diploma courses, the Commercial Driver's License program at the Camp, and the Certified Nursing Assistant program at the FMC.  As a result, the equipment and materials for these courses sat unused.

We also found that FMC Devens has only one vocational program offered for the entire institution; this was its Culinary Arts Program, which included a Barista Program.  Moreover, this program had space for only 10 inmates to participate and had 70 inmates on a waitlist.  The Culinary Arts Program is designed to train inmates to be better equipped to obtain jobs in the food services industry upon release from prison, and the food and beverages prepared by inmates are made available to FMC Devens employees for purchase. See the photographs below for examples of the Culinary Arts Program.

 

*Left,* Culinary Arts Program Weekly Menu Board, *Right,* Culinary Arts Program Barista Program Bar

**Source:**  OIG, April 2024 (Left Image Employee Faces Blurred and Right Image Product Names and Logos Blurred)

 

*Left,* Culinary Arts Program "Surf and Turf" Lunch, *Right,* Culinary Arts Program Dessert

**Source:**  OIG, April 2024

## LifeSkills Laboratory

The LifeSkills Laboratory is a BOP-wide initiative started in 2020 to help inmates with serious mental illnesses be better prepared upon release from prison to practice routine daily life skills, including health and hygiene, budgeting and shopping, manners and self-advocacy, cleaning and clothing care, and cooking. A BOP institution's LifeSkills Laboratory space includes a model store with a banking area, laundry room, and kitchen; see the photographs below for the space at FMC Devens.

 

*Left,* LifeSkills Laboratory Kitchen, *Right,* LifeSkills Laboratory Laundry Room

**Source:**  OIG, April 2024 (Left and Right Image Product Names Blurred)

 

*Left and Right,* LifeSkills Laboratory Store

**Source:**  OIG, April 2024 (Left and Right Image Product Names Blurred)

In FY 2021 FMC Devens received $150,000 of FSA funds as one of three BOP institutions selected to pilot the initial implementation of the FSA LifeSkills Laboratory program.  With those funds, the institution renovated available Psychology Services Department space to create a brand new LifeSkills Laboratory, which was completed in FY 2023.  However, as of FY 2025, FMC Devens had yet to enroll inmates in this program because it had not been allotted a Specialty Treatment Program Specialist position to oversee the program

until FY 2024 and had not filled the vacant position as of the beginning of FY 2025.  We are concerned that, 3 years after FMC Devens received funding to be a pilot site, the LifeSkills Laboratory there is not operational and inmates are not benefiting from this program.  As of June 25, 2024, 10 BOP institutions, including FMC Devens, had been approved and had received FSA funding for a LifeSkills Laboratory.  However, only one institution, U.S. Penitentiary Allenwood, had been fully activated.  Given the importance of FSA programming, in November 2024 we initiated a broader evaluation of the BOP's implementation and operation of FSA programming.

## Physical Conditions and Infrastructure

As we have observed at other BOP institutions, we found that FMC Devens has several unfunded major infrastructure and equipment repair projects that present safety and security issues.  As of February 2024, FMC Devens management estimated that the total cost to complete those projects was $15 million.  We are concerned that, if these repairs are not made soon, equipment will fail, which would not only negatively affect the conditions of confinement for inmates but would also cause repair and replacement costs to exceed current estimates.  This issue is not unique to FMC Devens.  The BOP found that weakened roofs across its institutions contributed to damaged security systems due to water intrusion.[21]  The BOP estimated in January 2024 that it had a $3 billion backlog of infrastructure maintenance and repairs across all of its institutions.

FMC Devens Facilities Department employees told us that many of the institution's systems are approaching the end of their projected lifespan and need to be updated and that roofs need repair.  The costliest proposed repair project at FMC Devens, estimated at $8 million, is to replace the FMC's heating and cooling systems.  Additionally, repairs to the FMC's roofs are estimated at $4 million.  FMC Devens requested funds to address these issues through its Regional Office; however, due to the BOP's limited budgetary resources for infrastructure repair and replacement, the request was unfunded at the time of our inspection.

During our inspection, we saw evidence of significant water intrusion caused by compromised roofs throughout the FMC, including multiple housing units, employee offices, the chapel, the optometry examination room, and the dialysis unit.  In one instance, an employee moved an inmate to a different cell due to water intrusion.  Another employee expressed concern that water intrusion in the FMC's optometry examination room would damage expensive equipment and was also a slip hazard.  See the photographs below for evidence of water damage throughout the institution.

---

[21]  This data is included in a document submitted by DOJ to the U.S. Senate Committee on the Judiciary on November 7, 2024, titled "A Funding Proposal to Address Critical Safety Needs Across the Federal Prison System."

C. Agnello   SE 0048

  

*Left,* Water Damage to the Ceiling in the Medical Office Area; *Middle,* Equipment in the Optometry Examination Room Covered to Prevent Damage from Water Intrusion; *Right,* Buckets Used to Catch Water and Covers over the Optometry Equipment to Prevent Water Damage

**Source:** OIG, April 2024 (Middle Image Darkened to Highlight Its Subject and Right Image Product Names and Logos Blurred)

  

*Left,* Ceiling Tiles Missing above a Bed; *Middle,* Water Damage to a Housing Unit's Ceiling; *Right,* Buckets in Front of Cells below a Water-damaged Ceiling

**Source:** OIG, April 2024 (Right Image Faces Blurred)



*Left,* Water Damage to the Ceiling in the Chapel; *Middle,* Ceiling in an Employee's Office Showing Signs of Water Intrusion above the Computer and Desk Chair; *Right,* Trash Can Used to Catch Water Leaking from the Ceiling near an Employee's Office

**Source:** OIG, April 2024 (Middle Image Darkened to Highlight Its Subject and Product Names and Logos Blurred)

Although not identified by the BOP as in need of significant repair or replacement, we found three additional areas of concern: inoperable showers in medical housing units, shower floor mats in the medical housing units that were misaligned and could cause falls, and missing mortar in the Special Housing Unit's (SHU) recreation walls. Specifically, we found that some of the inmate shower stalls inside the medical housing units were not working, which required inmates in those areas to use shared shower stalls in the hallways rather than in their own cells. The shared shower stalls were limited to four stalls in each housing unit, and only one shower stall in each housing unit was designated as handicap accessible. As this is an area that houses Medical Care Level 3 and 4 inmates, the lack of handicap-accessible showers and the inability of inmates to use their own, individual stalls could make it more difficult to shower for those with disabilities and for those who have medical equipment they need to use or clean in the shower.

We also found, as shown in the photograph below, that the nonslip shower mats in the communal shower stalls in one medical housing unit did not fully cover the shower floors and were misaligned. Inmates in this housing unit were concerned that the shower mats presented a slipping risk to inmates with disabilities. When we discussed this concern with FMC Devens management, they said that they would address the issue. After the on-site portion of our inspection, FMC Devens reported that it had repainted the majority of the shower stall flooring in the medical housing units with abrasive flooring paint, as shown in the photograph below, and repositioned mats under shower chairs in the shower stalls.




*Left,* Two of the Shared Shower Stalls in a Medical Housing Unit's Hallway, *Right,* an Inoperable Shower Stall in an Inmate's Cell That the Inmate Was Using for Storage, Located in a Medical Housing Unit

**Source:** OIG, April 2024




*Left,* Medical Housing Unit's Shower Stall with Misaligned Mats That Were a Tripping Hazard, *Right,* Housing Unit's Shower Stall Sprayed With an Abrasive Flooring Paint After the On-site Portion of Our Inspection

**Sources:** *Left,* OIG, April 2024, *Right,* FMC Devens Employee, July 2024

C.Agnello   SE 0051

We also found multiple areas of missing mortar between bricks in the SHU recreation yard, which serves as a barrier between the SHU's separate outdoor recreation area and a sidewalk used by inmates in the general population (see the photographs below).  We believe that there are safety and security risks associated with the missing mortar due to the dual accessibility.  For example, inmates could pass messages and contraband through the holes.  We are also concerned that inmates could further damage the mortar by chipping away at the damaged locations to enlarge the access points.



*Left,* a Hole in the Mortar of the SHU's Recreation Yard Wall, *Right,* Signs of Degraded Mortar on the SHU's Recreation Yard Wall

**Source:**  OIG, April 2024

---

### Relevant Prior OIG Work and Related Recommendations:  Infrastructure

In May 2023, the OIG reported that BOP institutions had a large and growing list of unfunded modernization and repair needs and that the BOP was unable to address these needs because it lacked a strategy to do so.  Further, we found that the BOP had historically failed to request funding to address its infrastructure needs.

To address this issue, the OIG recommended that the BOP develop an infrastructure strategy to increase the overall effectiveness of facilities management and to develop and implement key performance indicators to track whether the BOP is meeting its infrastructure goals.  As of the publication of this report on FMC Devens, these recommendations remain open.

See Appendix 2, Item XV, for more information about this report.

# Conclusion and Recommendations

## Conclusion

Our unannounced inspection at FMC Devens identified several serious issues related to staffing, inmate healthcare quality, failure to complete rounds, infrastructure, inmate programming, and radio system deficiencies.  Most significantly, substantial shortages of Correctional Officers and healthcare employees— which is an issue at many BOP institutions but raises particularly serious concerns at a medical institution— have created widespread and troubling operational challenges at FMC Devens that substantially affect the health, welfare, and safety of employees and inmates.

Particularly concerning, we found that FMC Devens's Correctional Services Department had only 161 of 201 authorized positions filled (80 percent) and the Health Services Department had only 113 of 149 positions filled (about 76 percent) at the time of our inspection.  Also concerning, during the on-site portion of our inspection and shortly thereafter, the medical institution had 1 physician and the Clinical Director (who is also a physician) to manage the care of the entire inmate population (approximately 941 inmates):  2 of the institution's 6 physicians were on extended leave without pay and 3 other physician positions were vacant. The Clinical Director, who leads the provision of preventive health services and provides standing orders for nurses, retired in June 2024; the position remained vacant as of October 5, leaving the FMC without this critical medical role filled and only one physician at the institution to provide daily patient care.  Other vacancies within the Health Services Department included approximately half of the institution's pharmacy positions, approximately a quarter of its nursing positions, and its Chief Dental Officer and Deputy Chief Psychologist positions.  Only 20 of 33 positions (61 percent) in the Psychology Services Department were filled.  We are concerned that the staffing crisis at FMC Devens has cascading effects on its ability to care for its inmates and limits the quality and quantity of medical services it can provide, including for inmates who were transferred there expressly for its specific medical programs.

We also identified concerns related to the quality of healthcare provided to inmates, including potentially dangerous medication distribution practices, lack of preventive healthcare screening, inappropriate placement of inmates in the Memory Disorder Unit (MDU), insufficient oversight of healthcare provider credential files, and inconsistent processes for requesting and accessing care.  Specifically, we observed BOP employees providing buprenorphine and naloxone to inmates at the Camp during the routine morning medication administration, along with other inmates receiving daily medications, rather than in separate pill lines.  The employees also did not directly supervise inmates who received buprenorphine and naloxone for the duration of the medication administration and consumption and did not conduct mouth checks before or after administration to ensure that diversion did not occur, which presents a diversion risk.  We also found that 57 outside medical appointments that had been ordered for inmates were an average of 53 days overdue from being scheduled at the time of our inspection due to outside medical providers canceling appointments and a lack of employees at FMC Devens to escort inmates to scheduled appointments while maintaining coverage of necessary posts at the institution.

We were also concerned to find that FMC Devens lacked oversight of its contracted company that manages outside medical records, which caused the delayed receipt of outside medical care records following an inmate's visit to an outside physician and resulted in a significant discrepancy between the number of pending outside medical records that the contracted company indicated it needed to send to FMC Devens

and the number of outside medical records that FMC Devens was waiting to receive.  After an outside medical visit or hospital stay is complete, the company is responsible for securing the inmate's medical records and, pursuant to the contract, submitting the records to FMC Devens within 10 business days of the medical appointment or hospital discharge.  We believe that the lack of oversight of outside medical records could lead to fragmented inmate care and a lack of prompt follow-up care by the institution that could exacerbate conditions that inmates were sent to outside providers to address.

Subsequently, we found inconsistencies regarding both inmates' access to medical care and routine screening of inmates over age 50 for preventive healthcare and cognitive impairment.  There appeared to be inconsistency in how FMC Devens nursing employees determined what constituted a need for sick call and how that need was tracked.  The inconsistency in practice and procedure may limit an inmate's ability to be seen and receive medication in a timely manner, which could negatively affect their overall health.  Additionally, we reviewed the medical records of 21 inmates over age 50 to determine whether they were receiving preventive healthcare screenings and found that only 48 percent (10 of 21) of the inmates had received a preventive health screening and none of the 21 inmates over age 50 had received a cognitive impairment screening as part of their preventive healthcare during the previous year.  We also determined that not all inmates with a diabetes diagnosis were tested within required BOP guidelines and not all healthcare provider credential files were verified as directed by BOP policy.  Further, we found that a quarter of the inmates were not appropriately housed in the MDU, the BOP's only unit designed specifically for inmates with dementia.  Finally, the OIG found that some inmates serving as medical companions were not eligible to participate in the program and some performed duties that were both outside the scope of the program and prohibited by the BOP.  The combination of these concerns carries multiple risks for the institution's ability to provide adequate, continuous, and follow-up care to inmates.

Further, we identified two issues concerning the institution's safety and security.  First, Correctional Officers failed to complete about half of the required inmate-monitoring rounds in the housing units that hold vulnerable inmates at the highest medical and mental health care levels (the MDU, hospital unit, and transitional mental health step-down unit).  This is notable because inmates housed in these units pose an increased risk for medical-related emergencies, self-harm, and suicide.  Second, we found multiple deficiencies in the institution's radio system, including "dead zones" where employee radios do not receive radio signals, namely the hospital areas, and we discovered that some radios were beyond their serviceable dates, rendering them outdated.  Nonworking radios impede employees' response to medical and nonmedical emergencies, thus jeopardizing inmates' and employees' safety.

We also noted concerning findings pertaining to the lack of sufficient inmate programming.  Namely, because of staffing shortages, many psychology and education-based programs offered to inmates have large waitlists, with over 100 inmates, and only 1 skills-based vocational program was offered to inmates at the time of our inspection.  Moreover, the one vocational training program had only 10 slots available and a waitlist of 70 inmates.  Additionally, the institution's LifeSkills Laboratory, a space designed for inmates with serious mental illnesses to practice routine skills—which received $150,000 in FIRST STEP Act funds—had yet to be used for programming since its construction 3 years prior to our inspection.

Lastly, FMC Devens had serious infrastructure issues, with many unfunded repair projects, including roof repairs and replacement of cooling and heating systems, which it estimated would cost $15 million.  The OIG noted the effects of water intrusion throughout the institution, including within housing units, employee

offices, and rooms with optometry and dialysis equipment. If the repairs are not made soon, equipment and infrastructure failure could exacerbate repair costs and negatively affect inmates' conditions of confinement.

## Recommendations

To ensure effective operations at FMC Devens and safe conditions of confinement for the inmates housed there, we recommend that the BOP:

1. Ensure that FMC Devens Executive Leadership and the Central Office's Human Resource Management Division discuss the staffing projection tool methodology and how it compares with FMC Devens Executive Leadership's understanding of its current and potential future mission needs to ensure greater alignment between stakeholder staffing projections.

2. Ensure that FMC Devens follows BOP guidance for buprenorphine and naloxone administration and observation and that all FMC Devens employees who administer medication receive training on BOP guidance and policies for medication administration.

3. Implement a plan to address the medical record backlog at FMC Devens.

4. Ensure that FMC Devens develops a consistent and accurate medical record tracking procedure with the contracted company that includes regular and recurring reconciliation of outside inmate medical records between FMC Devens and the contracted company.

5. Ensure that FMC Devens follows the BOP Patient Care Policy for sick call and provides training to all FMC Devens Health Services Department employees on the policy, as well as on FMC Devens sick call procedures.

6. Ensure that FMC Devens follows the BOP's Clinical Practice Guidelines for Preventive Healthcare Screening to establish a local preventive healthcare program and utilize all members of the healthcare team in preventive healthcare.

7. Ensure that all FMC Devens inmates over age 50 are receiving preventive healthcare screenings, including cognitive impairment screening.

8. Ensure that FMC Devens verifies the credential files of all providers prior to allowing them to administer care to inmates, and ensure that FMC Devens completes peer reviews in accordance with BOP policy.

9. Ensure that inmates admitted to and housed in the Memory Disorder Unit are appropriately placed in accordance with FMC Devens's established criteria.

10. Ensure that FMC Devens adheres to BOP policy on medical inmate companion screening and hiring and that FMC Devens employees screening and hiring these companions are trained on the policies and procedures.

C. Agnello   SE 0055

11. Ensure that FMC Devens evaluates the roles and responsibilities of medical inmate companions to ensure that they are not performing duties outside the scope of the inmate companion program.

# Appendix 1:  Purpose, Scope, and Methodology

## Standards

The DOJ OIG conducted this inspection in accordance with the Council of the Inspectors General on Integrity and Efficiency's Quality Standards for Inspection and Evaluation (December 2020).

## Purpose and Scope

The OIG has determined that it can enhance the effectiveness of its oversight, as well as its ability to alert the BOP of concerns, by conducting short-notice and unannounced inspections of BOP facilities, as appropriate.  Pursuant to the OIG's planned procedures for initiating an inspection, which we had previously shared with the BOP, the OIG notified FMC Devens at approximately 8 a.m. on April 22, 2024, that it would be initiating an inspection beginning at noon that day.  The OIG team, which consisted of 10 OIG employees and 3 medical subject matter experts contracted by the OIG, conducted the on-site inspection Monday, April 22, through Friday, April 26, 2024.  The focus of our inspection was the state of institution operations at the time of our inspection; although, for certain portions of our analysis, our scope included roughly the year that preceded our inspection, beginning around April 2023.

We selected FMC Devens as the site of our fifth inspection to better understand and assess the conditions of confinement for male inmates at a Federal Medical Center.  The scope of this inspection did not include specialized testing to definitively determine, for example, the potential presence of mold or other hazardous substances.

## Inspection Methodology

To better understand FMC Devens's operations, we toured the institution, interviewed inmates and employees, and reviewed its operational records.

### Observations

We toured the interior and exterior of the administrative-security institution and its adjacent minimum-security prison camp, including general population inmate housing units; Psychology Services Department housing units; Health Services Department housing units; the Special Housing Units; Health Services Department spaces; front lobby employee entrances and screening areas; programming areas used by the Psychology, Education, and Recreation Departments; the mail room; the commissary; laundry areas; the evidence storage area; the visitation room; inmate intake and screening areas; Facilities Department areas; food storage warehouses; and food preparation and dining areas.

We also reviewed security camera footage, as well as the functionality of the security camera system. Further, we tested ambient temperatures throughout the institution, as well as the functionality of showers, sinks, and toilets in inmate housing areas.

C. Agnello   SE 0057

## Interviews

We conducted on-site interviews with FMC Devens inmates who were housed in the general population and medical and mental health care units, as well as on-site interviews with institution employees.  Employees we interviewed included the Warden; Associate Wardens, one of whom serves as the institution's Prison Rape Elimination Act Coordinator; supervisory and nonsupervisory Correctional Officers; healthcare providers, managers, and employees; case managers; psychologists; food service employees; and employees responsible for institution safety, facilities management, human resources, and the trust fund program.  Following our on-site work at FMC Devens, we conducted virtual follow-up interviews with select FMC Devens employees and select employees at the BOP's Central Office, as well as with the institution's contracted comprehensive medical services company.

## General Document Review and Analysis

We reviewed FMC Devens records related to facilities management, staffing levels, use of overtime and augmentation, use of restrictive housing, provision of inmate healthcare, inmate mental healthcare, food service, inmate discipline, employee misconduct, sexual abuse reporting and tracking, inmate programming, and FIRST STEP Act implementation.

## Healthcare-related Review and Analysis

We reviewed FMC Devens's operational documentation related to the provision, access, and quality of inmate medical and mental healthcare services provided.  Specifically, our review included the implementation of the BOP's Clinical Practice Guidelines in areas of preventive healthcare screening, cognitive impairment screening, tuberculosis screening, medication administration, and management of diabetes; procedures for inmate placement in medical and mental healthcare housing units; management of inmate medical records and requests for care; scheduling of specialty appointments for medical services offered on site and in the community; and healthcare staff credentials, including licensure requirements, privileges, and practice agreements.  Additionally, we conducted several case studies on inmate mortalities and continuity of care concerns.

## External Subject Matter Experts Assisting the OIG

To assist the OIG in its efforts to assess the provision of healthcare to FMC Devens inmates, the OIG contracted the services of three healthcare subject matter experts:  one physician and two registered nurses.

# Appendix 2:  DOJ OIG and Other Oversight Agency Related Work

I.     For the FCI Waseca **inspection report**, see DOJ OIG, *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Waseca*, Evaluation and Inspections (E&I) Report 23-068 (May 2023), oig.justice.gov/reports/inspection-federal-bureau-prisons-federal-correctional-institution-waseca.

II.    For the FCI Tallahassee **inspection report**, see DOJ OIG, *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Tallahassee*, E&I Report 24-005 (November 2023), oig.justice.gov/reports/inspection-federal-bureau-prisons-federal-correctional-institution-tallahassee.

III.   For the FCI Sheridan **inspection report**, see DOJ OIG, *Inspection of Federal Bureau of Prisons' Federal Correctional Institution Sheridan*, E&I Report 24-070 (May 2024), oig.justice.gov/reports/inspection-federal-bureau-prisons-federal-correctional-institution-sheridan.

IV.    For the FCI Lewisburg **inspection report**, see DOJ OIG, *Inspection of Federal Bureau of Prisons' Federal Correctional Institution Lewisburg*, E&I Report 24-113 (September 2024), oig.justice.gov/reports/inspection-federal-bureau-prisons-federal-correctional-institution-lewisburg.

V.     For prior Government Accountability Office (GAO) reporting on **BOP staffing levels**, see GAO, *Bureau of Prisons:  Opportunities Exist to Better Analyze Staffing Data and Improve Employee Wellness Programs*, GAO Report 21-123 (February 2021), gao.gov/products/gao-21-123 (accessed November 6, 2024).

VI.    For prior OIG reporting on BOP inmate **deaths in custody**, see DOJ OIG, *Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions*, E&I Report 24-041 (February 2024), oig.justice.gov/reports/evaluation-issues-surrounding-inmate-deaths-federal-bureau-prisons-institutions.

VII.   For prior OIG reporting on the BOP's use of **overtime**, see DOJ OIG, *Management Advisory:  Analysis of the Federal Bureau of Prisons' Fiscal Year 2019 Overtime Hours and Costs*, Audit Report 21-011 (December 2020), oig.justice.gov/reports/management-advisory-analysis-federal-bureau-prisons-fiscal-year-2019-overtime-hours-and.

VIII.  For additional prior OIG reporting on the BOP's **staffing challenges**, see DOJ OIG, *Investigation and Review of the Federal Bureau of Prisons' Custody, Care, and Supervision of Jeffrey Epstein at the Metropolitan Correctional Center in New York, New York*, Investigations Report 23-085 (June 2023), oig.justice.gov/reports/investigation-and-review-federal-bureau-prisons-custody-care-and-supervision-jeffrey.

IX.    For prior OIG reporting on the insufficiency of the BOP's **security camera systems** and **contraband introduction** at BOP institutions, see DOJ OIG, *Review of the Federal Bureau of Prisons' Contraband Interdiction Efforts*, E&I Report 16-05 (June 2016), oig.justice.gov/reports/review-federal-bureau-prisons-contraband-interdiction-efforts.

C.Agnello   SE 0059

X.    For additional prior OIG reporting on the insufficiency of the BOP's **security camera systems**, see DOJ OIG, *Management Advisory Memorandum: Notification of Needed Upgrades to the Federal Bureau of Prisons' Security Camera System*, E&I Report 22-001 (October 2021), oig.justice.gov/reports/management-advisory-memorandum-notification-needed-upgrades-federal-bureau-prisons-security.

XI.    For prior OIG reporting on the BOP's **medical staffing challenges**, see DOJ OIG, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, E&I Report 16-02 (March 2016), oig.justice.gov/reports/review-federal-bureau-prisons-medical-staffing-challenges.

XII.    For additional prior OIG reporting on the **BOP's medical staffing challenges**, see Pandemic Response Accountability Committee, *Review of Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic* (September 2023), oversight.gov/sites/default/ files/oig-reports/PRAC/healthcare-staffing-shortages-report.pdf (accessed November 6, 2024).

XIII.    For prior OIG reporting on the BOP's scheduling of **outside medical visits**, see DOJ OIG, *Audit of the Federal Bureau of Prisons Comprehensive Medical Services Contracts Awarded to the University of Massachusetts Medical School*, Audit Report 22-052 (March 2022), oig.justice.gov/reports/audit-federal-bureau-prisons-comprehensive-medical-services-contracts-awarded-university.

XIV.    For prior OIG reporting on **BOP staffing levels**, see DOJ OIG, *Limited-Scope Review of the Federal Bureau of Prisons' Strategies to Identify, Communicate, and Remedy Operational Issues*, E&I Report 23-065 (May 2023), oig.justice.gov/reports/limited-scope-reviewfederal-bureau-prisons-strategies-identify-communicate-and-remedy.

XV.    For prior OIG reporting on the **BOP's infrastructure management challenges**, see DOJ OIG, *The Federal Bureau of Prisons' Efforts to Maintain and Construct Institutions*, Audit Report 23-064 (May 2023), oig.justice.gov/reports/federal-bureau-prisons-efforts-maintain-and-construct-institutions.

XVI.    For prior reporting on the BOP's **aging inmate population**, see DOJ OIG, *Review of the Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, E&I Report 15-05 (May 2015), oig.justice.gov/reports/review-impact-aging-inmate-population-federal-bureau-prisons.

# Appendix 3:  BOP Policies and Clinical Guidance Cited

| Topic Discussed in Report | Relevant Program Statement | Link |
|---|---|---|
| Escorted Trips | 5538.08<br>Escorted Trips<br>April 8, 2024 | www.bop.gov/policy/progstat/5538.08.pdf<br>(accessed July 8, 2024) |
| Credential Verification and Peer Review | 6027.02<br>Health Care Provider Credential Verification, Privileges, and Practice Agreement Program<br>October 12, 2016 | www.bop.gov/policy/progstat/6027_002.pdf<br>(accessed May 8, 2024) |
| Pharmacy Services | 6360.02<br>Pharmacy Services<br>October 24, 2024 | www.bop.gov/policy/progstat/6360_002.pdf<br>(accessed May 22, 2024) |
| Preventive Health Care, Colorectal Cancer, and Cognitive Impairment Screening | Preventive Health Care Screening<br>July 2022 | www.bop.gov/resources/pdfs/preventive_health_care_cg_2022.pdf<br>(accessed April 3, 2024) |
| Management of Diabetes | Management of Diabetes<br>March 2017 | www.bop.gov/resources/pdfs/201703_diabetes.pdf<br>(accessed April 12, 2024) |
| Psychology Services | 5310.17<br>Psychology Services Manual<br>August 25, 2016 | www.bop.gov/policy/progstat/5310_017.pdf<br>(accessed July 8, 2024) |
| Secure Mental Health Units | 5335.01<br>Secure Mental Health Units<br>January 23, 2023 | www.bop.gov/policy/progstat/5335.01.pdf<br>(accessed May 7, 2024) |
| Special Housing Units | 5270.12<br>Special Housing Units<br>March 5, 2024 | www.bop.gov/policy/progstat/5270.012.pdf<br>(accessed March 7, 2024) |
| Sex Offender Programs | 5324.10<br>Sex Offender Programs<br>February 15, 2013 | www.bop.gov/policy/progstat/5324_010.pdf<br>(accessed July 25, 2024) |
| Patient Care | 6031.05<br>Patient Care<br>May 14, 2024 | www.bop.gov/policy/progstat/6031.05.pdf<br>(accessed July 30, 2024) |

C. Agnello    SE 0061

| Certification and Civil Commitment of Sexually Dangerous Persons | 5394.01<br><br>[Certification and Civil Commitment of Sexually Dangerous Persons](www.bop.gov/policy/progstat/5394.01.pdf)<br><br>February 1, 2016 | www.bop.gov/policy/progstat/5394.01.pdf<br><br>(accessed September 30, 2024) |
|---|---|---|
| BOP Opioid Use Disorder Guidance | **BOP Opioid Use Disorder Guidance**<br><br>January 1, 2024 | Not applicable.  The BOP does not make this policy publicly available. |

# Appendix 4:  The BOP's Response to the Draft Report



**U. S. Department of Justice**
**Federal Bureau of Prisons**
*Central Office*

*Office of the Director*

*Washington, DC 20534*

December 6, 2024

MEMORANDUM FOR JAN HAMM, CHIEF INSPECTOR,
EVALUATIONS AND INSPECTIONS

FROM:            Colette S. Peters, Director

SUBJECT:        Response to the Office of Inspector General's (OIG) Draft Report:
                Inspection of the Federal Bureau of Prisons' Federal Medical Center
                Devens, Assignment Number A-2024-004

The Federal Bureau of Prisons (FBOP) appreciates the opportunity to formally respond to the Office of the Inspector General's (OIG) draft report: Inspection of the Federal Bureau of Prisons' Federal Medical Center Devens (the Report). Thank you for your thorough and thoughtful evaluation.

The FBOP appreciates the level of attention and detail that went into the Report.  FBOP has taken Agency-wide action to address the staffing and infrastructure challenges identified in this report.  In addition, the Federal Medical Center (FMC) Devens is actively addressing the recommendations from the Report.

**Agency-wide Actions to Address Staffing and Infrastructure Challenges**

This inspection report is one of several that have highlighted FBOP's staffing shortages and infrastructure challenges. The FBOP agrees that staffing shortages and crumbling infrastructure can create dangerous conditions in our institutions and compromise the health and security of FBOP employees and those in our care and custody. Addressing these challenges are among our top priorities. To that end, we are working closely with the Department to make the case for additional pay authorities and funding to ensure that we can fully effectuate our mission to safely house adults in custody (AICs) and prepare them for successful reentry into our communities.

Recently, the Department shared with Congress A funding proposal to address critical safety needs across the federal prison system. ("Funding Proposal"). That document sets out a 5-year plan to address FBOP's staffing and modernization and repair (M&R) challenges. The key elements of that plan are:

- Funding to implement a Special Salary Rate (SSR). FBOP has been working closely with DOJ and the Office of Personnel Management (OPM) to obtain approval for a nationwide SSR for corrections officers and nurses. We anticipate a decision from OPM in early 2025. However, FBOP will be unable to implement an SSR without additional funding. The Funding Proposal seeks $1,000,730,000 over the next five years to cover SSRs for the FBOP's current authorized levels of corrections officers and covered nurses.
- Additional funding and positions to increase CO and nurse staffing levels. The Funding Plan seeks an increase of 4,500 CO positions and 200 nurses along with $1,570,000,000 to fund those positions. The increase in positions is based on projections from the newly launched Automated Staffing Tool.
- Additional funding of $1,835,861,000 over five years to address critical M&R needs. The proposal is based on a Five-Year Capital Investment Plan (Capital Investment Plan) that FBOP developed in collaboration with the Justice Management Division (JMD) and the Office of Management and Budget (OMB).

As FBOP works to obtain additional pay authorities and resources, it continues to make progress on recruitment, retention, and M&R.

### Recruitment and Retention

As of mid-September 2024, FBOP had a net increase of almost 900 employees since January 1, 2024. In Fiscal Year (FY) 2024, FBOP increased new hires by approximately 14 percent and decreased separations by 19 percent. Additionally, as of pay period 22, there are 25 FBOP institutions with CO staffing levels at or above 95%.

Our success has extended to FSA and medical positions. FSA onboard positions nearly doubled in FY 2024. FBOP hired 331 new FSA positions, increasing total onboard from 338 positions at the end of FY 2023 to 669 positions at the end of FY 2024. In addition, FBOP achieved a 5.88% year-over-year increase in registered nurse hires and a 28.96% decrease in nurse vacancies (October 2024 vs October 2023). There was also a year-over-year increase in eligible applicants for several medical positions, including physician assistant and clinical psychologist.

We attribute our increased staffing levels to several factors, including:

- **2024 hiring initiatives**. In February 2024, the Director issued a memorandum for Chief Executive Officers focused on: (1) a renewed commitment to external hiring to expand the applicant pool to the greatest extent possible; (2) authorizing wardens to over hire for custody, medical, psychology, and FSA positions when an institution had more qualified applicants than allocated positions; and, (3) establishment of regional team of employees, determined through an application process, to serve as a "travel response team" to support institutions with the highest vacancies within their regions.
- **Nationwide Direct Hire Authority (DHA) for COs**: Direct hire authority offers a streamlined approach to federal hiring. In May 2024, OPM approved nationwide DHA for correctional officers. Previously, FBOP had direct hire authority for COs at a few institutions. The nationwide DHA has resulted in a dramatic increase in direct hire appointments. The FBOP has had 642 direct hires appointments in FY 2024 compared to

2

83 in FY 2022 and 196 in FY 2023.
- **Ongoing focus by our National Recruitment Office (NRO):** NRO continues to focus recruitment efforts on our most difficult to fill positions, including COs and medical.

Finally, on October 1, 2024, FBOP rolled out its Automated Staffing Tool (AST). The AST, which is applicable to all employee disciplines, calculates staffing levels for every kind of employee at each institution based on its unique mission and staffing guidelines. The AST calculates the optimal number of positions at each institution using standard metrics across the BOP. While this tool will not solve the staffing crisis, FBOP will use AST data to inform recruitment and retention efforts and to support Congressional budget requests. (Please see below for additional information regarding the AST.)

## M&R

FBOP continues to make strides in developing strategic approaches to address its M&R backlog. As noted above, FBOP worked with DOJ and OMB to develop the Capital Investment Plan. The plan establishes a rationale and timeline for making significant repairs required at institutions across the Agency. The plan would require $1,835,861,000 to execute, which is FBOP's assessment of what it can practically accomplish over the next five years. This funding need is included in the Funding Plan that has already been shared by Congress. In addition, FBOP plans to use the Capital Investment Plan as the basis for future Congressional budget requests.

The Capital Investment Plan is structured to ensure that all critical needs are systematically addressed. The plan is categorized into several key repair categories, each focusing on specific aspects of infrastructure and facility maintenance. By breaking down the repair needs into these specific categories, the plan aims to methodically tackle each area, ensuring that all necessary repairs and upgrades are completed in a timely and efficient manner. This structured approach not only addresses immediate repair needs but also supports planning for future maintenance, thereby promoting the long-term sustainability and functionality of the facilities. The prioritization of the five-year capital improvement plan projects is based on the following criteria:
- Safety system projects (e.g., as fire alarm, sprinkler replacement, fire pump, and duress systems projects). These projects are necessary to create a safe environment for both employees and AICs.
- Security projects. These projects are necessary to maintain secure institutions to confine offenders and protect the public.
- Infrastructure projects. These projects ensure maximum efficiency of the FBOP's physical plants resulting in safe, humane, and secure institutions.
- Bedspace impact projects. These projects are crucial to managing the AIC population by identifying and resolving offline bedspace.

Additionally, in August 2023, the FBOP hired a contractor, Guidehouse, to develop a long-term strategy to align infrastructure decisions with the FBOP's mission, including methodologies for allocating resources using short, medium, and long-range planning goals. The contractor has completed three of four deliverables (Current State Assessment; Industry Leading Practices; Develop M&R Strategic Framework) and is on track to complete the fourth deliverable

3

(Integration of Framework Report) by March 31, 2025. The FBOP anticipates using an application developed by the contractor in Spring 2025 as the regional priority lists are received by the Chief of Resource Management.

### Automated Staffing Tool (AST)

The FBOP provides the following general response regarding the AST and the steps that it is taking to ensure that AST accurately projects institution staffing needs.

**Criteria and Validation.** The selection and weighting of criteria and sub-criteria for the AST calculations are determined by a three-part methodology. First, a contractor hired by FBOP identified the drivers that have the most impact on FBOP's staffing needs, using methodologies and best practices from the industry and similar federal agencies. Second, FBOP's executive-approved staffing guidelines were analyzed, in conjunction with interviews with SMEs within these disciplines. The expertise and on-the-ground experience of the SMEs guide the AST calculations by identifying and appropriately weighting the most relevant criteria. For example, in custody, these criteria were determined to be age and size of the institution, distance to the hospital, mental health and medical care level, UNICOR presence, security level, facility type, and bed audit capacity.

External validation and independent research were conducted through similar agencies to affirm the validity of the criteria and align them with current industry standards, while identifying emerging trends that may warrant adjustments. In fact, over 400 subject matter experts were consulted in developing the AST. This comprehensive approach results in the AST providing credible and justified data-driven insights. Importantly, FBOP continues to work with institutions, including FMC Devens, to reconcile any disparate staffing projections. (See below FBOP response to Recommendation 1).

**Calculation of medical positions.** The AST projects medical positions needed to provide appropriate levels of medical care to those in our care and custody. The projections are based on patient care needs. As discussed during the FBOP's demonstration of the AST for OIG earlier this year, square footage of an institution (e.g. to accommodate office space) is not a factor in determining needed Health Services positions. FBOP Executive Leadership recognizes that additional office space will be needed at some institutions to support the AST's projections. We are evaluating the use of modular buildings or other cost-efficient options to accommodate office space needs for additional personnel.

**Institution input into AST development.** FBOP has provided all institutions and regions with multiple opportunities to discuss the AST's projections and methodology. Beginning in June 2023, with the rollout of each department, all institutions were given the opportunity to provide input and concerns regarding the position recommendations for their institution. Regarding the Correctional Services Department, HRMD participated in regional calls organized by the contractor to discuss methodology and familiarize users with the AST. In addition, all wardens and institution Human Resource Managers have user access to the AST and have been encouraged to raise questions directly to the contractor.

4

Further, at the Central Office level, each division designated one or more subject matter experts to work directly with the contractor to provide input into the appropriate criteria for departments under their area of responsibility. Each Assistant Director reviewed and confirmed the criteria prior to adopting it for use in the AST position calculations.

In August 2024, HRMD asked all Wardens to complete a survey to provide specific input on the AST position recommendations. Each Wardens was asked to confirm or provide concerns with the AST recommendations for their institutions. A significant majority of wardens agreed with the projections for their respective institution. HRMD has compiled survey results and shared them with each Regional Director to confirm any issues noted by institution leadership.

Although the goal of the AST is to standardize the methodology for calculating recommended positions, there will inevitably be outliers to the global criteria that will require individualized solutions. HRMD and the contractor have been working with wardens to ensure that they understand the AST's methodology and resolve questions and concerns to the extent possible. We note that the AST is designed to address the need for approved permanent institution staffing levels.

### Action Steps Taken by FMC Devens Since the Site Inspection

Importantly, since the time of the FMC Devens site inspection, FMC Devens has taken the below-noted actions.

### Staffing

FMC Devens has hired several new employees:

- **Doctors:** Hired one additional Medical Doctor (MD), with two other MD candidates in the hiring process.
- **Psychiatrist:** Hired psychiatrist who is scheduled to be on site at FMC Devens during pay period 24.
- **Advanced Care Level Psychologists:** Hired three Advanced Care Level Psychologists at FMC Devens. They started at FMC Devens on August 11, 2024, October 6, 2024, and November 17, 2024.
- **Physical Therapy employees:** Two additional physical therapy employees started on November 3, 2024.
- **Treatment Specialist:** A LifeSkills Lab Treatment Specialist started at FMC Devens on November 3, 2024. The Treatment Specialist is receiving training to initiate programming, and assessments have begun for AICs who were referred for programming to determine levels of support each AIC will need.
- **Corrections Officers:** FMC Devens has hired 12 COs hired since April 2024. Six (6) additional COs are scheduled to start on December 1, 2024.

### Programming

Regarding OIG's concern that staffing shortages have affected FMC Devens' ability to offer

5

programming, FMC Devens has noted that current staffing levels in the FMC Devens Education Department does not limit FMC Devens from offering GED courses; nor do staffing levels limit provision of CDL programming at the camp. Devens had 14 GED completions in FY 2024 and already has six in FY 2025. FMC Devens is establishing an MOU with the Massachusetts Registry of Motor Vehicles in order to begin the CDL program; staffing shortages are not precluding the program.

FMC Devens Psychology Services maintains a comprehensive approach to AIC care. Psychology Services prioritizes programming for inmates with higher mental health care needs, while also providing resources and programs for those with lower mental health care levels. Furthermore, as noted above, FMC Devens has hired three new psychologists, including one Staff Psychologist who offers evidence-based practice groups and First Step Act (FSA) groups to individuals with lower mental health care levels.

The FMC Devens Education Department is working to bolster meaningful and marketable skill programming at the camp. The FMC Devens Supervisor of Education (SOE) has directed one employee in the coming calendar year to specifically address needs at the camp. This employee will oversee the literacy program as well as the newly established Dog Training program. This dog training program will bring an opportunity for AICs to earn Dog Training Apprenticeships, which is a nationally recognized certificate offered by the Department of Labor. The SOE has also been working closely with Mount Wachusett College to bring the Pell Grant to Devens at the end of calendar year 2025, with the goal of offering college course work both inside the institution and at the camp. This partnership will also open the opportunity to partner with the college on vocational college credit hour earning programs.

## Safety & Security

In the Report, OIG noted a concern that employee radios did not receive a signal in some parts of the institution, namely the hospital and areas below ground, and radios were beyond their serviceable dates, rendering many radios unrepairable.

Since the time of OIG's site inspection, a repeater for the radio system at FMC Devens was repaired in May 2024. FMC Devens currently reports no "dead zones" or issues with the radio system. Moreover, FMC Devens is scheduled to receive new radios in FY 2025.

The Report also states that per post orders, "Correctional Officers must complete irregularly timed rounds within each 30-minute block of time while working a post in a housing unit." However, OIG found that "collectively only half the required rounds (53 percent) were completed in the [Memory Disorder Unit] MDU, hospital unit, and transitional mental health step-down unit, leaving vulnerable inmates unobserved for multiple hours each night."

FMC Devens understands the importance of assuring the welfare of all AICs and employees and continues to strive to ensure policy is being followed. FMC Devens employees are required to adhere to current policy requiring that they conduct 30-minute rounds not to exceed 40-minutes in all areas housing AICs in a continuous lockdown status (such as the Special Housing Unit, JA and JB and all housing units in N-building.) Employees assigned to the P building (hospital) are

6

required to conduct irregular rounds as those units are not in a continuous lock down status. Currently, FMC Devens leadership is conducting periodic reviews of video footage from the Special Housing Unit to ensure adherence to policy requirements. In addition, FMC Devens leadership will conduct periodic reviews of additional video footage from random housing units on random shifts. Further, FMC Devens leadership is sending reminders to employees about the importance of conducting rounds, as well as the requirement to read, be familiar with, and sign the post orders which detail all the required duties, including conducting rounds.

Infrastructure

In the Report, OIG found that FMC Devens has several unfunded major infrastructure and equipment repair projects that present safety and security issues, that many facility systems are approaching the end of their projected lifespan, and that the roofs need repair.

Shortly after the site inspection, shower stall flooring in medical housing units were replaced with abrasive flooring paint, and mats were repositioned under shower chairs in the shower stalls. Additionally, FBOP has included the following FMC Devens M&R projects in its Capital Investment Plan. The FY 2024 replacement generator project is funded. The remaining M&R projects are awaiting sufficient funding.

| Fiscal Year | Region | Project Name | City | State | Category | Project Description | Estimated Total Project Cost $000's | Months to Complete Estimate |
|---|---|---|---|---|---|---|---|---|
| FY24 | NER | FMC Devens | Ayer | MA | Utility Infrastructure | Replace Emergency Standby Generator | $1,008 | 18 |
| FY29 | NER | FMC Devens | Ayer | MA | Roofing | Replace Roofs | $3,900 | 18 |
| FY29 | NER | FMC Devens | Ayer | MA | Roofing | Repair Roofs | $504 | 18 |
| FY29 | NER | FMC Devens | Ayer | MA | General Improvement | Repair Asphalt | $2,100 | 12 |
| FY29 | NER | FMC Devens | Ayer | MA | Security | Replace Control PLC | $500 | 12 |
| FY29 | NER | FMC Devens | Ayer | MA | Utility Infrastructure | Replace Boiler Burners | $3,000 | 12 |
| FY30 | NER | FMC Devens | Ayer | MA | Climate Control | Replace Cooling Tower | $1,575 | 18 |

In addition to the above, FBOP offers the following responses to the Report Recommendations.

Recommendation 1: Ensure that FMC Devens Executive Leadership and the Central Office's Human Resources Management Division discuss the staffing projection tool methodology and how it compares with FMC Devens Executive Leadership's understanding of its current and potential future mission needs to ensure greater alignment

7

between stakeholder staffing projections.

**FBOP Response:** FBOP concurs with this recommendation. FMC Devens Executive Leadership is continuing ongoing communications with FBOP's Human Resource Management Division (HRMD) regarding the AST methodology and the proper staffing levels for FMC Devens.

The warden at FMC Devens completed the AST survey in August 2024. In September, FMC Devens's Executive Team, Regional Office Executive leadership, and the contractor discussed the staffing projection tool methodology.

The feedback from Executive Leadership at FMC Devens included the following:

- Number of authorized Correctional Services positions (201) should remain at current levels. This request was supported by new information related to the closure of a local hospital and the resulting need for additional positions to support hospital trips.
- Seven additional positions for Psychology.
- Decrease of 123 positions for Health Services.
- Agreement with AST projections for all other disciplines.

HRMD is continuing conversations with FMC Devens to ensure that it understands the methodology for the recommendations. In addition, HRMD and divisional SMEs will continue to engage with the institution and regional leadership to address the feedback above as well as any additional criteria or outlier issues that can be addressed for FMC Devens.

**Recommendation 2: Ensure that FMC Devens follows BOP guidance for buprenorphine and naloxone administration and observation and that all FMC Devens employees who administer medication receive training on BOP guidance and policies for medication administration.**

**FBOP Response:** FBOP concurs with this recommendation. Since the inspection, FMC Devens has ensured routine observation by Nurse Supervisors of the process for buprenorphine and naloxone administration and will continue to monitor the process closely and correct as needed.

Guidance was sent via email to all Devens Nursing Employees on April 26, 2024, regarding this medication administration at the camp facility. On May 2, 2024, FMC Devens Health Services Supervisory Clinical Nurse conducted an observational review of the FMC Devens camp MAT pill line. This review resulted in the creation of a document articulating issues and corrective actions for nursing related items on May 6, 2024. Specifically, it was noted in the review that not all nurses were conducting the MAT line and morning pill line separately and that there was not a second person available to observe during MAT administration. The review recommended that re-training be completed for nursing staff regarding the separation of MAT administration with the pill line. Additionally, the nurse manager communicated with the captain to require a camp officer to observe during the MAT pill line, including conducting mouth checks.

Subsequently, another email was sent on November 13, 2024, by the Acting Director of Nursing

8

at FMC Devens, again reminding all FMC Devens nursing employees of the relevant guidance and requirements. Additionally, all employees who administer medication will receive additional training during FMC Devens next Health Services Monthly meeting in December 2024.

Recommendation 3: Implement a plan to address the medical record backlog at FMC Devens.

FBOP Response: FBOP concurs with this recommendation, and FMC Devens Health Services Leadership has reconciled their list of pending reports and has ensured that all reports received from the comprehensive contract have been scanned into the electronic medical record and removed from the pending report list. FMC Devens continues to provide a monthly list of pending reports to the comprehensive contract representatives and will engage contract representatives more frequently to seek any time-sensitive reports.

FMC Devens Health Services Leadership and FMC Devens Contracting Specialists will continue to meet monthly and as needed to communicate expectations related to any past due pending reports. The contract representatives will complete a weekly reconciliation with FMC medical records staff until any pending reports are received.

Recommendation 4: Ensure that FMC Devens develops a consistent and accurate medical record tracking procedure with the contracted company that includes regular and recurring reconciliation of outside inmate medical records between FMC Devens and the contracted company.

FBOP Response: FBOP concurs with this recommendation. As stated in response to Recommendation 3, above, FMC Devens continues to provide a monthly list of pending reports to the comprehensive contract representatives and will engage contract representatives more frequently to seek any time-sensitive reports. FMC Devens Health Services Leadership and FMC Devens Contracting Specialists will continue to meet monthly and as needed to communicate expectations related to any past due pending reports. The contract representatives will complete a weekly reconciliation with FMC medical records staff until any pending reports are received.

Recommendation 5: Ensure that FMC Devens follows the BOP Patient Care Policy for sick call and provides training to all FMC Devens Health Services Department employees on the policy, as well as on FMC Devens sick call procedures.

FBOP Response: FBOP concurs with this recommendation. FMC Devens has already taken action to implement this recommendation. Since May 2024, nurse supervisors have been present in the outpatient clinic during sick call times to provide on-the-spot corrections to health services department employees as needed. Further, on November 21, the FMC Devens Assistant Health Services Administrator sent an email to all health services staff on sick call procedures with specific reminders about sick call procedures and attaching the local procedures document. FMC Devens will provide more education for all health services department staff at the next monthly health services meeting in December 2024.

Additionally, FMC Devens provided training to its nursing employees on the policy and FMC

9

Devens sick call procedures in May 2024, after OIG's site inspection. Subsequently, the FMC Devens Supervisory Clinical Nurse directed all FMC Devens nursing employees to require the following:

- Since July 1, 2024, AICs have been required to sign into a check-in logbook during sick call, between 7:30 and 8:30 a.m., even if the issue presented is non-sick-call related.
- The logbook must indicate the date, the AIC's last name and register number, and reason for visit.
- Sick Call Forms have been centrally placed for ease of use, and each AIC must complete the form prior to being seen.
- Sick Call Forms and the tracking log must be maintained for 60 days.
- Nurses must schedule follow-up appointments for providers using the sick call guidelines inputting the time and adding the appointment into the scheduler application directly from their clinical encounter, so that there is a time stamp maintained of appointment scheduling.
- The charge nurse will review the tracking log before the end of each day and verify that each entry was either seen the same day, does not require follow-up, or has an appointment entered into the scheduler, and notates that into the tracking log.

**Recommendation 6:** **Ensure that FMC Devens follows the BOP's Clinical Practice Guidelines for Preventive Healthcare Screening to establish a local preventive health program and utilize all members of the healthcare team in preventive healthcare.**

**FBOP Response:** FBOP concurs with this recommendation. FMC Devens established a collaborative local preventative health program in August 2024 which follows the current preventative health guidance recommendations in the FBOP's Clinical Practice Guidelines for Preventative Healthcare Screening, the United States Preventative Task Force guidance and the subscription service, UptoDate.

**Recommendation 7:** **Ensure that all FMC Devens inmates over age 50 are receiving preventive healthcare screenings, including cognitive impairment screening.**

**FBOP Response:** FBOP concurs with this recommendation and notes that during the exit conference, OIG clarified that this recommendation pertains specifically to all AICs over age 50 at FMC Devens. As stated in the response to Recommendation 6, FMC Devens established a collaborative local preventative health program in August 2024 which follows the current preventative health guidance recommendations for all inmates over age 50 in the FBOP's Clinical Practice Guidelines for Preventative Healthcare Screening, the United States Preventative Task Force guidance and the subscription service, UptoDate.
Included in the Standard Operating Procedures for the Implementation of the Preventative Health Care Clinical Practice Guidelines at FMC Devens, issued August 26, 2024, are requirements for:

- A thorough chart review to determine what tests and evaluations are indicated by the AIC's age, sex, and risk factors.
- Interviews of AICs to assess risk factors and recommend/order specific health screens and interventions.

10

- Instructing AICs about prevention measures.
- Administering immunizations.
- Referring abnormal results for follow-up to a physician.
- Scheduling AICs for preventative health baseline visits at intake or within the first six months of incarceration.
- Scheduling periodic visits every three years for AICs under age 50 and annually for those aged 50 or older.
- Clearly documenting preventative Health Periodic Visits as such.

**Recommendation 8:** Ensure that FMC Devens verifies the credential files of all providers prior to allowing them to administer care to inmates and ensure that FMC Devens completes peer reviews in accordance with BOP policy.

**FBOP Response:** FBOP concurs with this recommendation. Currently, FMC Devens verifies the credential files of all health services employees at FMC Devens, prior to hiring and upon license renewal. FMC Devens Health Services Leadership and FBOP Health Services Division are working together to complete necessary peer reviews and privileges in accordance with FBOP's Program Statement 6027.02 Health Care Provider Credential Verification, Privileges, and Practice Agreement Program.

Regarding two specific types of health services providers, telepsychiatrists and pharmacists: Any credential files completed by FBOP Health Services Division for telepsychiatry providers will also be locally maintained at FMC Devens and added to the FMC Devens credentialing tracker, ensuring that active privileges and peer reviews for telepsychiatry providers are in accordance with FBOP policy. Additionally, two pharmacist peer reviews at FMC Devens were submitted in September 2024 and the remaining three are scheduled to be completed and submitted upon their Collaborative Practice Agreement (CPA) renewal in 2025.

It is important to note that, in addressing the peer reviews for clinical pharmacists with a collaborative practice agreement, past practice and current policy distinguish between providers working under practice agreements, such as physician assistants and nurse practitioners, and pharmacist working under a CPA. While some institutions chose to apply the policy to both types, peer reviews for pharmacists working under collaborative practice agreements had not been explicitly required in P.S. 6027.02.

However, recognizing the need for clarification, FBOP Central Office Health Services Divisions issued a memo in February 2024 to clearly define and require peer reviews for all pharmacists working under a CPA to be completed, and submitted at the time of CPA renewal.

**Recommendation 9:** Ensure that inmates admitted to and housed in the Memory Disorder Unit are appropriately placed in accordance with FMC Devens's established criteria.

**FBOP Response:** FBOP concurs with this recommendation. To ensure that AICs admitted to and housed in the Memory Disorder Unit (MDU) are appropriately placed, FMC Devens Health Services Leadership reviewed each MDU resident in May 2024. Additionally, the Regional Medical Director reviewed each MDU resident again during the week of November 11, 2024, to

11

ensure that each resident has a diagnosis involving dementia or chronic memory impairment. FMC Devens has a temporary moratorium approved for admissions to the MDU at this time. FMC Devens Health Services Leadership, with guidance from FBOP Health Services Division, are in the process of reviewing and revising the established admission criteria to be inclusive of diagnoses that include dementia and chronic memory impairment as a symptom of the disorder. Once the admission criteria are revised, the moratorium will be discontinued. Further updates will be provided as that revision occurs.

**Recommendation 10:** **Ensure that FMC Devens adheres to BOP policy on medical inmate companion screening and hiring and that FMC Devens employees screening and hiring these companions are trained on the policies and procedures.**

**FBOP Response:** FBOP concurs with this recommendation. To ensure adherence to FBOP's Program Statement 6010.05 Health Services Administration, Section 5 (Inmate HSU Workers), FMC Devens Nurse Supervisor reviewed the AIC Companion roster during the week of November 11, 2024. This review resulted in a finding that there were two companions deemed ineligible and these AICs were terminated from their positions on November 18 and 19, 2024. The Nurse Supervisor responsible for hiring medical inmate companions now ensures that all medical AIC companions currently meet the eligibility criteria.

Additionally, starting July 2024, the Nurse Manager has sent monthly emails to Nursing Staff reminding them of the duties and responsibilities of inmate medical companions. Also, in September 2024, education and training were provided to medical inmate companions and all FMC Devens employees who supervise inmate companions. This training covered the technical guidance for the Medical Inmate Companion Program, companion qualifications / eligibility, and roles and responsibilities of inmate companions.

**Recommendation 11:** **Ensure that FMC Devens evaluates the roles and responsibilities of medical inmate companions to ensure that they are not performing duties outside the scope of the inmate companion program.**

**FBOP Response:** FBOP concurs with this recommendation. As indicated in the response to Recommendation 10, FMC Devens Nurse Supervisor reviewed the AIC Companion roster during the week of November 11, 2024, to ensure adherence to FBOP's Program Statement 6010.05 Health Services Administration, Section 5 (Inmate HSU Workers). Additionally, education and training were provided to medical inmate companions as described in the response to recommendation 10, above, to ensure that companions do not perform duties outside the scope of the inmate companion program.

12

# Appendix 5:  OIG Analysis of the BOP's Response

The OIG provided a draft of this report to the BOP for its comment.  The BOP's response is included in Appendix 4 to this report.

In its formal response, the BOP acknowledged the issues identified in this report and described actions that it has already taken to rectify the findings.  The BOP's response to this report was notably comprehensive in describing both agency-wide actions it has taken to address long-standing staffing and infrastructure challenges, as well as institution-level actions that FMC Devens has taken and planned to address each recommendation.  The BOP provided a separate set of responses from FMC Devens (not included in this appendix) describing those specific actions, along with relevant documentation demonstrating the steps taken.  FMC Devens has been proactive in its corrective actions and in the provision of documentation addressing the OIG's recommendations.  The OIG acknowledges the BOP's ongoing efforts, planned actions, and responsiveness to our recommendations.

The BOP agreed that staffing shortages and crumbling infrastructure can create dangerous conditions in its institutions and compromise the health and security of employees and inmates.  Addressing these challenges is among the BOP's top priorities, and it is working closely with the Department of Justice (Department) to obtain additional pay authorities and funding to ensure that it can fully effectuate its mission, the BOP reported.  The BOP cited the Department's funding proposal, which contains a 5-year plan to address the BOP's staffing and modernization and repair challenges, submitted to Congress on November 7, 2024.  The funding proposal (referenced in our report) names as key elements a nationwide Special Salary Rate for Correctional Officers and nurses; additional funding and positions to increase Correctional Officer and nurse staffing; and more than $1.8 billion over 5 years to address critical infrastructure needs, based on a 5-year Capital Investment Plan that the BOP developed with the Department and the Office of Management and Budget.  The BOP listed the FMC Devens modernization and repair projects that are included in the Capital Investment Plan.

The BOP described agency-wide recruitment and retention progress achieved through hiring initiatives in 2024; nationwide hire authority for Correctional Officers approved in May 2024, resulting in 642 direct hires in FY 2024; and a continued focus on recruiting Correctional Officers and medical positions.  In FY 2024, for example, the BOP stated that it increased new hires by approximately 14 percent and nearly doubled its FIRST STEP Act onboard positions.  Citing the October 2024 rollout of its staffing projection tool, the BOP described its efforts to ensure that the tool accurately projects institution staffing needs, including an August 2024 Wardens survey to collect input on position recommendations.

The BOP reported that since our inspection FMC Devens has hired new employees, including an additional medical doctor and three new psychologists, and the institution plans to bolster programming at the Camp with the Commercial Driver's License program and a new dog training program.  FMC Devens acknowledged the need for employees to follow policy on conducting rounds and stated that its leadership will conduct periodic reviews of video footage from random housing units.  Finally, FMC Devens now reports no "dead zones" or issues with the radio system, with new radios expected in FY 2025, the BOP stated.

The OIG's analysis of the BOP's response regarding specific recommendations and the actions necessary to close them are discussed below.  Please respond to all recommendations by March 11, 2025.

C.Agnello   SE 0075

## Recommendation 1

Ensure that FMC Devens Executive Leadership and the Central Office's Human Resource Management Division discuss the staffing projection tool methodology and how it compares with FMC Devens Executive Leadership's understanding of its current and potential future mission needs to ensure greater alignment between stakeholder staffing projections.

**Status:** Resolved.

**BOP Response:** The BOP concurred with this recommendation and stated that FMC Devens Executive Leadership is continuing ongoing communications with the BOP's Human Resource Management Division (HRMD) regarding the automated staffing tool methodology and the proper staffing levels for FMC Devens. The BOP noted that the FMC Devens Warden completed the staffing tool survey in August 2024 and that in September 2024 FMC Devens's Executive Leadership, Regional Office Executive Leadership, and the contractor discussed the staffing projection tool methodology. The BOP stated that feedback from FMC Devens Executive Leadership included maintaining the number of authorized Correctional Services positions (201), adding 7 additional positions to the Psychology Services Department, and decreasing the number of Health Services positions to 123. The BOP stated that the HRMD is continuing conversations with FMC Devens to ensure that it understands the methodology for the tool's recommendations and that it will continue addressing the FMC Devens feedback, as well as any additional criteria or outlier issues.

**OIG Analysis:** The BOP's actions are responsive to the recommendation. Please provide documentation demonstrating that FMC Devens Executive Leadership, BOP Regional Office Executive Leadership, BOP Central Office HMRD personnel, and contractor personnel have discussed the staffing projection tool methodology and identified any additional criteria and outlier issues for FMC Devens. Please describe any additional progress made to achieve greater alignment between stakeholders on staffing projections.

## Recommendation 2

Ensure that FMC Devens follows BOP guidance for buprenorphine and naloxone administration and observation and that all FMC Devens employees who administer medication receive training on BOP guidance and policies for medication administration.

**Status:** Resolved.

**BOP Response:** The BOP concurred with this recommendation and stated that, since the inspection, FMC Devens has ensured that nurse supervisors routinely observe the process for buprenorphine and naloxone administration and will continue to monitor the process closely. On April 26, 2024 (during our inspection), a nursing supervisor emailed to all FMC Devens nurses relevant guidance regarding this medication administration at the Camp facility. The BOP also noted that an FMC Devens Health Services Department manager conducted an observational review of the Camp Medication Assisted Treatment (MAT) pill line on May 2, 2024. According to the BOP, the review noted that not all nurses were conducting the MAT pill line and morning pill line separately and there was not a second person available to observe during MAT administration; the review recommended that retraining be completed for nursing employees regarding the separation of MAT administration with the morning pill line. This review resulted in the creation of a document on May 6, 2024, articulating issues and corrective actions. The BOP further noted that FMC

Devens had a Correctional Officer at the Camp observe during the MAT pill line, including conducting mouth checks.  The BOP also told us that on November 13, 2024, a nursing supervisor reinforced relevant guidance and requirements through an email.  The BOP noted that all employees who administer medication will receive additional training during FMC Devens's next Health Services monthly meeting in December 2024.

**OIG Analysis:**  The BOP's actions are responsive to the recommendation.  Since the inspection, FMC Devens has twice reminded its nursing employees via email of the medication administration guidance and a Health Services Department manager conducted a review of the MAT pill line that resulted in relevant corrective actions.  These corrective actions included a training session for nursing employees on conducting pill line, nurse managers notifying the institution's Food Service Manager of the need for food services to remain open until nursing employees clear the last inmate from the MAT line, and nurse managers notifying the institution's Captain of the need for a Camp Correctional Officer to assist in observing for diversion during the MAT pill line.  Please provide:  (1) training materials and documentation of training completion for all FMC Devens employees who administer medication, as referenced with respect to the December 2024 monthly Health Services Department meeting, and (2) documentation of the nurse manager's communication to the Captain regarding assistance during the MAT pill line.

## Recommendation 3

Implement a plan to address the medical record backlog at FMC Devens.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and stated that in early November 2024 FMC Devens reconciled its list of pending reports and ensured that all reports received from the contracted company had been scanned into the Bureau Electronic Medical Records System (BEMR) and removed from the pending report list.  FMC Devens continues to provide a monthly list of pending reports to the comprehensive contract representatives and plans to engage contract representatives more frequently to seek any time-sensitive reports.  The BOP stated that FMC Devens Health Services leadership and FMC Devens contracting specialists will continue to meet monthly and as needed to communicate expectations related to any past due pending reports.  Further, the BOP told us that contract representatives will complete a weekly reconciliation with FMC Devens Health Services Department employees until any pending reports are received.

**OIG Analysis:**  The BOP's actions are responsive to the recommendation.  Please provide documentation that all pending reports have been scanned into BEMR and removed from the pending report list.  Additionally, please provide the list of pending medical records and describe progress made by FMC Devens toward reducing the backlog.

## Recommendation 4

Ensure that FMC Devens develops a consistent and accurate medical record tracking procedure with the contracted company that includes regular and recurring reconciliation of outside inmate medical records between FMC Devens and the contracted company.

**Status:**  Resolved.

C. Agnello   SC 0077

**BOP Response:**  The BOP concurred with this recommendation and provided a similar response to that for Recommendation 3.

**OIG Analysis:**  The BOP's actions are responsive to the recommendation.  Please provide the procedure that includes regular and recurring reconciliation of outside medical records between FMC Devens and the contracted company.  Please also describe how FMC Devens will ensure the accurate tracking of its outside medical records with the contracted company.

## Recommendation 5

Ensure that FMC Devens follows the BOP Patient Care Policy for sick call and provides training to all FMC Devens Health Services Department employees on the policy, as well as on FMC Devens sick call procedures.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and reported that FMC Devens has already taken action to implement this recommendation.  In May 2024, following our inspection, FMC Devens provided training to its nursing employees on BOP policy and FMC Devens sick call procedures.  The BOP reported that FMC Devens directed all nursing employees to adhere to a variety of sick call guidelines, including ensuring that the logbook is up-to-date with inmates' information and that nurses must schedule follow-up appointments.  Since May 2024, the BOP reported that FMC Devens nurse supervisors have been present in the outpatient clinic during sick call times to provide on-the-spot corrections to Health Services Department employees as needed.  On November 21, 2024, FMC Devens Health Services Department management sent an email to all Health Services Department employees with specific reminders about sick call procedures; the local procedures document was attached to the email.

**OIG Analysis:**  The BOP's actions are responsive to the recommendation.  Please provide documentation showing that nurse supervisors have been present at the outpatient clinic during sick call times since May 2024.  Please also provide the training materials and documentation of training completion for all FMC Devens Health Services Department employees, as referenced with respect to the December 2024 monthly Health Services Department meeting.  Lastly, please describe how FMC Devens will continue to ensure that sick call procedures are followed by its employees.

## Recommendation 6

Ensure that FMC Devens follows the BOP's Clinical Practice Guidelines for Preventive Healthcare Screening to establish a local preventive healthcare program and utilize all members of the healthcare team in preventive healthcare.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and noted that in August 2024 FMC Devens established a collaborative local preventive health program, which follows the current preventive health guidance recommendations in the BOP's Clinical Practice Guidelines (CPG) for Preventive Healthcare Screening; the BOP provided a copy of the FMC Devens collaborative local preventive health program.

**OIG Analysis:**  The BOP's actions are responsive to the recommendation.  Please provide the implementation plan for the collaborative local preventive health program.

## Recommendation 7

Ensure that all FMC Devens inmates over age 50 are receiving preventive healthcare screenings, including cognitive impairment screening.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and, as in its response to Recommendation 6, noted that in August 2024 FMC Devens established a collaborative local preventive health program, which follows the current BOP CPG for Preventive Healthcare Screening.  Within the collaborative local preventive health program, the BOP stated that FMC Devens is required to schedule annual preventive health visits for inmates over age 50.

**OIG Analysis:**  The BOP's actions are responsive to the recommendation.  Please provide the number of FMC Devens inmates over age 50 who have received preventive healthcare screenings, including cognitive impairment screenings, and supporting documentation to demonstrate that such screenings have occurred. For inmates over age 50 who have yet to receive annual preventive healthcare screenings, including cognitive impairment screenings, please provide documentation demonstrating when the screening is scheduled to occur.  Additionally, please provide documentation on the progress of each requirement in the collaborative local preventive health program.

## Recommendation 8

Ensure that FMC Devens verifies the credential files of all providers prior to allowing them to administer care to inmates, and ensure that FMC Devens completes peer reviews in accordance with BOP policy.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and stated that FMC Devens verifies the credential files of all Health Services employees at FMC Devens prior to hiring and upon license renewal. The BOP also stated that FMC Devens is working to complete peer reviews and renew clinical privileges in accordance with the BOP's guidelines.  The BOP reported that any credential files completed by its Health Services Division for telepsychiatry providers will also be maintained at FMC Devens and added to the FMC Devens credentialing tracker, in accordance with BOP policy.  Two pharmacist peer reviews at FMC Devens were submitted in September 2024 and the remaining three are scheduled to be completed and submitted in 2025, the BOP reported.  Finally, BOP Central Office issued a memorandum in February 2024 to define and require peer reviews for all pharmacists working under a collaborative practice agreement to be completed and submitted at the time of collaborative practice agreement renewal.

**OIG Analysis:**  The BOP's actions are responsive to the recommendation.  Please provide documentation that FMC Devens maintains the active privileges and peer reviews for telepsychiatry providers.  Additionally, please provide the results of the peer reviews of the FMC Devens pharmacists.

## Recommendation 9

Ensure that inmates admitted to and housed in the Memory Disorder Unit are appropriately placed in accordance with FMC Devens's established criteria.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and reported that FMC Devens Health Services Department management reviewed each Memory Disorder Unit (MDU) resident in May 2024 and the Regional Medical Director reviewed them in November 2024.  These reviews were intended to ensure that inmates admitted to and housed in the MDU are appropriately placed following a diagnosis involving dementia or chronic memory impairment.  FMC Devens Health Services Department management, with guidance from the BOP Health Services Division, is reviewing and revising the established admission criteria; the temporary moratorium on MDU admissions will be discontinued once admission criteria are revised, the BOP stated.

**OIG Analysis:**  The BOP's actions are responsive to the recommendation.  Please provide copies of the May and November 2024 assessments of each inmate housed in the MDU and the revised admission criteria for the MDU once it is completed.

## Recommendation 10

Ensure that FMC Devens adheres to BOP policy on medical inmate companion screening and hiring and that FMC Devens employees screening and hiring these companions are trained on the policies and procedures.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and stated that FMC Devens Health Services Department management reviewed the inmate companion roster in November 2024 and found that two companions were ineligible; the ineligible inmates were subsequently terminated from their positions.  The BOP reported that the FMC Devens Health Services Department employees responsible for hiring medical inmate companions now ensure that all medical inmate companions meet the eligibility criteria.  In September 2024, the institution provided training covering companion qualifications, eligibility, roles, and responsibilities to both medical inmate companions and all FMC Devens employees who supervise inmate companions, the BOP reported.

**OIG Analysis:**  The BOP's actions are responsive to the recommendation.  Please provide documentation demonstrating how FMC Devens will monitor future inmate companion eligibility, including how it will adhere to BOP policy on medical inmate companion screening and hiring to ensure that all medical inmate companions meet the eligibility criteria.  As stated in this report, we found that multiple medical inmate companions should have been prohibited from becoming a medical inmate companion based on the BOP's eligibility criteria (3 had committed a sexual offense, 8 had committed a violent offense, and 6 were Medical Care Level 4 inmates with medical restrictions).  Additionally, please provide the training plan and curriculum for the FMC Devens Health Services Department employees responsible for hiring medical inmate companions and the roster of trained FMC Devens employees and medical inmate companions.

C.Agnello   SE 0080

## Recommendation 11

Ensure that FMC Devens evaluates the roles and responsibilities of medical inmate companions to ensure that they are not performing duties outside the scope of the inmate companion program.

**Status:** Resolved.

**BOP Response:** The BOP concurred with this recommendation and, as in its response to Recommendation 10, stated that FMC Devens Health Services Department management reviewed the inmate companion roster in November 2024 to ensure adherence to the BOP's policy and the institution provided training to medical inmate companions to ensure that they do not perform duties outside the scope of the medical inmate companion program.

**OIG Analysis:** The BOP's actions are responsive to the recommendation. Please provide documentation demonstrating that all medical inmate companions have received the required training and describe how FMC Devens will monitor and ensure that future inmate companions do not perform duties outside the scope of the program.



# EXHIBIT E

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

C.Agnello    SE 0082



SUBSCRIBE



**Exclusive**

# John Gotti's Daughter Victoria to Undergo Kidney Transplant with Her Son as Donor (Exclusive)

Victoria Gotti, the former 'Growing Up Gotti' star and mother of three, will undergo a kidney transplant, with her son, Carmine, as her donor

By **Sue Carswell** | Published on November 25, 2025 04:05PM EST

💬 **57 COMMENTS**



**Victoria Gotti.**
Credit : Jim Spellman/WireImage

SKIP TO CONTENT

C.Agnello   SE 0083

 

Victoria Gotti is to undergo a kidney transplant after learning over the summer that she has chronic kidney disease

Her son, Carmine Agnello, will be her kidney donor

"Victoria feels her son is giving her a brand-new life," a family source tells PEOPLE

Victoria Gotti, the daughter of infamous mob boss John Gotti, is scheduled to have a kidney transplant in NYC at NYU Langone Health Transplant in the upcoming weeks, PEOPLE has learned exclusively. Her eldest son, Carmine Gotti Agnello, 39 (with ex-husband Carmine Agnello), has met the medical qualifications to become her donor.

"She has three sons (John, 38, and Frank, 35), and all along, Carmine insisted," said a Gotti family source. "'It's got to be me,' Carmine said. 'That's all.' Victoria feels her son is giving her a brand-new life."

SKIP TO CONTENT

C.Agnello   SE 0084

Peon    SUBSCRIBE



**Victoria Gotti at her 2019 biopic premiere in LA.**
Credit: Rich Fury/Getty

People APP **Our new app is here!** Free, fun and full of exclusives. Scan to download now!



SKIP TO CONTENT

C.Agnello   SE 0085



**Peon**

SUBSCRIBE

produced the Litetime biopic *Victoria Gotti: My Father's Daughter* (2019), has kept a low-key public profile in recent years.

Her health issues started in her 20s when she was put on blood thinners due to a heart mitral valve prolapse (MVP) diagnosis and later a heightened leaky valve. Her blood levels became elevated around five years ago, says the source.

Over the summer, Gotti learned she had chronic kidney disease (CKD). After the transplant, Gotti is expected to be recovering at home for up to three months, while Carmine will be recovering at home for about two to three weeks.



Victoria Gotti and son Carmine Gotti Agnello Jr. in Boca Raton in 2017.
ia Gotti/Instagram

SKIP TO CONTENT

C.Agnello    SE 0086

 **SUBSCRIBE** 

**Her Son Died at 16 Years Old After Transplant Complications. How Other Grieving Moms Are Helping Her Heal (Exclusive)**

Mom Loses 13-Year-Old Son After

**Kidney Transplants: Woman Starts Facebook Matching Program**



According to the United Network for Organ Sharing (UNOS), as reported in January 2025, approximately 90,000 people are on the national kidney transplant waiting list, with 15% of Americans facing chronic kidney disease.

While deceased donor kidneys are most commonly used in transplants, it can take up to three to five years to receive a match, but that timing could be "shorter or longer," per the UNOS.

The Mayo Clinic states: "Living-donor transplantation offers an alternative to waiting for a deceased-donor organ to become available for people in need of an organ transplant. In addition, living-donor organ transplants are associated with fewer complications than are deceased-donor transplants and, overall, a longer survival of the donor organ."

SKIP TO CONTENT

**Peon**  SUBSCRIBE

**Victoria Gotti with sons, from left, Frank, John and Carmine Agnello in NYC (2005).**
Credit: Andrea Renault/ZUMA Press Wire/Shutterstock

**Never miss a story — sign up for [PEOPLE's free daily newsletter](#) to stay up-to-date on the best of what PEOPLE has to offer, from celebrity news to compelling human interest stories.**

Gotti has always been close to her sons, attending soccer games even when she was promoting her mystery novels and cookbooks. "Carmine would do anything for his mother," says the family source. "But this truly tops it."

To learn more about becoming a donor, visit the [National Kidney Registration](#).

LEAVE A COMMENT ↓

**Read more:**  LIFESTYLE   HEALTH   CELEBRITY HEALTH

SKIP TO CONTENT

C.Agnello   SE 0088

 

SUBSCRIBE

## You Might Like



**Bethenny Frankel Says She Has Stage 2 Chronic Kidney Disease: 'Go Get All Your Bloodwork Done'**

**Lifestyle**  •  January 22, 2026

**Teddi Mellencamp Insists Her Cancer Hasn't Returned After Dad John**

**Kate Gosselin Celebrates First Time Walking Unassisted in Public Since Leg Injury: 'I Did It!'**

SKIP TO CONTENT

C.Agnello   SE 0089

 

SUBSCRIBE

Lifestyle · 6 days ago

All comments are subject to our Community Guidelines. PEOPLE does not endorse the opinions and views shared by readers in our comment sections.

## **Related Articles**

CELEBRITY HEALTH

### Bethenny Frankel Says She Has Stage 2 Chronic Kidney Disease: 'Go Get All Your Bloodwork Done'

By Cara Lynn Shultz        53

CELEBRITY HEALTH

### Teddi Mellencamp Insists Her Cancer Hasn't Returned After Dad John Mellencamp Says She Was 'Really Sick'

By Cara Lynn Shultz        13

CELEBRITY HEALTH

### Kate Gosselin Celebrates First Time Walking Unassisted in Public Since Leg Injury: 'I Did It!'

By Cara Lynn Shultz

CELEBRITY HEALTH

### Dancehall Star Spice Underwent 7 Surgeries After a Near-Death Experience: 'My Body Was Becoming Poisonous' (Exclusive)

By Latoya Gayle

SKIP TO CONTENT

C.Agnello   SE 0090

  SUBSCRIBE

'Separated Shoulder' Being Screwed Back Together After Surgery

By Kirsty Hatcher

---

CELEBRITY HEALTH

### Nicole 'Snooki' Polizzi Reveals Doctors Found Cancerous Cells in Her Cervix: 'I'm Scared'

By Vanessa Etienne

---

CELEBRITY HEALTH

### Guy Fieri Shares Health Update Following Accident That Left Him in a Wheelchair: 'Worst Thing I've Been Through in the Last 20 Years' (Exclusive)

By Emily Rella

---

CELEBRITY HEALTH

### Ali Fedotowsky-Manno Shares 'Unsettling' Update on Husband Kevin's Thyroid Cancer Nearly 1 Year After Becoming 'Cancer Free'

By Charna Flam

---

CELEBRITY HEALTH

### Derek Hough Reveals the First Thing Wife Hayley Asked Doctors After Her Emergency Craniectomy 2 Years Ago (Exclusive)

By Brianne Tracy

SKIP TO CONTENT

  SUBSCRIBE

"Show Two 100." Faces" Episode 403 -- Pictured: Ron

**Diagnosis After Experiencing 'Cruel Drama' from Show: 'A Victory Worth Sharing'**

By Brenton Blanchet

---

Savannah Guthrie on TODAY on April 3, 2025.

CELEBRITY HEALTH

**Savannah Guthrie Tried to Embrace Her 'Sexy Demi Moore' Voice Before Vocal Surgery But 'Couldn't Ignore It Anymore' (Exclusive)**

By Alex Ross

---

Katie Thurston's mom diagnosed with cancer

CELEBRITY HEALTH

**Katie Thurston Reveals Her Mom's Breast Cancer Diagnosis Nearly 1 Year After *Bachelor* Star Was Diagnosed Herself**

By Ingrid Vasquez

---

Pawn Stars' Corey Harrison Suffers '11 Breaks in Rib Cage' After Accident as He

CELEBRITY HEALTH

***Pawn Stars*' Corey Harrison Says He'll Miss Dad Rick's Wedding After 11 Breaks in Rib Cage**

By Brenton Blanchet

---

Sofia Vergara and Octavia Spencer Team Up for New Empowering Health

CELEBRITY HEALTH

**Octavia Spencer and Sofía Vergara Team Up for New 'Empowering' Health Campaign: 'We're on a Mission' (Exclusive)**

By Vanessa Etienne

---

Jamie-Lynn Sigler on June 13, 2025 in New York City; Jamie-Lynn Sigler on

CELEBRITY HEALTH

**Jamie-Lynn Sigler Says Playing a Doctor with MS on 'Grey's Anatomy' Meant She 'Didn't Have to Hide' (Exclusive)**

By Eileen Finan

---

SKIP TO CONTENT



SUBSCRIBE



### She 'Would've Been Amazing' If She Had Them During Pro Tennis (Exclusive)

By Vanessa Etienne



## GET MORE IN OUR FREE APP




NEWSLETTERS

Follow Us

    

| | |
|---|---|
| NEWS | ENTERTAINMENT |
| ROYALS | LIFESTYLE |
| STYLEWATCH | SHOPPING |
| About Us | PEOPLE Tested |
| rial Policy | Careers |

SKIP TO CONTENT

C.Agnello    SE 0093

Peon 

SUBSCRIBE

Your Privacy Choices

People Inc.

PEOPLE is part of the People Inc. publishing family.



# EXHIBIT F

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

C.Agnello    SE 0095

# HHS Public Access

Author manuscript

*JAMA*. Author manuscript; available in PMC 2015 April 28.

Published in final edited form as:

*JAMA*. 2014 February 12; 311(6): 579–586. doi:10.1001/jama.2013.285141.

# Risk of End-Stage Renal Disease Following Live Kidney Donation

**Abimereki D. Muzaale, MD, MPH**, **Allan B. Massie, PhD**, **Mei-Cheng Wang, PhD**, **Robert A. Montgomery, MD, DPhil**, **Maureen A. McBride, PhD**, **Jennifer L. Wainright, PhD**, and **Dorry L. Segev, MD, PhD**

Department of Surgery, Johns Hopkins University School of Medicine, Baltimore, Maryland (Muzaale, Massie, Montgomery, Segev); Department of Biostatistics, Johns Hopkins Bloomberg School of Public Health, Baltimore, Maryland (Wang, Segev); United Network for Organ Sharing, Richmond, Virginia (McBride, Wainright); Department of Epidemiology, Johns Hopkins Bloomberg School of Public Health, Baltimore, Maryland (Segev)

## Abstract

**Importance**—Risk of end-stage renal disease (ESRD) in kidney donors has been compared with risk faced by the general population, but the general population represents an unscreened, high-risk comparator. A comparison to similarly screened healthy nondonors would more properly estimate the sequelae of kidney donation.

**Objectives**—To compare the risk of ESRD in kidney donors with that of a healthy cohort of nondonors who are at equally low risk of renal disease and free of contraindications to live donation and to stratify these comparisons by patient demographics.

Copyright 2014 American Medical Association. All rights reserved.

Corresponding Author: Dorry L. Segev, MD, PhD, Department of Transplant Surgery, Johns Hopkins Medical Institutions, 720 Rutland Ave, Ross 771B, Baltimore, MD 21205 (dorry@jhmi.edu).

**Author Contributions:** Dr Muzaale had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis. Drs Muzaale and Massie contributed equally to this article.

*Study concept and design:* Muzaale, Massie, Segev.

*Acquisition of data:* Muzaale, McBride, Wainright, Segev.

*Analysis and interpretation of data:* Muzaale, Massie, Wang, Montgomery, Wainright, Segev.

*Drafting of the manuscript:* Muzaale, Massie, Segev.

*Critical revision of the manuscript for important intellectual content:* Muzaale, Massie, Wang, Montgomery, McBride, Wainright, Segev.

*Statistical analysis:* Muzaale, Massie, Wang, McBride, Wainright, Segev.

*Obtained funding:* Segev.

*Administrative, technical, and material support:* Massie, Wainright.

*Study supervision:* Segev.

Supplemental content at jama.com

**Conflict of Interest Disclosures:** All authors have completed and submitted the ICMJE Form for Disclosure of Potential Conflicts of Interest. Dr Wainright reported that she is an employee of the United Network for Organ Sharing. Dr Segev reported institutional grant support from the National Institutes of Health. No other disclosures were reported.

**Additional Contributions:** United Network for Organ Sharing staff, including Dr Wainright, performed all Social Security number linkages to Social Security Death Master File and Centers for Medicare & Medicaid Services data to ensure confidentiality of Social Security number data provided to the OPTN. Likewise, Research Data Center staff at the National Center for Health Statistics performed all NHANES social security number linkages to Centers for Medicare and Medicaid Services data.

**Disclaimer:** The analyses described herein are the responsibility of the authors alone and do not necessarily reflect the views or policies of the US Department of Health and Human Services, nor does the mention of trade names, commercial products, or organizations imply endorsement by the US government.

**Design, Settings, and Participants**—A cohort of 96 217 kidney donors in the United States between April 1994 and November 2011 and a cohort of 20 024 participants of the Third National Health and Nutrition Examination Survey (NHANES III) were linked to Centers for Medicare & Medicaid Services data to ascertain development of ESRD, which was defined as the initiation of maintenance dialysis, placement on the waiting list, or receipt of a living or deceased donor kidney transplant, whichever was identified first. Maximum follow-up was 15.0 years; median follow-up was 7.6 years (interquartile range [IQR], 3.9-11.5 years) for kidney donors and 15.0 years (IQR, 13.7-15.0 years) for matched healthy nondonors.

**Main Outcomes and Measures**—Cumulative incidence and lifetime risk of ESRD.

**Results**—Among live donors, with median follow-up of 7.6 years (maximum, 15.0), ESRD developed in 99 individuals in a mean (SD) of 8.6 (3.6) years after donation. Among matched healthy nondonors, with median follow-up of 15.0 years (maximum, 15.0), ESRD developed in 36 nondonors in 10.7 (3.2) years, drawn from 17 ESRD events in the unmatched healthy nondonor pool of 9364. Estimated risk of ESRD at 15 years after donation was 30.8 per 10 000 (95% CI, 24.3-38.5) in kidney donors and 3.9 per 10 000 (95% CI, 0.8-8.9) in their matched healthy nondonor counterparts ($P < .001$). This difference was observed in both black and white individuals, with an estimated risk of 74.7 per 10 000 black donors (95% CI, 47.8-105.8) vs 23.9 per 10 000 black nondonors (95% CI, 1.6-62.4; $P < .001$) and an estimated risk of 22.7 per 10 000 white donors (95% CI, 15.6-30.1) vs 0.0 white nondonors ($P < .001$). Estimated lifetime risk of ESRD was 90 per 10 000 donors, 326 per 10 000 unscreened nondonors (general population), and 14 per 10 000 healthy nondonors.

**Conclusions and Relevance**—Compared with matched healthy nondonors, kidney donors had an increased risk of ESRD over a median of 7.6 years; however, the magnitude of the absolute risk increase was small. These findings may help inform discussions with persons considering live kidney donation.

Every year in the United States, approximately 6000 healthy adults accept the risks of donor nephrectomy to help family members, friends, or even strangers improve survival and quality of life.[1] It is imperative that the transplant community, in due diligence to donors, understands the risk of donation to the fullest extent possible and communicates known risks to those considering donation.[2,3] To date, studies have shown that perioperative death is extremely rare and subsequent survival rates are comparable with healthy nondonors.[4-6]

However, physiologic sequelae resulting from kidney donation remain less well characterized. Recent single-center[7-9] and nationwide[10] studies suggest that live donors do not have increased risk of end-stage renal disease (ESRD) compared with the general population; however, the general population is unscreened and, as such, at higher inherent risk of ESRD than carefully screened donors. Limited by small sample sizes and lack of a healthy comparison group, previous studies have been unable to compare the risk of ESRD that a healthy individual faces after donation with the risk that individual would have faced had he or she not donated.[11] Also, although studies show higher risk of ESRD in donor subgroups including black donors[10] compared with nonblack donors and male donors[8,9] compared with female donors, these studies comparing donors with other donors cannot

C.Agnello   SE 0097

account for the fact that race and sex are associated with ESRD (and chronic kidney disease) in nondonors as well.[12-16]

The goal of this study was to better understand the risk of ESRD following live donation by comparing the incidence of ESRD in live donors with their healthy nondonor counterparts.

## Methods

### Live Kidney Donors

By national mandate, all kidney donations in the United States are reported to the Organ Procurement and Transplantation Network (OPTN). Through this reporting, all adult live donors between April 1, 1994, and November 30, 2011, were included in this study. End-stage renal disease outcomes were ascertained by linkage to the Centers for Medicare & Medicaid Services' (CMS's) medical evidence Form 2728 (certification of ESRD), the transplant network's kidney waiting list transplant databases (including records through November 30, 2011) using a combination of Social Security number, last name, first, middle name, or all 3; date of birth; and sex. *End-stage renal disease* was defined as the initiation of maintenance dialysis, placement on the waiting list, or receipt of a living or deceased donor kidney transplant, whichever was identified first.

### Matched Nondonors

The matched nondonor population was drawn from the Third National Health and Nutrition Examination Survey (NHANES III). In this cohort, medical information was obtained from patient self-report, physical examination, and radiologic and laboratory test results at NHANES III enrollment between 1988 and 1994. A healthy, screened nondonor population was derived from adult NHANES III participants by excluding those with identified contraindications to kidney transplantation (eAppendix 1 in the Supplement). Nondonors were individually matched with replacement to live donors using iterative expanding radius matching.[6,17-20] Matching was based on age, sex, self-identified race, educational background, body mass index (BMI), smoking history, and systolic blood pressure (eAppendix 2 in the Supplement). Similar to the process outlined above for live donors, ESRD outcomes were ascertained by linkage to the CMS medical evidence Form 2728 and to the CMS patient profile and death notification Form 2746 (including records through September 30, 2008).

### Cumulative Incidence of ESRD

Kaplan-Meier methods were used to estimate cumulative incidence of ESRD, with a time scale of years since study entry (time of donation for donors, and enrollment into NHANES for nondonors).[21] Participants were censored at death or at the end of the study (November 30, 2011, for donors, and September 30, 2008, for nondonors).

### Estimated Lifetime Risk of ESRD

Kaplan-Meier methods were used to estimate lifetime risk of ESRD, with a time scale of age in years and left truncation of age prior to study entry. Time at risk was accrued from age at donation for live donors and from age at enrollment into NHANES for nondonors.[22] In other

C.Agnello  SE 0098

words, we estimated risk of ESRD across the life scale by splicing together observed incidence at younger ages (accrued by individuals who were young while they were part of the study population) with observed incidence at older ages (accrued by individuals who were older while they were part of the study population). For example, an individual who donated a kidney at age 45 years and was followed up for 7 years contributed to the estimate of ESRD accrued by donors ages 45 years to 52 years. Lifetime risk was estimated for 3 populations: live donors; matched healthy nondonors; and demographically matched unscreened nondonors (general population).

### Absolute Risk Increase

The difference in cumulative incidence between the live donors (ie, those exposed to donor nephrectomy) and the nondonor comparator populations was reported as the absolute risk increase.

### Statistical Analysis

Donor and nondonor characteristics at baseline were compared using ordinary least squares regression for continuous variables and logistic regression for categorical variables. The *P* values were estimated using bootstrap methods to account for resampling of participants in the nondonor population necessitated by the difference in sample size between the donor and nondonor cohorts. Risk of ESRD within live donor subgroups was compared using log-rank tests. Risk of ESRD between live donors and healthy nondonors was compared using bootstrap procedures tailored to the structure of our data.[23] We calculated 95% confidence intervals for ESRD incidence using separate bootstraps for the live donors and healthy nondonors. For assessment of effect-modification by race/ ethnicity, we calculated 83.4% confidence intervals for ESRD incidence to arrive at a type I error probability of 5%.[24] Each bootstrap repetition for the live donors and healthy nondonors drew with replacement from the original population. However, the probability that a given record would be drawn was proportional to the number of times it appeared in the data set, and, if drawn, all copies of that record were added to the bootstrapped sample. Selection continued in this way until the bootstrapped sample was the size of the original sample. All analyses were performed using Stata 12.0/MP for Linux (Stata Corp). All hypothesis tests were 2 sided ($\alpha = .05$).

## Results

### Study Populations

Among 96 217 live donors, 78.3% were younger than 50 years, 59.0% were women, 74.6% were white, and 63.7% had attended college at some point; 67.6% of live donors were biologically related to their recipient, 25.2% were obese (BMI>30, calculated as weight in kilograms divided by height in meters squared), 9.0% had a systolic blood pressure greater than 140 mm Hg, and 24.2% smoked cigarettes at the time of donation. Among 20 024 unscreened adult NHANES III participants, 9364 (47%) had no identified contraindication to kidney donation and were matched 1:1 to donors to create a healthy nondonor cohort of 96 217 (Table 1).

C. Agnello   SE 0099

## Frequency and Timing of ESRD

Among live donors, with median follow-up of 7.6 years (maximum, 15.0 years), ESRD developed in 99 individuals in a mean (SD) of 8.6 (3.6) years after donation. Of donors who subsequently developed ESRD, 50 were 18 to 39 years old at the time of donation, 57 were men, 50 were white, and 83 were biologically related to the recipient (Table 2). By contrast, among matched healthy nondonors, with median follow-up of 15.0 years (maximum, 15.0 years), ESRD developed in 17 individuals among the 9364 individuals in the nondonor pool, resulting in 36 ESRD events in matched nondonors in a mean (SD) of 10.7 (3.2) years after enrollment.

## Absolute Risk Increase

Estimated cumulative incidence of ESRD at 15 years after donation was 30.8 per 10 000 (95% CI, 24.3-38.5) in donors and 3.9 per 10 000 (95% CI, 0.8-8.9) in healthy nondonors ($P$ < .001; Figure 1A). Absolute risk of ESRD was highest among both black donors at 74.7 per 10 000 (95% CI, 47.8-105.8) and black nondonors at 23.9 per 10 000 (95% CI, 1.6-62.4), and the absolute risk increase was also highest in this race group (50.8 per 10 000, $P$ < .001). Risk among Hispanic donors was 32.6 per 10 000 (95% CI, 17.9-59.1) and for Hispanic nondonors, it was 6.7 per 10 000 (95% CI, 0.0-15.0), for an absolute risk increase of 25.9 per 10 000 ($P$ = .002). Absolute risk was lowest among both white donors at 22.7 per 10 000 (95% CI, 15.6-30.1) and white nondonors at 0.0 per 10 000 (95% CI, 0.0-0.0), and absolute risk increase was also lowest in this group (22.7 per 10 000; $P$ < .001; Figure 1B).

## Cumulative Incidence by Subgroup

Although low among live donors, cumulative incidence of ESRD per 10 000 at 15 years varied significantly by age: 29.4 (95% CI, 21.4-40.2) among those aged 18 through 39 years; 17.4 (95% CI, 10.1-30.0) among those 40 through 49 years; 54.6 (95% CI, 34.8-85.4) among those 50 through 59 years; and 70.2 (95% CI, 30.4-161.8) among those 60 years or older ($P$ < .001; Figure 2A) and differed per 10 000 at 15 years by race and sex: 96.0 (95% CI, 58.0-158.8) among black men vs 58.5 (95% CI, 34.2-100.0) among black women and 34.0 (95% CI, 22.7-51.0) among white men vs 14.6 (95% CI, 8.8-24.2) among white women ($P$ < .001; Figure 2B). The difference in ESRD incidence per 10 000 at 15 years between biologically related and unrelated donors was not statistically significant: 34.1 (95% CI, 26.9-43.3) for biologically related donors vs 15.1 (95% CI, 8.7-26.3) for biologically unrelated donors ($P$ = .15; Figure 2C). There was no observed temporal trend in risk of ESRD between 1994 and 2011 (trend $P$ = .92; Figure 2D).

## Estimated Lifetime Risk

Live donors had a higher estimated risk of ESRD than healthy nondonors across all ages (Figure 3). Those who had donated at some point before the age of 30 years had an estimated risk of 5 per 10 000 compared with healthy nondonors who had estimated risk of 0 per 10 000. Similarly, by age 50 years, estimated risk in donors was 28 per 10 000 vs 1 per 10 000 in nondonors, and by age 80 years, the estimated risk was 90 per 10 000 in donors vs 14 per 10 000 in nondonors, representing an estimated lifetime absolute risk increase of 76 per 10 000. Nevertheless, live donors had much lower estimated lifetime risk of ESRD than

C.Agnello    SE 0100

Author Manuscript  Author Manuscript  Author Manuscript  Author Manuscript

did the general population by age 80 years, 90 per 10 000 in donors vs 326 per 10 000 in the general population.

## Discussion

In this national study of 96 217 live kidney donors linked to CMS data for reliable ascertainment of ESRD, we estimated that approximately 23 white, 33 Hispanic, and 75 black donors per 10 000 developed ESRD after kidney donation; however, ESRD occurred in 23 white, 26 Hispanic, and 51 black individuals because they donated a kidney, whereas the remaining cases resulted from the inherent risk of ESRD. We also determined that kidney donors had a somewhat higher estimated risk of developing ESRD throughout their lifetimes (90 per 10 000) than similarly healthy individuals who did not donate (14 per 10 000), but still a much lower risk than the general population (326 per 10 000).

Our findings reaffirm the prevailing belief that lifetime risk of ESRD in live donors is no higher than in the general demographics-matched US population,[7,8,10] and our estimate of population-based risk of ESRD (derived from unscreened NHANES III participants) was comparable with a recent estimate of 360 per 10 000 in the general US population.[25] Although, to our knowledge, no association between donor nephrectomy and risk of ESRD has been reported before, this association in our study was strong and was statistically significant within each race/ethnicity stratum. Our findings are an extension of those by Ibrahim et al[7] who observed a decline in renal reserve in as many as 1400 per 10 000 carefully selected white donors, from a mean (SD) predonation glomerular filtration rate (GFR) of 84 (9.2) mL/min/1.73 $m^2$ to a post-donation GFR of less than 60 mL/min/1.73 $m^2$ (a decline of greater than 24 mL/min/1.73 $m^2$) in 12.2 (9.2) years after donation. Ibrahim et al further noted development of ESRD in 30 per 10 000 of these donors 22.5 (10.4) years after donation.

The primary strengths of our approach were the inclusion of every kidney donor in the United States over nearly 2 decades, the highly reliable linkage-based ESRD ascertainment, and the comparison with a healthy nondonor cohort matched on a wide range of demographic and clinical variables. Because of the large sample size of our study populations, we were able to estimate the incidence of a relatively rare event and to make inferences specific to race/ethnicity subgroups, providing critical information not only for those considering donation but also for the nearly 100 000 individuals in the United States living after a donor nephrectomy. An additional strength of our approach was the inclusion of an unscreened nondonor population demographically matched to the donor population. In showing that risk of ESRD in donors was no higher (and, in fact, much lower) than in this unscreened nondonor population, our findings are consistent with previous reports of risk of ESRD in donors.[7-10]

Despite these strengths, some limitations of this study are important to note. First, our inferences were based on 2 cohorts of healthy individuals from the United States and may generalize imperfectly to donors in other countries.[26] Second, donors are meticulously screened, and it is possible that the donors were healthier than the healthy nondonors, even after screening by NHANES history, physical, and laboratory testing. Third, the follow-up

C.Agnello   SE 0101

in our study, although long enough to identify a risk of ESRD in donors, was limited to 15 years and may not have permitted us to fully understand the long-term risk of donation; however, our lifetime risk estimates enable inferences generalizable to individuals of all ages irrespective of the number of years after donation.

It is also worth noting that the donors in this study donated between 1994-2011, whereas the nondonors to whom they were matched entered NHANES III between 1988-1994. With increasing incidence of ESRD over the last 2 decades,[27] one might wonder if the more recent cohort (ie, donors) had a higher risk of ESRD just by virtue of these secular trends. However, secular trends in the general population were mediated by conditions such as morbid obesity, diabetes, and hypertension[28]; these conditions have increased substantially over the last 2 decades in the general population, but much less so in carefully screened donors, for whom many of these conditions are contraindications to donation. As such, not surprisingly, the ESRD rate in donors did not change over time. Furthermore, our study screened for more than 30 medical conditions, thereby attenuating the possibility that the increased rates of ESRD in donors were attributable to secular trends rather than to donation.

## Conclusion

Compared with a matched cohort of healthy nondonors, kidney donors had an increased risk of ESRD; however, the magnitude of the absolute risk increase was small. These findings may help inform discussions with persons considering live kidney donation.

## Supplementary Material

Refer to Web version on PubMed Central for supplementary material.

## Acknowledgments

**Funding/Support:** This study was supported by grant R01DK096008 from the Health Resources and Services Administration contract 234-2005-370011C.

**Role of the Sponsors:** The sponsors had no role in the design and conduct of the study; collection, management, analysis, and interpretation of the data; preparation, review, or approval of the manuscript; and decision to submit the manuscript for publication.

## References

1. [Accessed April 17, 2013] Organ Procurement and Transplant Network website. http://optn.transplant.hrsa.gov/latestData/step2.asp

2. Delmonico FL, Dew MA. Living donor kidney transplantation in a global environment. Kidney Int. 2007; 71(7):608–614. [PubMed: 17290291]

3. Poggio ED, Braun WE, Davis C. The science of stewardship: due diligence for kidney donors and kidney function in living kidney donation— evaluation, determinants, and implications for outcomes. Clin J Am Soc Nephrol. 2009; 4(10):1677–1684. [PubMed: 19713294]

4. Bia MJ, Ramos EL, Danovitch GM, et al. Evaluation of living renal donors: the current practice of US transplant centers. Transplantation. 1995; 60(4):322–327. [PubMed: 7652758]

5. Matas AJ, Bartlett ST, Leichtman AB, Delmonico FL. Morbidity and mortality after living kidney donation, 1999-2001: survey of United States transplant centers. Am J Transplant. 2003; 3(7):830–834. [PubMed: 12814474]

C.Agnello   SE 0102

6. Segev DL, Muzaale AD, Caffo BS, et al. Perioperative mortality and long-term survival following live kidney donation. JAMA. 2010; 303(10):959–966. [PubMed: 20215610]

7. Ibrahim HN, Foley R, Tan L, et al. Long-term consequences of kidney donation. N Engl J Med. 2009; 360(5):459–469. [PubMed: 19179315]

8. Fehrman-Ekholm I, Nordén G, Lennerling A, et al. Incidence of end-stage renal disease among live kidney donors. Transplantation. 2006; 82(12):1646–1648. [PubMed: 17198252]

9. Wafa EW, Refaie AF, Abbas TM, et al. End-stage renal disease among living-kidney donors: single-center experience. Exp Clin Transplant. 2011; 9(1):14–19. [PubMed: 21605018]

10. Cherikh WS, Young CJ, Kramer BF, Taranto SE, Randall HB, Fan PY. Ethnic and gender related differences in the risk of end-stage renal disease after living kidney donation. Am J Transplant. 2011; 11(8):1650–1655. [PubMed: 21672160]

11. Garg AX, Muirhead N, Knoll G, et al. Donor Nephrectomy Outcomes Research (DONOR) Network. Proteinuria and reduced kidney function in living kidney donors: a systematic review, meta-analysis, and meta-regression. Kidney Int. 2006; 70(10):1801–1810. [PubMed: 17003822]

12. Eriksen BO, Ingebretsen OC. The progression of chronic kidney disease: a 10-year population-based study of the effects of gender and age. Kidney Int. 2006; 69(2):375–382. [PubMed: 16408129]

13. Hsu CY, Iribarren C, McCulloch CE, Darbinian J, Go AS. Risk factors for end-stage renal disease: 25-year follow-up. Arch Intern Med. 2009; 169(4):342–350. [PubMed: 19237717]

14. Brancati FL, Whittle JC, Whelton PK, Seidler AJ, Klag MJ. The excess incidence of diabetic end-stage renal disease among blacks: a population-based study of potential explanatory factors. JAMA. 1992; 268(21):3079–3084. [PubMed: 1433738]

15. Klag MJ, Whelton PK, Randall BL, Neaton JD, Brancati FL, Stamler J. End-stage renal disease in African-American and white men: 16-year MRFIT findings. JAMA. 1997; 277(16):1293–1298. [PubMed: 9109467]

16. Lentine KL, Schnitzler MA, Xiao H, et al. Racial variation in medical outcomes among living kidney donors. N Engl J Med. 2010; 363(8):724–732. [PubMed: 20818874]

17. Montgomery RA, Lonze BE, King KE, et al. Desensitization in HLA-incompatible kidney recipients and survival. N Engl J Med. 2011; 365(4):318–326. [PubMed: 21793744]

18. Berger JC, Muzaale AD, James N, et al. Living kidney donors ages 70 and older: recipient and donor outcomes. Clin J Am Soc Nephrol. 2011; 6(12):2887–2893. [PubMed: 22034505]

19. Muzaale AD, Dagher NN, Montgomery RA, Taranto SE, McBride MA, Segev DL. Estimates of early death, acute liver failure, and long-term mortality among live liver donors. Gastroenterology. 2012; 142(2):273–280. [PubMed: 22108193]

20. Van Arendonk KJ, Orandi BJ, James NT, Segev DL, Colombani PM. Living unrelated renal transplantation: a good match for the pediatric candidate? J Pediatr Surg. 2013; 48(6):1277–1282. [PubMed: 23845618]

21. Kaplan EL, Meier P. Nonparametric estimation from incomplete observations. J Am Stat Assoc. 1958; 53(282):25.

22. Vasan RS, Beiser A, Seshadri S, et al. Residual lifetime risk for developing hypertension in middle-aged women and men: the Framingham Heart Study. JAMA. 2002; 287(8):1003–1010. [PubMed: 11866648]

23. Efron B. Bootstrap methods: another look at the jackknife. Ann Stat. 1979; 7(1):1–27.

24. Knol MJ, Pestman WR, Grobbee DE. The (mis)use of overlap of confidence intervals to assess effect modification. Eur J Epidemiol. 2011; 26(4):253–254. [PubMed: 21424218]

25. Grams ME, Chow EK, Segev DL, Coresh J. Lifetime incidence of CKD stages 3-5 in the United States. Am J Kidney Dis. 2013; 62(2):245–252. [PubMed: 23566637]

26. Horvat LD, Shariff SZ, Garg AX; Donor Nephrectomy Outcomes Research (DONOR) Network. Global trends in the rates of living kidney donation. Kidney Int. 2009; 75(10):1088–1098. [PubMed: 19225540]

27. US Renal Data Systems. USRDS 2006 Annual Data Report: Atlas of End-Stage Renal Disease in the United States. Bethesda, MD: National Institutes of Health, National Institute of Diabetes and Digestive and Kidney Diseases; 2007.

C.Agnello   SE 0103

Author Manuscript   Author Manuscript   Author Manuscript   Author Manuscript

28. Coresh J, Selvin E, Stevens LA, et al. Prevalence of chronic kidney disease in the United States. JAMA. 2007; 298(17):2038–2047. [PubMed: 17986697]

C.Agnello   SE 0104





**Figure 1. Cumulative Incidence of End-Stage Renal Disease in Live Kidney Donors and Matched Healthy Nondonors**

A, The shaded areas indicate 95% confidence intervals obtained by bootstrapping. Matched healthy nondonors were identified among participants in the third National Health and Nutrition Examination Survey and were drawn with replacement in light of a larger population of donors compared with healthy nondonors by bootstrapping (see the Methods section).

C.Agnello   SE 0105



**Figure 2. Cumulative Incidence of End-Stage Renal Disease in Live Kidney Donors**

Estimates obtained using Kaplan-Meier methods and compared using log-rank tests. The y-axis scale shown in blue indicates the range from 0 to 40 events per 10 000.

C.Agnello   SE 0106

Muzaale et al.                                                                                              Page 12



No. at risk

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Unscreened nondonor | 1296 | 18436 | 36272 | 40863 | 26982 | 7990 | 647 |
| Live donor | 1143 | 13144 | 22647 | 22944 | 12151 | 2575 | 218 |
| Healthy nondonor | 1306 | 18487 | 36397 | 40961 | 28358 | 9011 | 870 |

**Figure 3. Estimated Lifetime Risk of End-Stage Renal Disease in Matched But Unscreened Nondonors, Live Kidney Donors, and Matched Healthy Nondonors**

Nondonors were identified among participants in the third National Health and Nutrition Examination Survey. Healthy nondonors were a subset of unscreened nondonors. Comparisons were made by bootstrapping.

*JAMA*. Author manuscript; available in PMC 2015 April 28.

C.Agnello    SE 0107

**Table 1**

**Characteristics of Live Kidney Donors in the United States at the Time of Donation and Matched Healthy Nondonors in the United States at the Time of NHANES Enrollment**

| Characteristics[a] | Live Kidney Donors, % (n = 96 217) | Matched Healthy Nondonors, % (n = 96 217)[b] | P Value |
|---|---|---|---|
| Age, mean (SD), y | 40.2 (11.1) | 40.2 (11.1) | .90 |
| 18-39 | 48.2 | 48.0 | |
| 40-49 | 30.1 | 29.8 | .70 |
| 50-59 | 17.5 | 17.9 | |
| 60 | 4.2 | 4.3 | |
| Women | 59.0 | 59.0 | >.99 |
| Race/ethnicity[c] | | | |
| White/other | 74.6 | 74.6 | |
| Black | 12.9 | 12.9 | >.99 |
| Hispanic | 12.5 | 12.5 | |
| Educational status[d] | | | |
| High school | 36.3 | 42.5 | |
| Attended college | 28.4 | 25.8 | <.001 |
| College graduate | 25.1 | 21.0 | |
| Post college | 10.2 | 10.7 | |
| BMI[e] | | | |
| Mean (SD) | 26.7 (7.5) | 26.2 (4.8) | <.001 |
| <24 | 33.0 | 40.1 | |
| 25-29 | 41.8 | 38.6 | <.001 |
| 30 | 25.2 | 21.3 | |
| Blood pressure, mm Hg[f] | | | |
| Systolic | | | |
| Mean (SD) | 121.0 (16.3) | 119.2 (12.5) | <.001 |
| <120 | 44.3 | 51.1 | |
| 120-139 | 46.7 | 43.0 | <.001 |
| 140 | 9.0 | 5.9 | |
| Diastolic | | | |
| Mean (SD) | 73.6 (11.5) | 75.5 (10.2) | <.001 |
| <80 | 69.0 | 62.1 | |
| 80-89 | 26.6 | 30.3 | <.001 |
| 90 | 4.4 | 7.6 | |
| Smoker[g] | 24.2 | 10.4 | <.001 |
| Creatinine, mean (SD), mg/dL | 0.9 (0.2) | 1.0 (0.2) | <.001 |
| eGFR, mL/min/1.73 m$^2$,[h] | | | |

C.Agnello  SE 0108

| Characteristics[a] | Live Kidney Donors, % (n = 96 217) | Matched Healthy Nondonors, % (n = 96 217)[b] | P Value |
|---|---|---|---|
| Mean (SD) | 100.7 (23.7) | 86.4 (24.6) | <.001 |
| <80 | 22.1 | 41.1 | |
| 80-89 | 7.2 | 10.2 | <.001 |
| 90 | 70.7 | 48.7 | |
| Urine albumin:creatinine ratio, mean (SD), µg/mg | | 0.04 (0.6) | |
| Biologically related to recipient[i] | 67.6 | | |
| Year of donation | | | |
| 1994-1997 | 13.8 | | |
| 1998-2001 | 21.5 | | |
| 2002-2005 | 26.9 | | |
| 2006-2009 | 25.8 | | |
| 2010-2011 | 12.0 | | |

Abbreviations: Blank cells, not applicable; BMI, body mass index, calculated as weight in kilograms divided by height in meters squared; eGFR, estimated glomerular filtration rate; NHANES, National Health and Nutrition Examination Survey.

SI conversion: To convert creatinine from mg/dL to µmol/L, multiply by 88.4.

[a] Characteristics at the time of donation (April 1994-November 2011) and at enrollment (January 1988-December 1994) are shown; age, sex, and race/ethnicity were available throughout the study period.

[b] Matched healthy nondonors were identified among participants in the NHANES III survey and were drawn with replacement in light of a larger population of donors than of healthy nondonors. Participants with missing data were excluded from this study.

[c] For race/ethnicity, the category of "Other" included American Indian, Native Hawaiian, Alaskan Native, Pacific Islander, and multiracial.

[d] For donors, education was only available after 1998 (42% missing between 2000-2004; 21% missing between 2005-2009, 9% missing 2010-2011).

[e] Body mass index was only available after 2003 (33% missing between 2005-2009; 19% missing between 2010-2011).

[f] Blood pressure was only available after 1999 (24% missing between 2000-2004; 8% missing between 2005-2009; 4% missing between 2010-2011).

[g] Smoking status was only available after 2004 (5% missing between 2005-2009; 1% missing between 2010-2011).

[h] Creatinine and eGFR (estimated using the chronic kidney disease– epidemiology collaboration equation) were only available after 1997 (34% missing between 1998-2001; 5% missing between 2002-2005; 1% missing after 2006).

[i] The Relationship to recipient was missing for 0.25% records between 1994-2011.

C.Agnello   SE 0109

**Table 2**

**Development of End-Stage Renal Disease in Subgroups of Live Kidney Donors in the United States, 1994-2011**

| | No. of Donors | Cases of ESRD | Cumulative Incidence of ESRD at 15 Years per 10 000 (95% CI) |
|---|---|---|---|
| All donors[a] | 96 217 | 99 | 30.8 (24.3-38.5) |
| Age at donation, y | | | |
| 18-39 | 46 344 | 50 | 29.4 (21.4-40.2) |
| 40-49 | 28 994 | 17 | 17.4 (10.1-30.0) |
| 50-59 | 16 840 | 25 | 54.6 (34.8-85.4) |
| 60 | 4039 | 7 | 70.2 (30.4-161.8) |
| Sex | | | |
| Women | 56 775 | 42 | 21.1 (14.9-29.9) |
| Men | 39 442 | 57 | 44.1 (32.9-59.1) |
| Race | | | |
| White/other | 71 769 | 50 | 22.7 (15.6-30.1) |
| Black | 12 387 | 36 | 74.7 (47.8-105.8) |
| Hispanic | 12 061 | 13 | 32.6 (17.9-59.1) |
| Relationship to recipient[b] | | | |
| Biological | 64 897 | 83 | 34.1 (26.9-43.3) |
| Nonbiological | 31 081 | 16 | 15.1 (08.7-26.3) |

[a] In a mean (SD) of 8.6 (3.6) years after donation, 99 donors who were aged 50 (13) years developed end-stage renal disease (ESRD).

[b] Relationship to recipient was missing for 0.25% of the records between 1994-2011.

C.Agnello   SE 0110

Author Manuscript   Author Manuscript   Author Manuscript   Author Manuscript



# EXHIBIT G

**Metcalf & Metcalf, P.C.**
99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

C.Agnello  SE 0111

 RELATED ARTICLES     FIGURES    ↓ SUPPLEMENTAL CONTENT

Home | JAMA | Vol. 303, No. 10

## Original Contribution



# Perioperative Mortality and Long-term Survival Following Live Kidney Donation

Dorry L. Segev, MD, PhD; Abimereki D. Muzaale, MD, MPH; Brian S. Caffo, PhD ; et al

» Author Affiliations | Article Information

 Cite     Permissions     Metrics

**JAMA**

**Published Online: March 10, 2010**
2010;303;(10):959-966.
doi:10.1001/jama.2010.237

## Abstract

**Context** More than 6000 healthy US individuals every year undergo nephrectomy for the purposes of live donation; however, safety remains in question because longitudinal outcome studies have occurred at single centers with limited generalizability.

**Objectives** To study national trends in live kidney donor selection and outcome, to estimate short-term operative risk in various strata of live donors, and to compare long-term death rates with a matched cohort of nondonors who are as similar to the donor cohort as possible and as free as possible from contraindications to live donation.

C.Agnello  SE 0112

≡ RELATED ARTICLES    ⊠ FIGURES    ↓ SUPPLEMENTAL CONTENT



range) follow-up was 6.3 (3.2-9.8) years. A matched cohort was drawn from 9364 participants of the third National Health and Nutrition Examination Survey (NHANES III) after excluding those with contraindications to kidney donation.

**Main Outcome Measures** Surgical mortality and long-term survival.

**Results** There were 25 deaths within 90 days of live kidney donation during the study period. Surgical mortality from live kidney donation was 3.1 per 10 000 donors (95% confidence interval [CI], 2.0-4.6) and did not change during the last 15 years despite differences in practice and selection. Surgical mortality was higher in men than in women (5.1 vs 1.7 per 10 000 donors; risk ratio [RR], 3.0; 95% CI, 1.3-6.9; *P* = .007), in black vs white and Hispanic individuals (7.6 vs 2.6 and 2.0 per 10 000 donors; RR, 3.1; 95% CI, 1.3-7.1; *P* = .01), and in donors with hypertension vs without hypertension (36.7 vs 1.3 per 10 000 donors; RR, 27.4; 95% CI, 5.0-149.5; *P* < .001). However, long-term risk of death was no higher for live donors than for age- and comorbidity-matched NHANES III participants for all patients and also stratified by age, sex, and race.

**Conclusion** Among a cohort of live kidney donors compared with a healthy matched cohort, the mortality rate was not significantly increased after a median of 6.3 years.

With a significant organ shortage in the United States and with minimal expansions of the deceased donor pool in recent decades, many patients with end-stage renal disease are turning to live donor kidney transplantation to improve survival and quality of life.[1-5] Although many healthy adults are eager and willing to accept the risk of donor nephrectomy to help their loved ones, the responsibility lies within the medical community to quantify these risks as best as possible and to make this information available to those considering donation.

Evidence to date suggests that live kidney donation is safe.[3,6-14] In fact, some studies show that live donors have better outcomes than their population counterparts.[1,3] But inferences have thus far been limited by lack of generalizability, restrictive sample size, and inappropriate comparison groups. Most studies that have evaluated live donor outcomes have been conducted at single academic centers with carefully selected, primarily white individuals who receive close follow-up and are often involved in funded research studies. Furthermore, although some single centers have studied as many as 3700 donors,[3] the event rate for long-term death in live donors is so low that the power to detect differences in outcomes is limited with these sample sizes. Finally, comparison groups for long-term outcomes have been limited to published population-based life tables or heavily confounded reference populations and as such lack the ability to select healthy controls in a manner comparable with the screening process for kidney donors.

C.Agnello   SE 0113

 **RELATED ARTICLES**    **FIGURES**   ↓ **SUPPLEMENTAL CONTENT**

kidney donor selection and outcome, to estimate short-term operative risk in various strata of live donors, and to improve the long-term comparison group by identifying a matched cohort of nondonors who are as similar to the donor cohort as possible and as free as possible from contraindications to live donation.

## Methods

### Study Population

**Live Donors.** By national mandate, all live kidney donors are reported to the Organ Procurement and Transplantation Network through the United Network for Organ Sharing (UNOS). A total of 80 347 live kidney donors between April 1, 1994, and March 31, 2009, were included in this study, excluding only 24 donors where age was not recorded and 12 donors where age was recorded as younger than 18 years. All donor characteristics are reported by the transplant centers to UNOS and are shown as entered on the donor registration form. Postdonation death was ascertained by linking donors to the Social Security Death Master File as of March 31, 2009, using the social security number and confirming with 1 or more of the following identifiers: first name, last name, middle initial, and date of birth, as has been previously reported in other studies of live donors.[3]

**Matched Cohort.** Potential comparison patients were identified from among participants of the third National Health and Nutrition Examination Survey (NHANES III) conducted between 1988 and 1994. NHANES III was a national household survey conducted by the National Center for Health Statistics of the Centers for Disease Control and Prevention using a complex oversampled multistage sample design. Baseline comorbidities and other medical information was obtained through home interviews, physical examinations, and radiographic and laboratory test results. Death among NHANES III participants was similarly ascertained by linkage as described above for the live donors, allowing for a reasonable comparison of death rates. Of 20 024 adults in the NHANES III, 9458 with recorded comorbidities or other factors that would have deemed them ineligible at most transplant centers were excluded. Exclusion comorbidities included kidney disease, diabetes, heart disease, and hypertension. Although some transplant programs accept donors with hypertension, the degree of hypertension is not recorded in either data set, and it is likely that donors with hypertension are well-controlled; therefore, for the sake of a reference group, donors with hypertension were held to the comparison standard of controls without hypertension.

Additional exclusion factors included answering "yes" to any of the questions listed in the eTable. Finally, NHANES III participants who were missing information on kidney disease, diabetes, heart disease, or hypertension could not serve as part of a comparison cohort and were thus excluded (n = 1228). A total of 9364 NHANES III participants remained who were without contraindications to live donation; 1 matched control for each live kidney donor was selected from this remaining NHANES III population with replacement, as fully delineated in the eMethods.

C. Agnello   SE 0114

≡ RELATED ARTICLES      🖼 FIGURES      ↓ SUPPLEMENTAL CONTENT

Mortality estimates were obtained by Kaplan-Meier curve methods, with administrative censoring at the time of linkage to the Social Security Death Master File. For live donors, time at risk was accrued from the date of donation. For NHANES III controls, time at risk was accrued from the date of enrollment into the study. Early postsurgical (3-month and 12-month) death rates were calculated per 10 000 donors with 95% confidence intervals (CIs) derived using Poisson exact intervals. Differences in early postsurgical deaths across donor characteristics were analyzed by using $\chi^2$ tests of independence. Associations between donor characteristics and long-term death (all deaths including early deaths) were analyzed using nested Cox proportional hazards regression models. Long-term death rates between live kidney donors and the matched cohort were compared using log-rank tests. Based on the number of patients for whom we had 10-year follow-up and a 10-year survival of 97%, we had 80% power to detect a difference of 1%; in other words, if live donor survival at 10 years was 96% or lower and matched cohort survival was 97%, we would anticipate having the power to detect this difference. All analyses were performed by using multiprocessor Stata version 11.0/MP for Linux (StataCorp, College Station, Texas), with α = .05. When applicable, all hypothesis tests were 2-sided.

## Results

### Donor Demographics

There was a significant increase in live donor kidney transplants in the United States during the last 15 years (from 3009 in 1994 to 5968 in 2008). Donor age changed considerably over time, with 13.9% of donors older than 50 years in 1994 compared with 22.8% in 2008. A total of 58 683 live kidney donors (73.1%) were white, 10 505 (13.1%) were black, and 9846 (12.3%) were Hispanic (**Table 1**). Educational backgrounds varied, with 38.4% of live kidney donors educated at grade school or high school level, 28.0% with some college, and 33.6% with a bachelor's degree or postcollege. Of donors where body mass index (BMI, calculated as weight in kilograms divided by height in meters squared) information was available (after 2003), 22.6% were obese (BMI ≥30). Very few individuals (1.8%) were categorized as having hypertension in the same era.

**Table 1.** Demographic and Predonation Characteristics of Live Kidney Donors[a]

---

⬈ **View Large**      ↓ **Download**

**Table 1.** Demographic and Predonation Characteristics of Live Kidney Donors[a]

☰ RELATED ARTICLES     FIGURES    ↓ SUPPLEMENTAL CONTENT

## Characteristics of Live Kidney Donors[a]

| Characteristics | No. (%) of Donors |
|---|---|
| **Age, y** | |
| 18-39 | 39 516 (49.2) |
| 40-49 | 24 375 (30.3) |
| 50-59 | 13 439 (16.7) |
| ≥60 | 3017 (3.8) |
| **Sex** | |
| Men | 33 380 (41.5) |
| Women | 46 967 (58.5) |
| **Race/ethnicity** | |
| White | 58 683 (73.1) |
| Black | 10 505 (13.1) |
| Hispanic | 9846 (12.3) |
| Other | 1252 (1.6) |
| **Education** | |
| Grade school | 910 (2.3) |
| High school | 14 497 (36.1) |
| Some college | 11 259 (28.0) |
| Bachelor degree | 9660 (24.1) |
| Postcollege | 3820 (9.5) |
| **BMI** | |
| 15-24 | 7343 (37.0) |
| 25-29 | 8016 (40.4) |
| ≥30 | 4473 (22.6) |
| **SBP, mm Hg** | |
| <120 | 25 713 (53.3) |
| 120-139 | 19 114 (39.6) |
| >140 | 3430 (7.1) |

C.Agnello  SE 0116

RELATED ARTICLES    FIGURES    ↓ SUPPLEMENTAL CONTENT

| | |
|---|---|
| No | 29 848 (98.2) |
| Yes | 545 (1.8) |
| Smoking (ever) | |
| No | 19 391 (76.0) |
| Yes | 6114 (24.0) |
| Creatinine values, mean (SD)[b] | |
| Serum creatinine, mg/dL | 0.9 (0.2) |
| Creatinine clearance, mL/min | 117 (36) |

Abbreviations: BMI, body mass index (calculated as weight in kilograms divided by height in meters squared); SBP, systolic blood pressure.

SI conversions: To convert serum creatinine to µmol/L, multiply by 88.4; and creatinine clearance to mL/s, multiply by 0.0167.

[a] Characteristics for age, sex, and race/ethnicity were available throughout the study period. For race/ethnicity, other included American Indian, Native Hawaiian, Alaskan Native, Pacific Islander, and multiracial. Education was only available after 1998 (46% missing between 1999-2004; 24% missing between 2005-2009). BMI was only available after 2003 (49% missing between 2004-2006; 31% missing between 2007-2009). SBP was only available after 1999 (22% missing between 2000-2005; 9% missing 2006-2009). Hypertension was only available after 2003 (41% missing in 2004; 3% missing in 2005; 1% missing between 2006-2008). Smoking was only available after 2004 (23% missing in 2005; 0.06% missing between 2006-2008).

[b] Serum creatinine (n=58 599) was only available after 1998 (49% missing between 1999-2000; 4% missing between 2001-2009). Cockcroft-Gault formula was used to obtain creatinine clearance estimates (n=21 295).

☰ RELATED ARTICLES     ⊞ FIGURES     ↓ SUPPLEMENTAL CONTENT

## Early Postsurgical Death

In general, the risk of death in the first 90 days following live donor nephrectomy was 3.1 per 10 000 donors in the first 90 days (95% CI, 2.0-4.6) (**Table 2**). Although more conservative than the commonly used 30-day perioperative mortality metric, death in the first 90 days seemed a good measure of surgical mortality, because this rate greatly exceeded the risk of death in the first 90 days for the NHANES III matched cohort (0.4 per 10 000 donors; 95% CI, 0.1-1.1; $P$ < .001) compared with live donors. By 1 year following nephrectomy, risk of death in the matched cohort was similar (4.6 per 10 000 donors; 95% CI,

C.Agnello   SE 0118

≡ RELATED ARTICLES    🖼 FIGURES    ↓ SUPPLEMENTAL CONTENT

**Table 2.** Death Within 3 and 12 Months of Live Donor Nephrectomy[a]

⬈ View Large    ↓ Download

**Table 2. Death Within 3 and 12 Months of Live Donor Nephrectomy[a]**

| Characteristic | Within 3 Months | | | Within 12 Months | | |
|---|---|---|---|---|---|---|
| | No. of Deaths | Rate per 10 000 Donors (95% CI) | P Value | Deaths | Rate per 10 000 Donors (95% CI) | P Value |
| Live donors (n = 80 347) | 25 | 3.1 (2.0-4.6) | <.001 | 52 | 6.5 (4.8-8.5) | .11 |
| Matched cohort (n = 80 347) | 3 | 0.4 (0.1-1.1) | | 37 | 4.6 (3.2-6.3) | |
| Age, y | | | | | | |
| 18-39 | 12 | 3.0 (1.6-5.3) | .46 | 24 | 6.1 (3.9-9.0) | .08 |
| 40-49 | 9 | 3.7 (1.7-7.0) | | 18 | 7.4 (4.4-11.7) | |
| 50-59 | 2 | 1.5 (0.2-5.4) | | 5 | 3.7 (1.2-8.7) | |
| ≥60 | 2 | 6.6 (0.8-23.9) | | 5 | 16.6 (5.4-38.7) | |
| Sex | | | | | | |
| Men | 17 | 5.1 (3.0-8.2) | .007 | 34 | 10.2 (7.1-14.2) | <.001 |
| Women | 8 | 1.7 (0.7-3.4) | | 18 | 3.8 (2.3-6.1) | |
| Race/ethnicity | | | | | | |
| White | 15 | 2.6 (1.4-4.2) | .04 | 32 | 5.5 (3.7-7.7) | .08 |
| Black | 8 | 7.6 (3.3-15.0) | | 12 | 11.4 (5.9-20.0) | |
| Hispanic | 2 | 2.0 (0.2-7.3) | | 6 | 6.1 (2.2-13.3) | |
| BMI | | | | | | |
| 15-24 | 2 | 2.7 (0.3-9.8) | .49 | 3 | 4.1 (0.8-11.9) | .76 |
| 25-29 | 1 | 1.2 (0.0-7.0) | | 4 | 5.0 (1.4-12.8) | |
| ≥30 | 0 | 0.0 (0.0-8.2) | | 1 | 2.2 (0.1-12.4) | |
| SBP, mm Hg | | | | | | |
| <120 | 4 | 1.6 (0.4-4.0) | .37 | 9 | 3.5 (1.6-6.6) | .07 |
| 120-139 | 7 | 3.7 (1.5-7.5) | | 14 | 7.3 (4.0-12.3) | |
| ≥140 | 1 | 2.9 (0.1-16.2) | | 4 | 11.7 (3.2-29.9) | |
| Hypertension | | | | | | |
| No | 4 | 1.3 (0.4-3.4) | <.001 | 13 | 4.3 (2.3-7.4) | .001 |
| Yes | 2 | 36.7 (4.4-132.6) | | 2 | 36.7 (4.4-132.6) | |
| Smoking | | | | | | |
| No | 3 | 1.5 (0.3-4.5) | .40 | 8 | 4.1 (1.8-8.1) | .45 |
| Yes | 2 | 3.3 (0.4-11.8) | | 4 | 6.5 (1.8-16.8) | |
| Year | | | | | | |
| 1994-1997 | 2 | 1.5 (0.2-5.4) | .33 | 6 | 4.5 (1.7-9.8) | .44 |
| 1998-2001 | 8 | 3.9 (1.7-7.6) | | 16 | 7.7 (4.4-12.6) | |
| 2002-2005 | 11 | 4.2 (2.1-7.6) | | 20 | 7.7 (4.7-11.9) | |
| 2006-2009 | 4 | 2.0 (0.5-5.0) | | 10 | 4.9 (2.3-9.0) | |

Abbreviations: BMI, body mass index (calculated as weight in kilograms divided by height in meters squared); CI, confidence interval; SBP, systolic blood pressure.
[a] Poisson exact 95% CIs reported. P values were calculated by χ² test across all values (rows) for a given category. Matched controls were identified among participants in the third National Health and Nutrition Examination Survey.

Surgical mortality did not change during the 15-year period, despite differences in surgical practice and donor selection (**Table 2**). Men had a statistically significantly higher surgical mortality than women did (5.1 per 10 000 donors; 95% CI, 3.0-8.2; vs 1.7 per 10 000 donors; 95% CI, 0.7-3.4; risk ratio [RR], 3.0; 95% CI, 1.3-6.9, P = .007), as did black individuals vs white and Hispanic individuals (7.6 per 10 000 donors; 95% CI, 3.3-15.0; vs 2.6 per 10 000 donors; 95% CI, 1.4-4.2; and 2.0 per 10 000 donors; 95% CI, 0.2-7.3; RR, 3.1; 95% CI, 1.3-7.1; P = .01 vs nonblack individuals). Donors with hypertension also had a statistically significantly higher surgical mortality than did donors without hypertension (36.7 per 10 000 donors; 95% CI, 4.4-132.6; vs 1.3 per 10 000 donors; 95% CI, 0.4-3.4; RR, 27.4; 95% CI, 5.0-149.5; P < .001), although this was based on only 2 deaths among 545 donors with hypertension; therefore, as indicated by the wide

C.Agnello   SE 0119

 RELATED ARTICLES     FIGURES    ↓ SUPPLEMENTAL CONTENT

## Long-term Donor Survival

Similar associations were observed when studying long-term mortality after live kidney donation as were shown in postsurgical death rates. When analyzing the entire cohort of live donors, individuals aged 50 to 59 years (hazard ratio [HR], 3.3; 95% CI, 2.6-4.1; unadjusted 3.5% 12-year mortality for this subgroup vs 1.3% 12-year mortality for those adults younger than 40 years), aged 60 years or older (HR, 9.4; 95% CI, 7.3-12.1; unadjusted 9.4% 12-year mortality for this subgroup), male sex (HR, 1.7; 95% CI, 1.5-2.0; unadjusted 2.7% 12-year mortality for men vs 1.9% 12-year mortality for women), and black race (HR, 1.3; 95% CI, 1.0-1.6; unadjusted 2.8% 12-year mortality for black individuals vs 1.7% 12-year mortality for white individuals) were associated with higher rates of long-term death (model 1 in **Table 3**). These associations were also observed in the cohort of donors between 2000 and 2009, where information about SBP was also available (model 2 in **Table 3**). In this cohort, SBP of 140 mm Hg or higher was also associated with a higher rate of death (HR, 1.7; 95% CI, 1.1-2.9; unadjusted 4.0% 9-year mortality vs 1.4% 9-year mortality for SBP of <120 mm Hg) (model 2 in **Table 3**).

**Table 3.** Characteristics Associated with Survival Among Live Donors[a]

⬈ View Large    ↓ Download

**Table 3. Characteristics Associated with Survival Among Live Donors[a]**

Table 3. Characteristics Associated with Survival Among Live Donors[a]

Missing covariate data resulted in a cohort limited to donors between 2004 and 2009 when studying the effect of smoking and hypertension (model 3 in **Table 3**). This cohort was one-fourth the size of the full cohort, with about one-third of the follow-up time (median [interquartile range], 2.1 [1.0-3.1] years; vs 6.3 [3.2-9.8] years for the full cohort), and many of the associations observed in the larger cohorts with longer follow-up were not detected in this model. In fact, the only statistically significant associations were SBP of 140 mm Hg or higher (HR, 3.3; 95% CI, 1.1-9.7; unadjusted 4% 9-year mortality vs 1% 9-year mortality for SBP of <120 mm Hg) and smoking (HR, 5.3; 95% CI, 2.6-10.8; unadjusted 1.0% 4-year mortality vs 0.7% 4-year mortality for nonsmokers), while hypertension was not associated with increased risk of death (HR, 0.9; 95% CI, 0.1-6.6; unadjusted 0.7% 3-year mortality vs 0.5% 3-year mortality for those donors without hypertension).

## Matched NHANES III Cohort

RELATED ARTICLES    FIGURES    SUPPLEMENTAL CONTENT

follow-up (5-year follow-up: 0.4% vs 0.9% and 12-year follow-up: 1.5% vs 2.9%; *P* < .001 by log-rank test) (**Figure 1**). Similar patterns were observed when comparing live kidney donors with matched controls stratified by age (**Figure 2**), sex (**Figure 3**), and race (**Figure 3**) (*P* < .001 for all comparisons by log-rank test).

View Large    Download

**Figure 1. Kaplan-Meier Curves Comparing Cumulative Mortality of Live Kidney Donors and Matched Controls for the Entire Cohort of Live Donors**

Figure 1. Kaplan-Meier Curves Comparing Cumulative Mortality of Live Kidney Donors and Matched Controls for the Entire Cohort of Live Donors

Matched controls were identified among participants in the third National Health and Nutrition Examination Survey.

View Large    Download

**Figure 2. Kaplan-Meier Curves Comparing Cumulative Mortality of Live Kidney Donors and Matched Controls by Age Category**

Figure 2. Kaplan-Meier Curves Comparing Cumulative Mortality of Live Kidney Donors and Matched Controls by Age Category

Matched controls were identified among participants in the third National Health and Nutrition Examination Survey.

View Large    Download

**Figure 3. Kaplan-Meier Curves Comparing Cumulative Mortality of Live Kidney Donors and Matched Controls by Sex and Race**

Figure 3. Kaplan-Meier Curves Comparing Cumulative Mortality of Live Kidney Donors and Matched Controls by Sex and Race

Matched controls were identified among participants in the third National Health and Nutrition Examination Survey.

☰ RELATED ARTICLES   🖼 FIGURES   ↓ SUPPLEMENTAL CONTENT

The benefits of live donation for the recipient in terms of reduction in waitlist mortality and longevity after transplantation have been well demonstrated. It is incumbent on the transplantation community to show that these lives are not saved at the cost of placing the donors at risk for excess perioperative or long-term mortality. In our study of all live donors during a 15-year period in the United States, 25 of 80 347 donors died within 3 months of donation, for an estimated surgical mortality of 3.1 per 10 000 cases. This compares with reported surgical mortality of approximately 18 per 10 000 cases for laparoscopic cholecystectomy[15] and approximately 260 per 10 000 cases for nondonor nephrectomy.[16] Although the proportion of donors older than 50 years nearly doubled, the death rate did not change over time. Similarly, although more than 20% of live donors were obese (BMI ≥30), surgical mortality was not associated with obesity. Although it is possible that surgical mortality was higher for older adults, this difference was also not statistically detectable. Surgical mortality was demonstrably higher for men (RR, 3.0), black individuals (RR, 3.1), and those reported to have hypertension (RR, 27.4), consistent with higher rates of death after other surgical procedures for these subgroups.[17-21] These factors were also associated with higher risk of long-term death, consistent with known population factors associated with vulnerability to mortality. Most importantly, long-term death rates were no higher for live donors than for the matched cohort of NHANES III participants selected to most closely resemble live donors.

The strength of our study lies in its generalizability, sample size, and choice of comparison group. This is the first longitudinal survival study to our knowledge that draws from the entire population of live US donors during a 15-year period. The use of a complete national population is critical, as most single-center studies to date have involved white donors without hypertension from large-volume transplant centers. For example, the largest longitudinal study of donors to date (3700 live donors at the University of Minnesota), although important and informative, is limited to a population that is nearly 100% white.[3] However, we have shown that 26% of US donors are nonwhite and outcomes differ by race/ethnicity, with higher surgical and long-term mortality in black individuals. With more than 10 000 black individuals in our study, we were also able to compare survival of these donors with their NHANES III controls; this comparison has not been possible in previous studies.

The large sample size of more than 80 000 live donors allows for more robust inferences about surgical mortality, which is a rare event (3.1 per 10 000 cases overall), and for comparison of death rates by various strata, including age, sex, race/ethnicity, BMI, SBP, and smoking. This is particularly relevant in terms of donor counseling, because risk awareness is the essence of informed consent when a healthy person embarks on a major operation. Previous surgical mortality estimates have been based mostly on self-report and literature review, with the risk of reporting bias, recall bias, and publication bias. Estimates currently quoted to candidate donors range from 0.03% based on a self-reported survey of members of a professional society conducted in 1992[8] to 0.06% based on a study of 8200 live donors drawn from the literature and a self-reported survey conducted in 1987.[22] Surgical mortality in the recent era has not been esti-

☰ RELATED ARTICLES    ⊡ FIGURES    ↓ SUPPLEMENTAL CONTENT

Although not statistically significant, it is entirely possible that the increase in surgical mortality between 1994-1997 and 1998-2005, and the subsequent reduction thereafter, reflects the learning curve with new technology.[12] If this is true, a mortality between 1.5 per 10 000 donors (from 1994-1997) and 2.0 per 10 000 donors (from 2006-2009) may be more representative as live donor nephrectomy moves forward.

Long-term live donor survival has traditionally been compared with population-based survival estimates. For example, Fehrman-Ekholm et al[6] compared live donor survival to expected survival using national mortality rates. Recently, Ibrahim et al[3] compared live donor survival with general population life tables from the National Center for Health Statistics. However, clearly live donors are very carefully selected and an appropriate comparison group should be selected in a similar manner. In applying our exclusion criteria, which were based on standard live donor candidate workup[4] as best ascertained by NHANES III data, more than half of the NHANES III cohort were found to be ineligible for live donation, illustrating the bias that is inherent in population-based comparison groups. Our matched cohort was thus carefully constructed to represent (within the limitations of the data) potential candidates for live donation and oversampled to represent the demographic distribution of the live donor cohort. Despite these efforts, unmeasured confounding still likely explains the lower observed survival among the matched cohort, given that candidate live donors are very carefully screened by multidisciplinary teams and significant laboratory and radiographic testing, while we were only able to exclude a proportion of the NHANES III controls based on approximately 30 screening questions.

Our study is limited by availability of data, duration of follow-up, and statistical artifacts resulting from an oversampled matched cohort. Of the 80 347 donors registered by national mandate through UNOS, all had information about age, sex, race/ethnicity, and vital status throughout the study period. However, more granular information about education, BMI, SBP, hypertension, and smoking was only available in the later periods. As a result, our ability to estimate early surgical mortality stratified by these factors was limited to a smaller (yet still very large and nationally representative) subset of donors (n = 22 745-47 695). Furthermore, our ability to make inferences about the effects of SBP, hypertension, or smoking on long-term survival was limited by shorter follow-up (maximum follow-up, 4.3-9.3 years vs 15.1 years for those donors with only age, sex, and race/ethnicity information).

Although NHANES III is a large, representative, and commonly studied population of potential comparison patients, this cohort was one-eighth the size of the live donor cohort after appropriate exclusions. As a result, in generating a matched cohort based on these patients, we had to sample with replacement (some patients were used more than once in the matched cohort). Although this accounted for confounding by making the matched cohort similar in demographics to the live donor cohort, the oversampling caused an artificially larger sample size for the purposes of standard error estimates. Of all statistical analyses performed in our study, the only one affected was the statistical comparison of the live donor survival with the



RELATED ARTICLES      FIGURES      ↓ SUPPLEMENTAL CONTENT

the artificial increase in sample size, we can still safely conclude that live donors did not have statistically significantly worse survival than their NHANES III counterparts.

We have shown that live kidney donation is safe and free from significant long-term excess mortality. Although perioperative mortality is low (3.1 of 10 000 cases), some subgroups seem to be at higher risk and individuals from these demographic groups should be counseled accordingly. Importantly, although selection criteria have changed over time and more adults older than 50 years are donating, we found no evidence that these adults are at higher risk of surgical mortality and no evidence that surgical mortality is changing over time. This suggests that current screening practices, even in older age groups, still result in a well-selected group of healthy adults.

Regardless of what physiologic changes might occur in a healthy adult after kidney donation, our findings of similar long-term survival between donors and healthy comparison patients suggest that these physiologic changes do not result in premature death. Although additional studies are clearly needed to better understand the physiologic changes after kidney donation, the current practice of live kidney donation should continue to be considered a reasonable and safe modality for addressing the profound shortage in deceased donor organs.

## Article Information

**Corresponding Author:** Dorry L. Segev, MD, PhD, Department of Surgery, Johns Hopkins Medical Institutions, 720 Rutland Ave, Ross 771B, Baltimore, MD 21205 (dorry@jhmi.edu).

**Author Contributions:** Dr Segev had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.

*Study concept and design*: Segev.

*Acquisition of data*: Segev, Taranto, McBride.

*Analysis and interpretation of data*: Segev, Muzaale, Caffo, Mehta, Singer, Taranto, Montgomery.

*Drafting of the manuscript*: Segev, Muzaale.

*Critical revision of the manuscript for important intellectual content*: Segev, Muzaale, Caffo, Mehta, Singer, Taranto, McBride, Montgomery.

*Statistical analysis*: Segev, Muzaale, Caffo, Mehta, McBride.

*Administrative, technical, or material support*: Montgomery.

C. Agnello   SE 0124

≡ RELATED ARTICLES    🖾 FIGURES    ↓ SUPPLEMENTAL CONTENT

**Financial Disclosures:** None reported.

**Funding/Support:** The Organ Procurement and Transplantation Network (OPTN) is supported by Health Resources and Services Administration contract 234-2005-370011C. To ensure confidentiality of Social Security number data provided to the OPTN, the Social Security number linkages to Social Security Death Master File were performed solely by United Network for Organ Sharing staff (including Dr McBride and Ms Taranto).

**Disclaimer:** The analyses described herein are the responsibility of the authors alone and do not necessarily reflect the views or policies of the US Department of Health and Human Services, nor does the mention of trade names, commercial products, or organizations imply endorsement by the US government.

**Additional Contributions:** Katarina Linden (United Network for Organ Sharing, Richmond, Virginia) provided advice and data support for the manuscript. Ms Linden did not receive any compensation.

# References

1. Poggio ED, Braun WE, Davis C. The science of stewardship: due diligence for kidney donors and kidney function in living kidney donation—evaluation, determinants, and implications for outcomes. *Clin J Am Soc Nephrol*. 2009;4(10):1677-168419713294
   PubMed  |  Google Scholar  |  Crossref

2. Delmonico FL, Dew MA. Living donor kidney transplantation in a global environment. *Kidney Int*. 2007;71(7):608-61417290291
   PubMed  |  Google Scholar  |  Crossref

3. Ibrahim HN, Foley R, Tan L,  et al.  Long-term consequences of kidney donation. *N Engl J Med*. 2009;360(5):459-46919179315
   PubMed  |  Google Scholar  |  Crossref

4. Delmonico F.Council of the Transplantation Society.  A report of the Amsterdam forum on the care of the live kidney donor: data and medical guidelines. *Transplantation*. 2005;79(6):(suppl)  S53-S6615785361
   PubMed  |  Google Scholar  |  Crossref

5.  United Network for Organ Sharing Web site. http://www.unos.org. Accessed February 5, 2010

6. Fehrman-Ekholm I, Elinder CG, Stenbeck M, Tyden G, Groth CG. Kidney donors live longer. *Transplantation*. 1997;64(7):976-9789381544
   PubMed  |  Google Scholar  |  Crossref

C.Agnello   SE 0125

☰ RELATED ARTICLES    🖼 FIGURES    ↓ SUPPLEMENTAL CONTENT

meta-analysis, and meta-regression. *Kidney Int*. 2006;70(10):1801-181017003822

PubMed  |  Google Scholar  |  Crossref

8.  Najarian JS, Chavers BM, McHugh LE, Matas AJ. 20 years or more of follow-up of living kidney donors. *Lancet*. 1992;340(8823):807-8101357243

PubMed  |  Google Scholar  |  Crossref

9.  Goldfarb DA, Matin SF, Braun WE,  et al.  Renal outcome 25 years after donor nephrectomy.  *J Urol*. 2001;166(6):2043-204711696703

PubMed  |  Google Scholar  |  Crossref

10.  Okamoto M, Akioka K, Nobori S,  et al.  Short- and long-term donor outcomes after kidney donation: analysis of 601 cases over a 35-year period at Japanese single center. *Transplantation*. 2009;87(3):419-42319202449

PubMed  |  Google Scholar  |  Crossref

11.  Andersen B, Hansen JB, Jorgensen SJ. Survival after nephrectomy. *Scand J Urol Nephrol*. 1968;2(2):91-945734267

PubMed  |  Google Scholar  |  Crossref

12.  Friedman AL, Peters TG, Jones KW, Boulware LE, Ratner LE. Fatal and nonfatal hemorrhagic complications of living kidney donation. *Ann Surg*. 2006;243(1):126-13016371747

PubMed  |  Google Scholar  |  Crossref

13.  Johnson EM, Remucal MJ, Gillingham KJ, Dahms RA, Najarian JS, Matas AJ. Complications and risks of living donor nephrectomy. *Transplantation*. 1997;64(8):1124-11289355827

PubMed  |  Google Scholar  |  Crossref

14.  Matas AJ, Bartlett ST, Leichtman AB, Delmonico FL. Morbidity and mortality after living kidney donation, 1999-2001: survey of United States transplant centers. *Am J Transplant*. 2003;3(7):830-83412814474

PubMed  |  Google Scholar

15.  Steiner CA, Bass EB, Talamini MA, Pitt HA, Steinberg EP. Surgical rates and operative mortality for open and laparoscopic cholecystectomy in Maryland. *N Engl J Med*. 1994;330(6):403-4088284007

PubMed  |  Google Scholar  |  Crossref

16.  Birkmeyer JD, Siewers AE, Finlayson EV,  et al.  Hospital volume and surgical mortality in the United States. *N Engl J Med*. 2002;346(15):1128-113711948273

PubMed  |  Google Scholar  |  Crossref

C.Agnello  SE 0126

☰ RELATED ARTICLES    🖾 FIGURES    ↓ SUPPLEMENTAL CONTENT

PubMed  |  Google Scholar  |  Crossref

**18.** Nathan H, Frederick W, Choti MA, Schulick RD, Pawlik TM. Racial disparity in surgical mortality after major hepatectomy. *J Am Coll Surg*. 2008;207(3):312-31918722934

PubMed  |  Google Scholar  |  Crossref

**19.** Sheikh K, Jiang Y, Bullock CM. Effect of comorbid and fatal coexistent conditions on sex and race differences in vascular surgical mortality. *Ann Vasc Surg*. 2007;21(4):496-50417628266

PubMed  |  Google Scholar  |  Crossref

**20.** Turrentine FE, Wang H, Simpson VB, Jones RS. Surgical risk factors, morbidity, and mortality in elderly patients. *J Am Coll Surg*. 2006;203(6):865-87717116555

PubMed  |  Google Scholar  |  Crossref

**21.** Nguyen GC, Laveist TA, Segev DL, Thuluvath PJ. Race is a predictor of in-hospital mortality after cholecystectomy, especially in those with portal hypertension. *Clin Gastroenterol Hepatol*. 2008;6(10):1146-115418928940

PubMed  |  Google Scholar  |  Crossref

**22.** Bay WH, Hebert LA. The living donor in kidney transplantation. *Ann Intern Med*. 1987;106(5):719-7273551714

PubMed  |  Google Scholar  |  Crossref

**23.** Schulam PG, Kavoussi LR, Cheriff AD,  et al.  Laparoscopic live donor nephrectomy: the initial 3 cases. *J Urol*. 1996;155(6):1857-18598618273

PubMed  |  Google Scholar  |  Crossref

**24.** Ratner LE, Kavoussi LR, Schulam PG, Bender JS, Magnuson TH, Montgomery R. Comparison of laparoscopic live donor nephrectomy versus the standard open approach. *Transplant Proc*. 1997;29(1-2):138-1399122930

PubMed  |  Google Scholar  |  Crossref

View Full Text  |  Download PDF



# Exhibit H

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

C.Agnello   SE 0128

H6EHLUMS

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        16 Cr. 483 (JSR)

5
    STEFAN LUMIERE,
6
                                         Sentence
7              Defendant.

8   ------------------------------x

9                                        New York, N.Y.
                                         June 14, 2017
10                                       9:40 a.m.

11

12  Before:

13                 HON. JED S. RAKOFF,

14                                       District Judge

15                     APPEARANCES

16  JOON H. KIM
         Acting United States Attorney for the
17       Southern District of New York
    IAN McGINLEY
18  DAMIAN WILLIAMS
         Assistant United States Attorney

19  JONATHAN HALPERN
    JONATHAN FRIEDMAN
20       Attorneys for Defendant

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C.Agnello  SC 0129

Case 2:24-cr-00366-NJC   Document 24-1   Filed 03/11/06/27   Page 133 of 569   PageID #:
Case 1:16-cr-00485-JSR   Document 113   Filed 06/27/17   Page 2 of 35   PageID #:
327
H6EHLUMS

```
 1              (Case called)

 2              THE COURT:  Good morning.  All right.  So the parties

 3     have stipulated to a gain amount.  This is a stipulation "for

 4     sentencing purposes only," whatever that may mean.  That a

 5     reasonable estimate of the gains resulting from the fraud is

 6     between 1.5 million and 3.1 million.  I've reviewed that

 7     calculation and the basis for it.  I find that it is a

 8     reasonable calculation.  The government also still asserts the

 9     possibility of a loss, a larger loss calculation.  I've

10     reviewed that calculation, and I don't find it sufficiently

11     adequately supported to adopt.  So I will adopt the gain

12     calculation, which means that to the base offense level of

13     seven, there is added an enhancement of 16 points.  The parties

14     still disagree as to the other enhancements, the two-point

15     enhancement for ten or more victims and the four-point

16     enhancement for associations with an investment adviser.

17              I'm persuaded by the government's arguments, and so I

18     will add those two enhancements for a total offense level of

19     29, for a guideline range of 87 to 108 months in prison.

20     However, if I did not add those enhancements and adopted the

21     defense position, the total offense level would be 23, and the

22     guideline range would be 46 to 57 months.  Excuse me.  Sit

23     down, counsel.  And my sentence, which is going to be below

24     either of the guideline ranges, would be exactly the same

25     whether those enhancements were added or not.  They are totally
```

C.Agnello   SC 0130

```
 1    irrelevant, as is the gain calculation.  It is, of course,

 2    relevant how much this was a serious crime, which it clearly

 3    was, but all this number-crunching gibberish that constitutes

 4    the irrational guidelines is of little or no consequence to

 5    this Court.  So we will proceed now to hear argument on factors

 6    under Section 3553(a).

 7              MR. HALPERN:  Your Honor, if I may just be heard on

 8    the last, on the guidelines point.  In conversations with --

 9              THE COURT:  You would rather my not give a

10    nonguideline sentence?

11              MR. HALPERN:  No, your Honor.

12              THE COURT:  So let's spend more time on the

13    guidelines, because even though I'm going to give a sentence

14    well below the guidelines, counsel for both sides seem to be of

15    the view, even though I've made that clear repeatedly, that

16    they should spend all their efforts on what is of little or no

17    relevance to this Court.  But go ahead, counsel.

18              MR. HALPERN:  Your Honor, I well understand that.  I

19    well appreciate it, and I understand very well your Honor's

20    point and the tenor of your Honor's comments.  They come

21    through loud and clear.  I also recognize, as your Honor does,

22    that there is an obligation under the law to do a calculation.

23              THE COURT:  I've done it.

24              MR. HALPERN:  Yes.  And what I wanted to say is that

25    in light of our stipulation, in conversations with the
```

C.Agnello  SC 0131

1    government yesterday, the government advised that the

2    calculation for the two-level enhancement for greater than ten

3    investors was not applicable and was not pressing.  I just put

4    that for --

5        THE COURT:  I presided over the trial.  I think it is

6    admissible, but it makes absolutely no difference to my

7    sentence.

8        MR. HALPERN:  Understood.  I just wanted to raise that

9    for your Honor.  I hope you'll forgive me for doing what I

10   thought I had an obligation to bring an issue to your Honor's

11   attention.

12       THE COURT:  So noted.

13       MR. HALPERN:  Thank you, your Honor.

14       On behalf of defendant Stefan Lumiere, we'd like to

15   address several of the 3553(a) factors, including the history

16   and characteristics, the role of the offense, and the special

17   circumstances in the treatment, that we respectfully request

18   the mercy of the Court a lenient sentence.

19       Mr. Lumiere is here and supported by his family, many

20   friends, former colleagues, his parents, and at least one

21   cousin and an aunt and a sibling, his significant other.  And

22   your Honor has been witness to the scores of letters -- it's

23   approximately 80 or more now -- of those witnesses who know

24   Mr. Lumiere the longest and the best.  And as your Honor is

25   aware that that presentation, that composite portrayal, is very

Case 2:24-cr-00366-NJC Document 24-1 Filed 03/11/86/27 Page 136 of 569 PageID #: 330
Case 1:16-cr-00485-JSR Document 113 Filed 06/27/17 Page 5 of 35
H6EHLUMS

1    different from the presentation through the lens of the prism

2    that was presented at trial.  I wasn't here for trial, as your

3    Honor is aware, but that's a very different portrait of a man.

4    I understand that -- I know your Honor has commented on the

5    formidable responsibility of imposing a sentence on a fellow

6    human being, and that sentence is imposed based on the whole

7    life of a human being as an individual uniquely, unprecedented

8    to any other matter, with the objective set forth in 3553(a)

9    and the balancing and competing acts.

10           Those witnesses essentially have testified to your

11   Honor.  They come from all walks of his life not only his

12   close-knit, loving, embracing family who has instilled in

13   Mr. Lumiere key values that are reflected in the letters of his

14   friends, his former colleagues, his former classmates in Costa

15   Rica at business school.

16           THE COURT:  There's absolutely no question that he has

17   wonderful friends.  He has a great many people who have

18   attested to the positive side of his character, and I'm going

19   to factor that in in a substantial way in the sentence that I

20   impose.  But in some ways that makes his deviation from those

21   characteristics all the more telling.  There's really no

22   excuse, because he knew what he was doing was wrong, and that

23   is the Court's calculation -- or, excuse me, determination and

24   also was clearly the jury's.  The broader aspects of his

25   characteristics are very important to this Court and, as I say,

Case 2:24-cr-00366-NJC Document 24-1 Filed 03/11/26 Page 137 of 569 PageID #:
Case 1:16-cr-00483-JSR Document 118 Filed 06/27/17 Page 6 of 35 PageID #:
331
H6EHLUMS

1    favor leniency, but in an ironic way, it also does pinpoint the

2    intentionality and willfulness of his misconduct.

3        MR. HALPERN:  I understand your Honor's views.  I'm

4    going to turn to those.  And, obviously, we're not here to

5    re-litigate the issues or argue inferences from the evidence,

6    and we acknowledge the jury's verdict.  And, obviously, that's

7    the reason we're here today in court, and the defendant stands

8    humbly before you for sentencing.  We'll turn to that.

9        I just want to identify some of those traits and

10   characteristics that come through and, I agree with your Honor,

11   that stand in very stark contrast to the presentation of the

12   conduct at trial, and they are ones of not only industriousness

13   but integrity, faithfulness, and loyalty.  The perception,

14   often too often, that's characterized of Wall Street and the

15   greed of that is completely inapplicable to Mr. Lumiere.  And

16   one example that comes through in the letters, and I'm sure

17   your Honor is aware of it, of all things of his character when

18   he had a long history of employment in Wall Street, but when he

19   went with a team, it was the Spears Leeds Kellogg Group,

20   investment group, a team with him that was taken over by

21   Goldman Sachs.  And after a couple of years, Goldman Sachs said

22   that Mr. Lumiere so excelled, his diligence, his hard work, his

23   nose to the grindstone, that they were going to offer

24   Mr. Lumiere solely the position, and he declined that without

25   Goldman Sachs taking on his group.  Goldman Sachs declined to

1   do that, and Mr. Lumiere, as character standing up for his team

2   at great self-sacrifice, declined that offer and went on.  And

3   had he accepted that offer, we may very well have been before

4   your Honor today.

5         I appreciate that also the picture that you have of

6   Mr. Lumiere, who has so dedicated to his profession, to the

7   industry, to financial world, that's lost, that's forfeited.

8   And with all of that that comes clear is that he, like other

9   human beings, is flawed.  Mr. Lumiere himself has many troubled

10  issues, a number of exceptional issues that your Honor is aware

11  of through the presentence report, through some of the letters,

12  Exhibit B and Exhibit C to the defendant's sentencing

13  submission.  They warrant serious attention and treatment, and

14  so that's part of the entire picture of the human being,

15  someone who your Honor has recognized has a whole life of hard

16  work --

17        THE COURT:  I certainly take account of the special

18  circumstances that you're alluding to.  I assume you don't want

19  to get into that in more detail here in the record.

20        MR. HALPERN:  I think that's right.  I make allusion

21  to it.  They're extensive.  I won't go beyond that, but they're

22  very serious.

23        THE COURT:  I just want to make note, for the record,

24  that I have taken that into account, but unless you want to, I

25  don't see the need to elaborate on that.

Case 2:24-cr-00366-NJC Document 24-1 Filed 03/11/86 Page 139 of 569 PageID #: 333
Case 1:16-cr-00485-JSR Document 185 Filed 06/27/17 Page 8 of 35
H6EHLUMS

1      MR. HALPERN:  I'll go into a little more detail later,

2  but that's right, your Honor.

3      Also what comes through is the scrupulousness of

4  Mr. Lumiere in other positions, of his former colleagues and

5  friends who attested to his work.  So I agree with your Honor's

6  assessment that there's a disconnect from the evidence, the

7  conduct that was portrayed and presented.  One of the authors

8  of the letter characterized Mr. Lumiere as scrupulous in his

9  behavior.  So I respectfully submit to your Honor, in

10  considering the sentence to fashion, that Mr. Lumiere is not

11  and does not represent or reflect the unflattering picture that

12  too often we unfairly and reflexively have the common view of

13  the caricature and stereotype of someone working at a hedge

14  fund or in Wall Street.

15      THE COURT:  I agree with you.  I don't share that

16  stereotype.  Every case is individual, and every person who

17  works in any field of endeavor, there are good folks and bad

18  folks, and people in between.  But what I think is

19  unquestionable, and I know you maintain your position, but just

20  so that the record's clear, this Court totally agrees with the

21  jury's verdict.  In the Court's view, the proof was

22  overwhelming that the defendant committed the crimes he's

23  convicted of.  And that's not so unusual.  You see again and

24  again otherwise good people who, for one reason or another,

25  succumb to temptations and commit serious crimes.  It's

Case 2:24-cr-00366-NJC Document 24-1 Filed 03/11/26 Page 140 of 569 PageID #: 334
Case 1:16-cr-00485-JSR Document 113 Filed 06/27/17 Page 9 of 35 PageID #:

H6EHLUMS

1   important to remember the broader aspects of their life, all

2   the laudable characteristics that you have so eloquently

3   referred to, but I don't want anyone to be under the

4   misimpression that I had any view of the misconduct here other

5   than that it was willful, intentional, and proven

6   overwhelmingly.

7               MR. HALPERN:  I understand your Honor's view.  And,

8   again, we're not engaging in this.  We're preserving all

9   rights.

10              THE COURT:  Of course.

11              MR. HALPERN:  Obviously, your Honor is aware of the

12  appeal, and I appreciate your Honor's comments.

13              Before I go on to the role and what I think is the

14  total disconnect between a full life of this human being and

15  what was portrayed at trial, I just would want to say that this

16  lifetime where Mr. Lumiere on his own, great sacrifice,

17  generosity, jumping in, interceding in positions where he had

18  no obligation to do so, his devotion as a member of his family,

19  close to his parents and to his nieces, that he has just

20  voluntarily taken on this role with great relish, and he has

21  been in his life in so many ways a role model in so many

22  different traits and characteristics.  He's a good soul, an

23  honorable soul.  I'll move on to the role in the offense.

24              When I had the good fortune of sitting in the

25  government's chair for, really, 15 years --

1          THE COURT:  But you've repressed all that.

2          MR. HALPERN:  I'm sorry?

3          THE COURT:  But you've repressed all that.

4          MR. HALPERN:  No, I've hopefully incorporated and

5    softened and moderated and tempered my views.  One of the

6    things I continue to appreciate and I learned when I was in the

7    office is that for investigations of fraud, white-collar crime,

8    and other crimes, but especially white collar is you follow the

9    money.  You look for the trail of the money.  Where does it

10   lead, who's benefiting the most, and who is it, who's

11   exploited, who's taken advantage?  Even if a jury will find

12   that there was criminal culpability, there are misjudgments

13   that are made.  I'm not -- I acknowledge the jury's verdict and

14   I understand your Honor's comments, but you follow the money

15   and that's what you look to.

16          For Mr. Lumiere's role in this offense, first, it's

17   absolutely clear Mr. Lumiere was not portfolio manager of the

18   credit fund of Visium.  Full stop.  He was, along with

19   something like a dozen others, a portfolio manager of the

20   global fund which had nothing to do with the charges in the

21   trial in the case before your Honor.  Mr. Lumiere was an

22   analyst in the credit fund, and he was from time to time on an

23   ad hoc basis asked to perform various duties.  And he had

24   expertise in restructuring --

25          THE COURT:  I'm not sure any of this is relevant, but

H6EHLUMS

|   |   |
|---|---|
| 1 | for what it's worth, I think there is evidence that he |
| 2 | functionally served as a portfolio manager regardless of |
| 3 | whatever title may have been involved.  But it's all, in my |
| 4 | view secondary.  He played, intentionally played, a role in |
| 5 | falsifying net asset value, in falsifying what was presented as |
| 6 | being the reality of the situation.  And it's relevant what |
| 7 | level he did that at, but it's more relevant that he did it. |
| 8 | MR. HALPERN:  I understand your Honor's view of the |
| 9 | conduct.  I take that.  I do think it's relevant because he was |
| 10 | exploited.  It was Chris Plaford who was the only one, |
| 11 | functionally or not, who ran that fund.  It was Chris Plaford, |
| 12 | by his own testimony, who interacted with investors.  That's |
| 13 | what the focus of the criminal activity was with a claim that |
| 14 | investors were misled.  It was Mr. Plaford who said that it |
| 15 | wasn't Mr. Lumiere who had anything to do with investors.  In |
| 16 | fact, Mr. Plaford said he didn't trust Mr. Lumiere to do |
| 17 | anything.  He was the one who directed Mr. Lumiere with the |
| 18 | quotes.  It was Mr. Plaford who prepared the overrides.  I |
| 19 | mean, just going down, down, down.  Yes, Mr. Lumiere was |
| 20 | exploited.  He was used. |
| 21 | The conduct was before your Honor, but I think context |
| 22 | is important; relativity is important.  Following the money, |
| 23 | Mr. Lumiere received a fraction of the compensation.  His |
| 24 | annual salary, enviable for most of America, in this context |
| 25 | was relatively small at $200,000.  Mr. Plaford -- |

C.Agnello   SEC 0139

Case 2:24-cr-00366-NJC  Document 24-1  Filed 03/11/26  Page 143 of 569 PageID #:2
Case 1:16-cr-00483-JSR  Document 115  Filed 08/27/17  Page 22 of 35
337
H6EHLUMS

1          THE COURT:  I don't think you can have it both ways

2    with Mr. Plaford's testimony.  He testified that Lumiere was "a

3    senior analyst/portfolio manager on the credit team" and that

4    Lumiere managed on average "over $100 million."  Thorell also

5    testified that Lumiere was "a portfolio manager in charge of a

6    section or subsection of the credit fund with a certain

7    strategy specific to him."  Now, I don't have to adopt those

8    specific items of testimony because, as I tried to express to

9    you a minute ago, I think this is somewhat a peripheral issue.

10   But I don't think you can say:  Oh, accept Plaford's testimony

11   for point X, but don't accept it for point Y.

12          MR. HALPERN:  Well, your Honor, I do recognize

13   Mr. Plaford pled guilty to seven felonies and is a cooperating

14   witness with the government on behalf of the government, and

15   Mr. Thorell had immunized testimony and struggled to

16   acknowledge certain of his conduct and what was the import of

17   that at that time.  I will say I'm aware -- I don't know if the

18   Court still gives this instruction -- but elsewhere, you know,

19   you evaluate the testimony of the witness, and sometimes it's

20   like a slice of burnt toast.  Sometimes you toss the whole

21   burnt toast away, and other times you're going to carve out the

22   toast.  So I think it can be appropriate to --

23          THE COURT:  I haven't used that analogy, but I'll

24   certainly keep it in mind for the future.  But I understand

25   your point.

Case 2:2ᵉ-cv-00366-NJC-Document 24-1 Filed 03/11/26 Page 144 of 569 PageID #3
Case 1:16-cv-00483-JSR Document 115 Filed 06/27/17 Page 13 of 35
338
H6EHLUMS

1        MR. HALPERN:  You don't have to be wholesale.  In any

2   event, I vigorously contest the notion that Mr. Lumiere

3   functioned as anything like a credit fund portfolio manager

4   given what he was actually doing.

5        Again, back to the money, Plaford had something like

6   ten times as much compensation as Mr. Lumiere.  It was Plaford

7   along with Jake Gottlieb, the CIO of the fund, who determined

8   bonus, and Plaford admitted that he received no bonus.  It was

9   his base $200,000 salary.  The disconnect is this, your Honor:

10  It's that Mr. Lumiere had no motivation to do what the jury

11  found, what was presented, and what your Honor inferred.  There

12  was no financial motivation.  He received no bonus.  He was in

13  an untenable situation in especially these times.  His sister

14  at the time was married to Mr. Gottlieb.  They were going

15  through a deterioration in their relationship which led to a

16  vitriolic and contentious divorce.  Mr. Lumiere was not

17  well-respected, was not well-treated, was not valued.  He was

18  exploited.  He had no future there.  There was no direct bonus

19  or compensation from the scheme.  He received no gain from the

20  offense in this.  It was coconspirators who received the gain

21  through fees, performance fees, that came in.

22        I know your Honor sometimes refers to indirect

23  benefits.  That, well, he didn't receive compensation or a

24  bonus in year one or year two, but there was a long-term

25  prospect that if he did well, it would promote the well-being

C.Agnello  SE 0141

Case 2:24-cv-00366-NJC Document 24-1 Filed 03/11/26 Page 145 of 569 PageID #:4
Case 1:16-cr-00483-JSR Document 115 Filed 08/27/17 Page 24 of 35

H6EHLUMS
339

1   of the firm, and he would receive incidental or derivative

2   benefits.  Not happened in this case.  He had no future there.

3   It was a completely untenable position to be there.  He

4   couldn't wait to get out, and he got out.

5          When he left in April or May of 2013, did the scheme,

6   as the government charged, proved, stop? Not at all.  It

7   continued unabated.  It didn't miss a beat.  It didn't miss

8   Mr. Lumiere.  So I think that is very important.  He was a

9   hapless soul.  He was, as we said, someone who was a working

10  stiff.  We understand what the conduct showed to your Honor and

11  to the jury.  We respectfully submit, you know, the defense

12  we're not going to argue here.  We have those issues.  It was

13  not presented, and the government even argued that it was just

14  argument.  So we acknowledge the jury's verdict and respect

15  your Honor's views, but in the context of what happened, he was

16  the low person, and he was taken advantage of.

17         I'd like to turn to the last section, given that

18  Mr. Lumiere essentially forfeited his career that he worked

19  very hard for, studying for an MBA, learning a second language

20  in a foreign country, earning that master's degree in a foreign

21  language.  He's given that up.  His role in the securities

22  world is over.  It's finished.  He will be deterred, and

23  there's no issue as to whether this will recur.  He's not a

24  danger to society by any stretch, and so there's no further

25  deterrence that way.  I would just like --

1      THE COURT:  Well, the main issue in white-collar cases

2  is often general deterrence, and there is a body of literature

3  largely ignored by the sentencing commission but which suggests

4  that, on the one hand, heavy sentences do not serve added

5  deterrent effect in white-collar cases, but that, on the other

6  hand, some meaningful prison time does serve a major deterring

7  effect in white-collar cases because it sends the message to

8  others similarly situated that you can't buy your way out of

9  this.

10      MR. HALPERN:  I understand that's a factor.

11  Certainly, that's to be considered, along with the seriousness

12  of the offense and other objectives.  Under these really

13  extraordinary circumstances for Mr. Lumiere personally,

14  individually, those other factors that make some reference to

15  that, when your Honor considers that, whatever punishment your

16  Honor imposes is going to be disproportionately harsh because

17  of the circumstances Mr. Lumiere finds himself in as outlined

18  in the PSR, including paragraphs 119 and 120.

19      THE COURT:  Based on my own assessment of some of the

20  materials you presented in that regard, I think one could

21  quibble here or there.  I essentially accept the basic picture

22  that's been portrayed there.  So I don't think we need to get

23  into that in great detail, unless you want to.  So I understand

24  the argument that you're making there.

25      MR. HALPERN:  I would just say he is, because of those

Case 2:21-cr-00366-JLC Document 24-1 Filed 03/11/22 Page 147 of 569 PageID #: 16
Case 2:10-cv-00483-JSR Document 115 Filed 08/27/17 Page 16 of 35
341
H6EHLUMS

```
 1   conditions, more vulnerable as a potential inmate.  And given
 2   the circumstances, that there are triggers that could generate
 3   dire, even life-threatening conditions, as your Honor is aware,
 4   and --
 5           THE COURT:  That's true.  On the other hand, depending
 6   on the sentence imposed, if he were sentenced, he would
 7   probably serve his time in a facility where those kinds of
 8   pressures would be less than they would be in a more onerous
 9   prison facility.
10           MR. HALPERN:  For example, a community house, halfway
11   house, would have -- serve those --
12           THE COURT:  Actually, I'm not sure.  This is really
13   getting off the subject and not worth talking about it, but
14   there are community houses and community houses.  Some of them
15   are actually worse than the low-level prisons that are offered
16   usually to white-collar offenders because they are populated
17   often by serious street criminals, violent street criminals who
18   are on their way back to society and who, in fairness, are
19   being given the opportunity to serve the last portion of their
20   sentence in a halfway house but are not really the best company
21   for someone situated like your client.
22           MR. HALPERN:  That's an argument for a probationary
23   sentence in this case.
24           THE COURT:  Or for a prison facility of a low level.
25           MR. HALPERN:  I understand your Honor's point.
```

Case 2:21-cr-00366-JLC Document 24-1 Filed 03/11/22 Page 148 of 569 PageID #: 7
Case 2:16-cr-00483-JSR Document 115 Filed 06/27/17 Page 17 of 35
342
H6EHLUMS

```
 1              Finally, in closing -- and, actually, your Honor, with
 2     respect, I hate to revert to this, but could we mark as a court
 3     exhibit the agreed stipulation between the parties --
 4              THE COURT:  Sure.
 5              MR. HALPERN:  -- on the gain?
 6              THE COURT:  Yes.
 7              MR. HALPERN:  Thank you, your Honor.
 8              THE COURT:  You want to hand that up.  Just give it to
 9     my courtroom deputy.  She'll mark it as Court Exhibit 1 to
10     today's proceeding.
11              MR. HALPERN:  Thank you.
12              So on all of those factors and the need for, I think I
13     would say, tempering the deterrence and other factors,
14     including respect for the law, just punishment, the seriousness
15     of the offense, with the specific and general deterrence that
16     apply here, the other factors that pertain to the defendant,
17     including that a sentence in custody would expose him to
18     vulnerabilities, including physical issues that have been
19     identified, that they would only exacerbate him, and, as I
20     said, it would be disproportionate.  And I know your Honor will
21     take that into account in fashioning an appropriate sentence.
22              I would just close on this part, your Honor, by saying
23     here is a good soul.  He has been a role model.  The life that
24     has at least been portrayed in the 80-or-so witness portrayals
25     before your Honor points to a very decent and loving and
```

Case 2:24-cr-00366-NJC Document 24-1 Filed 03/11/26 Page 149 of 569 PageID #:8
Case 2:16-cr-00483-JSR Document 115 Filed 06/27/17 Page 28 of 35
343
H6EHLUMS

```
 1    devoted, son, sibling, friend, colleague, and he has a lot to

 2    offer society.  He's given up his chosen career.  And we just

 3    ask that his opportunities, to the extent possible by your

 4    Honor, be permitted to grow, to flourish, and not snuff out --

 5    the opportunities snuffed out so he receives the attention and

 6    the treatment to get back on his feet, not appear before your

 7    Honor in any like circumstances, but be really a beacon and a

 8    model for others and to show that, you know, his life can make

 9    a difference.

10         So with respect, your Honor, I would humbly seek the

11    Court's leniency and mercy in imposing a sentence on

12    Mr. Lumiere.

13         THE COURT:  Thank you very much.

14         Let me hear from the government.

15         MR. McGINLEY:  Thank you, your Honor.  Your Honor

16    presided over this trial, and you have our submission, so I

17    won't belabor the points.  I'll note just a few things.  It is

18    important to remember that this crime was the defendant's

19    brainchild.  It started when his investments started to tank,

20    and he then reached out.  He got his friends -- there's no

21    dispute about that, Vandersnow and Brook.  They were the

22    defendant's friends -- he got them involved in the scheme, and

23    it started.

24         THE COURT:  And the motivation, you would suggest, is

25    that he saw that his own business acumen was being questioned
```

Case 2:21-cv-00366-NJC Document 24-1 Filed 03/11/26 Page 150 of 569 PageID #: 344
Case 1:16-cr-00483-JSR Document 115 Filed 08/27/17 Page 19 of 35
H6EHLUMS

1    and that his position, in effect, was not living up to his past

2    performance, and so that's what led him to commit the crime.

3    Is that your view?

4         MR. McGINLEY:  That's fair, your Honor.  There are

5    other reasons, right, to maintain his reputation, and there was

6    plenty of testimony that but for this, the defendant would have

7    been fired.  So I would just note that, your Honor, the crime

8    went on for years, deceptive act after deceptive act.  The

9    defendant sent thumb drives to the brokers.  He had them

10   communicate on personal cell phones to avoid detection.

11        I would also note, your Honor, there are recordings in

12   this case that your Honor's heard.  I'll bring attention to

13   two.  The first on his knowledge of the scheme is when he talks

14   to his friend PB as the scheme is ending, and he says, "By the

15   way, don't tell anyone about the F'ing mismarking of the book."

16   He knew exactly what was going on because he started the

17   scheme.  The other, and I think this goes to a number of points

18   that defense counsel just made, is that chilling recording

19   where he shows just how much he knows the scheme is wrong and

20   the magnitude of it because he says -- and again, this is

21   Government Exhibit 1222.  Thorell tells him, "Well, what do you

22   want to do with this information we have about the crime?"

23        And he says, "Well, first, we can extort it.  I'd love

24   to be able to go to him and say, 'Listen, Jake, Chris.  Give us

25   a hundred million between the both of you.'"

1    Now, that, your Honor, is not a hapless soul.  That's

2    not a working stiff.  That is a man who knows exactly what he

3    did, and he's trying to figure out a way for him to even gain

4    from that crime.  That is what he was thinking then.

5    Hopefully, this experience has changed him, but that was the

6    real Stefan Lumiere you heard in those recordings too.

7    THE COURT:  Let me ask a more technical question.  Do

8    you agree that under the *Honeycutt* case that came down a few

9    days ago, that forfeiture is no longer appropriate in this

10   case?

11   MR. McGINLEY:  Your Honor, I've consulted with my

12   office on that.  Main justice is still formulating a guidance

13   on that.  *Honeycutt*, I've read it.  It's a drug case.  We're

14   not seeking forfeiture under the drug statutes.  What I would

15   ask, and, obviously, your Honor will do what your Honor does,

16   is to have you calculate -- we advance two positions on

17   forfeiture.  That, at the very least, he should forfeit his

18   salary, but the other position is that he's jointly and

19   severally liable for the performance fees.  And what we would

20   ask is your Honor to make a finding on both and to delay a

21   final pronouncement.

22   THE COURT:  Well, I wonder how much -- again, as a

23   practical matter, one of my many, many, many problems with the

24   guidelines is they are so calculated in the abstract without

25   reference to the particulars of a given situation, whereas I

C.Agnello  SC 0148

1  think most judges prefer to be practical.  So *Honeycutt* does

2  not affect restitution, does it?

3          MR. McGINLEY:  It does not.

4          THE COURT:  Which is, what, 23 million-plus in this

5  case?  We may want to argue about the amount, but it's some

6  large amount.

7          MR. McGINLEY:  Well, if we go by gain, your Honor --

8          THE COURT:  It would be 3 million, or whatever.

9          MR. McGINLEY:  It would be, but we don't have the

10 identified victims.

11         THE COURT:  What about do I not have the ability to

12 impose a fine of up to $5 million?

13         MR. McGINLEY:  You do, your Honor.

14         THE COURT:  OK.  Anyway, anything else you wanted to

15 say?

16         MR. McGINLEY:  Just two very quick points.  To your

17 Honor's point on general deterrence, I think that is very

18 applicable here.  These are crimes are very hard to detect.

19 The crime here was simple, but the underlying conduct, the

20 underlying business, very complex, very hard to make these

21 cases.  And for that reason, we think a stronger sentence is

22 necessary.

23         THE COURT:  Let me hear from defense counsel and then

24 from the defendant if he wishes to be heard.

25         MR. HALPERN:  Thank you, your Honor.  Your Honor, the

Case 2:16-cr-00366-NGG Document 24-1 Filed 03/11/22 Page 153 of 569 PageID #: 2
Case 1:16-cr-00483-JSR Document 115 Filed 06/27/17 Page 22 of 35
347
H6EHLUMS

1    *Honeycutt* forfeiture is inapplicable here.  They say it's a

2    narcotics statute, but the principle applies that there should

3    be no joint and several liability here.  Mr. Lumiere

4    received --

5            THE COURT:  Let's assume I agree with you on that.

6    What do you think is the right calculation of restitution?

7            MR. HALPERN:  The right restitution, the right

8    calculation of restitution -- first of all, separate concept --

9    but zero, and that's because there are no actual victims.

10   There's no actual loss.  He stipulated to gain.  That's an

11   inappropriate measure for restitution, period.

12           THE COURT:  All right.  So assuming I were to agree

13   with you on that and assuming that you persuaded me that less

14   prison time than might otherwise be appropriate should be

15   imposed, does not that argue for a substantial fine?

16           MR. HALPERN:  In lieu of the forfeiture?

17           THE COURT:  No, no, not in lieu of the forfeiture.

18   It's a separate issue.

19           MR. HALPERN:  OK.

20           THE COURT:  But the issue is you've been eloquently

21   arguing to me that, in effect, prison would be particularly

22   difficult in his case because of vulnerabilities that he has,

23   and so forth.  I don't want you to be under a misimpression.

24   There's going to be some prison time in this case.  But

25   assuming that I were to reduce it from what I otherwise would

C.Agnello   SC 0150

Case 2:21-cr-00366-NJC Document 24-1 Filed 03/11/22 Page 154 of 569 PageID #: 23
Case 1:16-cv-00483-JSR Document 115 Filed 08/27/17 Page 23 of 35
348
H6EHLUMS

1   impose, punishment is still an important function, and should I
2   therefore not consider a substantial fine?
3        MR. HALPERN:  I agree, punishment is obviously a
4   factor, but I disagree with a substantial fine.  It's also with
5   respect to this defendant's finances.  He's not been working
6   other than what he's trying to cobble together in the
7   construction renovation --
8        THE COURT:  A fine would be imposed prospectively,
9   that is to say, a certain amount now, but a certain amount as a
10  percentage of future earnings.
11       MR. HALPERN:  Well, I understand that, but given the
12  relative and comparative role that he had, and he earned
13  $200,000 when others were earning millions of dollars from
14  Mr. Plaford, I don't think that's appropriate as to this
15  defendant.
16       THE COURT:  No, now you're confusing restitution and
17  fine.  The fine has nothing to do with how much he earned.  The
18  fine has to do -- it's a form of punishment, and it seems to me
19  that if I buy into your argument that there should be less
20  prison time for all the factors you've mentioned, then it's
21  important that I temper that with a less onerous but still
22  meaningful punishment in the form of a substantial fine.
23       MR. HALPERN:  I understand, your Honor, that a
24  criminal fine is part of the sentence your Honor can impose,
25  but I must say I don't think that you can give with one hand

1    and take away with the other.  I think it should be

2    treated that there are separate interests for custody, and I

3    understand this is a crime of fraud and there's a financial

4    component to it --

5            THE COURT:  I'm sorry.  It's obviously not some sort

6    of formula, but the same section 3553(a) factors that operate

7    in connection with prison also operate in connection with a

8    fine, and missing from a fine calculation are some of the

9    mitigating factors that you've argued for because vulnerability

10   becomes irrelevant.  So applying the Section 3553(a) factors to

11   the fine, is it not the case that there's an argument for a

12   substantial fine?

13           MR. HALPERN:  We disagree with "substantial fine"

14   because I think your Honor has to look also at the financial

15   condition of the defendant, which is apart from --

16           THE COURT:  I don't understand that argument if the

17   fine is calculated as a percentage of his gross monthly income.

18   So if he remains impecunious, he pays very little, and if he

19   hits it rich, he pays a lot.  So what does his present economic

20   state have to do with it?

21           MR. HALPERN:  As I understood the imposition of the

22   fine, that that is a factor, when a fine is imposed, it's at

23   the time of sentence and a kind of snapshot.

24           THE COURT:  Well, that's if the fine is you must pay

25   it now, but I'm talking about another.

C.Agnello  SC 0152

1      MR. HALPERN:  I appreciate what your Honor's saying.

2  I just don't think that -- I understand an appropriate but a

3  small fine, given all of the factors that we've identified,

4  would be appropriate, including his role relatively and the

5  conduct that your Honor saw.

6      THE COURT:  All right.  Let me hear from the defendant

7  if he wishes to speak.

8      MR. HALPERN:  I'm sorry.  On the forfeiture, though,

9  am I correct, your Honor, that --

10      THE COURT:  I'm not going to impose forfeiture, so you

11  don't need to argue it.

12      MR. HALPERN:  Thank you, your Honor.

13      THE DEFENDANT:  Your Honor, thank you for hearing me

14  today, and I just --

15      THE COURT:  You need to bring that microphone a little

16  closer to you.

17      THE DEFENDANT:  Can you hear me?  Yeah, I prefer to

18  read this if I may.

19      THE COURT:  You might as well sit down so you can get

20  right up to that microphone.

21      THE DEFENDANT:  Thank you.  I understand I've been

22  convicted.  I understand the process involved in the

23  sentencing, including the Court's role in determining a

24  punishment.  I respectfully ask your Honor consider these other

25  factors about me when you decide what kind of sentence to

Case 2:24-cr-00366-NJC Document 24-1 Filed 03/11/26 Page 157 of 569 PageID #: 351
Case 1:16-cv-00483-JSR Document 115 Filed 08/27/17 Page 26 of 35 PageID #: 26
H6EHLUMS

1    administer.

2         I'm blessed with the support of my friends and family,

3    many of whom are here today.  Others who were not able to

4    attend today have written letters to your Honor and offer their

5    views about my character and the type of person I am.  I

6    appreciate the time that your Honor has taken in reviewing my

7    submissions and the time your Honor has taken in reviewing my

8    character letters from family and friends who know me best, and

9    in so doing, you're able to see a more full picture of who I am

10   as a person than the way I was presented in the trial.

11        I've studied long and hard to enter the field of

12   finance, pursuing an MBA in a foreign language.  I participated

13   and passed my CFA program, which is a long process.  To achieve

14   this, I operate on very little sleep, countless hours, and now

15   in one fell swoop all of my studies and work and

16   accomplishments are for nothing.  The career path that I had

17   chosen has been shuttered; and, most importantly, the

18   reputation that I worked so hard for to build is ruined.  My

19   dreams of running my own investment company are over, but I

20   know I need to adapt and I need to be determined to find a way

21   to rebuild myself.

22        I entered into the field of real estate and

23   construction, since I was unable to return to my field of

24   choice.  I'm just getting started in this and hope to be able

25   to return to this career and go on with my life and hopefully

H6EHLUMS

1   have the opportunity to start a family someday.

2         What hurts me most about this experience is the

3   traumatic impact on my family, especially my mother who is sick

4   and has to deal with her health issues as well as my situation;

5   my father, a practicing physician in New York who was raised in

6   a small town in Georgia called Dalton and worked hard his whole

7   life just to be deeply embarrassed in having his family name

8   dragged through the mud in a very public setting.  Most of all

9   I'm saddened by the pain my sister has been suffering while

10  dealing with a never-ending and contentious divorce and its

11  ultimate impact on her children.

12        I've always considered myself to be a family man, a

13  strong man, a rock in the family.  I always said it was my

14  mission to be available for my family no matter what and

15  whatever they needed of me.  At my father's birthday party last

16  night, I promised my niece I would continue to be there for

17  her.  I hope I will be able to keep my promise to her, continue

18  to be there for my family and friends, just as they have been

19  here for me in support during this most trying time in my life.

20        As I stand before -- or sit before your Honor with

21  humbleness and respect, I ask for the Court's mercy and

22  leniency in deciding the sentence.  Thank you, your Honor.

23        THE COURT:  Thank you very much.

24        Let me begin on one sort of side note, but I can't

25  help but noting that this case once again demonstrates the

C.Agnello   SE 0155

```
 1    absurdity of the sentencing guidelines.  The sentence is driven
 2    largely by the gain amount, but there are other adjustments of
 3    a more technical nature.  And under the adjustments that the
 4    government originally argued for and I think are so supported
 5    by the evidence, the guideline sentence would have been eight
 6    years or more, which is just ridiculous, absurd, barbaric in
 7    some respects in connection with someone like Mr. Lumiere.  But
 8    even under the defense view of those adjustments or the middle
 9    position that apparently was acceded to by the government,
10    though not by the Court, you still are talking about four to
11    five years under the guidelines.
12            These draconian penalties bear no relationship, in the
13    Court's view, to any of the factors set forth in Section
14    3553(a): just punishment, the nature of the person's offense,
15    and the nature of the person's character, the need for specific
16    and general deterrence or not, and so forth.  It is a terrible
17    thing that this country's criminal legal system has become so
18    punitive.  I mean, Mr. Lumiere is lucky that he's a
19    white-collar defendant when one considers the kinds of
20    sentences that courts are often forced to impose by mandatory
21    minimums, and the like, on people who have none of his
22    advantages, but even as to him, these guideline sentences would
23    be much more typical of a brutal regime than of a proud
24    American legal system.
25            Now, having gotten that off my chest, so to speak,
```

Case 2:2x-cv-00366-NJC Document 24-1 Filed 03/11/26 Page 160 of 569 PageID #: 9
Case 2:16-cv-00483-JSR Document 115 Filed 06/27/17 Page 29 of 35
354
H6EHLUMS

```
1    let's turn to the individual before the Court.  So counsel for

2    the defendant has eloquently, both in his oral presentation and

3    in his excellent papers, made a good case for the claim that in

4    many respects Mr. Lumiere has led a laudable life, one of which

5    he and the many people who are here to support him can be

6    proud, and also that he suffers from certain psychological

7    vulnerabilities that would make him particularly -- that would

8    raise certain possible dangers or hardships associated with

9    prison time that would not necessarily be true of other

10   similarly situated individuals.  The Court accepts all that.

11   More than accepts it, takes that very much into account.

12           But, on the other hand, the Court cannot ignore the

13   fact that, as the government I think so correctly points out,

14   Mr. Lumiere embraced this fraudulent scheme, was a highly

15   significant part of the scheme, and did so not aberrationally

16   one day or one week, but for years, for months.  And even when

17   he was on the verge of being caught, sought ways to turn the

18   scheme to his further advantage through that attempt at

19   blackmail.  This is not the Mr. Lumiere that the people who

20   have come to support him know.  They, for the most part, or

21   perhaps all, were not present to hear the testimony, but the

22   testimony and the tapes and the evidence was overwhelming and

23   showed a Mr. Lumiere who had no compunctions about lying and

24   cheating, and that's very much the Mr. Lumiere who exists side

25   by side with the Mr. Lumiere who has so many positive traits.
```

Case 2:21-cr-00366-NJC Document 24-1 Filed 03/11/22 Page 161 of 569 PageID #: 355
Case 1:16-cv-00483-JSR Document 115 Filed 06/27/17 Page 90 of 135
H6EHLUMS

```
 1              So there is no doubt in the Court's mind that not only

 2      as a matter of general deterrence but also just as a matter of

 3      just punishment that prison time is required here.  I came into

 4      the Court this morning thinking that even after giving all

 5      deference to all the many positive factors that defense counsel

 6      had raised, that a sentence of two years was the right

 7      sentence, but counsel has convinced me that a slightly less

 8      sentence is called for here.  So the sentence of the Court is

 9      that the defendant is sentenced to a year and a half, to 18

10      months, in prison, concurrent on all counts.  No forfeiture

11      will be imposed.  Restitution in the amount of his salary which

12      was, what, 300,000?  Someone have that exact figure here?

13              MR. McGINLEY:  200,000.

14              THE COURT:  200,000.  Restitution in the amount of

15      200,000 will be imposed, and a fine of $1 million to be paid as

16      15 percent of his gross monthly income beginning with the

17      second month after he is released from prison.  He will also be

18      sentenced to three years of supervised release to follow

19      imprisonment.

20              The terms of supervised release are, first, the

21      mandatory conditions that he will not commit another federal,

22      state, or local crime; that he will not unlawfully possess a

23      controlled substance; that he will cooperate in the collection

24      of DNA; and that he will make restitution in accordance with

25      the schedule just set.  The drug testing condition, however,
```

1    will be suspended based on the Court's determination that he

2    poses a low risk of future substance abuse.

3          There will also be imposed the standard conditions of

4    supervision 1 through 13.  They appear on the face of the

5    judgment and will be gone over with the defendant by the

6    probation officer when he reports to begin his period of

7    supervised release, which he must do within 72 hours of his

8    release from prison, and he will be supervised by the district

9    of his residence.  There are other special conditions

10   recommended by the probation office, but I don't think they're

11   necessary.  Finally, there's a special assessment of $300 which

12   is mandatory and must be paid.

13         Now, before I advise the defendant of his right of

14   appeal, anything else that counsel wants to raise for the

15   Court?  First, anything from the government?

16         MR. McGINLEY:  No, your Honor.

17         THE COURT:  Anything from the defense?

18         MR. HALPERN:  I'm sorry, your Honor, respectfully, if

19   I just may be heard with respect to restitution, and I

20   apologize to your Honor if I misheard.  I had thought your

21   Honor was saying earlier in response to my inquiry there was

22   going to be zero restitution.  It's also, I would respectfully

23   submit, not applicable here because of gain and not actual loss

24   and identifiable victims.  So --

25         THE COURT:  No, that's not a frivolous position.

C.Agnello  SC 0159

1    What's the government's position?

2            MR. McGINLEY:  Your Honor, I think, just to be safe,

3    the government would forgo the restitution.

4            THE COURT:  So no --

5            MR. McGINLEY:  If I just --

6            THE COURT:  Not impose the restitution.

7            MR. McGINLEY:  And if I just may, just for the record,

8    because sometimes these proceedings wind up in other

9    proceedings, the government does not concede that there was no

10   actual loss to these victims, but it has not been finally

11   determined.

12           THE COURT:  The government's position, as was very

13   eloquently put forth in its many submissions, was that there

14   was huge loss, but I have not been persuaded that the

15   methodology is sufficiently accurate to permit that

16   calculation, but the government fully maintains its rights.

17   And with respect to forfeiture, I understand the government, if

18   not in this case but certainly in some cases, is going to try

19   to narrow *Honeycutt*, and all your rights are preserved.  So

20   we'll just leave it with the fine so far as the financial

21   aspects of this sentence are concerned.

22           Anything else?

23           MR. HALPERN:  Yes, your Honor, if I may, two things --

24   three things.  First thing, if I may, in terms of reporting

25   recommendation, if I could request your Honor, understanding

1    that it's limited, but would request that your Honor recommend

2    that Mr. Lumiere report to FCI Otisville given the proximity to

3    his family.

4              THE COURT:  Yes, I will recommend that.  As you

5    understand, I'm sure he understands, I can't order that; I can

6    only recommend it.  Otisville is frequently sought by many

7    similarly situated defendants, and they can't accommodate

8    everyone who wants to go there.  But I certainly think it would

9    be appropriate in his case, and I will recommend it.

10             MR. HALPERN:  And also because of the relatively fewer

11   strictures that may not trigger some of the conditions that we

12   referred to.

13             THE COURT:  Agree.

14             MR. HALPERN:  And this may be out of order, but I do

15   have an application for bail pending appeal.  But also if there

16   is reporting, would request that that date be Tuesday,

17   September 12, in light of the various factors we discussed.

18             THE COURT:  I have no trouble with Tuesday,

19   September 12, as the reporting date, 2:00 p.m. on September 12

20   to the designated institution.

21             The government's not seeking remand at this time, are

22   you?

23             MR. McGINLEY:  We're not seeking remand now, but we do

24   oppose bail pending appeal.  I don't know that that's ripe

25   right now.

C.Agnello  SE 0161

1          THE COURT:  No, I don't think it's ripe either.  So

2     when it becomes ripe, it will ripen.

3          MR. HALPERN:  I'm sorry.  Your Honor's not willing to

4     hear argument at this point on that issue, bail pending appeal;

5     do I understand that?

6          THE COURT:  Correct.

7          MR. HALPERN:  Would it be possible to set a schedule

8     with your Honor when we can make those arguments?

9          THE COURT:  First thing you have to do is file your

10     notice of appeal.  The second thing is you're going to have to

11     be in a position to tell me what your arguments are on appeal.

12     So when you're ready to do all that -- he's free till then.

13     He's free until he reports to the prison unless I order

14     otherwise.  So when you're ready, convene a call with the

15     prosecutor, and we'll set a schedule.

16          MR. HALPERN:  Thank you, your Honor.

17          THE COURT:  All right.

18          MR. HALPERN:  One other, in terms of conditions of

19     bail, I take it that there wouldn't be any less restrictive

20     measures with respect to travel?

21          THE COURT:  The bail conditions will be the same as

22     they are now.

23          MR. HALPERN:  Your Honor, last point, a little bit of

24     housekeeping note.  I just raise this.  We weren't trial

25     counsel, and we've worked with the good graces of our

Case 2:26-cv-00366-NJC  Document 24-1  Filed 03/11/26  Page 166 of 569 PageID #:
360
Case 1:16-cr-00483-JSR  Document 115  Filed 06/27/17  Page 35 of 35

H6EHLUMS

```
 1    predecessor, Mr. Creizman's office, to obtain discovery from

 2    the government.  It's been a long process.  We've identified a

 3    number of government productions that we just do not have, and

 4    so I've spoken with Mr. McGinley.  I understand that

 5    Mr. McGinley is undertaking to provide us with those copies

 6    that had previously been provided to Mr. Creizman.  I just

 7    wanted to raise that with the Court.  We hope that your Honor

 8    would have jurisdiction over that matter as well.  I don't

 9    anticipate any resistance, but look forward to the production

10    from the government.

11              THE COURT:  All right.  So, Mr. Lumiere, you have a

12    right to appeal the sentence.  Do you understand that?

13              THE DEFENDANT:  I do, your Honor.

14              THE COURT:  If you can't afford counsel for the

15    appeal, the Court will appoint one for you free of charge.  Do

16    you understand that?

17              THE DEFENDANT:  Yes.

18              THE COURT:  All right.  Very good.

19              (Adjourned)

20

21

22

23

24

25
```



# EXHIBIT I

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

- **Browse all sections**
- Banking
- Bankruptcy
- Class Action
- Competition
- Employment
- Energy
- Expert Analysis
- Insurance
- Intellectual Property
- Product Liability
- Securities

- Beta Tools
- Track docs
- Track attorneys
- Track judges

- Site Menu
- Join the Law360 team
- Search legal jobs
- Learn more about Law360
- Read testimonials
- Contact Law360
- Sign up for our newsletters
- Law360 Company
- About Law360 Authority
- Resource Library
- Site Map
- Help

Intellectual Property  Securities  Bankruptcy  Competition  Employment  White Collar  Legal Industry  Artificial Intelligence  Law360 UK  Pulse  ||  See all sections  ||  TAKE A FREE TRIAL

How satisfied are you with your job?
Click here to take the Law360 survey

Expert Analysis - Opinion

# Cannabis Fraud Decision Shows Need For

We use cookies that are necessary to make our site work. We may also use additional cookies to analyze, improve, and personalize our content and your digital experience. You can manage your cookie preferences using the **Cookie Settings** link and opt out of personalized advertising via **Ad Choices**. For more information, see our **Cookie Policy.**

C.Agnello    SE 0165

The prosecutors' novel theory of the case — that the defendant was criminally responsible for convincing banks to unwittingly process cannabis-related transactions — colored the case from start to finish.

During the sentencing phase in August, U.S. District Judge Jed Rakoff of the Southern District of New York refused to treat the entire $156 million in transactions facilitated by the defendant as the relevant loss.

This decision is notable because it highlights from a unique angle the way that U.S. sentencing laws place an outsized emphasis on financial elements of criminal activity even when they have a tenuous relationship with a defendant's criminal intent.



Lloyd Liu

Hamid "Ray" Akhavan was convicted in March 2021 on one count of conspiracy to commit bank fraud. Akhavan was charged with deceiving banks so that they would process $156 million or so in payments to marijuana retailers, despite the fact that the banks had internal compliance policies that forbade such services. There was no allegation that Akhavan had obtained any of the processed funds himself; he was simply a middleman.



Hilary LoCicero

In advance of sentencing, the parties extensively briefed the issue of loss under U.S. Sentencing Guidelines Section 2B1.1, which was complicated by the fact that no party had actually lost any money as a result of the transactions. Because of that unusual posture, Judge Rakoff directed the parties to provide briefing on the impact of Section 2B1.1, Note 3(b), which provides that "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."[1]

The government argued that the entire $156 million the banks had been "tricked into releasing" was a reasonably determinable loss amount and should be used in the guidelines calculation, and thus, that it was not necessary to calculate the defendant's gain.[2] The government adopted a fallback position that, because Akhavan had gained at least $17 million in processing fees through the criminal scheme, that figure also could be deemed the loss amount.[3]

Counsel for Akhavan urged the court to conclude that, because there was no loss whatsoever, Comment 3(b) to Section 2B1.1, which directed the court to consider gain only if there is a loss was not applicable.[4]

Ultimately, Judge Rakoff imposed a sentence of 30 months incarceration, after finding that there was, in fact, no loss that had resulted from Akhavan's conduct. At sentencing, Judge Rakoff observed, "It appears to me that there's never been a case where the guidelines were more irrational, silly and ridiculous than in this case."[5]

The government's arguments about how the loss amount should be calculated under Section 2B1.1 nevertheless carried over to its position on forfeiture. The government sought the entire $156 million in forfeiture or, alternatively, the $17 million in fees that Akhavan had received. Akhavan argued that forfeiture could not be ordered because he had not obtained any of the money in question, as is required under the forfeiture laws, and that a forfeiture order would violate the Eighth Amendment's prohibition against excessive fines.[6]

We use cookies that are necessary to make our site work. We may also use additional cookies to analyze, improve, and personalize our content and your digital experience. You can manage your cookie preferences using the **Cookie Settings** link and opt out of personalized advertising via **Ad Choices**. For more information, see our **Cookie Policy.**

As laid out above, there was no articulable loss to any party as a result of Akhavan's crime and a $17 million forfeiture order is seventeen times the maximum fine and 170 times the actual fine imposed in this case.[8]

This outcome makes sense both practically and equitably. It would be difficult to reconcile a conclusion that Akhavan's term of incarceration should be determined based on a loss amount far less than the $17 million, and yet he should be subject to forfeiture in that amount.

Judge Rakoff's analysis may be useful precedent for defense counsel in future white collar prosecutions, even after accounting for the unique facts of Akhavan's case.[9] Loss amounts play, by far, the largest part in calculating recommended sentences in federal criminal cases involving fraud and property crimes.

While most white collar criminal cases involve some loss as a result of the criminal conduct, there is an important subset of cases that result in defendants being held accountable for loss amounts greatly disproportionate to their culpability. Cases in which defendants are charged and convicted of criminal conspiracy despite playing a minor role in the events at issue, are commonplace and not far removed from the facts of Akhavan.

These cases have been a deep source of frustration for defense lawyers who represent lesser offenders in conspiracy cases yet must defend against the possibility of an enormous loss amount.[10] Judge Rakoff's decision begs the question: If a sentence in Akhavan based on a $17 million loss amount was so untethered to the defendant's conduct as to be unsupportable — and unconstitutional, as concerns forfeiture — is it not equally unfair to adopt such an expansive view in conspiracy cases?

Section 2B1.1 of the Sentencing Guidelines has been the subject of debate — and derision — for decades, for this reason and others. As Barry Boss and Kara Kapp note in "How the Economic Loss Guideline Lost its Way, and How to Save It"[11]:

> The current loss table is ... a poor proxy for relative culpability in many cases. For example, the loss calculation fails to account for the extent to which the offender personally profited from the offense. Indeed, each offender is responsible for the total reasonably foreseeable loss attributable to all co-defendants, regardless of how much each offender personally profited from that amount.[12]

The facts of Akhavan illustrate this conundrum.

There already has been significant judicial pushback against the unjustified impact of Section 2B1.1. Courts depart or vary below the guidelines in the majority of cases to which Section 2B1.1 applies.[13]

However, the government and presentence report writers still adhere closely to Section 2B1.1, as was the case in Akhavan. And, troublingly, the pushback is not consistent throughout the U.S. While Boss and Kapp note that from 2015 through 2019, "more than 50 percent of sentences issued to fraud offenders were below the guideline range," a significant percentage of sentences were not, and as Boss and Kapp further note, the guidelines nevertheless have a "significant anchoring effect."[14]

We use cookies that are necessary to make our site work. We may also use additional cookies to analyze, improve, and personalize our content and your digital experience. You can manage your cookie preferences using the **Cookie Settings** link and opt out of personalized advertising via **Ad Choices**. For more information, see our **Cookie Policy.**

purely permissive. And none of this is to say that intended loss is completely irrelevant to sentencing in all cases. It has a place where, for example, scheme is thwarted before it has a chance to succeed, though even that line of analysis is fraught.

But the central question that policymakers in the U.S. should be contemplating is how these factors should weigh upon a sentencing judge's mind and influence the outcome of his or her decision. Despite the undoubtedly excellent judgment of jurists like Judge Rakoff, who have seen firsthand, and vowed to combat, overcriminalization in this country,[15] the guidelines remain the predominant anchor point to sentencing.[16]

Akhavan exemplifies the Section 2B1.1 loss amounts mentality that reverberates beyond crafting a sentence. No guidance can be perfect, and there is always bound to be fuzziness at the edges. However, Akhavan is only just another of a legion of cases that show the too-often untethered results that stem from the Section 2B1.1 framework. The time for reform is now.

---

*Lloyd Liu is a partner and Hilary Holt LoCicero is a founding partner at Bennett LoCicero & Liu LLP.*

*The opinions expressed are those of the author(s) and do not necessarily reflect the views of the firm, its clients or Portfolio Media Inc., or any of its or their respective affiliates. This article is for general information purposes and is not intended to be and should not be taken as legal advice.*

[1] U.S. v. Akhavan, 20-CR-188 (JSR) (S.D.N.Y. August 2021). Docket Entry No. 315 at 1.

[2] DE 318 at 5.

[3] Id. at 3-4.

[4] DE 317 at 4.

[5] Stewart Bishop, "Businessmen Get Prison For Cannabis Bank Processing Con," Law360, June 18, 2021, https://www.law360.com/articles/1395688/businessmen-get-prison-for-cannabis-bank-processing-con.

[6] DE 317 at 13.

[7] DE 352 at 11-13.

[8] Id. at 19.

[9] Judge Rakoff has been outspoken about his concerns with respect to current sentencing framework. See Why The Innocent Plead Guilty and the Guilty Go Free, at 23 ("[T]he guidelines, like the mandatory minimums, provide prosecutors with weapons to bludgeon defendants into effectively coerced plea bargains.").

[10] David Debold and Matthew Benjamin provide an illustrative example in "'Losing Ground' – In Search of a Remedy for the Overemphasis on Loss and Other Culpability Factors in the Sentencing Guidelines for Fraud and

We use cookies that are necessary to make our site work. We may also use additional cookies to analyze, improve, and personalize our content and your digital experience. You can manage your cookie preferences using the **Cookie Settings** link and opt out of personalized advertising via **Ad Choices**. For more information, see our **Cookie Policy.**

tens of millions in proceeds for his own benefit, and flees the country. Motive, intent, and personal gain are all important offense characteristics that do not get accounted for in the guidelines.

[11] Barry Boss and Kara Kapp, "How the Economic Loss Guideline Lost its Way, and How to Save It," 18 Ohio St. J. Crim. L. 605 (Spring 2021).

[12] How the Economic Loss Guideline Lost its Way at 617.

[13] Id. at 621, n. 75.

[14] Id. at 621-2.

[15] More broadly, when discussing the overall phenomenon of our criminal justice system, Judge Rakoff himself has suggested that, "If there were the political will to do so, we could eliminate mandatory minimums, eliminate sentencing guidelines, and dramatically reduce the severity of our sentencing regimes in general." Why The Innocent Plead Guilty and the Guilty Go Free, at 30.

[16] See "Why the Innocent Plead Guilty and the Guilty Go Free" at 24 ("But what really puts the prosecutor in the driver's seat is the fact that the prosecutor – because of mandatory minimums, sentencing guidelines, and simply his ability to shape whatever charges are brought – can effectively dictate the sentence by how he drafts the indictment. [ . . . ]. [I]t is the prosecutor, not the judge, who effectively exercises the sentencing power, albeit cloaked as a charging decision.").

*For a reprint of this article, please contact reprints@law360.com.*

More Expert Analysis

Submit A Rebuttal

## Attached Documents

- Opinion

## Useful Tools & Links

- Add to Briefcase
- Save to PDF & Print
- Rights/Reprints
- Editorial Contacts

## Related Sections

- Banking
- California

We use cookies that are necessary to make our site work. We may also use additional cookies to analyze, improve, and personalize our content and your digital experience. You can manage your cookie preferences using the **Cookie Settings** link and opt out of personalized advertising via **Ad Choices**. For more information, see our **Cookie Policy.**

C. Agnello   SE 0169



# EXHIBIT J

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

As a library, NLM provides access to scientific literature. Inclusion in an NLM database does not imply endorsement of, or agreement with, the contents by NLM or the National Institutes of Health.

Learn more: PMC Disclaimer | PMC Copyright Notice



Clin J Am Soc Nephrol. 2019 Mar 11;14(4):597–608. doi: 10.2215/CJN.11220918

# Risks of Living Kidney Donation

Current State of Knowledge on Outcomes Important to Donors

Krista L Lentine [1,2,✉], Ngan N Lam [3], Dorry L Segev [4,5,✉]

Author information   Article notes   Copyright and License information
PMCID: PMC6450354   PMID: 30858158

See commentary "Commentary on Risks of Living Kidney Donation" on page 609.

## Abstract

In the past decade, there have been increasing efforts to better define and quantify the short- and long-term risks of living kidney donation. Recent studies have expanded upon the previous literature by focusing on outcomes that are important to potential and previous donors, applying unique databases and/or registries to follow large cohorts of donors for longer periods of time, and comparing outcomes with healthy nondonor controls to estimate attributable risks of donation. Leading outcomes important to living kidney donors include kidney health, surgical risks, and psychosocial effects of donation. Recent data support that living donors may experience a small increased risk of severe CKD and ESKD compared with healthy nondonors. For most donors, the 15-year risk of kidney failure is <1%, but for certain populations, such as young, black men, this risk may be higher. New risk prediction tools that combine the effects of demographic and health factors, and innovations in genetic risk markers are improving kidney risk stratification. Minor

perioperative complications occur in 10%–20% of donor nephrectomy cases, but major complications occur in <3%, and the risk of perioperative death is <0.03%. Generally, living kidney donors have similar or improved psychosocial outcomes, such as quality of life, after donation compared with before donation and compared with nondonors. Although the donation process should be financially neutral, living kidney donors may experience out-of-pocket expenses and lost wages that may or may not be completely covered through regional or national reimbursement programs, and may face difficulties arranging subsequent life and health insurance. Living kidney donors should be fully informed of the perioperative and long-term risks before making their decision to donate. Follow-up care allows for preventative care measures to mitigate risk and ongoing surveillance and reporting of donor outcomes to inform prior and future living kidney donors.

**Keywords:** Living donation; outcomes; Patient-centered care; Living Donors; Health Expenditures; Aftercare; quality of life; Kidney Failure, Chronic; kidney; Renal Insufficiency, Chronic; Insurance; Health; Registries; Nephrectomy; Salaries and Fringe Benefits

## Introduction

Since the inception of the successful practice of living donor kidney transplantation in 1954, >150,000 living persons in the United States have donated a kidney to help a family member, a friend, or even a stranger ([1](#)). Worldwide, >35,000 living donor kidney transplants are performed each year ([2](#)). Living donors derive no medical benefit from donation, nor do they expect to, but living donors do deserve transparent information on the short- and long-term outcomes of donation to support informed decision-making, follow-up, and care ([3](#)). The risks of living donation are accepted as sufficiently low to justify the practice, but notably, much of the available evidence has been limited by short observation periods, a high proportion of donors lost to follow-up, insufficient power to quantify rare events, and limited racial diversity ([4](#)–[6](#)). Furthermore, until recently, most studies compared donors with the unscreened general population. Recognition of these deficiencies, and the vital need to address them, prompted a growing body of research over the past decade that has helped advance understanding of donor risks ([7](#)). The study methodologies include construction of multicenter cohorts ([8,9](#)), integration of national donor registries with other data sources to acquire longer-term information for a broader spectrum of outcomes ([10](#)–[19](#)), and assembly of healthy nondonor controls for estimation of donation-attributable risks ([20](#)–[25](#)). The resulting evidence suggests small donation-related increases in the risk of kidney failure that have affected policy requirements and guidelines for the informed consent and care of living donors ([26,27](#)). Efforts to establish larger living donor consortia and registries with long-term follow-up are also being planned and pilot-tested ([28,29](#)).

*C.Agnello   SE 0172*

The recent 2017 Kidney Disease Improving Global Outcomes (KDIGO) *Clinical Practice Guideline on the Evaluation and Care of Living Kidney Donors* focuses on risk assessment as a foundational theme. A central framework of the guideline is promotion of "consistent, transparent and defensible decision-making" on the basis of comparisons of individualized, quantitative estimates of donor risks "to a transplant program's acceptable risk threshold" (Figure 1) (27). Although robust data necessary to ground risk thresholds for many outcomes are lacking, this conceptual framework provides a new structure for the consideration of available data by patients and providers, and a roadmap for design of future studies to address evidence gaps. Kidney donation is a decision with lifelong implications that can span dimensions of medical and psychosocial health. A new study found that "living kidney donors prioritized a range of outcomes, with the most important being kidney health and the surgical, lifestyle, functional, and psychosocial effects of donation" (30). In this review, we summarize the current state of evidence related to these outcomes important to donors, and suggest next steps to advance the evidence base for donor risk estimation and application with a transparent, consistent framework of shared decision-making.

Figure 1.



Open in a new tab

**The KDIGO framework to accept or decline donor candidates compares projected lifetime risk of kidney (quantified as the aggregate of risk related to demographic and health profile and donation-attributable risks) to a transplant program's threshold of acceptable risk.** Reproduced from reference 27, with permission.

## Kidney Health

Assessment of living kidney donor values and perceptions at three centers in Australia and Canada by Hanson *et al.* (30) identified kidney function as the highest ranked outcome important to living donors, underpinned by fear of developing kidney failure. Although many donors felt they had ruled out the risk of kidney failure during evaluation, some were uncertain whether their glomerular filtration rate (GFR) after donation was "normal" and how to protect their long-term

C. Agnello   SC 0174

kidney function (*e.g.*, by lifestyle or dietary modifications) ([30](#)). Similarly, a new study of 193 living kidney donors in the United States, assessed at 1, 6, 12, and 24 months postdonation, found that 21% (*n*=32) reported an emergence of anxiety about kidney injury or loss at one or more postdonation assessments, but this anxiety dissipated in 35% (11 out of 32) ([31](#)). In an interview-based study of 50 living donors at one center (assessed at a median 9 years after donation), 22% reported concern for failure of the remaining kidney before donation, whereas 12% endorsed this concern postdonation ([32](#)).

After donor nephrectomy there is compensatory hyperfiltration in the remaining kidney, such that the net reduction in GFR early after donation is only approximately 30% (25%–40%; *i.e.*, decrement in GFR of 25–40 ml/min per 1.73 m$^2$) ([33](#)–[36](#)). One long-term study of glomerular hemodynamics after kidney donation observed that the adaptive hyperfiltration mostly resulted from compensatory glomerular hypertrophy and hyperperfusion in the remaining kidney, rather than pathologic glomerular hypertension ([37](#)). In a prospective study of 182 predominantly (94.6%) white kidney donors and paired healthy nondonors, GFR measured by iohexol clearance declined 0.36 ml/min per year in nondonor controls but increased 1.47 ml/min per year in donors between 6 and 36 months of follow-up ([33,35](#)). The trajectory of change in GFR beyond 36 months postdonation, and associations with risk for ESKD, requires examination in larger, demographically diverse samples. A recent study of 2002 predominantly white living donors followed for up to 20 years at one center did not support an association of postdonation estimated glomerular filtration rate (eGFR) trajectory and ESKD risk ([38](#)). Nevertheless, there is concern that adaptive hyperfiltration might result in faster progression of *de novo* kidney disease that could accelerate deterioration to low levels of kidney function or kidney failure ([39](#)).

Clinically important kidney end points include progression to advanced stages of CKD, injury markers such as proteinuria, and most importantly, ESKD. One study of 3956 predominantly white kidney donors found that 36% had eGFR<60 ml/min per 1.73 m$^2$ (corresponding to CKD stage 3 or higher) at a median time of 9.2 years postdonation, and 2.6% had eGFR<30 ml/min per 1.73 m$^2$ (corresponding to CKD stage 4 or higher) at a median of 23.9 years ([40](#)). Postdonation proteinuria was higher in men (adjusted hazard ratio [aHR], 1.56; 95% confidence interval [95% CI], 1.18 to 2.05; *P*<0.001) and those with higher body mass index (BMI) (aHR, 1.10 per unit; *P*<0.001) ([40](#)). A meta-analysis found that after an average of 10 years of follow-up, 12% of donors had a GFR in the 30–59 ml/min range whereas only 0.2% had a GFR in the <30 ml/min range; further, most donors did not have a progressive GFR loss after the initial reduction postdonation ([36](#)). As in the general population, risk of kidney complications varies by baseline donor traits, such as race. For example, a study of 4650 donors in the United States found that by 7 years postdonation, after adjustment for age and sex, a greater proportion of black donors compared with white donors had kidney-

related diagnoses: CKD (12.6% versus 5.6%; aHR, 2.32), proteinuria (5.7% versus 2.6%; aHR, 2.27; 95% CI, 1.48 to 3.62), and nephrotic syndrome (1.3% versus 0.1%; aHR, 15.7; 95% CI, 2.97 to 83.0) ([17](17)).

Although the risk of ESKD after kidney donation does not exceed ESKD rates in the general population ([41](41)–[43](43)), two recent studies comparing donors with healthy nondonors for estimation of donation-attributable risk found that donation is associated with a small but significant increase in the risk of ESKD. In comparing 1901 kidney donors with 32,621 healthy, demographically matched controls in Norway, Mjøen *et al.* ([22](22)) found that nine donors (0.47%) developed ESKD versus 22 healthy nondonors (0.07%) (aHR, 11.9; 95% confidence interval [95% CI], 4.4 to 29.6). On the basis of linking data for 96,217 living donors from the United States donor registry and healthy participants drawn from National Health and Nutrition Examination Survey III to national ESKD reporting forms, Muzaale *et al.* ([21](21)) reported that the cumulative incidence of ESKD at 15 years was 30.8 per 10,000 in donors compared with 3.9 per 10,000 in matched donors (risk attributable to donation of 26.9 per 10,000). Considered by race, black living donors had the highest absolute risk of ESKD postdonation as well as the highest risk attributable to donation. Although the risk increase is small, details have been debated ([44](44)), and absolute postdonation risk is low overall, these data have appropriately shaped informed consent policies in the interest of transparent disclosure, such that United States transplant programs are now required to disclose the possibility of donation-attributable increase in ESKD risk ([26](26)), and similar disclosure is recommended for international practice by the 2017 KDIGO guideline ([27](27)).

Some information is available on ESKD causes after donation. A linkage of national donor registry data to ESKD registry data for 125,427 living donors found that early postdonation ESKD was predominantly reported as due to glomerulnephritis (GN), whereas late postdonation ESKD was more frequently reported as due to diabetes or hypertensive kidney disease, the latter two consistent with the leading causes of ESKD in the United States general population ([45](45)). In a single-center study of 3956 predominantly white living donors, 48% of ESKD events with known causes (*n*=12 out of 25) were related to hypertension or diabetes ([46](46)). Although the pathways from predonation metabolic and genetic risk factors to postdonation ESKD are not yet well defined, these data emphasize the importance of careful evaluation to identify kidney risk factors, counseling regarding known and unknown risks, and engagement in postdonation follow-up, especially for higher-risk groups, so that any signs of early postdonation kidney problems can be recognized and managed.

To help ground a quantitative framework for living donor candidate evaluation, the 2017 KDIGO guideline development methodology included collaboration with the CKD Prognosis Consortium

C.Agnello   SE 0176

to develop a tool to project the 15-year and lifetime incidence of kidney failure in the absence of donation on the basis of demographic and health characteristics at the time of evaluation ([47](#)). The risk model uses meta-analysis of data from nearly 5,000,000 healthy persons identified from seven general population cohorts who are similar to kidney donor candidates, calibrated to annual ESKD incidence in the United States healthy population ([47](#)), and the resulting online tool is available online ([www.transplantmodels.com](http://www.transplantmodels.com)    ). Projected ESKD risk was higher in the presence of a lower estimated GFR, higher albuminuria, hypertension, current or former smoking history, diabetes mellitus, and obesity. In the model-based lifetime projections, the risk of ESKD in the absence of donation was highest among persons in the youngest age group, particularly among young black men. Importantly, a central principle of the approach and tool is risk assessment on the basis of simultaneous consideration of a profile of demographic and clinical characteristics, rather than individual factors in isolation (*e.g.*, risk related to high BP or BMI alone), and comparison of integrated risk to a threshold of acceptable risk ([Figure 1](#)).

Other tools are available. Using a cohort of 3956 white donors, Ibrahim *et al.* ([40](#)) developed a calculator for eGFR<30 ml/min per 1.73 m$^2$ or ESKD on the basis of risk relationships for older age (hazard ratio [HR], 1.07; 95% CI, 1.05 to 1.09 *P*<0.001), higher BMI (HR, 1.08; 95% CI, 1.04 to 1.13; *P*<0.001), and higher systolic BP (HR, 1.02; 95% CI, 1.00 to 1.04; *P*=0.01). Another recent tool estimates postdonation risk on the basis of national United States registry and ESKD data for 133,824 living donors. ESKD risk after donation in this model is higher with male sex, black race, higher BMI, and biologic relationship to recipient ([48](#)). Because of the lack of available data, the model does not incorporate clinical or laboratory variables, such as the use of antihypertensive medications and urine albumin excretion. A key finding in this study was that although the 20-year predicted ESKD risk was very small in the average (median) donor (34 in 10,000), in a small subgroup of donors (1%) the risk was substantially higher than the median (256 in 10,000) ([48](#)). Recent studies of kidney outcomes in living donors, including ESKD, reduced GFR/CKD, and proteinuria, are summarized in [Table 1](#).

Table 1.

Summary of recent studies of kidney outcomes in living donors, according to risk perspective

| Author, yr | Data Source/Design | Outcome Measure and Follow-Up | Risk Perspective | Findings |
|---|---|---|---|---|
| **ESKD** | | | | |
| Gibney *et al.* ([87]) *Transplantation* 2007 | • Linkage of OPTN LKD registration (1993–2005) and transplant waitlist registration data (1993–2005) for 8889 United States LKD | • Transplant waitlist registrations among prior LKD as a measure of ESKD | • Descriptive<br><br>• Between donors | • 102 LKD waitlisted at median 17.6 yr postdonation<br><br>• Among listed LKD, 44% were black (compared with 14% total black donors; $P<0.0001$) and 40% were white (compared with 14% total black donors; $P<0.0001$) |
| Ibrahim *et al.* ([41]) *N Engl J Med* 2009 | • Cohort study of 3698 LKD at one center in Minnesota, United States (1963–2007); 98% white race | • ESKD requiring dialysis or transplantation on the basis of the report of the LKD or recipient | • LKD versus general population | • 11 LKD developed ESKD, at an average of 22.5±10.4 yr (180 cases PMPY)<br><br>• ESKD in LKD did not exceed national ESRD rate for white |

| Author, yr | Data Source/Design | Outcome Measure and Follow-Up | Risk Perspective | Findings |
|---|---|---|---|---|
| | | | | Americans (268 cases PMPY) |
| Cherikh *et al.* ([88](#)) *Am J Transplant* 2011 | • Linkage of OPTN LKD registration (1987–2003) and national kidney replacement treatment (1987–2009) for 56,458 United States LKD | • ESKD defined by CMS Medical Evidence Form 2728 | • LKD versus general population | • ESKD was significantly higher in black compared with white LKD: 0.423 versus 0.086 per 1000 yr at risk (RR, 4.92; *P*<0.05). |
| | | • Mean follow-up 9.8 yr | | • ESKD in LKD did not exceed national reports for general United States population, by race (0.998 and 0.273 per 1000 for black and white Americans, respectively) |
| Mjøen *et al.* ([22](#)) *Kidney Int* 2014 | • Linkage of transplant registry data for 1901 Norwegian LKD with national kidney replacement treatment records | • ESKD reported in the national registry | • LKD versus healthy nondonors | • ESKD was higher among LKD compared with healthy nondonors (302 versus 100 PMPY; aHR, 11.38; *P*<0.001) |
| | • Healthy controls from HUNT-1 survey (1984– | • Median and maximum donor | | |

| Author, yr | Data Source/Design | Outcome Measure and Follow-Up | Risk Perspective | Findings |
|---|---|---|---|---|
| | 1987) after screening for health exclusions to donation, then matched by demographic and clinical factors | follow-up: 15.2 and 44 yr, respectively | | |
| | | • Median and maximum control follow-up: 25 and 26 yr, respectively | | |
| Muzaale *et al.* ([21](#)) *JAMA* 2014 | • Linkage of OPTN LKD registration (1994–2011) and national kidney replacement treatment records for 96,217 United States LKD | • ESKD reported in national registries (initiation of maintenance dialysis, waitlist placement, or transplant) | • LKD versus healthy nondonors | • ESKD was higher among LKD compared with healthy nondonors (3.9 versus 30.8 per 10,000 over 15 yr; *P*<0.001) |
| | • "Healthy" controls drawn from NHANES III, after screening for health exclusions to donation, then matched by demographic and clinical factors | • Median and maximum LKD follow-up, 7.6 and 15 yr, respectively | | • Black LKD had highest cumulative incidence of ESKD and highest absolute risk increase (donation-attributable increase per 10,000 over 15 yr by race: 50.8 in black, 25.9 in Hispanic, and |

| Author, yr | Data Source/Design | Outcome Measure and Follow-Up | Risk Perspective | Findings |
|---|---|---|---|---|
| | | | | 22.9 in white LKD) |
| | | • Median and maximum control follow-up: 15 yr | | |
| Ibrahim *et al.* ([40](#)) *J Am Soc Nephrol* 2016 | • Cohort study of 3956 white LKD at one center in Minnesota, United States (1963–2013) | • Composite of ESKD (on the basis of report of the LKD or recipient), or eGFR<30 ml/min per 1.73 m$^2$ | • Between donors | • Cumulative incidence of ESKD per 10,000 at 15, 30, and 40 yr was 13.5, 68.7, and 78.7, respectively |
| | | • Mean and maximum follow-up: 16.6 and 51 yr, respectively | | • Composite end point was associated with older age (aHR, 1.07 per yr; *P*<0.001), higher BMI (aHR, 1.08 per kg/m$^2$; *P*<0.01), and higher systolic BP (aHR, 1.02 per mm Hg; *P*<0.01) at baseline. |
| Locke *et al.* ([89](#)) *Kidney Int* 2016 | • Linkage of OPTN LKD registration (1987–2013) and national kidney replacement treatment records | • ESKD reported in national registries, as per ([21](#)) | • Between donors | • Cumulative incidence of ESKD at 20 yr was 93.9 per 10,000 in obese compared with 39.7 per 10,000 in nonobese LKD |

| Author, yr | Data Source/Design | Outcome Measure and Follow-Up | Risk Perspective | Findings |
|---|---|---|---|---|
| | for 119,769 United States LKD | • Median and maximum follow-up: 10.7 and 20 yr, respectively | | • Covariate-adjusted ESKD risk was 86% higher in compared versus nonobese LDK (aHR, 1.86; $P$=0.04) |
| | | | | • Each 1-unit increase in BMI>27 kg/m$^2$ was associated with 7% higher ESKD risk (aHR, 1.07; $P$=0.004) |
| Anjum *et al.* ([45]) *Am J Transplant* 2016 | • Linkage of OPTN LKD registration (1987–2014) and national kidney replacement treatment records for 125,427 United States LKD | • ESKD reported in national registries, as per ([21])<br><br>• ESKD causes from CMS Medical Evidence Form 2728, categorized as hypertension/large vessel disease, diabetes, or GN | • Between donors | • Cumulative incidence of ESKD increased from 10 per 10,000 at 10 yr to 85 per 10,000 at 25 yr<br><br>• Early (within 10 yr) postdonation ESKD was predominantly attributed to GN, whereas later predominantly reported as diabetic and hypertensive (later versus |

C.Agnello  SE 0182

| Author, yr | Data Source/Design | Outcome Measure and Follow-Up | Risk Perspective | Findings |
|---|---|---|---|---|
| | | | | early IRR, 7.7 and 2.6, respectively) |
| | | • Median and maximum follow-up: 11 and 25 yr, respectively | | • Time-dependent increase did not occur for GN (IRR, 0.7) |
| Massie *et al.* ([48](#)) *J Am Soc Nephrol* 2017 | • Linkage of OPTN LKD registration (1987–2015) and national kidney replacement treatment records for 133,842 United States LKD | • ESKD defined by the CMS Medical Evidence Form 2728 | • Between donors | • ESKD risk was significantly (*P*<0.01) higher with black race (aHR, 2.96), male sex (aHR, 1.88), higher BMI (aHR, 1.61 per 5 kg/m$^2$), and first-degree relationship to recipient (aHR, 1.70) |
| | | | | • Among nonblack LKD, ESKD risk increased with older age (aHR, 1.40 per decade) |
| | | | | • Among black LKD, older age was not significantly associated with ESKD risk (HR, 0.88; *P*=0.3) |

| Author, yr | Data Source/Design | Outcome Measure and Follow-Up | Risk Perspective | Findings |
|---|---|---|---|---|
| Matas *et al.* ([46]) *Am J Transplant* 2018 | • Cohort study of 4030 LKD at one center in Minnesota, United States (1963–2015) | • ESKD on the basis of the report of the LKD or recipient as in ([41]), or return to center<br><br>• Mean and maximum follow-up: 18.0 and 15 yr, respectively | • Between donors | • 39 developed ESKD at mean of $27\pm9.8$ yr<br><br>• 48% of ESKD events with known causes ($n$=12/25) were attributed to hypertension or diabetes (alone or in combination) |
| Serrano *et al.* ([90]) *Am J Transplant* 2018 | • Cohort study of 3752 LKD at one center in Minnesota, United States (1975–2014); 98% white | • ESKD on the basis of the report of the LKD or recipient as in ([41]), or return to center<br><br>• End of follow-up not reported | • Between donors | • No difference in ESKD at end of study in obese and nonobese donors (0.5% versus 0.6%; $P$=0.46) |
| Wainright *et al.* ([91]) *Am J Transplant* 2018 | • Linkage of OPTN LKD registration (1994–2016) and national kidney replacement treatment records for 123,526 United States LKD | • ESKD reported in national registries, as per ([21])<br><br>• Median follow-up: 10.3 yr | • Between donors | • 218 developed ESKD, at a median of 11 yr<br><br>• ESKD risk was significantly ($P$<0.01) higher with male sex (aHR, 1.75), higher BMI (aHR, 1.34 per 5 kg/m$^2$), first-degree relationship to |

| Author, yr | Data Source/Design | Outcome Measure and Follow-Up | Risk Perspective | Findings |
|---|---|---|---|---|
| | | | | recipient (aHR, 2.01), lower predonation eGFR (aHR, 0.89 per 10 ml/min per 1.73 m$^2$ increase), and lower SES neighborhood at donation |
| | | | | • Among white LKD, ESKD risk increased with older age (aHR, 1.26 per decade) |
| | | | | • Among black LKD, ESKD risk decreased with older age (aHR, 0.75 per decade) |

**Reduced GFR/CKD, proteinuria, and other kidney complications**

| Author, yr | Data Source/Design | Outcome Measure and Follow-Up | Risk Perspective | Findings |
|---|---|---|---|---|
| Lentine *et al.* ([10]) *N Engl J Med* 2010 | • Linkage of OPTN data for 4650 LKD in 1987–2007 with administrative billing claims from a private health insurer (2000–2007 claims) | • CKD diagnosis over median 7.7 yr follow-up | • Descriptive | • Overall, CKD was reported in 5.2% at 5 yr |
| | • Stage-specific CKD coding | | • Between donors | • Adjusted CKD risk was twice as |

| Author, yr | Data Source/Design | Outcome Measure and Follow-Up | Risk Perspective | Findings |
|---|---|---|---|---|
| | examined a subgroup of 2307 LKD | | | likely among black (aHR, 2.32; $P<0.001$) or Hispanic (aHR, 1.90; $P<0.001$) compared with white LKD |
| | | | | • CKD stage 3 was higher in black (aHR, 3.60; $P=0.009$) or Hispanic (aHR, 4.2; $P=0.006$) versus white LKD |
| Lentine *et al.* (15) *Transplantation* 2013 | • Linkage of OPTN data (starting 1987) with administrative billing claims for 4650 privately insured (2000–2007 claims) and 4007 Medicare-insured (2000–2008 claims) LKD | • CKD and proteinuria diagnoses | • Descriptive | • At 5 yr, CKD was reported in 5.2% of the privately insured and 21.8% of the Medicare-insured LKD, and proteinuria in 2% and 5%, respectively |
| | | • Median follow-up 7.7 yr for the privately insured and 6 yr for the Medicare-insured samples | • Between donors | • Adjusted CKD risk was higher for black LKD in the privately insured (aHR, 2.32; $P<0.001$) and Medicare (aHR, 1.84; |

| Author, yr | Data Source/Design | Outcome Measure and Follow-Up | Risk Perspective | Findings |
|---|---|---|---|---|
| | | | | $P<0.001$) samples |
| | | | | • Adjusted proteinuria risk was higher for black LKD in privately insured (aHR, 2.27; $P<0.05$) and Medicare (aHR, 2.44; $P<0.001$) samples |
| Lentine *et al.* (17) *Transplantation* 2015 | • Linkage of OPTN data for 4650 LKD with private insurance medical claims, as above (10) | • CKD diagnosis over median 7.7 yr follow-up | • Descriptive | • At 7 yr, significantly more ($P<0.05$) black compared with white LKD had kidney condition diagnoses: CKD (12.6% versus 5.6%; aHR, 2.32), proteinuria (5.7% versus 2.6%; aHR, 2.27), nephrotic syndrome, (1.3% versus 0.1%; aHR, 15.7), and any kidney condition (14.9% versus 9.0%; aHR, 1.72) |
| | | | • Between donors | |

| Author, yr | Data Source/Design | Outcome Measure and Follow-Up | Risk Perspective | Findings |
|---|---|---|---|---|
| Kasiske *et al.* ([35](#)) *Am J Kidney Dis* 2015 | • Prospective study of 182 LKD (94.6% white) | • GFR measured by plasma iohexol clearance, from 6 to 30 mo postdonation | • LKD versus healthy nondonors | • GFR declined 0.36±7.55 ml/min per yr in controls but increased 1.47±5.02 ml/min per yr in LKD (*P* for difference in change =0.005) |
| | • Paired controls meeting donor selection criteria | • Proteinuria and albuminuria | | • Albuminuria increased modestly in LKD (3.6–4.2 mg/g) but not in controls (4.7–4.7 mg/g) (*P* for difference in change <0.001) |
| | | | | • Proteinuria did not increase in LKD or controls |
| Ibrahim *et al.* ([40](#)) *J Am Soc Nephrol* 2016 | • Cohort study of 3956 white LKD at one center in Minnesota, United States (1963–2013) | • Urinary AER >30 mg/g | • Between donors | • Proteinuria was identified in 6.1% at median 18 yr |
| | | Creatinine, 24-h urinary protein >200 mg/d, ≥2+on urine dipstick tests, self-report | | • Proteinuria was associated with higher BMI (aHR, 1.10 per kg/m$^2$; *P*<0.001) and male sex (aHR, 1.56; *P*<0.01), and less |

C.Agnello   SE 0188

| Author, yr | Data Source/Design | Outcome Measure and Follow-Up | Risk Perspective | Findings |
|---|---|---|---|---|
| | | | | common in donors related to their recipient (aHR, 0.58; $P$=0.03) |
| | | • Mean and maximum follow-up: 16.6 and 51 yr, respectively | | |
| Matas *et al.* (38) *Am J Transplant* 2018 | • Cohort study of 2002 white LKD at one center in Minnesota, United States (1990–2014) | • eGFR by CKD Epidemiology Collaboration equation | • Between donors | • Average eGFR increased steadily until donors reached age 70 yr: 1.12 ml/min per 1.73 $m^2$ per yr between 6 wk and 5 yr postdonation, 0.24 ml/min per 1.73 $m^2$ per yr between 5 and 10 yr postdonation, and 0.07 ml/min per 1.73 $m^2$ per yr between 10 and 20 yr postdonation |
| | | • Donors contacted at 6, 12, 24, and 36 mo, then every 3 yr | | • After age 70, eGFR declined |
| | | • Includes request to contact local clinics | | • eGFR trajectories did |

C.Agnello   SE 0189

| Author, yr | Data Source/Design | Outcome Measure and Follow-Up | Risk Perspective | Findings |
|---|---|---|---|---|
| | | for laboratory tests | | not explain ESKD risk |

Open in a new tab

Adapted and updated from reference 7, with permission. OPTN, Organ Procurement and Transplantation Network; LKD, living kidney donors; PMPY, per million per year; CMS, Centers for Medicare & Medicaid Services; RR, relative risk; HUNT-1, Nord-Trøndelag Health Study; aHR, adjusted hazard ratio; NHANES, National Health and Nutrition Examination Survey; GN, glomerulonephritis; BMI, body mass index; IRR, incidence rate ratio; HR, hazard ratio; SES, socioeconomic status; AER, albumin excretion rate.

## Surgical Risks

In the study by Hanson *et al.* (30), avoiding catastrophic consequences such as surgical mortality and morbidity was important to donors, particularly during decision-making, because they were the "most serious" outcomes and would also affect their family. Some participants ranked time to recovery, surgical complications, and pain highly because they felt "deeply disappointed" and "resentful" about enduring a more debilitating and protracted recovery than they had been "led to expect." (30) In a multicenter, prospective study of 228 living donors, perioperative complications, not surprisingly, were associated with clinically and statically significant reductions in measures of health-related quality of life (49). Other studies have noted that a minority of donors have reported slower than expected recovery (50). However, aside from capture of length of initial hospital stay and time to return to work in some clinical trials (typically comparisons of different operative techniques) (51,52) and single-center reports, data on postdonation recovery are not systematically captured.

Fortunately, the risk of morbidity and mortality after living donor nephrectomy is low. A United States study linking the national donor registry for 80,347 donors to the Social Security Death Master Index reported the 90-day mortality to be 3.1 per 10,000 (20). Consistent rates have also been reported in other studies (53). Administrative data have been used to identify perioperative complications in large samples of living kidney donors, independent of center or surgeon reporting. Using a composite outcome of cardiac, respiratory, digestive, urinary, procedural,

hemorrhage, or infectious complications, one United States study estimated the incidence of perioperative complications as 7.9% and noted a decrease over time, from 10.1% in 1998 to 7.6% in 2010 (54). Limitations of this study include the lack of confirmation of donor status through patient-level linkages to the national registry, and use of weighting schemes to draw inferences for a "represented" sample of all United States donors on the basis of a stratified sample of 20% of acute care hospitalizations (55). A subsequent study integrated national United States donor registry data as a source of verified living donor status with administrative records from a consortium of 98 academic hospitals (2008–2012, *n*=14,964). In this study, 16.8% of donors experienced any perioperative complication, most commonly gastrointestinal (4.4%), bleeding (3.0%), respiratory (2.5%), and surgical/anesthesia-related injuries (2.4%) (18). Major complications, defined as Clavien grading system for surgical complications level 4 or 5 (56), affected 2.5% of donors. Similarly, a Norwegian registry-based study of 1022 living kidney donations performed between 1997 and 2008 reported 18% minor and 2.9% major complications by Clavien grading (57). The 2017 KDIGO guideline and the *European Association of Urology Guidelines on Renal Transplantation: Update 2018* present these estimates as information for donor counseling (27,58). Given the low incidence of major perioperative complications, estimates for predonation characteristics that alter the risk are imprecise. Efforts to capture granular complications data, such as through large, national registries, including development and validation of patient-centered recovery measures, are needed to support contemporary estimates of the risk of perinephrectomy complications according to an individualized profile of predonation characteristics (27).

## Psychosocial Outcomes

### Quality of Life

Although living donors derive no personal medical benefit from donation, they may experience psychosocial benefits related to the altruistic act of improving the health and wellbeing of another person. A systematic review assessing psychosocial health in living kidney donors found that the majority of donors scored high on health-related quality-of-life measurements (59). Psychosocial health was unchanged or improved after donation and overall, and was similar or better than the general population. A minority of donors experienced negative psychosocial outcomes such as depression, anxiety, stress, and lower-quality relationships. Reassuringly, most donors did not regret their decision to donate and would undergo the process again, even in the rare circumstances when the recipient experiences a poor outcome (9). However, recipient graft loss and death have been associated with increased risk of depression treatment after donation in some studies (12).

Recently, Rodrigue *et al.* ([31](#)) reported on psychosocial measures assessed pre- and postdonation among 193 living kidney donors and 20 healthy controls. Donors experience minimal to no dysfunction in mood, body image, fear of kidney failure, life satisfaction, and decisional stability up to 2 years postdonation, and their outcomes did not differ significantly from the healthy nondonor controls. The overall incidence of new-onset mood disturbance (16%), fear of kidney failure (21%), body image concerns (13%), and life dissatisfaction (10%) after donation was low. Donors with preexisting concerns were at the highest risk of the same outcomes postdonation. Thus, although donors have generally favorable psychosocial outcomes postdonation, the small risk of adverse psychosocial functioning should be discussed with all living kidney donor candidates.

## Financial Risks

Although the study by Hanson *et al.* ([30](#)) found that some donors had financial assistance to help them absorb out-of-pocket expenses and replace lost income as a result of donation, other participants ranked financial concerns highly because they believed that lost income and out-of-pocket expenses were unfair barriers to donors. For younger donors, single parents, and one donor who was not a resident and uninsured, the costs were "a big hit" and, for one, "an absolute destruction." ([30](#)) The leave required for recovery caused some donors to lose their jobs ([30](#)). A recent survey of 51 United States donors found that perceived financial burden was highest among those with predonation cost concerns and with an income <$60,000 ([60](#)).

Although it is widely accepted that living donation should be a financially neutral act, unfortunately, financial risks are a reality in current practice. Even in countries where the donation-related medical expenses are paid by the recipient's insurance or the health care system, it has been documented that donor candidates may incur many types of direct and indirect costs in the donation process, including for travel, medications, lost time from work, and dependent care ([61](#)–[63](#)). In one United States study, 92% of living kidney donors incurred direct costs (median $433, range $6–$10,240) and more than one third (36%) reported lost wages in the first year after donation (median $2712, range $546–$19,728) ([62](#)). Similarly, a multicenter, Canadian cohort found that 98% of living kidney donors incurred donation-related costs, with median (seventh percentile) out-of-pocket costs of $1254 ($2598) (Canadian dollars); among 30% who experienced unpaid time off work, median lost income was $5534, and total costs exceeded $5500 in 25% of the cohort ([64](#)). A single-center, retrospective survey of living donors who were working for compensation at the time of donation (2005–2015) found that increased length of time to return to work was a significant predictor of financial burden, and that donors in manual/skilled trade occupations experienced greatest financial burden for each week away from work ([65](#)). Older age at donation and nondirected (versus directed) donation were associated with significantly

decreased financial burden ([65](#)). Living donation may also affect ability to obtain life, disability, and health insurance ([66](#)–[68](#)).

The National Organ Transplant Act has been clarified, to explicitly state that "reasonable payments associated with… the expenses of travel, housing, and lost wages incurred by the donor" are legal ([69](#)). Many states have enacted legislation to offer tax deductions or credits, or other benefits, to living organ donors ([70](#)). These programs vary state by state, are underused, and have not been studied with regard to effect on financial burden of donation. Trials of replacement of lost wages in the donation process are being pilot-tested ([71](#),[72](#)).

A 2016 convenience sample of informed consent forms for living donor and transplant candidate evaluation from nine geographically diverse programs in the United States identified misconceptions about defraying donation-related costs, reinforced by ambiguous language or omissions in the donor informed consent documents ([73](#)). Living donor candidates should receive counseling about financial costs and risks before donation, information about the availability of legal cost replacement programs, and assistance in accessing legitimate cost replacement programs. In 2016, the American Society of Transplantation launched an online financial toolkit to help donor candidates learn about the finances of being a living organ donor; this dynamic resource will be expanded and updated over time ([74](#)). An American Society of Transplantation Living Donor Community of Practice work group has developed guidance to help transplant centers maximize donor coverage and minimize financial consequences to donors ([75](#)).

## Summary and Future Directions

The practice of living donation relies on the ethical principles of beneficence and nonmaleficence (where the benefits to the recipient are great whereas the risks to the donor are justifiably low) as well as donor autonomy after informed consent (where risks and uncertainties are fully disclosed) ([76](#)). Understanding risks related to kidney health, surgical complications, and psychosocial outcomes is vital for donors and their care providers, and defining knowns and unknowns can inform future research and policy development priorities ([Figure 2](#)). However, focus on these key outcomes important to donors is not intended to be comprehensive, and other outcomes (*e.g.*, pregnancy risks, hypertension, metabolic conditions, and effect on relationships, family dynamics, and lifestyle) are discussed elsewhere ([13](#),[14](#),[19](#),[24](#),[77](#)–[85](#)). Some adverse outcomes may only be fully appreciated after decades of follow-up of large cohorts of donors with diverse demographic characteristics. Ongoing commitment to strengthen the evidence base for donor candidate evaluation, selection, and counseling, including longer follow-up in representative cohorts, well designed use of integrated data sources ([55](#)), long-term registries ([28](#)), and advancement of tools

for tailored risk estimation ([7](#),[47](#),[76](#),[86](#),[49](#)), should remain a leading priority for researchers, practitioners, and policymakers.

Figure 2.



Open in a new tab

**Applying knowledge on outcomes important to donors can inform current counseling and next steps for research and policy.** Infographic prepared for this perspective by Heather Hunt, JD, in collaboration with Alvin Thomas, MSPH.

## Disclosures

None.

## Acknowledgments

Heather Hunt, JD, and Alvin Thomas, MSPH, collaborated in preparing the original infographic for this article and grant permission for its use. Ms. Hunt is president of LIVE ON Organ Donation, Inc.,

a nonprofit organization that raises money to support living organ donors' nonmedical expenses, and is vice chair of the Organ Procurement and Transplantation Network (OPTN)/United Network for Organ Sharing (UNOS) Living Donor Committee. Mr. Thomas is a student in the Department of Epidemiology at the University of North Carolina at Chapel Hill.

## Footnotes

Published online ahead of print. Publication date available at www.cjasn.org .

See related Commentary, "Commentary on Risks of Living Kidney Donation: Current State of Knowledge on Core Outcomes Important to Donors," on pages 609–610.

## References

1. OPTN (Organ Procurement and Transplantation Network)/UNOS (United Network for Organ Sharing): National Data Reports, Donors Recovered in the U.S. by Donor Type, Latest Data. Available at: https://optn.transplant.hrsa.gov/data/view-data-reports/national-data/ . Accessed July 27, 2018

2. Global Observatory on Donation and Transplantation: Kidney Transplants (Year 2016). Available at: http://www.transplant-observatory.org/countkidney/ . Accessed August 18, 2018

3. Gordon EJ: Living organ donors' stories: (unmet) Expectations about informed consent, outcomes, and care. Narrat Inq Bioeth 2: 1–6, 2012 [DOI    ] [PubMed] [Google Scholar    ]

4. Ommen ES, Winston JA, Murphy B: Medical risks in living kidney donors: Absence of proof is not proof of absence. Clin J Am Soc Nephrol 1: 885–895, 2006 [DOI    ] [PubMed] [Google Scholar    ]

5. Lentine KL, Patel A: Risks and outcomes of living donation. Adv Chronic Kidney Dis 19: 220–228, 2012 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

6. Lentine KL, Segev DL: Health outcomes among non-caucasian living kidney donors: Knowns and unknowns. Transpl Int 26: 853–864, 2013 [DOI    ] [PubMed] [Google Scholar    ]

7. Lentine KL, Segev DL: Understanding and communicating medical risks for living kidney donors: A matter of perspective. J Am Soc Nephrol 28: 12–24, 2017 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

8. Gross CR, Messersmith EE, Hong BA, Jowsey SG, Jacobs C, Gillespie BW, Taler SJ, Matas AJ, Leichtman A, Merion RM, Ibrahim HN; RELIVE Study Group: Health-related quality of life in kidney donors from the last five decades: Results from the RELIVE study. Am J Transplant 13: 2924–2934, 2013 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

9. Clemens K, Boudville N, Dew MA, Geddes C, Gill JS, Jassal V, Klarenbach S, Knoll G, Muirhead N, Prasad GV, Storsley L, Treleaven D, Garg AX; Donor Nephrectomy Outcomes Research (DONOR) Network: The long-term quality of life of living kidney donors: A multicenter cohort study. Am J Transplant 11: 463–469, 2011 [DOI    ] [PubMed] [Google Scholar    ]

10. Lentine KL, Schnitzler MA, Xiao H, Saab G, Salvalaggio PR, Axelrod D, Davis CL, Abbott KC, Brennan DC: Racial variation in medical outcomes among living kidney donors. N Engl J Med 363: 724–732, 2010 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

11. Lentine KL, Schnitzler MA, Xiao H, Davis CL, Axelrod D, Abbott KC, Salvalaggio PR, Burroughs TE, Saab G, Brennan DC: Associations of recipient illness history with hypertension and diabetes after living kidney donation. Transplantation 91: 1227–1232, 2011 [DOI    ] [PubMed] [Google Scholar    ]

12. Lentine KL, Schnitzler MA, Xiao H, Axelrod D, Davis CL, McCabe M, Brennan DC, Leander S, Garg AX, Waterman AD: Depression diagnoses after living kidney donation: Linking U.S. Registry data and administrative claims. Transplantation 94: 77–83, 2012 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

13. Lentine KL, Vijayan A, Xiao H, Schnitzler MA, Davis CL, Garg AX, Axelrod D, Abbott KC, Brennan DC: Cancer diagnoses after living kidney donation: Linking U.S. Registry data and administrative claims. Transplantation 94: 139–144, 2012 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

14. Lentine KL, Schnitzler MA, Garg AX, Xiao H, Axelrod D, Tuttle-Newhall JE, Brennan DC, Segev DL: Understanding antihypertensive medication use after living kidney donation through linked national registry and pharmacy claims data. Am J Nephrol 40: 174–183, 2014 [DOI    ] [PubMed] [Google Scholar    ]

15. Lentine KL, Schnitzler MA, Xiao H, Axelrod D, Garg AX, Tuttle-Newhall JE, Brennan DC, Segev DL: Consistency of racial variation in medical outcomes among publicly and privately insured living kidney donors. Transplantation 97: 316–324, 2014 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

16. Lentine KL, Lam NN, Schnitzler MA, Garg AX, Xiao H, Leander SE, Brennan DC, Taler SJ, Axelrod D, Segev DL: Gender differences in use of prescription narcotic medications among living kidney donors. Clin Transplant 29: 927–937, 2015 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

17. Lentine KL, Schnitzler MA, Garg AX, Xiao H, Axelrod D, Tuttle-Newhall JE, Brennan DC, Segev DL: Race, relationship and renal diagnoses after living kidney donation. Transplantation 99: 1723–1729, 2015 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

18. Lentine KL, Lam NN, Axelrod D, Schnitzler MA, Garg AX, Xiao H, Dzebisashvili N, Schold JD, Brennan DC, Randall H, King EA, Segev DL: Perioperative complications after living kidney donation: A national study. Am J Transplant 16: 1848–1857, 2016 [DOI    ] [PubMed] [Google Scholar    ]

19. Lentine KL, Lam NN, Schnitzler MA, Hess GP, Kasiske BL, Xiao H, Axelrod D, Garg AX, Schold JD, Randall H, Dzebisashvili N, Brennan DC, Segev DL: Predonation prescription opioid use: A novel risk factor for readmission after living kidney donation. Am J Transplant 17: 744–753, 2017 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

20. Segev DL, Muzaale AD, Caffo BS, Mehta SH, Singer AL, Taranto SE, McBride MA, Montgomery RA: Perioperative mortality and long-term survival following live kidney donation. JAMA 303: 959–966, 2010 [DOI    ] [PubMed] [Google Scholar    ]

21. Muzaale AD, Massie AB, Wang M-C, Montgomery RA, McBride MA, Wainright JL, Segev DL: Risk of end-stage renal disease following live kidney donation. JAMA 311: 579–586, 2014 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

22. Mjøen G, Hallan S, Hartmann A, Foss A, Midtvedt K, Øyen O, Reisæter A, Pfeffer P, Jenssen T, Leivestad T, Line PD, Øvrehus M, Dale DO, Pihlstrøm H, Holme I, Dekker FW, Holdaas H: Long-term risks for kidney donors. Kidney Int 86: 162–167, 2014 [DOI    ] [PubMed] [Google Scholar    ]

23. Garg AX, Nevis IF, McArthur E, Sontrop JM, Koval JJ, Lam NN, Hildebrand AM, Reese PP, Storsley L, Gill JS, Segev DL, Habbous S, Bugeja A, Knoll GA, Dipchand C, Monroy-Cuadros M,

Lentine KL; DONOR Network: Gestational hypertension and preeclampsia in living kidney donors. N Engl J Med 372: 124–133, 2015 [DOI   ] [PMC free article] [PubMed] [Google Scholar   ]

24. Lam NN, McArthur E, Kim SJ, Prasad GV, Lentine KL, Reese PP, Kasiske BL, Lok CE, Feldman LS, Garg AX; Donor Nephrectomy Outcomes Research (DONOR) Network; Donor Nephrectomy Outcomes Research DONOR Network: Gout after living kidney donation: A matched cohort study. Am J Kidney Dis 65: 925–932, 2015 [DOI   ] [PubMed] [Google Scholar   ]

25. Lam N, Huang A, Feldman LS, Gill JS, Karpinski M, Kim J, Klarenbach SW, Knoll GA, Lentine KL, Nguan CY, Parikh CR, Prasad GV, Treleaven DJ, Young A, Garg AX; Donor Nephrectomy Outcomes Research (DONOR) Network: Acute dialysis risk in living kidney donors. Nephrol Dial Transplant 27: 3291–3295, 2012 [DOI   ] [PMC free article] [PubMed] [Google Scholar   ]

26. Organ Procurement and Transplantation Network/United Network for Organ Sharing: Policy 14: Living Donation, 2018. Available at: http://optn.transplant.hrsa.gov/governance/policies/   . Accessed July 27, 2018

27. Lentine KL, Kasiske BL, Levey AS, Adams PL, Alberú J, Bakr MA, Gallon L, Garvey CA, Guleria S, Li PK, Segev DL, Taler SJ, Tanabe K, Wright L, Zeier MG, Cheung M, Garg AX: KDIGO Clinical Practice Guideline on the Evaluation and Care of Living Kidney Donors. Transplantation 101[Suppl 1]: S1–S109, 2017 [DOI   ] [PMC free article] [PubMed] [Google Scholar   ]

28. Kasiske BL, Asrani SK, Dew MA, Henderson ML, Henrich C, Humar A, Israni AK, Lentine KL, Matas AJ, Newell KA, LaPointe Rudow D, Massie AB, Snyder JJ, Taler SJ, Trotter JF, Waterman AD; Living Donor Collective Participants: The living donor collective: A scientific registry for living donors. Am J Transplant 17: 3040–3048, 2017 [DOI   ] [PubMed] [Google Scholar   ]

29. Suwelack B, Wörmann V, Berger K, Gerß J, Wolters H, Vitinius F, Burgmer M; German SoLKiD Consortium: Investigation of the physical and psychosocial outcomes after living kidney donation - a multicenter cohort study (SoLKiD - safety of Living Kidney Donors). BMC Nephrol 19: 83, 2018 [DOI   ] [PMC free article] [PubMed] [Google Scholar   ]

30. Hanson CS, Chapman JR, Gill JS, Kanellis J, Wong G, Craig JC, Teixeira-Pinto A, Chadban SJ, Garg AX, Ralph AF, Pinter J, Lewis JR, Tong A: Identifying outcomes that are important to

living kidney donors: A nominal group technique study. Clin J Am Soc Nephrol 13: 916–926, 2018 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

31. Rodrigue JR, Schold JD, Morrissey P, Whiting J, Vella J, Kayler LK, Katz D, Jones J, Kaplan B, Fleishman A, Pavlakis M, Mandelbrot DA; KDOC Study Group: Mood, body image, fear of kidney failure, life satisfaction, and decisional stability following living kidney donation: Findings from the KDOC study. Am J Transplant 18: 1397–1407, 2018 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

32. Ruck JM, Van Pilsum Rasmussen SE, Henderson ML, Massie AB, Segev DL: Interviews of living kidney donors to assess donation-related concerns and information-gathering practices. BMC Nephrol 19: 130, 2018 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

33. Kasiske BL, Anderson-Haag T, Ibrahim HN, Pesavento TE, Weir MR, Nogueira JM, Cosio FG, Kraus ES, Rabb HH, Kalil RS, Posselt AA, Kimmel PL, Steffes MW: A prospective controlled study of kidney donors: Baseline and 6-month follow-up. Am J Kidney Dis 62: 577–586, 2013 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

34. Pabico RC, McKenna BA, Freeman RB: Renal function before and after unilateral nephrectomy in renal donors. Kidney Int 8: 166–175, 1975 [DOI    ] [PubMed] [Google Scholar    ]

35. Kasiske BL, Anderson-Haag T, Israni AK, Kalil RS, Kimmel PL, Kraus ES, Kumar R, Posselt AA, Pesavento TE, Rabb H, Steffes MW, Snyder JJ, Weir MR: A prospective controlled study of living kidney donors: Three-year follow-up. Am J Kidney Dis 66: 114–124, 2015 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

36. Garg AX, Muirhead N, Knoll G, Yang RC, Prasad GV, Thiessen-Philbrook H, Rosas-Arellano MP, Housawi A, Boudville N; Donor Nephrectomy Outcomes Research (DONOR) Network: Proteinuria and reduced kidney function in living kidney donors: A systematic review, meta-analysis, and meta-regression. Kidney Int 70: 1801–1810, 2006 [DOI    ] [PubMed] [Google Scholar    ]

37. Lenihan CR, Busque S, Derby G, Blouch K, Myers BD, Tan JC: Longitudinal study of living kidney donor glomerular dynamics after nephrectomy. J Clin Invest 125: 1311–1318, 2015 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

38. Matas AJ, Vock DM, Ibrahim HN: GFR ≤25 years postdonation in living kidney donors with (vs. without) a first-degree relative with ESRD. Am J Transplant 18: 625–631, 2018

C. Agnello    SE 0199

[DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

39. Miller PL, Rennke HG, Meyer TW: Glomerular hypertrophy accelerates hypertensive glomerular injury in rats. Am J Physiol 261: F459–F465, 1991 [DOI    ] [PubMed] [Google Scholar    ]

40. Ibrahim HN, Foley RN, Reule SA, Spong R, Kukla A, Issa N, Berglund DM, Sieger GK, Matas AJ: Renal function profile in white kidney donors: The first 4 decades. J Am Soc Nephrol 27: 2885–2893, 2016 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

41. Ibrahim HN, Foley R, Tan L, Rogers T, Bailey RF, Guo H, Gross CR, Matas AJ: Long-term consequences of kidney donation. N Engl J Med 360: 459–469, 2009 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

42. Fehrman-Ekholm I, Dunér F, Brink B, Tydén G, Elinder CG: No evidence of accelerated loss of kidney function in living kidney donors: Results from a cross-sectional follow-up. Transplantation 72: 444–449, 2001 [DOI    ] [PubMed] [Google Scholar    ]

43. Fournier C, Pallet N, Cherqaoui Z, Pucheu S, Kreis H, Méjean A, Timsit MO, Landais P, Legendre C: Very long-term follow-up of living kidney donors. Transpl Int 25: 385–390, 2012 [DOI    ] [PubMed] [Google Scholar    ]

44. Gill JS, Tonelli M: Understanding rare adverse outcomes following living kidney donation. JAMA 311: 577–579, 2014 [DOI    ] [PubMed] [Google Scholar    ]

45. Anjum S, Muzaale AD, Massie AB, Bae S, Luo X, Grams ME, Lentine KL, Garg AX, Segev DL: Patterns of end-stage renal disease caused by diabetes, hypertension, and glomerulonephritis in live kidney donors. Am J Transplant 16: 3540–3547, 2016 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

46. Matas AJ, Berglund DM, Vock DM, Ibrahim HN: Causes and timing of end-stage renal disease after living kidney donation. Am J Transplant 18: 1140–1150, 2018 [DOI    ] [PubMed] [Google Scholar    ]

47. Grams ME, Sang Y, Levey AS, Matsushita K, Ballew S, Chang AR, Chow EK, Kasiske BL, Kovesdy CP, Nadkarni GN, Shalev V, Segev DL, Coresh J, Lentine KL, Garg AX; Chronic Kidney Disease Prognosis Consortium: Kidney-failure risk projection for the living kidney-donor candidate. N Engl J Med 374: 411–421, 2016 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

48. Massie AB, Muzaale AD, Luo X, Chow EKH, Locke JE, Nguyen AQ, Henderson ML, Snyder JJ, Segev DL: Quantifying postdonation risk of ESRD in living kidney donors. J Am Soc Nephrol 28: 2749–2755, 2017 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

49.  Hosseini K, Omorou AY, Hubert J, Ngueyon Sime W, Ladriere M, Guillemin F: Nephrectomy complication is a risk factor of clinically meaningful decrease in health utility among living kidney donors. Value Health 20: 1376–1382, 2017. [DOI    ] [PubMed]

50. Rodrigue JR, Vishnevsky T, Fleishman A, Brann T, Evenson AR, Pavlakis M, Mandelbrot DA: Patient-reported outcomes following living kidney donation: A single center experience. J Clin Psychol Med Settings 22: 160–168, 2015 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

51. Wilson CH, Sanni A, Rix DA, Soomro NA: Laparoscopic versus open nephrectomy for live kidney donors. Cochrane Database Syst Rev (11): CD006124, 2011 [DOI    ] [PubMed] [Google Scholar    ]

52. Yuan H, Liu L, Zheng S, Yang L, Pu C, Wei Q, Han P: The safety and efficacy of laparoscopic donor nephrectomy for renal transplantation: An updated meta-analysis. Transplant Proc 45: 65–76, 2013 [DOI    ] [PubMed] [Google Scholar    ]

53. Matas AJ, Bartlett ST, Leichtman AB, Delmonico FL: Morbidity and mortality after living kidney donation, 1999-2001: Survey of United States transplant centers. Am J Transplant 3: 830–834, 2003 [PubMed] [Google Scholar    ]

54. Schold JD, Goldfarb DA, Buccini LD, Rodrigue JR, Mandelbrot DA, Heaphy EL, Fatica RA, Poggio ED: Comorbidity burden and perioperative complications for living kidney donors in the United States. Clin J Am Soc Nephrol 8: 1773–1782, 2013 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

55. Lentine KL, Segev DL: Better understanding live donor risk through big data. Clin J Am Soc Nephrol 8: 1645–1647, 2013 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

56. Clavien PA, Barkun J, de Oliveira ML, Vauthey JN, Dindo D, Schulick RD, de Santibañes E, Pekolj J, Slankamenac K, Bassi C, Graf R, Vonlanthen R, Padbury R, Cameron JL, Makuuchi M: The clavien-dindo classification of surgical complications: Five-year experience. Ann Surg 250: 187–196, 2009 [DOI    ] [PubMed] [Google Scholar    ]

57. Mjøen G, Øyen O, Holdaas H, Midtvedt K, Line PD: Morbidity and mortality in 1022 consecutive living donor nephrectomies: Benefits of a living donor registry. Transplantation

88: 1273–1279, 2009 [DOI   ] [PubMed] [Google Scholar   ]

58. Rodríguez Faba O, Boissier R, Budde K, Figueiredo A, Taylor CF, Hevia V, Lledó García E, Regele H, Zakri RH, Olsburgh J, Breda A: European association of urology guidelines on renal transplantation: Update 2018. Eur Urol Focus 4: 208–215, 2018 [DOI   ] [PubMed] [Google Scholar   ]

59. Wirken L, van Middendorp H, Hooghof CW, Rovers MM, Hoitsma AJ, Hilbrands LB, Evers AW: The course and predictors of health-related quality of life in living kidney donors: A systematic review and meta-analysis. Am J Transplant 15: 3041–3054, 2015 [DOI   ] [PubMed] [Google Scholar   ]

60. Ruck JM, Holscher CM, Purnell TS, Massie AB, Henderson ML, Segev DL: Factors associated with perceived donation-related financial burden among living kidney donors. Am J Transplant 18: 715–719, 2018 [DOI   ] [PMC free article] [PubMed] [Google Scholar   ]

61. Clarke KS, Klarenbach S, Vlaicu S, Yang RC, Garg AX; Donor Nephrectomy Outcomes Research (DONOR) Network: The direct and indirect economic costs incurred by living kidney donors-a systematic review. Nephrol Dial Transplant 21: 1952–1960, 2006 [DOI   ] [PubMed] [Google Scholar   ]

62. Rodrigue JR, Schold JD, Morrissey P, Whiting J, Vella J, Kayler LK, Katz D, Jones J, Kaplan B, Fleishman A, Pavlakis M, Mandelbrot DA; KDOC Study Group: Predonation direct and indirect costs incurred by adults who donated a kidney: Findings from the KDOC study. Am J Transplant 15: 2387–2393, 2015 [DOI   ] [PMC free article] [PubMed] [Google Scholar   ]

63. Klarenbach S, Gill JS, Knoll G, Caulfield T, Boudville N, Prasad GV, Karpinski M, Storsley L, Treleaven D, Arnold J, Cuerden M, Jacobs P, Garg AX; Donor Nephrectomy Outcomes Research (DONOR) Network: Economic consequences incurred by living kidney donors: A Canadian multi-center prospective study. Am J Transplant 14: 916–922, 2014 [DOI   ] [PMC free article] [PubMed] [Google Scholar   ]

64.  Przech S, Garg AX, Arnold JB, Barnieh L, Cuerden MS, Dipchand C, Feldman L, Gill JS, Karpinski M, Knoll G, Lok C, Miller M, Monroy M, Nguan C, Prasad GVR, Sarma S, Sontrop JM, Storsley L, Klarenbach S; Donor Nephrectomy Outcomes Research (DONOR) Network: Financial costs incurred by living kidney donors: A prospective cohort study. J Am Soc Nephrol 29: 2847–2857, 2018. [DOI   ] [PMC free article] [PubMed]

65. Larson DB, Wiseman JF, Vock DM, Berglund DM, Roman AM, Ibrahim HN, Matas AJ: Financial burden associated with time to return to work after living kidney donation. Am J

Transplant 19: 204–207, 2018 [DOI    ] [PubMed] [Google Scholar    ]

66. Yang RC, Thiessen-Philbrook H, Klarenbach S, Vlaicu S, Garg AX; Donor Nephrectomy Outcomes Research (DONOR) Network: Insurability of living organ donors: A systematic review. Am J Transplant 7: 1542–1551, 2007 [DOI    ] [PubMed] [Google Scholar    ]

67. Yang RC, Young A, Nevis IF, Lee D, Jain AK, Dominic A, Pullenayegum E, Klarenbach S, Garg AX; Donor Nephrectomy Outcomes Research (DONOR) Network: Life insurance for living kidney donors: A Canadian undercover investigation. Am J Transplant 9: 1585–1590, 2009 [DOI    ] [PubMed] [Google Scholar    ]

68. Boyarsky BJ, Massie AB, Alejo JL, Van Arendonk KJ, Wildonger S, Garonzik-Wang JM, Montgomery RA, Deshpande NA, Muzaale AD, Segev DL: Experiences obtaining insurance after live kidney donation. Am J Transplant 14: 2168–2172, 2014 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

69. Lapointe Rudow D, Cohen D: Practical approaches to mitigating economic barriers to living kidney donation for patients and programs. Curr Transpl Rep 4: 24–31, 2017 [Google Scholar    ]

70. Lacetera N, Macis M, Stith SS: Removing financial barriers to organ and bone marrow donation: The effect of leave and tax legislation in the U.S. J Health Econ 33: 43–56, 2014 [DOI    ] [PubMed] [Google Scholar    ]

71. Hays R: Informed consent of living kidney donors: Pitfalls and best practices. Curr Transplant Rep 2: 29–34, 2015 [Google Scholar    ]

72. Rodrigue JR, Fleishman A, Carroll M, Evenson AR, Pavlakis M, Mandelbrot DA, Baliga P, Howard DH, Schold JD: The living donor lost wages trial: Study rationale and protocol. Curr Transplant Rep 5: 45–54, 2018 [PMC free article] [PubMed] [Google Scholar    ]

73. Mittelman M, Thiessen C, Chon WJ, Clayville K, Cronin DC, Fisher JS, Fry-Revere S, Gross JA, Hanneman J, Henderson ML, Ladin K, Mysel H, Sherman LA, Willock L, Gordon EJ: Miscommunicating NOTA can Be costly to living donors. Am J Transplant 17: 578–580, 2017 [DOI    ] [PubMed] [Google Scholar    ]

74. American Society of Transplantation: Live Donor Toolkit: Resources for Those Consdiering Live Donation - Financial Toolkit, 2017. Available at: http://www.livedonortoolkit.com/financial-toolkit    . Accessed July 30, 2018

75. Tietjen A, Hays R, McNatt G, Howey R, Lebron-Banks U, Thomas CP, Lentine KL: Billing for living kidney donor care: Balancing cost recovery, regulatory compliance, and minimized donor burden. Curr Transplant Rep 2019, in press [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

76. Thiessen C, Gordon EJ, Reese PP, Kulkarni S: Development of a donor-centered approach to risk assessment: Rebalancing nonmaleficence and autonomy. Am J Transplant 15: 2314–2323, 2015 [DOI    ] [PubMed] [Google Scholar    ]

77. Lam NN, Garg AX, Segev DL, Schnitzler MA, Xiao H, Axelrod D, Brennan DC, Kasiske BL, Tuttle-Newhall JE, Lentine KL: Gout after living kidney donation: Correlations with demographic traits and renal complications. Am J Nephrol 41: 231–240, 2015 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

78. Garg AX, McArthur E, Lentine KL; Donor Nephrectomy Outcomes Research (DONOR) Network: Gestational hypertension and preeclampsia in living kidney donors. N Engl J Med 372: 1469–1470, 2015 [DOI    ] [PubMed] [Google Scholar    ]

79. Garg AX, Pouget J, Young A, Huang A, Boudville N, Hodsman A, Adachi JD, Leslie WD, Cadarette SM, Lok CE, Monroy-Cuadros M, Prasad GV, Thomas SM, Naylor K, Treleavan D; Donor Nephrectomy Outcomes Research (DONOR) Network: Fracture risk in living kidney donors: A matched cohort study. Am J Kidney Dis 59: 770–776, 2012 [DOI    ] [PubMed] [Google Scholar    ]

80. Garg AX, Meirambayeva A, Huang A, Kim J, Prasad GV, Knoll G, Boudville N, Lok C, McFarlane P, Karpinski M, Storsley L, Klarenbach S, Lam N, Thomas SM, Dipchand C, Reese P, Doshi M, Gibney E, Taub K, Young A; Donor Nephrectomy Outcomes Research Network: Cardiovascular disease in kidney donors: Matched cohort study. BMJ 344: e1203, 2012 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

81. Slinin Y, Brasure M, Eidman K, Bydash J, Maripuri S, Carlyle M, Ishani A, Wilt TJ: Long-term outcomes of living kidney donation. Transplantation 100: 1371–1386, 2016 [DOI    ] [PubMed] [Google Scholar    ]

82. Clemens KK, Thiessen-Philbrook H, Parikh CR, Yang RC, Karley ML, Boudville N, Ramesh Prasad GV, Garg AX; Donor Nephrectomy Outcomes Research (DONOR) Network: Psychosocial health of living kidney donors: A systematic review. Am J Transplant 6: 2965–2977, 2006 [DOI    ] [PubMed] [Google Scholar    ]

83. Ralph AF, Butow P, Hanson CS, Chadban SJ, Chapman JR, Craig JC, Kanellis J, Luxton G, Tong A: Donor and recipient views on their relationship in living kidney donation: Thematic synthesis of qualitative studies. Am J Kidney Dis 69: 602–616, 2017 [DOI    ] [PubMed] [Google Scholar    ]

84. Thys K, Schwering KL, Siebelink M, Dobbels F, Borry P, Schotsmans P, Aujoulat I, Donation EPO; ELPAT Pediatric Organ Donation and Transplantation Working Group: Psychosocial impact of pediatric living-donor kidney and liver transplantation on recipients, donors, and the family: A systematic review. Transpl Int 28: 270–280, 2015 [DOI    ] [PubMed] [Google Scholar    ]

85. Lam NN, Lentine KL, Levey AS, Kasiske BL, Garg AX: Long-term medical risks to the living kidney donor. Nat Rev Nephrol 11: 411–419, 2015 [DOI    ] [PubMed] [Google Scholar    ]

86. Steiner RW: Risk appreciation for living kidney donors: Another new subspecialty? Am J Transplant 4: 694–697, 2004 [DOI    ] [PubMed] [Google Scholar    ]

87. Gibney EM, King AL, Maluf DG, Garg AX, Parikh CR: Living kidney donors requiring transplantation: Focus on african Americans. Transplantation 84: 647–649, 2007 [DOI    ] [PubMed] [Google Scholar    ]

88. Cherikh WS, Young CJ, Kramer BF, Taranto SE, Randall HB, Fan PY: Ethnic and gender related differences in the risk of end-stage renal disease after living kidney donation. Am J Transplant 11: 1650–1655, 2011 [DOI    ] [PubMed] [Google Scholar    ]

89. Locke JE, Reed RD, Massie A, MacLennan PA, Sawinski D, Kumar V, Mehta S, Mannon RB, Gaston R, Lewis CE, Segev DL: Obesity increases the risk of end-stage renal disease among living kidney donors. Kidney Int 91: 699–703, 2017 [DOI    ] [PMC free article] [PubMed] [Google Scholar    ]

90. Serrano OK, Sengupta B, Bangdiwala A, Vock DM, Dunn TB, Finger EB, Pruett TL, Matas AJ, Kandaswamy R: Implications of excess weight on kidney donation: Long-term consequences of donor nephrectomy in obese donors. Surgery 164: 1071–1076, 2018 [DOI    ] [PubMed] [Google Scholar    ]

91. Wainright JL, Robinson AM, Wilk AR, Klassen DK, Cherikh WS, Stewart DE: Risk of ESRD in prior living kidney donors. Am J Transplant 18: 1129–1139, 2018 [DOI    ] [PubMed] [Google Scholar    ]

Articles from Clinical Journal of the American Society of Nephrology : CJASN are provided here courtesy of **American Society of Nephrology**



# EXHIBIT K

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

C.Agnello    SE 0207

American Journal of Transplantation 2011; 11: 2093–2109
Wiley Periodicals Inc.

© 2011 The Authors
Journal compilation © 2011 The American Society of
Transplantation and the American Society of Transplant Surgeons

doi: 10.1111/j.1600-6143.2011.03686.x

# Systematic Review: Kidney Transplantation Compared With Dialysis in Clinically Relevant Outcomes

M. Tonelli[a,*], N. Wiebe[a], G. Knoll[b], A. Bello[a],
S. Browne[c], D. Jadhav[b], S. Klarenbach[a]
and J. Gill[c]

[a]Department of Medicine, University of Alberta,
Edmonton, Alberta, Canada
[b]Department of Medicine, University of Ottawa, Ottawa,
Ontario, Canada
[c]Department of Medicine, University of British Columbia,
Vancouver, British Columbia, Canada
*Corresponding author: Marcello Tonelli,
no_reprints@med.ualberta.ca

Individual studies indicate that kidney transplantation is associated with lower mortality and improved quality of life compared with chronic dialysis treatment. We did a systematic review to summarize the benefits of transplantation, aiming to identify characteristics associated with especially large or small relative benefit. Results were not pooled because of expected diversity inherent to observational studies. Risk of bias was assessed using the Downs and Black checklist and items related to time-to-event analysis techniques. MEDLINE and EMBASE were searched up to February 2010. Cohort studies comparing adult chronic dialysis patients with kidney transplantation recipients for clinical outcomes were selected. We identified 110 eligible studies with a total of 1 922 300 participants. Most studies found significantly lower mortality associated with transplantation, and the relative magnitude of the benefit seemed to increase over time ($p < 0.001$). Most studies also found that the risk of cardiovascular events was significantly reduced among transplant recipients. Quality of life was significantly and substantially better among transplant recipients. Despite increases in the age and comorbidity of contemporary transplant recipients, the relative benefits of transplantation seem to be increasing over time. These findings validate current attempts to increase the number of people worldwide that benefit from kidney transplantation.

Key words: Cardiovascular events, dialysis, hospitalization, kidney transplantation, mortality, quality of life

Abbreviations: ESRD, end-stage renal disease; EQ-5D, European quality of life-5 dimensions; GHQ, general health questionnaire; HR, hazard ratio; HUI, health utility index; KDQoL, kidney disease quality of life; QoL, quality of life; SES, socio-economic status; SF-36, Medical Outcomes Study 36-item short-form health survey; SIP, sickness impact profile; TTO, time trade off; WHO-QoL, World Health Organization quality of life; 15D, Finnish 15 dimensions.

Received 27 April 2011, revised 02 June 2011 and accepted for publication 14 June 2011

## Introduction

Available treatments for end-stage renal disease (ESRD) include dialysis and kidney transplantation (1,2). Increasing prevalence of ESRD, together with stable or declining rates of organ donation have led to a critical shortage of kidneys available for transplantation (3,4). The median interval between placement on a transplant waiting list and receipt of a kidney transplant from a deceased donor has dramatically increased in recent years, and currently ranges between 3 and 7 years for North American patients with kidney failure, depending on region of residence (5). At the same time, the age and comorbidity of patients who are treated with dialysis continues to increase (6).

Individual studies indicate that kidney transplantation is associated with lower mortality and improved quality of life compared with chronic dialysis treatment (7,8). However, factors that are associated with greater or lesser benefit from transplantation are poorly described. In addition, there has been little or no systematic exploration of how the relative benefits of transplantation (compared to dialysis) have varied over time, given that contemporary dialysis patients are older and sicker (6), but must wait longer to receive a kidney transplant than those in previous years (3,9).

We did a systematic review to summarize the anticipated clinical benefit associated with kidney transplantation (compared with dialysis) in the current era. We also aimed to identify characteristics associated with especially large or small relative benefit, compared to dialysis.

## Materials and Methods

### Data sources and searches

This systematic review is reported according to published guidelines (10). An expert librarian conducted a comprehensive search to identify all relevant studies regardless of publication status. Nonenglish articles were included where an appropriate translator was available. Three electronic

C. Agnello   SE 0208

**Tonelli et al.**

databases, MEDLINE (1950–February 25, 2010), EMBASE (1980–February 25, 2010), and all evidence-based medicine reviews (September 7, 2007) were searched. The detailed search strategies are included in the Supporting Information. A content expert and a methodologist screened each citation or abstract. Any study considered potentially relevant by at least one reviewer was recovered for further review.

### Study selection

The full text of each potentially relevant study was independently assessed by two reviewers for inclusion in the review using predetermined eligibility criteria on a preprinted form. Studies were eligible for inclusion if they reported important clinical outcomes (mortality, cardiovascular events, hospitalization and quality of life [QoL]) in both a chronic dialysis population and a kidney transplantation population. Pediatric studies (age < 16 years) and studies including multi-organ transplantation were excluded. Studies had to include at least 30 participants in each relevant treatment modality group. This minimum sample size was set to improve the efficiency of the work without an appreciable loss of power and to minimize bias (robust calculations of standard deviation and to prevent small study bias). Multigroup cohort studies were included; crossover, case-control and cross-sectional studies were excluded with one exception—we included cross-sectional studies when QoL was reported. Disagreements were resolved by discussion and consultation with a third party. Reviewers agreed on study selection for 89% of the articles ($\kappa = 0.66$).

### Data extraction and risk of bias assessment

We assessed and reported risk of bias in included studies using items from the Downs and Black checklist (11). These include items of study design (selection of participants, allocation of participants and outcome definitions), statistical analysis (calculation of sample size and adjustment for potential confounding) and results (losses to follow up). Post hoc, we included three items specifically relevant to the time-to-event analyses in these studies: (1) selected time of origin (e.g. dialysis initiation or transplantation) and destination (e.g. modality failure, death), (2) adjustment for prior time spent on renal replacement therapy and (3) modeling time-dependency of modality (i.e. attributing the time on dialysis for eventual transplant recipients and graft failure patients to the dialysis hazard). Two reviewers independently assessed each included study, and resolved disagreements with the aid of a third party.

The following properties were extracted from each study: characteristics (country, data source, era of accrual, duration of follow-up, special subgroups or populations, sample size and setting), participants (age, gender, race, body mass index, socio-economic status and comorbidities), renal replacement modality (living or deceased donor, hemodialysis, peritoneal dialysis, etc.) and results (both unadjusted and adjusted, covariates, interactions and subgroups). The following outcomes were considered: all-cause mortality, cardiac events (limited to myocardial infarction, stroke, heart failure and to the aggregate of any cardiac event), hospitalization (incidence, rate, mean counts; limited to infection and all-cause) and QoL. Specifically, the following QoL instruments were included: European quality of life-5 dimensions (EQ-5D), time trade off (TTO), standard gamble, health utility index (HUI), Finnish 15 dimensions (15D), Medical Outcomes Study 36-Item Short-Form Health Survey (SF-36), kidney disease quality of life (KDQoL), Karnofsky, sickness impact profile (SIP), general health questionnaire (GHQ), and World Health Organization quality of life (WHO-QoL). A second reviewer checked the data for accuracy.

### Data synthesis and analysis

Because identified studies were expected to be observational and, therefore, both methodologically and clinically diverse, we decided a priori not

to statistically combine results. To facilitate comparison, we present individual study summary statistics in unpooled metagraphs using R software. Dichotomous outcomes (e.g. mortality) are summarized using the unadjusted risk ratio and all available adjusted ratios (i.e. hazard ratio [HR], risk ratio, odds ratio, rate ratio; depending on what was reported). Continuous outcomes (e.g. QoL) are summarized using the mean difference. Given the presence of large heterogeneity, we did not formally assess for the presence of publication bias (12).

We planned a priori to examine the following subgroups for evidence of effect modification on the association between transplantation and mortality: diabetic patients, elderly patients, patients with chronic infections (human immunodeficiency virus, hepatitis B or hepatitis C) and patients with cardiovascular disease. We were primarily interested in the results of formal tests for effect modification in the primary studies. Unfortunately, we did not identify eligible studies for all of these subgroups. However, using multivariable meta-regression models (weighted least squares linear regression), we examined whether era (midyear of the interval for inclusion of participants), restricting analyses to dialysis patients who were active on the kidney transplantation waiting list, or elements of study design (prospective, retrospective or registry) modified the relationship between unadjusted mortality and modality. To minimize participant overlap (and ensure independence of data) between studies in our meta-regression analyses, we restricted our pool of studies to unique combinations of region (or registry) and era of accrual. More current studies were given precedence; studies with special populations were excluded (e.g. hepatitis positive).

## Results

### Search yield

From 32 166 identified citations, 732 articles were recovered for detailed evaluation (Figure 1). Of these, 110 studies were eligible for inclusion in this review (Table 1). Study sample sizes ranged from 39 to 468 681 (median 501); enrolment of study participants ranged from 1960 to 2006 and maximum duration of follow up ranged from 6 months to 19 years.

### Populations studied

Dialysis modalities considered in eligible studies included in-center hemodialysis, satellite hemodialysis, home hemodialysis, nocturnal dialysis, peritoneal dialysis and multiple modalities (populations including both hemodialysis and peritoneal dialysis). Transplantation used allografts from deceased and living donors.

Mean age of transplant recipients in the included studies ranged from 30 to 68 years (median 44); the majority of patients were male (median 62%). We collected data on the proportion of patients in each group who had diabetes, coronary artery disease, hypertension, heart failure, stroke, lung disease, peripheral vascular disease, malignancy, infectious disease and smoking status. Unfortunately, these data were reported very infrequently and so are not reported here. Characteristics that were explored by the included studies as potential determinants of the benefit of transplantation were hepatitis B and/or hepatitis C virus serostatus of the recipient (13,14) and donor (15),

16000163, 2011, 10, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/j.1600-6143.2011.03666.x by Test, Wiley Online Library on [04/02/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

C.Agnello  SE 0209

16006143, 2011, 10, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/j.1600-6143.2011.03668.x by Test, Wiley Online Library on [04/02/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**Systematic Review of Kidney Transplantation**



**Figure 1: PRISMA flow diagram.** PRISMA = preferred reporting items for systematic reviews and meta-analyses); ESRD = end-stage renal disease. Details of the search strategies including data sources are in the Supporting Information.

extended-criteria donor (16,17), primary cause of ESRD (18–23), findings of coronary angiography (24,25), coronary artery bypass surgery (26), a low-protein diet (27), cancer (28), diabetes (22,29–34), obesity (35), employment (36), race (37–42) and age (7,43–47).

### Risk of bias assessment

All eligible studies used a cohort design: 26% were prospective, 36% were based on registries with prospectively collected data, 2% were ambispective (both prospective and retrospective data collection), 18% were retrospective and 13% did not specify the relative timing of hypothesis generation and data collection. The risk of bias

of included studies is reported in Table S2 and summarized in Figure 2.

### Mortality

In all, 163 cohorts (77 studies; 1 800 119 participants) reported unadjusted comparisons of mortality associated with transplantation as compared with dialysis. Of these, 76% found a significantly lower risk of death associated with transplantation and 7% found a significantly lower risk of death associated with dialysis (Figure S1).

Six studies (7,38,46,48–50; 19 945 participants) reported adjusted relative hazards for all-cause mortality in discrete time periods (Figure 3). During the period immediately

C. Agnello   SE 0210

Tonelli et al.

**Table 1:** Clinical and demographic characteristics of included studies

| Author and year | Country | Source | Accrual era | Maximum follow-up (years) | Population | Treatment | Sample size | Mean age (years) | Percent male | Percent diabetic |
|---|---|---|---|---|---|---|---|---|---|---|
| Bayat (43) 2010 | France | Regional registry | 1997–2003 | 7 | 60–80 years<br><60 years | TxvD | 54/940<br>280/221 | 63 | 57<br>62 | 41<br>21 |
| Ansell (96) 2009 | UK | UKRR | 1997–2006 | 1 | | TxvD | 17,545/22,115 | | | 21 |
| Buturovic-Ponikvar (65) 2009 | Slovenia | ERA-EDTA | 1998–2006 | 9 | | TxvHD; PD | 461/1271; 103 | 52/65; 53² | 57/55; 59 | 14/24; 21 |
| Chauveau (27) 2009 | France | Two sites | 1985–2000 | 11¹ | Low protein diet | TxvHD; PD | 101/102 | 42/62 | 52/– | — |
| Griva (88) 2009 | UK | Two sites | 1996–2000 | None⁶ | White; Black; South Asian | TxvHD; PD | 117/77; 68 | 50/50 | 60/65 | 5/17 |
| Jain (37) 2009 | UK | Multiple sites | 1997–2006 | 4² | | TxvHD; PD | 157/598 | 62² | 63 | 25 |
| Kramer (70) 2009 | Europe | ERA-EDTA | 2000–2005 | 10 | | CTx; LTx/HD; PD | 20,321; 2965/398, 871; 46, 524 | 46/63 | 63/61 | 12/22 |
| Martin Navarro (16) 2009 | Spain | — | 2000–2005 | 2² | WL; nWL; ECD | CTx/WL HD | 31/164 | 68/74 | 64 | 35/20 |
| Pauly (59) 2009 | Canada; USA | USRDS; Regional registry | 1994–2006 | 4² | | CTx; LTx/Night | 531/531/177 | 47, 44/46 | 58; 57/65 | 14; 14/14⁴ |
| Stel (97) 2009 | Europe | ERA-EDTA | 2000–2004 | 2 | | CTx; LTx/HD; PD | 13,753; 3505/7,137 | | | — |
| Patel (98) 2008 | UK | Single site | 2002–2005 | 3² | | CTx/WL HD; PD [nWL/HD; PD] | 80/142 [78] | 51 [54] | 64 | 19 [39] |
| Visnja (14) 2008 | Serbia | Single site | 1987–2001 | 17 | HBV+;<br>HCV+;<br>Hsp− | TxvWL HD | 67/128;<br>39/83;<br>278/192 | 35/50;<br>36/55;<br>33/50 | 75/58;<br>69/48;<br>68/53 | 0/8⁴;<br>5/8;<br>2/5 |
| Chavers (52) 2007 | USA | USRDS | 1996–2001 | 3 | | TxvHD; PD | 31,663/333,453 | | 60/53 | 29/45⁴ |
| Gill (77) 2007 | USA | USRDS | 1995–2003 | | | CTx; LTx/GF/WL D | 47,433 [5,461]/41, 769 | <65/65–74² | 62 [61]/60 | 30 [25]/36⁴ |
| Sorenson (30) 2007 | Denmark | ERA-EDTA; Multi-national registry | 1994–2005 | 7¹ | DM; nDM | TxvWL HD; PD [WL HD; PD] | 1,239/517 [4,737] | 49 [48]/50 | | 17/22 [24] |
| Cheawchanwattana (81) 2006 | Thailand | Single site | 2005 | None | | TxvHD; PD | 133/107; 62 | 45/45, 57 | 65/60; 55 | 23/18; 47 |
| Snyder (31) 2006 | USA | USRDS | 1995–2003 | | DM;<br>nDM | TxvWL D | 11,418/19,107;<br>32,009/34,202 | 50–64²;<br>35–49 | 60/59;<br>60/59 | 100;<br>0 |
| Yildirim (92) 2006 | Turkey | Multiple sites | 2004–2005 | None | | TxvHD; PD | 356/104; 186 | 44/55, 46 | 56/46; 53 | — |
| Zimmerman (55) 2006 | Brazil | Single site | 1996–1997 | None³ | | TxvHD | 64/40 | 45 | 55 | 11/32 |
| Borestain (25) 2005 | France | Single site | 1995–2001 | 4 | PTCA | TxvD | 37/75 | 52/61 | 95/69 | –/19 |
| Buturovic-Ponikvar (99) 2005 | Slovenia | Multiple sites | 2003 | 1 | | TxvHD; PD | 374/1171; 116 | | | — |
| Ho (69) 2005 | China | Regional registry | 1995–2004 | 7 | | TxvHD; PD | 3,174/1,119; 5,149; 209/99; 74 | 49–55² | ~59/52; 49 | 12/23; 39 |
| Lee (83) 2005 | Wales | Single site | 2002 | None | | TxvHD; PD | | 53/63; 59 | 60/61; 51 | — |
| Massad (26) 2005 | USA | Single site | 1992–2004 | | CABG;<br>ECD;<br>nECD | TxvHD; PD | 32/62 | 58/58 | 59/63 | 50/76 |
| Meiron (17) 2005 | USA | National registry | 1995–2002 | 10 | | CTx; LTx/D | 7,790 [41,052]; 15,203/45,082 | 40–59 [40–59];<br>/40–59² | 62 [61];<br>/58 | 27 [22];<br>–/58 |
| Niu (100) 2005 | Taiwan | Two sites | 2002 | None | | TxvHD; PD | 80/80; 80 | 43/55; 51 | 44/40; 43 | –/35⁴ |
| Oniscu (49) 2005 | UK | Multiple regional registries | 1989–1999 | 3 | | CTx/WL HD; PD | 1,095/641 | 43/53 | 61/62 | 12/19⁴ |
| Schaubel (101) 2005 | USA | National registry | 1999 | 3 | | CTx; LTx/D | 7,773/8,011 | | | — |

Continued.

C.Agnello  SE 0211

16006143, 2011, 10, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/j.1600-6143.2011.03666.x by Test, Wiley Online Library on [04/02/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**Table 1:** Continued

| Author and year | Country | Source | Accrual era | Maximum follow-up (years) | Population | Treatment | Sample size | Mean age (years) | Percent male | Percent diabetic |
|---|---|---|---|---|---|---|---|---|---|---|
| Abbott (15) 2004 | USA | USRDS | 1995–2000 | 6 | HCV+donor; HCV−donor | CAD/WL D | 389; 16,495/17,044 | 51: 46/50 | 75; 63/60 | 30; 34/40[4] |
| Moe (102) 2004 | USA | Single site | – | 2 | – | T×HD | 38/30 | 45/55 | 76/61 | 37/94 |
| Oniscu (46) 2004 | UK | Multiple regional registries | 1989–1999 | 11 | ≥60 years | T×HD; PD | 128/197 | 64/66 | 65/59 | 13/16 |
| Schon (103) 2004 | Sweden | National registry | 1991–2002 | 12 | – | CTx; LTxHD; PD | 721/3,052; 1,294 | – | – | 17/33; 35 |
| Sezer (13) 2004 | Turkey | Single site | <1996 | 5 | nDM: HCV+ HCV– | CTx; LTxHD CTx; LTxHD | 116/136 | 34/43 | 71/60 | 0 |
| Abbott (104) 2003 | USA | USRDS | 1994–1997 | – | – | T×HD; PD | 19,033/16,182 | 43/47 | 61/58 | 31/36[4] |
| Brunkhorst (19) 2003 | Germany | Regional registry | 1978–1996 | 19 | ESRD-DM; DM1 | DM1; DN | 46/46 | 43/45 | 69/69 | 100 |
| Gianton (35) 2003 | USA | USRDS | 1995–1999 | 7 | Obese nObese | CTx; LTxHD; PD | 1,719; 552/5,172 4,795; | 48 | 54 | 40 |
| McDonald (40) 2003 | Australia; New Zealand | ANZDATA | 1991–2000 | 9 | nIndigenous; ATSI; | T×HD; PD | 1,528/16,896 12,984 | 60[2] | 59 | 17[4] |
| Tomasz (105) 2003 | Poland | Two sites | – | None | Pacific; Maori | T×HD | 1,061 502 935 | 48 51 44 | 43 48 57 | 47 55 63 |
| Bajordi (80) 2002 | Italy | Single site | 1997–1999 | None[3] | – | T×HD; PD | 83/61 | 43/58 | 52/56 | – |
| McDonald (48) 2002 A | Australia; New Zealand | ANZDATA | 1991–2001 | 10 | – | CTx/WL HD; PD [nWL HD; PD] | 34/71; 30 2,362/2,782 [5,052] | 44/71; 30 44/62; 64 | 65/63; 63 | 3/6; 7 89/75 [50] |
| McDonald (106) 2002 B | Australia; New Zealand | ANZDATA | 2000 | 1 | Australia; New Zealand | T×HD; PD | 1,764 417 | 44/46 [53] | 63/58 [53] | – |
| Piccoli (107) 2002 | Italy | Regional registry | 1995–1999 | None | nDM | T×GF/HD; PD | 92, 40/56 | 51: 52/60 | 59, 73/54 | 0 |
| Abbott (18) 2001 | USA | USRDS | 1994–1997 | 2[1] | ESRD-DM | ESRD-DM | 5,683/5,686 | 47 | 60 | 100 |
| Bakewell (39) 2001 | UK | Single site | 1998 | None | South Asian; White | T×HD; PD | 40/40; 40 | 46/63; 49 | 70/65; 70 | 10/30; 30 |
| Rebollo (45) 2001 | Spain | Multiple sites | – | None | <65 years | T×HD | 213/116 | 49/56 | 66/58 | 7/10 |
| Schmidt (24) 2001 | Austria | Single site | 1994–1998 | 5 | PTCA | T×HD | 42/42 | 59/57 | 81/76 | 17/26 |
| Staathof-Galema (79) 2001 | Netherlands | Two sites | 1990–1996 | 7 | – | CTx; LTxHD | 54/102 | 50/48 | 61/63 | 3/3 |
| Choi (32) 2000 | South Korea | Single site | – | 0.5 | DM; nDM | T×PD | 71/101 | 59/58 | – | 30/18 |
| Fujisawa (82) 2000 | Japan | Two sites | – | None | – | CTx; LTxWL HD [nWL HD] | 117/49 [65] | 44/46 [46] | 43/76 [69] | 4/4[5] |
| Johnson (44) 2000 | Australia | Single site | 1993–1997 | 6 | >60 years | CTx/D | 67/107 | 66/66 | 49/41 | 8/20 |
| Rabbat (50) 2000 | Canada | CORR | 1990–1994 | 6 | – | CTx/D | 722/1,156 | 44 | 63/62 | 18/22[4] |
| Rebollo (86) 2000 | Spain | Multiple sites | 1996 | None | – | CTx/HD | 210/170 | 51/67 | 67/51 | 7/12[4] |
| Ward (20) 2000 | USA | USRDS | 1987–1994 | 3[2] | Females: ESRD-Lupus | T×/D | 946/3,431 | 36/40 | 0 | – |
| Mazzuchi (53) 1999 | Uruguay | Multiple sites | 1981–1998 | 10 | ESRD | T×HD | 5,173/66,202 12,733/100,980 | 41/61 43/62 | – | 100[4] |
| Wolfe (62) 1999 | USA | USRDS | 1991–1996 | 7 | – | CTx/D | 460/695 | 37/60 | 67/63 | 7/17 |
| Lim (73) 1998 | Malaysia | National registry | 1992–1995 | 4 | – | T×HD[Home]; PD | 23,275/22,889 | 40–59/40–59[4] | 63/58 | 31/35[4] |
| Schnuelle (8) 1998 | Germany | Regional registry | 1989–1997 | 8 | – | T×HD | 909/1,260; 307 | 34/42; 46 | 57/66; 54 | 9/26; 34 |
| Segoloni (78) 1998 | Italy | Single site | 1992–1996 | 5 | – | T×WL D | 144/167 | 48/44 | 60/62 | 5/14 |
| Spencer (41) 1998 | Australia | – | 1978–1996 | 18 | Indigenous; nIndigenous | T×/D | 344/916 56/158 | 45/46 45 | 60/64 46 | 1/2[4] 41 |

Continued.

C. Agnello   SE 0212

16000143, 2011, 10, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/j.1600-6143.2011.03666.x by Test, Wiley Online Library on [04/02/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Tonelli et al.

**Table 1:** Continued

| Author and year | Country | Source | Accrual era | Maximum follow-up (years) | Population | Treatment | Sample size | Mean age (years) | Percent male | Percent diabetic |
|---|---|---|---|---|---|---|---|---|---|---|
| Wight (87) 1998 | UK | Single site | 1995 | None | — | Tx/HD; PD; Home; Sat | 228/100; 109; 42; 41 | 40–49/50–59; 50–59; 40–49; 60–69[2] | 62/66; 57; 69; 59 | 10/11; 22; 0; 20[4] |
| Bonal (56) 1997 | Spain | Regional registry | 1984–1993 | 10 | — | Ctx/HD | 157/395 | 62/61 | 58/62 | 0[4] |
| Lui (108) 1997 | China | Regional registry | 1995–1996 | 1 | — | Ctx; Ltx/HD; PD | 957/495; 1,885 | 41/48; 57 | 57/52; 50 | 6/11; 24 |
| Ozminkowski (85) 1997 | USA | National registry | 1992–1995 | None | — | Tx/D | 211/304 | 45–59[2] | 54 | 29[4] |
| Boni (63) 1996 | Brazil | Single site | 1980–1990 | 3 | — | Ctx; Ltx/HD; PD | 36/36 | 33/33 | 67/61 | 3/3[4] |
| Agodoa (109) 1995 | USA | USRDS | — | — | — | Ctx; Ltx/HD; Home; Self; PD | 9,065/121,987 | 60–64[2] | 62[2] | 30 |
| Disney (66) 1995 | Australia | ANZDATA | 1983–1992 | 3 | — | Tx/HD; PD | 4,381/6,635 | −/45–64[2] | −/54–60[2] | 8–26[4] |
| Locatelli (61) 1995 | Italy | Regional registry | 1983–1992 | — | — | Tx/HD; PD | 1,450/6,823 | 57 | 58 | 3–7[4] |
| Schaubel (54) 1995 | Canada | CORR | 1987–1993 | 7 | — | Tx/D | 284/6,116 | 60–69/60–69[4] | 66/58 | 12/22 |
| Teraoka (110) 1995 | Japan | Multiple society registries | 1964–2002 | 9 | — | Ctx; Ltx/HD; Home; Night; PD | 6,367/123,926 | — | — | — |
| Cowie (21) 1994 | USA | Regional registry | 1974–1983 | 9 | <65 years; ESRD-DM1; ESRD-DM2 | Tx/D | 129/117 50/298 | 35 55 | 62 49 | 100 100 |
| El-Reshaid (111) 1994 | Kuwait | Multiple sites | 1986–1990 | 5 | — | Ctx; Ltx/HD; PD | 289/358 | 45[2] | 64 | 15[4] |
| Ojo (38) 1994 | USA | Multiple regional registries | 1984–1989 | 6 | Black | Ctx/D | 236/554 | 40/40 | 66/66 | 25/24 |
| Pugh (42) 1994 | USA | Regional registry | 1975–1985 | — | nHispanic White; Mexican-American; Black | Tx/HD; Home; PD | 649/4,731 264/2,898 261/3,160 | 50–59[2] 50–59 50–59 | — | 22[4] 44 20 |
| Del Pilar Garofano Plazas (112) 1993 | Spain | Multiple sites | — | None | — | Tx/HD | 45/111 | 38/54 | 56/50 | 0/7[4] |
| Port (7) 1993 | USA | Multiple regional registries | 1984–1989 | 6 | <65 years | Ctx/WL DI (nWL DI) | 799/770 [3,451] | — | 60 [—] | — |
| Brunori (113) 1992 | Italy | Single site | 1981–1990 | 10 | — | Ctx/HD; PD | 228/188; 232 | 36/53 | — | — |
| Alamartine (57) 1991 | France | Single site | 1973–1987 | 15 | — | Tx/D | 120/158 | 45 | 38/51 | — |
| Julius (114) 1989 | USA | Regional registry | 1981–1984 | None | — | Ctx; Ltx/HD; PD | 83; 80/171; 125 | 41–60; 20–60; 41–60[2] | 52; 61/49; 54 | 25; 34/26; 17[4] |
| Kjellstrand (115) 1989 | USA | Two sites | 1963–1985 | — | — | Tx/D | 2,579/2,004 | — | — | — |
| Petrie (116) 1989 | New Zealand | Single site | 1981–1986 | None | — | Ctx/HD; PD | 30/75 | 39/43 | 67/55 | — |
| Silins (75) 1989 | Canada | National registry | 1981–1986 | 5 | — | Tx/D | 2,436/5,996 | 45–64[2] | 61 | 18[4] |
| Fauchald (87) 1988 | Norway | Multiple sites | 1981–1985 | 6 | — | Ctx; Ltx/WL D [nWL D] | 122/127 [119] | 66/66 [70] | 69 | — |
| Morris (117) 1988 | UK | Single site | — | None | — | Tx/HD; Home; PD | 69/69 | 49/54 | 40/34 | — |
| Burton (51) 1987 | UK | Single site | 1974–1985 | 11 | — | Ctx; Ltx/HD; PD | 183/276; 158 | 38/42; 51 | 64/63; 58 | 5/4; 12[4] |
| Churchill (118) 1987 | Canada | Single site | 1976–1982 | None[3] | — | Tx/HD; Home; PD | 79/42; 31 | 33/42 | — | 100 |
| Khauli (22) 1986 | USA | Single site | 1976–1982 | 8 | ESRD-DM; DM1 | Ctx; Ltx/D | 52/48 | 34/41 | — | 100 |
| Khauli (33) 1986[5] | USA | Single site | 1976–1982 | 8 | DM | Ctx; Ltx/D | 48/52 | 33/42 | — | 100 |
| Evans (119) 1985 | USA | Multiple sites | — | None | — | Ctx; Ltx/HD; Home; PD | 144/34/7; 287; 81 | 37/52; 47; 50 | 48/50; 64; 46 | 8/10; 8; 16 |
| Garcia-Garcia (58) 1985 | USA | Single site | 1973–1981 | 9 | — | Ctx; Ltx/D | 103/238 | 47 | 45 | 28/29 |
| Minetti (120) 1985 | Italy | — | 1972–1985 | 14 | — | Ctx/HD WL | 284/211 | — | — | — |

Continued.

C.Agnello   SE 0213

16060443, 2011, 10, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/j.1600-6143.2011.03666.x by Test, Wiley Online Library on [04/02/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Systematic Review of Kidney Transplantation

**Table 1:** Continued

| Author and year | Country | Source | Accrual era | Maximum follow-up (years) | Population | Treatment | Sample size | Mean age (years) | Percent male | Percent diabetic |
|---|---|---|---|---|---|---|---|---|---|---|
| Hellerstedt (121) 1984 | USA | Multiple sites | 1978–1983 | 6 | — | CTx; LTxHD; Home; PD | 1,187/1,999 | 21–45/46–60² | 62/55 | — |
| Zimmerman (34) 1984 | USA | Two sites | 1971–1983 | — | DM | CTx; LTxHD; PD | 36; 37/66 | 37; 31/48 | — | 100 |
| Krakauer (69) 1983 | USA | National registry | 1977–1980 | — | — | CTx; LTxD | 7,595; 3,491/65,270 | 31–40; 21–30/>50² | 63; 60/56 | 7; 8/9⁴ |
| Kramer (23) 1983 | Europe | EDTA-ERA | 1976–1981 | — | ESRD-Lupus; ESRD-PCKD | Tx; GF/D | 120; 48/815 1,085; 407/6,293 | — | — | — |
| Vollmer (60) 1983 | USA | Multiple sites | 1960–1979 | 19 | — | CTx; LTxD | 255/594 | 45–54² | 55 | 11⁴ |
| Cestero (122) 1980 | USA | Multiple sites | 1967–1978 | — | — | TxHD; Home | 150/299; 109 | 43–48 | — | — |
| Nicholls (123) 1980 | UK | — | 1968–1978 | 10 | — | CTxD | 48/50 | 37 | — | — |
| Avram (124) 1979 | USA | Single site | 1973–1978 | 5 | — | CTx; LTxDM D [nDM DI] | 69/122 [482] | — | 75/63 [57] | 6/100 [0] |
| Dumler (125) 1979 | USA | Single site | 1972–1978 | 6 | — | CTx; LTxHD | 140/443 | 40/62 | — | 0 |
| Hull (126) 1979 | USA | Single site | >1970 | 5 | — | CTx; LTxD | 248/605 | — | 56 | — |
| Bonney (127) 1978 | USA | Multiple sites | 1967–1975 | 8 | — | CTxHD; Home | 84/328; 41 | 30/43; 46 | — | 0/30; 2⁴ |
| Golper (128) 1978 | USA | Single site | 1971–1977 | 7 | >45 years | CTxD | 30/51 | 51/51 | — | 3 |
| Kreis (71) 1978 | France | Single site | 1962–1976 | — | — | CTxHD; Home | 272/440; 210 | 30/<50 | — | — |
| Price (74) 1978 | Canada | Single site | 1964–1976 | 12 | — | CTx; Home; PD | 305 | 38 | 67 | — |
| Cantaluppi (76) 1977 | Italy | Single site | ≥1972 | 5 | — | CTx; LTxHD; Home | 66/61 | 34/37 | 71/66 | — |
| Higgins (129) 1977 | Canada | Single site | 1962–1975 | — | — | TxHD | 87/55 | 31 | 62 | 2⁴ |
| Rao (29) 1977 | USA | Single site | 1972–1976 | 5 | DM | CTx; LTxHD | 160/60 | 35/40 | 64/57 | 100 |
| Bonomini (64) 1975 | Italy | Single site | 1966–1974 | 9 | — | CTx; LTxD | 39/113 | — | — | — |
| Kruniovsky (72) 1975 | USA | Single site | 1970–1974 | 5 | — | CTx; LTxHD | 85/92 | — | — | — |
| Lowrie (130) 1973 | USA | Single site | 1964–1972 | 9 | — | CTx; LPTx; LSTx/Home | 112; 93; 79/125 | 38; 24; 36/44 | 62; 71; 58/73 | 1; 1; 0/5⁴ |

USA = United States of America; GOV = government; UK = United Kingdom; UKRR = United Kingdom Renal Registry; ERA-EDTA = European Renal Association–European Dialysis and Transplant Association; USRDS = United States Renal Data System; ANZDATA = Australia and New Zealand Dialysis and Transplant Registry; CORR = Canadian Organ Replacement Register; WL = waitlisted; nWL = not waitlisted; ECD = extended-criteria donor; HBV+ = hepatitis B virus positive; HCV+ = hepatitis C virus positive; Hep- = hepatitis negative; DM = diabetes mellitus; nDM = no diabetes mellitus; PTCA = percutaneous transluminal coronary angioplasty; CABG = coronary artery bypass graft; nECD = not expanded criteria donor; HCV+ donor = hepatitis C virus positive donor; HCV- donor = hepatitis C virus negative donor; HCV- = hepatitis C virus negative; ESRD-DM = end-stage renal disease caused by diabetes mellitus; DM1 = diabetes mellitus type 1; nObese = not obese; nIndigenous = non-indigenous; ATSI = aboriginal and Torres strait islander; ESRD-Lupus end-stage renal disease caused by lupus; ESRD-Other = end-stage renal disease caused by something other than diabetes mellitus or lupus; ESRD-DM2 = end-stage renal disease caused by diabetes mellitus type 2; nHispanic = non-Hispanic; ESRD-PCKD = end-stage renal disease caused by polycystic kidney disease; CTx = cadaveric donor transplantation; LTx = living donor transplantation; HD = hemodialysis; PD = peritoneal dialysis; Tx = transplantation; GF = graft failure dialysis; Home = home hemodialysis; Self = self hemodialysis; Sat = dialysis at a satellite unit; Night = nocturnal hemodialysis; D = dialysis; LPTx = living parent donor transplantation; LSTx = living sibling donor transplantation.
The studies are sorted by year and by the first author's last name.
¹Median.
²Mean.
³There was a second interview.
⁴Cause of end-stage renal disease.
⁵This study used the same transplantation group as the other Khauli 1986 study.
⁶Quality-of-life studies were not excluded if they had cross-sectional designs.

C. Agnello   SE 0214

16000143, 2011, 10, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/j.1600-6143.2011.03666.x by Test, Wiley Online Library on [04/02/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Tonelli et al.



**Figure 2: Risk of bias of included studies.** The responses for each question in this risk of bias tool are represented by different colors, segmented along a horizontal bar. Light gray depicts the percent of studies responding with the smallest risk of bias. Medium gray depicts the percent of studies responding with the greatest risk of bias. Dark gray indicates a moderate or unclear risk of bias. The responses to "Study design?" are prospective, registry and retrospective. The responses to "Waitlisted?" and "Contemporaneous groups?" are yes, unclear and no. The responses to "Population described?" and "Model adjustment?" are yes, partial and no.

after transplantation (five studies reported a time period of <30 days and one <3 months [48]), mortality tended to be significantly greater in transplant recipients (HR range 0.9–5.03). These studies also reported the relative hazard of mortality at 1 year after transplantation, which in all cases, was significantly lower among transplant recipients (HR range 0.19–0.49).

Thirty-eight cohorts (8,15,17,19,21,30,31,35,37,42–44,51–61; 23 studies; 904 610 participants) reported adjusted relative hazards, rates or odds for mortality during total follow-up after transplantation (maximum follow up ranged 6–19 years; Figure 3). Seventy-nine percent of these results significantly favored lower mortality in the transplantation groups (HR range 0.16–0.76) and 21% were nonsignificant (HR range 0.33–1.12). These studies also included perioperative deaths, and thus, demonstrate that the higher short-term risk of death associated with kidney transplantation is more than offset by the lower risk of mortality during subsequent follow up. In the subset of studies including only waitlisted participants (10 studies; 474 522 participants), 94% of comparisons significantly favored lower mortality for transplant recipients (15 of 16 comparisons; HR range 0.16–0.73).

Three studies (35,58,60) reported relative hazards separately for living donor transplantation and for deceased donor transplantation, and found that the relative hazards of transplantation, compared to dialysis, tended to be lower for analyses of living donors (HR 0.23, 0.33 and 0.55) than for analyses of deceased donors (0.39, 1.12 and 1.01,

respectively). However, given the small number of studies, no firm conclusions can be drawn from these results.

### Evidence of effect modification for mortality

In multivariable meta-regression of 20 studies (13,27,51–55,63–74; 865 208 participants), we found that the unadjusted relative risk of mortality associated with transplantation (compared with dialysis) was lower in more recently performed studies (p < 0.001; Figure 4, panel A). Results were similar when a subset of 10 studies (7,19,46,56,76–79), including only 97 873 dialysis patients who had been placed on the transplant waiting list, were considered (p = 0.12; Figure 4, panel B). Variables assessing risk of bias (i.e. study design [prospective, registry, etc.], adequate description of population, prevalent vs. incident patients, censoring at modality switch and funding) were not significantly associated with the benefit of transplantation in meta-regression. Other variables were not tested as they were not relevant to the unadjusted mortality results (e.g. outcome definitions, adjusted model) or they did not sufficiently differ in value (e.g. contemporaneous groups).

Limited information was available on characteristics modifying the association between transplantation and mortality. One study (60) tested whether age, the number of associated diseases and dialysis vintage affected the association between transplantation and mortality, but found no significant evidence of effect modification. Another study (61) also tested the association between age and the mortality benefit of transplantation, but found no significant

C. Agnello   SE 0215

16000143, 2011, 10, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/j.1600-6143.2011.03668.x, by Test, Wiley Online Library on [04/02/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**Systematic Review of Kidney Transplantation**



**Figure 3: Adjusted ratio of all-cause mortality by time period.** *Indicate waitlisted dialysis groups. †0–3 months of follow-up. Tx = transplant; D = dialysis; nDM = no diabetes mellitus; DM2 = type 2 diabetes mellitus; HepCdonor = hepatitis C donor; nDM/nPAD = no diabetes mellitus/no peripheral arterial disease; DM/nPAD = diabetes mellitus/no peripheral arterial disease; DM1 = type 1 diabetes mellitus; nDM/PAD = no diabetes mellitus/peripheral arterial disease; HCV + donor = hepatitis C donor; HCV – donor = hepatitis C negative donor; nDM = no diabetes mellitus; ECD = extended criteria donor; nObese = not obese; DM/PAD = diabetes mellitus/peripheral arterial disease; DM = diabetes mellitus; Adj HR = adjusted hazard ratio; Adj OR = adjusted odds ratio; CI = confidence interval; NS = not significant; ESRD = end-stage renal disease; RRT = renal replacement therapy. Oniscu 2005 adjusted for age, gender, ESRD cause, social deprivation, time on RRT and comorbidities. Oniscu 2004 adjusted for age, gender, ESRD cause, social deprivation, dialysis modality and distance to center. MacDonald 2002 adjusted for age and comorbidities. Rabbat 2000 adjusted for age, gender, race, time on RRT and ESRD cause. Ojo 1994 adjusted for age, gender and ESRD cause. Port 1993 adjusted for age, gender, race, ESRD cause and era. Bayat 2010 adjusted for age, BMI, comorbidities, dialysis modality and time on RRT. Jain 2009 adjusted for age, race, ESRD cause, comorbidities, dialysis modality and time on RRT. Pauly 2009 adjusted for age, gender, comorbidities, era; matched on race, DM and time on RRT. Sorenson 2007 adjusted for age, gender and race. Synder 2006 adjusted for age, race, ethnicity, BMI, ESRD cause, comorbidities and time on RRT. Merion 2005 adjusted for age, gender, race, ethnicity, blood type, ESRD cause, comorbidities at waitlist, era, panel reactive antibody values, dialysis modality, time from first RRT to waitlist and donation service area for the organ procurement organization. Abbott 2004 adjusted for age, race, BMI, smoking, ESRD cause, comorbidities, era, albumin and access complications. Brunkhorst 2003 matched for age, gender, era, time on RRT and time with DM. Glanton 2003 adjusted for age, race, BMI, cause of ESRD, comorbidities, era and albumin. Johnson 2000 adjusted for time on RRT. Mazzuchi 1999 adjusted for age, gender, alcoholism and comorbidities. Wolfe 1999 adjusted for age, sex, race, ESRD cause, era and time from first RRT to waitlist. Schnuelle 1998 adjusted for age, gender, BMI, comorbidities, residual urine volume, number of previous transplants performed and time on RRT. Bonal 1997 adjusted age, gender and comorbidities. Schaubel 1995 matched on age, ESRD cause and number of comorbidities. Cowie 1994 adjusted for age, gender, weight, era, comorbidities and blood pressure. Pugh 1994 adjusted for age, race, ESRD cause and center size. Garcia-Garcia 1985 adjusted for age, gender, race, ESRD cause, comorbidities, era, age of DM onset, insurance and age at transplantation. Vollmer 1983 adjusted for age, number of comorbidities and era. Burton 1987 did not report what they adjusted for. Chavers 2007 adjusted for age, gender, race, era, ESRD cause and time on RRT. Zimmerman 2006 adjusted for age and gender.

C. Agnello   SE 0216

16006143, 2011, 10, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/j.1600-6143.2011.03666.x by Test, Wiley Online Library on [04/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**Tonelli et al.**



Figure 3: Continued.

effect modification. A third study (31) found that the reduction in mortality associated with transplantation was greater among patients with peripheral arterial disease than in those without. We found no evidence that the association between transplantation and mortality was modified by dialytic modality.

Overall, there was no consistent association between markers of study risk of bias and the magnitude of the mortality reduction associated with transplantation. However, the benefits of transplantation seemed less pronounced in the subset of studies that were restricted to patients who were waitlisted for transplantation.

Meta-regression did not identify factors that significantly modified the association between transplantation and clinical outcomes other than mortality.



**Figure 4: Meta-regression line for year of study publication and mortality risk ratio associated with transplantation, compared with dialysis patients.** The mortality risk ratio is plotted against the year of study publication. Circles are the observed estimates; size is based on the inverse of the standard error of each study. The three lines are the fitted and the upper and lower bounds of the 95% confidence intervals. Panel (A) compares transplant patients with dialysis patients who may or may not have been active on the transplant waiting list and panel (B) compares transplant patients with dialysis patients who had been placed on the transplant waiting list. The era of study publication was significantly associated with the risk of mortality associated with transplantation, indicating that the relative magnitude of the benefit increased over time (panel A, p < 0.001). A similar trend was shown in Panel B (p = 0.12). RR, risk ratio.

C. Agnello   SE 0217

16906143, 2011, 10, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/j.1600-6143.2011.03686.x by Test, Wiley Online Library on [04/02/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Systematic Review of Kidney Transplantation



**Figure 5: Ratios of cardiac events and hospitalizations among transplant recipients, compared to dialysis patients.** The small solid diamonds represent the ratios (risk, hazard, rate) of cardiac events and hospitalizations between transplant patients and either hemodialysis and/or peritoneal dialysis patients (for each individual study). The black-colored diamonds are adjusted ratios; the gray-colored diamonds are unadjusted ratios. The shaded gray region denotes values between 0.80 and 1.25. Data points outside the gray region represent large differences between transplant patients and dialysis patients (ratio ≥ 20% reduction or improvement). Some studies contributed more than one cohort (datapoint) to analyses.

### Cardiovascular events and hospitalization

In unadjusted analyses, four of six cohorts (19,20,25,33; four studies; 189 769 participants) found that transplantation significantly reduced the risk of myocardial infarction; two of five cohorts (19,20,56; three studies; 190 109 participants) found that transplantation significantly reduced the risk of stroke and two further studies found that transplantation significantly reduced the risk of heart failure (11 369 participants [18]) and the incidence of ischemic heart disease (552 participants [56]). Only two studies reported adjusted analyses for cardiac events. One (19; 92 participants) found that transplantation from a deceased donor significantly reduced the rate of cardiac events by 76% (relative rate 0.24, 95% CI: 0.07–0.81) and the other (18; 11 369 participants) found no association between transplantation and heart failure. The risk of infection-related hospitalization seemed to be significantly decreased among transplant recipients, with both cohorts (one study; 336 986 participants) favoring transplantation. Results for all-cause hospitalization were more equivocal, with only 5 of 10 cohorts (six studies; 354 256 participants) significantly favoring transplantation. Results of these analyses are summarized in Figure 5.

### Quality of life

In unadjusted analyses comparing QoL using the SF-36 between transplant recipients and dialysis patients, 47–100% of cohorts (55,80–87; depending on the domain considered), significantly favored the transplantation groups and none significantly favored the dialysis groups. Three cohorts (80,88; two studies; 497 participants) reported the adjusted association between transplantation and SF-36 scores as compared with dialysis. The vast majority of analyses significantly favored transplantation over hemodialysis. One small cohort (80; 64 participants) comparing transplantation to peritoneal dialysis was not significantly different for any of the domains reported. These findings are summarized in Figure 6. Results were broadly similar

for unadjusted and adjusted analyses comparing QoL assessed using other instruments including EQ-5D, Karnofsky Performance Index, SIP, GHQ, WHO-QoL, 15D and TTO (data not shown).

## Discussion

In this systematic review of 110 studies including a total of 1 961 904 participants with kidney failure, kidney transplantation was associated with reduced risk of mortality and cardiovascular events as well as better QoL than treatment with chronic dialysis. Results were consistent for different dialysis modalities, for transplantation from both deceased and living donors and across countries with differing health care systems. These results confirm that kidney transplantation is the preferred modality of treatment for chronic kidney failure, and justifies current attempts to increase the number of patients worldwide who benefit from kidney transplantation—by increasing rates of deceased and living kidney donation, expanding the pool of potential donors and recipients and reducing the likelihood that potentially viable organs are discarded.

As expected, mortality among transplant recipients increased sharply as compared with those remaining on dialysis during the perioperative period (62). Thereafter, mortality among transplant recipients significantly declined such that cumulative mortality associated with transplantation was significantly lower than among patients treated with dialysis (62,89). Contemporary dialysis patients have more comorbidity and must wait longer for transplantation than patients awaiting kidney transplantation in previous years (6). Despite this, our results suggest that the relative benefit of transplantation may have significantly increased over time, compared to remaining on dialysis. For example, the unadjusted relative risk of mortality

C. Agnello   SE 0218

16066143, 2011, 10, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/j.1600-6143.2011.03668.x, by Test, Wiley Online Library on [04/02/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**Tonelli et al.**



**Figure 6: Mean differences in domains of the short form health survey (SF-36) among transplant recipients, compared to dialysis patients.** The small solid gray diamonds represent the mean difference in SF-36 domains between transplant patients and either hemodialysis and/or peritoneal dialysis patients (for each individual study). The black-colored diamonds are adjusted mean differences; the gray-colored diamonds are unadjusted mean differences. The shaded gray region denotes the minimal clinical important difference for SF-36 domains; Samsa et al. (131) found that a difference between 3 and 5 was clinically important. Data points outside the gray region represent large differences between transplant patients and dialysis patients (mean difference ≥5). Some studies contributed more than one cohort (datapoint) to analyses. SF-36, short form health survey-36 items; MD, mean difference.

associated with transplantation (compared with dialysis) decreased from 0.44 in 1985 to 0.17 in 2005. This finding may relate to use of more potent immunosuppression, better management of comorbid medical conditions, more careful selection of transplant recipients or perhaps, to highe mortality in more recent years among the comparator pool of patients remaining on dialysis (89–91). However, because our study did not identify the explanation for this finding, these suggestions are speculative. Alternatively, because the apparently greater benefit of transplantation in more recent years was based on unadjusted analyses, it is possible that confounding by comorbidity or other characteristics wholly or partially explains this finding. Finally, we used the median year of each study's accrual period as a proxy for era of transplantation—which may have led to the ecological fallacy. Therefore, although appealing, our conclusion that the relative benefit of transplantation has increased over time should be viewed with caution.

Immunosuppressive medications used in transplant recipients may cause anemia, hypertension, glucose intolerance and dyslipidemia (91). Despite this, in analyses based on a total of 10 studies (333 881 patients), we found that transplantation was associated with significantly lower risk of cardiovascular events compared to treatment with dialysis (18–20,25,33,56). Although this finding might be partially because of selection of healthier patients for transplantation, results were similar in analyses restricted to dialysis patients who were active on the transplant waiting list—which should minimize the effect of such bias. Although immunosuppressive medications can predispose to infection, our results suggest that transplantation is associated with reduced risk of hospitalization for infection—emphasizing the high risk of sepsis associated with vascular and peritoneal access required to perform dialysis. We did not find clear evidence that transplant recipients

were at lower risk of all-cause hospitalization than dialysis patients, perhaps because allograft recipients require hospitalization for transplantation itself as well as any surgical complications.

We found consistent and clinically relevant improvements in QoL associated with kidney transplantation (78,86,92). These results were consistent across a variety of settings, were preserved in adjusted analyses, and were observed for a broad range of QoL instruments (78,86,92,93). Because markedly reduced QoL is a hallmark of kidney failure, these improvements may be the most important benefit of kidney transplantation, compared with remaining on dialysis.

Although one of the major objectives of our study was to examine factors that modified the clinical benefits of transplantation (as compared to dialysis), we identified few data addressing this objective. However, findings from a single study (with 96 736 participants) suggested that the mortality reduction associated with transplantation was more pronounced in patients with peripheral arterial disease. Meta-regression was unhelpful for identifying factors that modified the association between transplantation and outcomes other than mortality.

To our knowledge, this is the most comprehensive and up-to-date summary of the potential benefits of kidney transplantation, as compared with dialysis. We used a carefully designed literature search and rigorous methods to capture and synthesize the results of 110 studies, published over a period of more than four decades. Our results clearly illustrate the clinical benefits of kidney transplantation. Together with the dismal outcomes associated with dialysis and the dramatic worldwide increases in projected waiting times for kidney transplantation among patients with kidney failure, these findings emphasize the

C.Agnello   SE 0219

16000143, 2011, 10, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/j.1600-6143.2011.03668.x by Test, Wiley Online Library on [04/02/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

urgent need to increase rates of deceased and living kidney donation (94).

As with all systematic reviews, the strength of our conclusions is dependent on the analysis of aggregate (study-level) data and the quality and availability of studies. In addition to assessing studies for bias using items from Downs and Black (11), we added specific items of bias pertinent to our question. Second, we found a significant increase in the benefit of kidney transplantation over time, perhaps because of improvements in the care of transplant recipients. Unfortunately, despite our best efforts, we were unable to identify patient-level or study-level factors that were associated with greater or lesser benefit from transplantation. Third, although we sought to determine a summary estimate of the benefit of kidney transplantation for clinically relevant outcomes, there was substantial heterogeneity in all pooled analyses ($I^2 \geq 97\%$), making the validity of meta-analysis questionable. Despite use of meta-regression, we were unable to explain the source of this heterogeneity—which may be because of the wide range of renal replacement modalities we included, to the observational nature of the various studies, to the ecological fallacy (95) or to the fact that some (but not all) studies included dialysis patients who were not eligible for transplantation (selection bias). However, the magnitude and consistency of the benefit associated with transplantation across analyses leave little doubt that transplantation is beneficial as compared with dialysis, even if this benefit cannot be easily conveyed in a single summary measure. Finally, because multiple studies from certain countries were captured by our search, it is possible that a small minority of patients were included in more than one study. Because we did not statistically pool results across studies and because results were consistent for all analyses, this is unlikely to have affected our results.

Given the scarcity of renal allografts, future studies should explicitly seek to identify patient-level factors associated with the benefit of transplantation for outcomes other than mortality. For some outcomes (such as cardiovascular events or all-cause hospitalization), this could be achieved by patient-level meta-analysis (perhaps of registry data from different countries), which would increase statistical power and also reduce the risk of the ecological fallacy. Other outcomes (such as QoL) will require detailed prospective study, perhaps in conjunction with data collected to determine candidacy for transplantation. Because statistical adjustment for potential confounders will be critical for the success of such initiatives, consensus on the best way to measure and adjust for comorbidity, accruing after wait-listing for transplantation, would be an important next step.

In summary, we found that (as compared with dialysis), kidney transplantation is associated with substantial reductions in the risk of mortality and cardiovascular events, as well as clinically relevant improvements in QoL. Despite increases in the age and comorbidity of contemporary transplant recipients, the relative benefits of transplantation (as compared to remaining on dialysis) seem to be increasing over time. Given the current organ shortage, these findings validate current attempts to increase the number of people worldwide that benefit from kidney transplantation.

## Acknowledgments

The authors sincerely thank Ellen Crumley for librarian support, Ghenette Houston for administrative support, Mohammad Karkhaneh, Natasha Krahn and Sophanny Tiv for additional reviewer support.

**Funding source:** This study was funded by the Canadian Institutes of Health Research. Drs. Tonelli and Klarenbach were supported by salary awards from the Alberta Heritage Foundation for Medical Research. Dr. Tonelli was also supported by a Government of Canada Research Chair in the optimal care of people with chronic kidney disease. Drs. Tonelli and Klarenbach were supported by a joint initiative between Alberta Health and Wellness and the Universities of Alberta and Calgary. Dr. Gill was supported by a salary award from the Michael Smith Foundation. Dr. Knoll is supported by a University of Ottawa Chair in Clinical Transplantation Research.

### Authors' contributions

M.T., G.K., S.K., J.G. and Ms. N.W. contributed to the design of the study. N.W. performed the statistical analyses and managed the project. M.T. wrote the first draft of the manuscript. All authors contributed to data acquisition, the interpretation of results and critical revision of the article for intellectually important content.

## Disclosure

The authors of this manuscript have no conflicts of interest to disclose as described by the *American Journal of Transplantation*.

## References

1. Levey AS, Atkins R, Coresh J, et al. Chronic kidney disease as a global public health problem: Approaches and initiatives—A position statement from kidney disease improving global outcomes. Kidney Int 2007; 72: 247–259.
2. Suthanthiran M, Strom TB. Renal transplantation. N Engl J Med 1994; 331: 365–376.
3. Wolfe RA, Roys EC, Merion RM. Trends in organ donation and transplantation in the United States, 1999–2008. Am J Transplant 2010; 10(4 Pt 2): 961–972.
4. United States Renal Data System (USRDS). [cited 10 March 2011]. Available at: http://www.usrds.org/2008/view/esrd_07.asp
5. Mathur AK, Ashby VB, Sands RL, Wolfe RA. Geographic variation in end-stage renal disease incidence and access to deceased donor kidney transplantation. Am J Transplant 2010; 10 (4 Pt 2): 1069–1080.
6. Himmelfarb J, Ikizler TA. Hemodialysis. N Engl J Med 2010; 363: 1833–1845.
7. Port FK, Wolfe RA, Mauger EA, Berling DP, Jiang K. Comparison of survival probabilities for dialysis patients vs cadaveric renal

C.Agnello    SE 0220

16000143, 2011, 10, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/j.1600-6143.2011.03666.x by Test, Wiley Online Library on [04/02/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**Tonelli et al.**

transplant recipients [see comment]. JAMA 1993; 270: 1339–1343.

8. Schnuelle P, Lorenz D, Trede M, Van Der Woude FJ. Impact of renal cadaveric transplantation on survival in end-stage renal failure: Evidence for reduced mortality risk compared with hemodialysis during long-term follow-up. J Am Soc Nephrol 1998; 9: 2135–2141.

9. Waitlist and Transplant Activity for Liver (Kidney, Heart, and Lung also in full set of slides) 1999–2008 [cited 16 March 2011]. Available at: http://www.ustransplant.org/fastfacts.aspx

10. Stroup DF, Berlin JA, Morton SC, et al. Meta-analysis of observational studies in epidemiology: A proposal for reporting. Meta-analysis Of Observational Studies in Epidemiology (MOOSE) group. JAMA 2000; 283: 2008–2012.

11. Downs SH, Black N. The feasibility of creating a checklist for the assessment of the methodological quality both of randomised and non-randomised studies of health care interventions. J Epidemiol Community Health 1998; 52: 377–384.

12. Song F, Eastwood AJ, Gilbody S, Duley L, Sutton AJ. Publication and related biases. Health Technol Assess 2000; 4: 1–115.

13. Sezer S, Ozdemir FN, Akcay A, Arat Z, Boyacioglu S, Haberal M. Renal transplantation offers a better survival in HCV-infected ESRD patients. Clin Transplant 2004; 18: 619–623.

14. Visnja L, Milan S, Jelena M, Vanja R, Ljubica D. Hepatitis B and hepatitis C virus infection and outcome of hemodialysis and kidney transplant patients. Ren Fail 2008; 30: 81–87.

15. Abbott KC, Lentine KL, Bucci JR, Agodoa LY, Peters TG, Schnitzler MA. The impact of transplantation with deceased donor hepatitis C-positive kidneys on survival in wait-listed long-term dialysis patients. Am J Transplant 2004; 4: 2032–2037.

16. Martin Navarro J, Ortega M, Gutierrez MJ, et al. Survival of patients older than 60 years with kidneys transplanted from Spanish expanded criteria donors versus patients continued on hemodialysis. Transplant Proc 2009; 41: 2376–2378.

17. Merion RM, Ashby VB, Wolfe RA, et al. Deceased-donor characteristics and the survival benefit of kidney transplantation. [see comment]. JAMA 2005; 294: 2726–2733.

18. Abbott KC, Hypolite IO, Hshieh P, et al. The impact of renal transplantation on the incidence of congestive heart failure in patients with end-stage renal disease due to diabetes. J Nephrol 2001; 14: 369–376.

19. Brunkhorst R, Lufft V, Dannenberg B, Kliem V, Tusch G, Pichlmayr R. Improved survival in patients with type 1 diabetes mellitus after renal transplantation compared with hemodialysis: A case-control study. Transplantation 2003; 76: 115–119.

20. Ward MM. Cardiovascular and cerebrovascular morbidity and mortality among women with end-stage renal disease attributable to lupus nephritis. Am J Kidney Dis 2000; 36: 516–525.

21. Cowie CC, Port FK, Rust KF, Harris MI. Differences in survival between black and white patients with diabetic end-stage renal disease. Diabetes Care 1994; 17: 681–687.

22. Khauli RB, Steinmuller DR, Novick AC, et al. A critical look at survival of diabetics with end-stage renal disease. Transplantation versus dialysis therapy. Transplantation 1986; 41: 598–602.

23. Kramer P, Broyer M, Brunner FP, et al. Combined report on regular dialysis and transplantation in Europe, XII, 1981. Proc Eur Dial Transplant Assoc 1983; 19: 4–59.

24. Schmidt A, Stefenelli T, Schuster E, Mayer G. Informational contribution of noninvasive screening tests for coronary artery disease in patients on chronic renal replacement therapy. Am J Kidney Dis 2001; 37: 56–63.

25. Borentain M, Le Feuvre C, Helft G, et al. Long-term outcome after coronary angioplasty in renal transplant and hemodialysis patients. J Interv Cardiol 2005; 18: 331–337.

26. Massad MG, Kpodonu J, Lee J, et al. Outcome of coronary artery bypass operations in patients with renal insufficiency with and without renal transplantation. Chest 2005; 128: 855–862.

27. Chauveau P, Couzi L, Vendrely B, et al. Long-term outcome on renal replacement therapy in patients who previously received a keto acid-supplemented very-low-protein diet. Am J Clin Nutr 2009; 90: 969–974.

28. Jacobs C, Brunner FP, Brynger H, et al. Malignant diseases in patients treated by dialysis and transplantation in Europe. Transplant Proc 1981; 13(1 Pt 2): 729–732.

29. Rao KV, Sutherland D, Kjellstrand CM, Najarian JS, Shapiro FL. Comparative results between dialysis and transplantation in diabetic patients. Trans Am Soc Artif Intern Organs 1977; 23: 427–432.

30. Sorensen VR, Mathiesen ER, Heaf J, Feldt-Rasmussen B. Improved survival rate in patients with diabetes and end-stage renal disease in Denmark. Diabetologia 2007; 50: 922–929.

31. Snyder JJ, Kasiske BL, Maclean R. Peripheral arterial disease and renal transplantation. J Am Soc Nephrol 2006; 17: 2056–2068.

32. Choi KH, Kim SI, Shin SK, et al. Renal replacement therapies in the elderly: Renal transplantation and continuous ambulatory peritoneal dialysis. Transplant Proc 2000; 32: 1814.

33. Khauli RB, Novick AC, Steinmuller DR, et al. Comparison of renal transplantation and dialysis in rehabilitation of diabetic end-stage renal disease patients. Urology 1986; 27: 521–525.

34. Zimmerman SW, Glass N, Sollinger H, Miller D, Belzer F. Treatment of end-stage diabetic nephropathy: Over a decade of experience at one institution. Medicine (Baltimore) 1984; 63: 311–317.

35. Glanton CW, Kao T-C, Cruess D, Agodoa LYC, Abbott KC. Impact of renal transplantation on survival in end-stage renal disease patients with elevated body mass index. Kidney Int 2003; 63: 647–653.

36. Blake C, Codd MB, Cassidy A, O'Meara YM. Physical function, employment and quality of life in end-stage renal disease. J Nephrol 2000; 13: 142–149.

37. Jain P, Cockwell P, Little J, et al. Survival and transplantation in end-stage renal disease: A prospective study of a multiethnic population. Nephrol Dial Transplant 2009; 24: 3840–3846.

38. Ojo AO, Port FK, Wolfe RA, Mauger EA, Williams L, Berling DP. Comparative mortality risks of chronic dialysis and cadaveric transplantation in black end-stage renal disease patients. Am J Kidney Dis 1994; 24: 59–64.

39. Bakewell AB, Higgins RM, Edmunds ME. Does ethnicity influence perceived quality of life of patients on dialysis and following renal transplant? Nephrol Dial Transplant 2001; 16: 1395–1401.

40. McDonald SP, Russ GR. Current incidence, treatment patterns and outcome of end-stage renal disease among indigenous groups in Australia and New Zealand. Nephrology 2003; 8:42–48.

41. Spencer JL, Silva DT, Snelling P, Hoy WE. An epidemic of renal failure among Australian Aboriginals. Med J Aust 1998; 168: 537–541.

42. Pugh JA, Tuley MR, Basu S. Survival among Mexican-Americans, non-Hispanic whites, and African-Americans with end-stage renal disease: The emergence of a minority pattern of increased incidence and prolonged survival. Am J Kidney Dis 1994; 23: 803–807.

43. Bayat S, Kessler M, Briancon S, Frimat L. Survival of transplanted and dialysed patients in a French region with focus on outcomes in the elderly. Nephrol Dial Transplant 2010; 25: 292–300.

C. Agnello    SE 0221

16000643, 2011, 10, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/j.1600-6143.2011.03668.x by Test, Wiley Online Library on [04/02/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

44. Johnson DW, Herzig K, Purdie D, et al. A comparison of the effects of dialysis and renal transplantation on the survival of older uremic patients. Transplantation 2000; 69: 794–799.

45. Rebollo P, Ortega F, Baltar JM, Alvarez-Ude F, Alvarez Navascues R, Alvarez-Grande J. Is the loss of health-related quality of life during renal replacement therapy lower in elderly patients than in younger patients? Nephrol Dial Transplant 2001; 16: 1675–1680.

46. Oniscu GC, Brown H, Forsythe JLR. How great is the survival advantage of transplantation over dialysis in elderly patients? Nephrol Dial Transplant 2004; 19: 945–951.

47. Macrae J, Friedman AL, Friedman EA, Eggers P. Live and deceased donor kidney transplantation in patients aged 75 years and older in the United States. Int Urol Nephrol 2005; 37: 641–648.

48. McDonald SP, Russ GR. Survival of recipients of cadaveric kidney transplants compared with those receiving dialysis treatment in Australia and New Zealand, 1991–2001. Nephrol Dial Transplant 2002; 17: 2212–2219.

49. Oniscu GC, Brown H, Forsythe JLR. Impact of cadaveric renal transplantation on survival in patients listed for transplantation. J Am Soc Nephrol 2005; 16: 1859–1865.

50. Rabbat CG, Thorpe KE, Russell JD, Churchill DN. Comparison of mortality risk for dialysis patients and cadaveric first renal transplant recipients in Ontario, Canada. J Am Soc Nephrol 2000; 11: 917–922.

51. Burton PR, Walls J. Selection-adjusted comparison of life-expectancy of patients on continuous ambulatory peritoneal dialysis, haemodialysis, and renal transplantation. [erratum appears in Lancet 1987; 1: 1330]. Lancet 1987; 1: 1115–1119.

52. Chavers BM, Solid CA, Gilbertson DT, Collins AJ. Infection-related hospitalization rates in pediatric versus adult patients with end-stage renal disease in the United States. J Am Soc Nephrol 2007; 18: 952–959.

53. Mazzuchi N, Gonzalez-Martinez F, Carbonell E, Curi L, Fernandez-Cean J, Orihuela S. Comparison of survival for haemodialysis patients vs renal transplant recipients treated in Uruguay. Nephrol Dial Transplant 1999; 14: 2849–2854.

54. Schaubel D, Desmeules M, Mao Y, Jeffery J, Fenton S. Survival experience among elderly end-stage renal disease patients. A controlled comparison of transplantation and dialysis. Transplantation 1995; 60: 1389–1394.

55. Zimmermann PR, Camey SA, Mari JdJ. A cohort study to assess the impact of depression on patients with kidney disease. Int J Psychiatry Med 2006; 36: 457–468.

56. Bonal J, Cleries M, Vela E. Transplantation versus haemodialysis in elderly patients. Renal Registry Committee. Nephrol Dial Transplant 1997; 12: 261–264.

57. Alamartine E, Leroy G, Toulon J, et al. Influence of dialysis and kidney transplantation on the survival of patients with end-stage chronic kidney failure. A multifactorial analysis. Presse Med 1991; 20: 21–24.

58. Garcia-Garcia G, Deddens JA, D'Achiardi-Rey R, et al. Results of treatment in patients with end-stage renal disease: A multivariate analysis of risk factors and survival in 341 successive patients. Am J Kidney Dis 1985; 5: 10–18.

59. Pauly RP, Gill JS, Rose CL, et al. Survival among nocturnal home haemodialysis patients compared to kidney transplant recipients. Nephrol Dial Transplant 2009; 24: 2915–2919.

60. Vollmer WM, Wahl PW, Blagg CR. Survival with dialysis and transplantation in patients with end-stage renal disease. N Engl J Med 1983; 308: 1553–1558.

61. Locatelli F, Marcelli D, Conte F, et al. 1983 to 1992: Report on regular dialysis and transplantation in Lombardy. Am J Kidney Dis 1995; 25: 196–205.

62. Wolfe RA, Ashby VB, Milford EL, et al. Comparison of mortality in all patients on dialysis, patients on dialysis awaiting transplantation, and recipients of a first cadaveric transplant. [see comment]. N Engl J Med 1999; 341: 1725–1730.

63. Boni RC, Soares VA, Caramori JC, Balbi AL, Correa LA, Carvalho MF. Comparative study of infection in renal allograft recipients and patients in regular dialysis treatment. Transplant Proc 1996; 28: 3376.

64. Bonomini V, Vangelista A, Albertazzi A, Stefoni S. Survival and 'true' rehabilitation after dialysis and transplantation: A 7-year follow-up. Proc Eur Dial Transplant Assoc 1975; 11: 256–260.

65. Buturovic-Ponikvar J. Slovenian renal replacement therapy registry G. Slovenian renal replacement therapy registry: Excerpts from the 2006 annual report. Ther Apher Dial 2009; 13: 258–263.

66. Disney AP. Demography and survival of patients receiving treatment for chronic renal failure in Australia and New Zealand: Report on dialysis and renal transplantation treatment from the Australia and New Zealand Dialysis and Transplant Registry. Am J Kidney Dis 1995; 25: 165–175.

67. Fauchald P, Albrechtsen D, Leivestad T, Pfeffer P, Talseth T, Flatmark A. Renal replacement therapy in patients over 60 years of age. Transplant Proc 1988; 20: 432–433.

68. Ho YW, Chau KF, Leung CB, et al. Hong Kong registry report 2004. Hong Kong J Nephrol 2005; 7: 38–46.

69. Krakauer H, Grauman JS, McMullan MR, Creede CC. The recent U.S. experience in the treatment of end-stage renal disease by dialysis and transplantation. N Engl J Med 1983; 308: 1558–1563.

70. Kramer A, Stel V, Zoccali C, et al. An update on renal replacement therapy in Europe: ERA-EDTA Registry data from 1997 to 2006. Nephrol Dial Transplant 2009; 24: 3557–3566.

71. Kreis H. Selection of hemodialysis versus cadaveric transplantation. Kidney Int Suppl 1978: S91–S94.

72. Krumlovsky FA, del Greco F, Simon NM, Roguska J. Morbidity and mortality of chronic hemodialysis compared to renal transplantation. Trans Am Soc Artif Intern Organs 1975; 21: 102–107.

73. Lim TO, Lim YN, Tan CC, Lee DG, Morad Z. Malaysian dialysis and transplant registry report. Nephrology 1998; 4: 123–126.

74. Price JD, Ashby KM, Reeve CE. Results of 12 years' treatment of chronic renal failure by dialysis and transplantation. Can Med Assoc J 1978; 118: 263–266.

75. Silins J, Fortier L, Mao Y, et al. Mortality rates among patients with end-stage renal disease in Canada, 1981–1986. CMAJ 1989; 141: 677–682.

76. Cantaluppi A, Ponticelli C, Frontini A, Licini R, Tarantino A, Mecca G. Dialysis versus integrated programme of dialysis and transplantation. Proc Eur Dial Transplant Assoc 1977; 14: 593–595.

77. Gill JS, Rose C, Pereira BJ, Tonelli M. The importance of transitions between dialysis and transplantation in the care of end-stage renal disease patients. Kidney Int 2007; 71: 442–447.

78. Segoloni GP, Messina M, Tognarelli G, et al. Survival probabilities for renal transplant recipients and dialytic patients: A single center prospective study. Transplant Proc 1998; 30: 1739–1741.

79. Straathof-Galema L, van Saase JL, Verburgh CA, de Fijter JW, Schut NH, van Dorp WT. Morbidity and mortality during renal replacement therapy: Dialysis versus transplantation. Clin Nephrol 2001; 55: 227–232.

80. Baiardi F, Degli Esposti E, Cocchi R, et al. Effects of clinical and individual variables on quality of life in chronic renal failure patients. J Nephrol 2002; 15: 61–67.

81. Cheawchanwattana A, Limwattananon C, Gross C, et al. The validity of a new practical quality of life measure in patients on

C.Agnello  SE 0222

**Tonelli et al.**

16000143, 2011, 10, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/j.1600-6143.2011.03668.x, by Test, Wiley Online Library on [04/02/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

renal replacement therapy. J Med Assoc Thai 2006; 89(suppl 2): S207–S17.

82. Fujisawa M, Ichikawa Y, Yoshiya K, et al. Assessment of health-related quality of life in renal transplant and hemodialysis patients using the SF-36 health survey. Urology 2000; 56: 201–206.

83. Lee AJ, Morgan CL, Conway P, Currie CJ. Characterisation and comparison of health-related quality of life for patients with renal failure. Curr Med Res Opin 2005; 21: 1777–1783.

84. Overbeck I, Bartels M, Decker O, Harms J, Hauss J, Fangmann J. Changes in quality of life after renal transplantation. Transplant Proc 2005; 37: 1618–1621.

85. Ozminkowski RJ, White AJ, Andrea Hassol MSPH, Michael Murphy BS. General health of end stage renal disease program beneficiaries. Health Care Financ Rev 1997; 19: 121–144.

86. Rebollo P, Ortega F, Baltar JM, et al. Health related quality of life (HRQoL) of kidney transplanted patients: Variables that influence it. Clin Transplant 2000; 14: 199–207.

87. Wight JP, Edwards L, Brazier J, Walters S, Payne JN, Brown CB. The SF36 as an outcome measure of services for end stage renal failure. [see comment]. Qual Health Care 1998; 7: 209–221.

88. Griva K, Jayasena D, Davenport A, Harrison M, Newman SP. Illness and treatment cognitions and health related quality of life in end stage renal disease. Br J Health Psychol 2009; 14(Pt 1): 17–34.

89. Hariharan S, Johnson CP, Bresnahan BA, Taranto SE, McIntosh MJ, Stablein D. Improved graft survival after renal transplantation in the United States, 1988 to 1996. N Engl J Med 2000; 342: 605–612.

90. Gill JS. Cardiovascular disease in transplant recipients: Current and future treatment strategies. Clin J Am Soc Nephrol 2008; 3(Suppl 2): S29–S37.

91. Halloran PF. Immunosuppressive drugs for kidney transplantation. N Engl J Med 2004; 351: 2715–2729.

92. Yildirim A. The importance of patient satisfaction and health-related quality of life after renal transplantation. Transplant Proc 2006; 38: 2831–2834.

93. Segev DL. Renal allograft survival: Getting better all the time. Am J Transplant 2011; 11: 422–423.

94. Segev DL. Evaluating options for utility-based kidney allocation. Am J Transplant 2009; 9: 1513–1518.

95. Reade MC, Delaney A, Bailey MJ, Angus DC. Bench-to-bedside review: Avoiding pitfalls in critical care meta-analysis—Funnel plots, risk estimates, types of heterogeneity, baseline risk and the ecologic fallacy. Crit Care 2008; 12: 220.

96. Ansell D, Roderick P, Hodsman A, Ford D, Steenkamp R, Tomson C. UK renal registry 11th annual report (December 2008): Chapter 7 survival and causes of death of UK adult patients on renal replacement therapy in 2007: National and centre-specific analyses. Nephron Clin Pract 2009; 111(Suppl 1): c113–c139.

97. Stel VS, Kramer A, Zoccali C, Jager KJ. The 2006 ERA-EDTA registry annual report: A precis. J Nephrol 2009; 22: 1–12.

98. Patel RK, Mark PB, Johnston N, et al. Prognostic value of cardiovascular screening in potential renal transplant recipients: A single-center prospective observational study. Am J Transplant 2008; 8: 1673–1683.

99. Buturovic-Ponikvar J. Expert group for dialysis in S. Renal replacement therapy in Slovenia: 2003 annual report. Ther Apher Dial 2005; 9: 196–201.

100. Niu S-F, Li IC. Quality of life of patients having renal replacement therapy. J Adv Nurs 2005; 51: 15–21.

101. Schaubel DE, Cai J. Analysis of clustered recurrent event data with application to hospitalization rates among renal failure patients. Biostatistics 2005; 6: 404–419.

102. Moe SM, O'Neill KD, Reslerova M, Fineberg N, Persohn S, Meyer CA. Natural history of vascular calcification in dialysis and transplant patients. [see comment][erratum appears in Nephrol Dial Transplant. 2004; 19: 2933 Note: Resterova, Martina [corrected to Reslerova, Martina]]. Nephrol Dial Transplant 2004; 19: 2387–2393.

103. Schon S, Ekberg H, Wikstrom B, Oden A, Ahlmen J. Renal replacement therapy in Sweden. Scand J Urol Nephrol 2004; 38: 332–339.

104. Abbott KC, Hshieh P, Cruess D, et al. Hospitalized valvular heart disease in patients on renal transplant waiting list: Incidence, clinical correlates and outcomes. Clin Nephrol 2003; 59: 79–87.

105. Tomasz W, Piotr S. A trial of objective comparison of quality of life between chronic renal failure patients treated with hemodialysis and renal transplantation. Ann Transplant 2003; 8: 47–53.

106. McDonald SP, Russ GR, Kerr PG, et al. ESRD in Australia and New Zealand at the end of the millennium: A report from the ANZDATA registry. Am J Kidney Dis 2002; 40: 1122–1131.

107. Piccoli GB, Mezza E, Anania P, et al. Patients on renal replacement therapy for 20 or more years: A clinical profile. Nephrol Dial Transplant 2002; 17: 1440–1449.

108. Lui SF. 1996 Hong Kong renal registry report: Central Renal Comitee. Nephrology 1997; 3: 577–581.

109. Agodoa LY, Eggers PW. Renal replacement therapy in the United States: Data from the United States Renal Data System. Am J Kidney Dis 1995; 25: 119–133.

110. Teraoka S, Toma H, Nihei H, et al. Current status of renal replacement therapy in Japan. Am J Kidney Dis 1995; 25: 151–164.

111. El-Reshaid K, Johny KV, Sugathan TN, Hakim A, Georgous M, Nampoory MR. End-stage renal disease and renal replacement therapy in Kuwait—Epidemiological profile over the past 4 1/2 years. Nephrol Dial Transplant 1994; 9: 532–538.

112. Del Pilar Garofano Plazas M, Morales MM, Extremera BG, Alhama JS. Quality of life in patients with end-stage renal disease. Study of 156 cases. Eur J Intern Med 1993; 4: 301–310.

113. Brunori G, Camerini C, Cancarini G, et al. Hospitalization: CAPD versus hemodialysis and transplant. Adv Perit Dial 1992; 8: 71–74.

114. Julius M, Hawthorne VM, Carpentier-Alting P, Kneisley J, Wolfe RA, Port FK. Independence in activities of daily living for end-stage renal disease patients: Biomedical and demographic correlates. Am J Kidney Dis 1989; 13: 61–69.

115. Kjellstrand CM, Fryd D, Najarian JS. Late deaths on dialysis and transplantation therapy. Contrib Nephrol 1989; 70: 64–74.

116. Petrie K. Psychological well-being and psychiatric disturbance in dialysis and renal transplant patients. Br J Med Psychol 1989; 62(Pt 1): 91–96.

117. Morris PL, Jones B. Transplantation versus dialysis: A study of quality of life. Transplant Proc 1988; 20: 23–26.

118. Churchill DN, Torrance GW, Taylor DW, et al. Measurement of quality of life in end-stage renal disease: The time trade-off approach. Clin Invest Med 1987; 10: 14–20.

119. Evans RW, Manninen DL, Garrison LP Jr., et al. The quality of life of patients with end-stage renal disease. N Engl J Med 1985; 312: 553–559.

120. Minetti L, Civati G, Brando B. A comparison between maintenance hemodialysis and transplantation in the treatment of end-stage renal disease. Transplant Proc 1985; 17(suppl 2): 28–31.

121. Hellerstedt WL, Johnson WJ, Ascher N, et al. Survival rates of 2,728 patients with end-stage renal disease. Mayo Clin Proc 1984; 59: 776–783.

C. Agnello   SE 0223

16006143, 2011, 10, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/j.1600-6143.2011.03668.x by Test, Wiley Online Library on [04/02/2026]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**Systematic Review of Kidney Transplantation**

122. Cestero RV, Jacobs MO, Freeman RB. A regional end-stage renal disease program: Twelve years' experience. Ann Intern Med 1980; 93: 494–498.

123. Nicholls AJ, Catto GR, Edward N, Engeset J, Macleod M. Accelerated atherosclerosis in long-term dialysis and renal-transplant patients: Fact or fiction? Lancet 1980; 1: 276–278.

124. Avram MM, Slater PA, Fein PA, Altman E. Comparative survival of 673 patients with chronic uremia treated with renal transplantation (RT) and maintenance hemodialysis (MD). Trans Am Soc Artif Intern Organs 1979; 25: 391–393.

125. Dumler F, Levin NW, Santiago G, Cruz C, Cortes P, Dienst S. End-stage renal disease in diabetics: Dialysis or transplantation? Lancet 1979; 2: 412–413.

126. Hull A, Peters P, Dickerman R, et al. Comparisons of dialysis and transplant results from one center. Transplant Proc 1979; 11: 125–126.

127. Bonney S, Finkelstein FO, Lytton B, Schiff M, Steele TE. Treatment of end-stage renal failure in a defined geographic area. Arch Intern Med 1978; 138: 1510–1513.

128. Golper TA, Barry JM, Bennett WM, Porter GA. Primary cadaver kidney transplantation in older patients: Survival equal to dialysis. Trans Am Soc Artif Intern Organs 1978; 24: 282–287.

129. Higgins MR, Grace M, Dossetor JB. Survival of patients treated for end-stage renal disease by dialysis and transplantation. Can Med Assoc J 1977; 117: 880–883.

130. Lowrie EG, Lazarus JM, Mocelin AJ, et al. Survival of patients undergoing chronic hemodialysis and renal transplantation. N Engl J Med 1973; 288: 863–867.

131. Samsa G, Edelman D, Rothman ML, Williams GR, Lipscomb J, Matchar D. Determining clinically important differences in health status measures: A general approach with illustration to the Health Utilities Index Mark II. Pharmacoeconomics 1999; 15: 141–155.

## Supporting Information

Additional supporting information may be found in the online version of this article.

**Table S1:** Literature search strategies

**Table S2:** Quality assessment of included studies

**Table S3:** Length of hospital stay among transplant recipients, compared with dialysis patients

**Figure S1:** Unadjusted risk ratio of all-cause mortality

Please note: Wiley-Blackwell is not responsible for the content or functionality of any supporting materials supplied by the authors. Any queries (other than missing material) should be directed to the corresponding author for the article.

C. Agnello    SE 0224



# EXHIBIT L

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

C.Agnello    SE 0225

Supplement

OPEN

# KDIGO Clinical Practice Guideline on the Evaluation and Care of Living Kidney Donors

Krista L. Lentine, MD, PhD,[1] Bertram L. Kasiske, MD,[2] Andrew S. Levey, MD,[3] Patricia L. Adams, MD,[4] Josefina Alberú, MD,[5] Mohamed A. Bakr, MD,[6] Lorenzo Gallon, MD,[7] Catherine A. Garvey, RN,[8] Sandeep Guleria, MBBS, MS, DNB,[9] Philip Kam-Tao Li, MD,[10] Dorry L. Segev, MD, PhD,[11] Sandra J. Taler, MD,[12] Kazunari Tanabe, MD, PhD,[13] Linda Wright, MHSc, MSW,[14] Martin G. Zeier, MD,[15] Michael Cheung, MA,[16] and Amit X. Garg, MD, PhD[17]

**Abstract:** The 2017 Kidney Disease: Improving Global Outcomes (KDIGO) Clinical Practice Guideline on the Evaluation and Care of Living Kidney Donors is intended to assist medical professionals who evaluate living kidney donor candidates and provide care before, during and after donation. The guideline development process followed the Grades of Recommendation Assessment, Development, and Evaluation (GRADE) approach and guideline recommendations are based on systematic reviews of relevant studies that included critical appraisal of the quality of the evidence and the strength of recommendations. However, many recommendations, for which there was no evidence or no systematic search for evidence was undertaken by the Evidence Review Team, were issued as ungraded expert opinion recommendations. The guideline work group concluded that a comprehensive approach to risk assessment should replace decisions based on assessments of single risk factors in isolation. Original data analyses were undertaken to produce a "proof-in-concept" risk-prediction model for kidney failure to support a framework for quantitative risk assessment in the donor candidate evaluation and defensible shared decision making. This framework is grounded in the simultaneous consideration of each candidate's profile of demographic and health characteristics. The processes and framework for the donor candidate evaluation are presented, along with recommendations for optimal care before, during, and after donation. Limitations of the evidence are discussed, especially regarding the lack of definitive prospective studies and clinical outcome trials. Suggestions for future research, including the need for continued refinement of long-term risk prediction and novel approaches to estimating donation-attributable risks, are also provided.

(*Transplantation* 2017;101(8S): S1–S109)

In citing this document, the following format should be used: Kidney Disease: Improving Global Outcomes (KDIGO) Living Kidney Donor Work Group. KDIGO Clinical Practice Guideline on the Evaluation and Care of Living Kidney Donors. *Transplantation* 2017; 101(Suppl 8S):S1–S109.

Received 10 February 2017.

Accepted 20 March 2017.

[1] Saint Louis University School of Medicine, St. Louis, MO.

[2] Hennepin County Medical Center, Minneapolis, MN.

[3] Tufts Medical Center, Boston, MA.

[4] Wake Forest School of Medicine, Winston-Salem, NC.

[5] Instituto Nacional de Ciencias Médicas y Nutrición Salvador Zubirán, Mexico City, Mexico.

[6] Mansoura University Mansoura, Egypt.

[7] Northwestern University, Chicago, IL.

[8] University of Minnesota, Minneapolis, MN.

[9] Indraprastha Apollo Hospitals, New Delhi, India.

[10] Chinese University of Hong Kong, Hong Kong, China.

[11] Johns Hopkins University, School of Medicine, Baltimore, MD.

[12] Mayo Clinic, Rochester, MN.

[13] Tokyo Women's Medical University, Tokyo, Japan.

[14] University of Toronto, Toronto, Canada.

[15] University Hospital Heidelberg, Heidelberg, Germany.

[16] KDIGO, Brussels, Belgium.

[17] Western University London, Canada.

Guideline Cochairs, K.L.L., A.X.G., contributed equally.

This Clinical Practice Guideline is based upon systematic literature searches last conducted in September 2014 supplemented with additional evidence through January 2017. It is designed to assist decision making. It is not intended to define a standard of care, and should not be interpreted as prescribing an exclusive course of management. Variations in practice will inevitably and appropriately occur when considering the needs of individual patients, available resources, and limitations unique to an institution or type of practice. Healthcare professionals using these recommendations should decide how to apply them to their own clinical practice.

Kidney Disease: Improving Global Outcomes (KDIGO) makes every effort to avoid any actual or reasonably perceived conflicts of interest that may arise from an outside relationship or a personal, professional, or business interest of a member of the work group. All members of the work group are required to complete, sign, and submit a disclosure and attestation form showing all such relationships that might be perceived as or are actual conflicts of interest. This document is updated annually and information is adjusted accordingly. All reported information is published in its entirety at the end of the document and is kept on file at KDIGO.

Disclosure and funding information can be found in the Appendix on page S106.

Correspondence: Krista L. Lentine, MD, PhD (lentinek@slu.edu).

S8    Transplantation ■ August 2017 ■ Volume 101 ■ Number 8S    www.transplantjournal.com

*Supplemental digital content (SDC) is available for this article. Direct URL citations appear in the printed text, and links to the digital files are provided in the HTML text of this article on the journal's Web site (www.transplantjournal.com).*

*Copyright © 2017 KDIGO. This is an open-access article distributed under the terms of the Creative Commons Attribution-Non Commercial-No Derivatives License 4.0*

*(CCBY-NC-ND), where it is permissible to download and share the work provided it is properly cited. The work cannot be changed in any way or used commercially without permission from the journal.*

*ISSN: 0041-1337/17/10108-00S1*
*DOI: 10.1097/TP.0000000000001769*

## SUMMARY OF RECOMMENDATION STATEMENTS

All recommendation statements are not graded unless specified otherwise.

## CHAPTER 1: GOALS OF EVALUATION, FRAMEWORK FOR DECISION-MAKING, AND ROLES AND RESPONSIBILITIES

### Goals and Principles of Evaluation

1.1: The donor candidate's willingness to donate a kidney voluntarily without undue pressure should be verified.

1.2: The benefits and risks of kidney donation should be assessed for each donor candidate.

1.3: The decision to accept or exclude a donor candidate should follow transplant program policies.

1.4: Donor candidate decision-making should be facilitated through education and counseling on individualized risks and benefits, methods to minimize risks, and the need for postdonation follow-up.

1.5: For an accepted donor candidate, a plan for donation care and follow-up should be formulated to minimize risks of donation.

1.6: For an excluded donor candidate, a plan for any needed care and support should be formulated.

### Framework for Decision-Making

1.7: The donor candidate, the intended recipient, and the transplant program must all agree with the decision to proceed with donation in concordance with transplant program policies and informed consent.

1.8: Transplant program policies must be defensible based on current understanding of the risks and benefits of kidney donation, and should apply to all donor candidates evaluated at the center.

1.9: Each transplant program should establish policies describing psychosocial criteria that are acceptable for donation, including any program constraints on acceptable relationships between the donor candidate and the intended recipient.

1.10: All donor candidates should be evaluated using the same criteria, regardless of whether donation is directed towards a designated recipient.

1.11: Each transplant program should establish policies describing medical criteria that are acceptable for donation, addressing when possible, numeric thresholds for short-term and long-term postdonation risks above which the transplant program will not proceed with donation. Risks should be expressed as absolute rather than relative risks.

1.12: When possible, transplant programs should provide each donor candidate with individualized quantitative estimates of short-term and long-term risks from donation, including recognition of associated uncertainty, in a manner that is easily understood by donor candidates.

1.13: Transplant programs should evaluate donor candidate risks in comparison to predetermined thresholds for acceptance. If a donor candidate's postdonation risk is

above the transplant program's acceptable risk threshold, the risk is not acceptable for donation. If a donor candidate's postdonation risk is below the transplant program's acceptance threshold, the candidate makes the decision whether or not to proceed with donation.

1.14: If a donor candidate is not acceptable, the transplant program should explain the reason for nonacceptance to the donor candidate.

1.15: Transplant programs should protect donor candidate's privacy regarding the evaluation, including all considerations in the decision to donate or not.

### Roles and Responsibilities

1.16: A multidisciplinary transplant program team knowledgeable in kidney donation and transplantation should evaluate, care for, and formulate a plan for donor care including long-term follow-up.

1.17: Transplant programs should minimize conflict of interest by providing at least one key team member not involved in the care or evaluation of the intended recipient who evaluates the donor candidate and participates in the determination of donor acceptance.

1.18: Transplant programs should conduct as efficient a donor evaluation as possible, meeting the needs of donor candidates, intended recipients and transplant programs.

## CHAPTER 2: INFORMED CONSENT

### Process of Informed Consent

2.1: Informed consent for donation should be obtained from the donor candidate in the absence of the intended recipient, family members and other persons who could influence the donation decision.

### Capacity for Decision Making

2.2: The donor candidate's capacity to provide informed consent (ie, ability to understand the risks, benefits and consequences of donation) should be confirmed before proceeding with evaluation and donation.

2.3: Substitute decision makers should not be used on behalf of a donor candidate who lacks the capacity to provide informed consent (eg, children or those who are mentally challenged), except under extraordinary circumstances and only after ethical and legal review.

### Content of Disclosure

2.4: Protocols should be followed to provide each donor candidate with information on:

- The processes of evaluation, donor acceptance, and follow-up
- The types of information that may be discovered during the evaluation, and what the transplant program will do with such information
- Individualized risks, benefits and expected outcomes of the donor evaluation, donation, and postdonation health, including a discussion of the uncertainty in some outcomes

C.Agnello   SE 0227

© 2017 Wolters Kluwer

- Treatment alternatives available to transplant candidates, and average expected outcomes
- How personal health information will be handled
- Availability of transplant program personnel for support

### Comprehension of Disclosed Information

2.5: The donor candidate's understanding of the relevant information on the risks and benefits of donation should be confirmed before proceeding with donation.

### Voluntarism

2.6: Donor candidates should have adequate time to consider information relevant to deciding whether they wish to donate or not.

2.7: A donor candidate's decision to withdraw at any stage of the evaluation process should be respected and supported in a manner that protects confidentiality.

2.8: A donor candidate who decides not to donate and has difficulty communicating that decision to the intended recipient should be assisted with this communication by the transplant program.

## CHAPTER 3: COMPATIBILITY TESTING, INCOMPATIBLE TRANSPLANTATION, AND PAIRED DONATION

### Evaluation

3.1: Donor ABO blood typing should be performed twice before donation to reduce the risk of unintended blood type incompatible transplantation.

3.2: Donor blood group A subtype testing should be performed when donation is planned to recipients with anti-A antibodies.

3.3: Human leukocyte antigen (HLA) typing for major histocompatibility complex (MHC) Class I (A, B, C) and Class II (DP, DQ, DR) should be performed in donor candidates and their intended recipients, and donor-specific anti-HLA antibodies should be assessed in intended recipients.

### Counseling

3.4: Donor candidates who are ABO blood group or HLA incompatible with their intended recipient should be informed of availability, risks, and benefits of treatment options, including kidney paired donation and incompatibility management strategies.

3.5: If a donor candidate and their intended recipient are blood type or crossmatch incompatible, transplantation should be performed only with an effective incompatibility management strategy.

3.6: Nondirected donor candidates should be informed of availability, risks and benefits of participating in kidney paired donation.

## CHAPTER 4: PREOPERATIVE EVALUATION AND MANAGEMENT

4.1: Donor candidates should receive guideline-based evaluation and management used for other noncardiac surgeries to minimize risks of perioperative complications, including a detailed history and examination to assess risks for cardiac, pulmonary, bleeding, anesthesia-related and other perioperative complications.

4.2: Donor candidates who smoke should be advised to quit at least 4 weeks before donation to reduce their risk of perioperative complications, and commit to lifelong abstinence to prevent long-term complications.

## CHAPTER 5: PREDONATION KIDNEY FUNCTION

### Evaluation

5.1: Donor kidney function should be expressed as glomerular filtration rate (GFR) and not as serum creatinine concentration.

5.2: Donor GFR should be expressed in mL/min per 1.73 m$^2$ rather than mL/min.

5.3: Donor glomerular filtration rate (GFR) should be estimated from serum creatinine (eGFR$_{cr}$) for initial assessment, following recommendations from the KDIGO 2012 CKD guideline.

5.4: Donor GFR should be confirmed using one or more of the following measurements, depending on availability:

- Measured GFR (mGFR) using an exogenous filtration marker, preferably urinary or plasma clearance of inulin, urinary or plasma clearance of iothalamate, urinary or plasma clearance of $^{51}$Cr-EDTA, urinary or plasma clearance of iohexol, or urinary clearance of $^{99m}$Tc-DTPA

- Measured creatinine clearance (mCrCl)

- Estimated GFR from the combination of serum creatinine and cystatin C (eGFR$_{cr-cys}$) following recommendations from the KDIGO 2012 CKD guideline

- Repeat estimated GFR from serum creatinine (eGFR$_{cr}$)

5.5: If there are parenchymal, vascular or urological abnormalities or asymmetry of kidney size on renal imaging, single kidney GFR should be assessed using radionuclides or contrast agents that are excreted by glomerular filtration (eg, $^{99m}$Tc-DTPA).

### Selection

5.6: GFR of 90 mL/min per 1.73 m$^2$ or greater should be considered an acceptable level of kidney function for donation.

5.7: The decision to approve donor candidates with GFR 60 to 89 mL/min per 1.73 m$^2$ should be individualized based on demographic and health profile in relation to the transplant program's acceptable risk threshold.

5.8: Donor candidates with GFR less than 60 mL/min per 1.73 m$^2$ should not donate.

5.9: When asymmetry in GFR, parenchymal abnormalities, vascular abnormalities, or urological abnormalities are present but do not preclude donation, the more severely affected kidney should be used for donation.

### Counseling

5.10: We suggest that donor candidates be informed that the future risk of developing kidney failure necessitating treatment with dialysis or transplantation is slightly higher because of donation; however, average absolute risk in the 15 years following donation remains low. (2C)

## CHAPTER 6: PREDONATION ALBUMINURIA

### Evaluation

6.1: Donor proteinuria should be measured as albuminuria, not total urine protein.

C.Agnello   SE 0228

S10     **Transplantation** ■ August 2017 ■ Volume 101 ■ Number 8S     www.transplantjournal.com

6.2: Initial evaluation of donor albuminuria (screening) should be performed using urine albumin-to-creatinine ratio (ACR) in a random (untimed) urine specimen.

6.3: Donor albuminuria should be confirmed using:
- Albumin excretion rate (AER, mg/day [mg/d]) in a timed urine specimen
- Repeat ACR if AER cannot be obtained

### Selection

6.4: Urine AER less than 30 mg/d should be considered an acceptable level for donation.

6.5: The decision to approve donor candidates with AER 30 to 100 mg/d should be individualized based on demographic and health profile in relation to the transplant program's acceptable risk threshold.

6.6: Donor candidates with urine AER greater than 100 mg/d should not donate.

## CHAPTER 7: PREDONATION HEMATURIA

### Evaluation

7.1: Donor candidates should be assessed for microscopic hematuria.

7.2: Donor candidates with persistent microscopic hematuria should undergo testing to identify possible causes, which may include:
- Urinalysis and urine culture to assess for infection
- Cystoscopy and imaging to assess for urinary tract malignancy
- 24-hour urine stone panel to assess for nephrolithiasis and/or microlithiasis
- Kidney biopsy to assess for glomerular disease (eg, thin basement membrane nephropathy, IgA nephropathy, Alport syndrome)

### Selection

7.3: Donor candidates with hematuria from a reversible cause that resolves (eg, a treated infection) may be acceptable for donation.

7.4: Donor candidates with IgA nephropathy should not donate.

## CHAPTER 8: KIDNEY STONES

### Evaluation

8.1: Donor candidates should be asked about prior kidney stones, and related medical records should be reviewed if available.

8.2: The imaging performed to assess anatomy before donor nephrectomy (eg, computed tomography angiogram) should be reviewed for the presence of kidney stones.

8.3: Donor candidates with prior or current kidney stones should be assessed for an underlying cause.

### Selection

8.4: The acceptance of a donor candidate with prior or current kidney stones should be based on an assessment of stone recurrence risk and knowledge of the possible consequences of kidney stones after donation.

### Counseling

8.5: Donor candidates and donors with current or prior kidney stones should follow general population, evidence-based guidelines for the prevention of recurrent stones.

## CHAPTER 9: HYPERURICEMIA, GOUT, AND MINERAL AND BONE DISEASE

### Evaluation

9.1: Donor candidates should be asked about prior episodes of gout.

### Counseling

9.2: Donor candidates may be informed that donation is associated with an increase in serum uric acid concentration, which may increase the risk for gout.

9.3: Donor candidates and donors with prior episodes of gout should be informed of recommended methods to reduce their risk of future episodes of gout.

## CHAPTER 10: PREDONATION BLOOD PRESSURE

### Evaluation

10.1: Blood pressure should be measured before donation on at least 2 occasions by clinical staff trained in accurate measurement technique, using equipment calibrated for accuracy.

10.2: When the presence or absence of hypertension in a donor candidate is indeterminate based on history and clinic measurements (eg, blood pressure is high normal or variable), blood pressure should be further evaluated using ambulatory blood pressure monitoring (ABPM) or repeated using standardized blood pressure measurements.

### Selection

10.3: Normal blood pressure, as defined by guidelines for the general population in the country or region where donation is planned, is acceptable for donation.

10.4: Donor candidates with hypertension that can be controlled to systolic blood pressure less than 140 mm Hg and diastolic blood pressure less than 90 mm Hg using 1 or 2 antihypertensive agents, who do not have evidence of target organ damage, may be acceptable for donation. The decision to approve donor candidates with hypertension should be individualized based on demographic and health profile in relation to the transplant program's acceptable risk threshold.

### Counseling

10.5: Donor candidates should be counseled on lifestyle interventions to address modifiable risk factors for hypertension and cardiovascular disease, including healthy diet, smoking abstinence, achievement of healthy body weight, and regular exercise according to guidelines for the general population. These measures should be initiated before donation and maintained lifelong.

10.6: We suggest that donor candidates should be informed that blood pressure may rise with aging, and that donation may accelerate a rise in blood pressure and need for antihypertensive treatment over expectations with normal aging. (*2D*)

## CHAPTER 11: PREDONATION METABOLIC AND LIFESTYLE RISK FACTORS

### Identification of Metabolic and Lifestyle Risk Factors

11.1: Risk factors for kidney and cardiovascular disease should be identified before donation and addressed by counseling to promote long-term health.

C. Agnello     SE 0229

© 2017 Wolters Kluwer

## Obesity

11.2: Body mass index (BMI) should be computed based on weight and height measured before donation, and classified based on World Health Organization (WHO) criteria for the general population or race-specific categories.

11.3: The decision to approve donor candidates with obesity and BMI >30 kg/m$^2$ should be individualized based on demographic and health profile in relation to the transplant program's acceptable risk threshold.

11.4: Donor candidates who have had bariatric surgery should be assessed for risk of nephrolithiasis.

## Glucose Intolerance

11.5: Donor candidates should be asked about prior diagnosis of diabetes mellitus, gestational diabetes, and family history of diabetes.

11.6: Glycemia should be assessed by fasting blood glucose and/or glycated hemoglobin (HbA$_{1c}$) before donation.

11.7: 2-hour glucose tolerance or HbA$_{1c}$ testing should be performed in donor candidates with elevated fasting blood glucose, history of gestational diabetes, or family history of diabetes in a first-degree relative, and results should be used to classify diabetes or prediabetes status using established criteria for the general population.

11.8: Donor candidates with type 1 diabetes mellitus should not donate.

11.9: The decision to approve donor candidates with prediabetes or type 2 diabetes should be individualized based on demographic and health profile in relation to the transplant program's acceptable risk threshold.

11.10: Donor candidates with prediabetes or type 2 diabetes should be counseled that their condition may progress over time and may lead to end-organ complications.

## Dyslipidemias

11.11: Fasting lipid profile (including total cholesterol, LDL-C, HDL-C and triglycerides) should be measured as part of an overall cardiovascular risk assessment before donation.

11.12: The decision to approve donor candidates with dyslipidemia should be individualized based on demographic and health profile in relation to the transplant program's acceptable risk threshold.

## Tobacco Use

11.13: The use of tobacco products should be assessed before donation.

11.14: Donor candidates who use tobacco products should be counseled on the risks of perioperative complications, cancer, cardio-pulmonary disease and kidney failure, should be advised to abstain from use of tobacco products, and should be referred to a tobacco cessation support program if possible.

11.15: The decision to approve donor candidates who are active tobacco users should be individualized based on demographic and health profile in relation to the transplant program's acceptable risk threshold.

## CHAPTER 12: PREVENTING INFECTION TRANSMISSION

### Evaluation

12.1: Risk for human immunodeficiency virus (HIV), hepatitis B virus (HBV), and hepatitis C virus (HCV) infections should be assessed before donation.

12.2: Donor candidates should be assessed for factors associated with an increased likelihood of endemic or unexpected infections, including geographic, seasonal, occupational, animal and environmental exposures.

12.3: Donor candidates should complete a urinalysis and testing for HIV, HBV, HCV, cytomegalovirus (CMV), Epstein-Barr virus (EBV), and *Treponema pallidum* (syphilis).

12.4: If indicated by regional epidemiology or individual history, donor candidates should complete testing for *Mycobacterium tuberculosis*, *Strongyloides*, *Trypanosoma cruzi*, West Nile virus, Histoplasmosis, and/or Coccidiomycosis.

12.5: Transplant programs should develop protocols to screen donor candidates for emerging infections in consultation with local public health specialists.

12.6: In general, donor infection risk factor and microbiological assessments should be performed or updated as close in time to donation as possible. For HIV, HBV and HCV, screening should be current within 28 days of donation.

### Selection

12.7: If a donor candidate is found to have a potentially transmissible infection, then the donor candidate, intended recipient and transplant program team should weigh the risks and benefits of proceeding with donation.

## CHAPTER 13: CANCER SCREENING

### Evaluation

13.1: Donor candidates should undergo cancer screening consistent with clinical practice guidelines for the country or region where the donor candidate resides. Transplant programs should ensure that screening is current according to guideline criteria at the time of donation.

### Selection

13.2: In general, donor candidates with active malignancy should be excluded from donation. In some cases of active malignancy with low transmission risk, a clear management plan and minimal risk to the donor, donation may be considered.

13.3: A kidney with a small simple (Bosniak I) cyst can be left in the donor, particularly if there are compelling reasons for donating the contralateral kidney.

13.4: Donation of a kidney with a Bosniak II renal cyst should proceed only after assessment for the presence of solid components, septations, and calcifications on the preoperative computed tomography scan (or magnetic resonance imaging) to avoid accidental transplantation of a kidney with cystic renal cell carcinoma.

13.5: Donor candidates with high grade Bosniak renal cysts (III or higher) or small (T1a) renal cell carcinoma curable by nephrectomy may be acceptable for donation on a case-by-case basis.

13.6: Donor candidates with a history of treated cancer that has a low risk of transmission or recurrence may be acceptable for donation on a case-by-case basis.

## CHAPTER 14: EVALUATION OF GENETIC KIDNEY DISEASE

### Evaluation

14.1: Donor candidates should be asked about their family history of kidney disease, and when present, the type

S12     **Transplantation** ■ August 2017 ■ Volume 101 ■ Number 8S2     www.transplantjournal.com

of disease, time of onset, and extra-renal manifestations associated with the disease.

14.2: When the intended recipient is genetically related to the donor candidate, the cause of the intended recipient's kidney failure should be determined whenever possible. The intended recipient should consent to share this medical information with the donor evaluation team, and with the donor candidate if it could affect the decision to donate.

### Selection

14.3: Donor candidates found to have a genetic kidney disease that can cause kidney failure should not donate.

### Counseling

14.4: Donor candidates must provide informed consent for genetic testing if indicated as part of their evaluation. Donor candidates should be informed of the possible effects of receiving a diagnosis of a genetic kidney disease, such as any impact on their ability to obtain health or life insurance.

14.5: In cases where it remains uncertain whether the donor candidate has a genetic kidney disease and whether the disease can cause kidney failure, donation should proceed only after informing the donor candidate of the risks of donation if the disease manifests later in life.

### Autosomal Dominant Polycystic Kidney Disease (ADPKD)

14.6: Donor candidates with ADPKD should not donate.

14.7: Donor candidates with a family history of ADPKD in a first-degree relative may be acceptable for donation if they meet age-specific imaging or genetic testing criteria that reliably exclude ADPKD.

### Apolipoprotein L1 (*APOL1*) Risk Alleles

14.8: Apolipoprotein L1 (*APOL1*) genotyping may be offered to donor candidates with sub-Saharan African ancestors. Donor candidates should be informed that having 2 *APOL1* risk alleles increases the lifetime risk of kidney failure but that the precise kidney failure risk for an affected individual after donation cannot currently be quantified.

## CHAPTER 15: PREGNANCY

### Evaluation

15.1: Female donor candidates should be asked about future childbearing plans.

15.2: Female donor candidates should be asked about prior hypertensive disorders of pregnancy (eg, gestational hypertension, preeclampsia, or eclampsia).

15.3: Local guidelines should be followed to confirm the absence of pregnancy before performing radiologic tests, including abdominal computed tomography (with iodinated contrast) or nuclear medicine GFR testing.

### Selection

15.4: Women should not donate while pregnant.

15.5: Women should not be excluded from donation solely because they desire to conceive children after donation.

15.6: Women with a prior hypertensive disorder of pregnancy may be acceptable for donation if their long-term postdonation risks are acceptable.

15.7: A decision to proceed with donation in the year after childbirth should consider the psychological needs of mother and child, and should include anesthesia and analgesia planning for nursing mothers.

### Counseling

15.8: Women with childbearing potential should be informed of the need to avoid becoming pregnant from the time of approval for donation to the time of recovery after nephrectomy; a quantitative human chorionic gonadotropin (β-hCG) pregnancy test should be performed and confirmed as negative immediately before donation.

15.9: We suggest that women with childbearing potential be counseled about the effects donation may have on future pregnancies, including the possibility of a greater likelihood of being diagnosed with gestational hypertension or preeclampsia. (2C)

15.10: Women with a prior hypertensive disorder of pregnancy should be informed about their long-term risks.

15.11: Women with childbearing potential who proceed with donation should be counseled on how to reduce the risk of complications in future pregnancies.

## CHAPTER 16: PSYCHOSOCIAL EVALUATION

### Evaluation

16.1: Donor candidates should receive in-person psychosocial evaluation, education and planning from health professionals experienced in the psychosocial concerns of donor candidates and donors.

16.2: To ensure voluntariness, at least a portion of the psychosocial evaluation of the donor candidate should be performed in the absence of the intended recipient, family members and other persons who could influence the donation decision.

16.3: Whenever possible, the psychosocial evaluation of the donor candidate should be performed by health professionals not involved in the care of the intended recipient.

16.4: Transplant programs should follow protocols for assessing the donor candidate's psychosocial suitability, available support, preparation and concerns for donation.

### Selection

16.5: Transplant programs should follow protocols defining psychosocial factors that either exclude donation, or prevent further evaluation until resolution.

### Disclosures and Support

16.6: We suggest that donor candidates be informed that donors usually have good quality of life after donation (2D).

16.7: Transplant programs should assist donor candidates and donors in receiving psychosocial or psychiatric support as needed.

## CHAPTER 17: ACCEPTABLE SURGICAL APPROACHES FOR DONOR NEPHRECTOMY

17.1: Renal imaging (eg, computed tomographic angiography) should be performed in all donor candidates to assess renal anatomy before nephrectomy.

17.2: The surgeon should have adequate training and experience for the surgical approach used for the donor nephrectomy.

17.3: We suggest that "mini-open" laparoscopy or hand-assisted laparoscopy by trained surgeons should be offered as optimal approaches to donor nephrectomy.

*C.Agnello   SE 0231*

© 2017 Wolters Kluwer

However, in some circumstances, such as for donors with extensive previous surgery and/or adhesions, and at centers where laparoscopy is not routinely performed, open nephrectomy (flank or laparotomy) may be acceptable. (*2D*)

17.4: Robotic, single-port, and natural orifice transluminal nephrectomy should generally not be used for donor nephrectomy.

17.5: Nontransfixing clips, (eg, Weck Hem-o-lok) should not be used to ligate the renal artery in donor nephrectomy; instead, renal artery transfixation by suture ligature or anchor staple within the vessel wall should be used.

17.6: In the absence of reasons to procure the right kidney (vascular, urological or other abnormalities), the left kidney should be procured in laparoscopic donor nephrectomy because of the relative technical ease associated with a longer venous pedicle.

17.7: We suggest laparoscopic procurement of the right rather than the left living donor kidney may be performed if the surgeon has adequate training and experience. (*2D*)

17.8: Procurement of a living donor kidney with 3 or more arteries should only be undertaken by surgeons with adequate experience.

17.9: A donor candidate with atherosclerotic renal artery disease or fibromuscular dysplasia involving the orifices of both renal arteries should not donate.

# CHAPTER 18: ETHICAL, LEGAL AND POLICY CONSIDERATIONS

## Ethical and Legal Framework

18.1: Local laws and regulations on living donation should be followed and explained as needed to donor candidates.

18.2: Where local laws or policies impede the ethical practice of living donation, avenues to advocate for change should be explored.

18.3: Autonomy (self-determination) in the willingness or not to be considered as a living donor should be respected during all phases of the evaluation and donation processes. Transplant programs should support autonomy through a fully informed consent process.

## Policies for Donor Candidate Identification

18.4: Public awareness of opportunities for living donation should be increased through education, donor advocacy, evaluation efficiencies, and removal of disincentives.

18.5: Transplant candidates should be assisted in identifying living donor candidates, as long as these efforts respect donor autonomy and do not exert undue pressure to donate.

18.6: Donor candidates should be informed of the dangers of transplant tourism.

18.7: Transplant programs should define and disclose their policies for the acceptance of donor candidates identified through public solicitation.

## Financial Support

18.8: Donor candidates should be informed of the availability of legitimate financial assistance for expenses from evaluation and donation.

## Communication of Policies

18.9: Nondirected donors and donors participating in paired donation should be informed of the transplant program's policy on contact with the recipient and other paired donation participants at all stages in the donation process.

18.10: Transplant programs should disclose the extent of the expected postdonation program-patient relationship before donation, including whether the donor can seek medical care at the transplant center after donation.

18.11: Regional policies should ensure access to kidney replacement therapy (dialysis and/or transplantation) for donors who develop kidney failure.

# CHAPTER 19: POSTDONATION FOLLOW-UP CARE

19.1: A personalized postdonation care plan should be provided before donation to clearly describe follow-up care recommendations, who will provide the care, and how often.

19.2: The following should be performed at least annually postdonation:

- Blood pressure measurement
- BMI measurement
- Serum creatinine measurement with GFR estimation
- Albuminuria measurement
- Review and promotion of a healthy lifestyle including regular exercise, healthy diet and abstinence from tobacco
- Review and support of psychosocial health and well-being

19.3: Donors should be monitored for CKD, and those meeting criteria for CKD should be managed according to the 2012 KDIGO CKD Guideline.

19.4: Donors should receive age-appropriate healthcare maintenance, and management of clinical conditions and health risk factors according to clinical practice guidelines for the regional population.

# METHODS FOR GUIDELINE DEVELOPMENT

## AIM

The overall aim of this project was to develop an evidence-based clinical practice guideline on the evaluation and care of living kidney donors. The guideline consists of recommendation statements and supporting rationale, including summaries of systematically generated evidence on relevant predefined clinical topics. The general Kidney Disease: Improving Global Outcomes (KDIGO) guideline development method is described at: http://www.kdigo.org/home/guidelines/development, and unique considerations for application to the current guideline are discussed below.

## PROCESS

The development of the *KDIGO Clinical Practice Guideline on the Evaluation and Care of Living Kidney Donors* included:

- Appointing work group (WG) members and the Evidence Review Team (ERT)
- Discussing guideline development processes and methods
- Developing guideline scope of work, including submission of proposed topics for public comment, and refining topics based on public feedback
- Identifying populations, interventions, risk factors, and outcomes of interest
- Selecting topics for systematic evidence review and conducting the literature review by:

S14     Transplantation ■ August 2017 ■ Volume 101 ■ Number 8S     www.transplantjournal.com

○ Developing and implementing literature search strategies
○ Screening abstracts and retrieving full-text articles based on predefined eligibility criteria
○ Creating data extraction forms
○ Extracting data from individual studies
○ Standardizing methodology for evidence quality assessment
○ Tabulating data from individual studies into summary tables and performing critical appraisal of the literature
○ Grading quality of evidence for each outcome across studies, and assessing the overall quality of evidence across outcomes with the aid of evidence profiles

• Where applicable, grading recommendation strength based on the quality of evidence and other considerations for recommendations with available evidence in the systematic review
• Using *de novo* evidence generation, WG consensus and prior KDIGO Guidelines to develop recommendations on topics not assigned to formal systematic review, but deemed important for the guideline
• Developing supporting rationale and finalizing guideline recommendations
• Distributing the guideline draft for public review from November to December 2015
• Editing the guideline based on public feedback, and creating the point-by-point response

The WG cochairs, KDIGO cochairs and ERT met to review the guideline development process, evidence review topics, and systematic review process. After this, 2 in-person meetings were held May 2014 and September 2014 with the WG, ERT, KDIGO cochairs and KDIGO support staff to review the available evidence, formulate recommendation statements and their rationale. Details of each chapter were discussed by teleconference between the WG cochairs, WG members and support staff before each in-person meeting, and by email. The WG cochairs, ERT, and support staff also held regular calls until completion of the evidence review and systematic review report, and the WG cochairs, KDIGO Chair and support staff met by regular teleconferences until guideline completion.

## Commissioning of the WG and the ERT

The KDIGO cochairs appointed the WG cochairs, who then assembled the WG to include individuals with expertise in nephrology, organ donation, transplantation, surgery, bioethics, psychology, epidemiology and public policy. The University of Minnesota Veterans Administration Center for Chronic Disease Outcomes Research in Minneapolis, Minnesota was contracted to conduct systematic evidence review and provided expertise in guideline development methodology. The ERT was led by guideline methodologists and clinicians with expertise in nephrology and evidence-based clinical practice guideline development.

## Defining the Scope and Topics

The WG cochairs and the ERT defined the scope and goals of the guideline (including a list of critical and important outcomes) and drafted a preliminary list of topics and key clinical questions. The project scope was submitted for public comment in October 2013 and refined based on the feedback. The WG and ERT further developed and refined each topic and specified screening criteria, literature search strategies, and data extraction forms.

## Establishing the Process for Guideline Development

The ERT performed a systematic literature search and organized abstract and article screening. The ERT also coordinated the methodological and analytical processes and defined and standardized the methodology for performing literature searches, data extraction, and summarizing the evidence. The WG wrote the recommendation statements and supporting rationale, in consultation with the ERT. For recommendations with available evidence in the systematic review, the ERT reviewed draft recommendation statements and their corresponding grades for consistency with the conclusions of the evidence systematic review.

## Formulating Questions of Interest

The KDIGO WG developed a scoping document to describe topics to be covered by the guideline. To inform the WG's initial work, the ERT searched for and identified existing clinical practice guidelines related to living kidney donation. The ERT extracted recommendations from prior guidelines on the identified topics of interest for the current guideline and provided a summary table of this information. This document was distributed to the WG in 2013. Certain topics within the scoping document were considered relevant to the systematic review based on importance and feasibility, and the ERT developed key research questions to address these topics (Table 1). The Population, Intervention, Comparator, Outcome, study Design, and Duration of follow-up (PICODDs) criteria for the systematic review (Table 2) are described in detail in an accompanying publication.[3] Outcomes were selected and ranked by assessing patient-centeredness. Risk assessment periods were defined as perinephrectomy/postnephrectomy (within 90 days of donation), and longer-term (after 90 days postdonation until the end of available follow-up). Long-term outcomes were based on a mean follow-up of at least 5 years.

## Ranking of Outcomes

The WG ranked outcomes of interest based on their importance for informing clinical decision making, as "critical",

| TABLE 1. |
|---|
| **Key questions defining the evidence review** |
| Key Question 1: What is the incidence of perinephrectomy/postnephrectomy outcomes among living kidney donors undergoing different types of nephrectomy procedures? |
| Key Question 2: Does the incidence of perinephrectomy/postnephrectomy outcomes vary by demographic subgroup (age, race, sex)? |
| Key Question 3: Does the incidence of perinephrectomy/postnephrectomy outcomes vary by the presence of donor IMAs (ie, obesity, hypertension, glucose intolerance)? |
| Key Question 4: What is the incidence of long-term health outcomes for living kidney donors compared with healthy nondonors? |
| Key Question 5: Does the incidence of long-term living kidney donor outcomes vary by demographic subgroup (age, race, sex)? |
| Key Question 6: Does the incidence of long-term living kidney donor outcomes vary by the presence of donor IMAs (ie, obesity, hypertension, glucose intolerance)? |
| Key Question 7: What is the incidence of maternal and fetal outcomes among female living kidney donors who become pregnant after donation compared with healthy nondonors? |

IMA, isolated medical abnormality.

© 2017 Wolters Kluwer

**TABLE 2.**

**Systematic review screening criteria**

**Living kidney donor outcomes**

| | Perinephrectomy/postnephrectomy | Long-term |
|---|---|---|
| Population | Living kidney donors | Living kidney donors |
| | | Living kidney donors—demographic subgroup (age, sex, race) |
| | | Living kidney donors with specific IMAs |
| | | Donors related to recipient or with known family history of kidney disease |
| | | Women with postdonation pregnancy |
| Intervention | Nephrectomy performed post-1994 | Living kidney donation |
| | Nephrectomy in donors with IMAs | |
| Comparator | Nephrectomy with different types of surgery; | Healthy nondonors [a] (ie, nondonor with medical characteristics |
| | Nephrectomy in donors without IMAs | suggesting they meet living donor criteria)) |
| | | Living kidney donors—demographic subgroups (age, sex, race) |
| | | Healthy nondonors [a]—demographic subgroups (age, sex, race) |
| | | Living kidney donors—without specific IMAs |
| | | Healthy nondonors [a]—with specific IMAs |
| | | Donors with unrelated recipient and no family history of kidney disease |
| | | Donors with predonation pregnancy |
| | | Healthy nondonors with pregnancy |
| Outcomes | Critical: all-cause mortality | Critical: all-cause mortality, CVD event, kidney failure, fetal death |
| | High Importance: CVD event | High importance: psychosocial outcomes, major pregnancy complications |
| | Moderate Importance: perinephrectomy/postnephrectomy | Moderate importance: fragility fractures, gastrointestinal bleeding, |
| | complications; time to return to usual activities | kidney stones, minor pregnancy complications |
| | Intermediate Outcomes: blood loss; length | Intermediate outcomes: kidney function, proteinuria, hypertension |
| | of hospital stay | |
| Study design | Systematic reviews, randomized controlled | Systematic reviews, randomized controlled trials, and observational studies |
| | trials, and observational studies | Full-text screening identified studies with total sample sizes (donor and |
| | | comparator combined) more than 50; studies with |
| | | total sample sizes more than 100 were extracted |
| Duration of follow-up | Systematic reviews with outcomes measured up | Full-text screening identified studies with outcomes measured 1 y |
| | to 90 d postnephrectomy were extracted | or later postdonation; studies with a mean duration of 5 y or more |
| | Full-text screening identified studies with outcomes | postdonation were extracted |
| | measured up to 1 y postdonation for extraction | |

[a] "Healthy" nondonor comparison groups must have matched or controlled for demographic and health characteristics. CVD, cardiovascular disease; IMA, isolated medical abnormality.

"high" or "moderate." The hierarchy of perinephrectomy/postnephrectomy and long-term outcomes is noted in Table 2. "Intermediate outcomes" are defined as events on the pathway to clinical outcomes of interest.

**Literature Searches and Article Selection**

The ERT searched Ovid Medline, Ovid EMBASE, and the Cochrane Library to identify previous systematic reviews, randomized controlled trials (RCTs), and observational studies published and indexed in bibliographic databases through September 2014. The ERT search strategy included relevant medical subject headings and natural language terms for the concept of living kidney donation (**Supplemental Appendix A, SDC,** http://links.lww.com/TP/B432). These terms were combined with filters to select RCTs, systematic reviews, and observational studies. Bibliographic database searches were supplemented with citation searches of highly relevant systematic reviews.

Two independent investigators reviewed titles and abstracts of search results published after 2003 to identify systematic reviews, trials and observational studies relevant to the key questions. The ERT relied on citation searching of relevant systematic reviews to identify relevant studies published before 2004. Citations deemed eligible by either investigator underwent full text screening. Two investigators independently screened full text to determine if PICODD criteria were met. A third investigator resolved discrepancies. The ERT documented the inclusion and exclusion status of citations undergoing full-text screening. The ERT often revisited the screening process as the WG identified new outcomes or subgroups not included in the original PICODDs. Screening criteria were liberal. The ERT did not extract data from all eligible studies. To capture the highest quality and most relevant and meaningful data as efficiently as possible, the ERT extracted data only from previous systematic reviews for perinephrectomy/postnephrectomy outcomes Key Questions (KQ1-3) and from systematic reviews and select observational studies for long-term outcomes (KQ 4-7). The ERT extracted long-term outcomes data from observational studies with sample sizes over 100 and mean follow-up time of at least 5 years.

Explicit recognition of perspectives of comparison is critical for drawing inferences about donor health outcomes (eg, estimation of predonation risk, absolute postdonation risk, and donation-attributable risk)[4] (Figure 1), and types of comparison were a critical consideration throughout the development of this guideline, including the design and conduct of the evidence review. Studies reporting long-term outcomes were required to include a nondonor comparison



**FIGURE 1.** Perspectives of risk in living kidney donation. These perspectives provide a framework for assessment of donor outcomes, interpretation of observations, patient communication, and future research design. LKD, living kidney donors. Adapted with permission from Lentine KL, Segev DL. Understanding and communicating medical risks for living kidney donors: a matter of perspective. *J Am Soc Nephrol.* 2017;28:12-24.[4]

group with baseline health characteristics similar to kidney donors. Studies comparing living kidney donors to the general population were not eligible.

### Data Extraction and Summary Tables

For perinephrectomy/postnephrectomy outcomes defined in the search criteria, the ERT extracted data from relevant comparisons in recent systematic reviews rather than performing a *de novo* extraction process. The ERT extracted relevant narrative information from systematic reviews that did not provide meta-analyses. For long-term outcomes defined in the search criteria, the ERT extracted data from observational studies and extracted pooled results from previous meta-analyses.

One investigator extracted relevant study, population demographic, and outcomes data from studies eligible for full extraction. Data fields extracted included author, year of publication, setting, donor and comparison populations, inclusion and exclusion criteria, donor and comparison characteristics, follow-up duration, descriptions, and results of outcomes. Relevant data were extracted into tables for descriptive analysis. In several cases, many comparisons were made within the same published study. In these cases, the ERT extracted relevant comparisons but did not extract ineligible comparisons.

### Assessment of Prior Systematic Review Quality and Individual Study Risk of Bias

The ERT assessed the quality of eligible systematic reviews using modified A Measurement Tool to Assess Systematic Reviews (AMSTAR) criteria.[5] The ERT assessed risk of bias for observational studies using an instrument developed based on the Research Triangle Institute Item Bank for assessing risk of bias and confounding in observational studies of interventions or exposures.[6] In this instrument, overall summary risk of bias is based upon the collective risk of bias inherent in each domain and confidence that results are believable given study limitations. The ERT used overall summary risk of bias assessments when grading evidence quality as described below.

### Evidence Profiles

The structured GRADE approach was used to grade the quality of the overall evidence (Table 3). Evidence profiles consisting of tables examining all relevant outcomes, including a summary of the results and judgments about the certainty and quality of the evidence, were used to facilitate this process. The GRADE approach is prescriptive in how evidence quality is assessed. The study design suggests the initial quality of evidence: high for RCTs and low for observational studies. Of note for the current guideline, most studies of outcomes in living kidney donation are not ethically or practically amenable to randomized controlled designs, limiting the possible quality rating based on the nature of possible study designs. Evidence quality is then lowered by one level if the studies in the evidence base for a comparison have serious risk of bias, and by 2 levels if the evidence base has very serious risk of bias. Evidence quality is also lowered when results across studies are inconsistent or

C.Agnello    SE 0235

© 2017 Wolters Kluwer

**TABLE 3.**

**Evidence quality assessment criteria**

| Study design | Quality of evidence | Lower if | Higher if |
|---|---|---|---|
| *Randomized trial* | *High* | Risk of Bias<br>−1 Serious<br>−2 Very serious | *Large effect*<br>+1 Large<br>+2 Very Large |
| | *Moderate* | Inconsistency<br>−1 Serious<br>−2 Very serious | +1 If all plausible confounding would reduce a demonstrated effect or<br>+1 If all plausible confounding would suggest a spurious |
| *Observational study* | *Low* | Indirectness<br>−1 Serious<br>−2 Very serious<br>Imprecision<br>−1 Serious<br>−2 Very serious | effect when results show no effect |
| | *Very Low* | Publication bias<br>−1 Likely | |

very inconsistent, if the relationship between the intervention and the outcome is indirect, or if the outcome does not directly influence patient well-being. Additionally, evidence quality is downgraded when estimates are imprecise and publication bias is likely. Evidence quality improves with a large effect size. A large effect size includes a relative risk (RR) confidence interval (CI) lower limit of at least 2; a very large effect size includes a RR CI lower limit of 5. Evidence quality is also increased when an effect is demonstrated after all plausible confounding has been addressed. Complete evidence profiles for KQs 1-7 can be found in the **Supplemental Evidence Report: Outcomes of Living Kidney Donation: A Systematic Review for a Clinical Practice Guideline by the Kidney Diseases Improving Global Outcomes (KDIGO), SDC,** http://links.lww.com/TP/B434. Evidence on long-term outcomes as reviewed and appraised by the ERT has also been published separately as part of this guideline systematic review.[3]

**Results of the Systematic Review**

The ERT's search identified 4530 citations, of which 414 met criteria for full text review after title and abstract screening. The ERT identified an additional 70 references via supplemental citation searching, yielding a total of 484 references for full text review (Figure 2). Studies excluded after full-text review and exclusion reasons are listed in **Supplemental Appendix B, SDC,** http://links.lww.com/TP/B432, of the evidence review publication.

The ERT extracted study characteristics, conducted systematic review quality assessments and risk-of-bias assessments, and extracted relevant outcomes into evidence tables for all studies eligible for extraction (**Supplemental Appendix C, SDC,**



**FIGURE 2.** Literature flow diagram. SR, systematic review.

S18     *Transplantation* ■ August 2017 ■ Volume 101 ■ Number 8S     www.transplantjournal.com

http://links.lww.com/TP/B432 for perioperative/postoperative studies; **Supplemental Appendix D, SDC,** http://links.lww.com/TP/B432 for long-term outcomes studies of the evidence review publication; **Evidence Report, SDC,** http://links.lww.com/TP/B434). Results were grouped by Key Question.

### De Novo Evidence Generation

In developing the current guideline, the WG concluded that the framework for assessing the acceptability of candidates for living kidney donation needed to be restructured to include a comprehensive determination of risk to the donor, based on simultaneous consideration of a composite profile of risk factors. No previous guidelines have advocated for this approach to the evaluation of living donor candidates, and there is a paucity of data to demonstrate its feasibility and applicability. The WG therefore collaborated with the Chronic Kidney Disease-Prognosis Consortium (CKD-PC) to conduct a meta-analysis to produce a comprehensive risk-prediction model for end-stage kidney disease (ESKD) applicable to donor candidates. The development and application of this clinical prediction tool are described in chapter 1 (Framework) of this guideline and in a separate publication.[7]

To inform choice of methods for kidney function estimation in the donor candidate evaluation, a web-based calculator was developed to compute posttest probabilities for measured glomerular filtration rate (mGFR) above or below threshold probabilities for decision-making based on estimated glomerular filtration rate (eGFR). The development and application of this clinical tool are described in chapter 5 (Kidney Function) of this guideline and in a separate publication.[8]

### Grading the Quality of Evidence and the Strength of Guideline Recommendations

A structured approach, based on GRADE[1,9,10] and facilitated by the use of evidence profiles, was used to grade the quality of the overall evidence and the strength of recommendations. For each topic with recommendations informed by the systematic review, the discussion of grading evidence quality was led by the ERT, and the discussion regarding the strength of the recommendations was led by the WG cochairs. The "strength of a recommendation" indicates the extent to which one can be confident that adherence to the recommendation will do more good than harm. The "quality of a body of evidence" refers to the extent to which confidence in an estimate of effect is sufficient to support a recommendation.

### Grading the Strength of the Recommendations

The strength of a recommendation is graded as level 1 or level 2. Table 4 shows the KDIGO nomenclature for grading the strength of a recommendation and the implications of each level for patients, clinicians, and policy makers. Recommendations can be for or against doing something. Each recommendation includes an explicit link between the quality of the available evidence and the strength of that recommendation. However, the strength of a recommendation is determined not only by the quality of the evidence, but also by other, often complex judgments regarding the size of the net medical benefit (potential risks vs benefit), values, and preferences, and costs (Table 5). Formal decision analyses including cost analysis were not conducted.

### Grading the Overall Quality of Evidence

The quality of the overall body of evidence was then determined on the basis of the quality grades for all outcomes of interest, taking into account explicit judgments about the relative importance of each outcome. The resulting 4 final categories for the quality of overall evidence were: "A," "B," "C," or "D" (Table 6).

### Ungraded Statements

This category was designed to allow the WG to issue advice on topics not explicitly addressed in the systematic review. The current guideline is notable in that many clinically important topics in living donation are not ethically or practically amenable to randomized controlled study designs and have not been not addressed in controlled observational studies. Thus, many recommendations were generated on topics deemed important for the care of living donors that were not addressed by eligible studies in the systematic evidence review. These recommendations were developed using other literature and WG consensus, and are therefore 'ungraded.'

As a result, very few of the guideline recommendations were rated for strength of the recommendation and quality of the evidence. This is not to say that there was no evidence for such "ungraded" guideline recommendations, but the WG and ERT only graded recommendations that were included as part of the ERT's systematic review and fulfilled the a priori search inclusion criteria. The WG felt that such "good practice statements" were necessary to address important aspects of donor care, and their preponderance may

---

**TABLE 4.**

**KDIGO nomenclature and description for grading recommendations**

| Grade[a] | Implications | | |
| | Patients | Clinicians | Policy |
|---|---|---|---|
| Level 1 'We recommend' | Most people in your situation would want the recommended course of action and only a small proportion would not | Most patients should receive the recommended course of action | The recommendation can be evaluated as a candidate for developing a policy or a performance measure |
| Level 2 'We suggest' | The majority of people in your situation would want the recommended course of action, but many would not | Different choices will be appropriate for different patients. Each patient needs help to arrive at a management decision consistent with her or his values and preferences | The recommendation is likely to require substantial debate and involvement of stakeholders before policy can be determined |

[a] The additional category 'Not Graded' is used, typically, to provide guidance based on common sense or where the topic does not allow adequate application of evidence. The most common examples include recommendations regarding monitoring intervals, counseling, and referral to other clinical specialists. Ungraded recommendations are generally written as simple declarative statements, but are not meant to be interpreted as being stronger recommendations than Level 1 or 2 recommendations.

C. Agnello   SE 0237

© 2017 Wolters Kluwer

**TABLE 5.**

**Determinants of strength of a recommendation**

| Factors | Comments |
|---|---|
| Balance between desirable and undesirable effects | The larger the difference between the desirable and undesirable effects, the more likely a strong recommendation is warranted. The narrower the gradient, the more likely a weak recommendation is warranted |
| Quality of the evidence | The higher the quality of evidence, the more likely a strong recommendation is warranted |
| Values and preferences | The more variability in values and preferences, or the more uncertainty in values and preferences, the more likely a weak recommendation is warranted. Values and preferences were obtained from the literature where possible or were assessed in the judgment of the work group where robust evidence was not identified |
| Costs (resource allocation) | The higher the costs of an intervention—that is, the more resources consumed—the less likely a strong recommendation is warranted |

be attributed to numerous reasons as stated in Table 7.[11] When the WG determined that there was evidence for a recommendation that was outside the scope of the ERT review, this was indicated in the rationale for that recommendation. It is also important to note that when recommendations from other KDIGO WGs were modified for the purpose of this guideline, the prior grading was provided in the rationale but the adapted recommendations were not graded so as to limit grading only to statements derived from the *de novo* systematic review performed for this guideline.

### Developing the Recommendations

Draft recommendation statements were developed by the WG cochairs and WG members with input from all WG members. The health risks and benefits associated with each recommendation were considered when formulating the guideline, as well as information on patient preferences when available. Recommendation statements were revised in a multi-step process during teleconferences and 2 face-to-face meetings, as well as in subsequent emails. All WG members provided feedback on initial and final drafts of the recommendations.

### Format for Recommendations

Each chapter contains one or more specific recommendations. When pertinent evidence was available in the systematic review, the strength of recommendation is indicated as level 1 or level 2 and the quality of the supporting evidence is shown as A, B, C, or D. When the ERT search parameters did not identify evidence from eligible studies pertinent to a recommendation, the statement is ungraded. In all cases, recommendation statements and grades (if applicable) are followed by rationale text summarizing the key points of the evidence base and the judgments supporting the recommendations. Research recommendations for future work to help resolve current uncertainties are also outlined at the conclusion of each chapter.

### Limitations of Systematic Review Approach

Although the literature searches were intended to be comprehensive, they were not exhaustive. Hand searches of journals were not performed, and review articles and textbook chapters were not systematically searched. However, any important studies known to domain experts that were missed by the electronic literature searches were added to retrieved articles and reviewed by the WG.

### Review of Guideline Development Process

Several tools and checklists have been developed to assess the quality of the methodological process for systematic review and guideline development. These include the Appraisal of Guidelines for Research and Evaluation (AGREE 2) criteria,[12] the Conference on Guideline Standardization (COGS) checklist,[13] and the Institute of Medicine's recent *Standards for Systematic Reviews*[14] and *Clinical Practice Guidelines We Can Trust*.[15] Table 8 displays the criteria which correspond to the COGS checklist and how each one is addressed in this guideline.

### Public Comment and Revision

A draft of the guideline was distributed for open public review in November 2015. The guideline was revised into final form by WG cochairs and members. A point-by-point response to all public comments is available online (**Supplemental Appendix E, SDC,** http://links.lww.com/TP/B433). All WG members approved the final version of the guideline.

### CHAPTER 1: GOALS OF EVALUATION, FRAMEWORK FOR DECISION-MAKING, AND ROLES AND RESPONSIBILITIES

The ERT search parameters did not identify evidence from eligible studies pertinent to the recommendations in chapter 1 and therefore the following recommendations are "Not Graded."

**TABLE 6.**

**Final grade for overall quality of evidence**

| Grade | Quality of evidence | Meaning |
|---|---|---|
| A | High | We are confident that the true effect lies close to that of the estimate of the effect |
| B | Moderate | The true effect is likely to be close to the estimate of the effect, but there is a possibility that it is substantially different |
| C | Low | The true effect may be substantially different from the estimate of the effect |
| D | Very low | The estimate of effect is very uncertain, and often will be far from the truth |

**TABLE 7.**

**Reasons why many ungraded recommendations are issued in this guideline**

The ERT's inclusion criteria (Table 2) are necessarily stringent given the limited time and resources for collecting and summarizing available evidence. As such, ungraded recommendations are issued:

- For topics that are not part of the ERT's inclusion criteria or when evidence lies outsides ERT's search yield
- In areas where the work group does not believe evidence is available (eg, recommendations grounded in ethics) or for which no there is no reasonable alternative (ie, based on common sense). Such recommendations may be deemed necessary because the work group considers such "good practice statements" essential especially when net benefit is great and unequivocal.
- In areas for which systematic review is not applicable (eg, monitoring intervals, counseling)
- Based on indirect evidence (eg, extrapolation of evidence from studies in general population)
- When adaped from prior KDIGO guidelines and extrapolated from different populations of interest (eg, general population or CKD population from KDIGO CKD Guideline)

CKD, chronic kidney disease; ERT, evidence review team; KDIGO, Kidney Disease: Improving Global Outcomes.

## Goals and Principles of Evaluation

1.1: The donor candidate's willingness to donate a kidney voluntarily without undue pressure should be verified.

1.2: The benefits and risks of kidney donation should be assessed for each donor candidate.

1.3: The decision to accept or exclude a donor candidate should follow transplant program policies.

1.4: Donor candidate decision-making should be facilitated through education and counseling on individualized risks and benefits, methods to minimize risks, and the need for postdonation follow-up.

1.5: For an accepted donor candidate, a plan for donation care and follow-up should be formulated to minimize risks of donation.

1.6: For an excluded donor candidate, a plan for any needed care and support should be formulated.

## Framework for Decision-Making

1.7: The donor candidate, the intended recipient, and the transplant program must all agree with the decision to proceed with donation in concordance with transplant program policies and informed consent.

1.8: Transplant program policies must be defensible based on current understanding of the risks and benefits of kidney donation, and should apply to all donor candidates evaluated at the center.

1.9: Each transplant program should establish policies describing psychosocial criteria that are acceptable for donation, including any program constraints on acceptable relationships between the donor candidate and the intended recipient.

1.10: All donor candidates should be evaluated using the same criteria, regardless of whether donation is directed towards a designated recipient.

1.11: Each transplant program should establish policies describing medical criteria that are acceptable for donation, addressing where possible, numeric thresholds for short-term and long-term postdonation risks above which the transplant program will not proceed with donation. Risks should be expressed as absolute rather than relative risks.

1.12: When possible, transplant programs should provide each donor candidate with individualized quantitative estimates of short-term and long-term risks from donation, including recognition of associated uncertainty, in a manner that is easily understood by donor candidates.

1.13: Transplant programs should evaluate donor candidate risks in comparison to predetermined thresholds for acceptance. If a donor candidate's postdonation risk is above the transplant program's acceptable risk threshold, the risk is not acceptable for donation. If a donor candidate's postdonation risk is below the transplant program's acceptable risk threshold, the candidate makes the decision whether or not to proceed with donation.

1.14: If a donor candidate is not acceptable, the transplant program should explain the reason for nonacceptance to the donor candidate.

1.15: Transplant programs should protect donor candidate's privacy regarding the evaluation, including all considerations in the decision to donate or not.

## Roles and Responsibilities

1.16: A multidisciplinary transplant program team knowledgeable in kidney donation and transplantation should evaluate, care for, and formulate a plan for donor care including long-term follow-up.

1.17: Transplant programs should minimize conflict of interest by providing at least one key team member not involved in the care or evaluation of the intended recipient who evaluates the donor candidate and participates in the determination of donor acceptance.

1.18: Transplant programs should conduct as efficient a donor evaluation as possible, meeting the needs of donor candidates, intended recipients and transplant programs.

## RATIONALE

### Goals and Principles of Donor Evaluation

Evaluation of candidates for living kidney donation requires balancing ethical principles of autonomy, beneficence, nonmaleficence, voluntarism and justice.[16] Determining acceptability or nonacceptability of donor candidates requires an assessment of their potential risks and anticipated benefits of donation, independent of intended recipient issues. Donation must be voluntary (autonomous), and the motivation for donation must be altruistic – to satisfy a well-considered desire to help another person. There must be protection from undue pressure or coercion at every step in the evaluation and donation process, including the option to confidentially withdraw from the evaluation or to decline to donate at any time with the full support of the transplant program.[17] In addition to these ethical principles, protection of patient privacy must be ensured. However, information regarding donor lifestyle, exposures or medical history that increase the risk for transmission of disease may need to be disclosed to the intended recipient for donation and transplantation to proceed; donor candidates should be given the opportunity to withdraw if they do not consent to sharing relevant personal health information in such circumstances.

© 2017 Wolters Kluwer

**TABLE 8.**

**The Conference on Guideline Standardization (COGS)[13] checklist for reporting clinical practice guidelines**

| Topic | Description | Discussed in KDIGO Clinical Practice Guideline on the Evaluation and Care of Living Kidney Donors |
|---|---|---|
| (1) Overview material | Provide a structured abstract that includes the guideline's release date, status (original, revised, updated), and print and electronic sources | Abstract and Methods for Guideline Development |
| (2) Focus | Describe the primary disease/condition and intervention/service/technology that the guideline addresses<br>Indicate any alternative preventative, diagnostic or therapeutic interventions that were considered during development | This guideline seeks to formalize the framework for decision making and evaluation process for living kidney donor candidates and to define the optimal postdonation follow-up care |
| (3) Goal | Describe the goal that following the guideline is expected to achieve, including the rationale for development of a guideline on this topic | This Clinical Practice Guideline is intended to assist the practitioner in evaluating living kidney donor candidates and optimizing the care for donors and their quality of life |
| (4) User/setting | Describe the intended users of the guideline (eg, provider types, patients) and the settings in which the guideline is intended to be used | Target audience is practicing nephrologists, transplant physicians and other allied health professionals who work in the setting of living kidney transplantation |
| (5) Target population | Describe the patient population eligible for guideline recommendations and list any exclusion criteria | Living kidney donors |
| (6) Developer | Identify the organization(s) responsible for guideline development and the names/credentials/potential conflicts of interest of individuals involved in the guideline's development | Organization: KDIGO<br>Names/credentials/potential conflicts of interest of individuals involved in the guideline's development are disclosed in the Biographic and Disclosure Information |
| (7) Funding source/sponsor | Identify the funding source/sponsor and describe its role in developing and/or reporting the guideline<br>Disclose potential conflict of interest | This guideline is supported by KDIGO with contributions from Canadian Blood Services, Canadian Society of Nephrology, Minneapolis Medical Research Foundation, and The Transplantation Society |
| (8) Evidence collection | Describe the methods used to search the scientific literature, including the range of dates and databases searched, and criteria applied to filter the retrieved evidence | Topics were triaged either to a) systematic review, b) systematic search followed by narrative summary (eg, prior living kidney donor guidelines), or c) narrative summary. The search was updated through September 2014 and supplemented by articles identified by work group members through January 2017. We also searched for pertinent existing guidelines and systematic reviews |
| (9) Recommendation grading criteria | Describe the criteria used to rate the quality of evidence that supports the recommendations and the system for describing the strength of the recommendations. Recommendation strength communicates the importance of adherence to a recommendation and is based on both the quality of the evidence and the magnitude of anticipated benefits and harms | Quality of evidence and strength of recommendations were graded following the GRADE approach (Tables 4 and 6). The work group could provide general guidance in ungraded statements |
| (10) Method for synthesizing evidence | Describe how evidence was used to create recommendations, eg, evidence tables, meta-analysis, decision analysis | For systematic review topics, summary tables and evidence profiles were generated |
| (11) Prerelease review | Describe how the guideline developer reviewed and/or tested the guidelines before release | The guideline had undergone external public review in November to December 2015. Public review comments were compiled and fed back to the work group, which considered the comments in its revision of the guideline |
| (12) Update plan | State whether or not there is a plan to update the guideline and, if applicable, an expiration date for this version of the guideline | The requirement for an update will be assessed on an ongoing basis from the publication date for potential important new evidence that may lead to changes to the recommendations |
| (13) Definitions | Define unfamiliar terms and those critical to correct application of the guideline that might be subject to misinterpretation | Abbreviations and Acronyms |
| (14) Recommendations and rationale | State the recommended action precisely and the specific circumstances under which to perform it<br>Justify each recommendation by describing the linkage between the recommendation and its supporting evidence<br>Indicate the quality of evidence and the recommendation strength, based on the criteria described in Topic 9 | This guideline contains recommendations for evaluation of kidney donor candidates and postdonation follow-up care. Each recommendation builds on a supporting rationale with evidence tables if available. The strength of the recommendation and the quality of evidence are provided in parenthesis within each recommendation, where applicable |

*Continued next page*

C.Agnello    SE 0240

**TABLE 8. (Continued)**

| Topic | Description | Discussed in KDIGO Clinical Practice Guideline on the Evaluation and Care of Living Kidney Donors |
|---|---|---|
| (15) Potential benefits and harms | Describe anticipated benefits and potential risks associated with implementation of guideline recommendations | The benefits and harm for each recommendation are provided in summary tables and summarized in evidence profiles where applicable. The estimated balance between potential benefits and harm was considered when formulating the recommendations |
| (16) Patient preferences | Describe the role of patient preferences when a recommendation involves a substantial element of personal choice or values | The inclusion of patient values and preferences is clearly articulated where appropriate |
| (17) Algorithm | Provide (when appropriate) a graphical description of the stages and decisions in clinical care described by the guideline | No overall algorithm |
| (18) Implementation considerations | Describe anticipated barriers to application of the recommendations | Review criteria were not suggested because implementation with prioritization and development of review criteria must proceed locally. Furthermore, most recommendations are discretionary, requiring substantial discussion among stakeholders before they can be adopted as review criteria |
| | Provide reference to any auxiliary documents for providers or patients that are intended to facilitate implementation | |
| | Suggest review criteria for measuring changes in care when the guideline is implemented | Research recommendations were also outlined to address current gaps in the evidence base |

GRADE, Grading of Recommendations Assessment, Development, and Evaluation; KDIGO, Kidney Disease: Improving Global Outcomes.

Preservation of donor candidate autonomy and minimization of short-term and long-term risks are high priorities in the practice of living donation. The transplant program has the responsibility to disclose anticipated risks and benefits to the donor candidate and intended recipient, tailored when possible for the characteristics of each donor candidate.[18] The donor candidate must have adequate time to make an informed decision and must accept the need for long-term follow-up. The transplant program must offer support for decision-making through education and the informed consent process, and has a responsibility to confirm that the donor candidate understands the likely risks and benefits of donation. The transplant program makes the final determination of acceptance of the donor candidate, based on the program's policies. The transplant program must have a mechanism for resolving disagreement among team members regarding acceptability of donor candidates that avoids conflicts of interest.

**A Quantitative Framework for Equitable Decision Making**

There will always be risks to living kidney donation. A central objective of donor candidate evaluation and selection is to minimize risks of short-term and long-term adverse outcomes after donation, and to ensure the risks are acceptable. Consistent, transparent and defensible decision-making to accept or decline a living kidney donor candidate has been limited by the lack of an evidence-based means to provide individualized, quantitative estimates of postdonation risk. Prior living kidney donor guidelines describe postdonation risk in relation to single predonation characteristics assessed in isolation, and generally agree on the single predonation characteristics that are associated with higher risks of poor postdonation outcomes. However, prior guidelines often differ on the recommended specific threshold for a characteristic that should be used to accept or decline living donor candidates, and are unclear about how values above or below the threshold alter the risk of postdonation outcomes. There have been several calls to improve the current status quo, and to support better shared decision making between donor candidates and their transplant professionals.[16,19-21]

An important advance is quantification of the combined impact of all of a donor candidate's predonation demographic (eg, age, sex, and race) and health characteristics at the time of evaluation (eg, kidney function, blood pressure [BP], body mass index [BMI], and so on) on the risk of serious adverse outcomes after donation. Serious postdonation adverse outcomes can be surgical, medical or psychosocial, and may occur during the perinephrectomy period, in a fixed period of long-term follow-up (eg, 15 years after donation), or for the remaining lifespan of the donor.

As described within this overall framework, a transplant program can use various methods to establish its threshold for acceptable outcomes after kidney donation. For example, if a transplant program decides a lifetime postdonation risk of kidney failure of up to 5% is acceptable, and if a candidate's projected risk is estimated to be above this threshold, the program should decline this candidate as a donor. Donor candidate autonomy does not overrule medical judgment and transplant professionals are ethically justified to decline a donor candidate when they believe the risk of poor postdonation outcomes is too high.[22] A poor outcome can have a very negative impact on the donor, on their recipient, and on public opinions about living donation.

Each transplant program should strive to develop and communicate a quantitative threshold of "acceptable risk" for each serious postdonation adverse outcome it wishes to avoid. Thresholds should be both evidence-based and consensus-based, and there are various sources of evidence and processes by which consensus can be achieved. Once established, a threshold should be applied consistently and transparently for all donor candidates evaluated by a program (unless subsequently revised). When a donor candidate's estimated risk is below the acceptable risk threshold, the transplant program should accept a donor candidate, and it should be the candidate's decision whether or not to proceed with living kidney donation after being informed of the risks. When a candidate's estimated risk is above the

C.Agnello  SE 0241

© 2017 Wolters Kluwer

acceptable threshold, the transplant program is justified in declining the candidate and can ground its decision in a quantitative framework (Figure 3).

During the development of this guideline we have advanced concepts and analyses to support this framework and approach. Here we discuss certain serious adverse outcomes and their amenability to quantitative risk estimation. We focus particularly on the postdonation development of kidney failure requiring dialysis or transplantation because it is a central outcome of a donor candidate's long-term risk. Finally, we describe the path for future work necessary to strengthen this framework, which includes the need for additional data.

### Perinephrectomy Outcomes

The incidence of perioperative death after living kidney donation is low. The 90-day all-cause mortality in a recent United States (US) study of 80 347 donors was reported to be approximately 1 in 3000 (0.03%) based on 25 deaths.[23] Similar rates have also been reported in other studies.[24,25] Given the low incidence of perioperative mortality, estimates for predonation characteristics that alter the risk of perioperative death are imprecise. For example, in this same study,[23] a predonation history of hypertension was associated with a 1 in 270 risk of 90-day mortality. However, this estimate was based only on 2 observed deaths, and the estimate would have substantially changed if 1 more or less death was observed; the 95% CI for the estimate was also wide, ranging from 1 in 75 to 1 in 2220. Thus, even if a transplant program defines an acceptable risk threshold for perinephrectomy mortality (for example, an incidence less than 1 in 1000), it will be difficult at this time to reliably determine a given donor candidate's estimated risk of this outcome according to their profile of predonation characteristics.

With respect to perioperative complications, the ERT identified 2 systematic reviews that examined perinephrectomy outcomes in relation to demographic and health characteristics of accepted donors. The ERT rated the quality of this evidence as very low (**Evidence Report Tables 6 and 7, SDC,** http://links.lww.com/TP/B434). In one review, a group of selected older donors (mean age, 66 years; range,

60 to 85 years at donation) did not differ statistically from a group of younger donors in their operative time, intraoperative blood loss, and length of hospital stay.[26] In both reviews, groups of selected obese donors (mean BMI of 34.5 kg/m²; range 32-39 kg/m²) did not differ statistically from groups of nonobese donors in their rates of perioperative complications, operative time, blood loss and length of hospital stay.[26,27]

Since then a large US study examined predonation characteristics associated with a higher risk of donor nephrectomy-related complications (as assessed through administrative data rather than adjudication, using a composite outcome of digestive, respiratory, procedural, urinary, hemorrhage, infectious or cardiac complications).[28] In this study, where each donor candidate characteristic was considered by itself (rather than as a combination of characteristics), complication rates were higher in men versus women (9.6% vs 7.2%); among African Americans (10.4%) and whites (8.7%) compared with other racial groups (6.3%); among donors without private insurance (8.5%) compared with those who had private insurance (7.3%); and among donors with hypertension (17.7%) compared with those without hypertension (7.9%).

A subsequent study integrated national US donor registry data from 2008 to 2012 with administrative records from a consortium of 98 academic hospitals and found that 16.8% of donors experienced a diagnosis or procedure for a perinephrectomy complication, most commonly gastrointestinal (4.4%), bleeding (3.0%), respiratory (2.5%), and surgical/anesthesia-related injuries (2.4%).[29] Major complications, defined as Clavien severity level 4 or 5, were identified in 2.5% of donors. After adjustment for demographic, clinical (including comorbidities), procedure, and center factors, compared with white donors, African Americans had significantly higher risks ($P < 0.05$) of experiencing any complication (18.2% vs 15.5%) and of experiencing major complications (3.7% vs 2.2%). Other significant correlates of major complications included obesity, predonation blood disorders, psychiatric conditions, and robotic nephrectomy, while greater annual hospital volume predicted lower risk.



**FIGURE 3.** Framework to accept or decline donor candidates based on a transplant program's threshold of acceptable postdonation risk. The decision by the transplant program to accept or decline a donor candidate is grounded on whether an individual's estimated postdonation risk is above or below the threshold set (dotted line) by the transplant program. The threshold may vary across transplant programs, but the same threshold should apply to all donor candidates at each program. For example, candidate A (green) would be acceptable because the estimated projected postdonation risk is far below the threshold. Candidate B (yellow) could be accepted with caution because the estimated projected postdonation risk is close but below the threshold, and candidate C (red) would be unacceptable because the estimated postdonation projected risk is far above the threshold.

As future data become available, it may become possible for transplant programs to estimate the risk of well-defined, serious perioperative complications according to a donor candidate's individual profile of baseline characteristics, and to compare these estimates to a threshold of acceptable risk to inform donor acceptance decisions.

### Long-term Outcomes

Donating a kidney is a decision with lifetime implications for the donor. While there are many outcomes to consider after kidney donation, a central outcome directly related to having one kidney removed is the long-term risk of developing kidney failure requiring dialysis or transplantation, commonly referred to as ESKD. Donor candidates often have a good understanding of the health effects of kidney failure, as their reason to donate is to treat the kidney failure of their intended recipient. For these reasons, we have grounded a quantitative framework for medical evaluation and acceptance of donor candidates on the long-term risk of postdonation kidney failure.

Each donor candidate has a long-term risk (cumulative incidence) of developing kidney failure that is influenced by the combination of risks conferred by their demographic and health characteristics at the time of evaluation plus risk attributable to donation (Figure 4). Demographic characteristics include age, sex, and race. Health characteristics include glomerular filtration rate (GFR), albuminuria, BMI, BP, diabetes status, smoking history, family history of kidney disease, and other factors. The risk attributable to donation may also vary according to demographic and health characteristics. Minimizing the lifetime risk of kidney failure in accepted donors is important to safeguard the practice, regardless of the degree to which it can be established that donation contributed to the risk of kidney failure.

Challenges to determining the postdonation lifetime risk of kidney failure based on current studies include limitations of study follow-up (the largest studies followed most donors for

less than 2 decades rather than for their lifetime).[30] The risk of kidney failure after donation is nonlinear, and is expected to be higher later (≥10 years) than earlier (<10 years) after donation.[31] When the WG was convened, 2 recent studies reported that the risk of kidney failure is higher in donors compared with risk among nondonors with similar baseline demographics. The ERT assessed the quality of evidence from these 2 studies as moderate (Table 2 of Slinin et al[3]).[30,32] Available data suggest that the average donation-attributable risk of kidney failure is approximately 27 per 10 000 (0.3%) at 15 years,[30] but there is substantial uncertainty in the estimate, and there are not sufficient data to project lifetime donation-attributable risk. Furthermore, the extent to which donation-attributable risk varies according to individual health characteristics is not known,[33,34] although available evidence suggests there is higher donation-attributable risks in some subgroups, such African Americans compared with white donors.[30]

Existing large population-based studies can help estimate the long-term risk of treated kidney failure in the *absence of donation*, based on a candidate's predonation health characteristics. Furthermore, if the risk of kidney failure attributable to donation becomes more precisely understood in relation to an individual's profile of baseline characteristics, then demographic-related, health status related, and donation-attributable risks can be aggregated to project individualized estimates of long-terms risks of postdonation kidney failure.

To help advance this paradigm, we enlisted the help of the CKD-Prognosis Consortium (CKD-PC) to develop a tool to project the 15-year and lifetime incidence of kidney failure in the absence of donation based on demographic and health characteristics at the time of evaluation in low-risk persons from large population cohorts. CKD-PC is a research group composed of investigators who analyze large cohort data and perform collaborative meta-analyses. The methods and results of these analyses are reviewed briefly here and



**FIGURE 4.** Framework to accept or decline donor candidates based on a transplant program's threshold of acceptable projected lifetime risk of kidney failure, quantified as the aggregate of risk related to demographic and health profile and donation-attributable risks. The decision by the transplant program whether to accept or decline a donor candidate is grounded on the candidate's estimated postdonation lifetime risk, including estimated risk in the absence of donation (risk related to demographic and health characteristics as denoted in blue and beige, respectively) and estimated risk attributable to donation (brown). BMI, body mass index; GFR, glomerular filtration rate.

C.Agnello  SE 0243

© 2017 Wolters Kluwer

presented in expanded form in a separate publication.[7] To project the estimated long-term incidence of kidney failure among persons who do not donate a kidney according to 10 demographic and health characteristics, risk associations were derived from a meta-analysis of 7 general population cohorts. Relative risks were calibrated to the population-level annual incidence of ESKD in the United States, derived from actual ESKD incidence and mortality data collected by the US Renal Data System and overall mortality data from the US Census.[35] Fifteen-year projections were compared with the observed risk among 52 998 living kidney donors in the United States. For estimation of relative risks related to health characteristics, a total of 4 933 314 participants from 7 cohorts were followed for a median of 4 to 16 years. For a 40-year-old person with health characteristics similar to those of age-matched kidney donors, the 15-year projections of ESKD risk in the absence of donation varied according to race and sex; the risk was 0.24% among black men, 0.15% among black women, 0.06% among white men, and 0.04% among white women. Risk projections were higher in the presence of lower eGFR, higher albuminuria, hypertension, current or former smoking, diabetes, and obesity. In the model-based lifetime projections, the risk of ESKD was highest among persons in the youngest age group, particularly among young black persons. The 15-year observed postdonation risks among kidney donors in the United States were 3.5 to 5.3 times as high as the projected risks in healthy persons in the absence of donation, according to sex and race.

This study has important limitations.[36] First, the projections were calibrated to historical incidence rates of ESKD from US population data. Annual incidence was derived with the use of life-table methods, which assume a constant age-, sex-, and race-specific incidence of ESKD over periods of decades and a static population substructure. Second, information on certain health characteristics of interest was not available, including heritable and environmental factors. The estimates reflect population averages for unmeasured characteristics. Donor candidates with a family history of kidney disease (especially younger candidates with such history) would be expected to have a higher risk of ESKD than projected. Third, the relative risk estimates were based on low-risk cohorts followed for a median of 4 to 16 years, based on an assumption of proportional hazards and after testing for nonproportionality. The analysis does not include untreated low GFR as an outcome, a condition that is more common among older persons, nor did it assess the risk of other outcomes, such as hypertension or pre-eclampsia, that have been linked to kidney donation. Finally, the analysis did not estimate the age at which ESKD would be expected develop in a donor candidate or the duration of ESKD before death.

The resulting risk models were incorporated into an online risk prediction tool for 15-year and lifetime ESKD risk (http://www.transplantmodels.com/esrdrisk/). Although the risk tool was developed specifically for the United States, the methods used may be adapted to other countries with the availability of local data sources. The WG endorses use of the online tool as the foundation for a new evaluation framework centered on simultaneous consideration of multiple demographic and health characteristics to predict long-term risk of an important outcome, while recognizing limitations in precision of risk estimates and uncertainty in donation-attributable risk. These models should be refined through further research to improve the precision and generalizability of predonation risk estimates and to incorporate estimates of indivdualized risk attributable to donation.

We endorse a quantitative framework for donor candidate evaluation and acceptance centered on lifetime risk of postdonation kidney failure (Table 9). For example, if a transplant program sets the acceptable lifetime postdonation ESKD risk threshold at 5%, and assumes a donation-attributable RR of 3.5 to 5.3 according to sex and race, then the acceptable predonation lifetime ESKD risk threshold would be approximately 1.0-1.5. This strategy enables decision-making based on a more comprehensive and integrated assessment of risk factors than is currently practiced, but application of the currently available online tool at this time requires clinician insight and interpretation.[37] Currently, there remains uncertainty in lifetime risk estimates, particularly for younger donor candidates, donors from developing countries, and ethnicities other than black or white race. At this time, transplant programs and donor candidates may consider other factors in their acceptance criteria for living kidney donation in addition to quantitative risk estimates. We see this work as starting point, and advocate strongly for continued efforts to improve the precision, tailoring and generalizability of predonation and postdonation risk estimates. Quantifying donation-attributable risk according to predonation demographic and health profile is a leading priority for future research, and we will update the online tool once estimates are available.

In summary, we advocate for a quantitative paradigm wherein transplant programs accept or decline donor candidates using the strongest evidence-based criteria currently available to simultaneously consider a profile of risk factors (demographic and health characteristics at evaluation and risk attributable to donation) and support consistent, transparent and defensible decisions. Ongoing efforts are needed to strengthen and advance this paradigm, including incorporation of data from cohorts observed for longer periods of time (ideally over the lifetime) and from diverse countries; estimation of risks related to genetic and familial factors; and quantification of donation-attributable risks

## TABLE 9.

**Approaches to implementation of a quantitative framework for donor candidate medical evaluation and acceptance centered on lifetime risk of kidney failure**

(1) Use the online tool (http://www.transplantmodels.com/esrdrisk/) to estimate the projected lifetime risk of kidney failure in the absence of donation according to baseline demographic and health characteristics included in the online tool

(2) Multiply the projected predonation risk by the best available estimate for donation-attributable risk to obtain the projected postdonation risk. For example, Grams et al[7] report a relative risk of 3.5 to 5.3 for 15-y end-stage kidney disease risk, according to sex and race

(3) Compare the projected risk estimate to the program's postdonation threshold of acceptable risk

(4) Exercise caution when there is concern that the individual has risk factors not captured in the online tool (eg, familial or genetic risk) and for younger candidates

S26   **Transplantation** ■ August 2017 ■ Volume 101 ■ Number 8S2   www.transplantjournal.com

**TABLE 10.**

**Roles and responsibilities of participants in donor candidate identification, evaluation, care, and follow-up**

| Entity | Responsibilities |
|---|---|
| General nephrologist/dialysis unit/advanced chronic kidney disease clinic | • Educate recipient candidates regarding early referral, preemptive and living donor transplantation options and resources for identifying donor candidates |
| Transplant program | • Educate recipient candidates regarding early referral, preemptive and living donor transplantation options |
| | • Educate donor candidates regarding all phases of the donation process including evaluation, surgery, postdonation follow-up, expected risks and outcomes, and existing uncertainties |
| Recipient candidate health insurance carrier | • Provide coverage for costs related to recipient candidate evaluation and transplantation, including coverage of donor candidate evaluation and treatment costs |
| Donor/donor candidate health insurance carrier | • Educate donor candidates regarding any anticipated out-of-pocket expenses related to evaluation and donation processes |
| | • Educate donor candidates regarding coverage for postdonation complications, both short-term and long-term after donation |
| Donor/donor candidate primary care physician | • Support donor candidates in their desire for information to make informed decisions |
| | • Participate in predonation and early postdonation care as needed |
| | • Participate in long-term care after donation |
| Donor/donor candidate physician/nephrologist | • Evaluate donor candidates without influence from recipient considerations |
| | • Oversee evaluation testing |
| | • Provide education regarding all phases of the donation process including postdonation follow-up |
| | • Participate in donor candidate selection |
| | • As needed, participate in care during the surgical hospitalization, in the early postdonation period, and long-term after donation, including serving as resource for primary providers |
| Donor surgeon | • Evaluate donor candidates for surgical risks and plan surgical approach |
| | • Provide education on the surgical procedure, risks and expected recovery |
| | • Participate in donor candidate selection |
| | • Provide care during surgery and perioperative period, and as needed postdonation |
| Nurse coordinator | • Educate donor candidates on recipient candidate treatment options and phases of the donation process |
| | • Facilitate and oversee completion of the evaluation |
| | • Assist with arranging surgery and inpatient care |
| | • Arrange and oversee postoperative care, and coordinate a plan for postdonation follow-up |
| Dietitian | • Review dietary habits and metabolic status including measures of obesity when needed |
| | • Provide guidance for nutritional treatment if indicated, including recommendations to address obesity |
| Social worker/psychologist/psychiatrist | • Perform donor candidate psychosocial evaluation including assessment of motivation |
| | • Educate donor candidates on recipient candidate treatment options |
| | • Provide donor candidates with information and support services related to donation, including information on resources that may be available to assist with donation-related expenses |
| | • Discuss potential adverse outcomes including loss of income because of donation, donation-related complications, or failure of the transplant. Assess the ability of donor candidates to cope with adverse outcomes |
| | • Support informed donation decisions |
| | • Assist donors with planning support around the time of donation and creation of a long-term follow-up plan |
| Independent living donor advocate [a] | • Verify that donor candidates have information needed to make a voluntary and informed decision on whether or not to donate |
| | • Verify consent for donation |
| | • Function independently from the recipient candidate's team |
| | • Advocate for the rights of donor candidates and donors |
| Regulatory and oversight agencies | • Create policies for minimum standards of donor candidate informed consent, evaluation, care and donor follow-up |
| Donor/donor candidate | • Agree to required psychosocial and medical evaluation |
| | • Agree to disclosure of required personal health information to intended recipient with regard to risk of disease transmission when necessary, or to withdraw from donation |
| | • Agree to required lifestyle modifications to reduce risks of donation and promote long-term good health |
| | • Agree to participate in postdonation follow-up |

[a] The role of the independent donor advocate may be served by another team member as long as criteria for independence and advocacy functions are satisfied.

C.Agnello   SE 0245

Case 2:24-cr-00366-NJC     Document 24-1     Filed 03/11/26     Page 249 of 569 PageID #: 443

according to multiple predonation health characteristics. The scope of the current guideline is focused on donor safety, and excludes consideration of recipient outcomes based on donor characteristics. However, we appreciate that a donor candidate's profile of predonation characteristics may also have important impacts on posttransplant recipient outcomes, and that topic also warrants future consideration.

## Roles and Responsibilities

Transplant programs bear the primary responsibility for evaluation, care and follow up of living kidney donor candidates and donors. The main responsibilities of the transplant program are to establish and maintain policies and a team of professionals to provide care according to policies. However, many other entities share in these responsibilities (Table 10). The decision to donate should be regarded as a shared responsibility between the donor candidate, the donor candidate's primary physician, and the transplant program. Transplant programs and the organizations that regulate transplant practice should:

- Evaluate and disclose risks to the best of currently available knowledge
- Respect the donor candidate's autonomy, including autonomy to take risk, within a program's/regulators' upper bound of acceptable risk
- Embrace a long-term relationship with the donor, because some risks are uncertain or evolving

## RESEARCH RECOMMENDATIONS

- Strengthen and refine estimates of long-term projected predonation and postdonation risks of kidney failure, including incorporation of data from cohorts observed for longer periods of time (ideally over the lifetime), from different countries and regions, and estimates of risk related to familial, genetic (eg, apolipoprotein L1 [*APOL1*]), and other factors (eg, birth weight).
- Engage in consensus-building activities among transplant professionals, donors and recipients to help establish uniform threshold of unacceptable risk. Strategies that may help inform consensus include:
  - Estimate the long-term risk of kidney failure among previously accepted donors, such as those captured in large national databases.
  - Estimate long-term risk of kidney failure based on donor acceptance criteria specified in prior guidelines.
  - Evaluate implications of racial variation in long-term risk of kidney failure exceeding possible thresholds for acceptable risk on opportunities for living donation. Develop strategies to promote equitable access to kidney transplantation without placing certain donors at unacceptable risk.
- Determine the best methods of communicating individualized risks to donor candidates and their intended recipients so that the information is understood and supports patient decision-making.
- Explore application of individualized risk estimates to guide predonation support and counseling (eg, target predonation BMI levels) to minimize the risk of adverse postdonation outcomes.
- Develop tools to predict risks of adverse short- and long-term psychosocial outcomes and a broader spectrum of medical outcomes according to predonation characteristics.

# CHAPTER 2: INFORMED CONSENT

The ERT search parameters did not identify evidence from eligible studies pertinent to the recommendations in chapter 2 and therefore the following recommendations are "Not Graded."

## Process of Informed Consent

2.1: Informed consent for donation should be obtained from the donor candidate in the absence of the intended recipient, family members and other persons who could influence the donation decision.

## Capacity for Decision Making

2.2: The donor candidate's capacity to provide informed consent (ie, ability to understand the risks, benefits and consequences of donation) should be confirmed before proceeding with evaluation and donation.

2.3: Substitute decision makers should not be used on behalf of a donor candidate who lacks the capacity to provide informed consent (eg, children or those who are mentally challenged), except under extraordinary circumstances and only after ethical and legal review.

## Content of Disclosure

2.4: Protocols should be followed to provide each donor candidate with information on:

- The processes of evaluation, donor acceptance, and follow-up
- The types of information that may be discovered during the evaluation, and what the transplant program will do with such information
- Individualized risks, benefits and expected outcomes of the donor evaluation, donation, and postdonation health, including a discussion of the uncertainty in some outcomes
- Treatment alternatives available to transplant candidates, and average expected outcomes
- How personal health information will be handled
- Availability of transplant program personnel for support

## Comprehension of Disclosed Information

2.5: The donor candidate's understanding of the relevant information on the risks and benefits of donation should be confirmed before proceeding with donation.

## Voluntarism

2.6: Donor candidates should have adequate time to consider information relevant to deciding whether they wish to donate or not.

2.7: A donor candidate's decision to withdraw at any stage of the evaluation process should be respected and supported in a manner that protects confidentiality.

2.8: A donor candidate who decides not to donate and has difficulty communicating that decision to the intended recipient should be assisted with this communication by the transplant program.

## RATIONALE

Obtaining informed consent to be evaluated as a living kidney donor candidate, and informed consent to undergo living kidney donation, are processes rather than a discreet

S28    Transplantation ■ August 2017 ■ Volume 101 ■ Number 8S    www.transplantjournal.com

event. The transplant program has a responsibility to establish that the donor candidate is capable of understanding the relevant information (*capacity*), is adequately informed of the likely risks and benefits of the donation, and of the alternative treatment options available to the recipient (*disclosure*), understands this information (*understanding*), and is acting voluntarily (*voluntarism*). This chapter provides recommendations to ensure satisfaction of the informed consent requirements for the living kidney donor candidate. The reader should also refer to chapter 1 for related discussions on the framework for decision-making and chapter 18 on the ethical, legal, and policy framework of living donation. Details of specific donation-related surgical, medical, and psychosocial risks are provided in other chapters (3-17) of the guideline.

### Process of Informed Consent

Transplant programs must establish a defensible process to ensure that the requirements of informed consent are met.[18,38-41] To date, donor candidate informed consent processes have been shown to vary widely across transplant programs worldwide, with discrepancies noted in standards, consistency and implementation.[39,40,42-45] It has been recommended that the informed consent structure and process be the same for donor candidates regardless of relationship (or lack thereof for nondirected donation) between the donor candidate and their intended recipient.[39,46,47]

Transplant programs must assure a donor candidate is acting voluntarily and not yielding to pressure or coercion. It is best if evaluations of the donor candidate and the intended recipient are performed by separate teams to mitigate potential conflict of interest. A recommendation that the donor candidate be evaluated by a team that is independent of the evaluation of the intended recipient is also recommended in several past guidelines.[47-51] The process of informed consent with a living kidney donor candidate should include discussions with a healthcare professional skilled and knowledgeable in organ donation and in evaluating a person's comprehension of the information. In the United States, to minimize conflict of interest, living donor recovery hospitals must designate and provide each donor candidate with an Independent Living Donor Advocate who is independent of the intended recipient's evaluation and the decision to transplant the intended recipient. This person seeks to ensure that the rights of the donor candidate are protected, that all the requirements of informed consent are met, and that the donation decision is made voluntarily.[51] Other countries may use other strategies such as an external review of planned donations to ensure that independence, advocacy for the donor's rights, and voluntarism are respected.[52] While avoidance of conflict of interest is a central principle, it also remains important that healthcare professionals in the teams evaluating the donor candidate and intended recipient work together to ensure effective communication and coordination of the donation and transplant processes. For example, it would be inefficient to fully evaluate a donor candidate if their intended recipient does not meet eligibility criteria for transplantation.

### Capacity for Decision Making

The transplant team has a duty to confirm that the donor candidate has the capacity to provide informed consent,

and is able to communicate their decisions based on accurate comprehension of the information disclosed to them.[2,18] Local laws and guidelines should be followed regarding minimum age criteria to become a living kidney donor.[53] For example, prior guidelines indicate that persons who are younger than 18 years or who lack the mental capacity to provide informed consent should not become living kidney donors with the assistance of substitute decision-makers, and that donation in such a setting only be considered in highly exceptional circumstances (eg, young parent to child) after ethical and legal review.[18,38,47,48,51,54,55]

### Content of Disclosure

Transplant programs must have a process to communicate relevant information to donor candidates that enables informed decision making.[18] Some prior guidelines have suggested use of a standardized checklist to ensure that all items are disclosed.[50] For US programs, the Organ Procurement and Transplantation Network (OPTN) has developed an informed consent checklist for programs to support compliance with policy requirements[56] and a patient resource (English and Spanish translations) to explain the process in lay language for donor candidates.[57]

The donor candidate needs to be informed from the onset of what is involved in the donor evaluation, including the required assessments and anticipated timelines. In general, education about the process and potential outcomes of living donation should be introduced in a manner conducive to learning and understanding. Prior guidelines and policy statements have recommended that discussions be provided in a language that enables meaningful dialogue between the donor candidate and transplant program staff, using communication strategies and materials that are culturally sensitive.[47,49] The information should also be presented in a sympathetic environment, using simple language, allowing time for questions, with information that is appropriate to a candidate's understanding and experience, at a pace determined by their needs.[49] Repetition of key information, and use of approaches that foster adult learning, are prudent.[58] The information to be disclosed to the donor candidate is described in many prior guidelines and policy statements.[47,48,51,54,59] Some regulations require minimum content elements that must be disclosed in the informed consent process,[51] and these requirements should be respected when locally applicable. The donor candidate must also provide consent for some tests performed during the evaluation, such as consent to receive intravenous contrast for renal imaging. In this guideline, we present a list of the content of recommended disclosures during the donor candidate evaluation, considering these prior guidelines and policies (Table 11). Candidates should also be reminded that they can only donate a kidney as a living person once, even though they may know someone else who may need a kidney transplant in the future.

Treatment alternatives available to transplant candidates (in general terms, not with specific recipient medical information) should be disclosed to the donor candidate (Table 11). Donor candidates who are biologically incompatible with an intended recipient should be informed of the availability desensitization protocols and kidney paired donation (KPD), and the considerations related to pursuit of these treatment options. Logistics, outcomes and risks specific to KPD and planned incompatible transplantation are discussed in chapter 3 of this guideline. Participation in KPD and incompatible

© 2017 Wolters Kluwer
KDIGO Living Kidney Donor Work Group    S29

---

**TABLE 11.**

**Recommended content of disclosure during the evaluation of living donor candidates**

| Type of disclosure | Information disclosed to the donor candidate |
| --- | --- |
| Handling of donor candidate's personal health information | • Personal health information collected during the donor candidate evaluation is confidential and protected under privacy law, similar to other personal health information<br>• The transplant program will only disclose a donor candidate's personal health information to the intended recipient or other parties with the donor candidate's permission<br>• The donor candidate may be asked for permission to disclose certain personal health information to their intended recipient. This information may include the donor candidate's identity, immunological compatibility, and medical history affecting the risk of disease transmission |
| Risks of discovery of donor health information | • The program's policy for disclosing information and arranging follow-up care for each of the following:<br>  ○ A health condition that may require further medical intervention<br>  ○ A health condition that could affect the donor candidate's ability to obtain insurance (eg, life, medical, disability), or the cost of insurance<br>  ○ An infectious disease that must be reported to public health authorities<br>  ○ A misattributed biological relationship between the donor candidate and intended recipient (such as misattributed paternity in a father-child relationship) discovered through blood group and immune compatibility testing |
| Risk and expected outcomes of donation | • The anticipated medical, surgical, psychosocial, and economic risks and outcomes of donation (for specific details see other chapters of this guideline), and the uncertainty in estimating risk and outcomes |
| Treatment alternatives available to transplant candidates | • Treatment options for kidney failure, including dialysis and deceased donor kidney transplantation, and their average expected outcomes compared with living kidney donor transplantation |
| Process of transplant candidate selection and when the intended recipient's personal health information is shared with the donor candidate | • Transplant candidate evaluation teams determine eligibility to receive a kidney transplant based on program criteria and clinical judgment<br>• Personal health information collected during the transplant candidate's evaluation is confidential, protected under privacy law, and is not generally shared with the donor candidate unless: 1) the transplant program determines the donor candidate requires such information to make an informed decision about proceeding with donation, and 2) the intended recipient gives permission for this information to be shared with the donor candidate |
| Processes of donor candidate evaluation, candidacy determination, and follow-up | • Separate consents may be needed for some tests<br>• Programs and personnel available to help donors with the financial burden of donation<br>• It may be a crime to receive any valuable consideration (money, property) for donation<br>• A description of what will happen if the candidate decides not to donate, emphasizing the right of the candidate to decline to donate at any time with the full support of the transplant program<br>• The transplant program decides if the donor candidate is eligible for donation based on the results of their evaluation<br>• If excluded from donation, information on why the donor candidate does not meet the program's criteria for donation and how the transplant program will support the candidate<br>• The program's recommendations for follow-up care, including the timing and financial impacts of care and the need for regular, ongoing healthcare maintenance and healthy lifestyle choices<br>• The program's need to collect ongoing personal health information after donation to inform the care of the recipient, and to guide the care of the donor<br>• The program's policy about providing care to the donor after evaluation and donation<br>• The availability of national and regional policies to assure prompt access to dialysis and transplantation for living donors who develop kidney failure |

---

transplantation requires specific informed consent, and minimum content elements may be specified by paired donation programs.[60,61] The transplant program should inform the donor candidate of policies regarding confidentiality and anonymity in KPD and nondirected donation, and should ensure donor acceptance of these policies before donation.[62] Some programs now permit biologically compatible pairs to participate in KPD; when this option is discussed, donor candidates who are biologically compatible with their intended recipient should voluntarily decide whether or not to pursue this option.[63-65]

Participating in donor evaluation includes risks of discovery. These risks include possible discovery of a health condition

that requires referral for further care, discovery of a health condition that could affect the donor candidate's insurability or cost of insurance, or discovery of an infectious disease for which there is a reporting requirement to public health authorities. Transplant programs should establish policies for managing such discoveries, and share these policies with the donor candidate as part of the informed consent process for evaluation. Testing a donor candidate and intended recipient in a family for the purpose of assessing immune compatibility may identify misattributed biological relationships as an incidental finding. For example, misattributed paternity is estimated to occur in approximately 1 to 3% of father-child living kidney donor-recipient pairs, or approximately

S30   Transplantation ■ August 2017 ■ Volume 101 ■ Number 8S   www.transplantjournal.com

0.25% to 0.5% of all living kidney donation evaluations.[66] Transplant programs should establish a policy on how or whether this information is disclosed.[67,68]

The donor candidate should be informed of donation-related surgical, medical, and psychosocial outcomes and risks as provided in other chapters of this guideline, individualized whenever possible for donor characteristics, and including the uncertainty of estimates. As described in chapter 1, 90-day all-cause mortality after donation in a US study of 80 347 donors (1994-2009) based on registry data and national death records was approximately 1 in 3000 (0.03%).[23] Similar rates have also been reported in other studies.[24,25] Given the low incidence of perinephrectomy mortality, estimates for predonation characteristics that alter the risk of perioperative death are imprecise.

The donor candidate should be informed of anticipated recipient outcomes associated with living donor transplantation (such as 1-year, 5-year and median recipient graft and patient survival), and with available treatment alternatives including deceased kidney donor transplantation and different types of dialysis. US policy requires that donor candidates are provided with current national and program-specific 1-year transplant recipient patient and allograft survival statistics, and that donor candidates are also informed that any transplant candidate may have risk factors for increased likelihood of adverse outcomes (including graft failure, complications, mortality) that exceed local or national averages.[51]

Many regions have legislation that protects the confidentiality of personal health information, and the same protections apply to information collected during the donor candidate evaluation. The donor candidate should know that their personal health information will only be disclosed to their intended recipient or other parties if they provide permission to do so. The donor candidate should also know that it is likely they will be asked for permission to disclose certain personal health information to their intended recipient so that the intended recipient can provide informed consent for the transplant to occur.[69,70] For example, in directed donation, while a donor candidate may wish to keep their act of donor evaluation initially confidential, if the transplant program does not permit anonymous directed donation, or if the intended recipient does not wish to proceed with anonymous directed donation, there may be a need for the donor candidate to provide permission for their identity to be disclosed to the intended recipient so that the intended recipient can make an informed decision about proceeding with the transplant. Similarly, donor candidates and intended recipients need to provide permission to make each other aware whether they are biologically compatible or not. During the donor evaluation process, it may be recognized that a donor candidate has additional health information that could impact the transplant outcome. For example, despite negative serological testing, a donor candidate may have a higher risk of specific infectious diseases based on his/her behavioral history. Some jurisdictions require standardized behavioral screening[71] during the evaluation and consent from the donor candidate to inform the intended recipient of behavior associated with increased risk of certain infections, so that the intended recipient can provide informed consent for the transplant to proceed.[51] Before donation the transplant program should also inform the donor candidate of requirements to share certain personal health information

with the recipient after donation, such as in the rare circumstance where soon after transplant (ie, within 1-2 years) it is discovered the donor has evidence of a serious infectious disease or malignancy.[51]

It is possible that the intended recipient has health information that could impact transplant outcomes, and which the transplant team believes could affect the donor candidate's decision making. For example, some donor candidates may want to know if the recipient lost a previously transplanted kidney due to medication nonadherence.[72] Knowledge of a genetic kidney disease in an intended recipient may be important for the evaluation and care of a genetically related donor candidate. As for the health information of donor candidates, personal health information collected during the transplant candidate's evaluation is protected under privacy law, and can only be shared with permission of the intended recipient. Prior guidelines, such as those of the British Transplantation Society and policy of the US OPTN, recommend disclosure of relevant information about the intended recipient to the donor candidate if the intended recipient has given consent[48,51]; the British Transplantation Society also recommends that donation and transplant not proceed unless the relevant information is shared.[48] The criteria for relevant information beyond the determination that the intended recipient is approved as a suitable transplant candidate by their evaluation team are currently undefined. Ongoing efforts are warranted to develop standardized criteria for the identification and disclosure of recipient risk factors for adverse transplant outcomes that may be relevant to donor decision making, and when donation and transplant should not proceed in the absence of disclosure, weighing considerations of privacy law, ethics, and the concerns of donor and recipient candidates (see Research Recommendations).

Donor candidates should be informed of transplant program resources and personnel available to offer support. Such support can include psychological support in the setting of a poor recipient outcome after transplantation or donor complications, or financial reimbursement programs for out-of-pocket expenses incurred during the evaluation and donation process. The donor candidate should understand what is required of them after donation, including the likely timing and financial impacts of donation-related recommended lifelong healthcare. The donor candidate should also understand how this care will be provided after donation, and the transplant program's policy for providing any healthcare (and what types of healthcare) after donation. In the US transplant programs are required to collect and report follow-up data on donors for 2 years after donation.[73]

In nearly all places in the world it is a crime to knowingly acquire or obtain any human organ for valuable consideration (ie, for anything of value such as money or property). Some prior guidelines recommend the donor candidate sign a statement attesting that they are not donating a kidney for monetary gain[46,74]; in the United States, such attestation is required for donation to proceed.[51] The donor candidate should understand the withdrawal process from evaluation, and their right to withdraw at any time before donation with the full support of the transplant program (described further below in this guideline chapter). Finally, while transplant programs respect the autonomy of a donor candidate to proceed with donation based on their preferences, needs and values, programs remain ethically justified to decline a donor

C. Agnello   SE 0249

© 2017 Wolters Kluwer

candidate who does not meet their eligibility criteria for donation (ie, when the donation is deemed to incur unacceptable risks).[22] A donor candidate should understand the transplant program makes the final determination of whether the donor candidate is eligible for donation or not based on the results of their evaluation. If the donor candidate does not meet the transplant program's criteria for donation, the program should inform the donor candidate of the decision and reason. Being told they do not meet a transplant program's acceptance criteria is distressing for some donor candidates.[75] The donor candidate should be informed how the transplant program will support them if they do not meet criteria for donation. Such support may include assistance in communicating the decision to the intended recipient; ongoing follow-up communication with the evaluation team; counseling related to the outcome of the evaluation; alternative ways of helping the intended recipient; and the possibility of referral to another program for a second opinion if the donor candidate does not accept the noneligibility decision.

### Comprehension of Disclosed Information

Donor candidates should have adequate time to consider the information they are provided during the evaluation process, as this is required for informed consent. The duration of adequate time is not well defined, and may vary according to donor characteristics. Some, but not all transplant programs, require all donor candidates to exercise a minimal period for this adequate consideration, referred to as a 'cooling-off' period.[44]

In current routine care, an assessment of a donor candidate's knowledge and comprehension of the possible outcomes of donation is typically done through discussions with healthcare professionals. Optimal methods to assess understanding in living donor candidates are not well defined,[39,58] but general techniques for comprehension assessment may include use of "teach-back," in which patients are asked to "teach back" what they have learned during their visit.[76] An instrument for assessing comprehension during informed consent for living liver donation has been pilot tested,[77] and provides a model for developing similar instruments for comprehension assessment in living kidney donor candidates. It is common for many donor candidates to voice no concerns during the evaluation process about the donation, as they are using an emotional rather than deliberative decision-making process. Some donors have an exaggerated sense of the true benefit of donation to their intended recipient, while others underappreciate the amount of postoperative physical pain they may experience or the time needed to fully recover after surgery.[78]

### The Voluntary Nature of Kidney Donation

Voluntarism is established when a transplant program ensures the donor candidate is free from undue pressure or coercion in deciding whether or not to donate.[79] Voluntarism should be respected by all members of the transplant team; as discussed above, additional safeguards may include use of Independent Living Donor Advocates or external reviews of planned donations.[51,52] Special groups such as prisoners have unique considerations.[80] Interviewing the donor candidate without the intended recipient, family members and other persons who could influence the donation decision is important in the assessment of voluntarism. Trust is maintained when the transplant program assures a donor candidate that

their participation in evaluation and personal health information is confidential, to be shared with the intended recipient only with their approval. This enables the donor candidate to speak openly about their health and donation choices.

For the purposes of donor candidacy, 'not deciding' about donation should be considered the same as 'deciding not to' proceed, as may occur in cases of ambivalent donor candidates who have not decided to proceed, but who also have not elected to formally withdraw from the donation process.[39]

Transplant programs should support donor candidates who decide to withdraw from the evaluation process or decline to donate in a way that is respectful and confidential.[81] So-called 'medical alibis,' provision of a false medical reason to justify unsuitability as a living donor, are discouraged as untruthful statements may undermine trust in the transplant program and the patient/physician relationship.[81] Thiessen et al recommend that all donor candidates be offered a general statement regarding 'unsuitability to donate' at any time; there is controversy about whether the transplant program should assist the donor candidate with wording that includes factual medical findings which may or may not preclude donation (such as mildly elevated BP or risk factors for metabolic syndrome).[82] Understandably, a donor candidate who decides not to donate may have difficulty communicating this decision to the intended recipient or others; in such circumstances the transplant program should assist with this communication, which may involve communication through the recipient evaluation team to the transplant candidate.

### RESEARCH RECOMMENDATIONS

- Determine the best methods to achieve informed consent from living kidney donor candidates, including what methods are most useful to impart information including risks and outcomes and what methods are most useful to assess comprehension.[42]
- Through focus groups and/or surveys, develop standardized criteria for circumstances under which intended recipients should be asked for permission to disclose certain personal health information to the living kidney donor candidate (such as loss of a prior graft due to medication nonadherence), so that donor candidates can make an informed decision about whether to proceed with donation or not.
  - Develop standardized criteria for when donation and transplant should not proceed in the absence of disclosure, weighing considerations of privacy law, ethics, and the concerns of donor and recipient candidates.
- Perform postdonation surveys to measure donors' assessments of the quality of standardized informed consent processes, including if the information provided before donation met the donor's needs and prepared them for the donation.[83]
- Compare experiences of donors who donated before and after the implementation of country-specific regulations for better informed consent processes for the practice of living donation.
- Evaluate appropriate circumstances for and approaches to substitute decision making and use of surrogate consent, including definition of the necessary supporting ethical framework for particular scenarios.
- Develop ethically-grounded, practical strategies to consider and manage evaluation of living kidney donor candidates identified by the intended recipient or their representatives through mass advertising and social media.[84]

S32    Transplantation ■ August 2017 ■ Volume 101 ■ Number 8S2    www.transplantjournal.com

# CHAPTER 3: COMPATIBILITY TESTING, INCOMPATIBLE TRANSPLANTATION, AND PAIRED DONATION

The ERT search parameters did not identify evidence from eligible studies pertinent to the recommendations in chapter 3 and therefore the following recommendations are "Not Graded."

## Evaluation

3.1: Donor ABO blood typing should be performed twice before donation to reduce the risk of unintended blood type incompatible transplantation.

3.2: Donor blood group A subtype testing should be performed when donation is planned to recipients with anti-A antibodies.

3.3: Human leukocyte antigen (HLA) typing for major histocompatibility complex (MHC) Class I (A, B, C) and Class II (DP, DQ, DR) should be performed in donor candidates and their intended recipients, and donor-specific anti-HLA antibodies should be assessed in intended recipients.

## Counseling

3.4: Donor candidates who are ABO blood group or HLA incompatible with their intended recipient should be informed of availability, risks, and benefits of treatment options, including kidney paired donation and incompatibility management strategies.

3.5: If a donor candidate and their intended recipient are blood type or crossmatch incompatible, transplantation should be performed only with an effective incompatibility management strategy.

3.6: Nondirected donor candidates should be informed of availability, risks and benefits of participating in kidney paired donation.

## RATIONALE

### Evaluation: Blood Type and Histocompatibility Testing

ABO blood typing should be performed in living donor candidates before donation, including routine duplicate testing, to reduce the risk of unintended blood type-incompatible transplantation. Unintended ABO-incompatible (ABOi) transplantation should be avoidable with ABO typing of the donor and the recipient; however, human errors have led to cases of accidental ABOi organ transplantation in contemporary practice.[85] ABO-subtype testing should be performed when donation is planned to recipients with anti-A antibodies.[86] Human leukocyte antigen (HLA) typing for major histocompatibility complex (MHC) class I (A, B, C) and class II (DP, DQ, DR) should be obtained in living donor candidates for recipient candidates with anti-HLA antibodies, as part of the assessment of compatibility during preoperative planning; there is an association between the presence of HLA-C and/or HLA-DP and DQ and a higher incidence of graft rejection.[87,88] While recipient care is out of the scope of this guideline, it is important to emphasize that recipient candidates should undergo antidonor antibody examinations, including complement-dependent cytotoxicity or flow cytometry crossmatching and Luminex (Bio-Rad Laboratories, Inc., Hercules, CA) assays to determine the history of sensitization,[89] and this testing should be current before proceeding with donor nephrectomy and living donor transplantation.

### Counseling Regarding Transplant Options and Expected Outcomes

Biological incompatibility remains a significant barrier to living donor kidney transplantation. Estimates based on blood group prevalence in the United States suggest that more than 35% of willing, healthy potential living donors are blood group incompatible with their intended recipients.[90] Options for transplant candidates whose only willing, healthy donor is ABO or HLA incompatible include: KPD, planned incompatible transplantation (with preconditioning/desensitization treatment of the intended recipient as needed), attempting to find a different living donor, or waiting for a compatible deceased donor organ.[91-93] While evaluation and management of the transplant recipient is not within the scope of this project, outcomes of recipients after various forms of transplant or waiting are relevant to living kidney donor candidate education. Perspectives of risk and benefit for counseling of the intended recipient and donor candidate include outcomes after compatible versus incompatible transplantation, outcomes after incompatible transplantation versus dialysis, and the likelihood of transplantation with options including KPD programs. Donor candidates who are ABO or HLA incompatible with their intended recipient should be informed of expected patient and graft survival for KPD and incompatible transplantation, as compared with compatible living donor transplantation and deceased donor transplantation, as well as expected patient survival on dialysis, based on best available information.

### Kidney Paired Donation

KPD has emerged as a successful approach to address ABO blood group and HLA incompatibilities for those who have a willing, but incompatible living donor candidate. The fastest growing modality for living donor transplantation is KPD, rising from 2 cases in 2000 to approximately 700 cases reported to the US OPTN in 2013.[94] In 2004, the Netherlands instituted a paired exchange system in all their transplant centers, which may explain the recent increase in living kidney donation in that country.[95]

Donor candidates who are ABO or HLA incompatible with their intended recipient should be informed of the availability of KPD, and the considerations related to pursuit of this treatment option. Participation in KPD requires KPD program-specific informed consent[60,61] (Please see also chapter 2: Informed Consent for details). The transplant program should inform the donor candidate of policies regarding confidentiality and anonymity in KPD and nondirected donation, and should ensure donor acceptance of these policies before donation.[62] Some programs now permit biologically compatible pairs to participate in KPD; when this option is discussed, donor candidates who are biologically compatible with their intended recipient should voluntarily decide whether or not to pursue this option.[63-65]

Donor candidates participating in KPD should be informed of the risks and benefits of kidney transport, possible organ redirection due to unforeseen circumstances, the inability to provide information on the ultimate recipient of their organ, as well as nonexchange donation options.[60] Living donors participating in exchanges should have the option to travel to the recipient center; however, experience from countries with well-developed KPD programs suggests that

© 2017 Wolters Kluwer

transport of living donor kidneys can be accomplished safely without adversely impacting transport outcomes, obviating the need for donor travel. In a survey of 30 US programs transporting 56 living donor kidneys (2007-2010), the creatinine nadir was less than 2.0 mg/dL (<177 μmol/L) in all recipients but one, and there were no cases of delayed graft function as defined by the need for dialysis in the first week.[96] Continued feasible and safe transport of living donor kidneys in the United States has been reported.[97]

Nondirected donors (donor without an identified recipient) have the unique potential to expand the donor pool through chains of kidney exchanges.[98] Nondirected donor candidates should be informed of opportunities for donating into a chain or KPD program, if available.

Participation in KPD should be considered preferable to incompatible transplantation if participation is deemed to have "reasonable" likelihood of yielding a compatible or lower-immunologic risk match for the donor candidate's intended recipient. Despite the expansion of KPD, blood group O candidates continue to have much lower rates of success on KPD lists than their non–O counterparts, particularly in circumstances of broad HLA sensitization.[86] Thus, for some transplant candidates, incompatible transplantation may offer their best option for transplantation without prolonged waiting times.

### Blood Type-Incompatible Living Donor Transplantation

While incompatible transplantation without preconditioning/desensitization treatment of the recipient may lead to hyperacute rejection and allograft loss, predetermined incompatibility management protocols have been developed in recent decades. In 1987, successful ABOi living donor transplantation was introduced in Japan using pretransplant antibody depletion, to expand access to transplantation in the absence of legal recognition of brain death.[99-101] Since that time, ABOi transplantation evolved into routine practice and constituted nearly 14% of living donor transplant procedures performed in Japan in 2011.

Recipient and donor candidates interested in ABOi living donor transplantation should be informed of possible complications and expected outcomes. US studies have reported higher rates of perioperative complications including hemorrhage, infections, and early graft loss compared with ABO-compatible (ABOc) transplantation.[91,102] In contrast, some European and Asian studies have found no increases in early or longer-term complications after ABOi transplantation,[103-106] possibly reflecting differences in preconditioning management protocols. Even in the US experience, after an early reduction in graft survival relative to blood ABOc living donor kidney transplant recipients,[91] the average long-term graft survival in ABOi living donor transplant recipients is not inferior to, and often exceeds, that of ABOc deceased donor transplant recipients.[91,107] In the United States, recipients of ABOi living donor kidney transplants also appear to incur higher costs of care before, during, and after transplant, although these costs increases are offset by avoiding long-term dialysis and its associated morbidity and costs.[108]

### HLA-Incompatible Living Donor Transplantation

HLA-incompatible transplantation remains the most difficult hurdle in achieving successful transplant outcomes. Flow cytometry crossmatching + or Luminex +/complement dependent cytotoxicity- incompatibility may be acceptable with

management including B-cell-depleting treatments (eg, anti-CD 20 antibody, rituximab) and/or splenectomy and/or intravenous immunoglobulin, but increased risk of early rejection remains, requiring additional immunosuppression and attendant risks to the recipient. Nonetheless, while allograft survival after HLA-incompatible living donor kidney transplantation is inferior to compatible transplantation, incompatible transplantation after desensitization may offer a substantial survival benefit compared with dialysis or waiting for a deceased donor kidney; however, there are few high-quality studies testing this hypothesis. A recent study compared 1025 recipients of HLA-incompatible living donor kidney transplants at 22 US medical centers with matched controls who remained on waiting lists or waited and received a transplant from a compatible deceased donor. After 8 years, 76.5% of those who received an incompatible living donor transplant were still alive, compared with 62.9% who remained on the waiting list or received a deceased donor transplant and only 43.9% who remained on the waiting list but were never transplanted.[109] HLA-incompatible transplantation does confer additional costs compared with compatible transplantation, but may be cost-effective compared with dialysis; formal cost effectiveness evaluations are needed.[110]

### What Prior Guidelines Recommend

In contrast with our recommendations, the European Renal Best Practice (ERBP) guideline for kidney donor and recipient evaluation recommends performing HLA-DQ, HLA-DP and HLA-C typing of the donor only when the intended recipient has HLA antibodies against those antigens.[50] The ERBP does not recommend routine typing for MHC Class I-related chain-A and other non-HLA antigens in either recipient or donor. Similar to our recommendations, the ERBP recommends establishing programs to select a donor towards whom the recipient does not produce antibodies through KPD, and recommends transplanting patients with donor-specific antibodies only if this cannot be accomplished by KPD.[50] Details of testing and clinical management associated with HLA and non-HLA antibodies in transplantation are out of the scope of the current guideline, but consensus-based recommendations from a 2012 Transplantation Society work group are available.[89]

In 2012, the American Society of Transplantation (AST)/American Society of Transplant Surgeons (ASTS) held a consensus conference directed at overcoming barriers to the adoption of KPD that produced recommendations related to KPD donor evaluation and care, guidelines for KPD histocompatibility testing, and recommended policies to overcoming geographic barriers to KPD.[60]

### RESEARCH RECOMMENDATIONS

- Define mediators of clinical outcomes and optimal management of ABO and HLA incompatible living donor transplantation to support donor and recipient selection, understanding of transplant utility and informed consent, including:
  - Standardized, controlled comparisons of preconditioning/desensitization and posttransplant immunosuppressive protocols for incompatible transplantation
  - Elucidation of the mechanisms of antibody production and long-term impact on the allograft
- Develop a long-term, appropriately powered RCT to compare the outcomes and cost effectiveness of options for highly sensitized candidates including participation in KPD with varying

waiting times versus living donor transplantation after various desensitization protocols.

## CHAPTER 4: PREOPERATIVE EVALUATION AND MANAGEMENT

The ERT search parameters did not identify evidence from eligible studies pertinent to the recommendations in chapter 4 and therefore the following recommendations are "Not Graded."

4.1: Donor candidates should receive guideline-based evaluation and management used for other noncardiac surgeries to minimize risks of perioperative complications, including a detailed history and examination to assess risks for cardiac, pulmonary, bleeding, anesthesia-related and other perioperative complications.

4.2: Donor candidates who smoke should be advised to quit at least 4 weeks before donation to reduce their risk of perioperative complications, and commit to lifelong abstinence to prevent long-term complications.

### RATIONALE

#### Evaluation

The goals of the general preoperative evaluation are to assess a donor candidate's risk of perioperative complications according to their profile of predonation characteristics assessed through a careful medical history, physical examination and testing; to determine if this risk is acceptable to proceed with donation; and to counsel the donor candidate on how to minimize their risk of perioperative complications (eg, stop smoking, lose weight if obese). The donor then receives care during the perioperative period to minimize their risk of complications, so that they can return to their level of presurgical function as quickly as possible. Recommendations on how to achieve these outcomes with good preoperative evaluation and management are sparse in prior living kidney donor guidelines, other than a description of elements of the detailed history required before donation (eg, prior surgeries, anesthesia-related reactions and bleeding disorders).[51] Associations of donation-specific surgical techniques with perioperative outcomes are described elsewhere (see chapter 17).

#### Risks of Perinephrectomy Complications

Living kidney donor nephrectomy is an elective surgical procedure that carries a low risk for complications as compared with other types of surgical procedures. As described in chapter 1, the 90-day all-cause mortality in a US study of integrated donor registry data and national death records (80 347 donors, 1994-2009) was approximately 1 in 3000 (0.03%) based on 25 deaths.[23] Similar rates have also been reported in other studies.[24,25] Given the low incidence of perioperative mortality, estimates for predonation characteristics that alter the risk of perioperative death are imprecise.

A US study recently described the incidence of perioperative complications in a large sample of living kidney donors from 1998 to 2010.[28] Outcomes were assessed through administrative data, using a composite outcome of digestive, respiratory, procedural, urinary, hemorrhage, infectious or cardiac complications. The incidence of perioperative complications was 7.9% and decreased from 1998 to 2010 (from 10.1% to 7.6%). Limitations of this study include the lack of confirmation of donor status through patient level-linkages

to the national registry, and use of weighting schemes to draw inferences for a "represented" sample of all US donors based on a stratified sample of 20% of acute care hospitalizations. A subsequent study integrated national US donor registry data as a source of verified living donor status with administrative records from a consortium of 98 academic hospitals (2008 to 2012, n = 14 964), and found that 16.8% of donors experienced any perioperative complication, most commonly gastrointestinal (4.4%), bleeding (3.0%), respiratory (2.5%), and surgical/anesthesia-related injuries (2.4%).[29] Major complications, defined as Clavien grading system for surgical complications level 4 or 5,[111] affected 2.5% of donors. The limitations of administrative database studies, including possible coding biases, highlight the need for prospective collection of granular clinical data on living donor perioperative outcomes. A Norwegian registry-based study of 1022 living kidney donations performed between 1997 and 2008 recorded 30 (2.9%) major complications and 184 (18%) minor complications by Clavien grading.[112]

Readmission after surgery is commonly used as a measure of care quality and healthcare utilization. A recent study examined postnephrectomy readmission using integrated US living donor registry data, records from a nationwide pharmacy claims warehouse, and administrative records from an academic hospital consortium (N = 14 959 donors, 2008-2012).[113] Overall, 2.9% of donors were readmitted to hospital within 90 days of donation. 11.3% donors filled 1 or greater opioid prescription in the year before donation, and those with the highest level predonation opioid use were more than twice as likely as nonusers to be readmitted within 90 days postdonation (6.8% vs 2.6%; adjusted odds ratio [OR]; $_{95\% \text{ lower CI}}$ [OR] $_{95\% \text{ upper CI } 1.74}$2.49$_{3.58}$). Adjusted readmission risk was also significantly ($P < 0.05$) higher for women (adjusted OR = 1.25), African Americans (adjusted OR = 1.45), spouses (adjusted OR = 1.42), exchange participants (adjusted OR = 1.46), uninsured donors (adjusted OR = 1.40), donors with predonation eGFR <60 mL/min per 1.73 m² (adjusted OR = 2.68), donors with predonation pulmonary disease (adjusted OR = 1.54), and after robotic nephrectomy (adjusted OR = 1.68). Continued efforts to identify and prevent modifiable causes of postoperative complications in all donors are warranted to maximize safety of the donation procedure.

Readers are encouraged to refer to chapter 17 for discussion of acceptable surgical approaches to donor nephrectomy and anticipated outcomes. As discussed in the Framework for this guideline (chapter 1), the transplant program team should provide the donor candidate with individualized quantitative estimates of short-term and long-term risks from kidney donation to the extent possible, including recognition of associated uncertainty, in a manner that is easily understood by donor candidates.

#### Preoperative and Perioperative Management to Minimize the Risk of Perinephrectomy Complications

Guidelines for evaluation and management before noncardiac surgery in the general population have been thoroughly reviewed and summarized.[114] There is no evidence to suggest that additional preoperative testing beyond guideline-based evaluation and management strategies used for other noncardiac surgeries results in a reduced incidence of perioperative complications in kidney donors.

C. Agnello   SE 0253

© 2017 Wolters Kluwer

Some transplant programs routinely perform preoperative noninvasive cardiac testing in older living kidney donor candidates (eg, stress electrocardiogram, nuclear stress test), but this practice is not supported by existing evidence. Recent US guidelines for the general population do not recommend cardiac testing for those undergoing noncardiac surgery with no active symptoms of heart disease who have reasonable functional capacity (defined as at least 4 metabolic energy equivalents, which represents the ability to walk 2 blocks on ground level or carry 2 bags of groceries up one flight of stairs without symptoms).[115] Outside the context of perioperative evaluation, other guidelines recommended against noninvasive cardiac testing for asymptomatic coronary artery disease, or conclude that there is insufficient evidence to warrant such testing.[116]

Recent guidelines on the assessment of bleeding risk before surgery or invasive procedures describe the following[117]: (i) Routine coagulation screening before surgery to predict postoperative bleeding in unselected patients is not recommended; (ii) bleeding history assessment should include details of a family history of bleeding, previous excessive posttraumatic or postsurgical bleeding, and current use of antithrombotic drugs; (iii) if the bleeding history is negative, no further coagulation testing is indicated; (iv) comprehensive coagulation testing is warranted if the bleeding history is positive. Although evidence in the context of donor nephrectomy is lacking, current OPTN policy for living donor evaluation in the United States requires assessment of bleeding and clotting disorders in the medical history, and performance of coagulation testing,[51] and other prior living donor evaluation guidelines have recommended blood coagulation testing.[54,118]

In a recent multicenter randomized trial of 10 010 patients undergoing noncardiac surgery, the use of aspirin before surgery and throughout the early postsurgical period had no significant effect on the risk of death or nonfatal myocardial infarction but increased the risk of major bleeding.[119] The trial authors recommend aspirin not be started before surgery, and for those chronically taking aspirin to hold it at least 3 days before surgery.

Recent guidelines for the prevention of perioperative venous thromboembolism (ie, deep vein thrombosis and pulmonary embolism) describe the use of a risk score (Rogers or Caprini score) to determine which of early ambulation, mechanical prophylaxis or perioperative unfractionated heparin (or low-molecular-weight heparin) is warranted to reduce risk.[120] Factors associated with a higher risk of perioperative venous thromboembolism include older age, obesity, and the use of oral contraceptive or hormone replacement therapy. Many donors will be at low risk (<2%) of perioperative venous thromboembolism, and some guidelines suggest early ambulation is all that is required in individuals at low risk of such events.

Guidelines to reduce the risk of perioperative pulmonary complications recommend a careful assessment of risk factors for postoperative pulmonary complications (conditions such as chronic obstructive pulmonary disease or congestive heart failure which will be absent in almost all donors).[121] Preoperative spirometry and chest radiography are not recommended as routine tests to predict the risk for postoperative pulmonary complications. Patients at higher risk for postoperative pulmonary complications may benefit from deep breathing exercises or incentive spirometry, or selective use of a nasogastric tube (as needed for postoperative nausea or vomiting, inability to tolerate oral intake, or symptomatic abdominal distention). The utility and difficulties of the preoperative evaluation for the potential identification of obstructive sleep apnea is described elsewhere.[122]

There have been 6 RCTs that enrolled smokers (ranging from 47 to 213 patients) to receive a smoking cessation intervention or not before surgery (procedures other than donor nephrectomy)[123] and found that smoking cessation reduced the risk of perioperative complications.

## RESEARCH RECOMMENDATIONS

- Develop contemporary estimates of 5.10, the risk of perinephrectomy complications according to an individualized profile of predonation characteristics, accounting for changes in baseline comorbidity burdens.
- Assess the predictive value of novel risk factors for perioperative complications and readmission after donor nephrectomy, including use of opioids and other pharmaceuticals.[113]
- Perform RCTs to formally assess the efficacy of evaluation and perioperative management techniques to minimize the risk of perioperative complications after living donor nephrectomy.

## CHAPTER 5: PREDONATION KIDNEY FUNCTION

Except in the case of Recommendation 5.10, the ERT search parameters did not identify evidence from eligible studies pertinent to the recommendations in chapter 5 and therefore the following recommendations are "Not Graded." Some of the recommendations extrapolated from the 2012 KDIGO CKD Guideline (Section 1.4.3)[124] were not part of the ERT review for this guideline and as such they are also "Not Graded."

### Evaluation

5.1: Donor kidney function should be expressed as glomerular filtration rate (GFR) and not as serum creatinine concentration.

5.2: Donor GFR should be expressed in mL/min per 1.73 m$^2$ rather than mL/min.

5.3: Donor glomerular filtration rate (GFR) should be estimated from serum creatinine (eGFR$_{cr}$) for initial assessment, following recommendations from the KDIGO 2012 CKD guideline.

5.4: Donor GFR should be confirmed using one or more of the following measurements, depending on availability:

- Measured GFR (mGFR) using an exogenous filtration marker, preferably urinary or plasma clearance of inulin, urinary or plasma clearance of iothalamate, urinary or plasma clearance of $^{51}$Cr-EDTA, urinary or plasma clearance of iohexol, or urinary clearance of $^{99m}$Tc-DTPA
- Measured creatinine clearance (mCrCl)
- Estimated GFR from the combination of serum creatinine and cystatin C (eGFR$_{cr-cys}$) following recommendations from the KDIGO 2012 CKD guideline
- Repeat estimated GFR from serum creatinine (eGFR$_{cr}$)

5.5: If there are parenchymal, vascular or urological abnormalities or asymmetry of kidney size on renal imaging, single kidney GFR should be assessed using radionuclides or contrast agents that are excreted by glomerular filtration (eg, $^{99m}$Tc-DTPA).

S36    **Transplantation** ■ August 2017 ■ Volume 101 ■ Number 8    www.transplantjournal.com

## Selection

5.6: GFR of 90 mL/min per 1.73 m$^2$ or greater should be considered an acceptable level of kidney function for donation.

5.7: The decision to approve donor candidates with GFR 60 to 89 mL/min per 1.73 m$^2$ should be individualized based on demographic and health profile in relation to the transplant program's acceptable risk threshold.

5.8: Donor candidates with GFR less than 60 mL/min per 1.73 m$^2$ should not donate.

5.9: When asymmetry in GFR, parenchymal abnormalities, vascular abnormalities, or urological abnormalities are present but do not preclude donation, the more severely affected kidney should be used for donation.

## Counseling

5.10: We suggest that donor candidates be informed that the future risk of developing kidney failure necessitating treatment with dialysis or transplantation is slightly higher because of donation; however, average absolute risk in the 15 years following donation remains low. (2C)

## RATIONALE

### Evaluation

The goals of the evaluation of kidney function in living donor candidates are to:

- Provide accurate assessment of level of GFR and prediction of long-term risk of ESKD (in the absence of and after donation) based on level of predonation GFR and other factors.
- Allow identification and exclusion of donor candidates whose postdonation risks are expected to exceed the acceptable risk threshold established by the transplant program.
- Provide counseling regarding level of risk for donor candidates whose long-term risks for ESKD are expected to be below the acceptable risk established by the transplant program.
- Provide counseling regarding the need for follow-up of decreased GFR after donation.

For this section, recommendations related to measurement of kidney function are based on physiological principles and recommendations for general clinical practice from the KDIGO 2012 CKD guideline.[124] These recommendations were based on a systematic review of the literature, which included some studies of donors before and after kidney donation.[125] There is no evidence to suggest that living kidney donor candidates or kidney donors differ from other populations regarding these recommendations.

> **Box 1. Key recommendations from the KDIGO 2012 CKD guideline regarding GFR estimation.[124]**
>
> - We recommend using serum creatinine and a GFR estimating equation for initial assessment (Recommendation 1.4.3.1, Grade 1A).
> - We suggest using additional tests (such as cystatin C or a clearance measurement) for confirmatory testing in specific circumstances when eGFR based on serum creatinine is less accurate (Recommendation 1.4.3.2: Grade 2B).

- We recommend that clinicians (Recommendation 1.4.3.3, Grade 1B):
  - Use a GFR estimating equation to derive GFR from serum creatinine (eGFR$_{cr}$) rather than relying on the serum creatinine concentration alone.
  - Understand clinical settings in which eGFR$_{cr}$ is less accurate.
- We recommend that clinical laboratories should (Recommendation 1.4.3.4, Grade 1B):
  - Measure serum creatinine using a specific assay with calibration traceable to the international standard reference materials and minimal bias compared to isotope-dilution mass spectrometry (IDMS) reference methodology.
  - Report eGFR$_{cr}$ in addition to the serum creatinine concentration in adults and specify the equation used whenever reporting eGFR$_{cr}$.
  - Report eGFR$_{cr}$ in adults using the 2009 CKD Epidemiology Collaboration (CKD-EPI) creatinine equation. An alternative creatinine-based GFR estimating equation is acceptable if it has been shown to improve accuracy of GFR estimates compared to the 2009 CKD-EPI creatinine equation.
- When reporting serum creatinine:
  - We recommend that serum creatinine concentration be reported and rounded to the nearest whole number when expressed as standard international units (μmol/L) and rounded to the nearest 100th of a whole number when expressed as conventional units (mg/dL).
- When reporting eGFR$_{cr}$:
  - We recommend that eGFR$_{cr}$ should be reported and rounded to the nearest whole number and relative to a body surface area of 1.73 m$^2$ in adults using the units mL/min per 1.73 m$^2$.
  - We recommend eGFR$_{cr}$ levels less than 60 mL/min per 1.73 m$^2$ should be reported as "decreased."
- If cystatin C is measured, we suggest that health professionals (Recommendation 1.4.3.6, Grade 2C):
  - Use a GFR estimating equation to derive GFR from serum cystatin C rather than relying on the serum cystatin C concentration alone.
  - Understand clinical settings in which eGFR$_{cys}$ and eGFR$_{cr-cys}$ are less accurate.
- We recommend that clinical laboratories that measure cystatin C should (Recommendation 1.4.3.7, Grade 1B):
  - Measure serum cystatin C using an assay with calibration traceable to the international standard reference material.
  - Report eGFR from serum cystatin C in addition to the serum cystatin C concentration in adults and specify the equation used whenever reporting eGFR$_{cys}$ and eGFR$_{cr-cys}$.
  - Report eGFR$_{cys}$ and eGFR$_{cr-cys}$ in adults using the 2012 CKD-EPI cystatin C and 2012 CKD-EPI creatinine-cystatin C equations, respectively, or alternative cystatin C-based GFR estimating equations if they have been shown to improve accuracy of GFR estimates compared to the 2012 CKD-EPI cystatin C and 2012 CKD-EPI creatinine-cystatin C equations.
- When reporting serum cystatin C:
  - We recommend reporting serum cystatin C concentration rounded to the nearest 100th of a whole number when expressed as conventional units (mg/L).
- When reporting eGFR$_{cys}$ and eGFR$_{cr-cys}$:
  - We recommend that eGFR$_{cys}$ and eGFR$_{cr-cys}$ be reported and rounded to the nearest whole number and

© 2017 Wolters Kluwer

relative to a body surface area of 1.73 m$^2$ in adults using the units mL/min per 1.73 m$^2$.
- ○ We recommend eGFR$_{cys}$ and eGFR$_{cr-cys}$ levels less than 60 mL/min per 1.73 m$^2$ should be reported as "decreased."
- We suggest measuring GFR using an exogenous filtration marker under circumstances where more accurate ascertainment of GFR will impact on treatment decisions (Recommendation 1.4.3.8, Grade 2B).

## GFR as an Index of Kidney Function

The level of GFR is widely accepted as the best overall index of kidney function in health and disease. The foundations for this acceptance are the well-known relationships of alterations in kidney structure and GFR in kidney disease, and well known pathophysiologic relationships of kidney disease complications to decreased GFR. Normative levels of GFR are expressed per 1.73 m$^2$ because GFR is proportional to kidney size, which is proportional to body size. Adjusting GFR to body surface area (BSA) reduces the variability in GFR in healthy individuals, allowing communication of GFR threshold for decision-making that can applied to most donors across the usual distribution of body size.

Based on a large body of evidence, mean GFR in healthy young adult white individuals is approximately 125 mL/min per 1.73 m$^2$, with a wide range.[126] There is some evidence that the normal level of GFR varies among ethnic groups.[127] GFR is affected by numerous physiologic and pathologic conditions and varies with time of day, dietary protein intake, exercise, age, pregnancy, obesity, hyperglycemia, use of antihypertensive drugs, surfeit or deficit of extracellular fluid, and acute and chronic kidney disease. Despite these limitations, no other measure has been proposed as an overall index of kidney function in the general population or in kidney donor candidates. Thus, it is important that the evaluation of kidney function in kidney donor candidates take into account factors that can affect GFR.

## Measurement Methods

It is not possible to directly measure GFR in humans; thus, the "true" GFR cannot be known with certainty. GFR can be measured indirectly as the clearance of exogenous filtration markers or estimated from serum levels of endogenous filtration markers, but both measured GFR (mGFR) and estimated GFR (eGFR) are associated with error in their determination. We recommend that the transplant program use the best available method to assess GFR in donor candidates, recognizing that at many centers, more than one method may be available. The accuracy of various methods for measuring and estimating GFR is not known with sufficient certainty to define specific threshold for each method.

The KDIGO 2012 CKD guidelines for GFR evaluation in the general population recommend expressing kidney function as GFR and not as serum creatinine concentration, and recommend expressing GFR in mL/min per 1.73 m$^2$ rather than mL/min.[124] The guidelines recommend 2-stage testing (initial testing followed by confirmatory testing as necessary). The WG concluded that these general recommendations were applicable to living kidney donor candidates.

The eGFR based on serum creatinine (eGFR$_{cr}$) is the recommended initial test. Serum creatinine assays should be traceable to the international reference standard. In North America, Europe, and Australia, the 2009 CKD CKD-EPI creatinine equation should be used unless other equations have been shown to be more accurate. eGFR$_{cr}$ using the 2009 CKD-EPI creatinine equation has minimal bias at normal GFR; however, it is imprecise (Figure 5), thus it is not useful for an initial evaluation.[128] In regions other than North America, Europe, and Australia, the 2009 CKD-EPI creatinine equation is less accurate. In these regions, other equations are recommended if they are more accurate than the 2009 CKD-EPI creatinine equation.

GFR estimating equations are developed using regression methodologies to relate the mGFR to steady state serum creatinine concentration and a combination of demographic and clinical variables as surrogates of the non-GFR determinants of serum creatinine. By definition, GFR estimates using serum creatinine concentration are more accurate in estimating mGFR than the serum creatinine concentration alone in the study population in which they were developed. Sources of error in GFR estimation from serum creatinine concentration include nonsteady-state conditions, nonGFR determinants of serum creatinine, measurement error at higher GFR, and interferences with the creatinine assays (Table 12). GFR estimates are less precise at higher GFR levels than at lower levels. The clinician should remain aware of caveats for any creatinine-based estimating equation which may influence the accuracy in a given individual.

A variety of confirmatory tests for GFR are available. In the general population, the 2012 KDIGO guideline suggests confirmation of GFR with either GFR estimation using cystatin C or a clearance measurement in specific circumstances when eGFR based on serum creatinine is less accurate (Box 1, 2012 CKD Recommendation 1.4.3.2). KDIGO further



**FIGURE 5.** Performance of the CKD-EPI equation in estimating measured GFR. The figure shows the difference between measured and estimated GFR (bias) versus estimated GFR in an external validation dataset (N = 3896). A smoothed regression line is shown with the 95% CI. CI, confidence interval; CKD-EPI, Chronic Kidney Disease Epidemiology Collaboration; GFR, glomerular filtration rate. Copyright © 2009 American College of Physicians and reprinted with permission from Levey AS, Stevens LA, Schmid CH, et al. A new equation to estimate glomerular filtration rate. *Ann Intern Med.* 2009;150:604-612.[128]

**TABLE 12.**

Sources of error in GFR estimation using creatinine

| Source of error | Example |
|---|---|
| Non–steady state | AKI |
| Non-GFR determinants of SCr that differ from study populations in which equations were developed | |
| • Factors affecting creatinine generation | Race/ethnicity other than United States and European black and white |
| | Extremes of muscle mass |
| | Extremes of body size |
| | Diet and nutritional status |
| | • High protein diet |
| | • Creatinine supplements |
| | Muscle wasting diseases |
| | Ingestion of cooked meat |
| • Factors affecting tubular secretion of creatinine | Decrease by drug-induced inhibition |
| | • Trimethoprim |
| | • Cimetidine |
| | • Fenofibrate |
| • Factors affecting extra-renal elimination of creatinine | Dialysis |
| | Decrease by inhibition of gut creatininase by antibiotics |
| | Increased by large volume losses of extracellular fluid |
| Higher GFR | Higher biological variability in non-GFR determinants relative to GFR |
| | • Higher measurement error in SCr and GFR |
| Interference with creatinine assay | Spectral interferences (eg, bilirubin, some drugs) |
| | Chemical interferences (eg, glucose, ketones, bilirubin, some drugs) |

AKI, acute kidney injury; GFR, glomerular filtration rate; SCr, serum creatinine.
Adapted with permission from Kidney Disease: Improving Global Outcomes (KDIGO) CKD Work Group. KDIGO 2012 clinical practice guideline for the evaluation and management of chronic kidney disease.
*Kidney Int* 2013:1–150.[124]

suggests measuring GFR using an exogenous filtration marker under circumstances where more accurate ascertainment of GFR will impact treatment decisions (Box 1, 2012 CKD Recommendation 1.4.3.8), including the evaluation of living organ donors). Based on these recommendations, the WG concluded that confirmation of GFR using the most accurate method available at the transplant center. In the United States, OPTN policy requires a clearance measurement (measured creatinine clearance [mCrCl] or mGFR) for confirmation of GFR.

Many methods for mGFR determination using exogenous filtration markers and clearance calculations are available, with variable accuracy. Recommendations for specific methods are based on a recent systematic review.[129] mGFR is not available at all centers, so other alternatives are acceptable. mCrCl is less accurate than mGFR,[129] but it is acceptable if mGFR is not available. mCrCl overestimates mGFR due to creatinine secretion.[130] The magnitude of overestimation is 15% or more at normal GFR, based on older data using nonstandardized serum creatinine assays. The magnitude of overestimation may be higher using standardized assays. In principle, mCrCl is available worldwide, however, in some donor candidates, mCrCl may not be available due to logistical difficulties in collecting or transporting a timed urine collection.

A recent study suggests that eGFR may be sufficiently accurate for decision-making without the need for mGFR in many cases.[8] A web-based calculator is available to compute posttest probabilities for mGFR above or below threshold probabilities for decision-making: http://ckdepi.org/equations/donor-candidate-gfr-calculator/. Post-test probabilities are computed from pretest probabilities for mGFR and test

performance for eGFR using serum creatinine (eGFR_cr) or the combination of creatinine and cystatin C (eGFR_cr-cys). Very high posttest probabilities provide reassurance that mGFR is above the threshold level for decision-making, while very low posttest probabilities provide reassurance that mGFR is below the threshold levels for decision-making. Transplant programs can determine what posttest probabilities are sufficient for clinical decision-making in the absence of mGFR and mCrCl. One study validating these computations in donor candidates has been reported.[131] Future studies should address prediction accuracy among racial and ethnic groups for whom the accuracy of eGFR is less certain (eg, nonblack, nonwhite persons).

In general eGFR_cys is not more accurate then eGFR_cr; however using 2 filtration markers improves precision of GFR estimates compared with using either marker alone; thus eGFR_cr-cys is generally recommended over eGFR_cr or eGFR_cys.[132,133] Advantages of cystatin C compared with creatinine are that cystatin C is not affected by muscle mass and current equations do not require specification of race. Therefore, eGFR_cys maybe more accurate than eGFR_cr-cys in people with very large or very small muscle mass, very high or very low meat intake, or race-ethnicity other than black (African American or African European) or white. If cystatin C is measured, cystatin C assays should be traceable to international reference standard (which is in the early stages of implementation) and the 2012 CKD-EPI eGFR_cys equation or eGFR_cr-cys equation should be used unless other equations have been shown to be more accurate. If cystatin C is not available, eGFR_cr can be used for decision-making. As with creatinine, sources of error in GFR estimation from serum cystatin C concentration include non–steady-state conditions, nonGFR determinants of serum cystatin C, measurement

C.Agnello    SE 0257

© 2017 Wolters Kluwer

**TABLE 13.**

**Sources of error in GFR estimation using cystatin C**

| Source of error | Example |
| --- | --- |
| Non–steady state | AKI |
| Non-GFR determinants of SCysC that differ from study populations in which equations were developed | |
| • Factors affecting cystatin C generation | Race/ethnicity other than United States and European black and white |
| | Disorders of thyroid function |
| | Administration of corticosteroids |
| | Other hypothesized factors based on epidemiologic associations (diabetes, adiposity) |
| • Factors affecting tubular reabosrption of cystatin C | None identified |
| • Factors affecting extra-renal elimination of cystatin C | Increased by severe decrease in GFR |
| Higher GFR | Higher biological variability in non-GFR determinants relative to GFR |
| | Higher measurement error in SCysC and GFR |
| Interference with cystatin C assay | Heterophilic antibodies |

AKI, acute kidney injury; GFR, glomerular filtration rate; SCysC, serum cystatin C.
Adapted with permission from Kidney Disease: Improving Global Outcomes (KDIGO) CKD Work Group. KDIGO 2012 clinical practice guideline for the evaluation and management of chronic kidney disease. *Kidney Int* 2013:1–150.[124]

error at higher GFR, and interferences with the cystatin C assays (Table 13).

Single ("divided" or "split") kidney GFR can be assessed by radionuclide imaging, but is not required in all kidney donor candidates. However, all kidney donor candidates undergo kidney imaging to detect parenchymal, vascular or urologic abnormalities, and asymmetry in kidney size suggests asymmetry in kidney function.

### Selection: Criteria for Acceptable Predonation GFR

#### GFR in the General Population

GFR in young men and women of 90 mL/min per 1.73 m² or greater is generally considered normal.[124] GFR between 60 and 89 mL/min per 1.73 m² is considered to be decreased compared with the usual level for young adults, but does not meet the KDIGO criterion for CKD.

GFR declines with age, although the cause of decline is not known and the rate of decline appears widely variable. Most data are based on cross-sectional studies, in which mean GFR is lower in older populations than in young populations. Other kidney function measures are also lower in older populations (eg, renal plasma flow, maximal urinary concentration) and kidney structure is altered in older populations (eg, cortical atrophy, global glomerulosclerosis, nephrosclerosis). There is debate about whether abnormalities in kidney function and structure in older people represents normal aging or disease.

Decreased GFR in the general population is associated with a higher risk of complications of CKD, including ESKD,



**FIGURE 6.** Complications of CKD according to baseline eGFR and albuminuria. The data above were derived using creatinine-based eGFR (eGFR_cr) estimated with the MDRD Study equation.[135] Comparable data are not available for mGFR. However, studies using more accurate GFR estimates confirm these results. For the outcomes of ESKD, all-cause mortality and cardiovascular mortality, any given reduced level of eGFR is associated with a greater increase in the risk of these outcomes if the 2009 CKD-EPI equation is used to estimate eGFR_cr.[136] The increase in risk is even greater if cystatin C is used to estimate GFR, either with or without creatinine (eGFR_cr-cys or eGFR_cys), compared with eGFR_cr.[137] The 3 lines represent severe, moderate, and normal/mild albuminuria (top to bottom, respectively). CKD, chronic kidney disease; CKD-EPI, Chronic Kidney Disease Epidemiology Collaboration; eGFR, estimated glomerular filtration rate; ESKD, end-stage kidney disease; GFR, glomerular filtration rate. MDRD, Modification of Diet in Renal Disease. Reprinted with permission from Levey AS, de Jong PE, Coresh J, et al. The definition, classification, and prognosis of chronic kidney disease: a KDIGO Controversies Conference report. *Kidney Int*. 2011;80:17-28.[135]

cardiovascular disease (CVD) and death. In general populations, compared with a reference eGFR of 95 mL/min per 1.73 m², the RR for complications related to decreased eGFR is apparent between 60 and 75 mL/min per 1.73 m² and is exponentially higher at lower eGFR.[134] Similar relationships of lower eGFR with adverse outcomes have been observed in subgroups including patients with known CKD (Figure 6).[134-137] KDIGO 2012 guideline defines GFR less than 60 mL/min per 1.73 m² for 3 months or more as satisfying the criteria for CKD. GFR 15 to 30 mL/min per 1.73 m² is defined as severely reduced, and GFR less than 15 mL/min per 1.73 m² is defined as kidney failure. However, the association of lower eGFR with a higher risk of adverse outcomes may be related to other conditions that co-occur with low GFR, such as hypertension, diabetes and CVD. Lower GFR in older people is associated with increased risk for CKD outcomes, including ESKD, CVD and death. The RR for these outcomes in older people with lower eGFR compared with the reference eGFR is less than the RR in younger people, however the increment in absolute risk is higher in older people than in younger people.[138]

A recent meta-analysis based on data from nearly 5 million healthy persons identified from 7 general population cohorts who are similar to kidney donor candidates found that lower GFR (in the absence of donation) is associated with an increased risk for ESKD over median cohort follow-up of 4 to 16 years.[7] After calibration to annual ESKD incidence in the US population, variations in the projected 15-year and lifetime risks of ESKD based on level of eGFR were generated according to age, sex, and race for healthy persons (assuming systolic BP (SBP) 120 mm Hg, urine albumin-to-creatinine ratio (ACR) 4 mg/g [0.4 mg/mmol], BMI 26 kg/m², and absence of diabetes mellitus) (Figures 7

and 8). This analysis demonstrates that lower eGFR is associated with increased lifetime risk for ESKD in all demographic subgroups. For eGFR of 90 mL/min per 1.73 m² or greater and other optimal characteristics (see above), lifetime risk for white men and white women was less than 1% at all ages, but was higher among young black men and women (Figure 8). Lifetime risk for eGFR 60 to 89 mL/min per 1.73 m² was less than 1% at ages older than 60 years. While these displays are useful for visualizing the impact of baseline eGFR on ESKD risk, we endorse consideration of eGFR as part of the assessment of predicted long-term ESKD risk based on a donor candidate's complete demographic and health profile (as opposed to consideration of single risk factors in isolation).

## GFR after Kidney Donation

GFR declines after kidney donation. A person with a predonation GFR of at least 90 mL/min per 1.73 m² would be expected to have a 1-year postdonation GFR of at least 60 mL/min per 1.73 m². In general, a donor immediately loses approximately 50% of renal mass, but there is rapid compensatory hyperfiltration leading to a net reduction in GFR of approximately 30% (25% to 40%) after donation (decrement in GFR of 25 to 40 mL/min per 1.73 m²).[139-141]

In prior guidelines a GFR level of 80 mL/min is frequently cited as the minimal threshold for an acceptable level of kidney function for donation.[38,142] Limited data show a higher risk for lower GFR after donation among kidney donors with lower predonation GFR.[3] (**Evidence Report Table 16, SDC,** http://links.lww.com/TP/B434, and **Supplemental Appendix Table D13, SDC,** http://links.lww.com/TP/B432).

There is theoretical justification for concern about development of kidney disease after nephrectomy. In experimental animals, hemodynamic alterations associated with



**FIGURE 7.** Estimated 15-year incidence (%) of ESKD in the United States according to baseline eGFR and demographic profile from the CKD-PC. *The base-case scenario is defined as: age-specific eGFR (114, 106, 98, 90, 82, 74, and 66 mL/min per 1.73 m² for ages 20, 30, 40, 50, 60, 70, and 80 years, respectively), SBP 120 mm Hg, urine ACR 4 mg/g [0.4 mg/mmol], BMI 26 kg/m², and no diabetes mellitus or antihypertensive medication use. These were selected as being representative of recent US living kidney donors where, with the exception of eGFR, there was little variation in health characteristics by age. ACR, albumin-to-creatinine ratio; BMI, body mass index; CKD-PC, Chronic Kidney Disease-Prognosis Consortium; eGFR, estimated glomerular filtration rate; ESKD, end-stage kidney disease; SBP, systolic blood pressure. Reprinted from Grams ME, Sang Y, Levey AS, et al. Kidney-failure risk projection for the living kidney-donor candidate. *N Engl J Med*. 2016;374:411-421.[7]



**FIGURE 8.** Estimated lifetime incidence (%) of ESKD in the United States according to baseline eGFR and demographic profile from the CKD-PC. *The base-case scenario is defined as: age-specific eGFR (114, 106, 98, 90, 82, 74, and 66 mL/min per 1.73 m² for ages 20, 30, 40, 50, 60, 70, and 80 years, respectively), SBP 120 mm Hg, urine ACR 4 mg/g [0.4 mg/mmol], BMI 26 kg/m², and no diabetes mellitus or antihypertensive medication use. These were selected as being representative of recent US living kidney donors where, with the exception of eGFR, there was little variation in health characteristics by age. Lifetime risk projections are based on 15 years of follow-up data and calibrated to the incidence of ESKD in the low-risk population, and thus are likely imprecise. ACR, albumin-to-creatinine ratio; BMI, body mass index; CKD-PC, Chronic Kidney Disease-Prognosis Consortium; eGFR, estimated glomerular filtration rate; ESKD, end-stage kidney disease; SBP, systolic blood pressure. Reprinted from Grams ME, Sang Y, Levey AS, et al. Kidney-failure risk projection for the living kidney-donor candidate. *N Engl J Med.* 2016;374:411-421.[7]

hyperfiltration after reduction in renal mass are followed by development of structural and functional abnormalities associated with kidney disease. In general, the severity of reduction in renal mass is directly associated with the rate of development of subsequent kidney disease. A recent study in humans documents similar hemodynamic alterations associated with hyperfiltration after kidney donation.[143,144]

The risk of ESKD after kidney donation does not exceed ESKD risk in the general population.[140,145,146] An analysis of living kidney donors in the United States between 1994 and 2003 quantified a postdonation ESKD rate of 0.134 per 1000 person-years over an average follow-up of 9.8 years, which was not higher than the ESKD rate in the general population, even though GFR is lower.[147] However, the general population is a limited comparison group given that donors undergo careful medical evaluation and selection.[4] The ERT identified 2 recent studies suggesting that donation is associated with an increase in the risk of ESKD compared to risk in nondonors selected for baseline good health, although the risk increase is small and the absolute postdonation risk remains low (**Supplemental Appendix Table D5, SDC,** http://links.lww.com/TP/B432). The quality of this evidence was rated as moderate. In comparing 1901 kidney donors with 32 621 healthy, demographically matched controls, Mjøen et al reported that 0.47% of donors (n=9) developed ESKD versus 0.07% of healthy nondonors (n=22) over a median 15.2-year follow-up.[32] Based on linking 96 217 donors from the US donor registry and healthy participants drawn from the National Health and Nutrition Examination Survey III to national ESKD reporting forms, Muzzale et al estimated that the cumulative incidence of ESKD at 15 years was 30.8 per 10 000 in donors compared with 3.9 per 10 000 in matched donors (risk attributable to donation of 26.9 per 10 000).[30] In this study, the incidence of ESKD was higher in individuals who are older versus younger at the time of donation, in men versus women, in blacks versus whites, and in biologically related versus unrelated donors, but risk based on predonation eGFR was not reported. Based on these findings, the likelihood of a small increase in ESKD risk should be discussed with donor candidates; such counseling is endorsed by a 2015 AST *Live Donor Community of Practice* consensus statement,[148] and is required in the US by the OPTN Informed Consent Policy beginning in 2017.[51]

### Single Kidney GFR

Many factors determine the preferred kidney to remove for transplantation. If GFR is acceptable, but there are parenchymal, vascular or urological abnormalities or asymmetry in kidney function, it is preferable to transplant the more severely affected kidney or the kidney with lesser function (see also chapter 16).

On average, kidney function and size are correlated. The average length and volume of a single kidney in healthy adults are approximately 11 cm and 150 mL, respectively, but vary based on age, sex, and body size.[149-151] On average the normal right kidney is approximately 5% smaller than the normal left kidney. Asymmetry in kidney size is generally considered as a difference in kidney size greater than 10% (for example, a difference in kidney length > 1.1 cm or kidney volume > 15 mL). An equivalent difference in kidney function would be greater than 10% (>55% vs <45% in split kidney function). Based on low quality evidence, 1 prior guideline suggested considering a radionuclide imaging study if the difference between kidney lengths is greater

S42    Transplantation ■ August 2017 ■ Volume 101 ■ Number 8S    www.transplantjournal.com

than 2 cm, and that a difference in function of 10% or greater between the kidneys may be considered significant.[48] No studies were found meeting criteria for review by the ERT.

### What Prior Guidelines Recommend

Some guidelines recommend that GFR of 80 mL/min or greater is acceptable for donation, based on the level of GFR in the donor (not adjusted for BSA) that was associated with acceptable outcomes in the recipient, not the donor.[152] Alternatively, some guidelines recommend a GFR level within 2 standard deviations of normal for age and sex. In general, the guidelines do not specify the GFR measurement method to be used, whether the threshold value should be adjusted for BSA, or provide standardized reference values based on sex, race, and age.[153]

A 2007 survey of practices by transplant programs in the United States revealed that approximately 90% of programs used mCrCl to measure kidney function, while the other 10% of programs used the clearance of an exogenous filtration marker, and that approximately 67% of transplant programs used a threshold of 80 mL/min or more to accept donors, while 25% used a threshold based on age and sex.[154]

In our view, there is not sufficient evidence to justify a single threshold value of 80 mL/min not adjusted for BSA, nor age-specific thresholds. In contrast, our recommendations are more consistent with accepted measurement methods and thresholds in general clinical practice, and acknowledge that there is variation in GFR measurement methods and uncertainty in the appropriate threshold to accept or decline donor candidates. For this reason, we recommend GFR measurement by urinary or plasma clearance of specific exogenous filtration markers, which are known to be more accurate than mCrCl, but allow other methods. We recommend a higher threshold value of GFR ($\geq$90 mL/min per 1.73 m$^2$) to routinely accept a donor candidate, and lower threshold value of GFR (<60 mL/min per 1.73 m$^2$) to routinely decline a donor candidate, and a wide intermediate range of GFR (60-89 mL/min per 1.73 m$^2$) in which transplant programs can individualize decisions based on other risk factors. Of note, this intermediate range would generally include a mCrCl of 80 mL/min as well as previously recommended age and sex thresholds for mGFR.

### RESEARCH RECOMMENDATIONS

- Evaluate the accuracy of eGFR$_{cr}$, eGFR$_{cys}$ and eGFR$_{cr-cys}$ for the prediction of mGFR in the evaluation and selection of living donor candidates.
- Evaluate long-term risks, including lifetime risk of ESKD, in living donor candidates and living donors according to predonation GFR.

## CHAPTER 6: PREDONATION ALBUMINURIA

The ERT search parameters did not identify evidence from eligible studies pertinent to the recommendations in chapter 6 and therefore the following recommendations are "Not Graded." Some of the recommendations extrapolated from the 2012 KDIGO CKD Guideline[124] were not part of the ERT review for this guideline and as such they are also "Not Graded."

### Evaluation

6.1: Donor proteinuria should be measured as albuminuria, not total urine protein.

6.2: Initial evaluation of donor albuminuria (screening) should be performed using urine albumin-to-creatinine ratio (ACR) in a random (untimed) urine specimen.

6.3: Donor albuminuria should be confirmed using:
- Albumin excretion rate (AER, mg/day [mg/d]) in a timed urine specimen
- Repeat ACR if AER cannot be obtained.

### Selection

6.4: Urine AER less than 30 mg/d should be considered an acceptable level for donation.

6.5: The decision to approve donor candidates with AER 30 to 100 mg/d should be individualized based on demographic and health profile in relation to the transplant program's acceptable risk threshold.

6.6: Donor candidates with urine AER greater than 100 mg/d should not donate.

## RATIONALE

### Evaluation

The goals of the evaluation of albuminuria in living donor candidates are to:

- Provide an accurate assessment of the amount of albuminuria and long-term risk of ESKD based on albuminuria and other factors.
- Exclude donor candidates whose postdonation risk is expected to exceed the acceptable risk threshold for ESKD established by the transplant program.
- Provide counseling regarding level of risk for donor candidates whose long-term risk for ESKD is expected to be below the acceptable risk threshold established by the transplant program.
- Provide counseling regarding follow-up of albuminuria after donation.

In this section, recommendations are based on physiological principles and recommendations for general clinical practice from the 2012 KDIGO CKD guideline.[124] There is no evidence to suggest or a reason to think that kidney donors differ from the general population regarding these recommendations.

### Proteinuria as a Marker of Kidney Damage

Urine protein is composed of small amounts of high molecular weight proteins (principally albumin) that are not normally filtered, low molecular weight serum proteins that are normally filtered by the glomeruli and reabsorbed by the tubules, and proteins secreted by the urinary tract.

Increased urinary protein is generally considered a marker of kidney damage: albuminuria reflects increased permeability of the glomeruli (glomerular proteinuria), and low molecular weight proteinuria reflects decreased tubular reabsorption (tubular proteinuria). CKD due to either glomerular or tubulointerstitial diseases is generally associated with both glomerular and tubular proteinuria (albuminuria and low molecular weight protein). Some tubulointerstitial diseases may cause predominantly tubular proteinuria, including Dent disease, toxicity due to heavy metals (eg, cadmium and lead) or aristolochic acid (Balkan and Chinese herb) nephropathy, Sjogren syndrome, multiple myeloma or hereditary diseases

C. Agnello   SE 0261

© 2017 Wolters Kluwer

associated with Fanconi syndrome, and acute tubular necrosis. Conditions other than kidney disease can also cause proteinuria: low molecular weight proteinuria may also reflect overproduction (eg, light chain proteinuria in lymphoproliferative disorders) and high and low molecular weight proteins may arise from increased secretion of urinary tract proteins (due to lower urinary tract diseases).

Urine albumin is the preferred measure of urine protein for assessment of kidney damage. Tests for total urine protein cannot be standardized because they are not traceable to a standard reference material due to the varying composition of urine protein. Current efforts to standardize albuminuria assessment are directed to establishing traceability of tests for urine albumin to standardized reference material for serum albumin. Other urine proteins are less well standardized than albumin.

The albumin loss rate (hereafter referred to as albumin excretion rate, AER) is not regulated in health and is widely accepted as a marker of kidney damage. Increased AER is associated with a wide range of complications and increased AER is one of the criteria for the definition of CKD. In diabetic kidney disease and other glomerular diseases, increased AER generally occurs before the decline in GFR.

### Measurement Methods

The KDIGO 2012 CKD guideline for the evaluation of albuminuria in the general population recommends 2-stage testing (initial testing followed by confirmatory testing).[124] The current living donor guideline WG concluded that these general recommendations were applicable to kidney donor candidates.

Initial tests, in order of preference, and the rationale are described below. In all cases an early morning urine sample is preferred as it minimizes variation due to diurnal variation in albumin excretion and urine concentration.

### Urine Albumin-to-Creatinine Ratio (ACR)

The rationale for preferring ACR to albumin concentration is that urine concentration and dilution can vary by more than 10-fold among individuals and during the day. The KDIGO CKD guideline therefore recommends that clinical laboratories measure creatinine when albumin is requested, and express the results as ACR in addition to albumin concentration. Indexing urine albumin by urine creatinine concentration overcomes variation due to urine concentration and dilution, but introduces variation by creatinine generation.

Recently, some investigators have proposed estimating creatinine excretion rate and multiplying this quantity by ACR to estimate AER.[155] The lower limit of detection for urine albumin in the clinical laboratory where the test is performed can be used for computation of urine ACR if the clinical laboratory reports "below the detectable limit." Factors affecting urine ACR in addition to kidney disease are shown in Table 14.

One study reported excellent performance of ACR to detect AER of 30 mg/d. The area under the receiver operator curve was 0.93.[156] An ACR threshold of ≥10 mg/g was associated with sensitivity and specificity of 88% each for detecting AER ≥30 mg/d. There was minor variation in area under the receiver operator curve based on age, sex, race, and body weight.

### Urine Protein-to-Creatinine Ratio (PCR)

Tests for total urine protein cannot substitute for tests for urine albumin. PCR is less sensitive than ACR, so even negative tests must be confirmed by tests for albumin. Increased PCR suggests increased ACR, but nonalbumin protein can cause a positive test, so positive tests should be confirmed by tests for albumin. Patients with elevated PCR and negative tests for albumin may have tubular proteinuria, light chain proteinuria or urinary tract disease. Specific assays are available for α1-microglobulin, β2 microglobulin, monoclonal heavy or light chains.

### Reagent Strip Urinalysis for Total Protein with Automated Reading

Reagent strips allow point-of-care, semi-quantitative assessment of total urine protein concentration. Reagent strips

**TABLE 14.**

**Factors affecting urinary ACR**

| Factor | Examples of effect |
| --- | --- |
| **Preanalytical factors** | |
| • Transient elevation in albuminuria | Menstrual blood contamination |
| | Symptomatic UTI |
| | Exercise |
| | Upright posture (orthostatic proteinuria) |
| | Other conditions increasing vascular permeability (eg, septicemia) |
| • Intraindividual variability | Intrinsic biological variability |
| | Genetic variability |
| • Preanalytical storage conditions | Degradation of albumin before analysis |
| • Nonrenal causes of variability in creatinine excretion | Age (lower in children and older people) |
| | Race (lower in white than black people) |
| | Muscle mass (eg, lower in people with amputations, paraplegia, muscular dystrophy) |
| | Gender (lower in women) |
| • Changes in creatinine excretion | Non–steady state for creatinine (AKI) |
| **Analytical factors** | |
| • Antigen excess ("prozone") effect | Samples with very high albumin concentrations may be falsely reported as low or normal using some assays |

ACR, albumin-to-creatinine ratio; AKI, acute kidney injury; UTI, urinary tract infection.
Adapted with permission from Kidney Disease: Improving Global Outcomes (KDIGO) CKD Work Group. KDIGO 2012 clinical practice guideline for the evaluation and management of chronic kidney disease. *Kidney Int* 2013:1–150.[124]

S44    Transplantation ■ August 2017 ■ Volume 101 ■ Number 8S    www.transplantjournal.com

("dipsticks") are more sensitive to albumin than other proteins, but lack specificity. Automated readers are more accurate than manual reading of reagent strips.

### Reagent Strip Urinalysis for Total Protein with Manual Reading, if the Above Measures are not Available

Because of variability in urine ACR and its relationship to urine AER, the WG recommends confirmation in all cases. The preferred confirmatory test is urine AER, expressed as mg/d. If urine AER is not available, a repeat ACR is acceptable. Consistent with the 2012 KDIGO CKD guideline, testing for specific urine proteins such as α1-microglobulin, β2 microglobulin, monoclonal heavy or light chains (also known as "Bence Jones" proteins) can be undertaken if significant nonalbumin proteinuria is suspected. These assays can be performed at the same time as tests for albuminuria.

### Selection: Criteria for Acceptable Predonation Albuminuria

### AER in the General Population

The normal level of AER in healthy young men and women is less than 10 mg/d. The coefficient of variation for repeated measurements is approximately 30%.[157] Because of the high coefficient of variation, repeated measurements are preferred for assessment of albuminuria.

AER rises with age, although the cause of rise is not known and the rate of rise appears widely variable. Most data are based on cross-sectional studies and mean AER is higher in older populations than in young populations. As discussed in chapter 5, there are often abnormalities in kidney function and structure in the elderly and there is debate about whether higher AER in older people represents normal aging or disease.

Higher albuminuria in the general population is associated with a higher risk of complications of CKD, including ESKD, CVD and death. In general populations, compared with a reference ACR of 5 mg/g (0.5 mg/mmol), the RR for complications related to increased ACR rises at higher ACR, without an apparent threshold when expressed on the log scale.[134] The risk of higher ACR is independent of the eGFR. Similar

relationships of high albuminuria with adverse outcomes have been observed in subgroups including patients with known CKD (Figure 6).[134-137] KDIGO 2012 CKD guideline defines AER >30 mg/d for 3 months or more as satisfying the criteria for CKD. AER less than 30 mg/d in young men and women is considered normal to mildly increased, with 10 to 29 mg/d considered as "high normal;" AER 30 to 300 mg/d is defined as moderately increased compared with the young adult level; and AER greater than 300 mg/d is defined as severely increased compared with the young adult level. Approximate ranges for other measures of urine protein are as shown in Table 15. The association of higher albuminuria with higher risk of adverse outcomes may be related to other conditions that co-occur with high albuminuria, such as hypertension, diabetes and CVD. The RR for these adverse CKD outcomes (ESKD, CVD, death) in older people with higher urine ACR compared with the reference urine ACR is less than the RR in younger people; however the increment in absolute risk in older people is higher in older people than in younger people.[138]

A recent meta-analysis based on data from nearly 5 million healthy persons identified from 7 general population cohorts found that each 10-fold increase in urinary ACR was associated with 3 times the risk of ESKD over median cohort follow-up of 4 to 16 years, although the finding was not statistical significant ([95% Lower Confidence Limit] adjusted hazard ratio [aHR] [95% Upper Confidence Limit] 0.99 2.94 8.75).[7] After calibration to annual ESKD incidence in the US healthy population, variations in the projected 15-year and lifetime risks of ESKD based on urine ACR were generated according to age, sex, and race for healthy persons (assuming age-specific eGFR, SBP 120 mm Hg, BMI 26 kg/m$^2$, and absence of diabetes mellitus; Figures 9 and 10). This analysis demonstrates that higher albuminuria is associated with higher lifetime risk of ESKD in all subgroups, with higher risk in men than women and blacks than whites. For urine ACR less than 10 mg/g and other optimal risk factors (see above), lifetime risk for white men and white women was less than 1% at all ages, but exceeded 2% for black men younger than 40 (Figure 10). For urine ACR less than 30 mg/g, the lifetime

**TABLE 15.**

Relationship among categories for albuminuria and proteinuria

| Measure | Categories | | |
| --- | --- | --- | --- |
| | Normal to mildly increased (A1) | Moderately increased (A2) | Severely increased (A3) |
| AER (mg/24 h) | <30 | 30-300 | >300 |
| PER (mg/24 h) | <150 | 150-500 | >500 |
| ACR | | | |
| (mg/mmol) | <3 | 3-30 | >30 |
| (mg/g) | <30 | 30-300 | >300 |
| PCR | | | |
| (mg/mmol) | <15 | 15-50 | >50 |
| (mg/g) | <150 | 150-500 | >500 |
| Protein reagent strip | Negative to trace | Trace to + | + or greater |

Albuminuria and proteinuria can be measured using excretion rates in timed urine collections, ratio of concentrations to creatinine concentration in spot urine samples, and reagent strips in spot urine samples. Relationships among measurement methods within a category are not exact. For example, the relationships between AER and ACR and between PER and PCR are based on the assumption that average creatinine excretion rate is approximately 1.0 g/d or 10 mmol/d. The conversions are rounded for pragmatic reasons. (For an exact conversion from mg/g of creatinine to mg/mmol of creatinine, multiply by 0.113.) Creatinine excretion varies with age, sex, race, and diet; therefore the relationship among these categories is approximate only. ACR less than 10 mg/g (<1 mg/mmol) is considered normal; ACR 10 to 30 mg/g (1-3 mg/mmol) is considered "high normal." ACR greater than 2200 mg/g (>220 mg/mmol) is considered "nephrotic range." The relationship between urine reagent strip results and other measures depends on urine concentration. AER, albumin-to-creatinine ratio; AER albumin excretion rate; PCR, protein-to-creatinine ratio; PER, protein excretion rate. Adapted with permission from Kidney Disease: Improving Global Outcomes (KDIGO) CKD Work Group. KDIGO 2012 clinical practice guideline for the evaluation and management of chronic kidney disease. *Kidney Int* 2013:1–150.[124]

C.Agnello    SE 0263



**FIGURE 9.** Estimated 15-year incidence (%) of ESKD in the United States according to baseline albumin-to-creatinine ratio (ACR, mg/g) and demographic profile from the CKD-PC. *The base-case scenario is defined as: age-specific eGFR (114, 106, 98, 90, 82, 74, and 66 mL/min per 1.73 m² for ages 20, 30, 40, 50, 60, 70, and 80 years, respectively), SBP 120 mm Hg, urine ACR 4 mg/g [0.4 mg/mmol], BMI 26 kg/m², and no diabetes mellitus or antihypertensive medication use. These were selected as being representative of recent US living kidney donors where, with the exception of eGFR, there was little variation in health characteristics by age. BMI, body mass index; CKD-PC, Chronic Kidney Disease-Prognosis Consortium; eGFR, estimated glomerular filtration rate; ESKD, end-stage kidney disease; SBP, systolic blood pressure. Reprinted from Grams ME, Sang Y, Levey AS, et al. Kidney-failure risk projection for the living kidney-donor candidate. *N Engl J Med*. 2016;374:411-421.[7]

risk was less than 1% in white men at age >50 years, black men at age >70, and black women at age >60. While these displays are useful for visualizing the associations of baseline ACR with ESKD risk, we endorse consideration of ACR as part of the assessment of predicted long-term ESKD risk based on a donor candidate's complete demographic and health profile (as opposed to consideration of single risk factors in isolation).



**FIGURE 10.** Estimated lifetime incidence (%) of ESKD in the United States according to baseline albumin-to-creatinine ratio (ACR, mg/g) and demographic profile from the CKD-PC. *The base-case scenario is defined as: age-specific eGFR (114, 106, 98, 90, 82, 74, and 66 mL/min per 1.73 m² for ages 20, 30, 40, 50, 60, 70, and 80 years, respectively), SBP 120 mm Hg, urine ACR 4 mg/g [0.4 mg/mmol], BMI 26 kg/m², and no diabetes mellitus or antihypertensive medication use. These were selected as being representative of recent US living kidney donors where, with the exception of eGFR, there was little variation in health characteristics by age. Lifetime risk projections are based on 15 years of follow-up data and calibrated to the incidence of ESKD in the low-risk population, and thus are likely imprecise. BMI, body mass index; CKD-PC, Chronic Kidney Disease-Prognosis Consortium; eGFR, estimated glomerular filtration rate; ESKD, end-stage kidney disease; SBP, systolic blood pressure. Reprinted from Grams ME, Sang Y, Levey AS, et al. Kidney-failure risk projection for the living kidney-donor candidate. *N Engl J Med*. 2016;374:411-421.[7]

S46    **Transplantation** ■ August 2017 ■ Volume 101 ■ Number 8    www.transplantjournal.com



**FIGURE 11.** Proteinuria after kidney donation. Solid line, regression line; dotted line: 95% confidence interval. Reprinted with permission of the Massachusetts Medical Society from Ibrahim HN, Foley R, Tan L, et al. Long-term consequences of kidney donation. *N Engl J Med.* 2009;360:459-469.[140]

## Proteinuria after Kidney Donation

Some but not all studies demonstrate donors have an increase in proteinuria compared with nondonor control groups (Figures 11 to 12).[139-141] In prior guidelines a protein excretion rate (PER) <150 mg/d was frequently cited as acceptable for donation.[48,50,158,159] This level corresponds roughly to AER less than 30 mg/d, which includes normal and mildly increased (Table 15).[124] However, the risk associated with albuminuria in kidney donors is uncertain.

There is theoretical justification for concern about development of kidney disease after nephrectomy. First, in experimental animals, reduction in renal mass is associated with increased glomerular permeability to albumin followed by other structural and functional abnormalities associated with kidney disease. Second, given that GFR declines after kidney donation, the filtered load of albumin would be expected to decline. Unchanged or higher albuminuria after donation suggests increased albumin filtration per nephron.

In a prior systematic review, the incidence of clinical proteinuria after donation was quantified in 42 studies, that followed 4793 living donors for an average of 7 years (range, 2-25 years).[141] There was significant heterogeneity between the studies ($P < 0.0001$). Some studies reported an incidence of proteinuria over 20%, whereas in others the incidence was less than 5%. The pooled incidence of proteinuria was 12% (95% CI, 8-16%). These results were similar in a supplementary analysis limited to 9 studies which consistently defined proteinuria as greater than 300 mg/d based on 24-hour urine. The pooled incidence of proteinuria among these 9 studies, which followed a total of 1799 donors for 7 years, was 10% (95% CI, 7-12%).

### What Prior Guidelines Recommend

Some guidelines recommend that accepted living donor candidates have a PER less than 150 to 300 mg per day, based on the usually accepted normal range, generally without reference to measurement methods. A survey of practices by transplant programs in the United States reported in 2007 found that approximately 76% of programs used a PER in a 24-hour urine collection for donor evaluation, and that 36% used PER > 150 mg/d as a threshold for donor exclusion (unless proteinuria is postural), while 44% reported higher exclusion thresholds of 300-1000 mg/d.[154]

By comparison, our recommendations are more consistent with the recently accepted criterion standard, measurement methods and thresholds in general clinical practice, but acknowledge that there is variation in ascertainment of albuminuria for screening and uncertainty in the appropriate threshold to accept or decline donor candidates. For these reasons, we recommend measurement of albumin rather than total protein, and AER in a timed urine collection rather than ACR in a spot urine specimen if possible. We recommend an AER threshold of less than 30 mg/d to routinely accept a donor candidate, which corresponds to normal to mildly increased. We recommend an intermediate range of AER 30 to 100 mg/d corresponding to the lower range for moderately increased AER, in which to individualize decisions based on other risk factors. We acknowledge that AER of 30 to 100 mg/d meets the criteria for CKD, and past recommendations have strived to exclude donor candidates with CKD. We have not excluded candidates solely on the basis of AER 30 to 100 mg/d because estimated projected predonation lifetime risk of ESKD in older persons with ACR in this range is very low in the absence of decreased GFR and other health risk factors.[7] Thus, we concluded that universal exclusion would not be consistent with a Framework that would allow donation from other candidates with similar risk due to other clinical risk factors.

We do not require tests of total urine protein in addition to albumin because there are no accepted normal ranges for urine nonalbumin protein excretion; disorders associated with predominant tubular proteinuria (tubulointerstitial kidney disease) and overproduction proteinuria (plasma cell or B-lymphocyte disorders) are uncommon, and patients with these disorders usually have other clinical abnormalities that would be discovered during the donor evaluation.

## RESEARCH RECOMMENDATIONS

- Assess the accuracy of urine ACR compared with AER for evaluation and selection of living donor candidates.
- Evaluate the association of urine albumin with other kidney measures (eg, GFR and kidney size) at the time of donor evaluation and with kidney measures and outcomes (eg, GFR change, ESKD, survival) after donation.

## CHAPTER 7: PREDONATION HEMATURIA

The ERT search parameters did not identify evidence from eligible studies pertinent to the recommendations in chapter 7 and therefore the following recommendations are "Not Graded."

### Evaluation

7.1: Donor candidates should be assessed for microscopic hematuria.

7.2: Donor candidates with persistent microscopic hematuria should undergo testing to identify possible causes, which may include:

- Urinalysis and urine culture to assess for infection

*C. Agnello    SE 0265*

© 2017 Wolters Kluwer



**FIGURE 12.** Meta-analysis of proteinuria after kidney donation. Controlled studies of proteinuria after kidney donation. The size of each square is inversely proportional to the variability of the study estimate. *Studies are arranged by the average number of years after donation. ‡Microalbuminuria was assessed by 24-hour urine. †Mathematically pooled results are not presented graphically because of statistical heterogeneity between studies. CI, confidence interval. Reprinted with permission from Garg AX, Muirhead N, Knoll G, et al. Proteinuria and reduced kidney function in living kidney donors: a systematic review, meta-analysis, and meta-regression. *Kidney Int.* 2006;70:1801-1810.[141]

- Cystoscopy and imaging to assess for urinary tract malignancy
- 24-hour urine stone panel to assess for nephrolithiasis and/or microlithiasis
- Kidney biopsy to assess for glomerular disease (eg, thin basement membrane nephropathy, IgA nephropathy, Alport syndrome)

**Selection**

7.3: Donor candidates with hematuria from a reversible cause that resolves (eg, a treated infection) may be acceptable for donation.

7.4: Donor candidates with IgA nephropathy should not donate.

## RATIONALE

### Evaluation and Definitions

Persistent microscopic hematuria is most often defined as more than 2 to 5 red blood cells per high-power field of urinary sediment on 2 to 3 separate occasions, unrelated to exercise, trauma, sexual activity or menstruation.[160-163] Consensus-based guidelines of the American Urological

S48      *Transplantation* ■ August 2017 ■ Volume 101 ■ Number 8S      www.transplantjournal.com

Association state that while a positive dipstick reading warrants microscopic examination to confirm the diagnosis of asymptomatic microhematuria, a positive dipstick alone does not define microhematuria, and evaluation should be based solely on findings from microscopic examination of urinary sediment.[161] Causes of a positive dipstick reading in the absence of red blood cells in the urine include hemoglobinuria, myoglobinuria, a dilute urine sample, or simply a false-positive test.

The estimated prevalence of microscopic hematuria varies widely from 0.18% to 16%.[160] A recent population study of 1.2 million persons aged 16 to 25 years in Israel identified prevalent asymptomatic persistent microscopic hematuria in 0.3% of individuals.[163] Persistent microscopic hematuria may be associated with urologic abnormalities (eg, stones, tumors) or glomerular disease. The most common glomerular causes of persistent isolated microscopic hematuria are IgA nephropathy, thin basement membrane nephropathy (TBMN) and Alport syndrome.[164-167]

There are consensus-based guidelines for the evaluation of asymptomatic microhematuria in the general population. For example, the 2012 recommendations from the American Urological Association[161] include assessment of risk factors for urinary tract malignancies (eg, irritative voiding symptoms, current or past tobacco use, chemical exposures), radiological evaluation (eg, multiphasic computed tomography urography, without and with intravenous contrast, or magnetic resonance urography), and cystoscopy in patients age 35 years or older regardless of history of use of anticoagulation therapy. Urine cytology and urine biomarkers are not recommended as a part of the routine evaluation of asymptomatic microhematuria.

The presence of dysmorphic urinary red blood cells detected by conventional microscopy, phase-contrast microscopy, or automated analyzer has a broad a range of sensitivities (32% to 100%) and specificities (from 33% to 100%) for glomerular causes of microhematuria.[161] The presence of dysmorphic red blood cells or cellular urinary casts and other clinical information can be used to prioritize the evaluation for glomerular causes of hematuria. However, the presence of dysmorphic red blood cells does not exclude underlying urologic disease.[161]

Although isolated microscopic hematuria in young persons is often considered "benign," a recent population-based study of 1.2 million Israeli persons aged 16 to 25 years with up to 35 years of follow-up identified small but significant increase in long-term renal risk associated with persistent asymptomatic isolated microscopic hematuria, with ESKD rates of 34.0 versus 2.05 per 100 000 person-years among those with versus without persistent microscopic hematuria (adjusted HR, $_{12.4}18.5_{27.6}$).[163] While participants were required to have serum creatinine values "within the normal range" and 24-hour urine protein less than 200 mg, this study does not provide information on ESKD risk after comprehensive evaluation and selection including measured kidney function.

### Selection

The sequence of the evaluation for microscopic hematuria, like other testing in this guideline, is designed to perform less invasive/expensive tests before more invasive/expensive tests, and only if the less invasive/expensive tests do not preclude donation (Figure 13).[168] Reversible causes of microscopic hematuria, for example, treatable urinary tract infection, should generally not preclude donation. In the absence of a family history suggesting possible TBMN or Aport disease, additional testing to rule out these causes is generally not



**FIGURE 13.** Sequential evaluation of microscopic hematuria in living kidney donor candidates. In general, lower risk and less expensive tests should be performed first, and at each step additional testing should only be performed if necessary. Boxes indicate stopping points in the donor candidate hematuria evaluation. AER, albumin excretion rate; GFR, glomerular filtration rate; hpf, high-power field; RBC, red blood cell.

C.Agnello  SE 0267

© 2017 Wolters Kluwer

necessary. Please refer to chapter 14 for a related discussion on genetic testing in the donor candidate.

Epidemiological studies of TBMN suggest increased risks of hypertension and proteinuria compared with the general population over time, but progression to ESKD is rare and thought to require an additional insult.[169] Data on outcomes of living kidney donor evaluation and donation in persons with TBMN are limited to small series with short-term follow-up.[170,171] A series of 512 consecutive donors at a US center identified asymptomatic, microscopic hematuria for at least 1 month in 2.7% (n = 14). Hematuria resolved after treatment for urinary tract infection in 2. Kidney biopsy was performed in 10/12, and showed: TBMN (5/12); normal (2/12); nonhomogeneous basement membrane abnormalities (1/12); IgA nephropathy (1/12); and greater than 20% glomerulosclerosis in a patient with a family history of Schimke's syndrome (immune-osseous dysplasia). Two of the 4 with TBMN, aged 44 and 53 years, proceeded with donation; after 15 months follow-up, donors were free of hypertension, proteinuria, and recipients had "excellent" graft function.[170] A Korean series including 5 living donors with TBMN defined by predonation biopsy reported favorable short-term outcomes, including mean serum creatinine 0.94 ± 0.32 mg/dL (83 ± 28.3 μmol/L) and no cases of new-onset hypertension or proteinuria over mean follow-up period of 34.7 ± 42.5 months.[171]

Notably, TMBN is often defined based on pathological description rather than as a distinct clinical entity. Carrier states for Alport mutations may present as TBMN. High rates of proteinuria (75%) and ESKD (8-30%) have been reported in female carriers of X-linked Alport syndrome mutations.[172] A recent study identified adverse kidney outcomes in 234 Alport carriers (including 29 autosomal recessive and 205 X-linked carriers): ESKD developed in 17.5% at a median age of 49 years, and outcomes including ESKD, proteinuria and impaired kidney function were similar in X-linked and autosomal recessive carriers,[173] although the number of autosomal recessive carriers was small. Among 6 female Alport carriers (5 X-linked, 1 autosomal recessive) who donated to their children at several European centers and were followed for an average 6.7 years, 3 developed new-onset hypertension and 2 developed new-onset proteinuria.[174] Creatinine clearance remained greater than 40 mL/min in all donors after up to 14 years. Thus, while data are limited, female carriers of X-linked Alport syndrome (ie, COL4A5 mutation) should be discouraged from kidney donation because of their own increased risk of hypertension and adverse kidney outcomes even in the absence of donation.

IgA nephropathy that presents with hematuria and minimal proteinuria is often a progressive disease.[175] In one series in Hong Kong, 72 consecutive patients with IgA nephropathy presenting as hematuria and minimal proteinuria (0.4 g/day or less) were followed for a median of 84 months; 33% developed proteinuria, 26% became hypertensive, and 7% developed impaired kidney function.[176] The presence of hematuria and glomerular IgA deposition is associated with increased risk of progressive kidney disease even in the absence of other clinical findings.[175] For this reason, there is broad consensus that people with known IgA nephropathy should not donate a kidney. Examination of a series of 510 implantation biopsies at a large center in Tokyo (including 446 living donors) found latent mesangial IgA deposition to be relatively common in healthy Japanese living donors, present in 16.1% of living donor allograft biopsies.[177] Mesangial IgA deposition was associated with a mild degree of microhematuria, mesangial proliferation and glomerular macrophage infiltration in some of the affected individuals, especially with C3 deposition.

Persistent hematuria without defined renal histopathology has been associated with proteinuria after kidney donation. In a series of 242 living kidney donors at one center in Japan, persistent predonation hematuria was identified in 8.3% (18.6% vs 6% in those with vs without family history of IgA nephropathy or Alport syndrome).[178] 95% of those with persistent predonation hematuria continued to have persistent hematuria after donation over median 27 month follow-up (compared with 28% of those with predonation occasional hematuria and 5% without predonation hematuria). Predonation hematuria was associated with increased likelihood of persistent proteinuria (dipstick ≥ 1+) after donation (without dysmorphic red blood cells: adjusted OR 3.8; with dysmorphic red blood cells: adjusted OR 12.3). Predonation hematuria was not associated with postdonation GFR, but persistent postdonation hematuria with dysmorphic red blood cells was associated with significant GFR decline over the study period.

## What Prior Guidelines Recommend

Previous guidelines recommend that evaluation of donor candidates for causes of hematuria include urine culture and imaging,[48] cystoscopy if older than 40 years,[48] urine cytology and "complete" urological evaluation.[54] A recent Canadian protocol recommends tests of urine culture, urine cytology, 24-hour urine calcium, metabolic stone workup, and then if the cause of hematuria is undetermined, cystoscopy and a native kidney biopsy.[179] In the absence of an identified cause, evaluation by kidney biopsy has been advised if hematuria is >1 +[48] or possibly caused by glomerular disease[38,54]

While a number of prior living kidney donor guidelines recommend kidney biopsy as part of the evaluation of persistent microhematuria before donation,[48,180] few articulate criteria for donor selection. The 2011 British Transplantation Society guidelines offer a "moderate quality" recommendation that "glomerular pathology precludes donation, with the possible exception of thin basement membrane disease."[48] Canadian Blood Service's protocol for KPD defines IgA nephropathy and Alport syndrome (including carrier status) as exclusions to donation.[179]

The 2013 "Expert Guidelines for the Management of Alport Syndrome and Thin Basement Membrane Nephropathy" include several consensus-based recommendations related to living donation selection[181]: A) "Individuals with TBMN may be kidney donors if they have normal BP, proteinuria, and renal function" and if a biopsy is done and Alport syndrome is excluded." Close monitoring and use of nephroprotective strategies are advised; B) "Individuals from families with autosomal recessive Alport syndrome who have only one of the causative mutations (parents, offspring, some siblings) may be kidney donors if they have normal BP, proteinuria levels, and renal function; if coincidental kidney disease has been excluded by kidney biopsy; and if X-linked Alport syndrome has been excluded by genetic testing." The document recommends "discouraging affected mothers of males with X-linked

S50   **Transplantation** ■ August 2017 ■ Volume 101 ■ Number 8S   www.transplantjournal.com

Alport syndrome from renal donation because of their own risk of kidney failure."

## RESEARCH RECOMMENDATIONS

- Perform long-term follow-up studies of living donors with infrequent clinical conditions including:
  - Alport female "carrier" state
  - TBMN
  - Incidental IgA deposition in glomeruli and isolated hematuria
  - Nephrolithiasis
- These studies should include appropriate controls and examine endpoints including CKD and kidney failure, premature death, and health-related quality of life.

## CHAPTER 8: KIDNEY STONES

The ERT search parameters did not identify evidence from eligible studies pertinent to the recommendations in chapter 8 and therefore the following recommendations are "Not Graded."

### Evaluation

8.1: Donor candidates should be asked about prior kidney stones, and related medical records should be reviewed if available.
8.2: The imaging performed to assess anatomy before donor nephrectomy (eg, computed tomography angiogram) should be reviewed for the presence of kidney stones.
8.3: Donor candidates with prior or current kidney stones should be assessed for an underlying cause.

### Selection

8.4: The acceptance of a donor candidate with prior or current kidney stones should be based on an assessment of stone recurrence risk and knowledge of the possible consequences of kidney stones after donation.

### Counseling

8.5: Donor candidates and donors with current or prior kidney stones should follow general population, evidence-based guidelines for the prevention of recurrent stones.

## RATIONALE

### Evaluation

Transplant programs typically assess donor candidates with past or present, symptomatic or asymptomatic kidney stones. In a cohort of approximately 2000 living kidney donor candidates who underwent computed tomography (CT) angiograms/urograms at a large US center (mean age, 43 years; 92% white; 58% women), 3% of candidates had past symptomatic kidney stones, and 11% had evidence of stones on renal imaging.[182]

A kidney stone in an individual with a solitary kidney can potentially obstruct the ureter, leading to acute kidney injury, and may result in urgent hospital attention and even surgical intervention. Donor candidates should have a detailed evaluation including a careful history and medical record review of any prior or current kidney stones. In the case of a prior history of stones, additional details that should be assessed include the time and location of prior episodes,

and any prior investigations or treatments. The frequency of kidney stones varies by sex, race and climate. The overall prevalence of kidney stones is approximately 6 to 9% in men, and 3 to 4% in women, and most stones are composed of calcium oxalate.[183] Living kidney donors without a predonation history of kidney stones have no difference in the risk of developing kidney stones after donation, or in receiving a urologic procedure for kidney stones after donation, compared with selected nondonors matched for similar baseline health.[184]

### Asymptomatic Kidney Stones Seen on Imaging

Approximately 5% of individuals have evidence of an asymptomatic kidney stone on CT angiography performed as part of the donor evaluation.[185] Such CT scans may detect very small calcifications in the kidneys in patients who are asymptomatic and have no history of a clinically recognized kidney stone; very small 1 to 2 mm calcifications in the renal papillae found on CT scans are referred to as Randall's plaques. These plaques have uncertain prognostic significance.

### Evaluation of Donor Candidates and Donors with Prior or Current Kidney Stones

Donor candidates and donors with current or prior kidney stones should have an evidence-based evaluation of nephrolithiasis. For example, the 2014 American Urological Association Guideline provides comprehensive consensus and evidence-based recommendations for the evaluation of adult patients with kidney stones[186]:

1. A clinician should perform a screening evaluation consisting of a detailed medical and dietary history, serum chemistries and urinalysis on a patient newly diagnosed with kidney or ureteral stones. (clinical principle)
2. Serum intact parathyroid hormone (PTH) concentration should be obtained as part of the screening evaluation if primary hyperparathyroidism is suspected. (clinical principle)
3. When a stone is available, a stone analysis should be performed at least once. (clinical principle)
4. Clinicians should obtain or review available imaging studies to quantify stone burden. (clinical principle)
5. Additional metabolic testing should be performed in high-risk or interested first-time stone formers and recurrent stone formers. (moderate evidence)
6. Metabolic testing should consist of one or two 24-hour urine collections obtained on a random diet and analyzed at minimum for total volume, pH, calcium, oxalate, uric acid, citrate, sodium, potassium and creatinine. (expert opinion)

Similarly, the 2016 European Association of Urology guideline also provides comprehensive expert and evidence-based recommendations on the evaluation of adults with kidney stones,[187] as do the Caring for Australians with Renal Impairment (CARI) guidelines.[183]

### Risk Factors for Recurrent Stones

Prospective studies have shown the median recurrence rate of kidney stones is 15 per 100 person-years.[188] However, the risk of recurrence after a single stone is difficult to predict in an individual. Compared with older adults, younger adults

C. Agnello   SE 0269

© 2017 Wolters Kluwer

have more remaining years to live, and so have a higher lifetime chance of kidney stone recurrence.

Characteristics associated with a higher lifetime risk of stone recurrence include[183]:

- Younger age (<40 years)
- A family history of kidney stones
- Frequent, recurrent kidney stones

Characteristics associated with a lower lifetime risk of stone recurrence include:

- Older age (≥40 years)
- No prior symptoms of kidney stones
- A kidney stone that is less than 15 mm, solitary and unilateral

### Selection and Management

The acceptance of a donor candidate with prior or current kidney stones should be based on an assessment of stone recurrence risk and knowledge of the possible consequences of kidney stones after donation.

As recommended in chapter 5 (Predonation Kidney Function), when asymmetry in GFR, parenchymal abnormalities (including stones), vascular abnormalities, or urological abnormalities are present but do not preclude donation, the more affected kidney should be used for donation.

### Possible Consequences of Kidney Stones

Kidney stones may be associated with a higher risk of CKD and ESKD, with possible mechanisms including obstructive uropathy or pyelonephritis, crystal plugs at tips of the renal papilla and parenchymal injury from treatments such as shockwave lithotripsy.[183,189] One or more episodes of kidney stones were associated with a 2-fold higher risk of ESKD in one population-based study from Alberta, Canada.[190] The association was stronger in patients with 2 or more episodes of kidney stones versus a single episode of kidney stones. A National Health and Nutrition Examination Survey also reported that a history of kidney stones was associated with CKD and ESKD, however the effect was largely confined to women.[191] Among 10 678 patients in the Atherosclerosis Risk in Communities study, nephrolithiasis history was associated with a 29% (HR, $1.29_{1.07}$-$1.54$) higher risk of CKD in demographic-adjusted analyses, but the association was no longer statistically significant after multivariable adjustment (HR, $1.09_{0.90}$-$1.32$).[192] To inform this guideline, CKD-PC analyzed multiple cohorts (see chapter 1).[7] They found the association between a prior history of kidney stones and ESKD was not significant in the meta-analysis; for this reason a history of kidney stones does not appear as a characteristic in the online tool to predict the 15-year and lifetime chance of kidney failure in the absence of donation.[7]

### Ex-vivo Removal of Kidney Stones

There are reports of nephrolithiasis-related adverse events for recipients of an allograft with a stone left in situ.[193] There are also reports on the safety and success of ex vivo ureteroscopy to remove stones from explanted donor kidneys before transplantation.[185]

### Counseling

Donors and donor candidates who develop kidney stones should follow general population evidence-based guidelines for dietary and pharmacologic-based strategies to prevent recurrent kidney stones. Recent systematic reviews and clinical practice guidelines summarize this evidence.[194,195] For example, there is low-strength evidence that increased fluid intake to achieve a urine output of at least 2 liters per day (vs normal fluid intake) and reduced soft-drink consumption lowers the risk of recurrent stones. In patients with multiple past calcium stones, most of whom increased their fluid intake, there is moderate-strength evidence that thiazide diuretics, citrate supplements, and allopurinol each further reduce the risk of future stones compared with placebo or control, although the benefit from allopurinol seemed limited to patients with baseline hyperuricemia or hyperuricosuria.

### What Prior Guidelines Recommend

Several prior guidelines and US policy requirements describe evaluation methods and/or acceptance criteria for donor candidates with prior or current kidney stones.[38,48,51,55,179] Generally, most prior guidelines recommend complete metabolic testing (serum PTH, 24-urine collection for calcium, phosphate, oxalate, citrate, urate, creatinine and sodium), and one guideline recommends all such candidates be assessed by a urologist.[179] Several prior guidelines recommend the current presence of bilateral kidney stones, multiple stones, or nephrocalcinosis precludes donation, while a current small single stone may be eligible to proceed with donation.[38,54,55,179,196]

## RESEARCH RECOMMENDATIONS

- Perform follow-up studies of approved donors with current stones, risk factors for recurrent stones, or small calcifications discovered on imaging to determine impact of these factors on long-term outcomes compared to donors without these characteristics, and also compared to nondonors with similar risk factors.
- Develop a tool to estimate the risk of postdonation kidney stones according to predonation clinical and demographic factors.

## CHAPTER 9: HYPERURICEMIA, GOUT, AND MINERAL AND BONE DISEASE

The ERT search parameters did not identify evidence from eligible studies pertinent to the recommendations in chapter 9 and therefore the following recommendations are "Not Graded."

### Evaluation

9.1: Donor candidates should be asked about prior episodes of gout.

### Counseling

9.2: Donor candidates may be informed that donation is associated with an increase in serum uric acid concentration, which may increase the risk for gout.

9.3: Donor candidates and donors with prior episodes of gout should be informed of recommended methods to reduce their risk of future episodes of gout.

## RATIONALE

### Hyperuricemia and Gout

High serum uric acid concentration is a potent risk factor for gout, for which the 10-year incidence is estimated to be

1%, 5%, and 49% for uric acid levels of < 7.0, 7.0-8.9, and ≥ 9.0 mg/L respectively.[197,198] A decline in GFR results in less uric acid excretion and a higher serum uric acid concentration.[199,200] These changes are evident with the 25% to 40% reduction in GFR that occurs after living kidney donation.[139,201,202] For example, one prospective US cohort study found that at 6 months after nephrectomy, donors versus healthy nondonor controls had 8.2% higher serum uric acid level [mean values of 5.3 ± 1.1 mg/dL (315.2 ± 65.4 μmol/L; standard deviation) vs 4.9 ± 1.2 mg/dL (291.5 ± 71.4 μmol/L); $P < 0.001$], that persisted over 36 months of follow-up.[139,201] Another study found donors to have 20% higher serum uric acid concentrations at a mean of 7 years after nephrectomy compared with predonation.[203]

In a study of 1988 living kidney donors from Ontario, Canada, who were followed for a median of 8.8 years (maximum, 20.8 years), living kidney donors were more likely to be diagnosed with gout compared with matched nondonors with similar baseline health, although the absolute risk remained low (3.5 vs 2.1 events per 1000 person-years; HR $_{1.2}1.6_{2.15}$).[203] At 8 years, the cumulative incidence of gout was 1.4% higher in donors compared to nondonors (3.4% vs 2.0%).[203] This report was not reviewed by the ERT but would be expected to have a moderate risk of bias similar to other reported outcomes from this cohort. Based on this report, some transplant teams may decide to inform donor candidates that donation is associated with an increase in serum uric acid concentration, which may increase the risk of gout. However, the authors of the primary report suggested the finding first be corroborated in other studies. In this guideline we endorse that donor candidates be asked about prior gout episodes, but given the limitations of existing information, we did not propose measuring uric acid as a standard part of evaluation or follow-up processes at this time. The risk of gout after kidney donation may vary based on demographic characteristics. A study of 4650 kidney donors from the US including 13.1% African Americans, found that, by 7 years, African Americans were almost twice as likely to develop gout as white donors (4.4% vs 2.4%; adjusted HR, $_{1.0}1.8_{3.2}$).[204] Postdonation gout risk also increased with older age at donation and was nearly 3-times higher in men compared with women.[204]

In nondonor populations hyperuricemia is associated with a higher risk of CVD and new-onset CKD.[203,205] However, the prognostic significance of hyperuricemia in living kidney donors is currently uncertain and warrants additional study. In the US cohort study mentioned above, compared with matched donors without gout, donors with gout had more frequent diagnoses of acute kidney injury, CKD, and other disorders of the kidney.

Donor candidates and donors with prior episodes of gout should be informed of recommended methods to reduce their risk of future episodes of gout. Previous clinical practice guidelines cite modest to low evidence for certain diet and lifestyle measures (eg, avoiding excessive alcohol, and avoiding ingestion of organ meats high in purine content) and possibly pharmacological therapies.[206] The prevention and treatment of hyperuricemia and gout may be complicated by decreased kidney function. The dose of allopurinol, which is frequently used to treat increased serum uric acid and prevent gout, should be adjusted in patients with decreased kidney function. Dose reductions may not be necessary with newer uricosuric agents.[207] Nonsteroidal anti-inflammatory drugs should probably be used cautiously in patients with decreased kidney function including living kidney donors. The treatment of choice for acute gout is colchicine, however the dose of colchicine should be reduced in patients with decreased kidney function.

## Metabolic Bone Disease

The effect of the modest decrease in GFR on the development of metabolic bone disease among kidney donors is not clear. Several recent studies describe changes in measures of bone mineral metabolism in kidney donors. These changes include a decline in the serum concentration of 1, 25-dihydroxyvitamin D and phosphate, a decline in tubular phosphate reabsorption, and a rise in the concentration of serum PTH.[139,201,202,208] For example, one study showed that kidney donors had higher serum concentrations of fibroblast growth factor-23 and greater fractional excretion of inorganic phosphate compared with nondonor controls.[209] The Assessing Long Term Outcomes of Living Donation prospective cohort study found a 23% higher PTH concentration among 206 donors assessed at 6 months postdonation compared with concentrations among 198 healthy controls (52.7 vs 42.8 pg/mL, respectively)[201] that persisted at 36-month follow-up.[139] Similarly, the Chronic Renal Impairment in Birmingham study of 68 donors at 2 United Kingdom centers reported larger increases in serum fibroblast growth factor-23 and parathyroid hormone concentrations compared with prospective changes in these parameters among healthy nondonors.[202]

The long-term effects of these changes on the risk of fractures, CVD, or other outcomes important to donors is uncertain, therefore the WG made no recommendations for managing mineral and bone disorders that would differ from guidelines for the general population. The ERT identified a single study of fractures in kidney donors (moderate risk of bias, with only a single study the quality of evidence was deemed very low; **Evidence Report Table 8, SDC,** http://links.lww.com/TP/B434; **Supplemental Appendix Table D5 SDC,** http://links.lww.com/TP/B432). In this study, 2015 kidney donors in Ontario, Canada, experienced no increase in the risk of non–trauma-related upper- or lower-extremity fractures compared with healthy nondonors.[210]

## What Prior Guidelines Recommend

As many of the studies on hyperuricemia, gout and mineral and bone disease in living kidney donors are recent, these issues have generally not been addressed in prior donor guidelines. The British Transplantation Society describes the importance assessing a history of gout as part of the candidate evaluation.[48] Amsterdam Forum and Spanish Society of Nephrology and Spanish National Transplant Organisation guidelines describe serum uric acid as a standard test in the evaluation of all living kidney donor candidates.[38,54]

## RESEARCH RECOMMENDATIONS

- Determine the effects of hyperuricemia in living kidney donor candidates and donors on the incidence of gout and CVD.
- Perform long-term follow-up of donors and healthy nondonor controls to determine the impact of kidney donation on gout recurrence.
- Perform long-term follow-up of donors and healthy nondonor controls to determine the impact of kidney donation (if any) on fracture risk.

C. Agnello   SE 0271

© 2017 Wolters Kluwer

## CHAPTER 10: PREDONATION BLOOD PRESSURE

Except in the case of Recommendation 10.6, the ERT search parameters did not identify evidence from eligible studies pertinent to the recommendations in chapter 10 and therefore the following recommendations are "Not Graded."

### Evaluation

10.1: Blood pressure should be measured before donation on at least 2 occasions by clinical staff trained in accurate measurement technique, using equipment calibrated for accuracy.

10.2: When the presence or absence of hypertension in a donor candidate is indeterminate based on history and clinic measurements (eg, blood pressure is high normal or variable), blood pressure should be further evaluated using ambulatory blood pressure monitoring (ABPM) or repeated using standardized blood pressure measurements.

### Selection

10.3: Normal blood pressure, as defined by guidelines for the general population in the country or region where donation is planned, is acceptable for donation.

10.4: Donor candidates with hypertension that can be controlled to systolic blood pressure less than 140 mm Hg and diastolic blood pressure less than 90 mm Hg using 1 or 2 antihypertensive agents, who do not have evidence of target organ damage, may be acceptable for donation. The decision to approve donor candidates with hypertension should be individualized based on demographic and health profile in relation to the transplant program's acceptable risk threshold.

### Counseling

10.5: Donor candidates should be counseled on lifestyle interventions to address modifiable risk factors for hypertension and cardiovascular disease, including healthy diet, smoking abstinence, achievement of healthy body weight, and regular exercise according to guidelines for the general population. These measures should be initiated before donation and maintained lifelong.

10.6: We suggest that donor candidates should be informed that blood pressure may rise with aging, and that donation may accelerate a rise in blood pressure and need for antihypertensive treatment over expectations with normal aging. (2D)

### RATIONALE

### Evaluation and Definitions

#### BP Measurement and Classification

It is important to use an accurate, well-calibrated device and an appropriately sized BP cuff based on arm length and circumference. An overly small cuff will overestimate and an excessively large cuff will underestimate true BP levels. The donor candidate should be seated quietly with back supported, feet on the floor and arm supported at heart level for the measurements. It is advisable to measure BP on at least 2 separate occasions by trained staff, or on one occasion plus ambulatory BP monitoring (ABPM) to minimize anxiety effects in donor candidates.[211] Automated serial BP measurements can also eliminate a "white coat" effect.[212] Multiple prior guidelines and policies for the evaluation and care of living kidney donor candidates recommend assessment of predonation BP on several occasions,[212,213] and/or consideration of ABPM in donor candidates with elevated office readings, receiving antihypertensive therapy, or who are older at evaluation.[38,50,51,196,214,215]

*Hypertension* is defined by office readings of systolic SBP of 140 mm Hg or greater or diastolic BP (DBP) of 90 mm Hg or greater, out-of-office daytime mean ABPM or home measurements of SBP of 135 mm Hg or greater or DBP of 85 mm Hg or greater,[213] or the need for medication to control BP. Note that some antihypertensive agents may be used for indications other than BP treatment (eg, diuretics for edema or beta-blockers for migraine headache prevention), and that the indication for the prescribed medications should be determined as part of the evaluation.

*White coat hypertension* is defined as hypertension by office BP measurements with normal out of office measurements by ABPM or home readings. Individuals with white coat hypertension have lower cardiovascular risk than persons with hypertension, but may carry increased risk for future hypertension.[212,216] Population-based studies suggest that 20-25% of adults may have white coat hypertension.[216] Individuals with treated hypertension may also have a "white coat effect," such that elevated BP is recorded in the medical environment even when treated BP is controlled by ABPM or home readings.

*Masked hypertension* is defined as normal BP by office measurements with hypertension by ABPM or home readings. Like sustained hypertension, masked hypertension is accompanied by increased risk for hypertensive target organ damage, and thus treatment is warranted if identified. Population-based studies suggest that 10-30% of adults may have masked hypertension.[216,217] Masked hypertension cannot be identified in donor candidates in whom BP is measured by office readings alone, but the implications of requiring ABPM or home readings to screen for masked hypertension in donor candidates (eg, outcomes, cost, efficiency) are not defined.

### Hypertension Risk Factors and Counseling

Potentially modifiable risk factors for hypertension include use of certain medications (eg, nonsteroidal anti-inflammatory agents, decongestants, stimulants) and presence of certain lifestyle factors (eg, excess alcohol intake, high sodium diet, use of dietary supplements, or smoking).[218-220] Nonmodifiable hypertension risk factors include a family history of hypertension, race, and age. Additional considerations include women with a history of preeclampsia or gestational hypertension. In this setting we suggest predonation counseling on the potential for increased cardiovascular risk and emphasis on healthy behaviors to reduce cardiovascular risk. Risk factors for hypertension by themselves do not constitute contraindications to donation in a normotensive person. Consistent with recommendations for the general population,[221] British Transplantation Society and Renal Association guidelines[48] recommend lifestyle measures in kidney donors to reduce the risk of hypertension and its consequences, including frequent exercise, smoking cessation, and weight loss where appropriate.

*Target organ damage* may be manifest as prior occurrence of a cardiovascular event such as myocardial infarction or stroke, urine AER greater than 30 mg/d (ACR > 30 mg/g or

3 mg/mmol), reduced kidney function (eg, GFR < 60 mL/min per 1.73 m²), hypertensive retinopathy, and/or evidence of left ventricular hypertrophy.[213]

*Lifestyle modification* can effectively treat hypertension without medication or with fewer medications and lower dosages required to achieve BP control.[221] Lifestyle modifications include healthy diet, smoking cessation, weight loss if overweight, regular exercise, and discontinuation of potential contributing medications according to guidelines for the general population. *Follow-up* of patents with hypertension is critical for monitoring of control in relation to targets and for monitoring and management of complications. The importance of access to healthcare and regular follow-up have also been emphasized in the selection and care of hypertensive donor candidates in 2 prior guidelines,[38,54] whereas the Spanish Society of Nephrology and Spanish National Transplant Organisation guidelines specify "reasonable guarantee that the donor will follow the check-up period and treatment indefinitely" among the criteria for acceptance of a hypertensive donor candidate.[54]

### Selection

#### Impact of Reduced GFR on BP in the General Population and After Donation

Reduced kidney function may cause or worsen hypertension in the general population.[222] While it is documented that BP often rises with aging,[223] GFR reduction from kidney donation may accelerate the risk or progression of hypertension over time to a greater extent than expected from normal aging, possibly due to physiological alterations (eg, hyperfiltration in the remaining kidney, changes in vascular tone and renin-angiotensin-aldosterone regulation) and/or heightened detection at donor follow-up.[224,225] Existing retrospective studies examining the impact of kidney donation on hypertension risk have been limited by short follow-up times, high rates of loss to follow-up, lack of controls and/or comparisons to unselected general rather than healthy populations. Use of antihypertensive medications was lower in a cohort of privately-insured donors compared with age- and sex-matched unscreened beneficiaries in the same insurance plan.[226] In contrast, a systematic review including data for 5145 predominantly white donors estimated 6 mm Hg higher weighted mean SBP and 4 mm Hg higher weighted mean DBP in donors compared with controls after an average of 7 years[224] (**Supplemental Appendix Tables D1 and D2, SDC,** http://links.lww.com/TP/B432). An administrative claims linkage study of 1278 (primarily white race) living donors in Ontario, Canada followed for a mean of 6 years (range, 1-16 years) found a higher incidence of claims-based hypertension diagnoses (16.3% vs 11.9%; HR, $1.2_{1.0}1.4_{1.7}$) among living donors compared with matched controls who were also screened for the absence of baseline comorbidities through administrative claims.[225]

Among more recent donor cohorts, higher rates of postdonation hypertension and antihypertensive medication use in African American compared with white donors have been reported.[226-228] While these patterns parallel hypertension prevalence differences in the general population,[228] one small study found higher rates of postdonation hypertension among 103 African American donors compared with race-matched "healthy" nondonor controls (41% vs 18% at an average of 6.8 years postdonation)[229] (**Supplemental Appendix** Table D10, SDC,** http://links.lww.com/TP/B432). Furthermore, many donors in this study were unaware of their hypertension. Associations of age at donation and sex with postdonation hypertension have been inconsistent (**Supplemental Appendix Tables D7 and D9, SDC,** http://links.lww.com/TP/B432).

Based on these data, we suggest that donor candidates should be informed that BP may rise with aging, and that donation may accelerate the rise in BP and the need for antihypertensive treatment over that expected with normal aging, especially if BP is high-normal before donation and among African American donor candidates. Furthermore, antihypertensive medication is more likely to be prescribed after donation.

### Hypertension as a Cause of CKD in the General Population

Hypertension is a contributing cause of CKD in the general population, although in many cases, CKD may be the cause of hypertension. A recent meta-analysis based on data from nearly 5 million healthy persons identified from 7 general population cohorts found that every 20 mm Hg increase in SBP was associated with a 42% increase (adjusted HR, $1.27^{1.42}_{1.58}$) in the risk of ESKD over median cohort follow-up of 4 to 16 years. Use of antihypertensive medications was also associated with increased ESKD risk (adjusted HR, $1.01^{1.35}_{1.82}$ over cohort follow-up).[7] After calibration to annual ESKD incidence in the US healthy population, variations in the projected 15-year and lifetime risks of ESKD based on level of SBP from this analysis were generated according to age, sex, and race for healthy persons (assuming age-specific GFR, urine ACR 4 mg/g [0.4 mg/mmol], BMI 26 kg/m², and absence of diabetes mellitus; (Figures 14 and 15). While these figures are useful for visualizing the impact of higher SBP on increased ESKD risk, we endorse consideration of BP as part of the assessment of predicted long-term ESKD risk based on a donor candidate's complete demographic and health profile (as opposed to consideration of single risk factors in isolation).

Clinical consequences of hypertension vary by race in the general population. Treating mild-to-moderate primary hypertension may not halt kidney disease progression in nondiabetic African Americans, whereas hypertension control appears to slow kidney disease progression in European Americans.[230-234] Recent literature supports that at least a portion of kidney failure previously attributed to hypertensive nephrosclerosis in persons of African descent may be genetically mediated by coding variants in the gene for *APOL1* and not modifiable by antihypertensive therapy (see chapter 14).[235-238]

### Predonation Hypertension as a Risk Factor for Adverse Outcomes after Kidney Donation

Living donor candidates undergo a rigorous evaluation process which includes measurement of kidney function and urine protein, but subtle scarring of the kidney from hypertensive nephrosclerosis may not be detected by these tests.[239] Compensatory hyperfiltration in the remaining kidney is normal after nephrectomy[240,241]; however, subclinical pathology or aging processes may impair compensation and reduce postdonation GFR.[240,242]

The ERT identified 3 studies, rated as very low quality in reporting postdonation outcomes according to predonation BP or hypertension status (**Evidence Report Table 19, SDC,**

© 2017 Wolters Kluwer KDIGO Living Kidney Donor Work Group **S55**



**FIGURE 14.** Estimated 15-year incidence (%) of ESKD in the United States according to baseline systolic blood pressure (SBP) and demographic profile from the CKD-PC. SBP mm Hg without (black) and with (red) antihypertension medication. *The base-case scenario is defined as: age-specific eGFR (114, 106, 98, 90, 82, 74, and 66 mL/min per 1.73 m² for ages 20, 30, 40, 50, 60, 70, and 80 years, respectively), SBP 120 mm Hg, urine ACR 4 mg/g [0.4 mg/mmol], BMI 26 kg/m², and no diabetes mellitus or antihypertensive medication use. These were selected as being representative of recent US living kidney donors where, with the exception of eGFR, there was little variation in health characteristics by age. ACR, albumin-to-creatinine ratio; BMI, body mass index; CKD-PC, Chronic Kidney Disease-Prognosis Consortium; eGFR, estimated glomerular filtration rate; ESKD, end-stage kidney disease. Reprinted from Grams ME, Sang Y, Levey AS, et al. Kidney-failure risk projection for the living kidney-donor candidate. *N Engl J Med*. 2016;374:411-421.[7]

http://links.lww.com/TP/B434, and **Supplemental Appendix Table D16, SDC,** http://links.lww.com/TP/B432). In a combined cohort of donors and matched healthy nondonors in

Norway, each 1 mm Hg increase in SBP was associated with a small increase in cardiovascular death and ESKD during up to 25 years of follow-up.[32] A study of only 6 hypertensive donors



**FIGURE 15.** Estimated lifetime incidence (%) of ESKD in the United States according to baseline systolic blood pressure (SBP) and demographic profile from the CKD-PC. SBP mm Hg without (black) and with (red) antihypertension medication. *The base-case scenario is defined as: age-specific eGFR (114, 106, 98, 90, 82, 74, and 66 mL/min per 1.73 m² for ages 20, 30, 40, 50, 60, 70, and 80 years, respectively), SBP 120 mm Hg, urine ACR 4 mg/g [0.4 mg/mmol], BMI 26 kg/m², and no diabetes mellitus or antihypertensive medication use. These were selected as being representative of recent US living kidney donors where, with the exception of eGFR, there was little variation in health characteristics by age. Lifetime risk projections are based on 15 years of follow-up data and calibrated to the incidence of ESKD in the low-risk population, and thus are likely imprecise. ACR, albumin-to-creatinine ratio; BMI, body mass index; CKD-PC, Chronic Kidney Disease-Prognosis Consortium; eGFR, estimated glomerular filtration rate; ESKD, end-stage kidney disease. Reprinted from Grams ME, Sang Y, Levey AS, et al. Kidney-failure risk projection for the living kidney-donor candidate. *N Engl J Med*. 2016;374:411-421.[7]

C.Agnello   SE 0274

S56    Transplantation ■ August 2017 ■ Volume 101 ■ Number 8S    www.transplantjournal.com

reported CKD in 4 (67%) compared with 22% of non-hypertensive donors during an average of 5.4 years follow-up.[243] A third study of 16 hypertensive donors was deemed at high risk of bias.[244] A systematic review by Young et al concluded that results from this and 2 additional studies were substantially heterogeneous and thus results were not pooled.[26]

Additional studies that did not meet criteria for the ERT evidence review include a large study based on linkage of the US Transplant Registry with national death records that found higher perioperative mortality among donors with versus without predonation hypertension (36.7 vs 1.3 per 10 000).[23] While reported baseline hypertension was not associated with long-term mortality, SBP of 140 mm Hg or greater at donor registration was associated with 3-times the adjusted RR of death over 12 years compared to SBP less than 120 mm Hg (adjusted HR $_{1.1}$3.3$_{9.7}$). A single-center study of 24 white, older (mean age, 53 years) donors with predonation hypertension (awake ABPM > 135/85 mm Hg and clinic/nurse-measured BP > 140/90 mm Hg) that was not included in the evidence review based on sample size found similar postdonation GFR reduction and urine protein excretion as in normotensive donors, and no increase in urinary protein excretion compared with predonation values over a mean 282 days of follow-up.[245] A recent US registry study found that ESKD among donors was more likely to be attributed to hypertension if the duration of follow-up was more than 10 years compared with less than 10 years.[31]

The WG concluded that the decision to approve donation in candidates with hypertension should be individualized based on demographic and health profile in relation to the transplant program's acceptable risk threshold. Donor candidates with hypertension should be treated according to guidelines for the general population in the country or region where donation will occur. BP control should be confirmed by standardized BP measurements over at least several weeks before donation. Donor candidates with hypertension should be informed that donation may accelerate the rise in BP and the need for antihypertensive treatment over expectations with normal aging, and that uncontrolled hypertension may cause target organ damage to their remaining kidney, and be counseled on the importance of maintaining a healthy lifestyle and BP control before and after donation.

### What Prior Guidelines Recommend

Multiple prior guidelines for the evaluation and care of living kidney donor candidates identify hypertensive end-organ damage (eg, proteinuria, microalbuminuria, left ventricular hypertrophy, and hypertensive retinopathy), as relative contraindications or exclusion criteria for kidney donation.[38,48,50,54,55,196,214,215] Other relative contraindications or exclusion criteria for donation defined in prior guidelines include uncontrolled hypertension[48,55,196,214]; need for more than 1,[54] or more than 2 antihypertensive agents[214,215] for adequate control; hypertension and age younger than 50 years at evaluation[196]; non-white or African American race[54,196]; or the presence of several comorbidities or cardiovascular risk factors.[50,196,214] We concur that uncontrolled hypertension or hypertension with target organ damage should be exclusions to kidney donation. However, based on our evidence review, we also conclude that

there is limited evidence from the donor population to make recommendations for donor acceptance based on hypertension status alone. Rather we endorse adherence to the general framework that compares predicted individual long-term ESKD risk according to baseline profile of demographic and health characteristics including BP to the transplant program's acceptable risk threshold.

## RESEARCH RECOMMENDATIONS

- Define optimal strategies for measuring BP during the donor candidate evaluation.
- Determine optimal strategies for treatment of hypertension in kidney donor candidates before donation, and in accepted donors after donation.
- Quantify the impact of living kidney donation on hypertension risk, as well as the impact of hypertension before and after donation on clinical outcomes including CVD and lifetime ESKD risk.
- Evaluate possible variation in the risk and consequences of hypertension at donation according to other characteristics, including baseline demographic and other clinical factors.

## CHAPTER 11: PREDONATION METABOLIC AND LIFESTYLE RISK FACTORS

The ERT search parameters did not identify evidence from eligible studies pertinent to the recommendations in chapter 11 and therefore the following recommendations are "Not Graded."

### Identification of Metabolic and Lifestyle Risk Factors

11.1: Risk factors for kidney and cardiovascular disease should be identified before donation and addressed by counseling to promote long-term health.

### Obesity

11.2: Body mass index (BMI) should be computed based on weight and height measured before donation, and classified based on World Health Organization (WHO) criteria for the general population or race-specific categories.

11.3: The decision to approve donor candidates with obesity and BMI >30 kg/m$^2$ should be individualized based on demographic and health profile in relation to the transplant program's acceptable risk threshold.

11.4: Donor candidates who have had bariatric surgery should be assessed for risk of nephrolithiasis.

### Glucose Intolerance

11.5: Donor candidates should be asked about prior diagnosis of diabetes mellitus, gestational diabetes, and family history of diabetes.

11.6: Glycemia should be assessed by fasting blood glucose and/or glycated hemoglobin (HbA$_{1c}$) before donation.

11.7: 2-hour glucose tolerance testing or HbA$_{1c}$ testing should be performed in donor candidates with elevated fasting blood glucose, history of gestational diabetes, or family history of diabetes in a first-degree relative, and results should be used to classify diabetes or prediabetes status using established criteria for the general population.

11.8: Donor candidates with type 1 diabetes mellitus should not donate.

*C. Agnello    S E 0275*

© 2017 Wolters Kluwer

11.9: The decision to approve donor candidates with prediabetes or type 2 diabetes should be individualized based on demographic and health profile in relation to the transplant program's acceptable risk threshold.

11.10: Donor candidates with prediabetes or type 2 diabetes should be counseled that their condition may progress over time and may lead to end-organ complications.

### Dyslipidemias

11.11: Fasting lipid profile (including total cholesterol, LDL-C, HDL-C and triglycerides) should be measured as part of an overall cardiovascular risk assessment before donation.

11.12: The decision to approve donor candidates with dyslipidemia should be individualized based on demographic and health profile in relation to the transplant program's acceptable risk threshold.

### Tobacco Use

11.13: The use of tobacco products should be assessed before donation.

11.14: Donor candidates who use tobacco products should be counseled on the risks of perioperative complications, cancer, cardio-pulmonary disease and kidney failure, should be advised to abstain from use of tobacco products, and should be referred to a tobacco cessation support program if possible.

11.15: The decision to approve donor candidates who are active tobacco users should be individualized based on demographic and health profile in relation to the transplant program's acceptable risk threshold.

### RATIONALE

#### Goals of Evaluation and Definitions

This section addresses the evaluation and management of metabolic and lifestyle risk factors associated with ESKD, CVD and/or all-cause mortality, as applicable to the care of donor candidates. Some of the factors considered do not have currently known associations with ESKD risk, but are relevant to a comprehensive predonation health assessment. Even if donation does not increase the risk, traditional CVD risk factors are expected to have at least the same effect in donors as in the general population. Attention to these risk factors is intended to prevent or delay the onset and progression of comorbid diseases, kidney disease, and CVD. All risk factors considered in this section are potentially modifiable by lifestyle and/or medical care.

According to World Health Organization (WHO), the prevalence of diabetes mellitus increased from 108 million people worldwide in 1980 to 422 million in 2014.[246] The rising prevalence of diabetes is linked with the obesity epidemic and 2.1 billion adults worldwide were estimated to be overweight or obese in 2013.[247] Underlying causes of the obesity epidemic may be modifiable, and include sedentary lifestyles, high-fat and energy-dense diets, and increased urbanization.[248-250] The WHO defines obesity based on thresholds of BMI, a measure of weight scaled for height, as: underweight ($<18.5$ kg/m$^2$), normal weight (18.5-24.9 kg/m$^2$), overweight (25-29.9 kg/m$^2$), obese (30-34.9 kg/m$^2$), and morbidly obese ($>35$ kg/m$^2$).[248] While BMI is recognized to be an imperfect measure of body composition, the components of BMI are easily measured, recorded, and followed over time, and have prognostic implications. Optimal BMI-based thresholds for

obesity may differ from WHO standards in non-whites, and race-specific thresholds have been proposed. Measurement of waist circumference and/or waist-to-hip ratios may also be considered to characterize the distribution of adiposity in obese persons.[251]

Multiple prior guidelines and policies for the evaluation and care of living donors recommend measurement of fasting plasma glucose and consideration of oral glucose tolerance testing and/or glycated hemoglobin (HbA$_{1c}$) as part of the donor evaluation.[38,48,51,196,252] The WHO defines diabetes mellitus as: fasting plasma glucose of 7.0 mmol/L or greater ($\geq$126 mg/dL), random plasma glucose of 11.1 mmol/L or greater ($\geq$200 mg/dL), or plasma glucose concentration of 11.1 mmol/L or greater ($\geq$200 mg/dL) 2 hours after a 75-g anhydrous glucose load in an oral glucose tolerance test. A 2011 addendum included recognition of HbA$_{1c}$ of 48 mmol/mol or greater (6.5%) as an additional criterion for diagnosing diabetes if assays are standardized to criteria aligned with international reference values, but also indicated that HbA$_{1c}$ less than 48 mmol/mol (6.5%) does not exclude diabetes diagnosed using glucose tests.[246]

The WHO defines Impaired Glucose Tolerance as fasting plasma glucose less than 7.0 mmol/L ($<$126 mg/dL) or 2-hour post–load plasma glucose of 7.8 or greater and less than 11.1 mmol/L ($\geq$140 and $<$ 200 mg/dL), while Impaired Fasting Glucose is defined as fasting plasma glucose 6.1 to 6.9 mmol/L (110 to 125 mg/dL) or 2-hour post–load plasma glucose less than 7.8 mmol ($<$140 mg/dL).[253] Currently there are various definitions of prediabetes and the equivalent term used by WHO, intermediate hyperglycemia, is defined by fasting plasma glucose of 6.1 to 6.9 mmol/L (110-125 mg/dL) and 1-hour post–load plasma glucose of 7.8-11.0 mmol/L (140-199 mg/dL).[254]

Dyslipidemias are classified based on elevations in total cholesterol and low-density lipoprotein cholesterol (LDL-C), and low concentrations of high-density lipoprotein cholesterol (HDL-C). Hypertriglyceridemia is an independent CVD risk factor.[255]

#### Obesity

Increased risk of perioperative complications including wound and surgical site infections in obese patients is well established in the general surgical literature.[256] The ERT report identified 2 systematic reviews that examined perioperative outcomes after donor nephrectomy according to BMI, with quality of source studies rated as low. Among 8 studies reporting operative time, all but one found a modest increase in operative time (mean difference of 16.9 minutes) among donors with BMI of 30 or greater compared to those with BMI less than 30 kg/m$^2$ (**Supplemental Appendix Table C7, SDC,** http://links.lww.com/TP/B432). While warm ischemia times were reported to be longer for obese donors in all but one study, this difference was not significant on meta-analysis. Pooled results showed no differences in blood loss or length of stay among obese compared with normal weight donors.

In the general population, obesity has been identified as a risk factor for diabetes mellitus and it may also be a risk factor for kidney disease, particularly obesity-related glomerulopathy.[257] The ERT identified 5 studies comparing long-term outcomes among donors by predonation BMI, rated as low quality, with follow-up ranging from 6.7 to 15.1 years (**Supplemental Appendix Table D12, SDC,** http://links.lww.

C. Agnello    SE 0276

com/TP/B432). One study found that BMI was associated with cardiovascular mortality but not all-cause mortality.[32] In contrast, another registry study found no association between BMI and death over 12 years.[23] A few studies of variable quality examined associations between BMI and intermediate outcomes.[140,244,258]

Multiple prior guidelines for the evaluation and care of living kidney donor candidates recommend BMI greater than 35 kg/m² as an absolute or relative contraindication to donation.[38,48,50,54,196,215,259] and other guidelines recommend careful evaluation for other comorbidities in donor candidates with BMI greater than 30 kg/m².[2,48,54] With regard to other metrics of obesity aside from BMI, the Spanish Society of Nephrology and Spanish National Transplant Organisation guidelines define waistline greater than 82 cm in women or greater than 102 cm in men as additional relative contraindications to donation.[54] CARI guidelines advise measurement of waist circumference within the assessment of overweight and obese donor candidates,[259] and a US Joint Societies work group consensus statement includes abdominal circumference as part of the definition of metabolic syndrome.[196] In contrast, the ERT concluded that there is limited evidence from the donor population to make recommendations for donor acceptance based on BMI alone among obese donor candidates.

A recent meta-analysis based on data from nearly 5 million healthy persons identified from 7 general population cohorts found a modest association of BMI greater than 30 kg/m² with increased risk of ESKD over median cohort follow-up of 4 to 16 years (adjusted HR, $_{1.04}1.16_{1.29}$).[7] Projected 15-year and lifetime risks of ESKD for healthy persons varied according to BMI and age, sex, and race (Figures 16 and 17). A recent study of 119 769 US donors published after the ERT

systemic review found a stronger association of higher BMI at donation with postdonation ESKD risk over 20 years than the predonation risk relationship observed in the general population cohorts.[260] We endorse consideration of BMI as part of the assessment of predicted long-term risk based on a donor candidate's complete demographic and health profile (as opposed to consideration of single risk factors in isolation). Findings from the recent US study[260] suggests more uncertainty when drawing inferences about long-term postdonation risk in obese donor candidates, and the need to develop individualized postdonation risk estimates according to demographic and health profile. Acceptance thresholds for donor candidate BMI can incorporate perinephrectomy complications along with long-term risks of ESKD and other complications as data become available.

We agree with prior recommendations that obese donor candidate should be counseled about the long-term risks of obesity, advised to pursue weight loss before donation, and to maintain a healthy body weight after donation.[38,48,50,215]

### Glucose Intolerance

Type 2 diabetes is a leading cause of CKD worldwide and accounts for approximately 50% of acquired, adult-onset ESKD.[261,262] Patients with diabetes mellitus are commonly excluded from living kidney donation. One report of 71 donors with baseline glucose intolerance including 27 older patients (mean age, 58 years) with diabetes defined by 2-hour glucose tolerance testing found no ESKD events and similar survival compared to donors without glucose intolerance over a mean follow-up of 88 months (**Supplemental Appendix Table D14, SDC**, http://links.lww.com/TP/B432).[263]

A recent meta-analysis based on data from nearly 5 million persons identified from 7 general population cohorts found



**FIGURE 16.** Estimated 15-year incidence (%) of ESKD in the United States according to baseline body mass index (BMI) and demographic profile from the CKD-PC. ªThe base-case scenario is defined as: age-specific eGFR (114, 106, 98, 90, 82, 74, and 66 mL/min per 1.73 m² for ages 20, 30, 40, 50, 60, 70, and 80 years, respectively), SBP 120 mm Hg, urine ACR 4 mg/g [0.4 mg/mmol], BMI 26 kg/m², and no diabetes mellitus or antihypertensive medication use. These were selected as being representative of recent US living kidney donors where, with the exception of eGFR, there was little variation in health characteristics by age. ACR, albumin-to-creatinine ratio; CKD-PC, Chronic Kidney Disease-Prognosis Consortium, eGFR, estimated glomerular filtration rate; ESKD, end-stage kidney disease; SBP, systolic blood pressure. Reprinted from Grams ME, Sang Y, Levey AS, et al. Kidney-failure risk projection for the living kidney-donor candidate. *N Engl J Med*. 2016;374:411-421.[7]

C.Agnello  SE 0277

© 2017 Wolters Kluwer



**FIGURE 17.** Estimated lifetime incidence (%) of ESKD in the United States according to baseline body mass index (BMI) and demographic profile from the CKD-PC. *The base-case scenario is defined as: age-specific eGFR (114, 106, 98, 90, 82, 74, and 66 mL/min per 1.73 m² for ages 20, 30, 40, 50, 60, 70, and 80 years, respectively), SBP 120 mm Hg, urine ACR 4 mg/g [0.4 mg/mmol], BMI 26 kg/m², and no diabetes mellitus or antihypertensive medication use. These were selected as being representative of recent US living kidney donors where, with the exception of eGFR, there was little variation in health characteristics by age. Lifetime risk projections are based on 15 years of follow-up data and calibrated to the incidence of ESKD in the low-risk population, and thus are likely imprecise. ACR, albumin-to-creatinine ratio; CKD-PC, Chronic Kidney Disease-Prognosis Consortium, eGFR, estimated glomerular filtration rate; ESKD, end-stage kidney disease; SBP, systolic blood pressure. Reprinted from Grams ME, Sang Y, Levey AS, et al. Kidney-failure risk projection for the living kidney-donor candidate. *N Engl J Med.* 2016;374:411-421.[7]

that, compared with nondiabetic persons, those with type 2 diabetes but otherwise good health had 3-times the risk of ESKD over median cohort follow-up of 4 to 16 years (adjusted HR, $1.91$–$3.01_{4.74}$).[7] The 15-year and lifetime risks of ESKD for healthy persons varied by type 2 diabetes and age, sex, and race (Figures 18 and 19). Multiple prior



**FIGURE 18.** Estimated 15-year incidence (%) of ESKD in the United States according to non–insulin-dependent diabetes mellitus status and demographic profile from the CKD-PC. *The base-case scenario is defined as: age-specific eGFR (114, 106, 98, 90, 82, 74, and 66 mL/min per 1.73 m² for ages 20, 30, 40, 50, 60, 70, and 80 years, respectively), SBP 120 mm Hg, urine ACR 4 mg/g [0.4 mg/mmol], BMI 26 kg/m², and no diabetes mellitus or antihypertensive medication use. These were selected as being representative of recent US living kidney donors where, with the exception of eGFR, there was little variation in health characteristics by age. ACR, albumin-to-creatinine ratio; BMI, body mass index; CKD-PC, Chronic Kidney Disease-Prognosis Consortium; eGFR, estimated glomerular filtration rate; ESKD, end-stage kidney disease; SBP, systolic blood pressure. Reprinted from Grams ME, Sang Y, Levey AS, et al. Kidney-failure risk projection for the living kidney-donor candidate. *N Engl J Med.* 2016;374:411-421.[7]

C.Agnello   SE 0278

S60    **Transplantation** ■ August 2017 ■ Volume 101 ■ Number 8S    www.transplantjournal.com



**FIGURE 19.** Estimated lifetime incidence (%) of ESKD in the United States according to non–insulin-dependent diabetes mellitus status and demographic profile from the CKD-PC. *The base-case scenario is defined as: age-specific eGFR (114, 106, 98, 90, 82, 74, and 66 mL/min per 1.73 $m^2$ for ages 20, 30, 40, 50, 60, 70, and 80 years, respectively), SBP 120 mm Hg, urine ACR 4 mg/g [0.4 mg/mmol], BMI 26 kg/$m^2$, and no diabetes mellitus or antihypertensive medication use. These were selected as being representative of recent US living kidney donors where, with the exception of eGFR, there was little variation in health characteristics by age. Lifetime risk projections are based on 15 years of follow-up data and calibrated to the incidence of ESKD in the low-risk population, and thus are likely imprecise. ACR, albumin-to-creatinine ratio; BMI, body mass index; CKD-PC, Chronic Kidney Disease-Prognosis Consortium; eGFR, estimated glomerular filtration rate; ESKD, end-stage kidney disease; SBP, systolic blood pressure. Reprinted from Grams ME, Sang Y, Levey AS, et al. Kidney-failure risk projection for the living kidney-donor candidate. *N Engl J Med.* 2016;374:411-421.[7]

guidelines for the evaluation and care of kidney donors recommend that diabetic persons be excluded from kidney donation.[38,54,179,196,215,252] However, the European Best Practice Guideline qualifies an exception of "exceptional circumstances"[215] and the British Transplantation Society recommends that "diabetics can be considered for kidney donation after a thorough assessment of the lifetime risk of cardiovascular and progressive renal disease in the presence of a single kidney."[48] The WG concluded that persons with type 1 diabetes should be excluded from kidney donation. However, consistent with the framework of integrated risk assessment, we endorse individualizing the decision to approve donation in persons with prediabetes or type 2 diabetes based on the severity of illness and predicted long-term risk (considering complete demographic and health profile) in relation to the transplant program's acceptable risk threshold. The WG considers that older candidates with type 2 diabetes with well-controlled glycemia, not requiring insulin and without end-organ damage, might be considered for donation.

Prediabetes represents an intermediate category of hyperglycemia, which poses increased risks for future type 2 diabetes mellitus and CVD.[261] Important risk factors for diabetes and prediabetes in the general population include increasing age, high-risk ethnicity or race, obesity, and history of diabetes in a first degree relative. Approximately 5-10% of individuals with prediabetes progress to diabetes per year[264] but the risk of progression can be reduced with lifestyle changes and weight loss.[265] The younger the individual with risk factors for prediabetes, the higher the likelihood that diabetes and subsequent kidney disease will develop in that person's remaining lifetime.[266]

A small cohort study found that carefully screened prediabetic living kidney donors may revert to normal fasting glucose and did not have an increased risk of impaired kidney function in the short term[267] (**Evidence Report Table 17, SDC,** http://links.lww.com/TP/B434; **Supplemental Appendix Table D14, SDC,** http://links.lww.com/TP/B432). However, quality of this study was very low. A recent study linking US national donor registry data to ESKD registry data for 125 427 living donors examined causes of ESKD after donation.[31] The finding that early postdonation ESKD was predominantly reported as due to glomerulonephritis while late postdonation ESKD was more frequently reported as diabetic-ESKD and hypertensive-ESKD could be consistent with an effect of donation on diabetes and hypertension as causes for ESKD. These findings emphasize the importance of counseling donor candidates with prediabetes regarding their increased lifetime risk for progression to diabetes and subsequent end-organ complications, and the importance of healthy lifestyle behaviors to reduce risks. Those who are approved to donate should be counseled on the importance of regular medical follow-up after donation including surveillance for hyperglycemia and kidney function for many decades after donation, and prompt institution of appropriate management.

Prior recommendations regarding candidacy of persons with prediabetes for kidney donation are conflicting. The European Best Practice Guideline states that impaired glucose tolerance is not an absolute contraindication to donation[50,215]; other guidelines consider prediabetes a relative contraindication[54,196] or a condition warranting careful consideration,[48] while CARI considers prediabetes as well as past history of gestational diabetes to be absolute contraindications.[252] Given the lack of current data specific to the donor population, we endorse individualizing the decision to approve donation in persons with

Case 2:24-cr-00366-NJC    Document 24-1    Filed 03/11/26    Page 283 of 569 PageID #: 477

prediabetes based on their predicted long-term risk in relation to the transplant program's acceptable risk threshold.

### Dyslipidemias

Dyslipidemia is a modifiable risk factor for CVD, and hypertriglyceridemia and low HDL-C are components of the metabolic syndrome. With regard to associations of lipid levels with outcomes after donation, one study identified by the ERT compared kidney function and albuminuria at 5 years among donors with versus without predonation metabolic syndrome (**Evidence Report Table 18, SDC**, http://links.lww.com/TP/B434; **Supplemental Appendix Table D15, SDC**, http://links.lww.com/TP/B432). Although small differences in the outcomes were suggested, statistical comparisons were not performed. No studies were identified comparing postdonation outcomes based on lipid status alone. A recent meta-analysis based on data from nearly 5 million persons identified from 7 general population cohorts found no associations of total cholesterol or LDL-C with ESKD risk over median cohort follow-up of 4 to 16 years.[7]

Several prior guidelines recommend fasting lipid profiling as part of the donor evaluation,[51,54,59,196] but do not define donor selection criteria based on lipid levels alone. A US Joint Societies work group consensus statement recognizes hypertriglyceridemia and low HDL-C as components of the metabolic syndrome, and considers impaired fasting glucose and other components of metabolic syndrome to be relative contraindications to donation in persons younger than age 50 years.[196] We endorse individualizing the decision to approve donation in persons with dyslipidemia based on their predicted long-term risk (considering complete demographic and health profile) in relation to the transplant program's acceptance threshold.

### Tobacco Use

Cigarette smoking is a strong, modifiable risk factor for CVD (as well as other adverse health such as lung disease and cancer); smoking may also cause direct renal damage through microvascular injury and promotion of atherosclerosis, and has been associated with CKD in the general population.[268,269] A recent meta-analysis based on data from nearly 5 million persons identified from 7 general population cohorts found that, compared with nonsmokers over median cohort follow-up of 4 to 16 years, current smokers had a 76% increase in the risk of ESKD (adjusted HR, $_{1.29}1.76_{2.41}$) and past smokers had a 45% increase in risk (adjusted HR, $_{1.23}1.45_{1.71}$).[7] After calibration to annual ESKD incidence in the US healthy population, variations in the projected 15-year and lifetime risks of ESKD based on smoking status were generated according to age, sex, and race for healthy persons (assuming age-specific GFR, urine ACR 4 mg/g [0.4 mg/mmol], SBP 120 mmHg, BMI 26 kg/m², and absence of diabetes mellitus; Figures 20 and 21).

Although data on the outcomes associated with smoking among living kidney donors are limited, an analysis of linked US transplant registry and national death records found that while smoking was not significantly associated with perinephrectomy mortality, donors who smoked had approximately 5-times the adjusted mortality over 12 years compared with nonsmoking donors.[23] See chapter 4 (Preoperative Evaluation) for a discussion of the smoking-related risks before general surgery.

Some prior guidelines for the evaluation and care of living donors advise assessment of smoking, but make no recommendations concerning smoking in the selection of donors.[51,196] Others advise encouraging smoking cessation



**FIGURE 20.** Estimated 15-year incidence (%) of ESKD in the United States according to baseline smoking status and demographic profile from the CKD-PC. *The base-case scenario is defined as: age-specific eGFR (114, 106, 98, 90, 82, 74, and 66 mL/min per 1.73 m² for ages 20, 30, 40, 50, 60, 70, and 80 years, respectively), SBP 120 mm Hg, urine ACR 4 mg/g [0.4 mg/mmol], BMI, 26 kg/m²; and no diabetes mellitus or antihypertensive medication use. These were selected as being representative of recent US living kidney donors where, with the exception of eGFR, there was little variation in health characteristics by age. Smoking status, current (Cur), former (For), and Never (Nev). ACR, albumin-to-creatinine ratio; BMI, body mass index; CKD-PC, Chronic Kidney Disease-Prognosis Consortium, eGFR, estimated glomerular filtration rate; ESKD, end-stage kidney disease; SBP, systolic blood pressure. Reprinted from Grams ME, Sang Y, Levey AS, et al. Kidney-failure risk projection for the living kidney-donor candidate. *N Engl J Med.* 2016;374:411-421.[7]

C. Agnello    SE 0280



**FIGURE 21.** Estimated lifetime incidence (%) of ESKD in the United States according to baseline smoking status and demographic profile from the CKD-PC. *The base-case scenario is defined as: age-specific eGFR (114, 106, 98, 90, 82, 74, and 66 mL/min per 1.73 m² for ages 20, 30, 40, 50, 60, 70, and 80 years, respectively), SBP 120 mm Hg, urine ACR 4 mg/g [0.4 mg/mmol], BMI 26 kg/m², and no diabetes mellitus or antihypertensive medication use. These were selected as being representative of recent US living kidney donors where, with the exception of eGFR, there was little variation in health characteristics by age. Lifetime risk projections are based on 15 years of follow-up data and calibrated to the incidence of ESKD in the low-risk population, and thus are likely imprecise. Smoking status, current (Cur), former (For), and Never (Nev). ACR, albumin-to-creatinine ratio; BMI, body mass index; CKD-PC, Chronic Kidney Disease-Prognosis Consortium, eGFR, estimated glomerular filtration rate; ESKD, end-stage kidney disease; SBP, systolic blood pressure. Reprinted from Grams ME, Sang Y, Levey AS, et al. Kidney-failure risk projection for the living kidney-donor candidate. *N Engl J Med.* 2016;374:411-421.[7]

without defining an exclusion criterion.[48,50,215] Two guidelines recommend smoking cessation 4 weeks before donor nephrectomy,[38,54] and guidelines from the Spanish Society of Nephrology and Spanish National Transplant Organisation emphasize long-term abstinence.[54] The 2000 National Kidney Foundation (NKF)/AST guidelines recommend considering acceptance of donor candidates who smoke only if they abstain form use of tobacco products for 6 months and have normal pulmonary studies.[18] We endorse individualizing the decision to approve donation in active smokers based on their predicted long-term risk (considering complete demographic and health profile) in relation to the transplant program's acceptance threshold.

### Impact of Donation on Cardiac Risk

The ERT identified 2 studies comparing cardiovascular events in donors versus healthy nondonors (very low quality of evidence; **Evidence Report Table 8, SDC,** http://links.lww.com/TP/B434; **Supplemental Appendix Table D5, SDC,** http://links.lww.com/TP/B432). In a study comparing 2028 living kidney donors in Ontario, Canada (1992 to 2009) with 20 280 healthy, demographically matched nondonors, the risk of death or major cardiovascular events over a median 7 years follow-up (maximum, 18 years) was lower in donors than in healthy nondonors (2.8 vs 4.1 events per 1000 person-years, adjusted HR, $_{0.48}0.66_{0.90}$).[270] The risk of death-censored major cardiovascular events was similar among donors and nondonors (1.7 vs 2.0 events per 1000 person-years).

A study with longer follow-up compared cardiovascular and all-cause mortality in 1901 kidney donors with a group of 32 621 healthy, matched controls selected from a population-based survey in Norway (Nord-Trøndelag Health Study [HUNT] I).[32] Mortality was similar in donors versus nondonors over the first 15 years, but at 25 years after donation, cumulative all-cause mortality was approximately 18% among donors versus 13% among healthy nondonors (adjusted HR $_{1.1}1.3_{1.5}$). Limitations of this study include differences in accrual periods and in baseline characteristics (including age) between the donors and nondonors.[271,272] Continued study is needed to assess the impact of donation on long-term survival in large, representative cohorts.

Limited data are available on the impact of donation on the pathophysiology of CVD. The Chronic Renal Impairment in Birmingham (CRIB)-Donor study included 68 donors at 2 United Kingdom centers (2011 to 2014), of whom 90% were white, and prospectively examined changes in left ventricular mass and other CVD surrogate markers at 12 months postdonation versus predonation, compared with changes in these parameters in healthy nondonors.[202] Donors had a greater increase in left ventricular mass (+7 ± 10 vs −3 ± 8 g; P < 0.001) and mass:volume ratio (+0.06 ± 0.12 vs −0.01 ± 0.09 g/mL; P < 0.01), but decreased aortic distensiblity; donors were also more likely than controls to develop detectable highly sensitive troponin T levels. The increase in left ventricular mass among donors was independently associated with the magnitude of decrease in mGFR. These pilot observations warrant replication efforts in larger cohorts with longer follow-up to better define the impacts of donation on CVD surrogates and clinical events.

### RESEARCH RECOMMENDATIONS

- Evaluate the outcomes of donors with metabolic and lifestyle risk factors for CVD, including perinephrectomy complications,

© 2017 Wolters Kluwer

long-term mortality, CVD events, CKD/proteinuria and ESKD. Develop integrated risk assessment tools tailored for demographic and health profiles.

- Quantify the direct effects of donation on CVD risk.
- Assess effectiveness of predonation interventions including counseling and weight or lifestyle changes on long-term donor outcomes.
- Assess the impact of the duration and durability of predonation weight loss on donor acceptance and postdonation outcomes in those who proceed to donation.

## CHAPTER 12: PREVENTING INFECTION TRANSMISSION

The ERT search parameters did not identify evidence from eligible studies pertinent to the recommendations in chapter 12 and therefore the following recommendations are "Not Graded."

### Evaluation

12.1: Risk for human immunodeficiency virus (HIV), hepatitis B virus (HBV), and hepatitis C virus (HCV) infections should be assessed before donation.

12.2: Donor candidates should be assessed for factors associated with an increased likelihood of endemic or unexpected infections, including geographic, seasonal, occupational, animal and environmental exposures.

12.3: Donor candidates should complete a urinalysis and testing for HIV, HBV, HCV, cytomegalovirus (CMV), Epstein-Barr virus (EBV), and *Treponema pallidum* (syphilis).

12.4: If indicated by regional epidemiology or individual history, donor candidates should complete testing for *Mycobacterium tuberculosis*, *Strongyloides*, *Trypanosoma cruzi*, West Nile virus, Histoplasmosis, and/or Coccidiomycosis.

12.5: Transplant programs should develop protocols to screen donor candidates for emerging infections in consultation with local public health specialists.

12.6: In general, donor infection risk factor and microbiological assessments should be performed or updated as close in time to donation as possible. For HIV, HBV and HCV, screening should be current within 28 days of donation.

### Selection

12.7: If a donor candidate is found to have a potentially transmissible infection, then the donor candidate, intended recipient and transplant program team should weigh the risks and benefits of proceeding with donation.

## RATIONALE

### Goals of Evaluation and Definitions

The goals of infection screening in donor candidates are to identify illnesses that may affect the donor candidate or the intended recipient.[273-276] Evaluation of donor candidates to reduce the risk of transmissible infections should include assessment of the individual's history of past infections and infectious disease risk factors (eg, risk of local endemic infections or travel to endemic areas), awareness of current patterns of geographically endemic infections, and focused microbiological screening.

Donor-derived infections can be classified as "expected" versus "unexpected."[274,276] The risks of "expected" donor-derived infection transmission are defined by donor and recipient screening, such as in high-risk scenarios for transmission of cytomegalovirus (CMV), Epstein-Barr virus (EBV) or toxoplasmosis from a seropositive donor to a seronegative recipient. "Expected" transmissions occur frequently and are managed by surveillance and/or prophylaxis strategies in the recipient after transplantation.[277-282] "Unexpected" donor-derived infections arise despite routine donor screening, such as human immunodeficiency virus (HIV) or hepatitis C virus (HCV) transmission due to false negative serologic testing or infection in a "window period." The 2013 US Public Health Service (PHS) Guideline provides an evidence-based instrument to screen for behavioral factors associated with recent HIV, hepatitis B virus (HBV), or HCV infection (Table 16).[71]

---

**TABLE 16.**

**US Public Health Service (PHS) 2013 Screening for factors associated with increased likelihood of recent HIV, HBV, or HCV infection**

- Donors who meet one or more of the following criteria should be identified as being at increased risk for recent HIV, HBV, and HCV infections.
- Each factor listed reflects increased risk of all 3 pathogens as an aggregate, as there is overlap of associated risk, even though each factor does not convey risk from all pathogens equally.
- The first 6 factors address sexual contact; the definition of "had sex" refers to any method of sexual contact, including vaginal, anal and oral contact.

1. Have you had sex with a person known or suspected to have HIV, HBV, or HCV infections in the preceding 12 mo?
2. If male: Have you had sex with another man in the preceding 12 mo?
3. If female: Have you had sex with a man with a history of male-sex-with-male behavior in the preceding 12 mo?
4. Have you had sex in exchange for money or drugs in the preceding 12 mo?
5. Have you had sex with a person that has injected drugs (by intravenous, intramuscular, or subcutaneous route) for nonmedical reasons in the preceding 12 mo?
6. Have you injected drugs (by intravenous, intramuscular, or subcutaneous route) for nonmedical reasons in the preceding 12 mo?
7. Have you been in lockup, jail, prison, or a juvenile correctional facility for more than 72 h in the preceding 12 mo?
8. Have you been newly diagnosed with or have been treated for syphilis, gonorrhea, *Chlamydia*, or genital ulcers in the preceding 12 mo?

- Donors who meet the following criterion should be identified as being at increased risk for recent HCV infection only:

9. Have you been on hemodialysis in the preceding 12 mo?

US PHS risk factors also include: 10. A child who is ≤ 18 months of age and born to a mother known to be infected with, or at increased risk for HIV, HBV, or HCV infection. 11. A child who has been breastfed within the preceding 12 months and the mother is known to be infected with, or at increased risk for, HIV infection. HBV, hepatitis B virus; HCV, hepatitis C virus; HIV, human immunodeficiency virus; PHS, Public Health Service. Adapted with permission from Seem DL, Lee I, Umscheid CA, et al. Excerpt from PHS guideline for reducing HIV, HBV and HCV transmission through organ transplantation. *Am J Transplant.* 2013;13:1953–1962.[71]

S64    Transplantation ■ August 2017 ■ Volume 101 ■ Number 8S    www.transplantjournal.com

"Unexpected" infectious disease transmissions through organ transplantation are rare, but may result in serious morbidity and mortality.[274,283] Although most "unexpected" disease transmissions have involved deceased donors, cases of HIV and HCV transmissions from living donors have been reported.[283,284] Notably, while reporting of suspected or documented donor-derived infection transmissions is required in the United States, reporting is voluntary in many other countries, and thus true incidence may be underestimated.

Infection transmission events may also be categorized according to the certainty that the donor is the origin of the infection, as opposed to reactivation or de novo infection in the recipient.[285] Consensus-based definitions have been offered to standardize categorization as: "proven," "probable," "possible," "unlikely," "excluded," "intervened upon without documented transmission," and "positive assay without apparent disease transmission" events.[285] "Proven" denotes clear evidence of the same infectious disease in the donor and at least one of the recipients, while "probable" is based on strong evidence suggesting but not proving a disease transmission. Use of standardized nomenclature may facilitate global tracking and study of such infectious disease transmissions as well as the comparison of data between published studies and reports collected globally.[285]

The risk of donor-derived disease transmission can be mitigated by the donor evaluation, including history taking (clinical, social/behavioral, travel) and microbiological testing. While microbiological testing should be performed in all donors for some pathogens [HIV, HBV, HCV, CMV, EBV, syphilis], focusing testing for other pathogens based on regional epidemiology and individual clinical, social or geographic risk factors should reduce the likelihood of procuring an organ that could transmit infection, while preserving opportunities for donation (avoiding false-positive test results) (Table 17). Approaches to screening should consider the virulence of a particular pathogen, available testing assays, and residual window periods for transmission despite screening[283,286] as discussed according to specific pathogen below.[71,273,275,276,286-291] Risks versus benefit must be balanced in the decision to use organs from infected donors, incorporating predonation treatment and recipient prophylaxis where appropriate. It is also necessary to inform the recipient and their care team of any known risks from the potential donated kidney.

### Hepatitis B Virus

Evaluation of donor candidates should include US PHS risk factor screening for increased risk of HBV infection.[71] All donor candidates should undergo testing for IgG hepatitis B core antibody (anti-HBcAb) and hepatitis B surface antigen (HBsAg).[71,273,275] HBV DNA nucleic acid testing (NAT) can further stratify transmission risk in donor candidates from HBV endemic areas who are anti-HBcAb+, those with possible mutant HBV infections, and those with abnormal liver function tests or a past history of liver disease of unknown etiology. Testing for HBV should be performed as close as possible to the date of the organ recovery, but within no longer than 28 days before donation.[71]

Transplantation of kidneys from HBsAg+ donors is contraindicated for HBsAg- recipients, but may be considered for HBsAg+ recipients or recipients with HBV protective immunity,[275] with informed consent of the recipient, possible antiviral HBV treatment of the recipient and posttransplant monitoring. Kidney transplant recipients from anti-HBcAb +/HBsAg-/HBV DNA- donors appear to have little risk of acquiring active HBV infection.[275,292] HBV NAT testing should be performed in donor candidates with isolated HBcAb+ status to further define risk of transmission. If the donor is anti-HBc + and HBV DNA-, the risk of transmission is negligible,[293] especially if the recipient is anti-HBsAb + or has been effectively immunized against HBV. Still, the recipient should be informed of the small potential risk of disease transmission, and posttransplant monitoring should be performed.

### Hepatitis C Virus

Evaluation of donor candidates should include US PHS risk factor screening for increased risk of HCV infection.[71] Additional HCV risk factors identified by the US Centers for Disease Control for the general public (not specific to organ donation) include: persistently abnormal alanine aminotransferase concentrations, receipt of blood transfusion or blood components before 1992, receipt of clotting factor concentrates produced before 1987, recognized exposure among healthcare workers, and children born from HCV+ mothers.[294] Regardless of past risk factors, all donor candidates should undergo testing for HCV infection as close as possible to the date of the organ recovery, but within no longer than 28 days before donation.[71] Thus, behavioral risk factor assessment is used to inform pretest probability for interpretation of microbiological test results and to guide counseling to avoid infection after testing, not to determine which donor candidates should be tested. Approximately 15% of people with anti-HCV antibodies will not have detectable HCV-RNA in the serum. The 2013 US PHS guideline recommends that all living donor candidates should be tested for both anti-HCV antibody and for HCV RNA by NAT.[71]

Before the advent of new direct-acting antiviral agents, active HCV infection in a donor candidate was considered a contraindication to living donation, not only because of the risk of transmitting HCV to the recipient but also because of the risk of glomerular disease in the donor.[295] HCV has been transmitted to naïve organ recipients from infected living and deceased donors.[296] Organ transplantation from an HCV+ donor is associated with significant risk of HCV transmission, especially to HCV- recipients.[297] However, how to handle the situation when an otherwise suitable living kidney donor is HCV+ may evolve in the era of effective treatment with direct-acting antiviral agents. It is of course best to use a living donor who is not HCV+. However, if research protocols are developed to assess living kidney donation from HCV+ persons, then regardless of the HCV status of the recipient it would make sense that protocols require donor treatment with direct-antiviral agents for at least 12 weeks, the treatment duration when most studies show sustained virologic response, before donating a kidney.[298]

### Human Immunodeficiency Virus

Evaluation of donor candidates should include US PHS risk factor screening for increased risk of HIV infection.[71] All donor candidates should undergo microbiological testing for HIV infection as close as possible to the date of the organ recovery, but within no longer than 28 days before donation.[71,275] HIV infection is a contraindication to organ donation to HIV- recipients as the transmission of HIV by organ

C. Agnello    SE 0283

© 2017 Wolters Kluwer

KDIGO Living Kidney Donor Work Group | S65

**TABLE 17.**

Microbiological screening to reduce the risk of living donor–derived infection transmission

| Pathogens | Target population for testing | Screening tests | Confirmatory/ additional tests | Timing of testing | Implications of positive test for donation and management |
|---|---|---|---|---|---|
| HIV (1/2) | All donor candidates | Anti-HIV-1/2 Ab or Ag/Ab combination assay | HIV NAT or HIV Ag/Ab combination assay | At initial screening and within no longer than 28 d before donation | • Donation from HIV+ persons contraindicated unless as part of an approved research protocol for HIV+ recipients |
| HBV | All donor candidates | Anti-HBcAb and HBsAg | HBV NAT | At initial screening and within no longer than 28 d before donation | • Donation from HBsAg + persons contraindicated for HBV− recipients, but may be considered for HBsAg+ recipients or recipients with HBV protective immunity.[275] with informed consent of the recipient, possible antiviral HBV treatment of the recipient and posttransplant monitoring<br>• Donation from isolated HBcAb+ persons may be considered with informed consent of the recipient and posttransplant monitoring; consider HBV immunoglobulin and anti-HBV antiviral treatment in nonimmune recipients |
| HCV | All donor candidates | Anti-HCV Ab<br>HCV NAT also recommended in all donors[71] | | At initial screening and within no longer than 28 d before donation | • Donation from HCV+ persons contraindicated unless as part of an approved research protocol for HCV+ recipients |
| CMV | All donor candidates | Anti-CMV IgG Ab | | At initial screening | • Use to guide posttransplant antiviral prophylaxis and monitoring in the recipient, based on recipient serology and program protocol |
| EBV | All donor candidates | Anti-EBV IgG Ab (antiviral capsid antigen and/or antinuclear antigen) | | At initial screening | • Use to guide assessment for and monitoring of risk of posttransplant lymphoproliferative disorder, especially in EBV-negative pediatric recipients |
| *Treponema pallidum* (Syphilis) | All donor candidates | Rapid plasma reagin (RPR) | Anti–*T. pallidum* Ab | Perform or update as close in time to donation as possible | • Donation from persons with latent syphilis may be considered after treatment of the donor candidate before donation; informed consent of the recipient, and recipient monitoring after transplant |
| *Mycobacterium tuberculosis* (TB) | Persons with any of the following risk factors:<br>• Lived in endemic regions<br>• Social or environmental risk factors such as: working in healthcare, jail/prison exposure, known TB exposure, homelessness, alcohol or other substance abuse | Chest radiograph (may be suggestive but not diagnostic)<br>Tuberculin skin testing (TST) or Interferon gamma release assay (IGRA) | Acid-fast bacilli staining, culture and/or NAT testing for active infection | Perform or update as close in time to donation as possible | • Donation contraindicated from persons with active TB infection.<br>  Consideration of donation after treatment of active TB should be individualized<br>• Donation may be considered from persons with latent TB infection after initiation of chemoprophylaxis in the donor candidate before donation, informed consent of the recipient, and recipient monitoring after transplant |

*Continued next page*

C.Agnello  SE 0284

**TABLE 17. (Continued)**

| Pathogens | Target population for testing | Screening tests | Confirmatory/ additional tests | Timing of testing | Implications of positive test for donation and management |
|---|---|---|---|---|---|
| *Strongyloides* | Persons with any of the following risk factors:<br>• Born in or lived in tropical/subtropical countries with substandard sanitation<br>• Significant exposure to soil in the Appalachia or the Southeastern United States including walking barefoot<br>• Unexplained eosinophilia and travel to an endemic area<br>• Prior history of Strongyloides infection | Anti-Strongyloides IgG Ab Serologic Ab testing preferred to stool examination, as stool screening tests may be negative in asymptomatic chronic infection[286] | | Perform or update as close in time to donation as possible | • Donation may proceed after treatment of the donor with an appropriate antiparasitic agent such as ivermectin |
| *Trypanosoma cruzi* (Chagas) | Persons with any of the following risk factors:<br>• Born or lived in endemic areas of Mexico, Central and South America<br>• Children of women who lived in endemic area<br>• Recipients of blood transfusion in endemic areas<br>• Prior history of Chagas | Anti-*T. cruzi* Ab (EIA or IFA test) | *T. cruzi* NAT is insensitive for chronic phase disease due to low levels of parasitemia | Perform or update as close in time to donation as possible | • Donation may be considered from persons with chronic Chagas disease after treatment of the donor candidate before donation, informed consent of the recipient, and recipient monitoring after transplant |
| WNV | Persons with history of mosquito exposure or blood transfusions<br>• Risk varies by geography and season | Anti-WNV IgM Ab is available, but WNV NAT advised in initial screening | WNV NAT | Within 7-14 d of donation when testing is indicated | • Donation should be delayed for 28 d when WNV NAT screening is positive, followed by repeat NAT and WNV IgM Ab testing, with further decisions based on combined results |
| Histoplasmosis | Persons who were born or lived in endemic regions (eg, Midwestern United States, Mississippi and Ohio River valleys, St. Lawrence River Valley in Canada, Gangetic West Bengal in India) | Chest radiograph (may be suggestive but not diagnostic) Anti-Histoplasmosis Ab (complement fixation, immunodiffusion or EIA) | Urine or serum antigen testing | Perform or update as close in time to donation as possible | • Donation may be considered from persons with pulmonary-limited histoplasmosis after treatment of the donor candidate before donation, resolution of clinical signs/symptoms and of antigenuria/ antigenemia (if present at diagnosis), informed consent of the recipient, and recipient monitoring after transplant |
| Coccidiomycosis | Persons who were born or lived in desert areas of the Southwestern United States | Chest radiograph (may be suggestive but not diagnostic) Anti-Coccidioides Ab (complement fixation, immunodiffusion or EIA) | Urine or serum antigen testing | Perform or update as close in time to donation as possible | • Donation may be considered from persons with Coccidiomycosis after treatment of the donor candidate before donation, resolution of clinical signs/symptoms and of antigenuria/antigenemia (if present at diagnosis), informed consent of the recipient, and recipient monitoring after transplant |

Source: References.[7,273,275,276,286-291]
Ab, antibody; Ag, antigen; CMV, cytomegalovirus; EBV, Epstein-Barr virus; EIA, enzyme immunoassay; HBcAb, hepatitis B core antibody; HBsAg, hepatitis B surface antigen; HCV, hepatitis C virus; IFA, immunofluorescent antibody; IgG, immunoglobulin G; IgM, immunoglobulin M; NAT, nucleic acid testing; WNV, West Nile Virus.

C.Agnello    SC 0285

© 2017 Wolters Kluwer

transplantation is well documented. Tests to detect HIV include antibodies generated against HIV antigens, direct detection of viral nucleic acid (NAT testing) or HIV antigen p24. Currently, antibodies against HIV antigens remain the most commonly used method for detection of HIV. The period from HIV exposure to the development of HIV antibodies is approximately 22 days, but can be up to 6 months. Thus the donor may be seronegative while potentially infectious.[283] NAT testing can reduce the window period for HIV to between 5.6 and 10.2 days.[299]

In contrast to undetected donor disease transmission, medical advancements in HIV antiviral therapy have led to consideration of planned kidney transplantation from HIV+ donors to HIV+ recipients, such as recent experience described in South Africa.[300] In the United States, the National Organ Transplant Act (NOTA) of 1984 prohibited the knowing procurement or transplantation of organs from an HIV infected donor, but in 2013 the HIV Organ Policy Equity (HOPE) Act repealed this prohibition and authorized the OPTN to develop standards for use of organs from known HIV infected individuals in HIV infected recipients. At this time, such donations and transplantation should occur only within the context of research protocols; protocols in the United States were developed by the National Institutes of Health (NIH).[301]

### Increased Risk Donors and Window Periods for HBV, HCV and HIV

Serological testing for infections has been highly effective in reducing the risks of donor-derived disease transmission. However, seroconversion requires the elaboration of antibodies against a specific pathogen and could be delayed for several weeks after infectious exposure. Testing during the window period for seroconversion may generate false-negative test results and could lead to inadvertent infection transmissions. Cases of donor-derived infection transmissions related to window period infections missed by serologic screening of donors have been reported.[274,283] The period from HIV exposure to the development of HIV antibodies is 22 days on average, but can be up to 6 months.[274] HBsAg enzyme-linked immunosorbent assays (ELISAs) have a window period of 38.3 to 49.7 days, while the time from HBV exposure to positive NAT testing ranges from 20.4 to 25.7 days. The window period for detection of HCV infection by ELISA is 38 to 94 days, but the duration of the window is substantially reduced to 6.1 to 8.7 days by the use of NAT.[274]

In 2007 in the United States, a previously uninfected deceased donor kidney transplant recipient tested positive for HIV and HCV infection. Routine donor serologic screening for HIV and HCV infection was negative; the donor's only known risk factor for HIV was having sex with another man. Four organs (2 kidneys, liver and heart) were transplanted to 4 recipients. NAT of donor sera and posttransplant sera from all recipients were positive for HIV and HCV.[302] This case highlighted the potential for donors to harbor HIV and HCV infection during the window period, when infection cannot be detected by antibody screening.

In 2009, a case of unexpected HIV transmission from a living organ donor in New York City was also reported.[284] Based on this case, it was suggested that to reduce the risk for transmission of HIV through living donor organ transplantation, transplant programs should screen living donors

for HIV as close to the time of organ recovery as possible, using sensitive tests for both chronic and acute infections, namely, antibody and NAT testing.[284]

In 2013, the US PHS updated their "Guideline for Reducing HIV, HBV and HCV Transmission through Organ Transplantation," including recommended risk factor assessment in all donor candidates (Table 16).[71] Living donor candidates with behaviors associated with increased risk of acquiring HIV, HBV or HCV identified during evaluation should receive individualized counseling on specific strategies to prevent exposure to these viruses during the period before donation surgery. Recommendations regarding microbiological testing include:

- All potential organ donors (living or deceased) should be tested for antibodies to HIV (ie, anti-HIV 1/2 Ab or HIV antigen/antibody [Ag/Ab] combination assay). All potential organ donors identified as being at increased risk for HIV infection should also be tested for HIV RNA by NAT or HIV antigen (eg, HIV Ag/Ab combination assay). Donor blood specimens should be obtained before procurement. Ab or Ag/Ab test results should be made available before transplantation.
- All potential organ donors (living or deceased) should be tested for both anti-HCV Ab and for HCV RNA by NAT. Donor blood specimens should be obtained before procurement. Antibody test results should be made available before transplantation.
- All potential organ donors (living or deceased) should be tested for anti-HBcAb and for HBsAg. Donor blood specimens should be obtained before procurement. Ag/Ab test results should be made available before transplantation.
- As noted above, the guideline recommends that all living donor candidates should be tested for HIV, HBV and HCV as close as possible to the date of the organ recovery operation, but within no longer than 28 days before surgery.

Whether retesting closer to the time of transplantation (eg, within 7 to 10 days before donation) is warranted to detect new infections and reduce the window period, overall or among high-risk donor candidates, remains controversial.[303,304] A survey of living donor transplant programs in New York State in 2012 found that most responding programs had policies to retest living donors within 14 days of donation and while there were rare cases of delays in donation associated with repeat testing, no cancellations occurred.[305]

### Epstein Barr Virus

The presence of anti-EBV antibodies signifies prior donor infection, with potential for reactivation of the latent virus and subsequent infection of the immunosuppressed recipient. While detection of the EBV in the living donor generally will not preclude donation, knowing that the kidney comes with latent EBV infection may be important in posttransplant recipient care.[306] Infection with EBV manifests as a spectrum of diseases ranging from asymptomatic viremia to infectious mononucleosis to posttransplant lymphoproliferative disorder (PTLD).[307] EBV disease and associated PTLD are more frequently seen when primary EBV infection occurs after transplant, a common scenario in EBV- pediatric solid organ transplant recipients who receive a kidney from an EBV+ donor. In the United States, the cumulative 1- and 5-year incidence of PTLD in 2010 was reported to be 1.3% and 2.4%, respectively, for pediatric kidney recipients but less

C.Agnello   SE 0286

than 0.2% and 0.6% respectively, for adult recipients.[307] When the donor is EBV+ and the recipient is EBV-, particularly in pediatric recipients, clinical vigilance is required after transplantation to detect PTLD.[308] Intensity of EBV viral load and immunosuppressive therapies influence the risk for PTLD.[307]

### Cytomegalovirus

Cytomegalovirus disease may result from reactivation of latent infection or primary infection transmitted by a kidney from a CMV+ donor. The laboratory methods for CMV diagnosis are serology, culture, antigenemia, and molecular methods such as CMV NAT, which is most commonly performed using real-time polymerase chain reaction.[309] The main clinical utility of CMV serology is stratification of a transplant recipient's risk of CMV disease based on donor and recipient status.[279,280,310]

The presence of anti-CMV antibodies in a donor candidate indicates prior infection, with the potential that the latent virus will reactivate and cause infection, particularly in the CMV- recipient. The detection of anti-CMV antibodies does not preclude donation, and infection risk can be anticipated and managed. Primary CMV infection is generally more severe than reactivation and recipients at highest risk are those who are CMV seronegative and receive a kidney transplant from a CMV seropositive donor. Matching CMV seronegative recipients with CMV seronegative donors is an effective strategy for reducing the risk of CMV infection but is rarely practical in the context of living donor kidney transplantation. CMV seropositive recipients may develop disease reactivation or donor-related infection. Thus organ donors and recipients should be tested for prior (latent) CMV infection using anti-CMV antibody for risk stratification and guidance of appropriate surveillance and/or antiviral prophylaxis after transplantation.[311]

### Syphilis

Transmission of syphilis by organ transplantation has been documented.[312] In the United States, all assays currently FDA-approved for detecting evidence of *T. pallidum* infection in organ and tissue donors are serologic assays.[313] There are 2 types of serologic assays: nontreponemal and treponemal. Nontreponemal assays use a combination of cardiolipin, cholesterol, and other lipid substances released from damaged cells as the antigenic source to detect antibodies against cardiolipin, which circulates in the sera of individuals infected with syphilis and may also be present in individuals with a variety of other conditions. Reactivity to cardiolipin generally disappears within a year or 2 after successful treatment of syphilis.[313] Treponemal assays detect *T. pallidum* antibodies, which tend to remain elevated for life. Therefore, treponemal assays cannot distinguish between recent, remote, and previously treated infection. Donors are screened for serological evidence of syphilis with a nontreponemal assay such as the rapid plasma reagin (RPR) or venereal disease research laboratory (VDRL) test, which should be confirmed later with a treponemal Ab immunoassay. A recent study found that current screening of deceased organ donors by RPR yields a significant number of false-positive results. Use of alternative tests or the routine use of confirmatory tests may reduce the frequency of false-positive syphilis results in potential deceased and living organ donors.[314]

As there are multiple available syphilis assays providing different types of information, no single blood assay can conclusively define an individual's disease status. For donor candidate testing, specimen collection and the time available to perform testing must be considered in choosing an appropriate donor screening assay.[313] Living donor candidate evaluation is less time constrained than the screening of deceased donors, and thus screening with nontreponemal assays followed by confirmation with treponemal assays is preferred if feasible.

Transmission of syphilis has been reported in the United Kingdom to 2 recipients from a deceased donor with a past history of treated disease, supporting recommendations of penicillin for treatment of recipients of deceased donor organs from serologically reactive donors.[312] Donation from living persons with latent syphilis may be considered after treatment of the donor candidate before donation (eg, with penicillin), informed consent of the recipient, and recipient monitoring after transplant.

### Tuberculosis (TB)

The incidence of posttransplant TB varies substantially depending on the local prevalence of TB infection, which ranges from 1% in Germany to nearly 14% in India.[290] Studies in the United States and Europe have estimated that 0.35% to 6.6% of transplant recipients develop TB infection (across organ and donor types), and that 4% posttransplant TB cases are donor-derived.[290,315] TB is one of the more common bacterial causes of donor-derived infection in the United States.[316]

Consensus-based recommendations for the diagnosis and management of TB in organ donors include:[288,290,317]

- Risk stratification of all donor candidates, according to:
  - Place of birth, residence or travel to a geographically endemic region, with increased risk defined by residence greater than 3 months or relief work in a high prevalence region
  - Social risk factors including working in healthcare, prison exposure/incarceration, known TB contact, homelessness, alcohol or other substance abuse
  - Medical risk factors including history of untreated TB or radiographic evidence of prior TB; underweight BMI and diabetes have also been correlated with increased TB risk
- Chest radiograph in all donor candidates
- Consideration of urinalysis with microscopy, genitourinary imaging, urine acid-fast bacilli smear and culture in living donor candidates from countries with intermediate to high TB prevalence
- Consideration of immune-based diagnostic testing by tuberculin skin testing (TST) or the interferon-gamma release assay (IGRA)
  - Diagnostic tests for latent TB infection are limited in sensitivity and have a relatively low predictive value for development of active TB.[318] The specificity of TST is related to the burden of TB in that region or country, and IGRA has superior specificity in populations where use of Bacillus Calmette-Guérin vaccination is common based on use of specific antigens absent in Bacillus Calmette-Guérin strains
  - Immune testing of all donor candidates or selective testing based on risk profile are considered acceptable options
  - Persons with positive immune-based TB testing who are asymptomatic and do not have signs of active TB are considered to have latent TB infection
- Donation from persons with active TB is contraindicated. Risk of transmission from donors with prior appropriately

Case 2:24-cr-00366-NJC    Document 24-1    Filed 03/11/26    Page 291 of 569 PageID #: 485

treated active TB appears to decline with longer time from treatment. Donation may be considered with informed consent of the recipient, consideration of recipient chemoprophylaxis under the guidance of an infectious disease specialist, and recipient monitoring after transplant.

- Living donor candidates with latent TB infection should be offered chemoprophylaxis according to local or national guidelines. Donation may be considered from persons with latent TB infection with informed consent of the recipient and recipient monitoring after transplant. As there are no data on optimal duration of treatment before donation, individualization of the timing of donation in relation to start of donor chemoprophylaxis is recommended. Chemoprophylaxis of recipients from donors with latent TB infection should also be considered, especially if the donor did not complete chemoprophylaxis before donation.[317]

A recent study in Korea, a country with an intermediate prevalence of TB, prospectively evaluated living donors using the TST and *Mycobacterium tuberculosis*-specific enzyme-linked immunosorbent spot (ELISPOT) IGRA.[319] Among the 205 living donors, 31% had a positive TST and 47% had a positive ELISPOT. Based on the high rate of suspected latent TB infection detected by screening living donors using TST and ELISPOT in a country with a TB intermediate prevalence, the authors recommended further study of the cost effectiveness of recipient TB chemoprophylaxis.[319]

### Urine Culture

Urine should be sent for culture from all donor candidates at evaluation, and ideally repeated close to the time of donation (eg, within the preceding 2 weeks). Acute symptomatic urinary tract infection is a reason to postpone donation. However, detection of asymptomatic bacteriuria is not infrequent, especially in female donors. A history of urinary tract infection in a donor candidate, particularly if there is a family history of reflux nephropathy, or in a male, requires detailed imaging of the kidneys (eg, assessment for cortical scarring). Any active bacterial or fungal infection in the donor should be treated and, ideally, resolved before donation and transplantation.[283] Antibiotic prophylaxis should be given to the recipient if resolution of infection is not confirmed before donation, as a positive urine culture early after transplantation, even when asymptomatic, may be associated with increased risk of acute rejection in the recipient.[320,321]

### Seasonal and Geographically Endemic Infections

The donor candidate evaluation should include assessment of place of residence, travel, seasonal, occupational, and recreational risks, as well as prior infections in the donor candidate and family members (Table 17). A number of geographically endemic and seasonal diseases have been transmitted through organ donors including: *Strongyloides*, *Trypanosoma cruzi* (Chagas disease), West Nile virus, histoplasmosis, coccidiomycosis, *Aspergillus*, toxoplasmosis, malaria, Creutzfeldt–Jacob disease, human T-cell lymphotrophic virus infection, and schistosomiasis.[273,275,286] Other viral, fungal, bacterial and parasitic pathogens recognized as sources of organ donor-derived infection transmissions are listed in Table 18. Living donation affords sufficient time for microbiological testing, donor treatment and deferral of donation and transplantation until resolution of infection. Organ donation may be possible after treatment of the donor candidate before donation,

**TABLE 18.**

**Social and clinical factors associated with increased likelihood of geographically endemic infections and infections related to specific exposures**

Geographic risks (including duration of time spent in a location)
- Home country/region
- Place of birth (outside vs inside home region)
- Prolonged residence outside home region (recent or distant)
- Occupational or recreational travel to other countries and/or regions
- Countries of origin for close family members
- Ingestion of well water

Occupational risks
- Healthcare workers
- Veterinarians, animal care workers
- Landscapers, park rangers, and other outdoor workers
- Occupations with international travel, such as Peace Corps, international journalists
- Medical mission trips (consider a 3-mo washout period before donation to allow identification of subclinical disease)

Seasonal risks
- Warm weather and insect exposure—eg, local West Nile Virus, dengue, Chikungunya virus, local rickettsial infections, Lyme disease

Hobbies
- Hunting/dressing game, taxidermy
- Time living outdoors including camping, swimming in lakes, drinking stream water, insect exposures
- Adventure sports
- Gardening

Significant animal exposure (wild and/or domestic)
- Large numbers of cats or dogs or any unusual pets, including whether pets reside mainly indoors or outdoors
- Laboratory/research animals
- Veterinarian/veterinarian assistant

Family members and close contacts with potential risk factors
- Geographic or seasonal infections previously diagnosed in close family members or other contacts may predict risk for subclinical infection in donor candidate

Personal history of seasonal or geographic infection in donor candidate, even if remote

Adapted from OPTN *Ad Hoc* Disease Transmission Advisory Committee[287]

informed consent of the recipient, as well as recipient monitoring and possible prophylaxis after transplant (Table 19).

*Strongyloidiasis* typically occurs only in the setting of specific environmental exposures. Donor-derived *Strongyloides* hyperinfection cases with high associated mortality have been reported, including from kidney transplantation.[322-324] Consensus-based recommendations of the 2013 *AST Infectious Diseases Community of Practice* work group and the OPTN *Ad Hoc* Disease Transmission Advisory Committee (DTAC) support screening for *Strongyloides* in the following potential organ donors[286,287]:

- Persons who were born in or lived in tropical or subtropical countries where sanitation conditions are substandard, including candidates with prior military service in endemic areas. The WHO emphasizes a correlation between improved sanitation and human waste disposal with the disappearance of Strongyloidiasis.[325] Strongyloidiasis has occurred in most countries with the exception of Canada, Japan and Northern Europe.

**TABLE 19.**

**Recognized organ donor-derived infection transmissions**

| Viruses | Bacteria |
|---|---|
| Adenovrius | *Mycobacterium tuberculosis* |
| BK polyoma virus | *Nocardia* spp. |
| Cytomegalovius | *Rickettsia rickettsii* (Rocky |
| Epstein-Barr virus | Mountain Spotted Fever) |
| Herpes simplex virus | *Treponema pallidum* (syphillis) |
| HIV | *Borrelia* (Lyme disease) |
| HBV | |
| HCV | |
| Hepatitis E virus | |
| Human T-cell lymphotropic | |
| virus 1 and 2 | |
| Influenza A/B | |
| Lymphocytic choriomeningitis virus | |
| Parvovirus B19 | |
| Rabies | |
| West Nile virus | |
| **Fungi** | **Parasites** |
| *Aspergillus* spp. | *Babesia microti* |
| *Candida* spp. | *Balamuthia mandrillaris* |
| *Coccidioides immitis* | *Malaria* spp. |
| *Cryptococcus neoformans* | *Naegleria fowleri* |
| *Histoplasma capsulatum* | *Toxoplasma gondii* |
| *Scopulariopsis brevicaulis* | *Trypanosoma cruzi* |
| *Zygomycetes* (Mucor) | *Schistosoma* spp. |
| | *Strongyloides stercoralis* |

HBV, hepatitis B virus; HCV, hepatitis C virus; HIV, human immunodeficiency virus. Adapted by permission from Macmillan Publishers Ltd: Fishman JA, Grossi PA. Donor-derived infection—the challenge for transplant safety. *Nat Rev Nephrol.* 2014;10:663–672.[274]

- Persons with significant exposure to soil in Appalachia or the Southeastern United States, including walking barefoot.
- Persons with unexplained eosinophilia and travel to endemic area.
- Persons reporting a prior history of *Strongyloides* infection.

Serologic Ab testing is the preferred screening test for *Strongyloides* infection, as the sensitivity of stool testing is limited and multiple stool screening tests may be negative in asymptomatic chronic infection.[286] *Strongyloides* IgG antibody testing (ELISA-based) is available in many reference labs.

Infected donor candidates should be treated with a minimum of 2 doses of ivermectin given over donation (200 μg/kg orally daily on 2 consecutive days)[286,287] Because of the potential for persistence of migrating larvae and eggs in the tissues, some experts recommend repeating this treatment 2 weeks later to cover an autoinfection cycle. After treatment, follow-up laboratory testing of the donor candidate before donation to confirm cure has been deemed unnecessary, unless reexposure has occurred.[286,287]

*Chagas disease* is transmitted through contact with infected triatomine "kissing" bugs, and residents of poorly constructed housing where these insects reside are at greatest risk of acquiring infection. Transmission has also been reported from mother to infant, through blood transfusion, and through organ transplantation. Consensus-based recommendations of the 2011 Chagas in Transplant Working Group, the 2013 *AST Infectious Diseases Community of Practice* work group, and OPTN DTAC support screening in the following potential organ donors[286,287,289]:

- Those who were born in or lived in an endemic region in Mexico, Central or South America
- Children of women who lived in endemic regions and whose *T. cruzi* infection status is positive or unknown
- Persons who received a blood transfusion in endemic regions
- Persons reporting a prior history of Chagas disease

Assessment of outcomes of 32 transplant recipients who received organs from 14 *T. cruzi* seropositive donors in the United States from 2001 to 2011 confirmed transmission in 9 recipients from 6 donors, including 2 of 15 (13%) kidney recipients, 2 of 10 (20%) liver recipients and 3 of 4 (75%) heart recipients.[326] Recommended monitoring posttransplant comprised regular testing by polymerase chain reaction, hemoculture, and serologic testing. Thirteen recipients had no or incomplete monitoring; transmission was confirmed in 5 of these recipients; 4 of the 5 recipients had symptomatic disease and all 4 died, although death was directly related to Chagas disease in only one. Nineteen recipients had partial or complete monitoring for *T. cruzi* infection with weekly testing by polymerase chain reaction, hemoculture and serologic testing; transmission was confirmed in 4 of the 19 recipients with no cases of symptomatic disease. Based on such evidence, recent guidelines support consideration of kidney donation from donors with *T. cruzi* infection on an individual basis with consent of the recipient.[286,287,289] Recipients must be informed of the need for participation in close monitoring and the available therapeutic interventions in the event of infection, as the medications available for treatment are not FDA-approved and are generally only available through specific protocols. Consideration of the recipient's access to testing and monitoring is imperative, as geographic concerns may impact the ability to follow the recipient closely.

*West Nile Virus* is a flavivirus that is transmitted by mosquitoes in an enzootic cycle with birds. When testing is indicated, screening living donor candidates by West Nile virus NAT within 7 to 14 days of donation has been recommended.[273,291] Proposed strategies for when to begin testing living donor candidates for West Nile virus include when regional blood banks start performing NAT screening or testing during a defined period of time that reflects the peak of local West Nile virus infection.[291] The 2013 *AST Infectious Diseases Community of Practice* work group recommended delaying donation for 28 days when NAT screening is positive, followed by repeat NAT and immunoglobulin M (IgM) Ab testing with the following management pathways based on the results[273]:

- NAT+: Defer donation for at least 120 days. Donation deemed likely to be safe if clearance of viremia demonstrated by NAT testing after 120 days
- NAT-/IgM Ab–: Consider initial NAT testing to reflect a false positive result. Donation may be considered after infectious disease consult
- NAT-/IgM Ab+: Suggests infection with clearance of viremia. Donation may be considered after infectious disease consult

## Emerging Infections

Transplant programs must maintain awareness of new and emerging infections that may be transmissible through organ donation. Availability of microbiological testing for new infections may be limited or available only at specialized laboratories, emphasizing the importance of careful assessment of exposure history in the donor candidate evaluation.

Case 2:24-cr-00366-NJC      Document 24-1      Filed 03/11/26      Page 293 of 569 PageID #: 487

For example, during the Ebola virus outbreak of 2014, the OPTN DTAC recommended that evaluation of candidates for organ donation should include screening for travel and epidemiologic risk factors for Ebola exposure, including[327]:

- Travel to a country where an Ebola outbreak occurred within the past 21 days
- Contact with blood, other body fluids, or human remains of a patient known or suspected to have Ebola
- Exposure as a healthcare worker to patients known to have Ebola
- Direct handling of bats or nonhuman primates from disease-endemic areas

If risk factors for Ebola are identified, the OPTN DTAC recommends aborting the evaluation process and excluding donation.

Zika virus is a mosquito-borne pathogen that gained attention in association with an outbreak of primary microcephaly among children born to infected mothers in Brazil in 2015, followed by rapid geographic spread across the Americas, prompting recognition as a global health emergency.[328] Other complications of Zika virus infection include acute autoimmune neuropathies such as Guillain-Barré syndrome. Guidance from the OPTN DTAC, the AST, and the ASTS recommend considering donor deferral if there is history of travel to Zika-endemic areas in the 28 days before donation.[329] In the case of potential living donors with Zika infection, donation should be deferred where possible.

Transplant programs should develop and maintain screening protocols to address emerging infections, including awareness of evolving geographic exposure patterns in consultation with local public health specialists. Current information on global health outbreaks are reported by organizations such as the US Centers for Disease Control.[330]

### What Prior Guidelines Recommend

US OPTN Policy for Medical Evaluation Requirements for Living Donors mandates similar screening tests as recommended in our current guideline: anti-CMV Ab, anti-EBV Ab, anti-HIV 1,2 Ag/Ab, HBsAg, anti-HBcAb, anti-HCV Ab, and syphilis testing.[51] US transplant programs are required to determine whether the donor has TB exposure risk factors and to test accordingly. US programs are also required to develop protocols to determine who to screen for geographically endemic and seasonal infections such as *Strongyloides*, *Trypanosoma cruzi* and West Nile virus.

The British Transplantation Society has also recommended testing for HBV, HCV, EBV, CMV and HIV as part of donor candidate evaluation.[48] The Spanish Society of Nephrology and Spanish National Transplant Organization recommendations for living donor kidney transplantation included the following as routine tests in the donor candidate evaluation: HIV [a], Hepatitis B: HBsAg [a], anti-HBcAb IgM/IgG [b], HBsAb, HBV DNA in plasma if anti-HBcAb+, Hepatitis C (ELISA and polymerase chain reaction) [a], CMV IgG/IgM [b], EBV IgG/IgM [b], *Toxoplasma* test, Syphilis (RPR- fluorescent treponemal antibody) [b], *Brucella* [b]. Here, [a] stands for 'Donation is contraindicated with positive results' and [b] stands for 'Donors and/or recipients have to undergo treatment with positive results'.[54]

In contrast to this recommendation, we believe that testing for *Toxoplasma* and *Brucella* should be guided by geography

and risk factors for possible exposure. Also, since the Spanish Society of Nephrology and Spanish National Transplant Organization guidelines were published in 2010,[54] new research published above supports revision of some categories of [a] 'Donation is contraindicated with positive results.'

### RESEARCH RECOMMENDATIONS

- Define the incidence of donor-derived disease transmission through improved monitoring and reporting. This is critical since determining the relative importance of specific pathogens and risk mitigation strategies requires collection of global data.
- Develop and validate risk assessment questionnaires and protocols for living donor-derived infections, taking into consideration behavioral, occupational, hobby-related, geographic and seasonal exposures.
- Optimize and standardize methods of microbiological assays for donor infection screening and diagnosis.
- Assess results of planned US NIH studies of transplantation from HIV+ donors to HIV+ recipients to develop guidance on appropriate consideration of such transplants in clinical practice.
- Determine, through clinical trials or observational protocols with informed consent, whether kidney donation and transplantation can be performed with acceptable safety and outcomes for the donor and recipient in the following scenarios:
  ○ Donation from HCV+ living donors to HCV+ recipients after antiviral treatment of the donor
  ○ Donation from HBsAg + living donors to HBsAg + recipients or recipients with HBV

## CHAPTER 13: CANCER SCREENING

The ERT search parameters did not identify evidence from eligible studies pertinent to the recommendations in chapter 13 and therefore the following recommendations are "Not Graded."

### Evaluation

13.1: Donor candidates should undergo cancer screening consistent with clinical practice guidelines for the country or region where the donor candidate resides. Transplant programs should ensure that screening is current according to guideline criteria at the time of donation.

### Selection

13.2: In general, donor candidates with active malignancy should be excluded from donation. In some cases of active malignancy with low transmission risk, a clear management plan and minimal risk to the donor, donation may be considered.

13.3: A kidney with a small simple (Bosniak I) cyst can be left in the donor, particularly if there are compelling reasons for donating the contralateral kidney.

13.4: Donation of a kidney with a Bosniak II renal cyst should proceed only after assessment for the presence of solid components, septations, and calcifications on the preoperative computed tomography scan (or magnetic resonance imaging) to avoid accidental transplantation of a kidney with cystic renal cell carcinoma.

13.5: Donor candidates with high grade Bosniak renal cysts (III or higher) or small (T1a) renal cell carcinoma curable by nephrectomy may be acceptable for donation on a case-by-case basis.

C.Agnello   SE 0290

S72    **Transplantation** ■ August 2017 ■ Volume 101 ■ Number 8    www.transplantjournal.com

13.6: Donor candidates with a history of treated cancer that has a low risk of transmission or recurrence may be acceptable for donation on a case-by-case basis.

## RATIONALE

### Goals of Evaluation

The goals of malignancy screening are two-fold. First, it is necessary to identify cancers to protect the health of the donor candidate. Reduced kidney function may compromise long-term health outcomes in individuals requiring cancer treatments with nephrotoxic or cardiovascular side effects (eg, some chemotherapies or radiation treatments). Potential psychosocial stresses of living donation may also be prohibitive in individuals faced with stress of an active cancer diagnosis and treatment. Second, the evaluation must mitigate risks of donor-derived malignancy transmission to the transplant recipient.

### General Population Cancer Screening and Incidence

Most jurisdictions have regional recommendations for which members of the general population should be screened for common cancers, including frequency of screening and acceptable testing modalities. These include screening recommendations for colon, breast, cervical, prostate, and lung cancer.[331-333] There are potential harms associated with cancer screening, as with any form of screening, if additional testing and procedures are undertaken in patients who ultimately do not have cancer. These risks should be included in the consent for evaluation of the living donor candidate. Transplant programs in countries without local clinical practices guidelines can refer to guidelines from countries or regions most similar to their population.[331-333]

The limited available data on cancer diagnoses after living kidney donation support that donor evaluation and selection practices reduce the incidence of postdonation cancer below that of general population controls, although risk reduction may dissipate with time after donation.[334] However, cases of cancer diagnoses including melanoma and uterine cancer within less than 1 year of donation have been reported,[334] emphasizing the need for up-to-date assessment for malignancy before donation.

### Recurrence Risk after Treated Cancer

Recurrence rates after treated cancer from the general population may be used to guide observation periods after cancer treatment before considering organ donation. Average times to recurrence vary by cancer type. Consideration of living donation from a person with a history of treated cancer should include consultation with the donor candidate's oncologist to confirm that individual case factors are associated with "low" (eg, less than 1%) risks of both lifetime recurrence and disease transmission, and that long-term surveillance will not require frequent imaging that may be restricted by reduced GFR (eg, CT scans with iodinated contrast or magnetic resonance imaging (MRI) scans requiring gadolinium).

### Donor-Derived Malignancy Transmission

Cases of malignancy transmission from deceased or living organ donors to recipients have been reported. A recent systematic review examined all case reports, case series and registry studies describing the outcomes of kidney transplant recipients with donor-derived cancer transmission published through December 2012.[335] Among 104 donor-transmitted cancer cases identified from 69 studies, the most common transmitted cancer types were renal cancer (n = 20, 19%), followed by melanoma (n = 18, 17%), lymphoma (n = 15, 14%) and lung cancer (n = 9, 9%). Recipients with transmitted renal cancers had the best outcomes, with more than 70% of recipients surviving for at least 24 months after transplantation. Patients with melanoma and lung cancers had the worst prognosis, with less than 50% of recipients surviving beyond 24 months from transplantation. While these data support that donor-derived cancer transmission is uncommon, potential reporting-bias prevents accurate incidence estimates. This report highlights the high mortality associated with donor-derived melanoma and lung cancer transmission.

A history of melanoma is particularly concerning when evaluating a living donor candidate. Aside from the potential for late recurrence and subsequent complications in the donor, melanoma transmission to transplant recipients has been reported after apparent dormancy in the donor for decades, supporting the ability of melanoma cells to remain dormant at distant sites for decades and then reactivate upon exposure to immunosuppression,[336,337] and transmission can be fatal. The Israel Penn International Transplant Tumor Registry, a voluntary registry of more than 250 cases of organs transplanted from donors with a history of malignancy that captures tumor histology, donor risk factors, method of tumor presentation and recipient outcome, described 13 donors with a history of melanoma (but deemed free of the disease at donation) who provided organs to 28 recipients.[338,339] Melanoma transmission occurred in 21 recipients (75%), of whom 13 (62%) died from metastatic disease. The time to diagnosis ranged from 2.5 to 42 months (median, 10.5 months), and the only patients who survived were those who underwent nephrectomy and cessation of immunosuppression. While some prior general population guidelines such as the US Preventative Services Task Force state that there is insufficient evidence to recommend routine whole body skin exam screening among general adults,[340] skin examinations for donor candidates with increased recreational or occupational exposure to sunlight, family or personal history of skin cancer, or clinical evidence of precursor lesions may be warranted. Pathology reports of living donor candidates with a prior history of skin cancer resection should be reviewed to ensure that the cancer was not a melanoma before approving donation.

### Selection

In 2011, the OPTN DTAC Malignancy Subcommittee published a classification of 6 risk categories for donor-derived malignancy transmission and suitability of organ donation from persons with active or prior malignancy histories[341]; this was also recently reviewed in Kirchner et al.[273] Classification was based on review of cancer registry reports, published literature, and data submitted to the OPTN. This article did not differentiate between cancer transmissions from living compared with deceased donors due to limited data.

- "No significant risk" was defined as benign tumors where malignancy has been excluded.

© 2017 Wolters Kluwer

- "Minimal risk" was defined as tumors with 0% to 0.1% transmission events per organ transplanted from donors with the specific tumor, and includes nonmelanoma skin cancers, noninvasive carcinoma of the bladder (for nonrenal transplants only), small papillary or follicular carcinoma of the thyroid and solitary, well-differentiated (≤1 cm) renal cell carcinoma.
- "Low risk" (0.1-1% transmission events per organ transplanted from affected donors) includes small renal cell carcinoma (1-2.5 cm), low grade central nervous system (CNS) tumors, primary CNS mature teratoma, solitary papillary thyroid carcinoma (0.5-2.0 cm), minimally invasive follicular carcinoma (1.0-2.0 cm), and history of treated non-CNS malignancy (≥5 years prior) with greater than 99% probability of cure.
- "Intermediate risk" (1-10% transmission events per organ transplanted from affected donors) includes breast and colon carcinoma in situ, resected well differentiated renal cell carcinoma (4-7 cm) and history of treated non-CNS malignancy (≥5 years prior) with probability of cure between 90-99%.
- "High risk" (>10% transmission events per organ transplanted from affected donors) includes current or past history of melanoma, leukemia/lymphoma or neuroendocrine tumors, breast or colon cancer stage 1 or higher, choriocarcinoma, any CNS tumor with ventriculoperitoneal or ventriculoarterial shunt, metastasis or high grade (III/IV) histology, metastatic carcinoma, sarcoma, lung cancer Stage I-IV, and renal cell carcinoma greater than 7 cm. The high risk category also included any treated non-CNS malignancy with insufficient follow-up to predict behavior, incurable or with <90% probability of cure, or any other active cancer not previously classified.
- Tumors of "unknown risk" were defined as a final category.

The authors suggested that donors in the "no significant risk" category are standard, and that organs from donors with "minimal risk" malignancies may be used for transplantation based on clinical judgment with informed consent of the recipient. The authors also proposed that organs from donors with "intermediate risk" malignancies could be considered for transplantation with informed consent for recipients who face substantial mortality without transplantation. This classification scheme should be updated with new information as data become available.

## Considerations Related to Renal Cysts and Renal Cell Carcinoma

The development of kidney cancer in a patient with a single kidney is very concerning because the surgical treatment of renal tumors may result in loss of function of the remaining kidney. The age-stratified lifetime cumulative incidence of kidney cancer is low. In a matched cohort study of 2119 donors in Ontario Canada (1992-2010) and 21 190 nondonors from the general population with similar baseline health, no living kidney donor in the cohort received a partial or total nephrectomy of their remaining kidney during follow-up.[342]

The decision to approve donation in a person with kidney cysts depends on radiographic characteristics (Tables 20 and 21). Because simple (Bosniak I) renal cysts are not associated with increased risk of complications, organ dysfunction, or cancer, simple cysts are not contraindications to kidney donation. Cases of back table excision of small renal cell carcinomas after donor nephrectomy, followed by use of the kidney for transplantation have been reported.[345-348] Based on review of cancer registry reports, published literature and disease transmission cases reported to the OPTN, a 2011 OPTN DTAC Malignancy Subcommittee

**TABLE 20.**
Bosniak renal cyst classification system

| Category | Description |
|---|---|
| I | A benign simple cyst with a hairline thin wall that does not contain septa, calcifications, or solid components. It measures water density and does not enhance |
| II | A benign cyst that may contain a few hairline thin septa in which "perceived" enhancement may be present. Fine calcification or a short segment of slightly thickened calcification may be present in the wall or septa. Uniformly high attenuation lesions < 3 cm (so-called high-density cysts) that are well marginated and do not enhance are included in this group. Cysts in this category do not require further evaluation |
| IIF (F for follow-up) | Cysts that may contain multiple hairline thin septa or minimal smooth thickening of their wall or septa. Perceived enhancement of their septa or wall may be present. Their wall or septa may contain calcification that may be thick and nodular, but no measurable contrast enhancement is present. These lesions are generally well marginated. Totally intrarenal nonenhancing high-attenuation renal lesions > 3 cm are also included in this category. These lesions require follow-up studies to prove benignity |
| III | "Indeterminate" cystic masses that have thickened irregular or smooth walls or septa in which measurable enhancement is present. These are surgical lesions, although some will prove to be benign (eg, hemorrhagic cysts, chronic infected cysts, and multiloculated cystic nephroma), some will be malignant, such as cystic renal cell carcinoma and multiloculated cystic renal cell carcinoma |
| IV | These are clearly malignant cystic masses that can have all the criteria of category III, but also contain enhancing soft-tissue components adjacent to, but independent of, the wall or septum. These lesions include cystic carcinomas and require surgical removal |

Reprinted with permission from Israel GM, Bosniak MA. An update of the Bosniak renal cyst classification system. *Urology*. 2005;66:484–488.[343]

C. Agnello   SE 0292

S74    **Transplantation** ■ August 2017 ■ Volume 101 ■ Number 8S    www.transplantjournal.com

**TABLE 21.**

**International TNM staging system for renal cell carcinoma**

| T: Primary tumor | | | |
|---|---|---|---|
| TX | Primary tumor cannot be assessed | | |
| T0 | No evidence of primary tumor | | |
| T1a | Tumor ≤ 4.0 cm and confined to the kidney | | |
| T1b | Tumor > 4.0 cm and ≤ 7.0 cm and confined to the kidney | | |
| T2a | Tumor > 7.0 cm and ≤ 10.0 cm and confined to the kidney | | |
| T2b | Tumor > 10.0 cm and confined to the kidney | | |
| T3a | Tumor grossly extends into the renal vein or its segmental (muscle-containing) branches, or tumor invades perirenal and/or renal sinus fat but not beyond Gerota fascia | | |
| T3b | Tumor grossly extends into the vena cava below the diaphragm | | |
| T3c | Tumor grossly extends into the vena cava above the diaphragm or invades the wall of the vena cava | | |
| T4 | Tumor invades beyond Gerota fascia (including contiguous extension into the ipsilateral adrenal gland) | | |
| N: Regional lymph nodes | | | |
| NX | Regional lymph nodes cannot be assessed | | |
| N0 | No regional lymph nodes metastasis | | |
| N1 | Metastasis in regional lymph node(s) | | |
| M: Distant metastases | | | |
| MX | Distant metastasis cannot be assessed | | |
| M0 | No distant metastasis | | |
| M1 | Distant metastasis present | | |
| Stage grouping | | | |
| Stage I | T1 | N0 | M0 |
| Stage II | T2 | N0 | M0 |
| Stage III | T1 or T2 | N1 | M0 |
| | T3 | Any N | M0 |
| Stage IV | T4 | Any N | M0 |
| | Any T | Any N | M1 |

Reprinted from Campbell SC, Lane BR. Chapter 57: Malignant renal tumors. In: *Campbell-Walsh Urology*, 11th Edn. Wein AJ, Kavoussi LR, Partin AW, et al. (eds). Elsevier, pp. 1314–1364, 2016.[344]

concluded, from a disease-transmission perspective, that "…kidneys with small, solitary, well differentiated renal cell carcinoma may be usable for transplantation provided the lesion itself is completely resected."[341] While partial (rather than complete) nephrectomy is often the treatment choice for small renal cell carcinomas for the purpose of nephron-sparing with comparable cure rates in affected individuals, persons planning kidney donation intend to undergo complete nephrectomy. Thus, the decision to proceed with donor nephrectomy in an individual with a high grade Bosniak cysts or suspected kidney cancer based on predonation imaging should incorporate considerations of the anticipated risk of future carcinoma in the donor's contralateral kidney, risk of disease transmission to the recipient (including whether the lesion is amenable to complete back table excision), chances of possible discard without transplantation after nephrectomy. Donation of a kidney with a Bosniak II renal cyst should proceed only after assessment for the presence of solid components, septations, and calcifications on the preoperative computed tomography scan (or magnetic resonance imaging) to avoid accidental transplantation of a kidney with cystic renal cell carcinoma. Procurement and transplantation of living donor kidneys with Bosniak (III or higher) renal cysts or small (T1a) renal cell carcinoma curable in the donor by nephrectomy and amenable to complete excision before implantation should proceed only after detailed informed consent of donor and recipient, and donor and recipient understanding and acceptance of these risks. In most circumstances, Bosniak IIF

or higher cysts should not be left in the donor but such decision should be individualized.

## What Prior Guidelines Recommend

Prior guidelines and policies for the evaluation and care of living donors recommend history, clinical examination, and investigation to exclude occult malignancy before donation, especially in those older than 50 years or with risk factors including family history.[38,48,51] The Amsterdam Forum recognized that risks of specific cancers may vary across countries.[38] "Active malignancy" is commonly cited as a contraindication to living kidney donation,[38,48,51] although exceptions were noted for low-grade nonmelanoma skin cancer.[38] Renal cell carcinoma was considered a contraindication to donation in some prior guidelines,[38,48] but is currently permissible under US policy in selected cases.[51]

Past cancers considered to be an absolute contraindication to donation in prior guidelines include melanoma, testicular cancer, choriocarcinoma, hematological malignancy, monoclonal gammopathy, bronchial cancer, and metastatic cancer.[38,48] Breast cancer is included, although the European Association of Urology qualifies the restriction to "advanced" disease.[55] Criteria for which donation may be acceptable despite a prior history of malignancy articulated in prior guidelines include that the specific cancer is curable and the potential transmission of the cancer can reasonably be excluded (eg, colon cancer (Dukes A, > 5 years ago), nonmelanoma skin cancer, or carcinoma in situ of the cervix).[38,48] The Amsterdam Forum defined additional criteria

© 2017 Wolters Kluwer

for approving donation in a person with prior cancer to include that prior treatment of the malignancy did not decrease renal reserve, place the donor at increased risk for ESKD, or increase the operative risk of nephrectomy.[38]

## RESEARCH RECOMMENDATIONS

- Improve quantification of the incidence of donor-derived disease transmission according to cancer type, clinical features and duration since treatment, through improved monitoring and reporting. Support and expand efforts such as the "Notify Project,"[349] a consortium of global experts who gather didactic information on documented types of adverse outcomes in transplantation to identify general principles for detection and investigation.
- Develop systematic monitoring of long-term donor and recipient outcomes in the case of kidney transplantation from living donors with small (T1a) renal cell carcinoma to better inform guidance for when donation and transplantation may or may not be acceptable.

## CHAPTER 14: EVALUATION OF GENETIC KIDNEY DISEASE

The ERT search parameters did not identify evidence from eligible studies pertinent to the recommendations in chapter 14 and therefore the following recommendations are "Not Graded."

### Evaluation

14.1: Donor candidates should be asked about their family history of kidney disease, and when present, the type of disease, time of onset, and extra-renal manifestations associated with the disease.

14.2: When the intended recipient is genetically related to the donor candidate, the cause of the intended recipient's kidney failure should be determined whenever possible. The intended recipient should consent to share this medical information with the donor evaluation team, and with the donor candidate if it could affect the decision to donate.

### Selection

14.3: Donor candidates found to have a genetic kidney disease that can cause kidney failure should not donate.

### Counseling

14.4: Donor candidates must provide informed consent for genetic testing if indicated as part of their evaluation. Donor candidates should be informed of the possible effects of receiving a diagnosis of a genetic kidney disease, such as any impact on their ability to obtain health or life insurance.

14.5: In cases where it remains uncertain whether the donor candidate has a genetic kidney disease and whether the disease can cause kidney failure, donation should proceed only after informing the donor candidate of the risks of donation if the disease manifests later in life.

### Autosomal Dominant Polycystic Kidney Disease (ADPKD)

14.6: Donor candidates with ADPKD should not donate.

14.7: Donor candidates with a family history of ADPKD in a first-degree relative may be acceptable for donation if they meet age-specific imaging or genetic testing criteria that reliably exclude ADPKD.

### Apolipoprotein L1 (*APOL1*) Risk Alleles

14.8: Apolipoprotein L1 (*APOL1*) genotyping may be offered to donor candidates with sub-Saharan African ancestors. Donor candidates should be informed that having 2 *APOL1* risk alleles increases the lifetime risk of kidney failure but that the precise kidney failure risk for an affected individual after donation cannot currently be quantified.

## RATIONALE

### Goals of Evaluation

Genetic kidney diseases include autosomal dominant polycystic kidney disease (ADPKD), *APOL1*-related kidney disease, atypical hemolytic uremic syndrome (aHUS), Alport syndrome, Fabry disease, familial focal segmental glomerulosclerosis (FSGS), and autosomal dominant tubulointerstitial kidney disease (ADTKD). A family history of a genetic kidney disease with an autosomal recessive mode of inheritance (such as cystinosis or some forms of familial FSGS) is usually not a contraindication for living kidney donation, although long-term follow-up data are not available in the literature.

All donor candidates should be asked detailed questions about a possible family history of hereditary kidney disease, and all reasonable measures should be taken by health professionals caring for the intended recipient to determine the cause of kidney failure in the setting of possible hereditary kidney disease. With permission of the intended recipient, information about the intended recipient's cause of kidney failure should be reviewed carefully by the donor evaluation team and shared with the donor candidate if it could affect the decision to donate.

Some donor candidates have a family history of genetic kidney disease.[350] Some of these diseases first manifest later in life and are not identified when donor evaluation occurs at a younger age. Donation could increase the future risk of kidney failure in such a candidate. For this reason, it is important that transplant programs have a strategy for evaluating for inherited kidney disease in donor candidates when there is a family history of kidney failure and the recipient's cause of kidney failure is uncertain.

Many of the standard tests done as part of the donor evaluation should be interpreted with special consideration in the setting of a family history of genetic kidney disease. Examples include renal imaging in the setting of family history of ADPKD, or hematuria testing in the setting of a family history of Alport syndrome (see also chapter 7).

Ideally, the estimation of long-term postdonation risk in a donor candidate should account for their family history of genetic kidney disease, but there are currently no tools that incorporate family history of genetic kidney disease with a donor candidate's other demographic and health characteristics to estimate long-term risk. Living donors who are biologically related versus unrelated to a recipient may have a higher incidence of ESKD. In a large study from the United States, the 15-year cumulative incidence of ESKD was 0.34% in living donors who were biologically related to a recipient versus 0.15% in unrelated donors (a two-fold increase in relative terms, although difference was not statistically significant ($P = 0.15$).[30]

Donor candidates must provide informed consent to have genetic testing if indicated as part of their evaluation. Donor

candidates should be informed of the possible effects of receiving a diagnosis of a genetic kidney disease, such as any effects on their ability to obtain health or life insurance. In cases where despite a normal evaluation at the time of donor candidate evaluation it remains uncertain whether the candidate has a genetic kidney disease, donation should proceed only after a full discussion with the donor candidate of the risks of donation if the disease manifests later in life.

With advances in genetic medicine and the implications of new risk alleles such as *APOL1*, there is likely to be rapidly evolving knowledge that may influence future donor candidate evaluations. However, at this time the testing for several genetic conditions is imperfect. This uncertainty should prompt a discussion with all relevant stakeholders to achieve consensus on proceeding with donation or not.

## Autosomal Dominant Polycystic Kidney Disease (ADPKD)

Recent studies and a KDIGO Controversies Conference summarize diagnostic criteria for ADPKD.[351,352] Simple cysts occur more frequently with increasing age in the general population. Kidney disease from *PKD2* presents later in life than *PKD1*. Age-dependent imaging criteria for diagnosis and disease exclusion have been established for at-risk adults with unknown ADPKD gene type (*PKD1* or *PKD2*).[353] For example, for candidates 40 years or older with a first degree relative with ADPKD, the finding of normal kidneys or a single cyst seen in one kidney with no cysts seen in the other kidney reliably rules out the presence of ADPKD.[354] However, the utility of ultrasound to rule out ADPKD in younger donor candidates is more limited, where an absent or limited number of cysts on CT or MRI can be considered to rule out ADPKD.[352] DNA testing can also sometimes help diagnose or exclude the condition.[355] Linkage-based genetic diagnoses of ADPKD using polymorphic markers flanking the 2 disease genes is now rarely performed. Rather, direct mutation screening (by Sanger or next-generation sequencing) is now commonly used for molecular diagnosis of ADPKD.[356,357] Up to 15% of patients with suspected ADPKD have a negative comprehensive mutation screen. The first-degree relative with ADPKD should undergo *PKD1* and *PKD2* mutation screening (using an acceptable technique), and if a pathogenic mutation is successfully identified, the donor candidate can be tested for this same mutation. However, when mutation screening in the first-degree relative with ADPKD is negative, DNA testing including molecular diagnostics is unhelpful in determining whether the donor candidate does or does not have ADPKD.

The criteria to diagnose ADPKD in patients with no family history of ADPKD is less certain (a family history is absent in 10-15% of patients with ADPKD). A patient with bilaterally enlarged kidneys with innumerable cysts most likely has ADPKD, although the presence of other cystic kidney diseases should also be considered.[351]

## Apolipoprotein L1 (*APOL1*) Risk Alleles

The use of *APOL1* genotyping in the donor evaluation is currently grounded primarily in evidence extrapolated from nondonor populations. Recent literature supports that at least a portion of kidney failure previously attributed to hypertensive nephrosclerosis or other diseases (eg, FSGS, lupus nephritis, HIV nephropathy, sickle cell disease) in persons of African descent may be genetically mediated or accelerated by coding variants in the *APOL1* gene. Having at least one *APOL1* risk allele confers resistance to lethal *Trypanosoma brucei* infections, and these variant alleles are observed in populations of African descent but essentially absent among white persons. Regionally, *APOL1* risk variants are common in persons from West Africa and South Africa (sub-Saharan African descent), and uncommon in North Africa. Approximately 13% of African Americans carry 2 *APOL1* risk alleles.[358] Among African Americans in the general population, carrying 2 *APOL1* risk alleles has been associated with FSGS[359] and HIV-associated nephropathy histopathologies, proteinuria, reduced GFR, younger age at dialysis and more rapid progression of kidney disease.[235-238] The presence of 2 *APOL1* risk alleles in a deceased donor associates with 2-to-4-times higher RR of graft loss in the recipient, compared with 0 or 1 risk alleles.[360,361] Case reports of possible *APOL1*-mediated adverse donor and recipient outcomes after living kidney donation among siblings of African ancestry were recently described.[359,362]

Routine use of *APOL1* genotyping and related counseling within evaluation protocols has been advocated by some,[358,363-365] while others raise concerns.[366] The utility of *APOL1* testing has not been addressed in prior living donor guidelines. The impact of *APOL1* screening on donor candidate exclusion, and the impact of test results on postdonation outcomes and graft outcomes in living donor transplant recipients are yet to be defined.[367] Nevertheless, given *APOL1*-related risks identified in the general population and among deceased donor transplant recipients, as well as known higher risk of renal complications among African American compared with white donors,[368] we recommend considering *APOL1* genotyping in donor candidates with sub-Saharan African ancestors. The implications of having 2 *APOL1* risk alleles likely differ in younger versus older donor candidates, and whether the genetically related intended recipient has the same alleles. The implications of having 2 *APOL1* risk alleles may also be influenced by the results of kidney function testing done at the time of donor candidate evaluation.

A *2016 AST Expert Conference* opined that pending more evidence, at this time all African American living donor candidates should be informed about the associations of *APOL1* risk alleles with CKD/ESKD risk in the general population and offer genetic testing as part of the evaluation (including coverage of testing costs) to candidates who wish to know their *APOL1* status.[369] The WG also recommended counseling donor candidates that precise ESKD risk for an affected individual cannot currently be quantified, and that genetic testing may post psychological stress. Finally, the authors advised that use of *APOL1* risk allele status should be integrated with the donor candidate's full profile of demographic and health characteristics in determining donor candidacy.

## Alport Syndrome (See also Chapter 7)

Alport syndrome is a genetic disease that alters collagen biosynthesis. Collagen is an important structural component of the basement membranes in the kidney, inner ear and eye, and the clinical manifestations of Alport syndrome include persistent microscopic hematuria, early onset bilateral sensorineural hearing loss, and ocular anterior lenticonus and

© 2017 Wolters Kluwer

retinal flecks. The combination of a detailed family history assessment and a kidney biopsy helps establish the diagnosis, where electron microscopy demonstrates areas of irregular glomerular basement membrane thickness with lamellation, splitting and sometimes characteristic "basket-weave appearances."[370] The presence of Alport syndrome can be confirmed by genetic testing, and next-generation sequence panels provide opportunities to genetically screen for collagen mutations.[371] Alport syndrome is primarily an X-linked disorder (approximately 80% of families), but can also be inherited in an autosomal recessive (approximately 15% of families) and autosomal dominant fashion (very rare).[372,373] Most women who are heterozygotes for X-linked Alport syndrome exhibit hematuria (95% of women in one European cohort). Of note, collagen (*COL4A*) mutations are present in families with Alport syndrome (85% of Alport syndrome is caused by mutations of *COL4A5*), and are also present in some families with familial FSGS, sporadic FSGS, and thin basement membrane disease.[374,375] Overall, the severity of nephropathy in Alport syndrome is variable. Many males with X-linked Alport syndrome will develop ESKD before the age of 40 years. Most female carriers of X-linked Alport syndrome will not develop kidney failure in their lifetime although cases of ESKD do occur.[370,373]

There is little information on the outcomes of such heterozygotes who proceeded with kidney donation (after confirming the absence of proteinuria, hypertension, low GFR and other manifestations of the disease such as sensorineural hearing loss). Gross et al[174] described 6 mothers with Alport syndrome (across several European centers) who donated kidneys to their children with the disease. Five mothers with X-linked Alport syndrome donated to their sons and one mother who was a carrier of autosomal recessive Alport syndrome donated to her daughter; kidney function declined 25% to 60% in 4 of the 6 donors over the observed 2 to 14 years after nephrectomy, although no donor's creatinine clearance was less than 40 mL/min at the time of follow-up evaluation; 4 of the 6 developed microalbuminuria or proteinuria, and hypertension was diagnosed in 4 of 6 donors. There are often several considerations in evaluating a mother with X-linked Alport syndrome for donation to a son with kidney failure, including her desire to care for her child and the possible guilt associated with passing on a genetic kidney disease.[376] Alternative treatment options should be considered (including other living donors), as should the age of the woman (older women have had more time to manifest kidney disease, so normal testing at the time of their evaluation is more reassuring than similar results in a younger woman).

## Fabry Disease

Fabry disease is an X-linked lysosomal storage disease caused by deficiency of the lysosomal hydrolase, α-galactosidase A (α-Gal A), which results in systemic accumulation of trihexosylceramide (globotriaosylceramide [GL-3]) in the lysosomes of the vascular endothelium in multiple organs. Clinical features include neuropathic pain and angiokeratoma, proteinuria, CKD, left ventricular hypertrophy, arrhythmia and stroke. Symptoms generally appear in childhood, although some go unrecognized until adulthood. Many affected males develop ESKD by the time they are 35 to 45 years of age. Heterozygous females have a different clinical course with variable clinical manifestations owing to random X chromosome inactivation. Renal manifestations include microscopic hematuria and the presence of white blood cells in the urine; less than 1% of heterozygous females develop kidney failure in their lifetime. A presumptive clinical diagnosis of Fabry disease can be made on the basis of a family history and signs and symptoms, with confirmatory testing for deficient α-galactosidase A enzyme activity in plasma and leukocytes (this deficiency is evident in males with the disease), and genetic testing.[377]

There is very little information on the outcomes of heterozygous females with Fabry disease who proceeded with kidney donation.[378] As with heterozygous Alport syndrome carriers, if donation is entertained, considerations should include the age of the woman and careful deliberation of all other treatment options for the intended recipient.

## Familial Focal Segmental Glomerulosclerosis (FSGS)

In recent years, many inheritable genetic forms of FSGS have been described, caused by mutations in a number of genes for proteins that are important for podocyte function or glomerular basement membrane assembly.[374,379] FSGS can follow both recessive and dominant inheritance patterns.[380] Of note, other clinical terms are used to describe the same or similar diseases based on age of onset or response to therapy (eg, congenital nephrotic syndrome, steroid resistant nephrotic syndrome).[381]

There are case reports of individuals who have developed FSGS, proteinuria and kidney failure after donating a kidney to a sibling with kidney failure from FSGS.[382] The role of genetic testing in relatives with a family history of kidney failure from FSGS is yet to be determined.

## Atypical Hemolytic Uremic Syndrome (aHUS)

There are case reports of individuals who donated a kidney to a relative with kidney failure from Atypical Hemolytic Uremic Syndrome (aHUS), where the donor developed aHUS in the year after donation.[383] A high chance of graft failure from aHUS reoccurrence in the recipient has also been described (>80% with some aHUS mutations). Current genetic testing is imperfect in excluding the presence of aHUS in a donor candidate even when the mutation is known in the recipient. For these reasons some suggest never to proceed with living kidney donation in the setting of a related recipient with aHUS. Others suggest assessing whether a donor candidate shares a genetic susceptibility factor to aHUS to determine whether or not they may be an acceptable donor.[384]

## Autosomal Dominant Tubulointerstitial Kidney Disease (ADTKD)

ADTKD is a heterogeneous genetic disorder. Individual families may have a large number of affected individuals. Mutations in at least 4 genes are implicated: *MUC1* gene which encodes mucin 1 (*MCKD1*), *REN* gene which encodes renin, *UMOD* gene which encodes uromodulin (*MCKD2*) and the *HNF1B* gene which encodes hepatocyte nuclear factor-1β.[385,386] Similar to other autosomal dominant diseases, there is 50% probability that each child will inherit the disease from their affected parent. Both *HNF1B* and *MUC1* mutations can arise *de novo* without a prior family history of disease. Donor candidates may be offered target mutation screening to assess whether the disease is present,

S78    **Transplantation** ■ August 2017 ■ Volume 101 ■ Number 8    www.transplantjournal.com

if they are biologically related to a patient with kidney failure who has evidence of the pathogenic mutation.

### Sickle Cell Trait

Approximately 8% of black Americans have sickle trait, and the trait is also common among patients with Mediterranean or Indian subcontinent heritage.[387,388] Many affected persons may be unaware that they carry the trait. The prevalence of sickle trait among potential and actual kidney donors is not known. Renal abnormalities in the presence of sickle cell trait range from isosthenuria to hematuria, to rare presentations with acute kidney injury in the context of severe physical stress, such as military training or pregnancy.[389] The manifestations of sickle cell trait depend on the individual's overall hemoglobin genotype and exposure to environmental stressors.[389,390] An increased incidence of medullary renal carcinoma has also been reported among persons with sickle cell trait. A prior survey of US transplant programs (2005, 54% response rate) demonstrated substantial variation in screening and exclusion practices, such that 83% (113/137) of responding programs did not have a policy to screen donors for sickle cell trait.[391] Among the programs reporting related exclusion practices, 18% (19/105) reported always excluding donor candidates with sickle cell trait whereas 16% (17/105) indicated they never exclude.

### What Prior Guidelines Recommend

Prior guidelines and policies for the practice of living kidney donation discuss genetic considerations in the evaluation, although not to the extent presented in the current guideline. Current OPTN policy requires that US transplant programs establish and follow a protocol for screening for ADPKD and other inherited kidney diseases as guided by family history.[51] Several guidelines including those from the British Transplantation Society describe imaging criteria used to exclude the presence of ADPKD.[48]

### RESEARCH RECOMMENDATIONS

- Determine how a genetic predisposition to various kidney diseases relates to outcomes after donation. Use genetic information along with other candidate characteristics to estimate the long-term risk of ESKD in the absence and presence of donation.[7]
- Develop better strategies and tools to screen donor candidates for genetic kidney diseases that consider the accuracy, efficiency and costs of testing, including assessment of targeted gene panels for known mutations implicated in kidney diseases.[392]
- Develop reliable imaging criteria to exclude ADPKD in donor candidates based on the results of the CT angiogram, which is frequently used to assess the renal vasculature as a routine part of the donor evaluation.
- Define the role *APOL1* genotyping in the evaluation of donor candidates of sub-Saharan African ancestry.[369] Acquire adequate data to assess rare outcomes such as ESKD in donors from national registries incorporating biospecimens and long-term outcomes information.
  - For example, in December 2016 the NIH announced 2 requests for applications to form the *APOL1* Long-term Kidney Transplantation Outcomes (APOLLO) Network consortium directed at designing and conducting multicenter, prospective, longitudinal studies to determine the impact of *APOL1* genetic variants on outcomes after living kidney donation/transplantation and deceased donor kidney transplantation.[393,394]

- Better define the implications of sickle cell trait on long-term kidney function and implications for donor selection.

### CHAPTER 15: PREGNANCY

Except in the case of Recommendation 15.9, the ERT search parameters did not identify evidence from eligible studies pertinent to the recommendations in chapter 15 and therefore the following recommendations are "Not Graded."

### Evaluation

15.1: Female donor candidates should be asked about future childbearing plans.

15.2: Female donor candidates should be asked about prior hypertensive disorders of pregnancy (eg, gestational hypertension, preeclampsia, or eclampsia).

15.3: Local guidelines should be followed to confirm the absence of pregnancy before performing radiologic tests, including abdominal computed tomography (with iodinated contrast) or nuclear medicine GFR testing.

### Selection

15.4: Women should not donate while pregnant.

15.5: Women should not be excluded from donation solely because they desire to conceive children after donation.

15.6: Women with a prior hypertensive disorder of pregnancy may be acceptable for donation if their long-term postdonation risks are acceptable.

15.7: A decision to proceed with donation in the year after childbirth should consider the psychological needs of mother and child, and should include anesthesia and analgesia planning for nursing mothers.

### Counseling

15.8: Women with childbearing potential should be informed of the need to avoid becoming pregnant from the time of approval for donation to the time of recovery after nephrectomy; a quantitative human chorionic gonadotropin (β-hCG) pregnancy test should be performed and confirmed as negative immediately before donation.

15.9: We suggest that women with childbearing potential be counseled about the effects donation may have on future pregnancies, including the possibility of a greater likelihood of being diagnosed with gestational hypertension or preeclampsia. (2C)

15.10: Women with a prior hypertensive disorder of pregnancy should be informed about their long-term risks.

15.11: Women with childbearing potential who proceed with donation should be counseled on how to reduce the risk of complications in future pregnancies.

### RATIONALE

#### Evaluation and Selection

Female donor candidates should be asked about their future childbearing plans and potential, which is determined by the candidate's age, history of menopause, and any prior history of sterilization. This information has implications for counseling and the need to confirm the absence of pregnancy at the time of donor nephrectomy.

When evaluating donor candidates, knowledge about a prior history of hypertensive disorder during pregnancy and its severity is important, as when such a history is present

C. Agnello    SE 0297

© 2017 Wolters Kluwer

(vs absent) it is associated with a higher risk of ESKD.[395] One meta-analysis concluded that women were at greater risk of albuminuria after a preeclamptic pregnancy compared with a normal pregnancy (5- to 10-year incidence of 31% vs 7%).[396] This meta-analysis was, however, restricted by small studies of variable quality that focused often on women with severe preeclampsia or underlying diseases such as diabetes mellitus. A population-based study from Norway suggested that women were at greater risk of ESKD if they developed preeclampsia during pregnancy than if they did not (approximate 30-year cumulative incidence after a woman's first pregnancy of 0.4% vs 0.1%)[397] The risk remained evident after excluding women with a prepregnancy history of known kidney disease, diabetes or hypertension. A study from Taiwan also described a greater risk of ESKD in pregnant women who developed a hypertensive disorder during pregnancy compared with a normal pregnancy (approximate 12-year cumulative incidence after pregnancy of 0.6% vs < 0.1%)[398] In general, characteristics associated with a lower long-term risk of ESKD after a history of hypertension in pregnancy include: i) a mild (vs severe) hypertensive event during pregnancy; ii) more than 10 years since last hypertension event in pregnancy; iii) no evidence of hypertension, albuminuria or low GFR in the current donor evaluation; and iv) no wish for future pregnancies.

Gestational diabetes is a strong risk factor for subsequent diabetes mellitus. A history of gestational diabetes mellitus is also associated with a higher risk of ESKD.[399] For recommendations related to gestational diabetes see Recommendations 11.5 and 11.7.

Because a fetus may be harmed by radiation and/or by radiocontrast, local guidelines should be followed to confirm the absence of pregnancy before performing certain tests as part of the donor candidate evaluation, such as an abdominal CT (with iodinated contrast) or a nuclear GFR test. Some guidelines suggest that it may be reasonable to proceed without a quantitative human chorionic gonadotropin (β-hCG) pregnancy test if a woman's menstrual period is not overdue and there is an absence of pregnancy symptoms.[400]

A woman should not donate while pregnant. Women with childbearing potential should be informed about the need to avoid becoming pregnant from the time she is approved for donation to the time she has recovered after nephrectomy. Approximately 1% of patients develop postoperative venous thromboembolism after donor nephrectomy and the risk of using estrogen-based oral contraceptive medications before surgery should be balanced against harms. Barrier birth control can be an appropriate option in the weeks before surgery.

Women with childbearing potential should be supported by transplant programs to make a well-informed donation decision. Transplant programs should enable donation when they estimate a candidate's long-term postdonation risks are acceptable. In other words, motivated well-informed women should not be excluded from donation solely on the basis of a desire to conceive children after donation. Most women with access to recommended pregnancy care have good maternal and fetal outcomes in their postdonation pregnancies.[401] We advocate that recommended postdonation pregnancy care be available to all women worldwide, including any treatments needed for pregnancy complications. A decision to proceed with donation in the year after delivery should carefully consider the needs of the mother and her baby.

With regard to prior guidelines, the 2004 Amsterdam Forum concluded that donor nephrectomy is not detrimental to the prenatal course or outcome of future pregnancies. At the time, the participants concluded there were no data to suggest that hyperfiltration associated with the combination of unilateral nephrectomy and pregnancy leads to significant hypertension, proteinuria, change in GFR, or abnormalities of the urinary sediment.[38] Some transplant programs have historically not disclosed any potential postdonation pregnancy risks as part of the informed consent process. However, 3 recent studies provided new information on this risk. Two retrospective cohort studies, one from the United States and the other from Norway, reported an increased risk of gestational hypertension and preeclampsia after kidney donation, based on comparisons of pregnancies before and after donation within donors (**Evidence Report Table 21, SDC,** http://links.lww.com/TP/B434, and **Supplemental Appendix Table D18, SDC,** http://links.lww.com/TP/B432).[402,403] Another recent retrospective cohort study from Canada demonstrated gestational hypertension or preeclampsia was more likely to be diagnosed in kidney donors than matched nondonors with similar indicators of baseline health (11% vs 5%).[401] The 2 groups did not differ significantly with respect to other maternal or fetal outcomes (Caesarean section, postpartum hemorrhage, preterm birth with gestation less than 37 weeks, low birth weight < 2500 g), and there were no maternal deaths, stillbirths, or neonatal deaths in either group (however, the CIs for the estimates were wide, meaning that a clinically important risk among donors was not excluded). Most women in these cohorts were white (Table 22).

## Counseling

Based on the new information, our guideline suggests that women who are capable of conceiving children after donation be counseled about the possible impact donation may have on future pregnancies. This suggestion agrees with a 2015 AST *Live Donor Community of Practice* consensus conference conclusion that information on postdonation pregnancy risk should be shared in the informed consent process for donor candidates with reproductive potential.[148] Beginning in 2017, OPTN Informed Consent Policy requires that US transplant programs inform donor candidates that the risks of preeclampsia or gestational hypertension are increased in pregnancies after donation.[51] The ERT found the evidence for a higher likelihood of being diagnosed with gestational hypertension or preeclampsia after donation to be consistent across the 3 studies, but of low quality.[3]

Women with childbearing potential who proceed with donation should be educated on recommended evidence-based methods to reduce the risk of complications in postdonation pregnancies. For example, in the nondonor population, several dietary and lifestyle interventions including interventions to reduce or prevent obesity have the potential to reduce the risk of preeclampsia.[404,405]

## RESEARCH RECOMMENDATIONS

- Investigate the precision of estimated, individualized pregnancy outcomes among donors through expanded monitoring and reporting, including capture of more detailed clinical information such as BP and kidney function.

**TABLE 22.**

Donor characteristics and maternal and fetal outcomes in postdonation pregnancies from 3 studies: Norway, Minnesota (United States), and Ontario (Canada)

| | Norway | Minnesota, United States | Ontario, Canada |
|---|---|---|---|
| **Donor characteristics** | | | |
| No. women | 69 | 239 | 85 |
| Years of donation | 1967 to 2002 | 1963 to 2007 | 1992 to 2009 |
| Family history of kidney failure (%) | NR | 96% | 65% |
| Mean predonation GFR, mL/min per 1.73 m$^2$ | NR | 91 | 114 |
| White race (%) | 98% | 97% | 70% |
| Number of postdonation pregnancies | 106 | 490 | 131 |
| Mean age at donation, y | 27 | 26 | 29 |
| Mean age at pregnancy, y | 32 | 29 | 32 |
| No. women with at least one predonation pregnancy (%) | NR | 98 (41%) | 25 (29%) |
| Mean or median time from donation to postdonation pregnancies, y | 5 | 5 | 4 |
| **Outcomes after donation** | | | |
| Postdonation maternal outcomes | | | |
| Gestational hypertension or preeclampsia | 9/106 (8%) | 55/490 (11%) | 15/131 (11%) |
| Gestational hypertension | 3/106 (3%) | 28/490 (6%) | 7/131 (5%) |
| Preeclampsia | 6/106 (6%) | 27/490 (6%) | 8/131 (6%) |
| Maternal death | NR | NR | 0 |
| Postdonation fetal outcomes | | | |
| Preterm birth (<37 wk gestation) | 10/106 (9%) | 35/490 (7%) | 10/131 (8%) |
| Low birth weight (<2500 g) | 9/106 (8%) | NR | 8/131 (6%) |
| Stillbirth | 3/106 (3%) | 2/490 (<1%) | 0 |
| Neonatal death (<28 days after birth) | 0 (0.0%) | NR | 0 |

GFR, glomerular filtration rate; NR, not reported. Modified with permission from Garg AX et al.[401]

○ Develop individualized estimates for women who differ in race/ethnicity, family history of kidney disease, and their healthcare system.

- Determine whether the risks of complications in postdonation pregnancies vary according to the side of nephrectomy. Pregnancy may be associated with ureteral obstruction and dilation, particularly of the right kidney.[37,406,407]
- Define the clinical sequelae of gestational hypertension and preeclampsia that develop in postdonation pregnancies, including effects on long-term kidney outcomes.
- Explore perceptions of pregnancy risk information by women with different characteristics to improve education, counseling, and informed consent processes.

## CHAPTER 16: PSYCHOSOCIAL EVALUATION

Except in the case of Recommendation 16.7, the ERT search parameters did not identify evidence from eligible studies pertinent to the recommendations in chapter 16 and therefore the following recommendations are "Not Graded."

### Evaluation

16.1: Donor candidates should receive in-person psychosocial evaluation, education and planning from health professionals experienced in the psychosocial concerns of donor candidates and donors.

16.2: To ensure voluntariness, at least a portion of the psychosocial evaluation of the donor candidate should be performed in the absence of the intended recipient, family members and other persons who could influence the donation decision.

16.3: Whenever possible, the psychosocial evaluation of the donor candidate should be performed by health professionals not involved in the care of the intended recipient.

16.4: Transplant programs should follow protocols for assessing the donor candidate's psychosocial suitability, available support, preparation and concerns for donation.

### Selection

16.5: Transplant programs should follow protocols defining psychosocial factors that either exclude donation, or prevent further evaluation until resolution.

### Disclosures and Support

16.6: We suggest that donor candidates be informed that donors usually have good quality of life after donation (2D).

16.7: Transplant programs should assist donor candidates and donors in receiving psychosocial or psychiatric support as needed.

## RATIONALE

### Evaluation

The psychosocial evaluation of the living kidney donor candidate serves many functions. This evaluation helps determine if a candidate is psychologically fit for donation, for example, by assessing if the donor candidate's motivations are appropriate and identifying psychosocial risk factors for poor outcomes. The evaluation also helps address any donor candidate concerns, and ensures potential psychosocial risks and benefits of kidney donation are disclosed and understood. The psychosocial evaluation can also be used to

*C. Agnello   SE 0299*

© 2017 Wolters Kluwer

develop a tailored plan to support the donor candidate in having a positive psychosocial experience throughout the evaluation and donation processes. We recommend that all donor candidates, irrespective of their relationship with the intended recipient, should be evaluated using uniform criteria.

A recent systematic review of living kidney and liver donor candidates summarized 34 publications (guidelines, consensus statements and transplant program clinical protocols) on the content of the psychosocial evaluation (including the elements to be considered and acceptance criteria) and the process of the psychosocial evaluation (including who should be evaluated, how the evaluation should be performed, and the timing of the evaluation).[408] The authors concluded that, at present, there is little good evidence, concrete guidance or consensus on what to screen for, how to handle psychosocial problems, or how to perform the psychosocial evaluation. These findings confirmed that there is substantial practice variation in regard to psychosocial evaluations. The authors concluded that, consistent with prior systematic reviews,[20] most recommendations in prior publications are based on expert opinions (via consensus conference) and individual transplant program experiences. The ERT assessed evidence related to psychosocial outcomes after donation.

### Should all Donors have a Psychosocial Evaluation?

Our recommendations are consistent with several prior guidelines and policies in some countries, which indicate that psychosocial assessment is a necessary part of the evaluation of each donor candidate.[38,48,50,51,54,55,409]

### In What Setting Should the Evaluation Be Performed?

While the initial screening may be performed by telephone, particularly for donor candidates living far from the transplant center, the main psychosocial evaluation should be conducted as a face-to-face interview, as has also been recommended in several prior reports.[408] Third parties should not be present during at least a portion of the interview, to maintain confidentiality and minimize the effect of external influences on the donor candidate's responses. This suggestion is consistent with some prior reports.[408] In other reports the presence of a relative or significant other during a portion of the interview (as long as they are not the intended recipient) is cited as potentially beneficial to the donor candidate and the assessment process, in that such participation may promote reliability of the information reported and provide information about support the donor candidate will need during the donation and recovery periods.[408]

### Who Should Perform the Psychosocial Evaluation?

Our recommendations are similar to many prior guidelines and national policies that recommend performance of the psychosocial evaluation by various healthcare professionals (eg, psychiatrist, psychologist, clinical social worker, or a psychiatric nurse) who meet qualifications of appropriate training, knowledge and skill in mental health and the psychosocial concerns of transplantation.[51,54] As with prior recommendations we suggest that the psychosocial evaluation should be performed by an individual who is not involved in the care of the intended recipient to reduce conflicts of interest in evaluating the donor candidate.[50]

**TABLE 23.**

Recommended processes and content of the psychosocial evaluation

| Process | Content element |
|---|---|
| Assessment of suitability and preparation | The following should be assessed in each donor candidate: |
| | • Motivation for donation |
| | • Expectations of the outcomes of donation, including impacts on their future relationship with the recipient. The donor candidate should be counseled if these expectations appear to be unrealistic. |
| | • History of current or past psychiatric disorders |
| | • History of current or past substance abuse or dependence (eg, use of alcohol, illicit drugs or prescription drugs) |
| | • Support system, including available family, friends and workplace supports, and coping strategies (including available programs) to minimize any negative impacts from donation |
| | • Preparation for the possible medical impact of donation, and any expected impact on their activities after donation |
| | • Preparation for the possible emotional impacts of donation (both positive and negative) |
| | • Preparation for the possible financial impacts of donation, including potential impact on employment status and wages, expenses for medical care, travel and dependent care, and any effects on insurability or rates |
| | • Understanding and acceptance of their responsibility for making good health choices after donation, including the need to organize and adhere to recommended routine medical follow-up |
| | • Behaviors that increase the risk of a donor transmitting an infectious disease to the recipient |
| Education | • The process and requirements of informed consent should be reviewed (see chapter 2 of this guideline for complete details) |
| | • Concerns about medical, emotional and financial impacts of donation should be elicited and addressed with appropriate education and/or referral to a knowledgeable member of the transplant team |
| | • Donor candidates can be told that most prior donors have experienced good psychosocial outcomes, although some people experience psychosocial difficulties after donation |
| Planning and support | • An individualized plan to support the donor candidate in having a positive psychosocial experience throughout the evaluation and donation processes should be developed for each candidate, guided by donor candidate concerns and psychosocial risk factors that can be managed without excluding donation |

Case 2:24-cr-00366-NJC    Document 24-1    Filed 03/11/26    Page 304 of 569 PageID #:
498
S82    **Transplantation** ■ August 2017 ■ Volume 101 ■ Number 8    www.transplantjournal.com

### Protocols for Assessing the Donor Candidate's Psychosocial Suitability

It is important for transplant programs to follow predetermined protocols in evaluating each donor candidate's psychosocial suitability equitably. The protocol should include a comprehensive list of the processes and content of the psychosocial evaluation (Table 23). Recommended components of the psychosocial evaluation specified in prior guidelines include mental health history,[47,48,51,54,196,409] substance use history,[47,48,51,54,409] understanding of risks,[47,51,55] ability to make an informed choice,[51] coping capacity,[47,51,409] social support,[47,48,51,409] risk factors for poor psychosocial outcomes (details unspecified),[51,409] motivation and voluntariness,[47,51,409] and donor-recipient relationship.[47,48]

### Considerations for Nondirected Donor Candidates

Practice patterns related to the psychosocial evaluation of nondirected donors vary considerably worldwide.[410-412] Our opinion is that candidacy criteria should be similar whether an individual is being assessed for directed or nondirected donation, recognizing that some elements of the informed consent may vary, including those related to how the intended recipient is selected, time frames for donation, travel requirements, and opportunities or prohibitions about contact with the recipient after donation and transplant.

### Selection

#### Which Predonation Characteristics are Associated with a Greater Chance of Poor Psychosocial Outcomes after Donation?

The ERT identified 2 studies examining whether the association between donation (donors vs healthy nondonors) and long-term psychological outcomes were modified by an individual's baseline characteristics (**Evidence Report Tables 9 and 11, SDC,** http://links.lww.com/TP/B434; **Supplemental Appendix Tables D6 and D8, SDC,** http://links.lww.com/TP/B432). The quality of this evidence was graded as very low. In one study the association between donation (donors vs nondonors) and long-term mental quality of life score was not modified by age.[413] In the other study, the cumulative incidence of recorded depression diagnoses was lower in donors compared with matched beneficiaries in the same insurance system, among both men and in women.[414]

The ERT summarized the results of several studies wherein donors with a characteristic were compared to donors without the characteristic, to see if the 2 groups differed on the chance of a poor psychosocial outcome. The quality of this evidence was graded as low to very low. These results are challenging to interpret because: many studies reported different psychosocial outcomes that were not directly comparable; the effects were not always seen across all psychosocial outcomes measured within a study; the results of characteristics associated with outcomes were inconsistent across the studies; and the likelihood a donor with the characteristic would experience the outcome was often reported in relative rather than absolute terms (see **Evidence Report Tables 10, 12, 14, 15, 20, SDC,** http://links.lww.com/TP/B434; **Supplemental Appendix Tables D7, D9, D11, D12, D17, SDC,** http://links.lww.com/TP/B432).

In some studies, predonation characteristics that were associated with reduced chance of poor psychosocial outcomes (ie, with a better psychosocial prognosis) included a lack of residual ambivalence about donation (ie, no lingering hesitation or uncertainty), more education, an absence of predonation psychiatric diagnoses, an absence of feeling morally obligated to donate, more social support, lower predonation expectations of health consequences after donation, less financial burden, and the feeling of having received adequate attention from the transplant team.[415-419] A systematic review of prospective studies of postdonation health-related quality-of-life (HRQoL) published after completion of the ERT's systematic review for this guideline found that, among 9 studies examining risk factors for impaired HRQoL, low psychological functioning before donation was the most common predictor.[420]

### What Psychosocial Criteria Should Exclude Donation?

Psychosocial elements that should be reviewed with the donor candidate and the psychosocial criteria that either exclude donation, or prevent further evaluation of the donor candidate until the issue is resolved, are summarized in Table 24. Donation should not occur when there is evidence of, or expectation of, unreasonable secondary gain. The Declaration of Istanbul endorses measures to protect individuals from the unregulated sale of organs.[421] At least 18 prior reports have described relative and absolute psychosocial contraindications to donation.[408]

### Disclosures and Support

#### What Should Donor Candidates be told about their Likely Psychosocial Outcomes after Donation?

The psychosocial evaluation provides an opportunity to share what emotions the donor candidate might experience after donation, and the anticipated short- and long-term psychosocial outcomes after donation.

Kidney donation has a profound and multifaceted impact on the lives of many donors and influences their identity, roles and relationships. Two recent systematic reviews summarize qualitative data about donor experiences after donation.[422,423] On average, donors experienced increased self-esteem, empowerment, and community awareness, but

**TABLE 24.**

**Recommendations for psychosocial factors that either exclude donation, or prevent further evaluation until resolution**

**Psychosocial contraindications to donation**

- A wish not to donate or marked ambivalence about donating
- Evidence of, or high suspicion of, undue pressure
- Evidence of, or high suspicion of, unreasonable or illegal secondary gain (such as an unregulated financial transaction)
- A failure to meet the requirements of informed consent (see chapter 2). This includes a donor candidate, who despite counseling, continues to have unrealistic expectations about the donation experience or potential outcomes
- Psychiatric conditions that can be treated to improve the donor candidate's predonation mental fitness and chance of a good postdonation outcome
- Past or present substance use disorder
- A psychosocial profile that predicts a level of postdonation risk that exceeds a transplant program's acceptable risk threshold. Such a profile may include an active substance use disorder, or the absence of needed psychosocial or financial support

C. Agnello   SE 0301

© 2017 Wolters Kluwer

some also described a lack of emotional support. A subsequent systematic review of 34 prospective studies of postdonation HRQoL (1990 to 2014) found that, after mild reductions early after nephrectomy, HRQoL returned to baseline or was slightly reduced by 3 to 12 months, particularly for fatigue, but was still comparable with general population norms.[420]

In general, donors demonstrate good quality of life and have low rates of donation regret. That said, living donation is not without psychosocial risk, and some donors have experienced psychosocial difficulties after donation (eg, depression, anxiety, stress, worries about health), and such problems have impacted their functioning and ability to return to work.

One study was identified by the ERT that reported psychosocial outcomes in a group of donors compared with healthy nondonors, and the evidence quality was graded as very low (**Evidence Report Table 8, SDC,** http://links.lww.com/TP/B434; **Supplemental Appendix Table D5, SDC,** http://links.lww.com/TP/B432).[413] In the reviewed multicenter study, average values of 3 HRQoL scores among donors (a median of 6 years after donation) were similar to a group of nondonors and population norms. There was also no significant difference between the 2 groups in marital status, mental health visits and psychotropic medication use.

A report of 2455 living donors from 3 large US centers known as the Renal and Lung Living Donors Evaluation Study (RELIVE) cohort (93% white race, 72% biologically related to recipient) found that HRQoL scores in living donors in the decades after donation were similar or better than the US population.[415] However, 9% of RELIVE study respondents reported one or more of the following poor psychosocial outcomes: "fair" or "poor" overall donor experience, financial burden, regret or discomfort with decision to donate, or psychological difficulties since donation.[424] Recipient graft failure was the only identified predictor of reporting one or more of these poor psychosocial outcomes, and was associated with 77% higher risk (OR, $1.33$[1.77]$2.34$). Another report of 4650 privately insured living kidney donors in the United States described lower rates of depression diagnoses after donation compared with rates among age- and sex-matched beneficiaries in the same insurance system.[414] A systematic review published in 2006 summarized 51 studies describing 5139 donors who were assessed on average 4 years after donation.[425] Most donors who participated in follow-up reported no depression or anxiety, with questionnaire scores similar to the general population. The majority reported no change or an improved relationship with their recipient, spouse, family members and nonrecipient children. Some experienced an increase in self-esteem. A majority expressed no change in their attractiveness. Most donors (96%) did not regret their donation decision.

Based on these data, we suggest that donor candidates be informed that in general, donors demonstrate good quality of life after donation. However, donor candidates should also be informed that some people experience psychosocial difficulties after donation (eg, depression, anxiety, a negative change in their relationship with the recipient, more pain than expected, a recovery time that is slower than expected, a decline in their vitality, unexpected expenses related to donation recovery, anticipated benefits that were short-lived or not met at all) or anxiety related to worries about their health (including a fear of kidney failure).[78,425]

## What Should Donors Be Told About How Donation May Impact Them Financially?

Donor candidates and living kidney donors incur personal direct and indirect expenses as part of the evaluation and donation processes, even in countries where the donor's medical expenses are paid by the recipient's insurance or the healthcare system. Major costs include transportation, accommodation, child care, lost income (or vacation time), and missed time from work.[426,427] In a prospective Canadian follow-up study, the mean cost associated with donation was $3268 (Canadian dollars); however for 15% of donors, costs exceeded $8000.[428] The expenses incurred during the predonation evaluation are also described in another recent study from the United States.[429] These findings have led to recommendations that living donor candidates receive counseling about financial costs before donation, and have fostered governmental and other programs in multiple countries to reimburse donors for their legitimate expenses and attempt to maintain financial neutrality.[430-432]

However, there are limitations to many current cost mitigation programs. In the United States, the National Living Donor Assistance Center (NLDAC) (via a Health Resources and Services Administration grant) offers grants to offset travel and lodging costs for living donors and an accompanying person during the evaluation, donation and follow-up, but reimbursement eligibility is means tested and is based on the incomes of both the living donor candidate and recipient; further, nondirected donors have limited access because they cannot provide recipient income information. In the United States, many states have enacted legislation to offer tax deductions or credits, or other benefits, to living organ donors.[433] These programs vary state by state, are underused, and have not been studied with regard to impact on financial burden of donation. Several studies have considered whether kidney donation affects one's ability to obtain life, disability and health insurance.[434-436] These issues are country-specific, and should be considered in donor candidate counseling and support.

A 2016 convenience sample of informed consent forms for living donor and transplant candidate evaluation from 9 geographically diverse US programs identified misconceptions about defraying donation-related costs, reinforced by ambiguous language or omissions in the donor informed consent documents.[437] Donor candidates should receive clear, accurate education on how to access available financial support as well as the limitations of available resources. In 2016, the AST launched an online financial toolkit to help donor candidates learn about the finances of being a living organ donor; this dynamic resource will be expanded and updated over time.[438] Although developed from the perspective of US-based policies and resources, the information may be helpful to donor candidates in other countries. See chapter 18 for a discussion of policy related to financial support and removal of economic disincentives to donation.

## How Should Transplant Programs Help Donor Candidates and Donors in Need of Psychosocial Support?

Tailored plans to support each donor candidate in having a positive psychosocial experience throughout the evaluation and donation processes should be developed, guided by donor candidate concerns and psychosocial risk factors that can be managed without excluding donation.

S84    **Transplantation** ■ August 2017 ■ Volume 101 ■ Number 8S    www.transplantjournal.com

Candidates ultimately excluded from living donation for any reason may experience feelings of emotional distress, disappointment and guilt, frustration from inability to control one's own body and health, and in the case of planned donation to a spouse or dependent, caregiver burden or ongoing impact of the intended recipient's illness on the donor's lifestyle.[75] The transplant program should assist excluded donor candidates who have difficulty accepting their candidacy decision in receiving needed psychosocial support or psychiatric help.

In approximately 5% of living kidney donor transplants the recipient or their graft does not survive the first year. Understandably, poor recipient outcomes can be a source of stress and disappointment to the donor, and the transplant program should provide postdonation psychosocial support at such times. In some studies, but not others, poor recipient outcomes have been associated with poor psychosocial outcomes in donors.[413,414,439-443] In one study, most of the adverse recipient events were beyond the first year posttransplant.[414] Most donors will not experience poor short- or long-term medical or psychosocial outcomes after donation, but for those who do, the transplant program should participate to ensure that the donor receives psychosocial support or psychiatric help. The responsibility to ensure that donors receive psychological support when outcomes are poor is also described in a prior guideline.[409] The Declaration of Istanbul states that all donors should be offered psychosocial services as a standard component of follow-up,[421] and the CARI guideline recommends follow-up of the psychosocial impact of living kidney donation for every living donor during the first year after donation.[409] Incomplete or inconsistent follow-up after the early postdonation period may lead to under-recognition of donation-related psychosocial problems in the longer-term. Models for the collection of long-term psychosocial outcomes after donation exist internationally, including the European Living Donation and Public Health (EULID) project, an 11-nation registry that uses an online tool for reporting follow-up information included psychosocial and socioeconomic outcomes.[444] The national Swiss Living Donor Health Registry (SOL-DHR) follows donors lifelong and includes an 8-Item Short-Form (SF-8) and social-status questionnaire.[445]

### RESEARCH RECOMMENDATIONS

- Better define the optimal processes and content of the psychosocial evaluation. For example, there are emerging efforts to help standardize the psychosocial evaluation through the development of semi-structured evaluation tools.[446]

  ○ Duerinckx et al,[408] on behalf of the Ethical Legal Psychological Aspects of Transplantation Organization, summarized surveys or tools used for psychometric testing in the donor candidate evaluation from prior guidelines, consensus statements and transplant program protocols such as mood questionnaires, personality interviews and drug abuse screening. The type, number and content of tools described in prior guidelines were variable.

  ○ The same group also recently provided a conceptual framework for the key elements in the psychosocial evaluation of living kidney donor candidates, including assessment of: i) motivation (eg, coercion, ambivalence); ii) the presence of psychopathology (eg, cognitive disturbance, mood or

anxiety disorder); iii) available social resources (eg, social support, workplace support); and iv) information disclosure, understanding and risk processing (eg, elements of informed consent).[447]

- Determine which components of the psychosocial interview should be structured to cover relevant material while addressing the unique needs and questions of a given donor candidate.
- Perform clinical trials to compare evaluation approaches, acceptance criteria, and interventions to minimize the risk of poor postdonation psychological outcomes.

  ○ For example, in a recent randomized trial of 113 potential kidney donors with some evidence of residual ambivalence to donation, it was suggested that motivational interviews (vs additional health education or standard care) reduced ambivalence to donation, anxiety symptoms, unexpected family-related problems, and the risk of negative physical symptoms after donation.[417]

## CHAPTER 17: ACCEPTABLE SURGICAL APPROACHES FOR DONOR NEPHRECTOMY

Except in the case of Recommendations 17.3 and 17.7, the ERT search parameters did not identify evidence from eligible studies pertinent to the recommendations in chapter 17 and therefore the following recommendations are "Not Graded."

17.1: Renal imaging (eg, computed tomographic angiography) should be performed in all donor candidates to assess renal anatomy before nephrectomy.

17.2: The surgeon should have adequate training and experience for the surgical approach used for the donor nephrectomy.

17.3: We suggest that "mini-open" laparoscopy or hand-assisted laparoscopy by trained surgeons should be offered as optimal approaches to donor nephrectomy. However, in some circumstances, such as for donors with extensive previous surgery and/or adhesions, and at centers where laparoscopy is not routinely performed, open nephrectomy (flank or laparotomy) may be acceptable. (2D)

17.4: Robotic, single-port, and natural orifice transluminal nephrectomy should generally not be used for donor nephrectomy.

17.5: Nontransfixing clips (eg, Weck Hem-o-lok) should not be used to ligate the renal artery in donor nephrectomy; instead, renal artery transfixation by suture ligature or anchor staple within the vessel wall should be used.

17.6: In the absence of reasons to procure the right kidney (vascular, urological or other abnormalities), the left kidney should be procured in laparoscopic donor nephrectomy because of the relative technical ease associated with a longer venous pedicle.

17.7: We suggest laparoscopic procurement of the right rather than the left living donor kidney may be performed if the surgeon has adequate training and experience. (2D)

17.8: Procurement of a living donor kidney with 3 or more arteries should only be undertaken by surgeons with adequate experience.

17.9: A donor candidate with atherosclerotic renal artery disease or fibromuscular dysplasia involving the orifices of both renal arteries should not donate.

### RATIONALE

The choice of surgical approach and the organ for procurement (left vs right kidney) should take into consideration the experience of the surgeon as well as any renal functional, parenchymal, vascular or urological abnormalities. Relevant outcomes to consider in comparing surgical approaches

© 2017 Wolters Kluwer

include: mortality; perioperative complications (eg, bleeding, reoperation, incisional hernias); quality of life, including pain and wound cosmesis; recovery time; and graft outcomes in the recipient. Studies often report operative time as a surrogate measure for risks of anesthesia-related complications. The ERT identified 4 recently published systematic reviews describing perioperative outcomes after living donor nephrectomy.[448-450]

### Laparoscopic versus Open Nephrectomy

The ERT identified 3 systematic reviews comparing outcomes after laparoscopic versus open nephrectomy[448,450,451] (**Evidence Report Table 3, SDC,** http://links.lww.com/TP/B434; **Supplemental Appendix Table C3, SDC,** http://links.lww.com/TP/B432). Collectively, these reviews provide very low to high quality evidence for several outcomes, including operative time, blood loss, warm ischemia time, reoperation, length of hospital stay, and return to work. Overall, laparoscopic and open donor nephrectomies have comparable outcomes with regard to donor safety and graft function. Simple open (flank subcostal retroperitoneal) donor nephrectomy is generally performed with shorter operative times than laparoscopic nephrectomy but may incur slightly higher blood loss. Open nephrectomy is no longer considered the standard of care due to a longer incision and generally longer associated hospital stay, higher analgesia requirements, and longer convalescence period. By 2013, almost all living donor nephrectomies in the United States were performed laparoscopically, and, with increasing experience, few are converted to open procedures.[94] However, in unusual circumstances, such as for donors with extensive previous surgery and/or adhesions, and at centers where laparoscopy is not routine, open nephrectomy (flank or laparotomy) may be justified. Of note, as for most surgical procedures, experience is likely to be an important determinant of outcomes, and trials and observational series were generally performed at experienced centers by limited numbers of surgeons.

### Operative Time

Fonouni et al[448] reported a trend towards longer average operative time for laparoscopic compared with open donor nephrectomy, and Yuan et al and Wilson et al confirmed longer operative times for laparoscopic procedures.[450,451] Meta-analysis by Yuan et al[451] estimated that laparoscopic nephrectomy requires an average of 51 minutes longer surgical time (95% CI, 33-68 minutes). Surgery times averaged 2 to 3 hours for open nephrectomy and 3 to 4 hours for laparoscopic nephrectomy.

### Blood Loss

Five of the 8 publications included in the review by Fonouni et al[448] reported less perioperative blood loss with laparoscopic nephrectomy, while the other 3 found no significant differences in blood loss between the approaches. Meta-analysis by Yuan et al,[451] including 12 studies with 917 donors, found a small but statistically significantly increase in perioperative blood loss with open vs laparoscopic nephrectomy (mean difference, −99.6 mL; 95% CI, −165.9 to −33.4) or open versus hand-assisted laparoscopy (−112.8 mL; 95% CI, −169.1 to −56.0).[451]

### Warm Ischemia Time

Data regarding warm ischemia times with laparoscopic versus open nephrectomy are conflicting. In 9 of the 11 publications evaluated by Fonouni et al,[448] longer warm ischemia times were reported in the laparoscopic nephrectomies compared with open nephrectomies. Similarly, all included studies in the review by Wilson et al[450] found longer warm ischemia times in the laparoscopic groups, with differences ranging from 2 to 17 minutes. In contrast, based on data from 15 trials including data for 1598 donors, Yuan et al identified a small, significant decrease in warm ischemia time with laparoscopic compared with open nephrectomy (mean difference, −1.8 minutes; 95% CI, 1.3-2.2); warm ischemia time also trended lower for hand-assisted laparoscopy compared with open nephrectomy (mean difference, 0.4 minutes; 95% CI, −0.2 to 1.0), but this difference was not statistically significant. Overall, there were no clinically important differences in warm ischemia times with laparoscopic versus open donor nephrectomies. Wilson et al[450] found no significant differences between laparoscopic and open nephrectomy for early graft loss (RR, $_{0.06}0.31_{1.48}$); delayed graft function (RR, $_{0.52}1.09_{2.30}$), acute rejection (RR, $_{0.87}1.41_{2.27}$), ureteric complications (RR, $_{0.69}1.51_{3.31}$), donor kidney function at 1 year (standardized mean difference, 0.15; 95% CI, −0.11 to 0.41) or graft loss at 1 year (RR, $_{0.15}0.76_{3.85}$).

### Reoperation

Fonouni et al[448] included 7 publications (both trials and meta-analyses with unreported donor sample sizes) reporting reoperation rates, and found mixed results. Although 4 of the publications found no difference between the groups, 3 found higher reoperation rates in the laparoscopic compared with the open group. Based on data from 6 studies, Wilson et al[450] found fewer reoperations with open nephrectomy compared with laparoscopic nephrectomy, but this difference was not statistically different (RR, $_{0.09}0.57_{3.64}$).

### Length of Hospital Stay

Among 9 publications (with unreported donor sample sizes) reviewed by Fonouni et al,[448] 4 of the 9 found no difference in length of hospital stay between the groups, while the remaining 5 found longer length of stay with open versus laparoscopic nephrectomy. Meta-analysis of 16 studies (including 1681 donors) by Yuan et al[451] identified significantly shorter length of hospital stay after laparoscopic compared with open nephrectomy (mean difference, −1.3 days; 95% CI, −1.7 to −0.8).[451] Significant trends toward shorter length of stay were found with standard laparoscopic (mean difference, −1.3 days; 95% CI, −1.9 to −0.7) and hand-assisted laparoscopic (mean difference, −1.3 days; 95% CI, −2.1 to −0.5) compared with open nephrectomy.[450]

### Return to Work

The time to return to work was reported in one systematic review based on pooled data from 9 studies capturing 1016 donors. Laparoscopic nephrectomy was associated with a statistically significant and clinically meaningful reduction in time to return to work (mean difference, −16.4 days; 95% CI, −23.0 to −9.7).[451]

C. Agnello  SE 0304

## Pain and Physical Functioning

Among 6 studies describing analgesia requirements in the review by Wilson et al,[450] 4 reported significant reductions in morphine requirements with laparoscopic versus open neprhrectomy. One study showed that donors who underwent laparoscopic nephrectomy required fewer days of analgesia postdischarge (3.3 vs 7.8 days, $P < 0.001$), while another reported a nonsignificant reduction in visual analogue pain scale scores after laparoscopic nephrectomy. The meta-analysis by Yuan et al[451] of 3 studies including 306 donors showed superior 36-item Medical Outcomes Study Short Form (SF-36) physical functioning (mean difference, 6.6; 95% CI, 2.3-10.8; $P = 0.002$) and bodily pain scores (mean difference, 5.9; 95% CI, 1.6-10.3; $P = 0.007$) with laparoscopic compared with open nephrectomy.

## What Prior Guidelines Recommend

Other guidelines have also recommended laparoscopic or minimally surgical invasive approaches for living donor nephrectomy[48,50,54,452] based on evidence supporting lower morbidity, less pain and analgesia requirements, and earlier return to normal activity compared with open nephrectomy. CARI notes equivalent rates of major complications with laparoscopic versus open nephrectomy (with complications after laparoscopy largely due to catastrophic bleeding due to failure of intraoperative securing of the vascular pedicle), larger resource requirements for laparoscopy, but advantages with laparoscopy in terms of reduced analgesia requirements and faster return to normal activity.[453] The European Association of Urology concludes that laparoscopy offers equivalent complication rates and graft outcomes as open nephrectomy but shorter convalescence and better cosmetic results.[55] The Japanese Society of Endourology emphasizes the importance of experience, recommending that institutions commencing laparoscopic living donor nephrectomy should do so under the direction of an accredited laparoscopist.[452]

## Minimally Invasive Nephrectomy Approaches: Standard Laparoscopic Versus Hand-Assisted Laparoscopic Nephrectomy

Three systematic reviews presented evidence comparing standard living donor laparoscopic nephrectomy and hand-assisted laparoscopic living donor nephrectomy, and summarize very low to low quality evidence supporting similar outcomes across these approaches[448,450,451] (**Evidence Report Table 4, SDC,** http://links.lww.com/TP/B434; **Supplemental Appendix Table C4, SDC,** http://links.lww.com/TP/B432).

## Operative Time

Yuan et al[451] reviewed 7 trials including 387 donors that compared hand-assisted laparoscopic nephrectomy to standard laparoscopic nephrectomy, and found no statistical difference in operating time by meta-analysis (mean difference, –24.6 minutes; 95% CI, –50.8 to 1.7).

## Blood Loss

Wilson et al[450] reported varying results for blood loss across the studies of standard laparoscopic and hand-assisted nephrectomy included in their review, but overall found no significant differences between the groups. Similarly, Yuan et al[451] found no significant differences in blood loss with standard compared with hand-assisted laparoscopic nephrectomy (mean difference, –20.7 mL; 95% CI, –43.9 to 2.6).

## Warm Ischemia Time

Yuan et al[451] found a small, statistically significant reduction in warm ischemia time with hand-assisted compared with standard laparoscopy (mean difference, –1.0 minutes; 95% CI, –1.4 to –0.6), but this small difference does not appear to be clinically meaningful.

## Length of Hospital Stay

Based on 6 studies comprising 320 donors, donors undergoing standard laparoscopic nephrectomy had a slight reduction in average length hospital stay compared to those undergoing hand-assisted laparoscopic nephrectomy (mean difference, 0.3 days; 95% CI, 0.1-0.6),[451] although the difference (less than 1 day) appears to be modest.

A clinical trial at 2 centers published after these systematic reviews described 190 donors randomized to hand-assisted or standard laparoscopy for left donor nephrectomy.[454] Hand-assisted laparoscopy resulted in shorter operative time (mean, 159 vs 188 minutes; $P = 0.001$) and a small reduction in warm ischemia time (2 vs 5 minutes; $P < 0.001$). Intraoperative complication rate (5% vs 11%, $P = 0.12$), length of stay (both 3 days; $P = 0.14$), postoperative complication rate (8% vs 8%; $P = 1.00$), potential graft-related complications (6% vs 13%; $P = 0.14$), and physical function at 1 month follow-up ($P = 0.55$) did not significantly differ between the groups.

## Novel Minimally-Invasive Nephrectomy Approaches

In recent years, innovations in laparoscopic surgery have provided transplant surgeons with a range of techniques and minimally invasive instruments. Robotic-assisted, total robotic, and single port nephrectomies have been described in case reports, small series, and small trials at experienced centers.[455-459]

A systematic review and meta-analysis published after the ERT's systematic review for this guideline examined 19 articles published through March 2016 reporting short-term complications after minimally invasive donor nephrectomy[460]; of these, outcomes from 41 articles that compared 2 or more minimally invasive nephrectomy approaches were included in a meta-analysis. Publication dates of identified articles ranged from 2000 to 2015; most studies were retrospective case series. Although the sample included some prospective series, there were only 16 RCTs. The distribution of 32 038 donors according to operative technique was: laparoscopic, 57.4%; hand-assisted laparoscopic, 25.3%; mini-open, 4.5%; hand-assisted retroperitoneoscopic, 3.8%; retroperitoneoscopic, 3.7%; single-port laparoscopic (ie, laparoscopic single-site surgery [LESS]), 3.8%; and robotic-assisted laparoscopic, 1.3%. Overall, conversion rate to traditional open nephrectomy was 1.1%. Intraoperative complication rate was 2.3%, most commonly bleeding (1.5%). Postoperative complications occurred in 7.3% of donors, including infectious complications in 2.6% (mainly wound infections, 1.6%) and bleeding in 1.0%. Reported mortality rate was 0.01%.

Among 7 studies (2 RCTs, 2 prospective, and 3 retrospective) comparing laparoscopic (n = 1159) with retroperitoneoscopic

C.Agnello  SE 0305

© 2017 Wolters Kluwer

(n = 311) techniques, there were no significant differences in rates of conversion, overall intraoperative or perioperative complications.[460] Based on 8 studies (3 RCTs, 5 prospective) comparing mini-open (n = 322) to endoscopic (n = 288) techniques (ie, laparoperitoneoscopic, retroperitoneoscopic, with or without hand assistance), intraoperative complications were more frequently seen in endoscopic procedures (8.2% vs 3.4%; RR $_{1.13}$2.45$_{5.35}$; $P = 0.02$). This difference was mostly due to intraoperative organ damage, which demonstrated a trend in favor of open procedures (0% vs 2.8%; RR $_{0.91}$5.18$_{29.35}$; $P = 0.06$). The postoperative complication rate was comparable after mini-open versus laparoscopic donor nephrectomy. Ten studies (3 RCTs, 1 prospective study, 6 retrospective series) compared single-port (n = 764) with multiport laparoscopic (n = 1214) procedures, among which pulmonary complications were more frequently reported after LESS donor nephrectomy (1.5% vs 0%; RR $_{1.25}$7.51$_{44.94}$; $P = 0.03$). The slightly higher incidence of postoperative pain after LESS compared with multiport nephrectomy was not statistically significant (2.7% vs 0.8%; RR $_{0.90}$3.56$_{14.11}$; $P = 0.07$).

Limitations of this systematic review[460] include the varying study designs, outcome definitions and ascertainment methodologies. A Cochrane review of RCTs published through January 2016 comparing LESS donor nephrectomy with laparoscopic donor nephrectomy identified 3 studies including 179 patients, and concluded that data were insufficient for drawing inferences on outcomes.[461] At the present time, given the current limited experience and lack of robust safety and outcomes data, robotic, single-port, and natural orifice transluminal nephrectomies are not currently standard of care approaches to living donor nephrectomy and should only be performed by surgeons with adequate training and experience, and after informed consent.

### What Prior Guidelines Recommend

The ERBP also recommends that the choice between minimal invasive and standard laparoscopic procedure should be based on the local expertise.[50] No other guidelines recommend a preference for standard laparoscopy versus hand-assisted or other minimally invasive approaches.

### Left Versus Right Laparoscopic Nephrectomy

In the absence of reasons to procure the right kidney (eg, vascular or urological abnormalities), the left kidney should be procured in laparoscopic living donor nephrectomy because of the relative technical ease associated with a longer venous pedicle. However, the choice of which kidney to procure should be made to minimize short-term and long-term complications in the donor. Thus, the presence of renal parenchymal, vascular or urological abnormalities which are not contraindications to donation may favor the use of an abnormal right kidney for donation and transplantation, for the goal of leaving the donor with the "more normal" kidney and/or to minimize complications related to multiple vascular pedicles. Recent evidence supports safe laparoscopic procurement of the right kidney without increased risk of adverse outcomes compared with procurement of the left kidney, although the evidence is weak. The ERT examined one systematic review by Liu et al[449] comparing right with left laparoscopic living donor nephrectomy, and identified very low

quality evidence for similar operative times, blood loss, warm ischemia times, and length of stay at experienced centers (**Evidence Report Table 5, SDC,** http://links.lww.com/TP/B434; **Supplemental Appendix Table C5, SDC,** http://links.lww.com/TP/B432). Although complication rates of minimally invasive surgery are generally low with experienced surgeons, complications can be life threatening, and therefore proper training and experience is critical.

### Operative Time

Among 14 studies including 2656 donors with available data, operative times were similar with left and right laparoscopic nephrectomy (weighted mean difference, 1.4 minutes; 95% CI, −11.7 to 14.4).[449]

### Blood Loss

Based on data from 15 studies including 3033 donors, blood loss was similar between donors who underwent left versus right nephrectomy (weighted mean difference, 4.4 mL; 95% CI, −19.8 to 28.6).[449]

### Warm Ischemia Time

Among 18 studies including 3516 donors, warm ischemia time was also similar among donors undergoing left versus right nephrectomy (weighted mean difference, −0.02 minutes; 95% CI, −0.4 to 0.05).[449]

### Length of Hospital Stay

The mean length of hospital stay in 11 studies including 1370 donors was similar between those undergoing left versus right nephrectomy (weighted mean difference, 0.05 days; 95% CI, −0.08 to 0.02).[449]

A subsequent study of 58 599 living donor nephrectomies from a US registry, including 13.9% right nephrectomies, found statistically significant but numerically small differences in outcomes after right versus left donor nephrectomy, including higher rates of conversion from laparoscopic to open nephrectomy (1.9% vs 0.95%, $P \leq 0.00001$; OR $_{1.16}$2.02$_{2.52}$), delayed allograft function (5.7% vs 4.2%, $P < 0.0001$; HR $_{1.24}$1.38$_{1.53}$) and early graft thrombosis (1.1% vs 0.79%, $P = 0.006$; HR$_{1.18}$1.48$_{1.86}$).[462] The authors concluded that the laterality of donor nephrectomy should be based on surgeon preference and experience.

### Laparoscopic Procedure Type for Right Nephrectomy

Use of hand-assisted laparoscopy over standard laparoscopy for right donor nephrectomy is controversial, as some authors report caudal position of the liver that limits the working space for the hand assisted approach.[463] A trial at a referral center with longstanding expertise in the standard laparoscopic right nephrectomy explored the safety and feasibility of right hand-assisted approach by randomly assigning 40 donors to either approach.[464] As compared with laparoscopic right nephrectomy, hand-assisted right nephrectomy resulted in slightly shorter warm ischemia time (2.8 vs 3.9 minutes; $P < 0.001$) and increased blood loss (187 vs 50 mL, $P < 0.001$), while operative time, complication rate, pain, hospital stay and 1 year quality of life scores were not significantly different between the groups.

## Multiple Renal Arteries

Kidneys with multiple renal arteries are common. A study of CT scan results performed during living donor evaluation reported a prevalence of 18% to 30% for multiple renal arteries, with up to 15% bilateral involvement.[465-467] Multiple renal arteries may adversely affect donor safety and recipient outcome. Multiple renal arteries may lead to intraoperative technical difficulties and complications, such as increased operative time, complicated dissection, or bleeding. Furthermore, either arterial reconstructions need to be created after procurement or multiple arterial anastomoses are needed in the recipient, both of which may be associated with complications. A small accessory artery that supplies a minor part of the upper pole (subjectively assessed using predonation CT scans) can often be safely sacrificed. However, an accessory artery that vascularizes the lower pole and the proximal ureter must be saved and reconstructed after nephrectomy. In the case of a complex venous anatomy, there is usually only one domain vein, and the remaining veins can be tied off. A systemic review by Ahmadi et al[468] capturing reports of outcomes associated with vascular multiplicity in living donors in the past decade concluded that renal arterial multiplicity (up to 3 renal arteries) and venous anomalies should not be a contraindication to living kidney donation. Vascular anomalies require longer operative times to manage, but were not associated with significant negative impact on donor or graft outcomes with modern surgical techniques and high surgical skills. As most living donors with multiple renal arteries in the reported studies had a maximum of 3 renal arteries, conclusions cannot be drawn for donors with 4 or more arteries. Prior guidelines have also concluded that multiple arteries are generally not a contraindication to living kidney donation.[48,54,55]

## Nontransfixing Vascular Clips

Hemorrhagic deaths of living kidney donors from failure of nontransfixing vascular clips (eg, Weck Hem-o-lok; Teleflex Medical, Bannockburn, IL) used to ligate the donor renal artery were first documented in 2006.[469,470] Despite a Class II recall of the Hem-o-lok clip for laparoscopic donor nephrectomy by the US FDA in 2006, and a FDA Black Box Warning that use of the Weck Hem-o-lok hemostatic clip to ligate the renal artery in living donor nephrectomy is contraindicated, use of these clips is still reported. A 2011 ASTS survey reported that Hem-o-lok or other clips are still used by some surgeons as sole means of arterial control in laparoscopic donor nephrectomy.[469] Subsequently, in a 2013 survey of 645 members of the European Society for Organ Transplantation, 20% of respondents reported use of clips (locking and nonlocking) to close the arterial stump.[471] Of the 121 reported hemorrhagic events, slippage and dislodgement of clips occurred in at least 58 (47.9%).[471] All surgeons operating on a living organ donor should select vascular control techniques that entail tissue transfixion and assure a safe operative recovery. The Hem-o-lok and other surgical clips should not be used to ligate the donor renal artery.

## What Prior Guidelines Recommend

The CARI guideline states that the use of a nontransfixing technique for securing the renal artery is not recommended, particularly with laparoscopic donor nephrectomy.[453] In the current guideline, we recommend that nontransfixing clips should *never* be used to ligate the renal artery in donor nephrectomy.

## RESEARCH RECOMMENDATIONS

- Define the incidence of perioperative outcomes in representative donor samples (ie, not limited to experienced centers with a limited number of surgeons) according to nephrectomy surgical approach and side.
- Define outcomes of nephrectomy surgical approaches according to baseline donor characteristics (eg, BMI, renal vascular anatomy).
- Define the outcomes of novel minimally invasive approaches to donor nephrectomy to guide future recommendations and appropriate use of these techniques.
- Determine the optimal training and experience levels necessary to define proficiency with donor nephrectomy approaches.[472]

## CHAPTER 18: ETHICAL, LEGAL AND POLICY CONSIDERATIONS

The ERT search parameters did not identify evidence from eligible studies pertinent to the recommendations in chapter 18 and therefore the following recommendations are "Not Graded."

### Ethical and Legal Framework

18.1: Local laws and regulations on living donation should be followed and explained as needed to donor candidates.

18.2: Where local laws or policies impede the ethical practice of living donation, avenues to advocate for change should be explored.

18.3: Autonomy (self-determination) in the willingness or not to be considered as a living donor should be respected during all phases of the evaluation and donation processes. Transplant programs should support autonomy through a fully informed consent process.

### Policies for Donor Candidate Identification

18.4: Public awareness of opportunities for living donation should be increased through education, donor advocacy, evaluation efficiencies, and removal of disincentives.

18.5: Transplant candidates should be assisted in identifying living donor candidates, as long as these efforts respect donor autonomy and do not exert undue pressure to donate.

18.6: Donor candidates should be informed of the dangers of transplant tourism.

18.7: Transplant programs should define and disclose their policies for the acceptance of donor candidates identified through public solicitation.

### Financial Support

18.8: Donor candidates should be informed of the availability of legitimate financial assistance for expenses from evaluation and donation.

### Communication of Policies

18.9: Nondirected donors and donors participating in paired donation should be informed of the transplant program's policy on contact with the recipient and other paired donation participants at all stages in the donation process.

© 2017 Wolters Kluwer

18.10: Transplant programs should disclose the extent of the expected postdonation program-patient relationship before donation, including whether the donor can seek medical care at the transplant center after donation.

18.11: Regional policies should ensure access to kidney replacement therapy (dialysis and/or transplantation) for donors who develop kidney failure.

## RATIONALE

### Ethical and Legal Framework for Living Donation

Living kidney donation must be practiced within a framework of the laws and regulations of each country and its governing or regulatory bodies. The legal framework gives legitimacy to living donation and provides some protection to the donor.[473] All practitioners in transplant programs should be aware of relevant laws and regulations that pertain to the living donor transplant program.[474] Ethical tenets and specific transplant program processes are applied to minimize donor risk. See chapter 1 for discussion of the conceptual framework for decision-making related to donor acceptance, and roles and responsibilities in donation-related care, and chapter 2 for details on the processes and content of informed consent.

When there is opportunity to identify needs for policy and legal changes to improve the practice of living donation, transplant programs should actively participate in the review and process to update or change laws, regulations and policies as needed.[475] Laws to regulate donation include, but are not limited to, those that: a) protect the vulnerable (eg, the cognitively impaired, young people, dependent persons)[53,476,477]; b) respect autonomy (eg, require informed consent); c) prohibit incentives to donate that may create undue influence (eg, payment for organs in money or in kind)[430] Other relevant laws and policies related to donor protections include insurability criteria related to donation status, state tax credits for donation-related expenses, and access to medical leave after donation.

Transplant professionals have an ethical duty to act in the best interests of donor candidates and donors. Self-determination related to the donation decision reflects a view of people as autonomous agents.[478] Donor autonomy in the willingness to be considered as a donor candidate or to withdraw should be respected during all phases of the evaluation and donation process. Programs should support autonomy through a fully informed consent process (chapter 2). Balancing risks and benefits to the donor as well as respecting the donor's wishes for donation addresses the principle of beneficence.

In the United States, concern that kidney paired donation could be construed as violating the prohibition of NOTA to transfers of organs for valuable consideration was addressed with a specific amendment ("Norwood Act" of 2007) that explicitly defined paired donation as exempt from NOTA violation.[479] Although nonsimultaneous chains initiated by nondirected donors do not technically fall within the exemption for kidney paired donation, there is arguably no need for an exemption with respect to chains initiated by nondirected donors because they are designed as a series of gifts, rather than as an exchange of valuable consideration. See chapter 3 for discussion of clinical and educational issues related to paired donation.

### Policies for Donor Candidate Identification

People may not be aware of or have accurate knowledge of living donation.[480] Recipient candidates may not feel comfortable sharing their need for an organ donor with their social network for reasons including not knowing how to ask, misunderstanding of risks, and fear for harm to the donor candidate.[481,482] A 2015 *AST Live Donor Community of Practice* consensus statement on "Best Practices in Live Kidney Donation" deemed implementation of approaches to empower transplant candidates and their loved one in their search for a living donor to be a high priority.[148,483] Developing effective methods to address the growing organ shortage, including through living donor transplantation, is the highest stated priority in the 2015 US OPTN Strategic Plan[484] and was endorsed in a June 2016 White House Summit on Organ Donation.[485] Appropriate strategies for promoting living donation might include education (public, clinic-based, home-based), use of advocated (eg, "live donor champions"), efficiencies in the evaluation of donor candidates (eg, use of new information technology) and the removal of disincentives.[486-490] Effective interventions may include participation of family and friends of the transplant candidate to increase knowledge and awareness of living donation within the patient's social network. The evidence supporting use of social media tools to enable transplant candidates to share their need for a living donor with their social network is at an early stage,[491] but given the growing use of the internet and devices such as smartphones globally, application of technology to donor identification is anticipated to grow and was referenced by the White House Office of Science and Technology Policy.[492]

The ethical appropriateness of strategies for promoting living donation may vary with the entity employing the strategy.[493] For example, direct promotion of donation by transplant programs may raise ethical concerns for conflict of interest and risk eroding public trust and the quality of donor decision-making, but training and support of advocated (eg, "live donor champions") can be an appropriate alternative if employed conscientiously, including the careful use of anticoercion training. Nonprofit groups separate from transplant programs may have more freedom in promoting donation without challenging ethical norms underlying the physician-patient relationship, but still bear ethical responsibilities to present evidence-based information and maintain public trust. Development of "best practices" related to use of well-designed, evidence-based approaches including technology to efficiently and ethically expand opportunities for willing, well-informed patients and potential donors to pursue living donor transplantation and living donation is an important priority. All strategies for living donor identification must respect donor autonomy and cannot exert undue pressure to donate. Critically, a wish not to donate must always be respected.[494]

Some people respond to public solicitations by offering to be a kidney donor.[495] By evaluating these donor candidates, transplant programs are enabling donation.[496] In this setting, the standard evaluation needs to address additional issues related to the parties' limited knowledge of each other, and the potential for exploitation.[497] Recently, the Canadian Society of Transplantation issued a position paper that addressed issues such as privacy, informed consent, and donor follow-up associated with public donor solicitation.[84]

S90    Transplantation ■ August 2017 ■ Volume 101 ■ Number 8    www.transplantjournal.com

## Financial Support for Living Donors and Removal of Economic Disincentives

Financial support for living kidney donors can be divided into cost replacement and financial gain. Living donor candidates have the right to be informed of available legitimate cost-replacements programs for evaluation and donation-related expenses.[430,432] Initiatives to remove financial disincentives to kidney donation (ie, replacement of costs incurred during the evaluation and donation such as lost income, travel costs, accommodation costs; avoidance of insurance discrimination) are acceptable as an issue of justice.[430] Multiple prior living donation guidelines and viewpoints endorse reimbursement for out-of-pocket expenses incurred during the evaluation and donation processes, independent of the final decision to proceed with donation.[47-49,498-500]

In the United States, the prohibition of organ exchange for "valuable consideration" in NOTA has been clarified as not prohibiting "reasonable payments associated with... the expenses of travel, housing, and lost wages incurred by the donor of a human organ in connection with the donation of the organ."[501] To date, developing programs for wage reimbursement has posed the most challenges internationally, including the need for accepted definition of lost wages and the potentially large cost of reimbursing very high-income donors.[502] In December 2016, New Zealand passed legislation to provide 100% of a donor's earnings for up to 12 weeks after donation plus childcare assistance for donors who need it while they recover.[503] Also in December 2016, the US NLDAC, which to date has provided funds to reimburse donation-related travel and lodging costs, announced that it will conduct an RCT to assess the impact of interventions intended to remove financial barriers to living organ donation through wage reimbursement.[504] Recommendations to offer life and disability and/or health insurance for living donors, or to pass legislation to offer tax credits and ensure employment and insurability protections to donors, have also been advanced.[55,432,500,505-508]

In 2016, the AST launched an online financial toolkit to help donor candidates learn about the finances of being a living organ donor; this dynamic resource will be expanded and updated over time.[438] Although developed from the perspective of United States-based policies and resources, the information may be helpful to donor candidates in other countries. See chapter 16 for a discussion of the potential financial impact of living donation.

## Financial Incentives for Donation

Payment for a kidney is illegal in almost all parts of the world. Suggestions to provide financial incentives for donation elicit some fears that vulnerable people such as the poor will be exploited, and that public views of donation and transplantation will be damaged.[509] The Declaration of Istanbul asserts that because transplant commercialism targets impoverished and otherwise vulnerable donors, it leads inexorably to inequity and injustice and should be prohibited.[421] However, the debate on the acceptability of incentives continues and a formal examination of donor incentives within clinical trials has been proposed.[509,510]

## Communication of Policies and Postdonation Follow-Up Care

Living anonymous donors are also referred to as nondirected living donors.[411] These are living donors who offer a kidney to a transplant center to allocate, as they do not have an identified recipient. Nondirected donors may also donate by participating in a KPD program or as part of a series of matched donor and recipient pairs allowing for a chain of multiple transplants. Some nondirected living donors and their recipients may request contact with each other postdonation. Clarification before donation of the center's policy on such contacts enables participants to adjust their expectations after donation.[511]

The extent of the physician-patient relationship after donation should be communicated before donation, including whether the donor can seek medical care at the transplant center after the donation. See chapter 19 for discussion of postdonation follow-up recommendations.

Kidney failure is a rare event after living kidney donation, but fatal in the absence of kidney replacement therapy. Federally funded programs to assure access to dialysis and transplantation can be promoted as a strategy to protect the safety of living donors if the remaining kidney fails after donation. Payment for dialysis services, payment for living or deceased donor transplantation, and allocation priority for deceased donor kidney transplantation are examples of such programs. Many countries provide substantial assistance for dialysis and transplantation as part of public health services. For example in the United States, prior living donors receive additional priority points for deceased donor kidney transplants,[512] which has been associated with higher transplant rates, shorter time to transplant, and receipt of higher quality allografts compared to candidates with otherwise similar clinical profiles.[513-515] However, the transplant center must report prior donor status for the patient to receive priority.[516] Priority for prior living donors can also be incorporated in KPD matching algorithms.[61] In Israel, when a living donor develops ESKD subsequent to the donation, the living donor can designate a family member to receive priority on the deceased donor transplant waitlist.[517] The purpose is to reduce the disincentive to current donation based on concern that a family member may need a kidney transplant in the future. The impact of this priority on the national allocation system and on attitudes and concerns about living donation warrants further study.[518]

## RESEARCH RECOMMENDATIONS

- Explore approaches to and impact of strengthening partnerships between general nephrologists, dialysis providers, and transplant centers regarding living donor kidney transplant education, access and disparities.[483]
- Examine the impact of patient and public education on increasing donation from living donors.[483,490,519]
- Develop "best practices" related to use of well-designed, evidence-based approaches to efficiently and ethically expand opportunities for willing, well-informed patients and potential donors to pursue living donor transplantation and living donation.[492,496,497] Research on strategies to promote living donation should evaluate not only efficacy in increasing donation but also effects on attitudes, quality of donor decision-making, and informed consent.[493]
- Examine the experiences of individuals exposed to different forms of "nonargumentative" influences promoting living donation (ie, approaches to shaping behavior that do not attempt to persuade through reason, such as appeals to emotion, messenger effects, and social norms) and whether exposed individuals feel the influence was appropriate.[493]

*C.Agnello   SE 0309*

© 2017 Wolters Kluwer

- Examine strategies for reducing financial barriers to living donation, with particular attention to impact on current disparities in living donor kidney transplantation.[432,502]
- Determine optimal approaches to allowing or restricting contact between nondirected kidney donors and their recipients.[511]
- Evaluate the outcomes of incentivizing organ donation via ethically and legally acceptable methods.[520,521]

## CHAPTER 19: POSTDONATION FOLLOW-UP CARE

The ERT search parameters did not identify evidence from eligible studies pertinent to the recommendations in chapter 19 and therefore the following recommendations are "Not Graded."

19.1: A personalized postdonation care plan should be provided before donation to clearly describe follow-up care recommendations, who will provide the care, and how often.

19.2: The following should be performed at least annually postdonation:
- Blood pressure measurement
- BMI measurement
- Serum creatinine measurement with GFR estimation
- Albuminuria measurement
- Review and promotion of a healthy lifestyle including regular exercise, healthy diet and abstinence from tobacco
- Review and support of psychosocial health and well-being

19.3: Donors should be monitored for CKD, and those meeting criteria for CKD should be managed according to the 2012 KDIGO CKD Guideline.

19.4: Donors should receive age-appropriate healthcare maintenance, and management of clinical conditions and health risk factors according to clinical practice guidelines for the regional population.

## RATIONALE

### Rationale for Postdonation Follow-Up

The living donor evaluation should be regarded as the initial stages of a long-term, collaborative relationship between 2 parties, the donor candidate and the transplant program.[196] The donor enters the relationship with an interest in offering an altruistic and life-extending gift of an organ for transplantation if he or she is healthy enough to donate and meets the transplant center's acceptance criteria. Grounded in primary concern for the well-being of the donor, the transplant center should promote the donor's autonomy, safety and long-term health throughout all phases of care including evaluation, donation surgery, long-term follow-up and donation-related care. Early postdonation follow-up care is routinely practiced as part of postoperative care. In contrast, responsibility for the coordination and performance of long-term donor follow-up has raised controversies regarding financial and time burden on both transplant centers and donors, especially in countries without universal health insurance.[522] Monitoring incurs costs and may provide only limited information for the majority of donors who may demonstrate stable clinical status and well-being. However, as articulated in a 2011 consensus conference report,[523] these concerns are outweighed by fundamental ethical

principles and clinical needs to support the practice of living donation, including:

- The need to provide accurate outcomes information to donor candidates and their recipients as a basis for informed consent, especially regarding trends in outcomes and incremental hazards that may be associated with race/ethnicity, baseline comorbidity, changes in surgical approaches and management strategies.
- The need to acquire more robust outcomes data to improve the evaluation process and to provide reliable counseling for donor candidates tailored for demographic and health profile.
- The possibility of identification of individual donor clinical problems through surveillance at a time when intervention is possible.
- Provision of program-specific feedback to guide quality assurance and performance improvement.
- Recognition of the professional obligation of the transplant community to continue to collect and monitor information on living donor outcomes.

Similarly, the "European Standards of Quality and Safety of Organs Intended for Transplantation" states that adequate follow-up is part of internationally recognized measures aimed at protecting living kidney donors and ensuring the quality and safety of organ donation.[524]

### Content of Follow-Up

Follow-up care after kidney donation should focus on the monitoring and maintenance of general and kidney health including reinforcement of healthy lifestyle practices (eg, healthy dietary habits, maintenance of healthy weight, regular aerobic exercise), avoidance of potentially nephrotoxic exposures (eg, tobacco use, nonsteroidal anti-inflammatory drugs, nephrotoxic medications), prevention of diseases that may cause CKD (eg, hypertension, diabetes mellitus, CVD), and timely management of such diseases if they develop after donation. As discussed in chapter 10, hypertension is diagnosed more commonly in kidney donors than in persons with comparable baseline health, although this may in part reflect greater monitoring and earlier recognition.[224,229] Early detection and treatment of medical conditions that may subsequently affect GFR may protect the donor from further loss of GFR or other deterioration in health. Such conditions should be managed according to clinical practice guidelines either by the donor's primary care provider, or at the transplant center if appropriate care is available.

Because many donors develop low GFR that meets criteria for diagnosis of CKD and the risk of someday developing kidney failure needing treatment with dialysis or transplantation is slightly higher as a result of donation (see chapter 5),[30,32] postdonation monitoring for kidney disease and CKD risk factors is warranted. Living kidney donors should be monitored for CKD and managed according to the 2012 KDIGO CKD Guideline.[124] Donors should also receive age-appropriate healthcare maintenance, and management of clinical conditions and health risk factors according to clinical practice guidelines for the local or regional population.

Assessment of psychosocial metrics such as HRQoL have been recommended as part of postdonation follow-up to

S92    Transplantation ■ August 2017 ■ Volume 101 ■ Number 8S    www.transplantjournal.com

monitor general well-being,[525] and to help transplant centers identify donors at risk for poor psychosocial outcomes.[414,526] Quality of life measures are collected as part of standard postdonation follow-up in some donor registries.[445,527] Guidelines for metric thresholds indicating presence of an impairment that would prompt more attention by the clinician are not specifically defined in donors, but could be based on existing test standards (eg, scores below 0.50 standard deviation of the normative mean on the "Short Form" (SF) class of measure, SF-36, 12, or 8).

## Follow-Up Timing and Processes

As part of the informed consent process for donation, transplant centers should educate donor candidates on the importance of follow-up, disclose donor responsibilities and potential costs of follow-up participation, and develop a personalized follow-up plan. Because donors in many countries report regular follow-up with a primary provider,[528] donor follow-up and care may be appropriately performed by a primary care provider to preserve convenience for the donor. However, communication of follow-up information back to the transplant center is necessary for centers to be aware of the health status of their donors, to comply with reporting mandates (when applicable), and to direct additional care if needed. The role of a primary care provider in a donor's follow-up plan should be established before donation. The transplant center should always be available as a resource for the donor's primary care provider. Documentation of a donor's acknowledgement of their responsibility to participate in follow-up through a signed care plan has been proposed as part of education,[525] although efficacy in achieving follow-up participation has not been formally evaluated. Particular attention should be given to donors with risk factors for follow-up deficiencies and to those with baseline factors associated with increased risk of CKD over time.

Donor education before and at the time of donation is critical to support an informed donation decision, but there is a need to continue education on health promoting practices as the donor recovers and ages. A donor in the midst of making a decision to donate or dealing with the early outcomes of donation such as postoperative pain and financial pressures may not absorb all the information on long-term issues.

The establishment of standardized follow-up at serial time points provides a pattern for follow-up care that the donor may be more likely to continue on regular, yearly preventive healthcare visits.[529] Regular contact between the transplant center and the donor and/or the donor's primary care physician also increases familiarity of staff with issues that develop after donation, providing an opportunity to modify education materials or processes to better manage these situations for future donors. While regular healthcare maintenance is important over the lifetime after donation, data collection at regular time points by transplant centers should be pertinent to donation, attainable, and not overly burdensome on the donor or the transplant center.

Early follow-up of donors by transplant centers is mandated in some countries including the United States, Canada and Australia.[47,49,73] In the United States, the country that performs the largest volume of living donor kidney transplants per year, follow-up reporting by centers to the national transplant registry is limited to 2 years postdonation, and has historically suffered from missing data and frequent loss-to-follow-up.[73,530-532] Follow-up deficiencies have correlated with patient factors including younger donor age, black race, lack of insurance, lower educational attainment, and greater distance to the transplant center.[528,530,531] Lack of health insurance had been more common among living kidney donors in the United States than in the general US population, although that disparity has not been present in recent years, perhaps due to changes in the economy and policy changes including the Patient Protection and Affordable Care Act (ACA).[533,534] Lack of insurance and lower educational attainment may pose lesser obstacles to follow-up in other countries where national healthcare is available. Among US centers in 2008 to 2012, large annual living donation volumes were also associated with increased rates of follow-up deficiencies.[530] However, implementation of mandatory thresholds for collection of postdonation clinical and laboratory data in the United States in 2013 with regulatory implications has led to improved rates of early follow-up data collection, and high levels of follow-up have been achieved by programs across the volume spectrum.[530,535]

There is a real need for comprehensive, long-term (lifetime) follow-up of living donors. Short-term follow-up may detect severe adverse outcomes early after donation but cannot detect gradual, progressive complications that occur late after donation. Clinically important events that may develop in the intermediate to long-term after donation include hypertension, CKD, metabolic conditions (eg, diabetes mellitus, hyperlipidemia) and CVD, which in turn may increase the risk of kidney failure and mortality.

Transplant programs achieve high rates of postdonation follow-up have practices that appear to be grounded in: 1) program conviction that follow-up is essential for donor safety and well-being; 2) emphasis on building and maintaining a relationship with each donor; 3) use of a systematic approach to follow-up; and 4) efforts to minimize the burden on donors.[525] Open-ended, qualitative interviews of US programs found that programs with high rates of successful follow-up endorsed all 4 of these concepts.[525] Recent single-center experience supports that institution of follow-up performance improvement initiatives with dedicated program resources is financially feasible and can result in more accurate and complete follow-up after donation.[536]

## Donor Registries

When national or regional donor registries exist, capture of donor follow-up information, either through center reporting or direct donor contacts, facilitates data aggregation, assessment and dissemination of current donor outcomes data. Informed consent for collection of follow-up information for registry reporting should be requested during the consent for donor evaluation. In countries where registries do not exist, efforts should be made to establish and maintain a donor registry to support ongoing monitoring of postdonation outcomes, as the characteristics of accepted donors and care practices may evolve over time.

Some countries have instituted systematic approaches to longer-term living donor follow-up and registry reporting. The EULID project began with an 11-nation assessment of living donation practices in Europe that recommended mandatory living donor registration and follow-up data collections through a centralized donor database system, and

© 2017 Wolters Kluwer

mandatory regulatory audits at the national and center level.[444] An online registry is used for reporting of information on donor health status, quality of informed consent, and psychosocial and socioeconomic outcomes. The European Living Donor Psychosocial Follow-Up (ELIPSY), a study conducted in 6 centers of different European countries (Spain, Germany, France, Portugal, Sweden and Turkey) in 2009 to 2012, focused on monitoring donor psychosocial well-being and quality of life.[527]

The SOL-DHR provides a model for involvement of primary care physicians to achieve short- and long-term follow-up of donor health and well-being.[445] In 1993, a national protocol was initiated for all Swiss transplant centers to organize lifelong follow-up after donation at 1, 3, 5, 7, 10 years, and biennially thereafter, by sending a package to the donor asking the donor to make an appointment with the family physician of their choice. The package contains brief information for the donor and the family physician, a health questionnaire, tubes for blood and urine samples, and a prepaid envelope for sending the samples at room temperature to the central laboratory. The basic biennial follow-up questionnaire is completed by the family physician. In 2002, requests were added for completion an additional 8-Item Short-Form (SF-8) and social-status questionnaire by the donor. Nonresponses are followed by contacting the recipient, the donor's health insurance and public registries to identify whether the donor has died and, if so, the cause of death. Lifelong follow-up of the living donor's health status by centers is required by the Swiss Transplant Law. Although donors may choose to stop participating, compliance is promoted by informing donors about the aims of the protocol and the registry before their donation. Similarly, in Norway, donor follow-up includes initial contacts at weeks 3 to 4, month 3, then yearly monitoring for 5 years, and then lifelong contacts every fifth year thereafter. Clinical assessment of donors including BP, blood tests and urinalysis examinations is performed by local county hospitals. Durability of follow-up has been demonstrated as 99, 95, 84, and 77% of donors are still seen by local nephrologists at 1, 5, 10, and 15 years follow-up, respectively (*Dr. Hallvard Holdaas, personal communication*).

In 2017, the US Scientific Registry of Transplant Recipients began planning and transplant program enrollment for a Health Services Research Administration "Living Donor Collective" pilot project that seeks to achieve life-long living donor follow-up through direct contacts by staff and novel data linkages. A notable feature of the Collective is a plan to collect long-term outcomes data on all persons who present for donor candidate evaluation to provide information on donor exclusion practices and identify a set of healthy controls (eg, approved donors who do not donate due to recipient exclusions.) If successful, the goal is to expand to national participation.[537]

Given the current limited scope and duration of donor registries in many countries, and the possibility that some donors as independent decision makers may choose not to stay in contact with their transplant center, collection of outcome data in dedicated, funded research studies, and integration of donor registry data with other information sources such as health administrative data, ESKD and mortality registries are also important additional priorities for advancing understanding of long-term health outcomes after donation.[538]

## What Prior Guidelines Recommend

The British Transplantation Society and The Renal Association UK Guidelines for Living Donor Kidney Transplantation state that:[48,499]

- Life-long follow-up is recommended after donor nephrectomy. For donors who are resident in the United Kingdom, this should be offered locally or at the transplant center according to the wishes of the donor, but such arrangements must facilitate the collection of data for submission to the UK Living Donor Registry on long-term morbidity and mortality. Donors from overseas who travel to the United Kingdom to donate are not entitled to follow-up in the United Kingdom but should be given advice about appropriate follow-up before returning to their country of origin (C1).
- Arrangements must be made to ensure that the unsuitable donor, who is unable to proceed to donation, is appropriately followed up and referred for further investigation and management (B1).
- National Health Service Blood and Transplant has given a formal undertaking that any living kidney donor who develops kidney failure in the perioperative period as a consequence of donation will receive priority for a deceased donor kidney transplant (not graded).

Although it was not a specific guideline recommendation and no evidence was cited, the Amsterdam Forum suggested that "As in the general population, based on age and other medical risk factors (eg, hypertension, proteinuria, hyperlipidemia, impaired glucose tolerance test), kidney donors should undergo regular long-term follow-up of body weight, BP, blood glucose, serum creatinine, and urinalysis."[38] In the United States, OPTN policy enacted in 2013 requires transplant centers to collect and report the following information on their donors to the national registry at 6 months, 1 year, and 2 years postdonation: serum creatinine, urine protein and a set of clinical outcomes (eg, kidney complications, need for maintenance dialysis, development of hypertension or diabetes, loss of insurance due to donation).[73] Other guidelines also suggest postdonation follow-up for at least 1 year[49] or lifelong[47,55] and provision of donation-related psychosocial services as needed during follow-up have also been proposed.[47,409,498] As discussed in chapter 18 (Policy), living donors who develop ESKD in the United States receive priority for deceased donor kidney allocation.[512]

## RESEARCH RECOMMENDATIONS

- Develop communication and integrated care models to:
  - Examine electronic tools such as websites or portals to maintain contact with donors, facilitate data collection, and provide messaging to disseminate educational information to donors.[522]
  - Formulate strategies for using inter-institution-compatible electronic medical records to facilitate transmission of donor follow-up information, such as clinical data from care encounters, directly to national registries.[531]
  - Formulate and assess the outcomes of center-based initiatives to provide long-term donor follow-up and support through integrated laboratory and clinical monitoring, expansion of preventive health strategies, and fostering of peer education through social support networks between past, current and future donors.[539]
- Establish, improve and integrate national/international donor registries to facilitate capture and analysis of long-term

outcomes information for large representative samples of living donors to: (1) address knowledge gaps related to the long-term consequences of donation, (2) provide data to inform donor selection criteria, (3) support quality assurance and program improvement at transplant centers, and 4) sustain and strengthen public confidence in the practice of living donation.[523,531]

- Develop HRQoL metric thresholds to identify the presence of an impairment in postdonation psychosocial well-being warranting closer attention by the clinician
- Improve and assess the efficacy of educational resources to promote sustained healthy lifestyle choices and behaviors, and participation in regular postdonation follow-up and care, such as via newsletters, links to transplant center health recommendations or national guideline website documents.
- Develop and assess strategies for communicating new information that differs from what a donor was told before donation, to past donors and their physicians.

## ACKNOWLEDGMENTS

A special debt of gratitude is owed to the KDIGO cochairs, David C. Wheeler and Wolfgang C. Winkelmayer, and the KDIGO Executive Committee for their invaluable guidance throughout the development of this guideline. In particular, the authors thank the ERT members for their substantial contribution to the rigorous assessment of the available evidence. The authors are also especially grateful to the WG members for their expertise throughout the entire process of literature review, meeting participation, the critical writing and editing of the statements and rationale, which made the publication of this guideline possible. The generous gift of their time and dedication is greatly appreciated. KDIGO gratefully acknowledges the valuable contributions from CKD-Prognosis Consortium and its members for their meta-analyses which serve as the basis for the donor selection framework presented in this report: Josef Coresh, MD, PhD, Morgan E. Grams, MD, PhD, Yingying Sang, MS, Kunihiro Matsushita, MD, PhD, Shoshana Ballew, PhD, Alex R. Chang, MD, Eric K. H, Chow MSc, Csaba P. Kovesdy, MD, Girish N. Nadkarni, MD, MPH, Varda Shalev, MD, MPA. KDIGO also thanks the following individuals who provided valuable feedback: Daniel C. Brennan, MD, Mary Amanda Dew, PhD, Robert Gaston, MD, Elisa J. Gordon, PhD, MPH, Rebecca Hays, MSW, Peter C. Harris, PhD, York Pei, MD, Emilio Poggio, MD, Peter P. Reese, MD, MSCE, Robert Steiner, MD, Christie P. Thomas, MD, Roser Torra, MD, PhD, Vicente E. Torres, MD, PhD, and Matthew Weir, MD. KDIGO also thanks Josep M. Campistol, MD, PhD, José Osmar Medina Pestana, MD, PhD, and Faissal A. Shaheen, MD for their initial contributions to the guideline scope.

Finally, and on behalf of the WG, the authors gratefully acknowledge the careful assessment of the draft guideline by external reviewers. The WG considered all of the valuable comments made and, where appropriate, suggested changes were incorporated into the final publication. The following individuals provided feedback during the public review of the draft guideline: Mario Abbud-Filho; Sadiq Abdul Baqi; ML Aguera; Abdulnaser Alabadi; Bülent Altun; Alesssandro Amore; Andrea Angioi; Mariano Arriola; Nancy Ascher; Gloria Ashuntantang; Phillippa Bailey; Peter Barany; Zunaid Barday; André Barreto Pereira; Rashad Barsoum; Rommel Bataclan; Don Batisky; Leticia Belmont-Martinez; Roberta Billman; Annie-Claude Blouin; Yassine Bouatou; Neil Boudville; Diane Brockington; Patricia Campbell; Marcelo Cantarovich; Jianghua Chen; Xingxing Cheng; Attasit Chokechanachaisakul; Rolando Claure-Del Granado; Shandie Covington; Ana Cusumano; Declan de Freitas; Goffredo Del Rosso; Francis Delmonico; Mary Amanda Dew; Nida Diesel; Christine Dipchand; Edmar Elcarte; Josette Eris; Stephen Fadem; Peter Ferenci; Sandro Feriozzi; Sebastião Ferreira-Filho; Frances Flinter; Sue Gagne; Alvaro Garcia Garcia; Mike Germain; Christiane Geuer; Osama Gheith; Matthias Girndt; Richard Glassock; Paul Goodyer; Elisa Gordon; William Gourlay; Jared Grantham; Rebecca Hays; Darlene Heisler; Macey Henderson; Seyed M Hosseini-Moghaddam; Osama Hrith; Salwa Ibrahim; Ikponmwosa Iyawe; Anthony Jevnikar; Chandra Mauli Jha; Vivek Jha; Malek Kamoun; Nada Kanaan; Clifford Kashtan; Thomas Kelly; Bryce Kiberd; Hyoung Tae Kim; David Klassen; Nine Knoers; Dirk Kuypers; David Landsberg; Po Chang Lee; Edgar Lerma; Marie Ludlow; Mitra Mahdavi-Mazdeh; Martin Mai; Shafi Malik; Francesca Mallamaci; Carlos Marroquin; Jennifer Martin; Thomas McGregor; Dianne McKay; Enisa Mesic; Piergiorgio Messa; Renzo Mignani; Euclides Briones Morales; Eugen Mota; Mark Murphy; Abimereki Muzaale; Charles Newstead; Abdou Niang; Maurizio Nordio; Uday Nori; Philip O'Connell; Juha Peräsaari; André Pereira; Gerson Marques Pereira Jr; Ronald Perrone; Carlos Poli-de-Figueiredo; Claudio Ponticelli; Pradeep Kumar Rai; Harun Rashid; Praveen Ratanasrimetha; Cibele Rodrigues; Jacques Rottembourg; Shaifali Sandal; Richard Sandford; Craig Schmidt; Silvi Shah; Deepak Sharma; Risa Simon; Neeraj Singh; Habib Skhiri; Robert Steiner; Sylvia Stracke; Rodrigo Tagle; Seng Hoe Tan; Ekamol Tantisattamo; Mihály Tapolyai; Gabor Telkes; Christie Thomas; Lee Anne Tibbles; Vali Toth; Nico Tronchet; Teresa Trottman; Yusuke Tsukamoto; Albertien M. van Eerde; Evgueniy Vazelov; Anitha Vijayan; Rafael Weissheimer; Kerstin Westman; Christine White; Jean-Luc Wolff; Mai-Szu Wu; Chulwoo Yang; Jane Zill; Carmine Zoccali.

Participation in the review does not necessarily constitute endorsement of the content of this report by the above individuals, or the organization or institution they represent.

Amit X. Garg, MD, PhD
Krista L. Lentine, MD, PhD
Work Group Cochairs

## REFERENCES

1. Uhlig K, Macleod A, Craig J, et al. Grading evidence and recommendations for clinical practice guidelines in nephrology. A position statement from Kidney Disease: Improving Global Outcomes (KDIGO). *Kidney Int.* 2006;70:2058–2065.
2. Ethics Committee of the Transplantation Society. The consensus statement of the Amsterdam Forum on the Care of the Live Kidney Donor. *Transplantation* 2004;78:491–492.
3. Slinin Y, Brasure M, Eidman K, et al. Long-term outcomes of living kidney donation. *Transplantation*. 2016;100:1371–1386.
4. Lentine KL, Segev DL. Understanding and communicating medical risks for living kidney donors: a matter of perspective. *J Am Soc Nephrol.* 2017;28:12–24.
5. White CM, Ip S, McPheeters M, et al. Using existing systematic reviews to replace de novo processes in conducting comparative effectiveness reviews. In: *Methods Guide for Effectiveness and Comparative Effectiveness Reviews [Internet]*. Rockville (MD): Agency for Healthcare Research and Quality (US); 2008-.AHRQ Methods for Effective Health Care; 2009.

© 2017 Wolters Kluwer

6. Viswanathan M, Berkman ND, Dryden DM, et al. *Assessing risk of bias and confounding in observational studies of interventions or exposures: further development of the RTI item bank*. AHRQ Methods for Effective Health Care: Rockville (MD); 2013.

7. Grams ME, Sang Y, Levey AS, et al. Kidney-failure risk projection for the living kidney-donor candidate. *N Engl J Med*. 2016;374:411–421.

8. Huang N, Foster MC, Lentine KL, et al. Estimated GFR for living kidney donor evaluation. *Am J Transplant*. 2016;16:171–180.

9. Guyatt GH, Oxman AD, Kunz R, et al. Going from evidence to recommendations. *BMJ*. 2008;336:1049–1051.

10. Atkins D, Best D, Briss PA, et al. Grading quality of evidence and strength of recommendations. *BMJ*. 2004;328:1490.

11. Guyatt GH, Schunemann HJ, Djulbegovic B, et al. Guideline panels should not GRADE good practice statements. *J Clin Epidemiol*. 2015; 68:597–600.

12. AGREE Collaboration. Development and validation of an international appraisal instrument for assessing the quality of clinical practice guidelines: the AGREE project. *Qual Saf Health Care* 2003;12:18–23.

13. Shiffman RN, Shekelle P, Overhage JM, et al. Standardized reporting of clinical practice guidelines: a proposal from the Conference on Guideline Standardization. *Ann Intern Med*. 2003;139:493–498.

14. Institute of Medicine. *Finding what works in health care: Standards for systematic reviews*. The National Academies Press: Washington, DC, 2011.

15. Institute of Medicine. *Clinical practice guidelines we can trust*. The National Academies Press: Washington, DC, 2011.

16. Thiessen C, Gordon EJ, Reese PP, et al. Development of a donor-centered approach to risk assessment: rebalancing nonmaleficence and autonomy. *Am J Transplant*. 2015;15:2314–2323.

17. Sixty-Third World Health Assembly. WHA63.22. Agenda item 11.21, 21 May 2010 Human organ and tissue transplantation. Available at: http://apps.who.int/gb/ebwha/pdf_files/WHA63/A63_R22-en.pdf. (Accessed: September 7, 2016).

18. Abecassis M, Adams M, Adams P, et al. Consensus statement on the live organ donor. *JAMA*. 2000;284:2919–2926.

19. Tong A, Chapman JR, Wong G, et al. Living kidney donor assessment: challenges, uncertainties and controversies among transplant nephrologists and surgeons. *Am J Transplant*. 2013;13:2912–2923.

20. Tong A, Chapman JR, Wong G, et al. Screening and follow-up of living kidney donors: a systematic review of clinical practice guidelines. *Transplantation*. 2011;92:962–972.

21. Cozzi E, Biancone L, López-Fraga M, et al. long-term outcome of living kidney donation: position paper of the European Committee on Organ Transplantation, Council of Europe. *Transplantation*. 2016;100: 270–271.

22. Reese PP, Caplan AL, Kesselheim AS, et al. Creating a medical, ethical, and legal framework for complex living kidney donors. *Clin J Am Soc Nephrol*. 2006;1:1148–1153.

23. Segev DL, Muzaale AD, Caffo BS, et al. Perioperative mortality and long-term survival following live kidney donation. *JAMA*. 2010;303:959–966.

24. Matas AJ, Bartlett ST, Leichtman AB, et al. Morbidity and mortality after living kidney donation, 1999-2001: survey of United States transplant centers. *Am J Transplant*. 2003;3:830–834.

25. Hadjianastassiou VG, Johnson RJ, Rudge CJ, et al. 2509 living donor nephrectomies, morbidity and mortality, including the UK introduction of laparoscopic donor surgery. *Am J Transplant*. 2007;7:2532–2537.

26. Young A, Storsley L, Garg AX, et al. Health outcomes for living kidney donors with isolated medical abnormalities: a systematic review. *Am J Transplant*. 2008;8:1878–1890.

27. Lafranca JA, Hagen SM, Dols LF, et al. Systematic review and meta-analysis of the relation between body mass index and short-term donor outcome of laparoscopic donor nephrectomy. *Kidney Int*. 2013;83:931–939.

28. Schold JD, Goldfarb DA, Buccini LD, et al. Comorbidity burden and perioperative complications for living kidney donors in the United States. *Clin J Am Soc Nephrol*. 2013;8:1773–1782.

29. Lentine KL, Lam NN, Axelrod D, et al. Perioperative complications after living kidney donation: a national study. *Am J Transplant*. 2016;16: 1848–1857.

30. Muzaale AD, Massie AB, Wang MC, et al. Risk of end-stage renal disease following live kidney donation. *JAMA*. 2014;311:579–586.

31. Anjum S, Muzaale AD, Massie AB, et al. Patterns of end-stage renal disease caused by diabetes, hypertension, and glomerulonephritis in live kidney donors. *Am J Transplant*. 2016;16: 3540–3547.

32. Mjoen G, Hallan S, Hartmann A, et al. Long-term risks for kidney donors. *Kidney Int*. 2014;86:162–167.

33. Lam NN, Lentine KL, Garg AX. End-stage renal disease risk in live kidney donors: what have we learned from two recent studies? *Curr Opin Nephrol Hypertens*. 2014;23:592–596.

34. Lam NN, Lentine KL, Levey AS, et al. Long-term medical risks to the living kidney donor. *Nat Rev Nephrol*. 2015;11:411–419.

35. Kiberd BA, Clase CM. Cumulative risk for developing end-stage renal disease in the US population. *J Am Soc Nephrol*. 2002;13: 1635–1644.

36. Steiner RW. The risks of living kidney donation. *N Engl J Med*. 2016; 374:479–480.

37. Grams ME, Garg AX, Lentine KL. Kidney-failure risk projection for the living kidney-donor candidate. *N Engl J Med*. 2016;374:2094–2095.

38. Delmonico F, Council of the Transplantation Society. A report of the Amsterdam forum on the care of the live kidney donor: data and medical guidelines. *Transplantation*. 2005;79:S53–S66.

39. Hays RE. Informed consent of living kidney donors: pitfalls and best practice. *Curr Transpl Rep*. 2015;2:29–34.

40. Thiessen C, Kim YA, Formica R, et al. Written informed consent for living kidney donors: practices and compliance with CMS and OPTN requirements. *Am J Transplant*. 2013;13:2713–2721.

41. Valapour M, Kahn JP, Bailey RF, et al. Assessing elements of informed consent among living donors. *Clin Transplant*. 2011;25:185–190.

42. Gordon EJ. Informed consent for living donation: a review of key empirical studies, ethical challenges and future research. *Am J Transplant*. 2012;12:2273–2280.

43. Housawi AA, Young A, Boudville N, et al. Transplant professionals vary in the long-term medical risks they communicate to potential living kidney donors: an international survey. *Nephrol Dial Transplant*. 2007;22: 3040–3045.

44. Rodrigue JR, Pavlakis M, Danovitch GM, et al. Evaluating living kidney donors: relationship types, psychosocial criteria, and consent processes at US transplant programs. *Am J Transplant*. 2007;7:2326–2332.

45. Gordon EJ, Butt Z, Jensen SE, et al. Opportunities for shared decision making in kidney transplantation. *Am J Transplant*. 2013;13:1149–1158.

46. Dew MA, Jacobs CL, Jowsey SG, et al. Guidelines for the psychosocial evaluation of living unrelated kidney donors in the United States. *Am J Transplant*. 2007;7:1047–1054.

47. Canadian Council for Donation and Transplantation. Enhancing living donation: a Canadian forum—report and recommendations, February 9-12, 2006, Vancouver, British Columbia.

48. The British Transplantation Society and The Renal Association. The United Kingdom guidelines for living donor kidney transplantation. Third Edition, 2011. Available at: https://bts.org.uk/wp-content/uploads/2016/09/19_BTS_RA_Living_Donor_Kidney-1.pdf. (Accessed: September 7, 2016).

49. National Health and Medical Research Council. Organ and tissue donation by living donors. Guidelines for ethical practice for health professionals, 2007. Available at: https://www.nhmrc.gov.au/guidelines-publications/e75. (Accessed: September 7, 2016).

50. Abramowicz D, Cochat P, Claas FH, et al. European Renal Best Practice Guideline on kidney donor and recipient evaluation and perioperative care. *Nephrol Dial Transplant*. 2015;30:1790–1797.

51. OPTN (Organ Procurement and Transplantation Network)/UNOS (United Network for Organ Sharing). OPTN Policies, Policy 14: Living Donation. http://optn.transplant.hrsa.gov/governance/policies/. (Accessed: June 28, 2017).

52. Gesetz über die Spende, Entnahme und Übertragung von Organen. [Legislation on the donation, harvesting and transplantation of organs] (Transplantationsgesetz - TPG) From November 5, 1997 (Bundesgesetzblatt I page 2631).

53. Campbell M, Wright L, Greenberg RA, et al. How young is too young to be a living donor? *Am J Transplant*. 2013;13:1643–1649.

54. Spanish Society of Nephrology (S.E.N.) and Spanish Transplant Organisation (ONT). Recommendations for living-donor kidney transplantation. *Nefrologia* 2010;30:1–105.

55. Kälble T, Lucan M, Nicita G, et al. EAU guidelines on renal transplantation. *Eur Urol*. 2005;47:156–166.

56. Living Donor Informed Consent Checklist. Available at: https://optn.transplant.hrsa.gov/resources/living-donation. (Accessed: June 29, 2017).

57. Plain language informed consent policy summary (English and Spanish). Available at: https://optn.transplant.hrsa.gov/resources/living-donation. (Accessed: June 29, 2017).

58. Tan JC, Gordon EJ, Dew MA, et al. Living donor kidney transplantation: facilitating education about live kidney donation—recommendations from a consensus conference. *Clin J Am Soc Nephrol*. 2015;10:1670–1677.

C.Agnello    SE 0314

S96    **Transplantation** ■ August 2017 ■ Volume 101 ■ Number 8S    www.transplantjournal.com

59. European Best Practice Guidelines for Renal Transplantation. Section II: Evaluation and selection of donors. *Nephrol Dial Transplant* 2000;15:39–51.

60. Melcher ML, Blosser CD, Baxter-Lowe LA, et al. Dynamic challenges inhibiting optimal adoption of kidney paired donation: findings of a consensus conference. *Am J Transplant*. 2013;13:851–860.

61. OPTN (Organ Procurement and Transplantation Network)/UNOS (United Network for Organ Sharing). OPTN Policies, Policy 13: Kidney paired donation (KPD). Available at: http://optn.transplant.hrsa.gov/governance/policies. (Accessed: June 28, 2017).

62. Mamode N, Lennerling A, Citterio F, et al. Anonymity and live-donor transplantation: an ELPAT view. *Transplantation*. 2013;95:536–541.

63. Bingaman AW, Wright FH Jr, Kapturczak M, et al. Single-center kidney paired donation: the Methodist San Antonio experience. *Am J Transplant*. 2012;12:2125–2132.

64. Hendren E, Gill J, Landsberg D, et al. Willingness of directed living donors and their recipients to participate in kidney paired donation programs. *Transplantation*. 2015;99:1894–1899.

65. Cuffy MC, Ratner LE, Siegler M, et al. Equipoise: ethical, scientific, and clinical trial design considerations for compatible pair participation in kidney exchange programs. *Am J Transplant*. 2015;15:1484–1489.

66. Young A, Kim SJ, Gibney EM, et al. Discovering misattributed paternity in living kidney donation: prevalence, preference, and practice. *Transplantation*. 2009;87:1429–1435.

67. Ross LF. Good ethics requires good science: why transplant programs should not disclose misattributed parentage. *Am J Transplant*. 2010; 10:742–746.

68. Wright L, MacRae S, Gordon D, et al. Disclosure of misattributed paternity: issues involved in the discovery of unsought information. *Semin Dial*. 2002;15:202–206.

69. Mataya L, Meadow J, Thistlethwaite JR Jr, et al. Disclosing health and health behavior information between living donors and their recipients. *Clin J Am Soc Nephrol*. 2015;10:1609–1616.

70. Hizo-Abes P, Young A, Reese PP, et al. Attitudes to sharing personal health information in living kidney donation. *Clin J Am Soc Nephrol*. 2010;5:717–722.

71. Seem DL, Lee I, Umscheid CA, et al. Excerpt from PHS guideline for reducing HIV, HBV and HCV transmission through organ transplantation. *Am J Transplant*. 2013;13:1953–1962.

72. Rodrigue JR, Ladin K, Pavlakis M, et al. Disclosing recipient information to potential living donors: preferences of donors and recipients, before and after surgery. *Am J Transplant*. 2011;11:1270–1278.

73. OPTN (Organ Procurement and Transplantation Network)/UNOS (United Network for Organ Sharing). OPTN Policies, Policy 18: Data submission requirements. http://optn.transplant.hrsa.gov/governance/policies/. (Accessed: June 28, 2017).

74. Danovitch GM, Chapman J, Capron AM, et al. Organ trafficking and transplant tourism: the role of global professional ethical standards—the 2008 Declaration of Istanbul. *Transplantation*. 2013;95:1306–1312.

75. Allen MB, Abt PL, Reese PP. What are the harms of refusing to allow living kidney donation? An expanded view of risks and benefits. *Am J Transplant*. 2014;14:531–537.

76. Agency for Healthcare Research and Quality: The SHARE Approach—Using the Teach-Back technique: A reference guide for health care providers. http://www.ahrq.gov/professionals/education/curriculum-tools/shareddecisionmaking/tools/tool-6/index.html (Access date: May 4, 2016).

77. Gordon EJ, Mullee J, Butt Z, et al. Optimizing informed consent in living liver donors: evaluation of a comprehension assessment tool. *Liver Transpl*. 2015;21:1270–1279.

78. Rodrigue JR, Vishnevsky T, Fleishman A, et al. Patient-reported outcomes following living kidney donation: a single center experience. *J Clin Psychol Med Settings*. 2015;22:160–168.

79. Faden RR, Beauchamp T. *A history and theory of informed consent*. New York: Oxford University Press; 1986.

80. Millis MA, Simmerling M. Prisoners as organ donors: is it worth the effort? Is it ethical? *Transplant Proc*. 2009;41:23–24.

81. Ross LF. What the medical excuse teaches us about the potential living donor as patient. *Am J Transplant*. 2010;10:731–736.

82. Thiessen C, Kim YA, Formica R, et al. Opting out: confidentiality and availability of an 'alibi' for potential living kidney donors in the USA. *J Med Ethics*. 2015;41:506–510.

83. Maple NH, Hadjianastassiou V, Jones R, et al. Understanding risk in living donor nephrectomy. *J Med Ethics*. 2010;36:142–147.

84. Fortin MC, Buchman D, Wright L, et al. Public solicitation of anonymous organ donors: a position paper by the Canadian Society of Transplantation. *Transplantation*. 2017;101:17–20.

85. Cook RI, Wreathall J, Smith A, et al. Probabilistic risk assessment of accidental ABO-incompatible thoracic organ transplantation before and after 2003. *Transplantation*. 2007;84:1602–1609.

86. Gloor JM, Lager DJ, Moore SB, et al. ABO-incompatible kidney transplantation using both A2 and non-A2 living donors. *Transplantation*. 2003;75:971–977.

87. Bachelet T, Martinez C, Del Bello A, et al. Deleterious impact of donor-specific anti-HLA antibodies toward HLA-Cw and HLA-DP in kidney transplantation. *Transplantation*. 2016;100:159–166.

88. Filippone EJ, Farber JL. Humoral immune response and allograft function in kidney transplantation. *Am J Kidney Dis*. 2015;66:337–347.

89. Tait BD, Süsal C, Gebel HM, et al. Consensus guidelines on the testing and clinical management issues associated with HLA and non-HLA antibodies in transplantation. *Transplantation*. 2013;95:19–47.

90. Segev DL, Gentry SE, Melancon JK, et al. Characterization of waiting times in a simulation of kidney paired donation. *Am J Transplant*. 2005; 5:2448–2455.

91. Montgomery JR, Berger JC, Warren DS, et al. Outcomes of ABO-incompatible kidney transplantation in the United States. *Transplantation*. 2012;93:603–609.

92. Montgomery RA, Lonze BE, King KE, et al. Desensitization in HLA-incompatible kidney recipients and survival. *N Engl J Med*. 2011;365: 318–326.

93. Segev DL, Gentry SE, Warren DS, et al. Kidney paired donation and optimizing the use of live donor organs. *JAMA*. 2005;293:1883–1890.

94. Matas AJ, Smith JM, Skeans MA, et al. OPTN/SRTR 2013 Annual Data Report: kidney. *Am J Transplant*. 2015;15(Suppl 2):1–34.

95. de Klerk M, Haase-Kromwijk BJ, Witvliet M, et al. [Favourable results of the first 2 years of the Dutch paired, living donor, kidney exchange programme]. *Ned Tijdschr Geneeskd*. 2007;151:130–133.

96. Segev DL, Veale JL, Berger JC, et al. Transporting live donor kidneys for kidney paired donation: initial national results. *Am J Transplant*. 2011;11: 356–360.

97. Treat EG, Miller ET, Kwan L, et al. Outcomes of shipped live donor kidney transplants compared with traditional living donor kidney transplants. *Transpl Int*. 2014;27:1175–1182.

98. Melcher ML, Leeser DB, Gritsch HA, et al. Chain transplantation: initial experience of a large multicenter program. *Am J Transplant*. 2012;12: 2429–2436.

99. Aikawa A, Kawamura T, Shishido S, et al. ABO-incompatible living-donor pediatric kidney transplantation in Japan. *Clinics (Sao Paulo)*. 2014;69(Suppl 1):22–27.

100. Aikawa A, Saito K, Takahashi K. Trends in ABO-incompatible kidney transplantation. *Exp Clin Transplant*. 2015;13(Suppl 1):18–22.

101. Takahashi K, Saito K, Takahara S, et al. Excellent long-term outcome of ABO-incompatible living kidney transplantation in Japan. *Am J Transplant*. 2004;4:1089–1096.

102. Lentine KL, Axelrod D, Klein C, et al. Early clinical complications after ABO-incompatible live-donor kidney transplantation: a national study of Medicare-insured recipients. *Transplantation*. 2014;98:54–65.

103. Ishikawa N, Yagisawa T, Kimura T, et al. Kidney transplantation of living unrelated and ABO-incompatible donor-recipient combinations. *Transplant Proc*. 2013;45:1242–1244.

104. Kong JM, Ahn J, Park JB, et al. ABO incompatible living donor kidney transplantation in Korea: highly uniform protocols and good medium-term outcome. *Clin Transplant*. 2013;27:875–881.

105. Montgomery RA, Locke JE, King KE, et al. ABO incompatible renal transplantation: a paradigm ready for broad implementation. *Transplantation*. 2009;87:1246–1255.

106. Opelz G, Morath C, Süsal C, et al. Three-year outcomes following 1420 ABO-incompatible living-donor kidney transplants performed after ABO antibody reduction: results from 101 centers. *Transplantation*. 2015; 99:400–404.

107. OPTN (Organ Procurement and Transplantation Network)/UNOS (United Network for Organ Sharing). National Data Reports. https://optn.transplant.hrsa.gov/data/view-data-reports/national-data/. (Accessed June 28, 2017).

108. Axelrod D, Segev DL, Xiao H, et al. Economic impacts of ABO-incompatible live donor kidney transplantation: A national study of Medicare-insured recipients. *Am J Transplant*. 2016;16: 1465–1473.

C.Agnello    SE 0315

© 2017 Wolters Kluwer

109. Orandi BJ, Luo X, Massie AB, et al. Survival benefit with kidney transplants from HLA-incompatible live donors. *N Engl J Med*. 2016;374: 940–950.

110. Axelrod D, Lentine KL, Schnitzler MA, et al. The incremental cost of incompatible living donor kidney transplant: A national cohort analysis. *Am J Transpl*. 2017. ePub ahead of print.

111. Clavien PA, Barkun J, de Oliveira ML, et al. The Clavien-Dindo classification of surgical complications: five-year experience. *Ann Surg*. 2009;250: 187–196.

112. Mjøen G, Øyen O, Holdaas H, et al. Morbidity and mortality in 1022 consecutive living donor nephrectomies: benefits of a living donor registry. *Transplantation*. 2009;88:1273–1279.

113. Lentine KL, Lam NN, Schnitzler MA, et al. Predonation prescription opioid use: a novel risk factor for readmission after living kidney donation. *Am J Transplant*. 2017;17:744–753.

114. Cohn SL. Preoperative evaluation for noncardiac surgery. *Ann Intern Med*. 2016;165:ITC81–ITC96.

115. Fleisher LA, Beckman JA, Brown KA, et al. ACC/AHA 2007 guidelines on perioperative cardiovascular evaluation and care for noncardiac surgery: a report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines (Writing Committee to Revise the 2002 Guidelines on Perioperative Cardiovascular Evaluation for Noncardiac Surgery): developed in collaboration with the American Society of Echocardiography, American Society of Nuclear Cardiology, Heart Rhythm Society, Society of Cardiovascular Anesthesiologists, Society for Cardiovascular Angiography and Interventions, Society for Vascular Medicine and Biology, and Society for Vascular Surgery. *Circulation*. 2007;116:e418–499.

116. Ferket BS, Genders TS, Colkesen EB, et al. Systematic review of guidelines on imaging of asymptomatic coronary artery disease. *J Am Coll Cardiol*. 2011;57:1591–1600.

117. Chee YL, Crawford JC, Watson HG, et al. Guidelines on the assessment of bleeding risk prior to surgery or invasive procedures. British Committee for Standards in Haematology. *Br J Haematol*. 2008;140:496–504.

118. Fernández Fresnedo G, de la Oliva Valentín M, Cruzado JM, et al. [Objectives and methodology of S.E.N-ONT guidelines for living donor kidney transplantation]. *Nefrologia*. 2010;30(Suppl 2):1–2.

119. Devereaux PJ, Mrkobrada M, Sessler DI, et al. Aspirin in patients undergoing noncardiac surgery. *N Engl J Med*. 2014;370:1494–1503.

120. Guyatt GH, Akl EA, Crowther M, et al. Executive summary: Antithrombotic Therapy and Prevention of Thrombosis, 9th ed: American College of Chest Physicians Evidence-Based Clinical Practice Guidelines. *Chest*. 2012;141:7S–47S.

121. Qaseem A, Snow V, Fitterman N, et al. Risk assessment and strategies to reduce perioperative pulmonary complications for patients undergoing noncardiothoracic surgery: a guideline from the American College of Physicians. *Ann Intern Med*. 2006;144:575–580.

122. American Society of Anesthesiologists Task Force on Perioperative Management of patients with obstructive sleep apnea. Practice guidelines for the perioperative management of patients with obstructive sleep apnea: an updated report by the American Society of Anesthesiologists Task Force on Perioperative Management of patients with obstructive sleep apnea. *Anesthesiology* 2014;120:268–286.

123. Mills E, Eyawo O, Lockhart I, et al. Smoking cessation reduces postoperative complications: a systematic review and meta-analysis. *Am J Med*. 2011;124:144–154 e148.

124. Kidney Disease: Improving Global Outcomes (KDIGO) CKD Work Group. KDIGO 2012 clinical practice guideline for the evaluation and management of chronic kidney disease. *Kidney Int* 2013:1–150.

125. Earley A, Miskulin D, Lamb EJ, et al. Estimating equations for glomerular filtration rate in the era of creatinine standardization: a systematic review. *Ann Intern Med*. 2012;156:785–795.

126. Wesson L. *Physiology of the Human Kidney*. New York: Grune & Stratton; 1969.

127. Jafar TH, Islam M, Jessani S, et al. Level and determinants of kidney function in a South Asian population in Pakistan. *Am J Kidney Dis*. 2011;58:764–772.

128. Levey AS, Stevens LA, Schmid CH, et al. A new equation to estimate glomerular filtration rate. *Ann Intern Med*. 2009;150:604–612.

129. Soveri I, Berg UB, Bjork J, et al. Measuring GFR: a systematic review. *Am J Kidney Dis*. 2014;64:411–424.

130. Ognibene A, Grandi G, Lorubbio M, et al. KDIGO 2012 clinical practice guideline CKD classification rules out creatinine clearance 24 hour urine collection? *Clin Biochem*. 2016;49:85–89.

131. Gaillard F, Flamant M, Lemoine S, et al. Estimated or measured GFR in living kidney donors work-up? *Am J Transplant*. 2016;16:3024–3032.

132. Fan L, Inker LA, Rossert J, et al. Glomerular filtration rate estimation using cystatin C alone or combined with creatinine as a confirmatory test. *Nephrol Dial Transplant*. 2014;29:1195–1203.

133. Inker LA, Schmid CH, Tighiouart H, et al. Estimating glomerular filtration rate from serum creatinine and cystatin C. *N Engl J Med*. 2012;367:20–29.

134. Matsushita K, van der Velde M, Astor BC, et al. Association of estimated glomerular filtration rate and albuminuria with all-cause and cardiovascular mortality in general population cohorts: a collaborative meta-analysis. *Lancet*. 2010;375:2073–2081.

135. Levey AS, de Jong PE, Coresh J, et al. The definition, classification, and prognosis of chronic kidney disease: a KDIGO Controversies Conference report. *Kidney Int*. 2011;80:17–28.

136. Matsushita K, Mahmoodi BK, Woodward M, et al. Comparison of risk prediction using the CKD-EPI equation and the MDRD study equation for estimated glomerular filtration rate. *JAMA*. 2012;307:1941–1951.

137. Shlipak MG, Matsushita K, Arnlov J, et al. Cystatin C versus creatinine in determining risk based on kidney function. *N Engl J Med*. 2013;369: 932–943.

138. Hallan SI, Matsushita K, Sang Y, et al. Age and association of kidney measures with mortality and end-stage renal disease. *JAMA*. 2012; 308:2349–2360.

139. Kasiske BL, Anderson-Haag T, Israni AK, et al. A prospective controlled study of living kidney donors: three-year follow-up. *Am J Kidney Dis*. 2015;66:114–124.

140. Ibrahim HN, Foley R, Tan L, et al. Long-term consequences of kidney donation. *N Engl J Med*. 2009;360:459–469.

141. Garg AX, Muirhead N, Knoll G, et al. Proteinuria and reduced kidney function in living kidney donors: a systematic review, meta-analysis, and meta-regression. *Kidney Int*. 2006;70:1801–1810.

142. Cohney S, Kanellis J, Howell M. The CARI guidelines. Donor renal function. *Nephrology (Carlton)*. 2010;15(Suppl 1):S137–S145.

143. Blantz RC, Steiner RW. Benign hyperfiltration after living kidney donation. *J Clin Invest*. 2015;125:972–974.

144. Lenihan CR, Busque S, Derby G, et al. Longitudinal study of living kidney donor glomerular dynamics after nephrectomy. *J Clin Invest*. 2015;125: 1311–1318.

145. Fehrman-Ekholm I, Duner F, Brink B, et al. No evidence of accelerated loss of kidney function in living kidney donors: results from a cross-sectional follow-up. *Transplantation*. 2001;72:444–449.

146. Fournier C, Pallet N, Cherqaoui Z, et al. Very long-term follow-up of living kidney donors. *Transpl Int*. 2012;25:385–390.

147. Cherikh WS, Young CJ, Kramer BF, et al. Ethnic and gender related differences in the risk of end-stage renal disease after living kidney donation. *Am J Transplant*. 2011;11:1650–1655.

148. LaPointe Rudow D, Hays R, Baliga P, et al. Consensus conference on best practices in live kidney donation: recommendations to optimize education, access, and care. *Am J Transplant*. 2015;15: 914–922.

149. Wang X, Vrtiska TJ, Avula RT, et al. Age, kidney function, and risk factors associate differently with cortical and medullary volumes of the kidney. *Kidney Int*. 2014;85:677–685.

150. Glodny B, Unterholzner V, Taferner B, et al. Normal kidney size and its influencing factors—a 64-slice MDCT study of 1.040 asymptomatic patients. *BMC Urol*. 2009;9:19.

151. Emamian SA, Nielsen MB, Pedersen JF, et al. Kidney dimensions at sonography: correlation with age, sex, and habitus in 665 adult volunteers. *AJR Am J Roentgenol*. 1993;160:83–86.

152. Norden G, Lennerling A, Nyberg G. Low absolute glomerular filtration rate in the living kidney donor: a risk factor for graft loss. *Transplantation*. 2000;70:1360–1362.

153. Zaky ZS, Gebreselassie S, Poggio ED. Evaluation of kidney function and structure in potential living kidney donors: implications for the donor and recipient. *Curr Transpl Rep*. 2015;2:15–21.

154. Mandelbrot DA, Pavlakis M, Danovitch GM, et al. The medical evaluation of living kidney donors: a survey of US transplant centers. *Am J Transplant*. 2007;7:2333–2343.

155. Inker LA. Albuminuria: time to focus on accuracy. *Am J Kidney Dis*. 2014;63:378–381.

156. Gansevoort RT, Verhave JC, Hillege HL, et al. The validity of screening based on spot morning urine samples to detect subjects with microalbuminuria in the general population. *Kidney Int Suppl*. 2005: S28–35.

157. Mogensen CL. *Microalbuminuria and kidney function: notes on methods, interpretation and classification*. NY: Wiley; 1986.

S98        Transplantation ■ August 2017 ■ Volume 101 ■ Number 8        www.transplantjournal.com

158. Boudville N, Kanellis J. The CARI guidelines. Donors at risk: proteinuria. *Nephrology (Carlton)*. 2010;15(Suppl 1):S106–S110.

159. Kasiske BL, Ravenscraft M, Ramos EL, et al. The evaluation of living renal transplant donors: clinical practice guidelines. Ad Hoc Clinical Practice Guidelines Subcommittee of the Patient Care and Education Committee of the American Society of Transplant Physicians. *J Am Soc Nephrol*. 1996;7:2288–2313.

160. Cohen RA, Brown RS. Clinical practice. Microscopic hematuria. *N Engl J Med*. 2003;348:2330–2338.

161. Davis R, Jones JS, Barocas DA, et al. Diagnosis, evaluation and follow-up of asymptomatic microhematuria (AMH) in adults: AUA guideline. *J Urol*. 2012;188:2473–2481.

162. Sutton JM. Evaluation of hematuria in adults. *JAMA*. 1990;263:2475–2480.

163. Vivante A, Afek A, Frenkel-Nir Y, et al. Persistent asymptomatic isolated microscopic hematuria in Israeli adolescents and young adults and risk for end-stage renal disease. *JAMA*. 2011;306:729–736.

164. Chow KM, Kwan BC, Li PK, et al. Asymptomatic isolated microscopic haematuria: long-term follow-up. *QJM*. 2004;97:739–745.

165. Kovacevic Z, Jovanovic D, Rabrenovic V, et al. Asymptomatic microscopic haematuria in young males. *Int J Clin Pract*. 2008;62:406–412.

166. Lee YM, Baek SY, Kim JH, et al. Analysis of renal biopsies performed in children with abnormal findings in urinary mass screening. *Acta Paediatr*. 2006;95:849–853.

167. Park YH, Choi JY, Chung HS, et al. Hematuria and proteinuria in a mass school urine screening test. *Pediatr Nephrol*. 2005;20:1126–1130.

168. Lam NN, Lentine KL, Garg AX, et al. Renal and cardiac assessment of living kidney donor candidates. *Nat Rev Nephrol*. 2017;13:420–428.

169. Savige J, Rana K, Tonna S, et al. Thin basement membrane nephropathy. *Kidney Int*. 2003;64:1169–1178.

170. Koushik R, Garvey C, Manivel JC, et al. Persistent, asymptomatic, microscopic hematuria in prospective kidney donors. *Transplantation*. 2005;80:1425–1429.

171. Choi SR, Sun IO, Hong YA, et al. The role of kidney biopsy to determine donation from prospective kidney donors with asymptomatic urinary abnormalities. *Transplant Proc*. 2012;44:11–13.

172. Jais JP, Knebelmann B, Giatras I, et al. X-linked Alport syndrome: natural history and genotype-phenotype correlations in girls and women belonging to 195 families: a "European Community Alport Syndrome Concerted Action" study. *J Am Soc Nephrol*. 2003;14:2603–2610.

173. Temme J, Peters F, Lange K, et al. Incidence of renal failure and nephroprotection by RAAS inhibition in heterozygous carriers of X-chromosomal and autosomal recessive Alport mutations. *Kidney Int*. 2012;81:779–783.

174. Gross O, Weber M, Fries JW, et al. Living donor kidney transplantation from relatives with mild urinary abnormalities in Alport syndrome: long-term risk, benefit and outcome. *Nephrol Dial Transplant*. 2009; 24:1626–1630.

175. D'Amico G. Natural history of idiopathic IgA nephropathy and factors predictive of disease outcome. *Semin Nephrol*. 2004;24:179–196.

176. Szeto CC, Lai FM, To KF, et al. The natural history of immunoglobulin A nephropathy among patients with hematuria and minimal proteinuria. *Am J Med*. 2001;110:434–437.

177. Suzuki K, Honda K, Tanabe K, et al. Incidence of latent mesangial IgA deposition in renal allograft donors in Japan. *Kidney Int*. 2003;63:2286–2294.

178. Kido R, Shibagaki Y, Iwadoh K, et al. Persistent glomerular hematuria in living kidney donors confers a risk of progressive kidney disease in donors after heminephrectomy. *Am J Transplant*. 2010;10:1597–1604.

179. Richardson R, Connelly M, Dipchand C, et al. Kidney paired donation protocol for participating donors 2014. *Transplantation*. 2015;99:S1–S88.

180. Ierino F, Kanellis J, CARI. The CARI guidelines. Donors at risk: haematuria. *Nephrology (Carlton)*. 2010;15(Suppl 1):S111–S113.

181. Savige J, Gregory M, Gross O, et al. Expert guidelines for the management of Alport syndrome and thin basement membrane nephropathy. *J Am Soc Nephrol*. 2013;24:364–375.

182. Lorenz EC, Lieske JC, Vrtiska TJ, et al. Clinical characteristics of potential kidney donors with asymptomatic kidney stones. *Nephrol Dial Transplant*. 2011;26:2695–2700.

183. Hughes P, Caring for Australians with Renal Impairment (CARI). The CARI guidelines. Kidney stones epidemiology. *Nephrology (Carlton)*. 2007; 12(Suppl 1):S26–S30.

184. Thomas SM, Lam NN, Welk BK, et al. Risk of kidney stones with surgical intervention in living kidney donors. *Am J Transplant*. 2013; 13:2935–2944.

185. Olsburgh J, Thomas K, Wong K, et al. Incidental renal stones in potential live kidney donors: prevalence, assessment and donation, including role of ex vivo ureteroscopy. *BJU Int*. 2013;111:784–792.

186. Pearle MS, Goldfarb DS, Assimos DG, et al. Medical management of kidney stones: AUA guideline. *J Urol*. 2014;192:316–324.

187. Türk C, Petřík A, Sarica K, et al. EAU guidelines on diagnosis and conservative management of urolithiasis. *Eur Urol*. 2016;69:468–474.

188. Ferraro PM, Curhan GC, D'Addessi A, et al. Risk of recurrence of idiopathic calcium kidney stones: analysis of data from the literature. *J Nephrol*. 2017;30:227–233.

189. Rule AD, Krambeck AE, Lieske JC. Chronic kidney disease in kidney stone formers. *Clin J Am Soc Nephrol*. 2011;6:2069–2075.

190. Alexander RT, Hemmelgarn BR, Wiebe N, et al. Kidney stones and kidney function loss: a cohort study. *BMJ*. 2012;345:e5287.

191. Shoag J, Halpern J, Goldfarb DS, et al. Risk of chronic and end stage kidney disease in patients with nephrolithiasis. *J Urol*. 2014;192:1440–1445.

192. Kummer AE, Grams M, Lutsey P, et al. Nephrolithiasis as a risk factor for CKD: the Atherosclerosis Risk in Communities Study. *Clin J Am Soc Nephrol*. 2015;10:2023–2029.

193. Strang AM, Lockhart ME, Amling CL, et al. Living renal donor allograft lithiasis: a review of stone related morbidity in donors and recipients. *J Urol*. 2008;179:832–836.

194. Fink HA, Wilt TJ, Eidman KE, et al. Medical management to prevent recurrent nephrolithiasis in adults: a systematic review for an American College of Physicians Clinical Guideline. *Ann Intern Med*. 2013;158: 535–543.

195. Qaseem A, Dallas P, Forciea MA, et al. Dietary and pharmacologic management to prevent recurrent nephrolithiasis in adults: a clinical practice guideline from the American College of Physicians. *Ann Intern Med*. 2014;161:659–667.

196. AST/ASTS/NATCO/UNOS Joint Societies Work Group. Evaluation of the Living Kidney Donor—a Consensus Document from the AST/ASTS/NATCO/UNOS Joint Societies Work Group.

197. Campion EW, Glynn RJ, DeLabry LO. Asymptomatic hyperuricemia. Risks and consequences in the Normative Aging Study. *Am J Med*. 1987;82:421–426.

198. Zhang W, Doherty M, Pascual E, et al. EULAR evidence based recommendations for gout. Part I: Diagnosis. Report of a task force of the Standing Committee for International Clinical Studies Including Therapeutics (ESCISIT). *Ann Rheum Dis*. 2006;65:1301–1311.

199. Lipkowitz MS. Regulation of uric acid excretion by the kidney. *Curr Rheumatol Rep*. 2012;14:179–188.

200. Krishnan E. Reduced glomerular function and prevalence of gout: NHANES 2009-10. *PLoS One*. 2012;7:e50046.

201. Kasiske BL, Anderson-Haag T, Ibrahim HN, et al. A prospective controlled study of kidney donors: baseline and 6-month follow-up. *Am J Kidney Dis*. 2013;62:577–586.

202. Moody WE, Ferro CJ, Edwards NC, et al. Cardiovascular effects of unilateral nephrectomy in living kidney donors. *Hypertension*. 2016; 67:368–377.

203. Lam NN, McArthur E, Kim SJ, et al. Gout after living kidney donation: a matched cohort study. *Am J Kidney Dis*. 2015;65:925–932.

204. Lam NN, Garg AX, Segev DL, et al. Gout after living kidney donation: correlations with demographic traits and renal complications. *Am J Nephrol*. 2015;41:231–240.

205. Braga F, Pasqualetti S, Ferraro S, et al. Hyperuricemia as risk factor for coronary heart disease incidence and mortality in the general population: a systematic review and meta-analysis. *Clin Chem Lab Med*. 2016;54:7–15.

206. Khanna D, Fitzgerald JD, Khanna PP, et al. 2012 American College of Rheumatology guidelines for management of gout. Part 1: systematic nonpharmacologic and pharmacologic therapeutic approaches to hyperuricemia. *Arthritis Care Res (Hoboken)*. 2012;64:1431–1446.

207. van Echteld IA, van Durme C, Falzon L, et al. Treatment of gout patients with impairment of renal function: a systematic literature review. *J Rheumatol Suppl*. 2014;92:48–54.

208. Kasiske BL, Kumar R, Kimmel PL, et al. Abnormalities in biomarkers of mineral and bone metabolism in kidney donors. *Kidney Int*. 2016;90: 861–868.

209. Young A, Hodsman AB, Boudville N, et al. Bone and mineral metabolism and fibroblast growth factor 23 levels after kidney donation. *Am J Kidney Dis*. 2012;59:761–769.

210. Garg AX, Pouget J, Young A, et al. Fracture risk in living kidney donors: a matched cohort study. *Am J Kidney Dis*. 2012;59:770–776.

C. Agnello   SE 0317

© 2017 Wolters Kluwer

211. Textor SC, Taler SJ, Larson TS, et al. Blood pressure evaluation among older living kidney donors. *J Am Soc Nephrol*. 2003;14:2159–2167.

212. O'Brien E, Parati G, Stergiou G, et al. European Society of Hypertension position paper on ambulatory blood pressure monitoring. *J Hypertens*. 2013;31:1731–1768.

213. Chobanian AV, Bakris GL, Black HR, et al. Seventh report of the Joint National Committee on prevention, detection, evaluation, and treatment of high blood pressure. *Hypertension*. 2003;42:1206–1252.

214. Ierino F, Boudville N, Kanellis J. The CARI guidelines. Donors at risk: hypertension. *Nephrology (Carlton)*. 2010;15(Suppl 1):S114–S120.

215. Pascual J, Abramowicz D, Cochat P, et al. European renal best practice guideline on the management and evaluation of the kidney donor and recipient. *Nefrologia*. 2014;34:293–301.

216. Stergiou GS, Asayama K, Thijs L, et al. Prognosis of white-coat and masked hypertension: International Database of HOme blood pressure in relation to Cardiovascular Outcome. *Hypertension*. 2014;63:675–682.

217. Hanninen MR, Niiranen TJ, Puukka PJ, et al. Target organ damage and masked hypertension in the general population: the Finn-Home study. *J Hypertens*. 2013;31:1136–1143.

218. Aljadhey H, Tu W, Hansen RA, et al. Comparative effects of nonsteroidal anti-inflammatory drugs (NSAIDs) on blood pressure in patients with hypertension. *BMC Cardiovasc Disord*. 2012;12:93.

219. Elliott WJ. Drug interactions and drugs that affect blood pressure. *J Clin Hypertens (Greenwich)*. 2006;8:731–737.

220. Snowden S, Nelson R. The effects of nonsteroidal anti-inflammatory drugs on blood pressure in hypertensive patients. *Cardiol Rev*. 2011;19:184–191.

221. Eckel RH, Jakicic JM, Ard JD, et al. 2013 AHA/ACC guideline on lifestyle management to reduce cardiovascular risk: a report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines. *J Am Coll Cardiol*. 2014;63:2960–2984.

222. Young JH, Klag MJ, Muntner P, et al. Blood pressure and decline in kidney function: findings from the Systolic Hypertension in the Elderly Program (SHEP). *J Am Soc Nephrol*. 2002;13:2776–2782.

223. Vasan RS, Beiser A, Seshadri S, et al. Residual lifetime risk for developing hypertension in middle-aged women and men: the Framingham Heart Study. *JAMA*. 2002;287:1003–1010.

224. Boudville N, Prasad GV, Knoll G, et al. Meta-analysis: risk for hypertension in living kidney donors. *Ann Intern Med*. 2006;145:185–196.

225. Garg AX, Prasad GV, Thiessen-Philbrook HR, et al. Cardiovascular disease and hypertension risk in living kidney donors: an analysis of health administrative data in Ontario, Canada. *Transplantation*. 2008; 86:399–406.

226. Lentine KL, Schnitzler MA, Garg AX, et al. Understanding antihypertensive medication use after living kidney donation through linked national registry and pharmacy claims data. *Am J Nephrol*. 2014;40:174–183.

227. Lentine KL, Schnitzler MA, Xiao H, et al. Consistency of racial variation in medical outcomes among publicly and privately insured living kidney donors. *Transplantation*. 2014;97:316–324.

228. Lentine KL, Schnitzler MA, Xiao H, et al. Racial variation in medical outcomes among living kidney donors. *N Engl J Med*. 2010;363:724–732.

229. Doshi MD, Goggins MO, Li L, et al. Medical outcomes in African American live kidney donors: a matched cohort study. *Am J Transplant*. 2013;13:111–118.

230. Lv J, Ehteshami P, Sarnak MJ, et al. Effects of intensive blood pressure lowering on the progression of chronic kidney disease: a systematic review and meta-analysis. *CMAJ*. 2013;185:949–957.

231. Lewis EJ, Hunsicker LG, Bain RP, et al. The effect of angiotensin-converting-enzyme inhibition on diabetic nephropathy. The Collaborative Study Group. *N Engl J Med*. 1993;329:1456–1462.

232. Brenner BM, Cooper ME, de Zeeuw D, et al. Effects of losartan on renal and cardiovascular outcomes in patients with type 2 diabetes and nephropathy. *N Engl J Med*. 2001;345:861–869.

233. Appel LJ, Wright JT Jr, Greene T, et al. Long-term effects of renin-angiotensin system-blocking therapy and a low blood pressure goal on progression of hypertensive chronic kidney disease in African Americans. *Arch Intern Med*. 2008;168:832–839.

234. Appel LJ, Wright JT Jr, Greene T, et al. Intensive blood-pressure control in hypertensive chronic kidney disease. *N Engl J Med*. 2010;363:918–929.

235. Friedman DJ, Kozlitina J, Genovese G, et al. Population-based risk assessment of APOL1 on renal disease. *J Am Soc Nephrol*. 2011;22:2098–2105.

236. Kanji Z, Powe CE, Wenger JB, et al. Genetic variation in APOL1 associates with younger age at hemodialysis initiation. *J Am Soc Nephrol*. 2011;22:2091–2097.

237. Kopp JB, Nelson GW, Sampath K, et al. APOL1 genetic variants in focal segmental glomerulosclerosis and HIV-associated nephropathy. *J Am Soc Nephrol*. 2011;22:2129–2137.

238. Parsa A, Kao WH, Xie D, et al. APOL1 risk variants, race, and progression of chronic kidney disease. *N Engl J Med*. 2013;369:2183–2196.

239. Meguid El Nahas A, Bello AK. Chronic kidney disease: the global challenge. *Lancet*. 2005;365:331–340.

240. Poggio ED, Braun WE, Davis C. The science of stewardship: due diligence for kidney donors and kidney function in living kidney donation—evaluation, determinants, and implications for outcomes. *Clin J Am Soc Nephrol*. 2009;4:1677–1684.

241. Oh CK, Jeon KO, Kim HJ, et al. Metabolic demand and renal mass supply affecting the early graft function after living donor kidney transplantation. *Kidney Int*. 2005;67:744–749.

242. Rook M, Bosma RJ, van Son WJ, et al. Nephrectomy elicits impact of age and BMI on renal hemodynamics: lower postdonation reserve capacity in older or overweight kidney donors. *Am J Transplant*. 2008; 8:2077–2085.

243. Lee JH, Kim SC, Han DJ, et al. Risk factors for MDRD-GFR of less than 60 mL/min per 1.73 m2 in former donors. *Nephrology (Carlton)*. 2007;12:600–606.

244. Gracida C, Espinoza R, Cedillo U, et al. Kidney transplantation with living donors: nine years of follow-up of 628 living donors. *Transplant Proc*. 2003;35:946–947.

245. Textor SC, Taler SJ, Driscoll N, et al. Blood pressure and renal function after kidney donation from hypertensive living donors. *Transplantation*. 2004;78:276–282.

246. World Health Organization (WHO). *Global Report on Diabetes. Executive Summary*. Available at: http://apps.who.int/iris/bitstream/10665/204874/1/WHO_NMH_NVI_16.3_eng.pdf. (Accessed: July 31, 2016).

247. Ng M, Fleming T, Robinson M, et al. Global, regional, and national prevalence of overweight and obesity in children and adults during 1980–2013: a systematic analysis for the Global Burden of Disease Study 2013. *Lancet*. 2014;384:766–781.

248. World Health Organization. *Obesity: Preventing and managing global epidemic*. WHO Technical Report Series No 894, 2000.

249. Padwal RS. Obesity, diabetes, and the metabolic syndrome: the global scourge. *Can J Cardiol*. 2014;30:467–472.

250. Zobel EH, Hansen TW, Rossing P, et al. Global changes in food supply and the obesity epidemic. *Curr Obes Rep*. 2016;5:449–455.

251. World Health Organization. *Waist Circumference and Waist–Hip Ratio*. Report of a WHO Expert Consultation. Geneva, 8–11 2008.

252. Boudville N, Isbel N. The CARI guidelines. Donors at risk: impaired glucose tolerance. *Nephrology (Carlton)*. 2010;15(Suppl 1):S133–S136.

253. World Health Organization. *Global Report on Diabetes*. 2016.

254. Makaroff LE. The need for international consensus on prediabetes. *Lancet Diabetes Endocrinol*. 2017;5:5–7.

255. Stone NJ, Robinson JG, Lichtenstein AH, et al. 2013 ACC/AHA guideline on the treatment of blood cholesterol to reduce atherosclerotic cardiovascular risk in adults: a report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines. *J Am Coll Cardiol*. 2014;63:2889–2934.

256. DeMaria EJ, Carmody BJ. Perioperative management of special populations: obesity. *Surg Clin North Am*. 2005;85:1283–1289.

257. D'Agati VD, Chagnac A, de Vries AP, et al. Obesity-related glomerulopathy: clinical and pathologic characteristics and pathogenesis. *Nat Rev Nephrol*. 2016;12:453–471.

258. von Zur-Muhlen B, Berglund D, Yamamoto S, et al. Single-centre long-term follow-up of live kidney donors demonstrates continued kidney function but the necessity of a structured lifelong follow-up. *Ups J Med Sci*. 2014;119:236–241.

259. Isbel N, CARI guidelines. The CARI guidelines. Donors at risk: obesity. *Nephrology (Carlton)*. 2010;15(Suppl 1):S121–S132.

260. Locke JE, Reed RD, Massie A, et al. Obesity increases the risk of end-stage renal disease among living kidney donors. *Kidney Int*. 2017; 91:699–703.

261. Narayan KM, Boyle JP, Thompson TJ, et al. Lifetime risk for diabetes mellitus in the United States. *JAMA*. 2003;290:1884–1890.

262. Plantinga LC, Crews DC, Coresh J, et al. Prevalence of chronic kidney disease in US adults with undiagnosed diabetes or prediabetes. *Clin J Am Soc Nephrol*. 2010;5:673–682.

C.Agnello   SE 0318

S100    **Transplantation** ■ August 2017 ■ Volume 101 ■ Number 8    www.transplantjournal.com

263. Okamoto M, Suzuki T, Fujiki M, et al. The consequences for live kidney donors with preexisting glucose intolerance without diabetic complication: analysis at a single Japanese center. *Transplantation*. 2010;89: 1391–1395.

264. Tabak AG, Herder C, Rathmann W, et al. Prediabetes: a high-risk state for diabetes development. *Lancet*. 2012;379:2279–2290.

265. Ferrannini E. Definition of intervention points in prediabetes. *Lancet Diabetes Endocrinol*. 2014;2:667–675.

266. Ligthart S, van Herpt TT, Leening MJ, et al. Lifetime risk of developing impaired glucose metabolism and eventual progression from prediabetes to type 2 diabetes: a prospective cohort study. *Lancet Diabetes Endocrinol*. 2016;4:44–51.

267. Chandran S, Masharani U, Webber AB, et al. Prediabetic living kidney donors have preserved kidney function at 10 years after donation. *Transplantation*. 2014;97:748–754.

268. Zammit AR, Katz MJ, Derby C, et al. Metabolic syndrome and smoking are associated with future development of advanced chronic kidney disease in older adults. *Cardiorenal Med*. 2016;6:108–115.

269. Young BA, Katz R, Boulware LE, et al. Risk factors for rapid kidney function decline among African Americans: the Jackson Heart Study (JHS). *Am J Kidney Dis*. 2016;68:229–239.

270. Garg AX, Meirambayeva A, Huang A, et al. Cardiovascular disease in kidney donors: matched cohort study. *BMJ*. 2012;344:e1203.

271. Kaplan B, Ilahe A. Quantifying risk of kidney donation: the truth is not out there (yet). *Am J Transplant*. 2014;14:1715–1716.

272. Amer H, Prieto M, Heimbach JK, et al. Increasing mortality by living kidney donation? The devil is in the details. *Kidney Int*. 2014;85:1469.

273. Kirchner VA, Liu PT, Pruett TL. Infection and cancer screening in potential living donors: best practices to protect the donor and recipient. *Curr Transpl Rep*. 2015;2:35–43.

274. Fishman JA, Grossi PA. Donor-derived infection—the challenge for transplant safety. *Nat Rev Nephrol*. 2014;10:663–672.

275. Len O, Garzoni C, Lumbreras C, et al. Recommendations for screening of donor and recipient prior to solid organ transplantation and to minimize transmission of donor-derived infections. *Clin Microbiol Infect*. 2014;20(Suppl 7):10–18.

276. Morris MI, Fischer SA, Ison MG. Infections transmitted by transplantation. *Infect Dis Clin North Am*. 2010;24:497–514.

277. Bohl DL, Brennan DC, Ryschkewitsch C, et al. BK virus antibody titers and intensity of infections after renal transplantation. *J Clin Virol*. 2008; 43:184–189.

278. Bohl DL, Storch GA, Ryschkewitsch C, et al. Donor origin of BK virus in renal transplantation and role of HLA C7 in susceptibility to sustained BK viremia. *Am J Transplant*. 2005;5:2213–2221.

279. Mwintshi K, Brennan DC. Prevention and management of cytomegalovirus infection in solid-organ transplantation. *Expert Rev Anti Infect Ther*. 2007;5:295–304.

280. Andrews PA, Emery VC, Newstead C. Summary of the British Transplantation Society guidelines for the prevention and management of CMV disease after solid organ transplantation. *Transplantation*. 2011;92: 1181–1187.

281. Brennan DC, Agha I, Bohl DL, et al. Incidence of BK with tacrolimus versus cyclosporine and impact of preemptive immunosuppression reduction. *Am J Transplant*. 2005;5:582–594.

282. Spinner ML, Saab G, Casabar E, et al. Impact of prophylactic versus preemptive valganciclovir on long-term renal allograft outcomes. *Transplantation*. 2010;90:412–418.

283. Ison MG, Grossi P, AST Infectious Diseases Community of Practice. Donor-derived infections in solid organ transplantation. *Am J Transplant*. 2013;13(Suppl 4):22–30.

284. HIV transmitted from a living organ donor-New York City, 2009. *Am J Transplant*. 2011;11:1334–1337.

285. Garzoni C, Ison MG. Uniform definitions for donor-derived infectious disease transmissions in solid organ transplantation. *Transplantation*. 2011; 92:1297–1300.

286. Levi ME, Kumar D, Green M, et al. Considerations for screening live kidney donors for endemic infections: a viewpoint on the UNOS policy. *Am J Transplant*. 2014;14:1003–1011.

287. OPTN (Organ Procurement and Transplantation Network)/UNOS (United Network for Organ Sharing). Recognizing Seasonal and Geographically Endemic Infections in Organ Donors: Considerations during Living Donor Evaluation. 2014 (http://optn.transplant.hrsa.gov/media/1138/seasonal_disease_guidance.pdf). (Accessed: September 7, 2016).

288. OPTN (Organ Procurement and Transplantation Network)/UNOS (United Network for Organ Sharing) Ad Hoc Disease Transmission Advisory Committee (DTAC). Guidance for Identifying Risk Factors for Mycobacterium tuberculosis (MTB) During Evaluation of Potential Living Kidney Donors. Available at: https://optn.transplant.hrsa.gov/resources/guidance/guidance-for-identifying-risk-factors-for-mycobacterium-tuberculosis-mtb-during-evaluation-of-potential-living-kidney-donors/. (Accessed September 7, 2016).

289. Chin-Hong PV, Schwartz BS, Bern C, et al. Screening and treatment of Chagas disease in organ transplant recipients in the United States: recommendations from the Chagas in transplant working group. *Am J Transplant*. 2011;11:672–680.

290. Morris MI, Daly JS, Blumberg E, et al. Diagnosis and management of tuberculosis in transplant donors: a donor-derived infections consensus conference report. *Am J Transplant*. 2012;12:2288–2300.

291. OPTN (Organ Procurement and Transplantation Network)/UNOS (United Network for Organ Sharing) Ad Hoc Disease Transmission Advisory Committee (DTAC). Identifying Risk Factors for West Nile Virus (WNV) During Evaluation of Potential Living Donors. Available at: https://optn.transplant.hrsa.gov/resources/guidance/identifying-risk-factors-for-west-nile-virus-wnv-during-evaluation-of-potential-living-donors/. (Accessed September 7, 2016).

292. Feng S, Buell JF, Cherikh WS, et al. Organ donors with positive viral serology or malignancy: risk of disease transmission by transplantation. *Transplantation*. 2002;74:1657–1663.

293. Ouseph R, Eng M, Ravindra K, et al. Review of the use of hepatitis B core antibody-positive kidney donors. *Transplant Rev (Orlando)*. 2010;24: 167–171.

294. Centers for Disease Control and Prevention (CDC). Testing recommendations for hepatitis C virus infection. Available at: http://www.cdc.gov/hepatitis/hcv/guidelinesc.htm. (Accessed: September 7, 2016).

295. Johnson RJ, Gretch DR, Yamabe H, et al. Membranoproliferative glomerulonephritis associated with hepatitis C virus infection. *N Engl J Med*. 1993;328:465–470.

296. Natov SN. Transmission of viral hepatitis by kidney transplantation: donor evaluation and transplant policies (Part 2: hepatitis C virus). *Transpl Infect Dis*. 2002;4:124–131.

297. Abbott KC, Lentine KL, Bucci JR, et al. The impact of transplantation with deceased donor hepatitis C-positive kidneys on survival in wait-listed long-term dialysis patients. *Am J Transplant*. 2004;4:2032–2037.

298. European Association for the Study of the Liver. EASL recommendations on treatment of hepatitis C 2016. *J Hepatol* 2017;66:153–194.

299. Busch MP, Glynn SA, Stramer SL, et al. A new strategy for estimating risks of transfusion-transmitted viral infections based on rates of detection of recently infected donors. *Transfusion*. 2005;45:254–264.

300. Muller E, Kahn D, Mendelson M. Renal transplantation between HIV-positive donors and recipients. *N Engl J Med*. 2010;362:2336–2337.

301. U.S. Federal Register. Human Immunodeficiency Virus (HIV) Organ Policy Equity (HOPE) Act Safeguards and Research Criteria for Transplantation of Organs Infected With HIV. A Notice by the National Institutes of Health on 06/18/2015. Available at: https://www.federalregister.gov/articles/2015/06/18/2015-15034/human-immunodeficiency-virus-hiv-organ-policy-equity-hope-act-safeguards-and-research-criteria-for. (Accessed September 7, 2016).

302. Ison MG, Llata E, Conover CS, et al. Transmission of human immunodeficiency virus and hepatitis C virus from an organ donor to four transplant recipients. *Am J Transplant*. 2011;11:1218–1225.

303. Blumberg EA, Ison MG, Pruett TL, et al. Optimal testing of the live organ donor for blood-borne viral pathogens: the report of a consensus conference. *Am J Transplant*. 2013;13:1405–1415.

304. Ison MG, Abecassis M, Blumberg E, et al. Achieving consensus on increased risk donors to improve access to organ transplantation. Northwestern Agency for Healthcare Research and Quality-funded Consensus Conference, presented to the Advisory Committee on Organ Transplantation of the U.S. Department of Health and Human Services, August 2, 2012. Available at: http://www.feinberg.northwestern.edu/sites/transplant/docs/conference/FinalReport.pdf. (Accessed September 7, 2016).

305. Echenique IA, Cohen D, Rudow DL, et al. Impact of repeat testing of living kidney donors within 14 days of the transplant procedure: a multicenter retrospective survey. *Transpl Infect Dis*. 2014;16:403–411.

306. Brennan DC, Aguado JM, Potena L, et al. Effect of maintenance immunosuppressive drugs on virus pathobiology: evidence and potential mechanisms. *Rev Med Virol*. 2013;23:97–125.

307. Green M, Michaels MG. Epstein-Barr virus infection and posttransplant lymphoproliferative disorder. *Am J Transplant*. 2013;13(Suppl 3):41–54.

C.Agnello    SE 0319

© 2017 Wolters Kluwer

308. Morton M, Coupes B, Roberts SA, et al. Epstein-Barr virus infection in adult renal transplant recipients. *Am J Transplant*. 2014;14:1619–1629.

309. Beam E, Razonable RR. Cytomegalovirus in solid organ transplantation: epidemiology, prevention, and treatment. *Curr Infect Dis Rep*. 2012;14:633–641.

310. Preiksaitis JK, Brennan DC, Fishman J, et al. Canadian Society of Transplantation consensus workshop on cytomegalovirus management in solid organ transplantation final report. *Am J Transplant*. 2005;5:218–227.

311. Hodson EM, Ladhani M, Webster AC, et al. Antiviral medications for preventing cytomegalovirus disease in solid organ transplant recipients. *Cochrane Database Syst Rev*. 2013;2:CD003774.

312. Cortes NJ, Afzali B, MacLean D, et al. Transmission of syphilis by solid organ transplantation. *Am J Transplant*. 2006;6:2497–2499.

313. Cortez KJ, Greenwald MA. Current trends in donor testing to detect syphilis infection. *Curr Infect Dis Rep*. 2014;16:423.

314. Theodoropoulos N, Jaramillo A, Penugonda S, et al. Improving syphilis screening in deceased organ donors. *Transplantation*. 2015;99:438–443.

315. Meije Y, Piersimoni C, Torre-Cisneros J, et al. Mycobacterial infections in solid organ transplant recipients. *Clin Microbiol Infect*. 2014;20(Suppl 7):89–101.

316. Ison MG, Nalesnik MA. An update on donor-derived disease transmission in organ transplantation. *Am J Transplant*. 2011;11:1123–1130.

317. Aguado JM, Torre-Cisneros J, Fortún J, et al. Tuberculosis in solid-organ transplant recipients: consensus statement of the group for the study of infection in transplant recipients (GESITRA) of the Spanish Society of Infectious Diseases and Clinical Microbiology. *Clin Infect Dis*. 2009;48:1276–1284.

318. Subramanian AK. Tuberculosis in solid organ transplant candidates and recipients: current and future challenges. *Curr Opin Infect Dis*. 2014;27:316–321.

319. Moon SM, Park IA, Kim SM, et al. Living donor and recipient screening for latent tuberculosis infection by tuberculin skin test and interferon-gamma releasing assay in a country with an intermediate burden of tuberculosis. *J Infect Chemother*. 2013;19:1009–1013.

320. Ariza-Heredia EJ, Beam EN, Lesnick TG, et al. Impact of urinary tract infection on allograft function after kidney transplantation. *Clin Transplant*. 2014;28:683–690.

321. Lee JR, Bang H, Dadhania D, et al. Independent risk factors for urinary tract infection and for subsequent bacteremia or acute cellular rejection: a single-center report of 1166 kidney allograft recipients. *Transplantation*. 2013;96:732–738.

322. Abdalhamid BA, Al Abadi AN, Al Saghier MI, et al. Strongyloides stercoralis infection in kidney transplant recipients. *Saudi J Kidney Dis Transpl*. 2015;26:98–102.

323. Le M, Ravin K, Hasan A, et al. Single donor-derived strongyloidiasis in three solid organ transplant recipients: case series and review of the literature. *Am J Transplant*. 2014;14:1199–1206.

324. Roseman DA, Kabbani D, Kwah J, et al. Strongyloides stercoralis transmission by kidney transplantation in two recipients from a common donor. *Am J Transplant*. 2013;13:2483–2486.

325. World Health organization (WHO). Strongyloidiasis Epidemiology. Available at: http://www.who.int/intestinal_worms/epidemiology/strongyloidiasis/en/. (Accessed: September 7, 2016).

326. Huprikar S, Bosserman E, Patel G, et al. Donor-derived Trypanosoma cruzi infection in solid organ recipients in the United States, 2001-2011. *Am J Transplant*. 2013;13:2418–2425.

327. OPTN (Organ Procurement and Transplantation Network)/UNOS (United Network for Organ Sharing) Ad Hoc Disease Transmission Advisory Committee (DTAC). Guidance regarding Ebola virus disease. Available at: https://optn.transplant.hrsa.gov/news/guidance-regarding-ebola-virus-disease/. (Accessed: September 7, 2016).

328. World Health organization (WHO). Zika virus fact sheet (Updated 2 June 2016). Available at: http://www.who.int/mediacentre/factsheets/zika/en/. (Accessed: September 7, 2016).

329. OPTN (Organ Procurement and Transplantation Network)/UNOS (United Network for Organ Sharing) Ad Hoc Disease Transmission Advisory Committee (DTAC). Guidance on Zika virus. Available at: https://optn.transplant.hrsa.gov/news/guidance-on-zika-virus/. (Accessed: September 7, 2016).

330. Centers for Disease Control and Prevention (CDC). Global Health. Available at: http://www.cdc.gov/globalhealth/index.html. (Accessed: September 7, 2016).

331. US Preventative Services Task Force. *USPSTF Published recommendations for cancer screening*. Available at: http://www.uspreventiveservicestaskforce.org/BrowseRec/Index. (Accessed: September 7, 2016).

332. American Cancer Society. *Guidelines for the Early Detection of Cancer*. Available at: http://www.cancer.org/healthy/findcancerearly/cancerscreeningguidelines/american-cancer-society-guidelines-for-the-early-detection-of-cancer. (Accessed: September 7, 2016).

333. United Kindgom (UK) National Screening Committee (UK NSC). *Current UK NSC recommendations*. Available at: http://legacy.screening.nhs.uk/screening-recommendations.php. (Accessed: September 7, 2016).

334. Lentine KL, Vijayan A, Xiao H, et al. Cancer diagnoses after living kidney donation: linking U.S. Registry data and administrative claims. *Transplantation*. 2012;94:139–144.

335. Xiao D, Craig JC, Chapman JR, et al. Donor cancer transmission in kidney transplantation: a systematic review. *Am J Transplant*. 2013;13:2645–2652.

336. Kauffman HM, Cherikh WS, McBride MA, et al. Deceased donors with a past history of malignancy: an organ procurement and transplantation network/united network for organ sharing update. *Transplantation*. 2007;84:272–274.

337. Strauss DC, Thomas JM. Transmission of donor melanoma by organ transplantation. *Lancet Oncol*. 2010;11:790–796.

338. Penn I. Malignant melanoma in organ allograft recipients. *Transplantation*. 1996;61:274–278.

339. Buell JF, Beebe TM, Trofe J, et al. Donor transmitted malignancies. *Ann Transplant*. 2004;9:53–56.

340. Bibbins-Domingo K, Grossman DC, Curry SJ, et al. Screening for skin cancer: US preventive services task force recommendation statement. *JAMA*. 2016;316:429–435.

341. Nalesnik MA, Woodle ES, Dimaio JM, et al. Donor-transmitted malignancies in organ transplantation: assessment of clinical risk. *Am J Transplant*. 2011;11:1140–1147.

342. Ordon M, Welk B, McArthur E, et al. Risk of nephrectomy in previous living kidney donors. *Transplantation*. 2016;100:1313–1317.

343. Israel GM, Bosniak MA. An update of the Bosniak renal cyst classification system. *Urology*. 2005;66:484–488.

344. Campbell SC, Lane BR. Chapter 57: Malignant renal tumors. In: Campbell-Walsh Urology, 11th Edn. Wein AJ, Kavoussi LR, Partin AW, et al. (eds). Elsevier, p. 1314–1364, 2016.

345. Musquera M, Pérez M, Peri L, et al. Kidneys from donors with incidental renal tumors: should they be considered acceptable option for transplantation? *Transplantation*. 2013;95:1129–1133.

346. Valente M, Furian L, Rigotti P. Organ donors with small renal cancer: report of 3 cases. *Transplant Proc*. 2012;44:1846–1847.

347. Sener A, Uberoi V, Bartlett ST, et al. Living-donor renal transplantation of grafts with incidental renal masses after ex-vivo partial nephrectomy. *BJU Int*. 2009;104:1655–1660.

348. Ghafari A. Transplantation of a kidney with a renal cell carcinoma after living donation: a case report. *Transplant Proc*. 2007;39:1660–1661.

349. Notify Library. *The global vigilence and surveillance database for medical products of human origin*. Available at: http://www.notifylibrary.org/. (Accessed: September 7, 2016).

350. Kuppachi S, Smith RJH, Thomas CP. Evaluation of genetic renal diseases in potential living kidney donors. *Curr Transpl Rep*. 2015;2:1–14.

351. Chapman AB, Devuyst O, Eckardt KU, et al. Autosomal-dominant polycystic kidney disease (ADPKD): executive summary from a Kidney Disease: Improving Global Outcomes (KDIGO) Controversies Conference. *Kidney Int*. 2015;88:17–27.

352. Pei Y, Hwang YH, Conklin J, et al. Imaging-based diagnosis of autosomal dominant polycystic kidney disease. *J Am Soc Nephrol*. 2015;26:746–753.

353. Kanaan N, Devuyst O, Pirson Y. Renal transplantation in autosomal dominant polycystic kidney disease. *Nat Rev Nephrol*. 2014;10:455–465.

354. Pei Y, Obaji J, Dupuis A, et al. Unified criteria for ultrasonographic diagnosis of ADPKD. *J Am Soc Nephrol*. 2009;20:205–212.

355. Simms RJ, Travis DL, Durkie M, et al. Genetic testing in the assessment of living related kidney donors at risk of autosomal dominant polycystic kidney disease. *Transplantation*. 2015;99:1023–1029.

356. Audrezet MP, Cornec-Le Gall E, Chen JM, et al. Autosomal dominant polycystic kidney disease: comprehensive mutation analysis of PKD1 and PKD2 in 700 unrelated patients. *Hum Mutat*. 2012;33:1239–1250.

357. Rossetti S, Consugar MB, Chapman AB, et al. Comprehensive molecular diagnostics in autosomal dominant polycystic kidney disease. *J Am Soc Nephrol*. 2007;18:2143–2160.

358. Riella LV, Sheridan AM. Testing for high-risk APOL1 alleles in potential living kidney donors. *Am J Kidney Dis*. 2015;66:396–401.

359. Zwang NA, Shetty A, Sustento-Reodica N, et al. APOL1-associated end-stage renal disease in a living kidney transplant donor. *Am J Transplant*. 2016;16:3568–3572.

C. Agnello     SE 0320

S102    **Transplantation** ■ August 2017 ■ Volume 101 ■ Number 8S    www.transplantjournal.com

360. Reeves-Daniel AM, DePalma JA, Bleyer AJ, et al. The APOL1 gene and allograft survival after kidney transplantation. *Am J Transplant*. 2011;11: 1025–1030.

361. Freedman BI, Pastan SO, Israni AK, et al. APOL1 genotype and kidney transplantation outcomes from deceased African American donors. *Transplantation*. 2016;100:194–202.

362. Kofman T, Audard V, Narjoz C, et al. APOL1 polymorphisms and development of CKD in an identical twin donor and recipient pair. *Am J Kidney Dis*. 2014;63:816–819.

363. Cohen DM, Mittalhenkle A, Scott DL, et al. African American living-kidney donors should be screened for APOL1 risk alleles. *Transplantation*. 2011;92:722–725.

364. Lentine KL, Segev DL. Health outcomes among non-Caucasian living kidney donors: knowns and unknowns. *Transpl Int*. 2013;26:853–864.

365. Ross LF, Thistlethwaite JR Jr. Introducing genetic tests with uncertain implications in living donor kidney transplantation: ApoL1 as a case study. *Prog Transplant*. 2016;26:203–206.

366. Chandraker A. The real world impact of APOL1 variants on kidney transplantation. *Transplantation*. 2016;100:16–17.

367. Freedman BI, Julian BA. Should kidney donors be genotyped for APOL1 risk alleles? *Kidney Int*. 2015;87:671–673.

368. Lentine KL, Schnitzler MA, Garg AX, et al. Race, relationship and renal diagnoses after living kidney donation. *Transplantation*. 2015;99:1723–1729.

369. Newell KA, Formica RN, Gill JS, et al. Integrating APOL-1 gene variants into renal transplantation: considerations arising from the American Society of Transplantation expert conference. *Am J Transplant*. 2017;17:901–911.

370. Chan MM, Gale DP. Isolated microscopic haematuria of glomerular origin: clinical significance and diagnosis in the 21st century. *Clin Med (Lond)*. 2015;15:576–580.

371. Miner JH, Baigent C, Flinter F, et al. The 2014 international workshop on Alport syndrome. *Kidney Int*. 2014;86:679–684.

372. Niaudet P. Living donor kidney transplantation in patients with hereditary nephropathies. *Nat Rev Nephrol*. 2010;6:736–743.

373. Heidet L, Gubler MC. The renal lesions of Alport syndrome. *J Am Soc Nephrol*. 2009;20:1210–1215.

374. Gast C, Pengelly RJ, Lyon M, et al. Collagen (COL4A) mutations are the most frequent mutations underlying adult focal segmental glomerulosclerosis. *Nephrol Dial Transplant*. 2016;31:961–970.

375. Weber S, Strasser K, Rath S, et al. Identification of 47 novel mutations in patients with Alport syndrome and thin basement membrane nephropathy. *Pediatr Nephrol*. 2016;31:941–955.

376. Kashtan CE. Women with Alport syndrome: risks and rewards of kidney donation. *Nephrol Dial Transplant*. 2009;24:1369–1370.

377. Favalli V, Disabella E, Molinaro M, et al. Genetic screening of Anderson-Fabry disease in probands referred from multispecialty clinics. *J Am Coll Cardiol*. 2016;68:1037–1050.

378. Popli S, Molnar ZV, Leehey DJ, et al. Involvement of renal allograft by Fabry's disease. *Am J Nephrol*. 1987;7:316–318.

379. Rood IM, Deegens JK, Wetzels JF. Genetic causes of focal segmental glomerulosclerosis: implications for clinical practice. *Nephrol Dial Transplant*. 2012;27:882–890.

380. Pollak MR. Familial FSGS. *Adv Chronic Kidney Dis*. 2014;21:422–425.

381. Sadowski CE, Lovric S, Ashraf S, et al. A single-gene cause in 29.5% of cases of steroid-resistant nephrotic syndrome. *J Am Soc Nephrol*. 2015; 26:1279–1289.

382. Winn MP, Alkhunaizi AM, Bennett WM, et al. Focal segmental glomerulosclerosis: a need for caution in live-related renal transplantation. *Am J Kidney Dis*. 1999;33:970–974.

383. Donne RL, Abbs I, Barany P, et al. Recurrence of hemolytic uremic syndrome after live related renal transplantation associated with subsequent de novo disease in the donor. *Am J Kidney Dis*. 2002;40:E22.

384. Zuber J, Fakhouri F, Roumenina LT, et al. Use of eculizumab for atypical haemolytic uraemic syndrome and C3 glomerulopathies. *Nat Rev Nephrol*. 2012;8:643–657.

385. Hart TC, Gorry MC, Hart PS, et al. Mutations of the UMOD gene are responsible for medullary cystic kidney disease 2 and familial juvenile hyperuricaemic nephropathy. *J Med Genet*. 2002;39:882–892.

386. Kirby A, Gnirke A, Jaffe DB, et al. Mutations causing medullary cystic kidney disease type 1 lie in a large VNTR in MUC1 missed by massively parallel sequencing. *Nat Genet*. 2013;45:299–303.

387. Ojodu J, Hulihan MM, Pope SN, et al. Incidence of sickle cell trait—United States, 2010. *MMWR Morb Mortal Wkly Rep*. 2014;63: 1155–1158.

388. Nagar R, Sinha S, Raman R. Haemoglobinopathies in eastern Indian states: a demographic evaluation. *J Community Genet*. 2015;6:1–8.

389. Key NS, Derebail VK. Sickle-cell trait: novel clinical significance. *Hematology Am Soc Hematol Educ Program*. 2010;2010:418–422.

390. Gebreselassie S, Simmons MN, Montague DK. Genitourinary manifestations of sickle cell disease. *Cleve Clin J Med*. 2015;82:679–683.

391. Reese PP, Hoo AC, Magee CC. Screening for sickle trait among potential live kidney donors: policies and practices in US transplant centers. *Transpl Int*. 2008;21:328–331.

392. Thomas CP, Mansilla MA, Sompallae R, et al. Screening of living kidney donors for genetic diseases using a comprehensive genetic testing strategy. *Am J Transplant*. 2017;17:401–410.

393. Department of Health and Human Services. *APOL1* Long-term Kidney Transplantation Outcomes Network (APOLLO) Clinical Centers (Collaborative U01). https://grants.nih.gov/grants/guide/rfa-files/RFA-DK-16-025.html. Accessed January 24, 2017.

394. Department of Health and Human Services. *APOL1* Long-term Kidney Transplantation Outcomes Network Scientific and Data Research Center (APOLLO SDRC) (Collaborative U01). https://grants.nih.gov/grants/guide/rfa-files/RFA-DK-16-024.html. Accessed January 24, 2017.

395. Vikse BE. Pre-eclampsia and the risk of kidney disease. *Lancet*. 2013; 382:104–106.

396. McDonald SD, Han Z, Walsh MW, et al. Kidney disease after preeclampsia: a systematic review and meta-analysis. *Am J Kidney Dis*. 2010;55:1026–1039.

397. Vikse BE, Irgens LM, Leivestad T, et al. Preeclampsia and the risk of end-stage renal disease. *N Engl J Med*. 2008;359:800–809.

398. Wang IK, Muo CH, Chang YC, et al. Association between hypertensive disorders during pregnancy and end-stage renal disease: a population-based study. *CMAJ*. 2013;185:207–213.

399. Beharier O, Shoham-Vardi I, Pariente G, et al. Gestational diabetes mellitus is a significant risk factor for long-term maternal renal disease. *J Clin Endocrinol Metab*. 2015;100:1412–1416.

400. The Royal College of Radiologists and the College of Radiographers. *Protection of Pregnant Patients during Diagnostic Medical Exposures to Ionising Radiation Advice from the Health Protection Agency*. Documents of the Health Protection Agency Radiation, Chemical and Environmental Hazards, 2009. https://www.rcr.ac.uk/sites/default/files/publication/HPA_preg_2nd.pdf. (Accessed on September 8 2015).

401. Garg AX, Nevis IF, McArthur F, et al. Gestational hypertension and preeclampsia in living kidney donors. *N Engl J Med*. 2015;372:124–133.

402. Reisaeter AV, Roislien J, Henriksen T, et al. Pregnancy and birth after kidney donation: the Norwegian experience. *Am J Transplant*. 2009;9:820–824.

403. Ibrahim HN, Akkina SK, Leister E, et al. Pregnancy outcomes after kidney donation. *Am J Transplant*. 2009;9:825–834.

404. Thangaratinam S, Rogozińska E, Jolly K, et al. Interventions to reduce or prevent obesity in pregnant women: a systematic review. *Health Technol Assess*. 2012;16:iii–iv 1-191.

405. Allen R, Rogozinska E, Sivarajasingam P, et al. Effect of diet- and lifestyle-based metabolic risk-modifying interventions on preeclampsia: a meta-analysis. *Acta Obstet Gynecol Scand*. 2014;93:973–985.

406. Rasmussen PE, Nielsen FR. Hydronephrosis during pregnancy: a literature survey. *Eur J Obstet Gynecol Reprod Biol*. 1988;27:249–259.

407. Garg AX, McArthur E, Lentine KL, et al. Gestational hypertension and preeclampsia in living kidney donors. *N Engl J Med*. 2015;372: 1469–1470.

408. Duerinckx N, Timmerman L, Van Gogh J, et al. Predonation psychosocial evaluation of living kidney and liver donor candidates: a systematic literature review. *Transpl Int*. 2014;27:2–18.

409. van Hardeveld E, Tong A. The CARI guidelines. Psychosocial care of living kidney donors. *Nephrology (Carlton)*. 2010;15(Suppl 1): S80–S87.

410. Henderson AJ, Landolt MA, McDonald MF, et al. The living anonymous kidney donor: lunatic or saint? *Am J Transplant*. 2003;3:203–213.

411. Sharif A. Unspecified kidney donation—a review of principles, practice and potential. *Transplantation*. 2013;95:1425–1430.

412. Tong A, Craig JC, Wong G, et al. "It was just an unconditional gift." Self reflections of non-directed living kidney donors. *Clin Transplant*. 2012; 26:589–599.

413. Clemens K, Boudville N, Dew MA, et al. The long-term quality of life of living kidney donors: a multicenter cohort study. *Am J Transplant*. 2011;11:463–469.

414. Lentine KL, Schnitzler MA, Xiao H, et al. Depression diagnoses after living kidney donation: linking U.S. Registry data and administrative claims. *Transplantation*. 2012;94:77–83.

© 2017 Wolters Kluwer

415. Gross CR, Messersmith EE, Hong BA, et al. Health-related quality of life in kidney donors from the last five decades: results from the RELIVE study. Am J Transplant. 2013;13:2924–2934.

416. de Groot IB, Stiggelbout AM, van der Boog PJ, et al. Reduced quality of life in living kidney donors: association with fatigue, societal participation and pre-donation variables. Transpl Int. 2012;25:967–975.

417. Dew MA, DiMartini AF, DeVito Dabbs AJ, et al. Preventive intervention for living donor psychosocial outcomes: feasibility and efficacy in a randomized controlled trial. Am J Transplant. 2013;13:2672–2684.

418. Jowsey SG, Jacobs C, Gross CR, et al. Emotional well-being of living kidney donors: findings from the RELIVE Study. Am J Transplant. 2014;14:2535–2544.

419. Messersmith EE, Gross CR, Beil CA, et al. Satisfaction with life among living kidney donors: a RELIVE study of long-term donor outcomes. Transplantation. 2014;98:1294–1300.

420. Wirken L, van Middendorp H, Hooghof CW, et al. The course and predictors of health-related quality of life in living kidney donors: a systematic review and meta-analysis. Am J Transplant. 2015;15:3041–3054.

421. The Declaration of Istanbul on organ trafficking and transplant tourism. Transplantation 2008;86:1013–1018.

422. Thys K, Schwering KL, Siebelink M, et al. Psychosocial impact of pediatric living-donor kidney and liver transplantation on recipients, donors, and the family: a systematic review. Transpl Int. 2015;28:270–280.

423. Tong A, Chapman JR, Wong G, et al. The motivations and experiences of living kidney donors: a thematic synthesis. Am J Kidney Dis. 2012; 60:15–26.

424. Jacobs CL, Gross CR, Messersmith EE, et al. Emotional and financial experiences of kidney donors over the past 50 Years: The RELIVE study. Clin J Am Soc Nephrol. 2015;10:2221–2231.

425. Clemens KK, Thiessen-Philbrook H, Parikh CR, et al. Psychosocial health of living kidney donors: a systematic review. Am J Transplant. 2006;6:2965–2977.

426. Clarke KS, Klarenbach S, Vlaicu S, et al. The direct and indirect economic costs incurred by living kidney donors—a systematic review. Nephrol Dial Transplant. 2006;21:1952–1960.

427. Rodrigue JR, Schold JD, Morrissey P, et al. Direct and indirect costs following living kidney donation: findings from the KDOC study. Am J Transplant. 2016;16:869–876.

428. Klarenbach S, Gill JS, Knoll G, et al. Economic consequences incurred by living kidney donors: a Canadian multi-center prospective study. Am J Transplant. 2014;14:916–922.

429. Rodrigue JR, Schold JD, Morrissey P, et al. Predonation direct and indirect costs incurred by adults who donated a kidney: findings from the KDOC study. Am J Transplant. 2015;15:2387–2393.

430. Delmonico FL, Martin D, Dominguez-Gil B, et al. Living and deceased organ donation should be financially neutral acts. Am J Transplant. 2015;15:1187–1191.

431. Sickand M, Cuerden MS, Klarenbach SW, et al. Reimbursing live organ donors for incurred non-medical expenses: a global perspective on policies and programs. Am J Transplant. 2009;9:2825–2836.

432. Tushla L, Rudow DL, Milton J, et al. Living-donor kidney transplantation: reducing financial barriers to live kidney donation-recommendations from a Consensus Conference. Clin J Am Soc Nephrol. 2015;10:1696–1702.

433. Lacetera N, Macis M, Stith SS. Removing financial barriers to organ and bone marrow donation: the effect of leave and tax legislation in the U.S. J Health Econ. 2014;33:43–56.

434. Boyarsky BJ, Massie AB, Alejo JL, et al. Experiences obtaining insurance after live kidney donation. Am J Transplant. 2014;14:2168–2172.

435. Yang RC, Thiessen-Philbrook H, Klarenbach S, et al. Insurability of living organ donors: a systematic review. Am J Transplant. 2007;7:1542–1551.

436. Yang RC, Young A, Nevis IF, et al. Life insurance for living kidney donors: a Canadian undercover investigation. Am J Transplant. 2009;9:1585–1590.

437. Mittelman M, Thiessen C, Chon WJ, et al. Miscommunicating NOTA can be costly to living donors. Am J Transplant. 2017;17:578–580.

438. American Society of Transplantation (AST). Live Donor Financial Toolkit. Available at: https://www.myast.org/patient-information/live-donor-toolkit. (Accessed: September 7, 2016).

439. Frade IC, Fonseca I, Dias L, et al. Impact assessment in living kidney donation: psychosocial aspects in the donor. Transplant Proc. 2008;40:677–681.

440. Giessing M, Reuter S, Schönberger B, et al. Quality of life of living kidney donors in Germany: a survey with the Validated Short Form-36 and Giessen Subjective Complaints List-24 questionnaires. Transplantation. 2004;78:864–872.

441. Haljamae U, Nyberg G, Sjostrom B. Remaining experiences of living kidney donors more than 3 yr after early recipient graft loss. Clin Transplant. 2003;17:503–510.

442. Johnson EM, Anderson JK, Jacobs C, et al. Long-term follow-up of living kidney donors: quality of life after donation. Transplantation. 1999;67:717–721.

443. Weizer N, Weizman A, Shapira Z, et al. Suicide by related kidney donors following the recipients' death. Psychother Psychosom. 1989;51:216–219.

444. Manyalich M, Ricart A, Martinez I, et al. EULID project: European living donation and public health. Transplant Proc. 2009;41:2021–2024.

445. Thiel GT, Nolte C, Tsinalis D. Prospective Swiss cohort study of living-kidney donors: study protocol. BMJ Open. 2011;1:e000202.

446. Iacoviello BM, Shenoy A, Braoude J, et al. The live donor assessment tool: a psychosocial assessment tool for live organ donors. Psychosomatics. 2015;56:254–261.

447. Ismail SY, Duerinckx N, van der Knoop MM, et al. Toward a conceptualization of the content of psychosocial screening in living organ donors: an ethical legal psychological aspects of transplantation consensus. Transplantation. 2015;99:2413–2421.

448. Fonouni H, Mehrabi A, Golriz M, et al. Comparison of the laparoscopic versus open live donor nephrectomy: an overview of surgical complications and outcome. Langenbecks Arch Surg. 2014;399:543–551.

449. Liu N, Wazir R, Wang J, et al. Maximizing the donor pool: left versus right laparoscopic live donor nephrectomy—systematic review and meta-analysis. Int Urol Nephrol. 2014;46:1511–1519.

450. Wilson CH, Sanni A, Rix DA, et al. Laparoscopic versus open nephrectomy for live kidney donors. Cochrane Database Syst Rev. 2011:CD006124.

451. Yuan H, Liu L, Zheng S, et al. The safety and efficacy of laparoscopic donor nephrectomy for renal transplantation: an updated meta-analysis. Transplant Proc. 2013;45:65–76.

452. Tanaka M, Ono Y, Matsuda T, et al. Guidelines for urological laparoscopic surgery. Int J Urol. 2009;16:115–125.

453. Gibbons N, Nicol D, CARI. The CARI guidelines. Surgical techniques in living donor nephrectomy. Nephrology (Carlton). 2010;15(Suppl 1):S88–S95.

454. Dols LF, Kok NF, d'Ancona FC, et al. Randomized controlled trial comparing hand-assisted retroperitoneoscopic versus standard laparoscopic donor nephrectomy. Transplantation. 2014;97:161–167.

455. Cohen AJ, Williams DS, Bohorquez H, et al. Robotic-assisted laparoscopic donor nephrectomy: decreasing length of stay. Ochsner J. 2015;15:19–24.

456. Laplace B, Ladriere M, Claudon M, et al. Robotic assisted laparoscopic living donor nephrectomy: preoperative assessment and results of 100 cases. Prog Urol. 2014;24:288–293.

457. Tzvetanov I, Bejarano-Pineda L, Giulianotti PC, et al. State of the art of robotic surgery in organ transplantation. World J Surg. 2013;37:2791–2799.

458. Kaouk JH, Khalifeh A, Laydner H, et al. Transvaginal hybrid natural orifice transluminal surgery robotic donor nephrectomy: first clinical application. Urology. 2012;80:1171–1175.

459. Alcaraz A, Musquera M, Peri L, et al. Feasibility of transvaginal natural orifice transluminal endoscopic surgery-assisted living donor nephrectomy: is kidney vaginal delivery the approach of the future? Eur Urol. 2011;59:1019–1025.

460. Kortram K, Ijzermans JN, Dor FJ. Perioperative events and complications in minimally invasive live donor nephrectomy: a systematic review and meta-analysis. Transplantation. 2016;100:2264–2275.

461. Gupta A, Ahmed K, Kynaston HG, et al. Laparoendoscopic single-site donor nephrectomy (LESS-DN) versus standard laparoscopic donor nephrectomy. Cochrane Database Syst Rev. 2016:CD010850.

462. Khalil A, Mujtaba MA, Taber TE, et al. Trends and outcomes in right vs. left living donor nephrectomy: an analysis of the OPTN/UNOS database of donor and recipient outcomes—should we be doing more right-sided nephrectomies? Clin Transplant. 2016;30:145–153.

463. Dols LF, Kok NF, Alwayn IP, et al. Laparoscopic donor nephrectomy: a plea for the right-sided approach. Transplantation. 2009;87:745–750.

464. Klop KW, Kok NF, Dols LF, et al. Can right-sided hand-assisted retroperitoneoscopic donor nephrectomy be advocated above standard laparoscopic donor nephrectomy: a randomized pilot study. Transpl Int. 2014;27:162–169.

465. Apisarnthanarak P, Suvannarerg V, Muangsomboon K, et al. Renal vascular variants in living related renal donors: evaluation with CT angiography. J Med Assoc Thai. 2012;95:941–948.

466. Roza AM, Perloff LJ, Naji A, et al. Living-related donors with bilateral multiple renal arteries. A twenty-year experience. Transplantation. 1989;47:397–399.

S104    Transplantation ■ August 2017 ■ Volume 101 ■ Number 5    www.transplantjournal.com

467. Flechner SM, Sandler CM, Houston GK, et al. 100 living-related kidney donor evaluations using digital subtraction angiography. *Transplantation*. 1985;40:675–678.

468. Ahmadi AR, Lafranca JA, Claessens LA, et al. Shifting paradigms in eligibility criteria for live kidney donation: a systematic review. *Kidney Int*. 2015;87:31–45.

469. Friedman AL, Peters TG, Ratner LE. Regulatory failure contributing to deaths of live kidney donors. *Am J Transplant*. 2012;12:829–834.

470. Friedman AL, Peters TG, Jones KW, et al. Fatal and nonfatal hemorrhagic complications of living kidney donation. *Ann Surg*. 2006;243: 126–130.

471. Janki S, Verver D, Klop KW, et al. Vascular management during live donor nephrectomy: an online survey among transplant surgeons. *Am J Transplant*. 2015;15:1701–1707.

472. Serrano OK, Bangdiwala AS, Vock DM, et al. Defining the tipping point in surgical performance for laparoscopic donor nephrectomy among transplant surgery fellows: a risk-adjusted cumulative summation learning curve analysis. *Am J Transplant*. 2017;17:1868–1878.

473. European Union. Toolbox Living Kidney Donation. Developed by experts of the working group on living donation nominated by their National Competent Authorities (CAs) established by Directive 2010/53/EU]. 2014. Available at: http://ec.europa.eu/health/blood_tissues_organs/docs/eutoolbox_living_kidney_donation_en.pdf. (Accessed: September 7, 2016).

474. Lopp L. *Regulations Regarding Living Organ Donation in Europe. Possibilities of Harmonisation*. Springer-Verlag Berlin Heidelberg; 2013.

475. Lennerling A, Lovén C, Dor FJ, et al. Living organ donation practices in Europe—results from an online survey. *Transpl Int*. 2013;26:145–153.

476. Thys K, Van Assche K, Nobile H, et al. Could minors be living kidney donors? A systematic review of guidelines, position papers and reports. *Transpl Int*. 2013;26:949–960.

477. Van Assche K, Genicot G, Sterckx S. Living organ procurement from the mentally incompetent: the need for more appropriate guidelines. *Bioethics*. 2014;28:101–109.

478. Veatch R. *Transplantation Ethics. Chapter 12: Live Donor Transplant*. Georgetown University Press; 2000.

479. Tenenbaum EM. Bartering for a compatible kidney using your incompatible, live kidney donor: legal and ethical issues related to kidney chains. *Am J Law Med*. 2016;42:129–169.

480. Tong A, Ralph A, Chapman JR, et al. Public attitudes and beliefs about living kidney donation: focus group study. *Transplantation*. 2014;97: 977–985.

481. Young A, Karpinski M, Treleaven D, et al. Differences in tolerance for health risk to the living donor among potential donors, recipients, and transplant professionals. *Kidney Int*. 2008;73:1159–1166.

482. Rodrigue JR, Cornell DL, Kaplan B, et al. Patients' willingness to talk to others about living kidney donation. *Prog Transplant*. 2008;18:25–31.

483. Waterman AD, Morgievich M, Cohen DJ, et al. Living donor kidney transplantation: Improving education outside of transplant centers about live donor transplantation—recommendations from a consensus conference. *Clin J Am Soc Nephrol*. 2015;10:1659–1669.

484. OPTN (Organ Procurement and Transplantation Network)/UNOS (United Network for Organ Sharing): OPTN 2015 Strategic Plan. Available at: http://optn.transplant.hrsa.gov/governance/strategic-plan/. (Accessed: September 7, 2016).

485. Taylor M. White House gets major commitments on organ transplants, donations. June 13, 2016. Available at: http://medcitynews.com/2016/06/white-house-organ-transplants/. (Accessed: September 7, 2016).

486. Garonzik-Wang JM, Berger JC, Ros RL, et al. Live donor champion: finding live kidney donors by separating the advocate from the patient. *Transplantation*. 2012;93:1147–1150.

487. Rodrigue JR, Pavlakis M, Egbuna O, et al. The "House Calls" trial: a randomized controlled trial to reduce racial disparities in live donor kidney transplantation: rationale and design. *Contemp Clin Trials*. 2012;33:811–818.

488. Rodrigue JR, Cornell DL, Lin JK, et al. Increasing live donor kidney transplantation: a randomized controlled trial of a home-based educational intervention. *Am J Transplant*. 2007;7:394–401.

489. Ismail SY, Luchtenburg AE, Timman R, et al. Home-based family intervention increases knowledge, communication and living donation rates: a randomized controlled trial. *Am J Transplant*. 2014;14:1862–1869.

490. Waterman AD, Robbins ML, Peipert JD. Educating prospective kidney transplant recipients and living donors about living donation: practical and theoretical recommendations for increasing living donation rates. *Curr Transplant Rep*. 2016;3:1–9.

491. Kumar K, King EA, Muzaale AD, et al. A smartphone app for increasing live organ donation. *Am J Transplant*. 2016;16:3548–3553.

492. Erickson J, Barbero R, Brewster M. A call to action to help reduce the waiting list for organ transplants. 2016. Available at: https://www.whitehouse.gov/blog/2016/09/01/call-action-help-reduce-waiting-list-organ-transplants. (Accessed: September 7, 2016).

493. Allen MB, Reese PP. The ethics of promoting living kidney donation using nonargumentative influence: applications, concerns, and future directions. *Am J Transplant*. 2016;16:3378–3384.

494. Wright L, Faith K, Richardson R, et al. Ethical guidelines for the evaluation of living organ donors. *Can J Surg*. 2004;47:408–413.

495. Frunza M, Van Assche K, Lennerling A, et al. Dealing With public solicitation of organs from living donors—an ELPAT view. *Transplantation*. 2015;99:2210–2214.

496. Wright L. Ethical controversies in public solicitations for organs. *Transplant Rev (Orlando)*. 2008;22:184–186.

497. Neidich EM, Neidich AB, Cooper JT, et al. The ethical complexities of online organ solicitation via donor-patient websites: avoiding the "beauty contest." *Am J Transplant*. 2012;12:43–47.

498. International Summit on Transplant Tourism and Organ Trafficking. The Declaration of Istanbul on organ trafficking and transplant tourism. *Kidney Int* 2008;74:854–859.

499. Andrews PA, Burnapp L, Manas D, et al. Summary of the British Transplantation Society/Renal Association U.K. guidelines for living donor kidney transplantation. *Transplantation*. 2012;93:666–673.

500. Hays R, Rodrigue JR, Cohen D, et al. Financial neutrality for living organ donors: reasoning, rationale, definitions, and implementation strategies. *Am J Transplant*. 2016;16:1973–1981.

501. NOTA. National Organ Transplant Act. 42 U.S.C. § 273 §274. 1984. https://history.nih.gov/research/downloads/PL98-507.pdf. Accessed January 24, 2017.

502. LaPointe Rudow D, Cohen D. Practical approaches to mitigating economic barriers to living kidney donation for patients and programs. *Curr Transpl Rep*. 2017;4:24–31.

503. Radio New Zealand. New law gives financial assistance to organ donors. http://www.radionz.co.nz/news/political/319407/new-law-gives-financial-assistance-to-organ-donors. (Accessed on Jan 14, 2017).

504. American Society of Transplant Surgeons. Lost Wages Reimbursement for Living Organ Donors Trial Announced. https://asts.org/news-and-publications/asts-news/article/2016/12/21/lost-wages-reimbursement-for-living-organ-donors-trial-announced#WHqB1H05BQp. (Accessed January 14, 2017).

505. Gaston RS, Danovitch GM, Epstein RA, et al. Limiting financial disincentives in live organ donation: a rational solution to the kidney shortage. *Am J Transplant*. 2006;6:2548–2555.

506. Joshi S, Kupin W. Reciprocating living kidney donor generosity: tax credits, health insurance and an outcomes registry. *Clin Kidney J*. 2016;9:168–171.

507. Congressional Research Service. Summaries for the Living Donor Protection Act of 2016. Available at: https://www.govtrack.us/congress/bills/114/hr4616/summary. (Accessed: September 7, 2016).

508. Gill JS, Delmonico F, Klarenbach S, et al. Providing coverage for the unique lifelong health care needs of living kidney donors within the framework of financial neutrality. *Am J Transplant*. 2017;17:1176–1181.

510. Matas AJ. The rationale for incentives for living donors: an international perspective? *Curr Transpl Rep*. 2015;2:44–51.

511. Wright L, Anstey A. *Contact Between Living Anonymous Donors and Recipients: Ethical Issues. Ethical, Legal and Psychological Aspects of Transplantation. Global Issues, Local Solutions. (Weimar W, Bos MA, van Busschbach JJ: eds.)*. Lengerich, Germany: Pabst Publishers; 2014.

512. OPTN (Organ Procurement and Transplantation Network)/UNOS (United Network for Organ Sharing). OPTN Policies, Policy 8: Allocation of Kidneys. Available at: http://optn.transplant.hrsa.gov/governance/policies. (Accessed: June 28, 2017).

513. Muzaale AD, Massie AB, Kucirka LM, et al. Outcomes of live kidney donors who develop end-stage renal disease. *Transplantation*. 2016; 100:1306–1312.

514. Potluri V, Harhay MN, Wilson FP, et al. Kidney transplant outcomes for prior living organ donors. *J Am Soc Nephrol*. 2015;26:1188–1194.

515. Stewart DE, Kucheryavaya AY, Klassen DK, et al. Changes in deceased donor kidney transplantation one year after KAS implementation. *Am J Transplant*. 2016;16:1834–1847.

516. Wainright JL, Klassen DK, Kucheryavaya AY, et al. Delays in prior living kidney donors receiving priority on the transplant waiting list. *Clin J Am Soc Nephrol*. 2016;11:2047–2052.

C. Agnello    SE 0323

© 2017 Wolters Kluwer

517. Lavee J, Ashkenazi T, Gurman G, et al. A new law for allocation of donor organs in Israel. *Lancet*. 2010;375:1131–1133.

518. Lavee J, Ashkenazi T, Stoler A, et al. Preliminary marked increase in the national organ donation rate in Israel following implementation of a new organ transplantation law. *Am J Transplant*. 2013;13: 780–785.

519. Tumin M, Rasiah R, Noh A, et al. Living kidney donation: the importance of public education. *Clin Transplant*. 2014;28:423–427.

520. Salomon DR, Langnas AN, Reed AI, et al. AST/ASTS workshop on increasing organ donation in the United States: creating an "arc of change" from removing disincentives to testing incentives. *Am J Transplant*. 2015;15:1173–1179.

521. Tong A, Chapman JR, Wong G, et al. Perspectives of transplant physicians and surgeons on reimbursement, compensation, and incentives for living kidney donors. *Am J Kidney Dis*. 2014;64: 622–632.

522. Mandelbrot DA, Pavlakis M, Karp SJ, et al. Practices and barriers in long-term living kidney donor follow-up: a survey of U.S. transplant centers. *Transplantation*. 2009;88:855–860.

523. Leichtman A, Abecassis M, Barr M, et al. Living kidney donor follow-up: state-of-the-art and future directions, conference summary and recommendations. *Am J Transplant*. 2011;11:2561–2568.

524. Van Assche K, Sterckx S, Lennerling A, et al. The relevance of Directive 2010/53/EU for living organ donation practice: an ELPAT view. *Transplantation*. 2015;99:2215–2222.

525. OPTN/UNOS Living Donor Committee. *Procedures to collect post-donation follow-up data from living donors*. Available at: https://optn.transplant.hrsa.gov/resources/guidance/procedures-to-collect-post-donation-follow-up-data-from-living-donors/. (Accessed: Septebmer 7, 2015).

526. Litwin MS. Editorial comment: the psychosocial impact of donating a kidney. *J Urol*. 1997;157:1600–1601.

527. Manyalich M, Manyvar A, Yucetin L, et al. Living donor psychosocial assessment/follow-up practices in the partners' countries of the ELIPSY project. *Transplant Proc*. 2012;44:2246–2249.

528. Weng FL, Reese PP, Waterman AD, et al. Health care follow-up by live kidney donors more than three yr post-nephrectomy. *Clin Transplant*. 2012;26:E300–E306.

529. Reith P. Adapting the selective periodic health exam to a college-aged population. Joint American Preventive Services Task Force. Canadian Task Force on Health Care Screening. *J Am Coll Health*. 1989;38:109–113.

530. Schold JD, Buccini LD, Rodrigue JR, et al. Critical factors associated with missing follow-up data for living kidney donors in the United States. *Am J Transplant*. 2015;15:2394–2403.

531. Ommen ES, LaPointe Rudow D, Medapalli RK, et al. When good intentions are not enough: obtaining follow-up data in living kidney donors. *Am J Transplant*. 2011;11:2575–2581.

532. Davis CL. Living kidney donor follow-up: state-of-the-art and future directions. *Adv Chronic Kidney Dis*. 2012;19:207–211.

533. Casagrande LH, Collins S, Warren AT, et al. Lack of health insurance in living kidney donors. *Clin Transplant*. 2012;26:E101–E104.

534. Rodrigue JR, Fleishman A. Health insurance trends in United States living kidney donors (2004 to 2015). *Am J Transplant*. 2016;16:3504–3511.

535. Wainright J, McBride M, Dew MA, et al. Follow-up reporting for living kidney donors. Abstr 195. *Am J Transplant*. 2013;13:90.

536. Keshvani N, Feurer ID, Rumbaugh E, et al. Evaluating the Impact of performance improvement initiatives on transplant center reporting compliance and patient follow-up after living kidney donation. *Am J Transplant*. 2015;15:2126–2135.

537. Scientific Registry of Transplant Recipients. The Living Donor Collective: SRTR to Launch a Pilot Project to Create a Registry of Living Donors. https://www.srtr.org/news-media/news/news-items/news/. (Accessed June 28, 2017).

538. Lentine KL, Segev DL. Better understanding live donor risk through big data. *Clin J Am Soc Nephrol*. 2013;8:1645–1647.

539. Kulkarni S, Thiessen C, Formica RN, et al. The long-term follow-up and support for living organ donors: A center-based initiative founded on developing a community of living donors. *Am J Transplant*. 2016;16:3385-3391.

C.Agnello    SE 0324



# EXHIBIT M

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

C.Agnello   SE 0325



SEGUNDA OPINIÓN          BOOK ONLINE

# What Is the Life Expectancy of a Person on Kidney Dialysis?

HOME . WHAT IS THE LIFE EXPECTANCY OF A PERSON ON KIDNEY DIALYSIS?





July 14, 2025 by [admin](#)

If you or someone you care about is facing [kidney dialysis](#), this question is probably weighing heavily on your mind. It's completely natural to want to understand what lies ahead, and any kidney specialist will tell you that while the statistics provide a framework, every person's situation is unique. The reality is that kidney dialysis has helped millions of people live longer, more fulfilling lives, though life expectancy depends on many individual factors.

# Understanding the Numbers

The [statistics](#) around dialysis life expectancy can seem overwhelming at first. According to recent data, the average five-year survival rate for dialysis patients is approximately 35–40%. This means that about 4 out of 10 people on dialysis are still alive five years after starting treatment.



# Age Makes a Substantial Difference

Younger patients on dialysis often have survival rates that are much more encouraging. People under 45 who start dialysis have a five-year survival rate of about 85%. This drops to around 60% for those between 45-64 and continues to decline with advancing age.

This doesn't mean older patients can't do well on dialysis—many do. But it does highlight why your kidney specialist will consider your age, along with other factors, when discussing your prognosis and treatment options.

# Other Health Conditions Impact Outcomes

Your overall health status when starting dialysis significantly affects your life expectancy. Diabetes and heart disease are the two most common conditions that accompany kidney failure, and both can complicate your prognosis.

People with diabetes who require dialysis typically have shorter life expectancies than those without diabetes. Similarly, existing heart problems can make dialysis more challenging and affect long-term outcomes. However, proper management of these conditions can improve your prognosis substantially.



# Matters

There are two main types of dialysis: hemodialysis and peritoneal dialysis. Hemodialysis is typically performed at a dialysis center three times per week, while peritoneal dialysis can often be done at home daily.

Some studies suggest that peritoneal dialysis may offer survival advantages, particularly in the first few years of treatment. However, the best type of kidney dialysis for you depends on your specific medical situation, lifestyle, and personal preferences.

# Quality of Life Considerations

While survival statistics are important, quality of life is equally significant. Many people on dialysis continue to work, travel, and maintain active social lives. The key is finding the right balance between treatment and living your life.

# The Importance of Compliance

One of the biggest factors affecting life expectancy on dialysis is how well you follow your treatment plan. This includes showing up for all scheduled dialysis sessions, taking prescribed medications, and following dietary restrictions.

Skipping dialysis sessions or not following your fluid restrictions can lead to serious complications and a shorter life expectancy. Your kidney specialist and dialysis team will work with you to make compliance as manageable as possible.



# Transplant as a Game Changer

For many people, a kidney transplant represents the best long-term option. The life expectancy for someone with a successful kidney transplant is significantly better than staying on dialysis long-term.

However, not everyone is a candidate for transplant, and the waiting list for donor kidneys can be long. Your kidney specialist will evaluate whether you're a good transplant candidate and help you navigate the process if appropriate.

# Lifestyle Factors That Help

Several lifestyle factors can improve your outcomes on dialysis. Maintaining good nutrition, staying as active as possible, managing stress, and keeping up with preventive medical care all contribute to better health and longer life expectancy.

Regular exercise, performed within the limits set by your healthcare team, can improve your energy levels and overall health. Mental health support is also crucial, as depression and anxiety are common among dialysis patients and can affect treatment outcomes.

# The Role of Your Healthcare Team

Your kidney specialist and dialysis team play crucial roles in your long-term success. Regular monitoring, adjusting treatment as needed, and addressing complications early all contribute to better outcomes.



# What To Expect

While facing kidney dialysis can feel overwhelming, remember that treatment continues to improve. New technologies, better understanding of patient needs, and improved medications are constantly enhancing outcomes for dialysis patients.

If you have questions about kidney dialysis, schedule a consultation with our kidney doctor today.

📁 Dialysis

🏷️ dialysis, dialysis faqs, quality of life

‹ Does Hypertension Cause Headaches?

› Can Acute Kidney Injuries Lead to Chronic Disease?

# Recent Posts

How End-Stage Renal Disease Affects the Entire Body

Causes of Proteinuria: When Should You Be Concerned?

Can Exercise Lower Blood Pressure?

Lifestyle Changes That Help Manage Diabetes Long-Term

Can Acute Kidney Injuries Lead to Chronic Disease?



## Beverly Hills

3 1 0 . 5 5 0 . 6 2 4 0

50 North La Cienega Boulevard, Suite 310,
Beverly Hills, CA 90211

## Follow Us



PRIVACY POLICY | TERMS & CONDITIONS | HIPAA PRIVACY POLICY | CONTACT US

COPYRIGHT © 2026 VICTOR GURA, M.D.



# EXHIBIT N

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)



U.S.    Nancy Guthrie    Winter Olympics    World    Politics    HealthWatch    MoneyWatch    Entertainment    Crime    Sports    The

<u>U.S.</u>

# Sisters Leave Prison Under Kidney Sharing Deal

January 7, 2011 / 7:11 AM EST / CBS/AP

⊞ Add CBS News on Google

*Last Updated 4:27 p.m. ET*

PEARL, Miss. - Two imprisoned sisters whose life sentences were suspended on the condition that one donates a kidney to the other have been released from a Mississippi prison.

Jamie and Gladys Scott, who have been been incarcerated for 16 years, left the Central Mississippi Correctional Facility in an SUV and waved to reporters early Friday.

"We're free," they yelled. "God bless y'all."

An afternoon news conference for the sisters in Jackson was attended by dozens of supporters. Many cheered. Some sang. A few cried.

C.Agnello    SE 0335

The sisters - Jamie wearing pink, Gladys wearing purple - sat smiling at a table, their hands clasped before them as their attorney, Chokwe Lumumba, thanked a list of advocacy groups who worked for their release.

"We just totally blessed. We totally blessed," Gladys Scott said. "It's been a long, hard road, but we made it."



Gladys said she learned about her release on television.

"I just started screaming and hollering. I'm still screaming and hollering," she said.

Jamie said she looked forward to moving on her with her life and doubted at times she'd ever be free, but she leaned on her faith.

C.Agnello   SE 0336

"My sister been saying all day, 'You don't look well,'" she said. "I haven't woke up. It's like a dream."

Watch CBS News

Jamie said the reality of the situation will probably sink in when she sees her grown children, who were young kids when they went to prison. She said she would have a dialysis treatment Saturday morning in Florida.

The sisters are moving to Pensacola in the Florida Panhandle to live with their mother. They hope to qualify for government-funded Medicaid insurance to pay for the transplant and for 36-year-old Jamie Scott's dialysis, which officials said had cost Mississippi about $200,000 a year. A few doctors have expressed interest in performing the transplant, but there are no firm plans yet.

Gov. Haley Barbour agreed to release her because of her medical condition. But 38-year-old Gladys Scott's release order says she must donate the kidney within one year.

C.Agnello  SC 0337

The idea to donate the kidney was Gladys Scott's, and she volunteered to do it in her petition for early release.

Watch CBS News

The sisters' attorney, Chokwe Lumumba, said the first thing they want to do is eat a good meal.

"And you know how women are. They want to get some clothes," he said.

Lumumba spoke in an open field used for law enforcement training just across a highway from the prison on a cold winter morning.

A news helicopter circled over the massive prison complex, which sits on a rural stretch of highway in Pearl in central Mississippi.

Corrections Commissioner Chris Epps said the state will supply them with 30 days of medication. Jamie Scott was scheduled to have a dialysis treatment Thursday at the prison.

Epps said once the sisters are in Florida, local probation officials will take over their case.

C.Agnello   SE 0338

Jo Ellyn Rackleff, a spokeswoman for the Florida Department of Corrections, said officials there expect the women to report Monday, but they may come in sooner and they have until Jan. 18.

They'll have to report to probation officers for the rest of their lives, reports **CBS News correspondent Kelly Cobiella**.

Lumumba said the women hope to get government-funded Medicaid health insurance in Florida and begin the needed steps to make the transplant happen.

Lumumba said a few doctors have expressed an interest in performing the kidney transplant, but there are no firm plans yet. And the sisters need to undergo testing to make sure they are compatible.

Some medical experts said the arrangement for the sisters' release raises legal and ethical concerns, but their supporters say Gladys Scott wants to try to save her sister's life.

For instance, the condition could be interpreted as trading an organ for freedom, which could violate federal laws against selling organs, said Arthur Caplan, director of the Center for Bioethics at the University of Pennsylvania.

The American Society of Transplantation called Friday for Barbour to issue a formal statement saying the transplant will no longer be tied to the women's early release from prison.

C.Agnello   SC 0339

"The decision to donate an organ should be a truly selfless act, free from
coercion and not conditioned on financial or any other material gain," the
group's president, Dr. Maryl R. Johnson, said in a statement.

Watch CBS News

The Scott sisters' surroundings in Pensacola will be a far cry from the tall
fences and concertina wire that wrap the perimeter of the prison along a
rural state road near a police academy and mental hospital. The facility
houses male and female inmates under conditions ranging from minimum-
to maximum-security.

The two women have been held recently in different parts of the Central
Mississippi Correctional Facility in Pearl, and it's unlikely they had much
interaction in the sprawling complex of 13 housing units on 171 acres.

The Scotts were convicted in 1994 of leading two men into an ambush in
central Mississippi the year before. The robbery didn't net much; amounts
cited have ranged from $11 to $200.

Mitchell Duckworth, one of the women's victims, told The Associated Press
in a phone interview Thursday that he believes the sisters planned the
robbery. He remembered it as a terrifying experience in which he was
assaulted with a shotgun, and said he's thankful to be alive.

"I just really don't even want to think about that anymore," he said.

Still, Duckworth said, he thinks the women have served enough time for the
crime and wasn't concerned with them being released.

C.Agnello   SE 0340

"I think it's all right as long as they've been there," Duckworth said.

Watch CBS News

National NAACP President and CEO Benjamin Todd Jealous, who says the women's double life sentences were the result of prejudice in the judicial system, has called Barbour's decision to suspend the sentences "a shining example" of the power of clemency.

The NAACP said Thursday in statement attributed to Jealous that he shares concerns about the condition of release, but right now he's focused on the sisters "getting the freedom they have won, the health care they need and ultimately the full pardon they deserve."

The Scott sisters' attorney and advocacy groups have long cited $11 as the amount taken in the robbery, though there's been some dispute about exactly how much was stolen. The lower amount has been used to illustrate that the crime did not merit the life sentences the women received.

However, one of the victims in the case testified that he was robbed of about $200. A 14-year-old boy involved in the crime testified that his cut was between $9 and $11. Lumumba says the $11 amount trumpeted by advocacy groups is based on the indictment, which says they stole "in excess of $10."

Whatever the case, the sisters' supporters say the life sentences were excessive. The sisters are black, and their case has been a cause celebre in the state's African-American community.

C.Agnello   SE 0341

© 2011 CBS Interactive Inc. All Rights Reserved. This material may not be published, broadcast, rewritten, or redistributed. The Associated Press contributed to this report.

Watch CBS News

**Featured**

Nancy Guthrie Updates

Milan Winter Olympics 2026

UFC Results

Winter Olympics Medal Count

**Follow Us On**

YouTube

Facebook

Instagram

X

**Privacy**

Privacy Policy

California Notice

Your Privacy Choices

Terms of Use

**More from CBS News**

Newsletters

Podcasts

Download Our App

Brand Studio

Sitemap

**Company**

About Paramount

Advertise With Paramount

Join Our Talent Community

Help

Feedback

Contact the Ombudsman

Copyright ©2026 CBS Interactive Inc. All rights reserved.

C.Agnello    SE 0342



# EXHIBIT O

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

COMMENTARY

# The Mississippi Decision Exchanging Parole for Kidney Donation: Is This the Beginning of Change for Altruistic-Based Human Organ Donation Policy in the United States?

Christopher M. Burkle, MD, JD

Governor Haley Barbour's recent decision to indefinitely suspend the life sentences of 2 Mississippi sisters convicted of a 1994 armed robbery drew considerable media attention worldwide.[1-3] Jamie and Gladys Scott were reported to be traveling in a car with 2 men. When Jamie feigned illness, the driver of the car pulled over to the side of the road, at which point 3 men who had been following in a car behind robbed the 2 men at gunpoint. The 3 men who were arrested along with the Scott sisters pled guilty and were sentenced to shorter prison terms in exchange for testifying against Jamie and Gladys. That the women were black, living in the South, and sentenced to what many thought a harsh prison term for a crime netting a mere $11 prompted critical social examination. Health care professionals and bioethicists alike were further drawn to an element of Governor Barbour's decision that crossed into the realm of long-standing social transplant policy. At the time of the suspension, Jamie was undergoing dialysis treatment at an annual cost to the state of $200,000 and was scheduled for early release because of her need for a kidney transplant. According to the governor's office, in her petition to the Mississippi parole board for early release in 2010, Gladys voluntarily offered to donate her kidney to her incarcerated sister.[4] The governor explained that, after the sisters' request for early release, the Mississippi parole board recommended against either a pardon or a commuted sentence. On further review of the sisters' case, the board determined that the Scotts were no longer a threat to society and granted an indefinite suspension of their sentences.[4]

Gladys' indefinite suspension, which state officials describe as equivalent to parole, requires her to donate her kidney to her 36-year-old sister within 1 year after her release. The governor reportedly has said that the kidney donation "should be scheduled with urgency."[4] At the time of the sisters' release from the Mississippi Department of Corrections facility on January 7, 2011, no information was available as to tissue compatibility or other potential limitations to the prospect of a medically optimized transplant. Although the governor has yet to publically announce whether he will require the sisters to return to prison in the event of a failure to proceed with the conditioned kidney transplant, NAACP (National Association for the Advancement of Colored People) President Benjamin Jealous stated that, during his meeting with the governor, he was told that Gladys will not go back to prison if her kidney is not a match.[5]

The purpose of this article is to evaluate the recent decision made by Mississippi state officials in the context of current organ transplant legislation. A brief description of the theoretical concepts that involve criminal punishment and parole affords a better appreciation of whether the Mississippi decision aligns with the traditional goals established by the criminal justice system. The criminal justice market and the market for human organs are compared. Examining prior legislative efforts assists in unmasking the potential conflict introduced by combined decisions involving the criminal justice system and human organ transplant donation. Finally, this article argues that, although the State of Mississippi decision, and any further public reaction that follows, may offer some preliminary insight as to a willingness to deviate from purely altruistic motives regulating solid organ donation in the United States, it will likely fail as the first true test of a criterion for change.

## THEORIES OF CRIMINAL PUNISHMENT

Theories justifying punishment of criminal activity fall into 2 broad categories of thought: retribution and utilitarian.[6] Retributivists base their rationalization for punishment on the principle that people who commit crimes deserve to be punished ("an eye for an eye").[6,7] It is a backward looking approach of punishing what has already been committed.[6] The goal of retribution is to counter the advantage the criminal has seized by refusing to live within the laws of society.[6] Popularized by Immanuel Kant during the 18th century, retribution notions strongly influenced the drafters of the US Constitution.[6,7] With the retribution theory, behavior while incarcerated, future risk of criminal acts, and plans for activities after release are all made irrelevant to the choice of punishment.[7] Retribution, or "just des-

From the Department of Anesthesiology, Mayo Clinic, Rochester, MN.

An earlier version of this article appeared Online First.

Individual reprints of this article are not available. Address correspondence to Christopher M. Burkle, MD, JD, Department of Anesthesiology, Mayo Clinic, 200 First St SW, Rochester, MN 55905 (burkle.christopher@mayo.edu).

© 2011 Mayo Foundation for Medical Education and Research

For personal use. Mass reproduce only with permission from *Mayo Clinic Proceedings*.

C. Aiello — SC 0344

serts," was a popular method of criminal punishment until the 1980s, as reflected by lengthy prison terms and limited chance for parole.[7] On the basis of a backward looking approach model, retribution could place a temporal length on punishment without the need for future term adjustment through parole processes.

In contrast to retribution bases for criminal punishment, utilitarian theories use a forward looking approach.[6] Utilitarians validate the need for punishment by referring to the alleged benefits that accrue after implementation.[6] Three fundamental paradigms are within the boundaries of utilitarian punishment theory.[6] General deterrence acts on the assumption that a person's awareness of the risk of punishment after a crime will reduce the likelihood that he or she will commit a future crime. Incapacitation restricts a criminal's ability to commit a future crime against society by removing him or her from the public forum. Finally, and perhaps of most interest to the public, the goal of utilitarian theory is to use punishment as a means of reform. Similar in some respect to utilitarian incapacitation concepts, reform efforts act to protect the public by changing the mindset of the criminal, rather than simply removing the criminal from the victim-rich environment. Because punishment works to mitigate the risk that the criminal presents to society, utilitarian theory offers a better association with truncating prison terms through parole measures than does its retribution counterpart.[7]

## MARKET CONCEPTS

Market concepts have been used to describe both the criminal justice sentencing system and human organ transplant programs.[8,9] In her 2009 law review article, Lee[9] explained how exchanges of guilty pleas for mitigated sentence terms could equate to market practices. Prosecutors are awarded ease of conviction in return for proposing truncated sentence terms. Criminals benefit from shorter incarceration terms in exchange for giving up both their right to trial by jury and their constitutional protections involving self-incrimination. Lee[9] classifies the criminal justice market as an "open" market because it allows for public oversight and accountability. Because most judges and public prosecutors who formulate terms of incarceration are voted into office, the public may refuse to reelect them if dissatisfied with their decisions. Criminal justice markets require less fixed regulatory oversight because they are visible, or open, to public scrutiny.

In contrast to the criminal justice sentencing market, the human body parts market often requires substantial regulatory oversight.[8,9] The degree of openness in the human body market varies on the basis of the scarcity of the body part being exchanged.[9] Some of the more common exchanges involving human body parts include those that are either plentiful or regenerated with reasonable ease (eg, hair, sperm, eggs, and blood). Blood donation must occur on a volunteer and uncompensated basis, whereas sperm and egg donors may receive payment in exchange for their product. Interestingly, some egg and sperm donors may benefit from a graduated payment system based on intelligence and beauty traits.[9]

The human organ market involves a product that is scarce and vital to continued life. As such, it is more regulated and therefore better described by closed market theories. The first piece of federal action impacting human organ donation in the United States was the Uniform Anatomical Gift Act (UAGA) of 1968.[8-10] Despite its title, the UAGA could not be classified as either an act or legislation.[11] Instead, it was meant to serve as a model on which states could base their own statutes. Until that time, state laws varied in the handling of organ procurement practices.[11] Passage of the UAGA helped to reduce differences in state laws while simplifying the process with which people could become organ donors.[9-11] Although the body of the text of the UAGA did not expressly address human organ sales, some have argued that the term *gift* used in its title was intended to prohibit monetary or other types of exchanges for organ donation.[8,11] In 1987, the UAGA was amended to expressly prohibit the sale or purchase of human body organs removed after death but did not address living organ donation.[8,10,11] No similar commercial restriction was addressed by the updated UAGA for living organ donor exchange.[11] Unlike the earlier version of the UAGA that had been approved by all 50 states and the District of Columbia, the 1987 UAGA has been adopted in only 26 states.[11]

After the antirejection drug cyclosporine was approved by the US Food and Drug Administration in 1983, human organ transplantation increased considerably.[8,11-13] A more equitable means of linking supply with demand for living organ donation was needed.[8,11] The 1984 passage of the National Organ Transplant Act (NOTA) was the first federal legislation promulgated to regulate human organ transplants. The champion of the bill, Representative Al Gore, Jr, of Tennessee, initially considered that future incentives may be necessary if organ supplies based on altruistic donation alone were short of demand.[11] However, during continued congressional debate over NOTA, fears that incentives may actually decrease organ supplies, lessen the quality of the organs, and possibly exploit the poor led to the addition of Section 301 to the bill.[11] Labeled as "Prohibition of Organ Purchases," Section 301 made it "...unlawful for any person to knowingly acquire, receive, or otherwise transfer any human organ for *valuable consideration* for use in human transplantation if the transfer affects interstate commerce [italics added]."[11,14] With passage of NOTA, federal

For personal use. Mass reproduce only with permission from *Mayo Clinic Proceedings*.

C. Agnello - SC 0345

criminal legislation now exists that prohibits any exchange of living or deceased donor human organs for valuable consideration.

### RECENTLY PROPOSED LEGISLATION

In an attempt to increase the number of available human organs for transplant, South Carolina lawmakers introduced Senate Bill 480 (SB 480) in 2007.[9] The core of the bill was to trim 180 days from a prisoner's sentence in exchange for donation of a kidney.[9] Although SB 480 did not move past initial legislative procedural barriers, its introduction stimulates concern over possible conflicts that may arise when attempts are made to mesh the criminal justice markets with the human body part markets. If SB 480 had been passed by the South Carolina legislature, it likely would have survived legal scrutiny within a criminal justice sentencing open market concept. As the proponent of the bill, Senator Ralph Anderson worked to reassure the public that government officials would ensure that prisoners' decisions were voluntary and made only after receiving all the information they required.[9]

The barriers confronting the legitimacy of SB 480 resulted from its conflict with human organ market limitations, rather than open market criminal justice restrictions.[9] As the language of NOTA's legislation prescribes, human organs may not be transferred in exchange for valuable consideration. At its foundation, contract law requires an exchange of "consideration," or a promise to provide something of value to one party in exchange for his or her promise to provide something of value in return.[15] In the case of SB 480, South Carolina government officials proposed offering a 180-day reduction in sentencing. In exchange, prisoners would be required to donate a kidney. Although state officials were not suggesting tendering money as valuable consideration, they were offering freedom or liberty from incarceration. As both the Fifth and Fourteenth Amendments of the US Constitution hold that liberty cannot be taken away without due process, there can be little doubt that liberty equates to valuable consideration in a free society.[9] In the context of a prison inmate, freedom from incarceration may be an especially important element of value.[9] Although exchanges of prison time for human organs may meet legal muster under criminal justice law open market sentencing concepts, strict compliance with NOTA's regulations would restrict such arrangements.[9]

### IN PLACE LEGISLATION: TRADING PRISON TIME FOR INVASION OF BODY

Nine states have passed legislation that authorizes chemical or physical castration of convicted criminals.[9,16] In most of those states, consent to castration impacts an offender's eligibility for parole or probation.[9,16] Although the laws in the 9 states differ to a degree, they remain consistent by authorizing castration only after criminal activity involving some form of sexual victimization. Such a procedural process ensures a natural association between the crime and the punishment.[9] Given that the proposed goal of castration is to help protect society from future harms, this type of punishment best falls within the framework established by utilitarian views.

### WHY THE SCOTT SISTERS' PAROLE ARRANGEMENT MAY FAIL

In her 2009 writing, Lee[9] argued that plea bargaining practices function under a market theory construct. Parole processes that truncate prison terms likely follow a similar market-based schema. Public officials regulate both initial sentencing decisions (plea bargaining) and eligibility for early release (parole). Public satisfaction with government decisions that involve criminal incarceration is measured through voter actions. Like their plea bargaining counterpart, parole decisions that involve exchange of human organs for transplant are likely legal under criminal justice standards.[9] NOTA's strict prohibition against a market exchange of human organs for valuable consideration is why the Mississippi state government's decision to truncate the sisters' sentence terms in exchange for Gladys' assurance may fail to meet legal muster. Analogous to the arguments presented during discussion of South Carolina's failed SB 480 legislation attempt, parole board decisions that involve a prisoner's freedom from incarceration may be equated to valuable consideration.

A further ethical blow to the state of Mississippi's agreement with the Scott sisters arises from the lack of clear connection between the donation of a human body part and the theoretical goals of criminal punishment and parole. Although castration has been suggested to serve a utilitarian role of protecting society from a criminal's actions, no similar association can be drawn with the donation of a kidney by Gladys.

The purpose of this article is not to offer my opinion as to whether the current laws that restrict compensation for donor organs should be amended. However, reactions of the public, bioethicists, and health care professionals to the decision by the governor's office and the Mississippi parole board may provide insight into society's willingness to favor future legislation that allows "payment" for organ donation. Many academics have written about the potential risks involved with compensation of donors through a free market system.[8,11] Examples of these concerns include coercion of donors, lack of adequate informed consent among donors, donors' misrepresentation of the health of their potentially donated organs, the poor disproportionally donating to the rich in need of an organ, financial suffer-

For personal use. Mass reproduce only with permission from *Mayo Clinic Proceedings*.

C. Aniello - SC 0346

ing of the poor donor with increased health costs, and the potential for a decrease in overall organs donated if those who would otherwise offer organs for altruistic reasons become disenchanted by the commercial nature of the market.[11,17,18] Whether these are tangible risks or the product of common myths further propagated by well-publicized stories in foreign countries of "organs for money" schemes is a topic for separate discussion. Many have argued that a well-structured and supervised free market for organs may offer an ethical and practical means of helping resolve the ongoing shortage of available human body organs supplied by altruistic donor pools.[19-21] The conditions involved with the indefinite suspension of Gladys' prison term stimulate concern that such an exchange of valuable consideration for consent to organ donation violates the restrictions imposed by NOTA.

Although the Mississippi decision has the potential of stirring public debate over the future viability of a structured compensation exchange program for human organ donation, the unique features of the Scott sisters' case make it unlikely that any settled consensus will be met. Of note, Gladys is said to have voluntarily offered to donate her kidney to her sister Jamie. When describing her willingness to donate her kidney to her sister after her release on January 7, 2011, Gladys is reported to have said that "[the Governor] didn't even have to put that in the order 'cause I was going to do that anyway.'"[22] Whether these reports are an accurate assessment of Gladys' altruistic motives is not a topic that I feel at liberty to question.

Had the State of Mississippi initiated a negotiation that offered Gladys an indefinite suspension in exchange for a kidney donation, public reaction might be viewed as reflective of acceptance or rejection of potentially coerced agreements. Further limiting possible public outcry is that the Scott sisters had already served 16 years for an $11 crime and that the Mississippi parole board concluded that they were no longer a threat to society. If instead Gladys had recently been imprisoned and remained a danger to society, the public's response to her release could more clearly signal society's willingness to accept the introduction of valuable consideration into transplant policy. Perhaps the greatest limitation in using the Scotts' case as a test case stems from the fact that Gladys' indefinite suspension may in fact not truly be conditioned on her consent to donate a kidney. Although the governor remains elusive in his answers as to what may occur if the Scott sisters are not an acceptable tissue match, NAACP reports suggest that the governor's office had already decided early on to forgo any requirement that Gladys return to prison.[5]

With the Mississippi State government running at deficit levels, allowing the release of not only Jamie but also her potential kidney transplant donor Gladys could be viewed as a fiscally acceptable means of cutting future state incarceration costs. According to Mississippi Corrections Commissioner Christopher Epps, the State of Mississippi spent $50 million on inmate health care in 2010 alone.[4] Given this annual expense, one could argue that the conditional release of Gladys may serve a utilitarian purpose by benefiting Mississippi's populus through economic savings. With the threat of continued criminal activity abated and the cost of continued confinement extreme, the question of whether the conditions placed on Gladys' indefinite suspension collide with transplant ethics may not be that important to the public.

Time will tell whether it will be written that the governor's office, the Mississippi State parole board, and the Scott sisters were instrumental in initiating change to domestic human organ transplant policy. Although the unique aspects of this case may limit public debate on the topic of nonaltruistic organ donation, others more closely associated with the ethical and administrative components of transplant medicine may argue the merits and future impact of Mississippi's decision for some time. Although the true intent behind the decision to release Gladys from prison remains under debate, the condition requiring organ donation remains authenticated in the legal records and history of the state of Mississippi. Individuals or state authorities seeking to promote nonaltruistic organ donation policies will likely reference the Scott case as a positive or "shining" example of such a policy in action. In addition, while appreciating the unique features of the Scott case, parties to future arrangements that involve solid organ exchange may still benefit when studying the reaction it caused, or did not cause, as they test the boundaries of change.

**REFERENCES**

1. Herbert B. For two sisters, the end of an ordeal. *New York Times.* December 31, 2010. Web site. http://www.nytimes.com/2011/01/01/opinion/01herbert.html?_r=1. Accessed March 24, 2011.

2. In Miss. Sisters' parole depends on kidney donation. *All Things Considered.* NPR Web site. December 30, 2010. http://www.npr.org/2010/12/30/132488858/In-Miss-Sisters-Parole-Contingent-On-Kidney-Donation. Accessed March 24, 2011.

3. Gabbatt A. Sisters granted parole in return for kidney donation. Guardian.co.uk Web site. December 31, 2010. http://www.guardian.co.uk/world/2010/dec/31/mississippi-sisters-parole-kidney. Accessed March 24, 2011.

4. Social and political pressure brought about freedom for the Scott sisters? *EURWeb* Web site. December 30, 2010. http://www.blackwebportal.com/wire/DA.cfm?ArticleID=7515. Accessed March 24, 2011.

5. Thompson K. 'Conditioned on' kidney donation, sisters' prison release prompts ethics debate. *Washington Post* Web site. December 30, 2010. http://www.washingtonpost.com/wp-dyn/content/article/2010/12/30/AR2010123002930.html?wprss=rss_nation. Accessed March 24, 2011.

6. Dressler J. *Cases and Materials on Criminal Law.* 3rd ed. St. Paul, MN: Thomson West; 2003.

7. Burke PB. *Current Issues in Parole Decisionmaking: Understanding the Past; Shaping the Future.* Washington, DC: US Dept of Justice, National

For personal use. Mass reproduce only with permission from *Mayo Clinic Proceedings.*

C. Agnello SC 0347

MISSISSIPPI DECISION EXCHANGING PAROLE FOR KIDNEY DONATION

Institute of Corrections;1988. http://nicic.gov/pubs/pre/007017.pdf. Accessed March 24, 2011.

**8.** Hughes JA. You get what you pay for?: Rethinking U.S. organ procurement policy in light of foreign models. *Vanderbilt J Transnational Law.* 2009;42:351-381. http://media.web.britannica.com/ebsco/pdf/603/36865603.pdf. Accessed March 24, 2011.

**9.** Lee EC. Trading kidney for prison time: when two contradictory legal traditions intersect, which one has the right-of-way? *Univ San Francisco Law Rev.* 2009;43:507-557. http://usf.usfca.edu/law/academic/journals/lawreview/printissues/v43i3/Lee.pdf. Accessed March 24, 2011.

**10.** King PA, Areen J, Gostin LO. *Law, Medicine and Ethics.* New York, NY: Foundation Press; 2006.

**11.** Satel S. *When Altruism Isn't Enough: The Case for Compensating Kidney Donors.* Washington, DC: The AEI Press; 2008. http://www.sallysatelmd.com/html/aeibookflyer.pdf. Accessed March 24, 2011.

**12.** Linden PK. History of solid organ transplantation and organ donation. *Crit Care Clin.* 2009;25:165-184, ix.

**13.** Ruth RJ, Wyszewianski L, Campbell DA. The future of kidney transplantation: the effect of improvements in survival rate on the shortage of donated kidneys. *Med Care.* 1987;25:238-249.

**14.** National Organ Transplantation Act. http://livingdonorassistance.org/documents/NOTA.pdf. Accessed March 24, 2011.

**15.** Knapp CL, Crystal NM, Prince HG. *Rules of Contract Law: 2005-2006.* New York, NY: Aspen Publishers; 2005.

**16.** Scott CL, Holmberg T. Castration of sex offenders: prisoners' rights versus public safety. *J Am Acad Psychiatry Law.* 2003;31:502-509.

**17.** Goyal M, Mehta RL, Schneiderman LJ, Sehgal AR. Economic and health consequences of selling a kidney in India. *JAMA.* 2002;288:1589-1593.

**18.** Jha V. Paid transplants in India: the grim reality. *Nephrol Dial Transplant.* 2004;19:541-543.

**19.** Halpern SD, Raz A, Kohn R, Rey M, Asch DA, Reese P. Regulated payments for living kidney donation: an empirical assessment of the ethical concerns. *Ann Intern Med.* 2010;152:358-365.

**20.** Hippen BE. In defense of a regulated market in kidneys from living vendors. *J Med Philos.* 2005;30:593-626.

**21.** Taylor JS. Black markets, transplant kidneys and interpersonal coercion. *J Med Ethics.* 2006;32:698-701.

**22.** Donate kidney—jailed Mississippi sisters freed. Nonprofit News Web site. January 17, 2011. http://www.onlinecardonation.org/charitynews/archives/142. Accessed March 24, 2011.

For personal use. Mass reproduce only with permission from *Mayo Clinic Proceedings*.

C. Arnello SC 0348



# EXHIBIT P

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

ADVERTISEMENT
Ad removed.
Show details

LIVE          Mickey Lolich dies at 85     Anthony Davis trade     Savannah Guthrie's mom     Winter Olympics 2026
Trump administration

# Women released from Mississippi prison make life in Florida

BY MELISSA NELSON GABRIEL
Updated 5:34 PM GMT-3, July 23, 2018

PENSACOLA, Fla. (AP) — Serving double life sentences for taking part in a 1993 armed robbery that netted $11, sisters Jamie and Gladys Scott hit bottom at different points.

It happened to Gladys six months after she entered the Central Mississippi Correctional Facility in Pearl, Mississippi, two months after she gave birth to a baby girl that she was not allowed to raise.

"I tried to commit suicide because it bothered me so bad. I fell into a bad depression. I cut myself with a razor blade, but God wasn't ready for me," she said.

It happened to Jamie in 2003 when she learned her father died.

"I felt like something inside me died. I think he died of a broken heart because he couldn't get us out of prison," she said. "I saved up pills because I wanted to end my life, I couldn't see my life keep being in that place."

Guards found the pills and confiscated them during an unannounced search of her cell.

ADVERTISEMENT

"I took that as a message from God that he didn't want me to die," she said.

Seven years after the Scott sisters made national headlines following then-Mississippi Gov. Haley Barbour's unusual agreement to release them from prison, the women have fought to build a life for themselves in Pensacola.

C.Agnello   SE 0350

It hasn't been easy.

Barbour indefinitely suspended the sisters' sentences on the condition that Gladys donate a kidney to Jamie, who was on dialysis and in failing health. Legal scholars questioned whether Mississippi could put such conditions on the sister's release, but both sisters agreed to the deal.

The sisters' original sentences drew widespread condemnation from Civil Rights leaders and others. The women were 19 and 21 and had no prior criminal convictions when they were arrested and charged with orchestrating the Christmas Eve armed robbery of two men in Forest, Mississippi.

Prosecutors said they led the men, who were hit on the back of their heads with shotguns, into an ambush. Three male teenagers charged in the case testified against the sisters in exchange for lighter sentences.

ADVERTISEMENT

The sisters maintain their innocence and are seeking a full pardon from Mississippi Gov. Phil Bryant so they can be released from parole requirements. Bryant has so far declined to issue pardons in the case.

The women moved to Pensacola after their release from prison because that is where their mother, Evelyn Rasco, was living. Rasco died in 2013 at the age of 65 from diabetes and other health complications.

"You cannot measure a mother's love. She did everything to fight for us, including letting her health go down. When we came home, her health was already failing and she was tired. But the three years I had with her were the best of my life," Gladys said during a recent interview from her sister's west Pensacola home.

Jamie has yet to receive her desperately needed kidney transplant and spends nearly four hours, three days a week on dialysis.

She had lost 61 pounds following weight-loss surgery. She was also working and taking classes at Pensacola State College.

Everything changed April 9, 2017, when an intoxicated driver struck the car she was driving and caused her to crush her ankle while attempting to press the brakes to keep her car from spinning out of control.

A
D
V

C.Agnello   SE 0351

E
R
T
IS
E
M
E
N
T

Surgeons amputated her right foot in late May after seven unsuccessful surgeries.

"It was a hard decision, and I wasn't going to do it at first but Gladys started crying and told me that she would rather have me here with one leg than not have me here at all. Eventually I knew it was what I had to do so that I could live," Jamie said.

The two sisters are incredibly close.

"I used to ask my mom whether we were twins because we had such a close connection," Gladys said. "People are always saying that when you see one of us, you see both us."

After the amputation, Gladys took Jamie to a nail salon for a manicure.

The sisters laughed because the salon charged Jamie the same for manicuring one foot as for manicuring both feet.

"They didn't even give me a discount for having one foot," Jamie said, laughing.

The sisters' tight bond helped them make it through 16 years in prison. They shared a cell for much of the first 10 years before the state of Mississippi ordered that relatives could not be housed together.

A
D
V
E
R
T
IS
E
M
E
N
T

In the seven years since their release, they have relied on each other like never before. Gladys now works full-time as runner for the Michaels and Booth law firm.

C.Agnello    SE 0352

"She is the only one who really knows what I have been through," Gladys said. "We have seen things (in prison) shouldn't no one have to see."

Gladys wakes up in the middle of the night with her inmate number — 19142 — going through her head.

"You don't have a name when you are in there, just a number and sometimes you don't believe it is real that you are out. You think that if you close your eyes it will all go away," she said.

Greater Little Rock Baptist Church Pastor Lonnie Wesley III has become close friends with Gladys and Jamie in the last seven years.

ADVERTISEMENT

"They have taught me a lot about what the newly released from prison person goes through. People don't realize the stigma that they have to fight while simultaneously trying to play catch up," he said.

Despite all the women have been through, "not one time have they complained," Wesley said.

"Our prayer is that they won't let the fight get the best of them and they can keep on fighting," he said.

Although Mississippi prison officials said Gladys was a match to donate a kidney to Jamie, the Mayo Clinic in Jacksonville needs to do more tests. If Gladys is a compatible donor, the women will have to spend weeks in Jacksonville before and after the transplant. Because of her amputated foot, Jamie will not be able stay without someone to help her.

The sisters are worried about the expenses associated with the trip and about whether their parole conditions with the state of Mississippi will allow them to be away from home for so long.

"It's discouraging because I will have to stay in a hotel there for a long time even after I am released from the hospital," Jamie said. "And we have to be able to leave here very quickly when the time comes for the transplant."

Jamie's son, 24-year-old Richard Scott, is close with both women. Richard has watched his mother and aunt try to adapt after 16 years behind bars.

"You cannot get back that time that was lost. When I was younger, it created some anger in me," said Richard, an Army soldier who will deploy to Afghanistan later this year. "If you stay back on grudges, you are never

going to move forward."

He laughs about the women's unfamiliarity with cellphones and other technology. The trio joke about how he tried to Face Time them on a recent deployment.

"You could just see Gladys' nose," he laughed.

The women collaborated on the 2016 book, "The Scott Sisters: Revealing the Truth, Exposing Injustice and Trusting God." They donated all proceeds to help women released from prison adapt to life outside.

"It was scary reliving some of the things we saw in prison to write the book, but it was like you releasing something with every chapter. It was therapeutic," Gladys said.

The state of Mississippi prohibited the women from traveling to some book signings in that state because of the conditions of their parole.

"We are not through with our fight," said Jamie, who added that the parole stipulations mean that she and her sister are not truly free.

"We haven't come this far, 16 years and 32 days, to give up," Gladys said.

ADVERTISEMENT



## MOST READ

1  Ex-leader Harper says Canada should ma_____ce from US

2  SBA says legal permanent residents will b_____

3  Every Homeland Security officer in Minn_____em says

4  Judge seems skeptical of legal justificati_____

5  What to know about the disappearance o_____ Guthrie

# SUGGESTED FOR YOU



## This Month's Top Offers



**360 PERFORMANCE SAVINGS**

- No fees
- No minimums
- Open in about 5 min

### 3.30 % APY ⓘ

As of 01/08/2026 | Member FDIC

OPEN ACCOUNT



**360 CHECKING**
Member FDIC

Earn a $250 bonus with 360 Checking. No fees, no minimums. Terms apply.

OPEN ACCOUNT



**Leverage a powerful platform designed for self-directed traders.**

Advertisement: TradeStation



**Level Up with a Georgetown Master's in Supply Chain Management**

Advertisement: Georgetown University



C.Agnello - SC 0556

**Earnings Season: What to Watch**

Advertisement: Charles Schwab

ADVERTISEMENT



# EXHIBIT Q

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

C.Agnello    SE 0358

**FILED** 6:00 a.m. EST
12.16.2025

<span style="color:red">FEATURE</span>

# Women Are Sent to This Federal Prison for Dialysis. They Say It's Killing Them.

*Patients at Carswell medical prison in Texas describe unsanitary conditions, missed treatments and substandard care.*



HOKYOUNG KIM FOR THE MARSHALL PROJECT

By **KALEY JOHNSON**

Evangelina Perez lost count of the number of times her mother, Martha Perez, called her from federal prison, gasping for breath because she had missed dialysis treatments for her kidney failure.

At 59, Martha Perez also had diabetes and congestive heart failure. She had been in various federal prisons since 2005 on money laundering and drug convictions. In 2018, the Bureau of Prisons sent her to the Federal Medical Center Carswell in Fort Worth, the country's only federal medical prison for women.

The bureau houses some of the sickest women at Carswell, and it's the only federal women's prison with in-patient dialysis — a critical, life-sustaining treatment for people with kidney failure.

But in court documents she filed pleading for release, Perez described her worsening health and her fear of dying at Carswell. In May 2022, another incarcerated person had to help her write a final request because of her poor vision. Just over a year later, Perez died in a Fort Worth hospital. No family was with her.

"I understand the circumstances, but initially, like there is a care that they should have been providing," Evangelina Perez said. "It got to the point where she started retaining fluid on her chest, and she ended up passing away from a heart attack."

This article was published in partnership with the Fort Worth Star-Telegram.

Perez had serious illnesses that required consistent care. But Carswell does not adequately provide the dialysis care that the Bureau of Prisons claims it does, according to lawyers, medical experts, former bureau officials, along with court and medical records. Women at Carswell describe missed treatments, poor education for patients, dialysis machines that break down mid-treatment or that lacked enough clean water, and other routine problems.



A photo of Martha Perez is found in a bin of family photos at the Perez's home in Prescott Valley, Arizona, on March 9, 2025. COURTNEY PEDROZA FOR THE MARSHALL PROJECT

Doctors who reviewed the women's court filings and allegations say the problems described would put dialysis patients in serious danger. Legal filings by prisoners, medical records and expert court testimony raise flags about preventable — and potentially fatal — conditions arising from

substandard care. The Bureau of Prisons, which is supposed to fix those problems, operates with little to no external oversight over its medical care.

A federal judge overseeing a dialysis patient's compassionate release case said testimony from seven women on dialysis was "concerning," but said he could not approve the release. Doing so, the judge said, could imply the entire Bureau of Prisons provides ineffective dialysis care.

Michele Deitch, director of the Prison and Jail Innovation Lab at the University of Texas in Austin, said people in prison "have a constitutional right to receive medical care for their serious medical needs. And dialysis is certainly an example of that."

If the federal government "cannot take care of people and meet their needs as required by the Constitution," Deitch said, "then we have no business locking them up."

The Bureau of Prisons declined requests for an interview. In answers to emailed questions, spokespersons wrote that the agency provides adequate dialysis care, including sufficient staffing and education for patients.

"At present, there have been no reports or claims concerning the quality of the dialysis care being provided at FMC Carswell," wrote spokesman Donald Murphy.

Carswell has been the subject of numerous investigations calling into question its treatment of incarcerated people. In 2020 and 2021, women at the facility described negligent medical care and malicious treatment as COVID spread through the prison. In 2023, a Fort Worth Star-Telegram investigation highlighted a pattern of sexual abuse by staff. In response, a state representative called for a congressional inquiry into the prison, though none were launched.

W hen she died in June 2023, Perez was one of about 15 women at Carswell receiving dialysis. The treatment uses a surgically-installed port to connect a patient to a machine that filters their blood, removing toxins the kidneys no longer can process, before pumping the cleaned blood back into the patient. The process takes 3 to 5 hours and is usually needed three times a week — or patients may risk serious complications and death.

Kidney failure can be caused by a multitude of issues, most commonly diabetes, high blood pressure and chronic kidney disease. Perez had all three. In June 2021, Perez started dialysis after

she had a stroke.

Federal medical prisons, despite their name, are not hospital-like facilities: They keep incarcerated people with medical needs, but in many cases, do not provide all of their care in-house. Carswell, which houses approximately 1,200 people, contracts with the University of North Texas Health Science Center for much of its medical care. The Health Science Center, in turn, subcontracts dialysis services to the private provider U.S. Renal Care of West Fort Worth, according to the Bureau of Prisons. Under Carswell's contract with the Health Science Center, the bureau is still responsible for providing all dialysis equipment.

U.S. Renal Care confirmed it provides dialysis at Caswell, but did not respond to several interview requests and other emailed questions about its services there.

Dialysis is only part of the treatment for people with kidney failure. They also need a strict diet and water intake monitoring, and blood work to closely check various chemical levels. A patient's port must be kept extremely clean to avoid sepsis, a life-threatening infection.

According to Bureau of Prisons mortality reviews from 2015 to April 2020, at least three women undergoing dialysis at Carswell died in that time period. All three women had been transferred to Carswell specifically to receive medical treatment, and all three developed sepsis prior to their death, according to the mortality reviews. Reason Magazine obtained the documents through a records request and provided them to The Marshall Project.

Sepsis is far less common if staff follow the proper contamination protocols for dialysis machines, said Dr. Charles Howard, who for 13 years was a medical officer at the FMC Devens in Massachusetts, which includes a large dialysis unit. Howard occasionally worked as acting medical director at the prison.

There are no publicly available records of deaths in federal prisons. The Bureau of Prisons has yet to fulfill records requests for mortality reviews or the number of dialysis patients who have died at Carswell.

When asked how many Carswell dialysis patients have died since 2020, a bureau spokesman initially said "zero." When asked specifically about Perez, who died in 2023, spokesman Scott Taylor said that no one "had passed away as a result of their condition that required dialysis." Regarding Perez's death, Taylor said "there was no correlation between the need for dialysis and the cause of death."

Five current or former dialysis patients at Carswell spoke with The Marshall Project and also detailed in court records the dialysis conditions there. Four others described dialysis treatments in compassionate release pleas or other court records. The women said their treatment included severe cramping during dialysis, treatment sessions cut short or missed, and poor machine maintenance, such as broken parts, discolored tubing, and machine settings that were set incorrectly. Four women said pipes in the water room would break frequently, and the machines would sit in puddles of water.

"The truth lies in the consistency of the women's statements," said Amber Rabon, a lawyer in one of the women's cases, who has been a federal criminal defense attorney since 2008.

Evangelina Perez, Martha Perez's daughter, said her mother told her she frequently missed dialysis treatments prior to her death in 2023.

"I can't even keep track of how many times that occurred where they wouldn't complete the dialysis on them. And that was an issue, and she would call me, she would call me panicking because she knows how she would get if she skipped one," Evangelina Perez said. "She would be so short of breath that her stomach would be tight from all the fluid she was retaining."



🔲 Evangelina Perez holds a photo of her mother, Martha Perez, down the street from her home in Prescott Valley, Arizona, on March 9, 2025. COURTNEY PEDROZA FOR THE MARSHALL PROJECT
🔲 Members of the Perez family pose for a portrait near their home in Prescott Valley, Arizona, on March 9, 2025. From left are Francisco Perez, Francisco Perez IV, Daniel Perez, Gabriella Perez, Evangelina Perez, Cecilia Perez, and Angelica Perez. COURTNEY PEDROZA FOR THE MARSHALL PROJECT

She said her mother would tell staff that something was wrong, but they "said 'She was fine, she's fine,' until there was fluid literally coming out of her belly button," Perez said.

Missing a dialysis session is dangerous for patients, said Dr. Rebecca Ahdoot, a kidney specialist at the University of California Irvine. Without rigorous dialysis, toxins can build up, and the person can die.

Alicia Elliott, who was on dialysis at Carswell for 15 months while incarcerated on drug charges, said in court records and interviews that she was forced to miss appointments or had her treatment cut short multiple times. In late 2022 and twice in early 2023, Elliot emailed Carswell's associate

warden for medical to complain about being taken off dialysis early. In one case, she said staff wanted to leave early because of ice on the roads.

Sanjuana Garcia-Ramirez started dialysis at Carswell in November 2023. She said she had been on dialysis for two years before incarceration; comparatively, she said treatments at Carswell are less consistent and the machines are poorly managed.

"I have four kids I have to get back home to, and it frightens me that I might not make it out of here because of the way they run dialysis," said Garcia-Ramirez, who is serving a 6-year sentence on a drug conviction.

Successful dialysis goes hand-in-hand with proper nutrition plans, said Howard.

"A patient has to be their own advocate, and they have to be very, very, very much aware of what they need and what they have to do to manage their condition," Howard said. If they're not able to do it or they're not properly educated, he said, "they will not do well on dialysis."

But Stephanie Williams, who said she was on dialysis at Carswell for 11 months, said women would start dialysis and get no education on nutrition. Some women did not know that people with kidney problems have to monitor their potassium, sodium, fluid and phosphorus levels, for example, or they risk possibly fatal complications.

"Them girls, when I said phosphorus, they said, 'What is phosphorus?' And [I was] like, 'What are you doing?'" Williams said.

She also said in interviews and court records that women were not told how to keep their port clean — or the importance of doing so. Women would shower without covering up their ports and get them wet, which increases the risk for infection, she said.

"It's a lack of education. It's not the girls' fault. But it's killing them."

**W**hile U.S. Renal Care oversees dialysis treatments and a nephrologist — a kidney specialist — visits once a month, patients rely on Carswell staff at all other times for medical needs. Doctors, lawyers and the Bureau of Prisons' own budget proposal this year questioned whether Carswell has the ability and resources to provide that care.

Understaffing and a depleted budget have sapped federal prisons of resources over the last few years. In a 2024 report, the Office of the Inspector General identified providing adequate medical care as one of the primary challenges the bureau faces.

In the bureau's 2025 budget submission to Congress, the agency lamented its difficulties in hiring and maintaining medical staff. The budget cited a 2016 Office of Inspector General report, which declared recruitment of medical professionals to be "one of the Bureau's greatest challenges."

Carswell is no exception. In 2022, Carswell then-staff union leader Jennifer Howard filed a whistleblower complaint about COVID-19 guidance and staff shortages at the facility. At the time, Howard told the Fort Worth Star-Telegram that staffing levels were "unacceptable for a medical facility."



The entrance to the Federal Medical Center Carswell in Fort Worth, Texas. YFAT YOSSIFOR/KERA

Despite understaffing, the bureau may face further cuts. In February, the agency announced it would reduce or eliminate retention pay for correctional officers, a decision that American Federation of Government Employees said would "exacerbate staffing shortages and make working conditions less safe."

A former bureau warden and administrator, Jason Terris, questioned Carswell's ability to care for dialysis patients as part of his declaration cited in a compassionate release case for Feliza Renteria, a 45-year-old dialysis patient at the facility.

Renteria arrived at Carswell in 2021. But the dialysis treatments have made her sicker, she argued in court records. In an interview, she described excruciating pain during treatment. "I did not

experience what a cramp was before I was incarcerated —- I did dialysis a year before this and never had cramps," she said.

Dialysis patients should not have constant cramping, Ahdoot said. Cramps can be a sign that too much fluid is being pulled out of the body too quickly, she said, and treatment should be adjusted.

Patients "certainly shouldn't be on dialysis and suffering," said Ahdoot, who has been a nephrologist for 12 years. "If you are having crazy cramps all the time, then there is certainly a problem."

Carswell's contract with the Health Science Center says a kidney doctor will be available to patients once a month for up to four hours. Ideally, Ahdoot said, a nephrologist should see patients once a week to ensure the right amount of fluid is being pulled off during dialysis.

In his declaration for Renteria's suit, Terris wrote that he did not know if the staff at Carswell could handle the "logistical and care-related challenges" Renteria's condition presented due to staffing shortages and a lack of resources.

But those statements are part of the reason U.S. District Judge Anthony Battaglia, in California's Southern District, denied Renteria's compassionate release. When he denied the request in a September 2023 hearing, Battaglia said granting her motion could have implications beyond Renteria's case because of the message it would send about the bureau's care.

"I mean, granting relief here, does that mean that every dialysis patient in the Bureau of Prisons should be similarly accommodated because the quality of care is, perhaps, ineffective?" Battaglia said, according to a court transcript. "I'm looking at sort of the greater picture here. Because some of the accounts, from some of the people, is concerning."

Last year, the Ninth Court of Appeals denied Renteria's appeal for compassionate release.

There is no third-party agency currently monitoring dialysis treatments at Carswell. Multiple outside agencies that used to evaluate the Bureau of Prisons' medical care no longer do so.

Carswell's contract with the Joint Commission, which provided the facility's accreditation as a healthcare organization, expired in October 2020 and was not renewed, according to the Bureau of Prisons spokesperson. The American Correctional Association ended its audits of the agency in 2023, after the Office of Inspector General found the Bureau of Prisons was "in effect, paying ACA to affirm [the bureau's] own findings," and as a result, there was "no real certification or action for improvement."

The state of Texas does not monitor Carswell either. Oversight rules are built into Carswell's contract with the Health Science Center, but neither the Sciences Center nor Carswell have responded to requests for monitoring records.

According to its contract with the bureau, the Health Science Center is supposed to send quarterly reports about dialysis treatment at Carswell to a bureau administrator. But Health Science Center spokeswoman Paula Cobler said the hospital does not have those records; she said U.S. Renal Care is responsible for them and provides Carswell with copies. Another Health Science Center spokesman, Andy North, said the dialysis reports include "patient-care specific problems experienced during the quarter," but declined to answer questions about what those problems entailed.

U.S. Renal Care did not provide those records to The Marshall Project. The bureau has not fulfilled a records request for those quarterly reports.

The Office of the Inspector General found evidence that the bureau's contracts are not always monitored adequately. A 2023 audit found the bureau's contract evaluations were often untimely, incomplete, or for the wrong time period. This may result in the agency not getting the best services, the report noted.

In 2024, then-President Joe Biden signed the Federal Prison Oversight Act to increase independent inspections of prisons, but Congress has not approved money for the inspections. Deitch, of the Prison and Jail Innovation Lab, said the priority now is for the act to be fully funded "to provide the critical oversight role that is needed."

As her fears of dying inside prison grew, Perez filed requests for a reduced sentence or compassionate release five times between 2012 and 2022. A judge had not ruled on her final release request when she died in July 2023.

Compassionate release is a way to address deficiencies in care for some incarcerated people, but it is seldom granted. Judges look for evidence that a prison can't provide the necessary treatment, said Marc Stern, the court-appointed monitor for the State of Arizona Department of Corrections. Without that proof, most motions will be denied. Out of the nine dialysis patients at Carswell that The Marshall Project identified, eight filed for sentence reduction or compassionate release since 2022. Seven were denied. In the remaining case, a judge initially denied the request, but reversed the decision and released the woman in 2020, citing "the abominable COVID-19 statistics at FMC Carswell." The judge said the facility's inaccurate data suggested the bureau could not be trusted to care for someone with complicated health conditions.



A photo of Martha Perez is found in a bin of family photos at the Perez's home in Prescott Valley, Arizona, on March 9, 2025. COURTNEY PEDROZA FOR THE MARSHALL PROJECT

In a compassionate release request for one woman, who asked not to be named due to fear of retaliation, her lawyer wrote that Carswell frequently missed her dialysis treatments, forcing her to go five to six days without. The woman's former physician wrote a letter in November 2023 in support of her release request, saying that "continued incarceration would be severely detrimental" to her health due to her complex medical issues.

Williams, the former Carswell patient, described Perez's deteriorating condition as "the scariest thing I've seen."

"She was bad off," said Williams, who was released in November 2023. "The week she died, she said, 'I need to see a doctor right now.'"

In the days before Perez's death, her family said, the bureau did not tell them that her condition had worsened or that she was in the hospital. She was admitted to John Peter Smith Hospital in Fort Worth on July 2, 2023, for low blood pressure after a dialysis treatment, medical records show. Her admission records at the hospital indicated she had had a serious heart attack and, on July 6, she was transferred to Medical City Fort Worth Hospital for surgery.

Medical staff tried to reverse the damage and stabilize Perez, but on July 7, she lost her pulse. For one hour, staff tried to bring Perez back. A prison guard finally called the family to ask if they wanted them to continue to try to resuscitate Perez. Her daughter said the decision fell to her father as Perez's next of kin. He told them to stop.

In a letter to the family, the Bureau of Prisons said Perez died from cardiac arrest; she also had coronary artery disease. Seven months later, Evangelina Perez got her mother's death certificate from the state of Texas. The cause of death is listed as "pending investigation."

*Kaley Johnson is a reporter based in Texas. She can be reached at kaleyalyssajohnson@gmail.com.*

**Correction:** *An earlier version of this story incorrectly identified Dr. Charles Howard's former roles in the Bureau of Prisons. He was a medical officer at FMC Devens in Massachusetts, occasionally serving as acting medical director. He later was medical director at the Federal Detention Center Miami.*



# EXHIBIT R

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

Podcasts        Schedule        **Donate**        Listen
(https://ra

(https://ncpr.securealleigance.com/ncpr/WebModule/Giv

P=WEBSITE&PAGETYPE=PLG&CHECK=Bhp4yZNb2aeYC2D

# Barbour Was Moving On Sisters' Case Before Controversial Comments (https://www.northcountrypublicradio was-moving-on-sisters-case-before-controversial-comments)

BY MARK MEMMOTT (HTTPS://WWW.NPR.ORG/PEOPLE/104192887/MARK-MEMMOTT)  —  DEC 30, 2010 11:50AM (NPR)

The news from Mississippi that Republican Gov. Haley Barbour has suspended the life sentences (http://www.npr.org/templates/story/story.php?storyId=132451849) of two sisters convicted in 1994 for their roles in an armed robbery that netted $11 has naturally led to questions from reporters about whether the decision would have been made if Barbour hadn't gotten himself into controversy (http://www.npr.org/blogs/itsallpolitics/2010/12/21/132232306/haley-barbour-explains-he-wasnt-praising-racist-group) two weeks ago with comments that at first blush seemed to praise a 1960s-era supremacist group.

The sisters, Jamie and Gladys Scott, are African-American and their cause has been taken up by civil rights activists in recent years.

C.Agnello    SE 0372

For its part, the NAACP is praising Barbour's decision (http://www.naacp.org/news/entry/breaking-news-scott-sisters-coming-home-at-last/). And on CNN moments ago, NAACP President and CEO Ben Jealous was asked whether he thinks Barbour's decision was accelerated by the comments controversy.

"We don't know" for sure, he said. "There certainly has been a lot of conjecture" about a connection.

But, "the reality is that we've been going back and forth with [Barbour's] office" about the sisters' case "for a very long time. ... And we were anticipating this [decision] weeks ago."

Barbour, Jealous said, "has show interest for a long time" in freeing the Scott sisters.

Jamie Scott, 38, needs regular dialysis. Gladys, 35, has offered to give her sister a kidney -- and their release is conditioned on her going through tests to determine whether that's possible, and surgery to do it if it is.

© 2026 NPR (http://www.npr.org/sections/thetwo-way/2010/12/30/132477213/barbour-was-moving-on-sisters-case-before-controversial-comments)

---

NCPR is supported by:

## More from NPR



(https://www.lakeplacidclub.com/)

Researchers say no evidence TikTok censorship, but they remain wary (/news/npr/nx-s1-5701409/researchers-say-no-evidence-of-tiktok-censorship-but-they-remain-wary)

AI chatbots upended their lives. Then they turned to each other (/news/npr/nx-s1-5699470/ai-chatbots-upended-their-lives-then-they-turned-to-each-other)



Your Project. Your Partners.

beardsley
architects + engineers

(https://www.beardsley.com/)

Newly released court records reveal misconduct inquiry into federal judge (/news/npr/nx-s1-5699462/newly-released-court-records-reveal-misconduct-inquiry-into-federal-judge)

Will the U.S. withdraw military forces from Syria? (/news/npr/nx-s1-5696554/will-the-u-s-withdraw-military-forces-from-syria)

Moltbook is the newest social media platform — but it's just for AI bots (/news/npr/nx-s1-5697392/moltbook-is-the-newest-social-media-platform-but-it-s-just-for-ai-bots)

The Supreme Court lets California use its new, Democratic-friendly congressional map (/news/npr/nx-s1-5691890/the-supreme-court-lets-california-use-its-new-democratic-friendly-congressional-map)

Reporter's notebook: A peek inside the Olympic Village (/news/npr/nx-s1-5699473/reporter-s-notebook-a-peek-inside-the-olympic-village)

Search for Nancy Guthrie, mother of 'Today' show host Savannah Guthrie, enters 4th day (/news/npr/nx-s1-5699399/search-for-nancy-guthrie-mother-of-today-show-host-savannah-guthrie-enters-4th-day)

Greetings from Kyiv, where candles are the last option during wartime blackouts (/news/npr/g-s1-108433/greetings-from-kyiv-where-candles-are-the-last-option-during-wartime-blackouts)

Bezos orders deep job cuts at 'Washington Post' (/news/npr/nx-s1-5699328/bezos-orders-deep-job-cuts-at-washington-post)

Photos: Scenes from the 150th Westminster Dog Show (/news/npr/nx-s1-5698120/photos-scenes-from-the-150th-westminster-dog-show)

Congress faces tight deadline to fund DHS. And, Ryan Routh faces sentencing (/news/npr/g-s1-108639/congress-faces-tight-deadline-to-fund-dhs-and-ryan-routh-faces-sentencing)

## Contact NCPR (/contact.html)

North Country Public Radio
🟥 (http://www.stlawu.edu) St. Lawrence University (http://www.stlawu.edu)
Canton, New York 13617
1-877-388-6277 • radio@ncpr.org (mailto:radio@ncpr.org)

NCPR is a proud affiliate of:
npr National Public Radio (http://www.npr.org)
○ APM American Public Media (http://americanpublicmedia.publicradio.org)
PRI Public Radio International (http://www.pri.org)

## Radio (/programs/grid.html)

Schedule (/programs/grid.html)
FM Frequencies (/about/coverage.html)
NCPR Shows (/programs/localpro.html)
News/Talk (/programs/newspro.html)
Music/Arts (/programs/artspro.html)
Podcasts (/programs/podcasts.html)

C. Agnello   SE 0375

**⊁PRX Public Radio Exchange (http://www.prx.org)**

© 2026 North Country Public Radio

# About (/about.html)

**Award-winning NCPR (/about/awards.html)**
**Our Staff (/about/staff.html)**
**News Team (/news/reporters)**
**Contact NCPR (/contact.html)**
**Comments (/contact/comment.html)**
**Submissions (/contact/submissions.html)**
**Subscriptions (/contact/newsletter.html)**
**Jobs at NCPR (/hiring.html)**
**Station Governance (/about/stationgovernance.html)**
**Executive Council (/about/ec.html)**
**FCC Public Inspection Files (/about/stationgovernance.html#PIFs)**
**FCC Applications (/about/stationgovernance.html#FCCApps)**

# Support NCPR (/support)

**Donate (https://donate.nprstations.org/ncpr/donate)**
**Donate via PayPal (https://www.paypal.com/cgi-bin/webscr?cmd=_s-xclick&hosted_button_id=6FT565C8NJTAN)**
**MemberCard (http://www.membercard.com/ncpr/)**
**Sponsorship (http://ncpr.org/underwriting)**
**Planned Giving (http://northcountrypublicradio.plannedgiving.org/)**
**Endowment (/support/endowment.html)**

C.Agnello   SE 0376

**NCPR Funders
(/support/whopays.html)
Vehicle Donation
(https://www.cardonationwizard.com/north-
country-public-
radio/info/car-donation-
canton-ny.html)**



# EXHIBIT S

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

C.Agnello   SE 0378

# What to Expect After Donation

Last updated: December 16, 2024
Medically reviewed by: NKF Patient Education Team

Life doesn't change much after donating. After recovering from surgery, donors are able to return to work, physical activity and are able to eat a regular diet.

## About Life After Donating a Kidney

For most living donors, life after donating a kidney isn't too different than before you donated. You can return to work a couple of weeks after you recover from surgery, return to physical activity, and eat a normal, well-balanced diet. Your risks of long-term problems like kidney failure are very low.

## Recovering From Surgery

Usually, living donors stay in the hospital 1 to 2 nights after surgery. How long you'll stay in the hospital depends on if you're in pain, when your doctors feel that you're ready to go home, and how close you live. Most donors who live close by can return home after 1-2 nights. If you live far away, the team will ask you to stay in the area for about one week, just in case you need to go back to the hospital for any reason.

The two most common types of surgery (laparoscopic and robotic) are non-invasive, meaning they allow the surgeon to remove your kidney safely while making the least number of incisions to allow your body to recover more quickly.

Right after surgery and a few weeks into recovery, you may feel:

- Bloated and constipated, which are normal symptoms after any surgery.

- Itching and some pain around the incisions (cuts) as they heal.

C.Agnello   SE 0379

- Fatigue (feeling tired).

- Some discomfort from the gas that you'll receive during surgery that allows the surgeons to see inside your body to remove the kidney.

- Shoulder pain after donating as any gas that is left over moves up the body.

Most living donors make a full recovery four to six weeks after surgery.



## Becoming a Living Donor

Free, self-paced online videos about donating a kidney.

## Eating and Drinking After Donating

There are no limits on what you can eat and drink after you donate.  You should follow a healthy, well-balanced diet to take good care of your body and your one kidney.

You can drink alcohol after donating in moderation. Drinking too much alcohol is dangerous, and there is a greater risk for dehydration with one kidney. Make sure you drink enough water throughout the day to take care of your kidney and to stay hydrated.

## Getting Pregnant after Donating

Pregnancy after donation is possible. It is usually recommended to wait at least six months to one year after donating. Your body will need time to adjust to living with one kidney.

C.Agnello   SE 0380

Generally, living kidney donors do well with pregnancy after they donate. However, you may be at a slightly higher risk for gestational diabetes (diabetes during pregnancy), gestational hypertension (high blood pressure during pregnancy), and preeclampsia (health condition causing swelling, headaches and protein in your urine). If you're a female donor, you should talk to your OBGYN doctor and transplant team before trying to get pregnant.

## Length of Life After Donating Your Kidney

Donating your kidney doesn't change your life expectancy (how long you'll live). In fact, some studies have shown that living donors live longer than the average person. This is because donors are in very good health and get a full medical evaluation before being approved to donate.

## Keeping Up with Your Health

It's important to see your primary care provider (the doctor you see for yearly check-ups) each year to have your urine (pee), blood pressure, and kidney function (GFR) checked. While living donors are healthier than the average person and only have a slightly higher risk of developing kidney disease than someone who does not donate, it's still important to go to your annual doctor visits to keep an eye on your overall health.

You won't have to take any special medicines because you donated your kidney. You'll only need pain medicine and stool softeners for a few weeks after surgery.

## Returning to Work, Sports, and Physical Activity

You should be able to return to normal activities four to six weeks after surgery. If you have a physical job, and need to return to work before six weeks, you can ask your employer if you can do paperwork or other work that involves little to no physical activity. You shouldn't lift anything heavier than a jug of milk for about six weeks after surgery.

You also may not be able to drive for up to two weeks, which is why your transplant team will talk to you about having a care partner (caregiver) or someone to rely on for a week or two after surgery.

C. Agnello   SC 0381

It's a good idea to avoid contact sports where your kidney could get hurt. Wearing protective gear such as padded vests under clothing can help protect your kidney during sports. Talk with your transplant team before returning to exercise or playing any type of sports.

## Emotional Health After Donating

During your donation journey, you may experience a mix of both positive and negative emotions, including the excitement of waiting to see if you're approved to donate. Then, once you donate and the emotional buildup ends, you may experience uncomfortable emotions, including feeling "down" and not like yourself for a short period of time.  This is something that happens to a lot of living donors, but it's important to remember that these feelings only last while you're recovering and during the first few weeks after surgery. Living donors are also typically very healthy, active people so having the down time during recovery can sometimes add to these unpleasant feelings.

 As long as you're aware of the possibility of feeling down, you can take some steps to help you feel better if you do experience them, including:

- Talking with another living donor before or after you donate. You can ask your transplant team to connect you with someone at their center, or contact NKF Peers, a mentoring program where you can talk to a living donor (by phone or video) about their experience and ask questions.

- Talk with a close friend or family member about how you're feeling for emotional support. Try scheduling a time every day or week so that you have something to look forward to while you recover.

- If you have and enjoy certain hobbies that involve little to no physical activity, try to continue them.

- Taking walks or other light physical activity can help you feel better (when your transplant team says it's okay).

Most people who have donated a kidney report having a positive experience overall, with 90-95% of donors saying that they would make the decision to donate again, if they could.

## Long-Term Risks of Living Donation

While donating a kidney is generally very safe, it's important to know about the possible long-

C.Agnello   SC 0382

term health issues that you could be at risk for later in life, including high blood pressure.

## Needing a Kidney Transplant After Donation

Your transplant team will talk to you about anything related to your health that may put you at a higher risk of developing kidney disease and be very thoughtful before approving you to donate. In rare cases, people who donate a kidney may have kidney failure and need a transplant later in life.

Less than 1% of people who donate develop End Stage Kidney Disease and need a kidney transplant. If you end up needing a kidney transplant after donating, you will be given a higher priority on the deceased donor waitlist.

If you donate through a National Kidney Registry (NKR) program, you'll be given priority for a living donor kidney. As of 2024, NKR has had 6,000 people donate through their programs, and none of these donors have needed a kidney transplant.

## Questions for your Health Care team

- How soon will I be able to go home after surgery based on where I live?

- Are there any sports that I should avoid after I donate? Can we talk about the activities I care about and how donating might affect them?

- Can you connect me with someone who has donated at your center?

## More resources

- Talk to someone who has donated (NKF Peers)

- Ask questions and get help finding a transplant center (NKF CARES)

This content is provided for informational use only and is not intended as medical advice or as a substitute for the medical advice of a healthcare professional. C.Agnello  SC 0383

© 2026 National Kidney Foundation, Inc.



# EXHIBIT T

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

# How the Economic Loss Guideline Lost its Way, and How to Save It

## Barry Boss[*] and Kara Kapp[**]

### TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................605

    A. *History of the Guidelines*..............................................................................607
      1. Overview and Purpose of the Sentencing Guidelines .............................607
      2. History and Evolution of the Economic Loss Guideline .........................608

II. SECTION 2B1.1 TODAY .................................................................................614

    A. *The Loss Guideline Has Lost its Way*.......................................................614

    B. *A Judicial Consensus Has Emerged that the Section 2B1.1 Loss Guideline is Unduly Harsh* ......................................................................................618

III. EMPIRICAL DATA SHOWS THAT SECTION 2B1.1 IS NOT FOLLOWED IN THE MAJORITY OF CASES, AND HAS NOT PREVENTED WIDESPREAD SENTENCING DISPARITIES ....................................................................................................620

IV. REFORM OF SECTION 2B1.1'S LOSS TABLE IS URGENTLY NEEDED...............628

### I. INTRODUCTION

This Article revisits a stubborn problem that has been explored by commentators repeatedly over the past thirty years, but which remains unresolved to this day. The economic crimes Guideline, Section 2B1.1 of the United States Sentencing Manual, routinely recommends arbitrary, disproportionate, and often

---

    [*] Co-Chair of Commercial Litigation Department and White Collar Defense & Investigations Practice at Cozen O'Connor. Former Co-Chair of the U.S. Sentencing Commission's Practitioner's Advisory Group and former Co-Chair of the American Bar Association's Criminal Justice Section Sentencing Committee. J.D., George Washington University Law School, 1985; B.A., Bates College, 1982.

    [**] Partner at Cozen O'Connor in the White Collar Defense & Investigations Practice, J.D., Stanford Law School, 2010; B.A. Dartmouth College, 2006. Deepest thanks to Dean Erwin Chemerinsky and Judge Bruce Black for their wisdom and patient mentorship over the years and their invaluable comments on this article. Special thanks also to Sara Frank for her excellent edits and support. We also wish to express our profound gratitude to the staff of the Ohio State Journal of Criminal Law for their thoughtful and excellent edits.

draconian sentences to first-time offenders of economic crimes.[1] These disproportionate sentences are driven primarily by Section 2B1.1's current loss table, which has an outsized role in determining the length of an economic crime offender's sentence. Moreover, this deep flaw in the Guideline's design has led many judges to lose confidence entirely in the Guideline's recommended sentences, leading to a wide disparity of sentences issued to similarly situated economic crime offenders across the country.[2] Accordingly, this Guideline has failed to address the primary problem it was designed to solve—unwarranted disparities among similarly situated offenders. Worse still, it not only has failed to prevent such unwarranted disparities, its underlying design actively exacerbates them.

In the wake of the United States Sentencing Commission's recent launch of its Interactive Data Analyzer in June 2020, the authors have identified new evidence that this pernicious problem continues to persist.[3] In Part I, we review the history and purposes of the Sentencing Guidelines, generally, and the economic crimes Guideline specifically. In Part II, we explain how the current version of the economic crimes Guideline operates in practice, the extraordinarily high sentences it recommends in high-loss cases, and the resulting overemphasis on loss that overstates offenders' culpability. In Part III, we analyze data made available through the Commission's Interactive Data Analyzer and discuss our findings. In Part IV, we offer a series of reforms designed to restore the judiciary's and practitioners' respect for this Guideline so that it may serve its animating purpose—to reduce unwarranted sentencing disparities among similarly situated offenders.

---

[1]    Section 2B1.1 provides the sentencing framework for the following crimes, all of which are referred to hereinafter as "economic crimes": fraud and deceit, forgery, larceny, embezzlement, theft, offenses involving stolen property, property damage or destruction, and counterfeiting crimes. U.S. SENT'G GUIDELINES MANUAL § 2B1.1 (U.S. SENT'G COMM'N 2018). The Section 2B1.1 loss table is also specifically incorporated into Section 2C1.1, which covers bribery offenses, certain extortion offenses, and honest services fraud. U.S. SENT'G GUIDELINES MANUAL § 2C1.1(b)(2) (U.S. SENT'G COMM'N 2015). Accordingly, these additional offenses are likewise grouped in for purposes of the analysis that follows with the Section 2B1.1 offenses as "economic crimes."

[2]    Letter from Jonathan Wroblewski, Dir., Dep't of Just. Off. of Pol'y and Legis., to Hon. William K. Sessions III, Chair of the Sent'g Comm'n 2, 4–5 (June 28, 2010).

[3]    While this is not the first article to address this question based on a review of empirical data of sentences issued to fraud offenders, the most recent scholarship addressing this issue analyzed data that is now almost a decade old, from 2002–2012. *See, e.g.*, Jillian Hewitt, Note, *50 Shades of Gray: Sentencing Trends in Major White-Collar Cases*, 125 YALE L.J. 1018, 1038 (2016) (reviewing data from S.D.N.Y. cases between 2002–2012); *see also* U.S. SENT'G COMM'N, U.S. SENT'G AND GUIDELINE APPLICATION INFO. FOR § 2B1.1 OFFENDERS (2013), (reviewing national data between 2003–2012) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/economic-crimes/20130918-19-symposium/Sentencing_Guideline_Application_Info.pdf.

A. *History of the Guidelines*

1. Overview and Purpose of the Sentencing Guidelines

Before 1984, federal judges sentencing economic crime offenders had unfettered discretion to impose any sentence up to the statutory maximum and were not required to consider any specific factors or explain their reasoning for the sentence imposed.[4] In 1984, Congress passed the Sentencing Reform Act (SRA) and created the United States Sentencing Commission (the Commission), in an effort to reduce unwarranted sentencing disparities.[5] In doing so, Congress instructed the Commission to promulgate Sentencing Guidelines and to use the average sentences issued to offenders for each type of crime as an anchor in creating these uniform guidelines.[6] The Commission grounded most of the Sentencing Guidelines (the Guidelines) in empirical data, anchoring the promulgated ranges in historic judicial practice for similarly situated offenders.[7] Under the SRA, as passed in 1984, the imposed Guidelines were binding on federal judges, unless a recognized basis for a departure under the Guidelines applied.[8]

In 2005, in *United States v. Booker*, the Supreme Court struck down the provisions of the SRA that made the Guidelines mandatory.[9] It reasoned that a mandatory Guidelines system effectively resulted in mandatory increased sentences on the basis of judicial fact-finding in violation of the Sixth Amendment.[10] To avoid this constitutional infirmity, the Court rendered the Guidelines advisory.[11]

At bottom, Congress commissioned the Guidelines to make federal criminal sentences fairer by addressing a central problem—wildly disparate sentences issued

---

[4]   *See* Mistretta v. United States, 488 U.S. 361, 363–64 (1989).

[5]   Sentencing Reform Act of 1984, Pub. L. No. 98–473, 98 Stat. 1987; Kenneth R. Feinberg, *Federal Criminal Sentencing Reform: Congress and the United States Sentencing Commission*, 28 WAKE FOREST L. REV. 291, 295–96 (1993).

[6]   28 U.S.C. § 994(m).

[7]   U.S. SENT'G GUIDELINES MANUAL ch. 1, pt. A, at 4 (U.S. SENT'G COMM'N 2009) ("In its initial set of guidelines, the Commission sought to solve both the practical and philosophical problems of developing a coherent sentencing system by taking an empirical approach that used as a starting point data estimating pre-guidelines sentencing practice. It analyzed data drawn from 10,000 presentence investigations, the differing elements of various crimes as distinguished in substantive criminal statutes, the United States Parole Commission's guidelines and statistics, and data from other relevant sources in order to determine which distinctions were important in pre-guidelines practice. After consideration, the Commission accepted, modified, or rationalized these distinctions."). Note, however, that the Commission deviated from this approach with respect to crafting the economic crimes Guideline. *See infra* Part I.B.

[8]   United States v. Booker, 543 U.S. 220, 233–34 (2005) (citing 18 U.S.C. § 3553(b)(1), which provided that federal courts "shall impose a sentence of the kind, and within the range" established by the Sentencing Guidelines).

[9]   *Id.* at 227.

[10]  *Id.* at 232–34.

[11]  *Id.* at 245.

to similarly situated offenders. In reaction to this problem, it tasked the Commission with drafting Guidelines that would present a uniform baseline from which all judges would start. While *Booker* restored to federal judges the ability to exercise their discretion as to whether to apply the Guideline range in a given case, the Court has emphasized the Guidelines' continued importance as a uniform "starting point and the initial benchmark" from which all judges should begin their analysis.[12]

Thus, the Guidelines, even post-*Booker*, remain a foundational anchor in which all federal sentences are grounded. Past scholarship has documented that the Guidelines' function as an anchor has been largely effective in practice.[13] As Judge Jed Rakoff explains, the Guidelines "create[] a kind of psychological presumption from which most judges are hesitant to deviate too far."[14] For an anchoring Guideline to in fact promote fairness in sentencing, however, it must in fact be fair and reasonable in its recommendations. While some Guidelines may serve this purpose faithfully, the economic crimes Guideline manifestly does not.[15]

### 2. History and Evolution of the Economic Loss Guideline

The sentencing calculation for federal economic crimes include an enhancement under the Section 2B1.1 economic loss table in any case where the government can show an intended or actual loss. The calculations in this loss table are extraordinarily important because the magnitude of the enhancement can single-handedly drive the severity of sentences issued to economic crime offenders, especially in large-loss cases. This outcome, moreover, is *by design*. The loss table was, in fact, designed (and redesigned) by the Commission to drive the severity of sentences for fraud offenders based primarily on the magnitude of the loss. As the Guidelines explain, "the Commission has determined that, ordinarily, the sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss caused or intended by their crimes."[16]

The initial fraud Guideline was located at Section 2F1.1, while the initial theft Guideline was located at Section 2B1.1. In drafting these two Guidelines, the Commission was tasked, as with the Guidelines generally, to collect data on past sentencing practices for fraud and theft cases and draw on that data in crafting the relevant guidelines. In preparing the initial loss table in Section 2F1.1, the Commission did in fact review presentence reports from 10,000 prior cases in

---

[12]   Gall v. United States, 552 U.S. 38, 49 (2007).

[13]   Hewitt, *supra* note 3, at 1022; Mark W. Bennett, *Confronting Cognitive "Anchoring Effect" and "Blind Spot" Biases in Federal Sentencing: A Modest Solution for Reforming a Fundamental Flaw*, 104 J. CRIM. L. & CRIMINOLOGY 489, 492–93 (2014); Jed S. Rakoff, *Why the Federal Sentencing Guidelines Should Be Scrapped*, 26 FED. SENT'G REP. 226, 228 (2013); David M. Isaacs, Note, *Baseline Framing in Sentencing*, 121 YALE L.J. 426, 439–41 (2011).

[14]   Rakoff, *supra* note 13, at 228.

[15]   *See infra* Parts I.B, II, & III.

[16]   18 U.S.C. app. § 2B1.1 background (2018).

Case 2:24-cr-00366-NJC    Document 24-1    Filed 03/11/26    Page 393 of 569 PageID #: 587

1984.[17] However, after reviewing the empirical data, the Commission deviated from its standard practice of anchoring the recommended sentencing ranges in the empirical data.[18] First, the Commission chose to exclude from its analysis fifty percent of the total data—every sentence in which a judge had issued a sentence of probation.[19] In addition, even after excluding half of the relevant data, it chose to recommend more severe sentences than the mean sentences of incarceration reflected in the remaining 50 percent empirical data it considered.[20]

The Commission deviated from the empirical data for two reasons. First, the Commission sought to encourage judges to issue sentences of incarceration for fraud offenders.[21] In addition, the Commission aimed to equalize sentences for "white collar" fraud and "blue collar" theft offenses, in contrast to past practices, in which theft offenders had received more severe sentences than fraud offenders.[22]

The resulting loss table for fraud offenses topped out at $5 million, with enhancements increasing by one point for every loss bracket. The original table was as follows:

| Loss Amount | Applicable Enhancement |
|---|---|
| More than $2,000 | +1 |
| More than $5,000 | +2 |
| More than $10,000 | +3 |
| More than $20,000 | +4 |
| More than $50,000 | +5 |
| More than $100,000 | +6 |
| More than $200,000 | +7 |
| More than $500,000 | +8 |
| More than $1,000,000 | +9 |
| More than $2,000,000 | +10 |
| More than $5,000,000 | +11 |

---

[17]  Mark Osler & Mark W. Bennett, *A "Holocaust in Slow Motion?": America's Mass Incarceration and the Role of Discretion*, 7 DEPAUL J. FOR SOC. JUST. 117, 140–41 (2014); Mark H. Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 FED. SENT'G REP. 19, (2013).

[18]  James E. Felman, *The Need to Reform the Federal Sentencing Guidelines for High-Loss Economic Crimes*, 23 FED. SENT'G REP. 138, 138 (2010); U.S. SENT'G GUIDELINES MANUAL ch. 1, pt. A (U.S. SENT'G COMM'N 2009) (recognizing that while the Commission generally anchored its Guidelines in empirical data, it departed from the empirical data in crafting guidelines for economic crimes); Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 HOFSTRA L. REV. 1, 7, 23 (1988).

[19]  Mark W. Bennett et al., *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 IOWA L. REV. 939, 950 n.48 (2017).

[20]  Osler & Bennett, *supra* note 17, at 141.

[21]  Bennett et al., *supra* note 19, at 951.

[22]  Bennett et al., *supra* note 19, at 950–51.

Under this table, a first-time fraud offender involved in a $1 million+ fraud scheme, with no applicable enhancements other than loss, would have faced an Offense Level of 15 and a Guideline range of 18–24 months.[23] Likewise, a first-time fraud offender involved in a $20 million+ fraud scheme, with no applicable enhancements other than loss, would have faced an Offense Level of 17 and a Guideline range of 24-30 months.[24] The Commission's initial deviations from the underlying empirical data thus resulted in modest increases in the severity of sentences, but these initial ranges were far from the arbitrary, disproportionate, and at times draconian sentences produced under today's loss table.

Indeed, the Commission's initial deviations from the empirical data, and the resulting Guideline ranges, were modest in comparison to the distortions caused by subsequent amendments. Specifically, since the initial loss Guideline was promulgated, there have been three significant amendments that dramatically increased the severity of the loss table.

In 1989, in the wake of the savings and loan fraud crisis, the Commission increased the severity for offenses greater than $40,000 and extended the loss table by four brackets from losses greater than $5 million to losses greater than $80 million.[25] The resulting loss table was as follows:

| Loss Amount | Applicable Enhancement |
|---|---|
| More than $2,000 | +1 |
| More than $5,000 | +2 |
| More than $10,000 | +3 |
| More than $20,000 | +4 |
| More than $40,000 | +5 |
| More than $70,000 | +6 |
| More than $120,000 | +7 |
| More than $200,000 | +8 |
| More than $350,000 | +9 |
| More than $500,000 | +10 |
| More than $800,000 | +11 |
| More than $1,500,000 | +12 |
| More than $2,500,000 | +13 |
| More than $5,000,000 | +14 |
| More than $10,000,000 | +15 |
| More than $20,000,000 | +16 |

---

[23] *See* U.S. Sent'g Guidelines Manual ch. 5, pt. A (U.S. Sent'g Comm'n 1987), https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/Chapter_5.pdf.

[24] *See id.*

[25] 18 U.S.C. app. §§ 99, 154 (1989).

| More than $40,000,000 | +17 |
|---|---|
| More than $80,000,000 | +18 |

Under the revised table, the enhancement for offenses between $500,000 and $10 million generally increased by 2–3 levels each. However, the enhancements for high-loss frauds, those greater than $10 million, increased at even steeper increments—ranging from a 4-level additional enhancement for frauds between $10 and $20 million to a 7-level additional enhancement for frauds over $80 million. Under this revised table, a first-time fraud offender involved in a $1 million+ fraud scheme, with no applicable enhancements other than loss, would face an Offense Level of 17 and a Guideline range of 24–30 months (previously reserved for a $20 million fraud offender).[26] Further, a first-time fraud offender involved in a $20 million+ fraud scheme, with no applicable enhancements other than loss, would face an Offense Level of 22 and a Guideline range of 41–51 months.[27] At the highest end, just two-years after the initial Guidelines took effect, a first-time fraud offender involved in an $100+ million fraud scheme would face an Offense Level of 24 and a Guideline range of 51–63 months, more than *double* the range from the original loss table.

Subsequent amendments caused the loss table to become further untethered from any empirical grounding. In 2001, as part of the Commission's "Economic Crime Package," the Commission merged three guidelines, 2F1.1 (fraud), 2B1.1 (theft/embezzlement), and 2B3.1 (property destruction) into one Guideline, Section 2B1.1.[28] The new Guideline contained an even harsher loss table, which used two-level increments instead of the former one-level increase for each loss bracket.[29] The amendment additionally increased the severity even more stiffly for losses greater than $400,000, ranging from 4–5 levels for losses over $1 million to an increase of 8 levels for losses greater than $100 million.[30] The resulting loss table was as follows:

---

[26] *See* U.S. Sᴇɴᴛ'ɢ Gᴜɪᴅᴇʟɪɴᴇs Mᴀɴᴜᴀʟ ch. 5, pt. A (U.S. Sᴇɴᴛ'ɢ Cᴏᴍᴍ'ɴ 1989), https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1989/manual-pdf/Chapter_5.pdf.

[27] *Id.*

[28] 18 U.S.C. app. § 617 (2001).

[29] *Id.* This series of amendments was influenced in part by a desire by some to equalize sentences for drug crimes and fraud crimes. *See, e.g.*, Barry Boss & Jude Wikramanayake, *Sentencing in White Collar Cases: Time Does Not Heal All Wounds*, 13 Fᴇᴅ. Sᴇɴᴛ'ɢ. Rᴇᴘ. 15, 16–17 (2000). As these commentators observed, however, inflating the loss tables on this basis would "not only artificially and unnecessarily increas[e] the sentences in these economic crime cases, but also legitimiz[e] as a sentencing baseline the draconian and irrational sentencing scheme in drug cases." *Id.* at 17.

[30] *Id.*

| Loss Amount | Applicable Enhancement |
|---|---|
| More than $5,000 | +2 |
| More than $10,000 | +4 |
| More than $30,000 | +6 |
| More than $70,000 | +8 |
| More than $120,000 | +10 |
| More than $200,000 | +12 |
| More than $400,000 | +14 |
| More than $1,000,000 | +16 |
| More than $2,500,000 | +18 |
| More than $7,000,000 | +20 |
| More than $20,000,000 | +22 |
| More than $50,000,000 | +24 |
| More than $100,000,000 | +26 |

Taking again the example of a first-time fraud offender involved in a $1 million+ fraud scheme, under this new table, with no applicable enhancements other than loss, the offender would face an Offense Level of 22 (5 levels higher) and a Guideline range of 41–51 months (previously reserved for a $20 million fraud offender).[31] Further, a first-time fraud offender involved in a $20 million+ fraud scheme, with no applicable enhancements other than loss, would face an Offense Level of 28 and a Guideline range of 78–97 months (6.5–8 years), nearly double the previously applicable range.[32] At the highest end, a first-time fraud offender involved in an $100+ million fraud scheme, with no other enhancements, would face an Offense Level of 32 and a Guideline range of 121–151 months (10–12.5 years), more than *double* the range from the original loss table.[33]

The final series of significant enhancements came just two years later, in 2003, after the passage of the Sarbanes-Oxley Act. The Commission again amended Section 2B1.1, this time by increasing the base offense level from 6 to 7 for fraud offenses carrying a statutory maximum penalty of 20 years or more.[34] Additionally, the loss table was further extended by two additional brackets, making the highest loss bracket greater than $400 million.[35] At the $400 million+ level, an offender would receive a 30-level increase.[36] For a $400 million+ first-time fraud offender,

---

[31]   *See* U.S. SENT'G GUIDELINES MANUAL ch. 5, pt. A (U.S. SENT'G COMM'N 2001), https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/2001/manual/CHAP5.pdf.

[32]   *See id.*

[33]   *See id.*

[34]   18 U.S.C. app. §§ 647, 653 (2003).

[35]   *Id.*

[36]   *Id.*

this enhancement alone would translate to an Offense Level of 37, with a Guideline range of 210–262 months (17.5–21.8 years).[37]

In 2015, the Commission issued amendments to Section 2B1.1 that modestly addressed concerns previously raised about the operation of the loss table.[38] Most significantly, this amendment adopted a narrower (subjective) interpretation for intended loss, defining intended loss as "the pecuniary harm that the defendant purposely sought to inflict."[39] However, this amendment in no way corrected the underlying problem—that the loss table has become entirely divorced from the empirical data that informed its creation. Rather, with respect to the loss table itself, the Commission maintained the same number of brackets and adjusted the ranges upward for inflation. For example, the "more than $5000" bracket became a "more than $6,500" bracket, the "more than $10,000" bracket became a "more than $15,000" bracket, and so on. However, it simultaneously increased the scale of attendant penalties, thus doubling-down on the draconian punishments that correspond to high-loss economic offenses.

In combination, this series of amendments resulted in a loss table today that recommends sentences for economic crimes that are *orders of magnitude* greater than the same sentence for the same crime back in the mid-1980s. For example, as Judge Rakoff explains, while a typical fraud in 1987 would have produced a guideline range of 30–37 months, by 2003, that same case would result in a recommended sentence of 151–188 months, an increase of more than 500 percent.[40] This gulf between the recommended Guideline sentences and any grounding in empirical data fundamentally undermines the Guideline's ability to fulfill its key function of "reflect[ing] a rough approximation of sentences that might achieve § 3553(a)'s objectives."[41] For this reason, the Supreme Court has held that courts have broad discretion to vary from the Guidelines, even in a run-of-the-mill case, where the particular Guideline provision is not anchored in "empirical data and [past] national experience," as is the case with Section 2B1.1.[42]

---

[37]  *See* U.S. Sent'g Guidelines Manual ch. 5, pt. A (U.S. Sent'g Comm'n 2003), https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/2003/manual/2003guid.pdf.

[38]  For a full description and analysis of these amendments, *see* James E. Felman, *Reflections on the United States Sentencing Commission's 2015 Amendments to the Economic Crimes Guideline*, 27 Fed. Sent'g Rep. 288 (2015).

[39]  U.S. Sent'g Guidelines Manual App. C § 792 (2015).

[40]  United States v. Gupta, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014).

[41]  Kimbrough v. United States, 552 U.S. 85, 109 (2007) (quoting Rita v. United States, 551 U.S. 338, 350 (2007)).

[42]  *Id.* at 109–110 (quoting United States v. Pruitt, 502 F.3d 1154, 1171 (2007)).

## II. SECTION 2B1.1 TODAY

### A. *The Loss Guideline Has Lost its Way*

As discussed below, the economic crimes Guideline, Section 2B1.1, has failed in its mission and, in its current form, cannot be justified by the policy concerns animating its dysfunctional design. Under today's Section 2B1.1 loss table, the loss calculation is often the determining factor in the severity of an economic crime offender's sentence. As the size of the loss increases, particularly at the higher end of the loss table, penalties escalate in magnitude, especially in conjunction with the sentencing table. Today's loss table is as follows:

| Loss Amount | Applicable Enhancement |
|---|---|
| More than $6,500 | +2 |
| More than $15,000 | +4 |
| More than $40,000 | +6 |
| More than $95,000 | +8 |
| More than $150,000 | +10 |
| More than $250,000 | +12 |
| More than $550,000 | +14 |
| More than $1,500,000 | +16 |
| More than $3,500,000 | +18 |
| More than $9,500,000 | +20 |
| More than $25,000,000 | +22 |
| More than $65,000,000 | +24 |
| More than $150,000,000 | +26 |
| More than $250,000,000 | +28 |
| More than $550,000,000 | +30 |

At the highest end, under today's loss table, a loss of $550 million+ results in an Offense Level of 37, with a corresponding Guideline range of 210–262 months (17.5–21.8 years).[43] Notably, this is the *minimum* applicable Guideline range at this loss level, which would only apply to an offender who was not a leader, supervisor, or even manager within the scheme.[44] Rather, this 17–21 year sentence range would apply to the participants with the *least* responsibility for the scheme. In combination with other potentially applicable enhancements, such as a 4-level leadership enhancement and a 2-level sophisticated means enhancement, a first-time offender's

---

[43]   *See* U.S. SENT'G GUIDELINES MANUAL ch. 5, pt. A (U.S. SENT'G COMM'N 2016), https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/2016/GLMFull.pdf.

[44]   *See* U.S. SENT'G GUIDELINES MANUAL § 3B1.1 (U.S. SENT'G COMM'N 2018) (providing for 2-, 3-, or 4-level enhancements for offenders who were leaders, organizers, managers, or supervisors in a scheme).

Offense Level can reach or exceed 43, which corresponds to a sentence of life imprisonment.[45] Thus, as a result of these amendments, the economic crimes Guideline in high loss cases recommends staggering sentences otherwise reserved for violent crimes—regularly sentences of life imprisonment—even for defendants with no prior criminal history.

Such extraordinarily stiff penalties could only be justified by compelling policy concerns that these draconian penalties directly address and resolve. The purpose of Section 2B1.1's focus on the magnitude of the loss is to serve as a proxy for both the seriousness of the offense and for the offender's relative culpability. As the Guideline explains, "[L]oss serves as a measure of [both] the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under this guideline."[46] However, the current loss Guideline performs poorly on both fronts.

To begin with, the calculated loss amount often serves as a poor proxy for either metric because the manner in which loss is calculated in economic crimes cases is often necessarily imprecise. Section 2B1.1 defines "loss" as the greater of actual or intended loss attributable to the entire group of co-defendants. "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense."[47] Many factors make it difficult to accurately calculate this sum. Courts must, among other things, separate out the loss attributable to an economic crime from other complicating causal factors, such as independent market events.[48] Thus, loss calculations are not often a particularly precise metric of the actual magnitude of harm caused. Indeed, courts have recognized that calculating loss is "more an art than a science"[49] and courts are "not required to compute the loss resulting from a fraud offense 'with precision.'"[50] Accordingly, the inherent impreciseness of many loss calculations calls into question the fairness of using this metric alone to overwhelmingly drive the magnitude of sentences imposed on economic crime offenders.

As to the loss calculation's "fit" as a proxy for seriousness of the offense, the current loss enhancement serves as a poor proxy for this factor for two additional reasons. First, the loss calculation ignores a critical consideration—the extent to

---

[45]  *See* United States v. Adelson, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006); *see also* United States v. Parris, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) ("[W]e now have an advisory guideline regime where, as reflected by this case, any officer or director of virtually any public corporation who has committed securities fraud will be confronted with a guidelines calculation either calling for or approaching lifetime imprisonment.").

[46]  U.S. SENT'G GUIDELINES MANUAL § 2B1.1 background (U.S. SENT'G COMM'N 2018).

[47]  *Id.* at § 2B1.1 cmt. 3.

[48]  Peter J. Henning, *White Collar Crime Sentences after* Booker*: Was the Sentencing of Bernie Ebbers Too Harsh?*, 37 McGEORGE L. REV. 757, 763 (2006).

[49]  United States v. Deleon, 704 F.3d 189, 193–94 (1st Cir. 2013) (quoting United States v. Rostoff, 53 F.3d 398, 407 (1st Cir. 1995)).

[50]  United States v. Kumar, 617 F.3d 612, 632 (2d Cir. 2010) (quoting United States v. Jacobs, 117 F.3d 82, 95 (2d Cir. 1997)).

which individuals suffered any actual loss. For example, if a group of offenders dreamt up a $600 million scheme, but caused $0 in actual loss, each offender will be sentenced under Section 2B1.1 as if he caused a $600 million loss to actual victims, which would correspond to a minimum Guideline range—if no other enhancements apply—of 210–262 months (17.5–21.8 years). This is so even if the intended loss was "impossible or unlikely to occur."[51] In contrast, an offender who caused $50 million in actual losses to actual victims would correspond to Offense Level 29 and a Guideline range of 87–108 months (7.25–9 years)—a sentence *over ten years* smaller. The loss table produces this absurd result despite the fact that a crime that causes $0 in actual loss is, in reality, substantially less harmful to society than a crime causing $50 million in actual losses to individuals. Yet, the loss table is entirely blind to this factor in the degree of punishment it recommends.

Second, even where the calculation is based on actual (rather than intended) loss, that calculation often does not correspond with the degree of losses in fact suffered by the victims. It seems axiomatic that a crime in which individuals were deprived of a needed good or service or suffered out-of-pocket losses is more severe than one causing only a diffuse loss of revenue to the government. Yet, the loss table is entirely insensitive to these significant distinctions in the relative seriousness of an offense. In fact, there are many tax, healthcare, and other fraud offenses with high loss amounts resulting from a diffuse loss of government revenue, but where no individual was deprived of any good or service or suffered a loss of any kind.[52]

Third, using the steep ladder of loss enhancements as a proxy for seriousness of the offense results in unfair double counting. The reliance on loss as a proxy for seriousness of the offense is rooted in an assumption that larger loss frauds tend to be more sophisticated, affect a larger number of victims, result in greater illicit gains, and involve an abuse of one's position of power. However, other specific enhancements in Section 2B1.1 already cover many of these same characteristics. For example, Section 2B1.1 contains specific and separate enhancements for whether the offense involved (i) sophisticated means,[53] (ii) a large number of

---

[51] U.S. SENT'G GUIDELINES MANUAL § 2B1.1 application n. 3(A)(ii) (U.S. SENT'G COMM'N 2018).

[52] *See, e.g.* Farha v. United States, Dkt. 16-888, Petition for Certiorari at 9, 26 (Jan. 2017), https://www.scotusblog.com/wp-content/uploads/2017/02/16-888-cert-petition.pdf (noting in a health care fraud case with an $11 million intended loss that the entity involved in the fraud conviction "was no sham corporation; it was a nationally accredited [organization] that provided services exceeding [state agency] standards" and that the case "involves no fake patients, unnecessary treatments, or substandard care"); United States v. Free, 839 F.3d 308, 309, 315 (3d Cir. 2016) (in a bankruptcy fraud case with a $1.83 million loss, all creditors were paid in full); United States v. Woods, No. 1:18-cr-00390-DLF, Doc. 24, at 17–18 (D.D.C. Dec. 13, 2019) (observing that defendant in $500,000 honest services fraud scheme "did not obtain payment for any fake services, but rather provided the contracted training services for which the D.C. Government paid"); United States v. Bernard, No. 2:17-cr-00061-SPC-MRM, Doc. 59, at 10–11 (M.D. Fl. Jan. 23, 2018) (noting that in a tax fraud scheme with a $42 million loss, "there is no victim who inevitably has or will suffer a pecuniary loss" and the only harm was a $4.3 million loss of tax revenue to the government).

[53] U.S. SENT'G GUIDELINES MANUAL § 2B1.1(b)(10) (U.S. SENT'G COMM'N 2018).

Case 2:24-cr-00366-NJC     Document 24-1     Filed 03/11/26     Page 401 of 569 PageID #: 595

victims,[54] (iii) a loss to a Government health care program over $1 million, $7 million, or $20 million,[55] (iv) gross receipts of more than $1 million from financial institutions,[56] (v) a violation of securities or commodities law where the defendant was an officer or director of a publicly traded company, a registered broker or dealer, or an investment adviser,[57] or (vi) certain misappropriations of trade secrets.[58] Accordingly, the severe increases in the loss table, coupled with these independent enhancements, result in deeply unfair double counting, which in high loss cases often results in the extreme and disproportionate recommendation of life imprisonment.[59]

The current loss table is likewise a poor proxy for relative culpability in many cases. For example, the loss calculation fails to account for the extent to which the offender personally profited from the offense. Indeed, each offender is responsible for the total reasonably foreseeable loss attributable to all co-defendants,[60] regardless of how much each offender personally profited from that amount. Accordingly, an offender who saw no profit at all or a nominal amount of profit will be sentenced just as harshly under the loss table as the mastermind who received the greatest share of the profits. This calculation thus fails to fairly account for relative culpability among offenders and results in disproportionately high sentences for more marginal co-conspirators.[61]

Further, the loss tables are entirely insensitive to motive—the reason why an offender committed the crime.[62] As explained in *United States v. Ranum*, "the guidelines treat a person who steals $100,000 to finance a lavish lifestyle the same as someone who steals the same amount to pay for an operation for a sick child . . . [F]rom the victim's perspective the loss is the same no matter why it occurred. But from the standpoint of personal culpability, there is a significant difference."[63] The loss table's insensitivity to these considerations makes it a highly imperfect proxy for both seriousness of the offense and the offender's relative

---

54    *Id.* at § 2B1.1(b)(2).

55    *Id.* at § 2B1.1(b)(7).

56    *Id.* at § 2B1.1(b)(17)(A).

57    *Id.* at § 2B1.1(b)(20).

58    *Id.* at § 2B1.1(b)(14).

59    *See* Daniel S. Guarnera, *A Fatally Flawed Proxy: The Role of "Intended Loss" in the U.S. Sentencing Guidelines for Fraud*, 81 Mo. L. Rev. 716, 743–44 (2016).

60    U.S. Sent'g Guidelines Manual §§ 1B1.3(a)(1), 2B1.1 application n. 3(A)(i) (U.S. Sent'g Comm'n 2018) ("'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense.").

61    *See* United States v. Watt, 707 F. Supp. 2d 149, 155 (D. Mass. 2010) (relying on the Third Circuit for the proposition that, as to peripheral defendants, the loss table can "overstate both the degree of [defendant's] criminality and his need to be corrected" (quoting United States v. Stuart, 22 F.3d 76, 82 (3d Cir. 1994))).

62    *See* United States v. Dikiara, 50 F. Supp. 3d 1029, 1032 (E.D. Wis. 2014) (noting that "the [loss] guideline fails to take into account other relevant factors, including motive and culpability").

63    353 F. Supp. 2d 984, 990 (E.D. Wis. 2005).

culpability. In short, the calculation of loss often fails to directly address the underlying policy concerns justifying reliance on this factor. Accordingly, the current loss table, which is often the determining factor in an economic crime offender's sentence, has an outsized role in influencing such sentences.

## B. *A Judicial Consensus Has Emerged that the Section 2B1.1 Loss Guideline is Unduly Harsh*

As a result of these problems with the design and operation of the loss table, a broad judicial consensus has developed that Section 2B1.1's loss table overstates culpability in a great many cases.[64] For instance, New York federal courts, which handle some of the highest volumes of fraud cases in the country,[65] have repeatedly criticized the grossly disproportionate nature of the loss tables. They have called the loss tables "patently absurd"[66] and "a black stain on common sense"[67] that rely upon a "flawed methodology for tabulating white-collar sentences[.]"[68] Accordingly, courts have concluded that imposing sentences corresponding to the loss tables would "effectively guarantee[] that many such sentences would be irrational on their face."[69] An array of white collar scholars and commentators have likewise echoed these concerns.[70]

---

[64]   *See, e.g.*, United States v. Moody, 2013 U.S. Dist. LEXIS 109506, at *14 (D. Colo. Aug. 5, 2013) (adopting view that the loss guidelines are "fundamentally flawed"); *see also* United States v. Corsey, 723 F.3d 366, 378 (2d Cir. 2013) (Underhill, J., concurring); Bennett et al., *supra* note 19, at 941–44 ("[A]s the guidelines have become harsher and crimes both more complex and involving larger loss amounts, judges regularly sentence economic criminals well below the minimum guideline in all but the smallest of loss cases."); United States v. Johnson, 2018 U.S. Dist. LEXIS 71257 at *11–12 (E.D.N.Y. Apr. 26, 2018) (reasoning that the "loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime"); United States v. Gupta, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012); United States v. Parris, 573 F. Supp. 2d 744, 745, 747–48 (E.D.N.Y. 2008) (finding that application of 18-point loss enhancement was "patently absurd" and varying downward 17 points for defendant with $2.5 million loss (quoting United States v. Adelson, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006))).

[65]   *See* U.S. D. Cts., *Criminal Defendants Pending, by Offense—During the 12-Month Periods Ending September 30, 2017 and 2018*, JUDICIAL BUSINESS tbl. D-8 (2018), https://www.uscourts.gov/sites/default/files/data_tables/jb_d8_0930.2018.pdf.

[66]   *Adelson*, 441 F. Supp. 2d at 515.

[67]   *Parris*, 573 F. Supp. 2d at 754.

[68]   *Johnson*, 2018 U.S. Dist. LEXIS 71257, at *14.

[69]   *Gupta*, 904 F. Supp. 2d at 351.

[70]   *See, e.g.*, Hewitt, *supra* note 3, at 1022; David Debold & Matthew Benjamin, Essay, *"Losing Ground"—In Search of a Remedy for the Overemphasis on Loss and Other Culpability Factors in the Sentencing Guidelines for Fraud and Theft*, 160 U. PA. L. REV. ONLINE 141, 154–55 (2011); Alan Ellis et al., *At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 CRIM. JUST. 34, 35 (2011); Felman, *supra* note 18, at 139; Derick R. Vollrath, Note, *Losing the Loss Calculation: Toward a More Just Sentencing Regime in White-Collar Criminal Cases*, 59 DUKE L.J. 1001, 1001 (2010); Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 FED. SENT'G REP. 167,

Especially as the loss amount increases into the millions, the sentences recommended by the loss table are widely viewed as unduly severe, increasingly arbitrary, and manifestly disproportionate to the non-violent nature of the underlying economic crimes.[71] For example, a first-time fraud offender convicted of wire fraud with a calculated loss over $3.5 million, with no other applicable enhancements, would face an Offense Level of 25 and a Guideline range of 57–71 months. Yet, under the Guidelines, such an offense level would advise a prison term comparable to that recommended for arson, aggravated assault or robbery involving serious bodily injury, and transmission of biological weapons causing serious bodily injury.[72] Likewise, a first-time fraud offender convicted of an offense with a loss exceeding $9.5 million would face an Offense Level of 27—with no other enhancements—and a Guideline range of 70–87 months. Again, under the Guidelines, this sentence is comparable to that recommended for several serious, violent offenses, including attempted murder, arson, and assault with intent to commit murder.[73] These severe sentences, moreover, are recommended equally to offenders who caused $9.5 million in losses to actual individuals and to offenders who caused little or no actual economic harm to any persons.

Further, the magnitude of the scaled loss enhancements far exceeds that of other enhancements designed to capture similar concerns for culpability and seriousness of the offense. By way of comparison, another enhancement designed to measure relative culpability—the leader-organizer enhancement—has only 4 levels of enhancement, ranging from 2 levels for a manager of a small group to 4 levels for the most culpable senior leader of a larger group. In contrast, the loss table has 16 brackets, ranging from 2 levels to 30 levels of possible enhancement.

---

169 (2008); Ellen S. Podgor, *Throwing Away the Key*, 116 Yale L.J. Pocket Part 279, 280 (2007) (describing how reliance on "mathematical computation of loss" can result in "exorbitant sentences" for white-collar defendants); Andrew Weissmann & Joshua A. Block, *White-Collar Defendants and White-Collar Crimes*, 116 Yale L.J. Pocket Part 286, 286 (2007); Boss, *supra* note 29, at 15.

71    *See supra*, notes 63–68.

72    U.S. Sent'g Guidelines Manual § 2A2.2 (U.S. Sent'g Comm'n 2018) (aggravated assault involving a firearm and serious bodily injury to a victim, OL 24 (14 + 5 +5)); *Id.* § 2B3.1 (robbery involving firearm, OL 25 (20 + 5)); *Id.* § 2B3.2 (extortion by force with the threat of death and brandishing of a firearm, OL 25 (18 + 2 + 5)); *Id.* § 2K1.4 (arson knowingly creating a serious risk of death or bodily injury, OL 24); *Id.* § 2M3.3 (unauthorized disclosure of classified national defense information to a foreign government, OL 24); *Id.* § 2M6.1 (transmitting biological weapons causing serious bodily injury to a victim, OL 24 (20 + 2 + 2)); *Id.* § 2N1.1 (tampering with consumer products involving risk of death or bodily injury, OL 25).

73    *Id.* § 2A2.1 (attempted murder); *Id.* § 2A2.1 (assault with intent to commit murder); *Id.* § 2B3.2 (extortion by force with the threat of death and use of a firearm); *Id.* § 2D1.10 (endangering human life while illegally manufacturing methamphetamine); *Id.* § 2K1.4 (arson creating a serious risk of death or bodily injury).

### III. EMPIRICAL DATA SHOWS THAT SECTION 2B1.1 IS NOT FOLLOWED IN THE MAJORITY OF CASES, AND HAS NOT PREVENTED WIDESPREAD SENTENCING DISPARITIES

As discussed above in Part II.B, the economic loss Guideline has lost respect among jurists because of its unjustified harshness. Based on its arbitrariness and the disproportionately severe sentences it often recommends, courts routinely conclude that these Guidelines do not serve as a reliable proxy for culpability and issue sentences below the Guideline range.[74]

This trend has been confirmed by data recently released by the Commission through its Interactive Data Analyzer. The Interactive Data Analyzer shows that judges are more likely to vary below the Guideline range in Section 2B1.1 cases than the average federal criminal case. Specifically, as shown in the last row of Figure 1, federal judges on average tend to grant non-government sponsored downward variances to first-time (Category I) offenders in 18 to 20 percent of all federal criminal cases. In contrast, as shown in the last row of Figure 2, in sentencing first-time offenders under Section 2B1.1, federal judges, on average, grant non-

---

[74] *See, e.g.*, United States v. Musgrave, 647 Fed. App'x 529, 530, 538 (6th Cir. 2016) (affirming downward variance for defendant with offense level of 25 and a $1.7 million loss to a sentence of one day of imprisonment, reasoning that "because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances."); *Johnson*, 2018 U.S. Dist. LEXIS 71257, at *16–20 (finding that application of the 16-point loss enhancement corresponding to $3.1 million gain would result in a sentence "well out of proportion to [an] appropriate sentence" and imposing a sentence of 24 months on defendant with total offense level of 29); Judgment at 2, 8 & Sentencing Transcript at 59, United States v. Murray, No. 1:16-cr-00176-RDM (D.D.C. Feb. 2017), ECF No. 25, 27 (varying downward because loss overstated culpability and sentencing defendant with loss between $250,000 and $550,000 to 6 months imprisonment); Minutes & Transcript at 91–92, United States v. Farha, No. 8:11-cr-00115-JSM-MAP (M.D. Fl. May 19, 2014), ECF No. 882, 885, 888, 891, 903 at 91–2 (varying downward by up to 16.5 years as to defendants convicted at trial of an $11 million fraud from Guideline ranges of 97–293 months (at offense levels 30, 37, and 38), issuing sentences between 12–36 months); United States v. Suarez-Reyes, No. 8:12-cr-67, 2012 U.S. Dist. LEXIS 178771, at *1, *18, *21 (D. Neb. Dec. 18, 2012) (finding that the application of a 14-point loss enhancement would "exaggerate [defendant's] culpability and would not be an accurate measure of his blameworthiness," varying downward to sentence of one day imprisonment for defendant with $693,000 loss); *Gupta*, 904 F. Supp. 2d at 353, 355 (issuing 24-month sentence to defendant in case involving $5 million gain and offense level of 28); United States v. Lenagh, No. 8:07-cr-346, 2009 U.S. Dist. LEXIS 9226, at *17–18 (D. Neb. Feb. 6, 2009) (issuing 24-month sentence in a case involving $1.4 million fraud and affording the fraud Guidelines "less deference" because they are not empirically grounded and as such are "not always a reliable proxy for the culpability of an individual defendant"); Judgment at 3,5, United States v. Kohll, No. 8:04-cr-00409-TDT (D. Neb. Nov. 16, 2004), ECF No. 22 (one year of probation for a mail fraud scheme involving loss of $500,000); United States v. Redemann, 295 F. Supp. 2d 887, 898, 901 (E.D. Wis. 2003) (issuing sentence of 12 months to defendant in $2.5 million fraud involving false and inflated invoices, concluding that the amount of loss "under the guidelines substantially exceeded any fair measure of [defendant's] culpability"); *see also* Bennett et al., *supra* note 19, at 943–44 ("[A]s the guidelines have become harsher and crimes both more complex and involving larger loss amounts, judges regularly sentence economic criminals well below the minimum guideline in all but the smallest of loss cases.").

government sponsored downward variances about 10 percent more frequently, in about 28 to 30 percent of cases.[75]

**Figure 1**

**Sentence Imposed Relative to Guideline Range**
Fiscal Year 2015,2016,2017,2018,2019

| Sentence Range | 2015 N | 2015 % | 2016 N | 2016 % | 2017 N | 2017 % | 2018 N | 2018 % | 2019 N | 2019 % |
|---|---|---|---|---|---|---|---|---|---|---|
| Grand Total | 31,291 | 100.0% | 31,561 | 100.0% | 29,630 | 100.0% | 31,735 | 100.0% | 34,659 | 100.0% |
| Within Range | 14,783 | 47.2% | 15,770 | 50.0% | 14,489 | 48.9% | 16,845 | 53.1% | 19,335 | 55.8% |
| Upward Departure | 137 | 0.4% | 126 | 0.4% | 125 | 0.4% | 98 | 0.3% | 128 | 0.4% |
| §5K1.1 Substantial Assistance | 4,367 | 14.0% | 3,763 | 11.9% | 3,547 | 12.0% | 3,368 | 10.6% | 3,414 | 9.9% |
| §5K3.1 Early Disposition Program | 1,947 | 6.2% | 1,987 | 6.3% | 1,888 | 6.4% | 2,234 | 7.0% | 2,198 | 6.3% |
| Downward Departure Govt Motion | 695 | 2.2% | 738 | 2.3% | 621 | 2.1% | 504 | 1.6% | 490 | 1.4% |
| Non-Govt Downward Departure | 718 | 2.3% | 692 | 2.2% | 535 | 1.8% | 526 | 1.7% | 533 | 1.5% |
| Upward Variance | 310 | 1.0% | 480 | 1.5% | 484 | 1.6% | 456 | 1.4% | 496 | 1.4% |
| Downward Variance Govt Motion | 1,738 | 5.6% | 1,748 | 5.5% | 1,886 | 6.4% | 1,678 | 5.3% | 1,707 | 4.9% |
| Non-Govt Downward Variance | 6,596 | 21.1% | 6,257 | 19.8% | 6,055 | 20.4% | 6,026 | 19.0% | 6,358 | 18.3% |

FILTER:
Fiscal Year: 2015,2016,2017,2018,2019; Crime Type: All; Guideline: All
Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All;
Citizenship: All; Education: All

SOURCE: This was produced using the U.S. Sentencing Commission's
Interactive Data Analyzer (IDA)
(https://ida.ussc.gov).

**Figure 2**

**Sentence Imposed Relative to Guideline Range**
Fiscal Year 2019

| Sentence Range | 2015 N | 2015 % | 2016 N | 2016 % | 2017 N | 2017 % | 2018 N | 2018 % | 2019 N | 2019 % |
|---|---|---|---|---|---|---|---|---|---|---|
| Grand Total | 5,582 | 100.0% | 4,977 | 100.0% | 4,458 | 100.0% | 4,071 | 100.0% | 3,976 | 100.0% |
| Within Range | 2,241 | 40.1% | 2,145 | 43.1% | 1,869 | 41.9% | 1,684 | 41.4% | 1,680 | 42.3% |
| Upward Departure | 15 | 0.3% | 15 | 0.3% | 10 | 0.2% | 11 | 0.3% | 12 | 0.3% |
| §5K1.1 Substantial Assistance | 927 | 16.6% | 745 | 15.0% | 675 | 15.1% | 650 | 16.0% | 590 | 14.8% |
| §5K3.1 Early Disposition Program | 2 | 0.0% | 3 | 0.1% | 4 | 0.1% | 1 | 0.0% | 4 | 0.1% |
| Downward Departure Govt Motion | 108 | 1.9% | 127 | 2.6% | 115 | 2.6% | 68 | 1.7% | 72 | 1.8% |
| Non-Govt Downward Departure | 167 | 3.0% | 125 | 2.5% | 83 | 1.9% | 79 | 1.9% | 62 | 1.6% |
| Upward Variance | 57 | 1.0% | 61 | 1.2% | 49 | 1.1% | 42 | 1.0% | 46 | 1.2% |
| Downward Variance Govt Motion | 362 | 6.5% | 348 | 7.0% | 366 | 8.2% | 326 | 8.0% | 358 | 9.0% |
| Non-Govt Downward Variance | 1,703 | 30.5% | 1,408 | 28.3% | 1,287 | 28.9% | 1,210 | 29.7% | 1,152 | 29.0% |

FILTER:
Fiscal Year: 2019; Crime Type: Fraud/Theft/Embezzlement; Guideline:
§2B1.1 Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All;
Citizenship: All; Education: All

SOURCE: This was produced using the U.S. Sentencing Commission's
Interactive Data Analyzer (IDA)
(https://ida.ussc.gov).

Indeed, courts depart or vary below the Guidelines in the majority of cases to which the Section 2B1.1 loss enhancement applies. For example, from 2015 through 2019, more than 50 percent of sentences issued to fraud offenders were below the

---

[75] *Interactive Data Analyzer*, U.S. SENT'G COMM'N, https://ida.ussc.gov fig. 1 & 2. For purposes of this comparison, we focused on first-time offenders (identified as Category I) because the loss Guidelines are particularly disproportionately harsh with respect to this specific group.

Guideline range.[76] The downward variances given to such offenders, moreover, are typically significant. The mean sentences imposed on fraud offenders in 2018 and 2019 were 21 and 20 months respectively, more than 50 percent below the low end of the Guideline range.[77] Likewise, the median sentences imposed on fraud offenders in 2015 through 2019 were 12, 15, and 16 months, a 45 to 50 percent below the low end of the Guideline range.[78] This is so despite the significant anchoring effect of the Guidelines, and despite the fact that scholarship suggests that anchors influence the judgment of decision makers even when an anchor is incomplete, inaccurate, or otherwise unreliable.[79]

The degree of downward variances issued to fraud offenders, moreover, are typically more substantial than the downward variances issued generally under the Guidelines. The median sentences from 2015 through 2019 across all crimes were between 35 and 37 percent below the low end of the Guideline range, as compared to the 45 through 50 percent downward variances given under Section 2B1.1.[80] This significant trend of substantial downward variances under Section 2B1.1, accordingly, underscores the substantial degree to which this particular Guideline has lost judicial confidence. This data thus provides further evidence that the Section 2B1.1 Guideline overstates the judicial assessment of culpability and the seriousness of these offenses.

While the national data shows that courts vary below the Guideline range under 2B1.1 with higher frequency than in general, and, in so doing, grant substantial variances downward, there are significant variations across jurisdictions in the degree to which courts grant downward variances under this Guideline. A review of all first-time offenders sentenced for economic crimes, by circuit, reveals a

---

[76] U.S. SENT'G COMM'N, 2015 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS tbl.27A (2015) [hereinafter 2015 SOURCEBOOK]; U.S. SENT'G COMM'N, 2016 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS tbl.27A [hereinafter 2016 SOURCEBOOK]; U.S. SENT'G COMM'N, 2017 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS tbl.27A [hereinafter 2017 SOURCEBOOK]; U.S. SENTENCING COMM'N, 2018 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS tbl.31 [hereinafter 2018 SOURCEBOOK]; U.S. SENT'G COMM'N, 2019 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS tbl.31 [hereinafter 2019 SOURCEBOOK]. Notably, the 2015–2019 USSC Sourcebooks provided no statistics on the number of below-Guideline sentences issued to fraud offenders based on the applicable loss calculation.

[77] 2018 SOURCEBOOK, *supra* note 76, at tbl.40; 2019 SOURCEBOOK, *supra* note 76, at tbl.40.

[78] 2015 SOURCEBOOK, *supra* note 76, at tbl.31C (50% decrease); 2016 SOURCEBOOK, *supra* note 76, at tbl.31C (50% decrease); 2017 SOURCEBOOK, *supra* note 76, at tbl.31C (47.8% decrease); 2018 SOURCEBOOK, *supra* note 76, at tbl.40 (46.7% decrease); 2019 SOURCEBOOK, *supra* note 76, at tbl.40 (48.9% decrease).

[79] *See* Felman, *supra* note 18, at 138. Further note that these findings are consistent with scholarship analyzing earlier data sets. *See, e.g.*, Hewitt, *supra* note 3, at 1038 (analyzing data from sentencings in the Southern District of New York between 2002–2012); U.S. SENT'G COMM'N 2013, *supra* note 3 (analyzing national data between 2003–2012).

[80] 2015 SOURCEBOOK, *supra* note 76, at tbl.31C (36.8% decrease); 2016 SOURCEBOOK, *supra* note 76, at tbl.31C (36.4% decrease); 2017 SOURCEBOOK, *supra* note 76, at tbl.31C (34.9% decrease); 2018 SOURCEBOOK, *supra* note 76, at tbl.40 (34.8% decrease); 2019 SOURCEBOOK, *supra* note 76, at tbl.40 (34.8% decrease).

difference of more than 20 percent among the circuits in the degree to which courts have granted downward variances under Section 2B1.1 over the past 5 years (Figure 3).[81]



**Figure 3**
**Average Percentage of Non-Government Sponsored Downward Variances Under § 2B1.1 By Circuit (2015-2019)**

The disparities among courts in sentencing first-time economic crime offenders under Section 2B1.1 are even more substantial when the data is reviewed at a more granular level, by state.

---

[81]    U.S. SENT'G COMM'N, *supra* note 75, fig. 3. We filtered the Interactive Data Analyzer's data down to Category I offenders of economic crimes sentenced under Section 2B1.1 and reviewed the data, by circuit, from 2015–2019, generated under the "Sentence Imposed Relative to Guideline Range" table within the Guideline Application tab. We then averaged, for each circuit, the percentages of non-government sponsored downward variances across the five-year span. We chose to focus on non-government sponsored below-Guideline sentences for purposes of this comparison to exclude cases in which judges granted downward variances or departures based on cooperation with the government. Because cooperation provides a strong reason for a court to grant a below-Guideline sentence independent of the judges' assessment of whether the Guideline range is inappropriately high relative to the offender's culpability, these cases were excluded from consideration.

624          *OHIO STATE JOURNAL OF CRIMINAL LAW*          Vol: 18.2:605



**Figure 4**
**Average Percentage of Non-Government Sponsored**
**Downward Variances Under § 2B1.1 By State (2015-2019)**

**Figure 5**
**Average Percentage of Sentences At or Above Guideline Range Under § 2B1.1 By State (2015-2019)**

| State | Average Percentage |
|---|---|
| Alabama | 52.8 |
| Alaska | 55.5 |
| Arizona | 39.2 |
| Arkansas | 67.4 |
| California | 34.2 |
| Colorado | 58.7 |
| Connecticut | 25.4 |
| DC | 39.7 |
| Delaware | 12.9 |
| Florida | 47.5 |
| Georgia | 40.9 |
| Hawaii | 73.5 |
| Idaho | 67.3 |
| Illinois | 28.8 |
| Indiana | 38.9 |
| Iowa | 64.6 |
| Kansas | 54.8 |
| Kentucky | 51.4 |
| Louisiana | 51.7 |
| Maine | 47 |
| Maryland | 31.4 |
| Massachusetts | 26.6 |
| Michigan | 31 |
| Minnesota | 37.4 |
| Mississippi | 68.6 |
| Missouri | 44.6 |
| Montana | 42.9 |
| Nebraska | 42.4 |
| Nevada | 41 |
| New Hampshire | 60.6 |
| New Jersey | 33 |
| New Mexico | 50.7 |
| New York | 28.5 |
| North Carolina | 48 |
| North Dakota | 52.2 |
| Ohio | 41 |
| Oklahoma | 61.6 |
| Oregon | 23.6 |
| Pennsylvania | 40.5 |
| Rhode Island | 25 |
| South Carolina | 48.3 |
| South Dakota | 64 |
| Tennessee | 37.6 |
| Texas | 61.9 |
| Utah | 36.9 |
| Vermont | 20.5 |
| Virginia | 48.5 |
| Washington | 42.3 |
| West Virginia | 59.2 |
| Wisconsin | 35.3 |
| Wyoming | 38.3 |

■ Average Percentage of Sentences At or Above Guideline Range Under Section 2B1.1 from 2015-2019



**Figure 6**
**Sentences Relative to the Guideline Range Under § 2B1.1**
**By State (2015-2019)**

A review of all first-time economic crime offenders, by state, reveals a difference of more than 40 percent among various states in the degree to which they have granted non-government sponsored downward variances under Section 2B1.1 over the past 5 years (Figure 4).[82] As Figure 4 demonstrates, in some states, such as North Dakota and Kansas, courts rarely grant downward variances under Section 2B1.1. In contrast, in other states, such as Montana, Rhode Island, and Vermont, downward variances are granted in more than half of all cases under Section 2B1.1. This data thus illustrates that the willingness of courts to grant non-government sponsored downward variances under Section 2B1.1 can vary dramatically by state and region. Figure 5 further shows that the extent to which federal courts hew to Section 2B1.1's recommended sentences continues to vary dramatically despite the fact that Section 2B1.1, as with the Guidelines generally, was designed to minimize unwarranted disparities among similarly situated offenders.[83] Courts in some states, like Arkansas, Hawaii, Mississippi, and South Carolina issue Guideline (or higher) sentences in more than 60 percent of all cases under Section 2B1.1. In contrast, courts in other states, like Delaware or Vermont, issue Guideline (or higher) sentences under Section 2B1.1 in only 10 to 20 percent of cases. There is a gulf of greater than 50 percent dividing the courts at either end of this spectrum. Further, as Figure 6 shows, the courts less likely to issue non-government sponsored downward variances are, as a corollary, more likely to issue Guideline-length sentences.

As this data underscores, deep disparities remain in the extent to which economic crime offenders are sentenced to Guideline-length sentences under Section 2B1.1. Moreover, the gap in the relative lengths of sentences issued to 2B1.1 offenders is also likely deep, given that courts granting downward variances under Section 2B1.1 tend to vary substantially, close to 50 percent *below* the Guideline range.[84] In fact, these disparities are a direct byproduct of the loss table's design. As discussed in Part I.B, Section 2B1.1 was designed to drive the severity of sentences for economic crime offenders based primarily on the magnitude of the loss.[85] Yet, it is precisely these excessive penalties attendant to high-loss offenses that have driven many courts to vary deeply below the Guideline range.[86] Accordingly, it is the very design of the loss table itself that perpetuates this deep chasm in sentencing practice

---

[82]    We filtered the Interactive Data Analyzer data down to Category I offenders sentenced under Section 2B1.1 and reviewed the data, by state, from 2015–2019, generated under the "Sentence Imposed Relative to Guideline Range" table within the Guideline Application tab. For each state, we then averaged the percentages of non-government sponsored downward variances across the five-year span.

[83]    In preparing Figure 5, we filtered the Interactive Data Analyzer data down to Category I offenders sentenced under Section 2B1.1 and reviewed the data, by state, from 2015–2019, generated under the "Sentence Imposed Relative to Guideline Range" table within the Guideline Application tab. For each state, we then averaged the percentages of Guideline sentences and upward departures and variances across the five-year span.

[84]    *See* U.S. SENT'G COMM'N, *supra* notes 76–77;

[85]    *See supra* Part I.B; 18 U.S.C. app. § 2B1.1, *supra* note 16.

[86]    *See supra* Part II.B; *supra* note 73.

under Section 2B1.1. The gulf between the economic crimes Guideline and the average sentences issued under this Guideline results in particularly unfair punishment for offenders sentenced by "Guidelines" judges who do not, absent government cooperation or extraordinary circumstances, vary or depart downward, and who do not vary downward based on the harshness of the loss tables. As a result, similarly situated offenders sentenced in different jurisdictions can receive wildly divergent sentences, despite the fact that this is precisely the problem the Guidelines were meant to address and correct.

### IV. Reform of Section 2B1.1's Loss Table is Urgently Needed

As detailed above, Section 2B1.1's loss enhancement is entirely untethered from its empirical roots,[87] fails to effectively address the policy concerns animating this deviation from prior judicial practice,[88] and has lost the confidence of a great many jurists.[89] As a result, the loss enhancement exacerbates, rather than corrects, the underlying problem of unwarranted sentencing disparities that the Guidelines were designed to solve.[90] Moreover, the loss enhancement results, at times, in draconian sentences for non-violent offenders that strain our correction facilities and do nothing to rehabilitate offenders. This cannot and should not be. The time for reform is now.

Meaningful reform has many facets, but we focus on just two that would make the greatest impact in restoring proportionality to Section 2B1.1. First, to increase the reliability of the loss calculation as a proxy for the seriousness of the offense, the loss calculation should be based on *actual* loss, not intended loss. The seriousness of a non-violent offense should generally be measured by the harm actually caused to society, not by the harm an offender fantasizes about causing. Basing the loss calculation on actual loss removes the risk of offenders being sentenced to draconian terms of imprisonment based on an intended loss that was impossible or unlikely to occur.[91] To account for the relatively higher culpability of an offender who intended a substantially greater loss than that which occurred, the Commission could add a separate intended-loss enhancement ranging from 2–4 levels, similar to the aggravating-role enhancement. A separate enhancement would serve as a more proportional proxy for relative culpability than the current Guideline—which is entirely indifferent to whether a given economic offense caused any harm at all as long as a loss was intended.

Alternatively, should the Commission keep intended loss as a basis for the loss calculation, it should require the Government to prove that the defendant not only

---

87   *See supra* Part I.B.

88   *See supra* Part II.A.

89   *See supra* Part II.B.

90   *See supra* Part III.

91   *See* 18 U.S.C. app. § 2B1.1 application note 3(A)(ii) (defining "intended loss" to include "intended pecuniary harm that would have been impossible or unlikely to occur").

Case 2:24-cr-00366-NJC     Document 24-1     Filed 03/11/26     Page 413 of 569 PageID #: 607

"purposely sought to inflict" the loss at issue,[92] but also that the total intended loss was substantially likely to occur. Such an amendment would, importantly, ensure a closer relationship between the evidence of intended loss and the seriousness of the offense conduct.

In addition, the loss table should be anchored in empirical data. As the Supreme Court recognized in *Kimbrough*, Guidelines that reflect empirical data of prior judicial practice serve a critical institutional role to the courts—offering insight into national sentencing practice to help courts avoid unwarranted sentencing disparities.[93] The only Guideline loss table that comes close to reflecting prior judicial practice is the 1987 table, even though that table increased the proposed sentences beyond what the empirical data demonstrated. In an effort to return this Guideline to a firm foundation in empirical data untainted by the anchoring influence of the disproportionate loss Guideline, the Commission should restore the original loss table from 1987, with adjustments for inflation. It could reasonably add additional brackets for higher levels of loss than were accounted for in 1987, but should follow the enhancement pattern established in the 1987 loss table, which relied on 1-level enhancements for each additional bracket. As adjusted for inflation,[94] our proposed loss table could look as follows:

| Loss Amount | Applicable Enhancement |
|---|---|
| More than $5,000 | +1 |
| More than $10,000 | +2 |
| More than $20,000 | +3 |
| More than $50,000 | +4 |
| More than $100,000 | +5 |
| More than $225,000 | +6 |
| More than $450,000 | +7 |
| More than $1,000,000 | +8 |
| More than $2,250,000 | +9 |
| More than $4,500,000 | +10 |
| More than $10,000,000 | +11 |
| More than $50,000,000 | +12 |
| More than $100,000,000 | +13 |
| More than $250,000,000 | +14 |
| More than $550,000,000 | +15 |

---

[92]   18 U.S.C. app. § 792 (2015).

[93]   552 U.S. 85, 108–09 (2007).

[94]   To adjust for inflation, we relied on the Bureau of Labor Statistics consumer price index, under which prices in 2020 are 125% higher than average prices in 1987. *CPI Inflation Calculator*, U.S. Bureau of Labor Statistics, https://www.bls.gov/data/inflation_calculator.htm. We then rounded each figure up or down to a round figure.

Notably, in April 2013 the American Bar Association's Criminal Justice Section assembled a Task Force on the Reform of Federal Sentencing for Economic Crimes to draft a model economic crime guideline that would reflect the chorus of concerns raised by judges and commentators.[95] The Task Force consisted of five professors,[96] three judges,[97] six practitioners,[98] two organizational representatives,[99] and observers from the Department of Justice and the Federal Defenders.[100] The group arrived at a consensus final proposal for the Commission's consideration in November 2014.[101] Our proposal herein aligns significantly with the loss table recommendations made by this Task Force.[102] While our proposed loss table has more levels, the enhancements at each loss level closely correspond with those proposed by the Task Force.[103] Further, while the Task Force's proposed loss table

---

[95]  *A Report on Behalf of the ABA Criminal Justice Section, Task Force on the Reform of Federal Sentencing for Economic Crimes, Final Draft*, AMERICAN BAR ASS'N 8 (Nov. 10, 2014), https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.pdf.

[96]  Stephen Salzburg (George Washington University School of Law), Sara Sun Beale (Duke University School of Law), Nancy Gertner (Harvard Law School), Jane Ann Murray (University of Minnesota Law School), and Kate Stith (Yale Law School). AMERICAN BAR ASS'N, *supra* note 95, at 8.

[97]  The Honorable John Gleeson (Eastern District of New York), the Honorable Gerard Lynch (Second Circuit), and the Honorable Jed Rakoff (Southern District of New York). AMERICAN BAR ASS'N, *supra* note 95, at 8.

[98]  James Felman (Kynes, Markman & Felman), Reporter to the Task Force, Barry Boss (Cozen O'Connor) (author herein), David Debold (Gibson Dunn & Crutcher), Gary Lincenberg (Bird, Marella, Boxer, Wolpert, Nessim, Brooks & Lincenberg), Marjorie Peerce (Ballard Spahr), and Neal Sonnett (Neal R. Sonnett, P.A.). AMERICAN BAR ASS'N, *supra* note 95, at 8.

[99]  Kyle O'Dowd (National Association of Criminal Defense Lawyers) and Mary Price (Families against Mandatory Minimums). AMERICAN BAR ASS'N, *supra* note 95, at 8.

[100]  A.J. Kramer (District of Columbia) and Jonathan Wroblewski (DOJ Office of Policy and Legislation). AMERICAN BAR ASS'N, *supra* note 95, at 8.

[101]  AMERICAN BAR ASS'N, *supra* note 95, at 9.

[102]  We recognize that the ABA proposed guideline focused not solely on loss, as our proposal does, but rather also incorporated enhancements based on relative culpability and victim impact. We appreciate the benefit of this approach and the loss table proposed herein is not offered as a criticism of that more holistic approach. Rather, it is offered as a recognition that the ABA proposed guideline would require a complete overhaul of Section 2B1.1 and has not mustered sufficient support to foment meaningful change to the current Guideline. As our more modest proposal works within the structure of the existing Guideline and would simply restore the loss table to its empirical roots, our hope is that this proposal could generate broader support for meaningful reform.

[103]  For example, the ABA Task Force proposed a 4-level increase for a $20,000 loss, compared with our proposed 3-level increase for the same. The Task Force proposed a 6-level increase for a $100,000 loss, compared with our proposed 5-level increase for the same. Likewise, the Task Force proposed an 8-level increase for a $1 million loss, which is the same recommendation contained in our table. The Task Force likewise proposed a 10-level increase for a $5 million loss, which is the same as our recommendation for a $4.5 million loss. Our table, however, adds a few additional increments at the end to incorporate the highest loss levels reflected in the most recent version of the Section 2B1.1 loss table. AMERICAN BAR ASS'N, *supra* note 95, at 1.

was not anchored in empirical data,[104] its proposed loss enhancements correspond closely to those in our table, which is anchored in the empirically based 1987 loss table. Importantly, the Task Force applied its proposed loss table—with similar enhancement levels to our own—to a number of case scenarios, which reassured the Task Force that the proposed loss enhancements "placed appropriate weight on the consideration[] of loss . . . ."[105]

The Commission's recent launch of the Interactive Data Analyzer presents a unique opportunity to revisit those Guidelines not anchored in empirical data and analyze the degree to which such Guidelines result in unwarranted sentencing disparities. The findings contained in this Article reveal troubling sentencing disparities under Section 2B1.1 and provide a compelling reason for the Commission to re-evaluate the design of Section 2B1.1's loss table. We believe that similar analyses should be undertaken with respect to the drug offense Guidelines, which were likewise not anchored in empirical data.[106] The release of this new data, moreover, presents an important opportunity for the Commission to revisit the Task Force's 2014 recommendations for Section 2B1.1, as well as those offered herein and by other commentators. Should the release of the Interactive Data Analyzer serve as a catalyst for meaningful reform, the Commission will have the opportunity to rebuild the judiciary's faith in Section 2B1.1. If it succeeds in doing it, it may finally restore the loss Guideline's fidelity to its animating purpose of minimizing unwarranted sentencing disparities.

---

[104] AMERICAN BAR ASS'N, *supra* note 95, at 9.

[105] AMERICAN BAR ASS'N, *supra* note 95, at 9.

[106] *See, e.g.*, Kimbrough v. United States, 552 U.S. 85, 96 (2007).



# EXHIBIT U

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

C.Agnello   SE 0413

**Boston University** Law Review

# Rehabilitation Under the Rehabilitation Act: The Case for Medication-Assisted Treatment in Federal Correctional Facilities

Jaclyn S. Tayabji*

101 B.U. L. Rev. Online 79 (2021)

PDF

Abstract

*Incarcerated individuals are situated at the cross section of two destructive and deadly epidemics: mass incarceration and the opioid epidemic. The continuing legacy of the war on drugs is readily apparent in correctional facilities, where the incarcerated population disproportionately exhibits signs of substance use disorder. More than half of the incarcerated population meets the diagnostic criteria for drug dependence. Thus, after decades of racialized and punitive antidrug policies, the most vulnerable individuals, those with opioid use disorder ("OUD"), are behind bars, where they are blocked from the rest of society and from the most effective forms of medical treatment. Although medication-assisted treatment ("MAT") is a proven effective treatment for OUD, incarcerated individuals are often denied access to such*

*medication as a matter of prison policy, putting them at increased risks of recidivism, relapse, and overdose death upon release.*

*This Note argues the United States Bureau of Prisons ("BOP") is violating Section 504 of the Rehabilitation Act of 1973 ("Rehab Act") by discriminating on the basis of disability. BOP largely prohibits the use of MAT for the long-term treatment of OUD for nonpregnant individuals, and it fails to conduct an individualized assessment into whether an accommodation to provide MAT is reasonable. These policies and practices deprive incarcerated individuals with OUD meaningful access to the prison's medical services on the basis of their disabilities. Although it appears that BOP is taking steps to implement a voluntary MAT program, its rollout is far too slow and lacks the key planning details necessary to provide MAT in an effective and timely manner to eligible incarcerated individuals. The number of individuals receiving MAT in BOP custody still drastically trails the number of incarcerated individuals in need of this medication, and it is still uncertain who will be eligible to receive it. Accordingly, BOP's current and foreseeable failure to provide reasonable accommodations to incarcerated individuals with OUD violates the Rehab Act and directly conflicts with Department of Justice initiatives to combat discriminatory barriers to treatment for OUD.*

*The failure to provide MAT to treat OUD is not only a disability justice issue but also a criminal justice issue, a public health issue, and a racial justice issue. It is crucial to hold BOP to the standards espoused in the Rehab Act and to advocate for broader policy changes regarding incarcerated individuals with OUD before more lives are needlessly lost to this treatable disease.*

Introduction[1]

People are dying from a treatable disease. In 2018, more than 68,000 people in the United States lost their lives to drug overdoses.[2] In 2019, this number rose to nearly 71,000 people, [3] with over 70% of overdose deaths involving an opioid.[4] These are not just statistics; every day, 136 people in the United States die from opioid overdoses.[5] These high death tolls contributed to a lower life expectancy in the United States for three years in a row,[6] even before the 2019 novel coronavirus disease ("COVID-19") devastated communities of color[7] and resulted in the greatest single-year drop in life expectancy in at least forty years.[8] The COVID-19 pandemic exacerbated the existing opioid epidemic,[9] healthcare disparities,[10] and other systemic inequities.[11] As a result, in the United States, May 2019 to May 2020 saw

the highest number of overdose deaths ever recorded in a twelve-month period: over 81,000. [12]

The drop in life expectancy during the COVID-19 pandemic correlates with structural inequity, affecting individuals with marginalized identities the most: life expectancy decreased 3 years for Latinx people, 2.1 years for Black people, and 0.68 years for White people.[13] Racial inequity and increased susceptibilities to the COVID-19 pandemic are perhaps most apparent in the country's overcrowded jails and prisons,[14] where the COVID-19 pandemic has exacerbated poor conditions, taxed resources, and placed incarcerated individuals at heightened risk of overdose death upon release.[15] Incarcerated individuals are situated at the cross section of the opioid epidemic and mass incarceration. It is crucial to address incarcerated individuals' heightened vulnerabilities before more lives are needlessly lost.

Mass incarceration is the inevitable aftermath of decades of prosecuting people of color, particularly Black individuals,[16] under the "war on drugs."[17] Although its practices continue to the present day, the phrase war on drugs commonly refers to a series of racialized and punitive antidrug policies[18] from the 1970s to the 1990s that purported to address the overall drug problem in the United States but instead focused on "mass hysteria over crack cocaine" in communities of color.[19] War on drugs legislation classified substances into different "schedules" under the Controlled Substances Act,[20] imposed and lengthened mandatory minimum sentences for drug offenses,[21] and expanded federal drug regulatory agencies like the Drug Enforcement Administration ("DEA"),[22] directly targeting only communities of color.[23] Some of the most devastating policies from the war on drugs involved the criminalization of drug use during pregnancy,[24] which uniquely oppressed Black women because of the intersection of their identities as Black people and as women.[25] The plight of people of color as a result of the drug crisis of the 1980s did not elicit the same levels of public sympathy as the perceived White opioid crisis has today,[26] nor has it resulted in the same recovery support social services.[27] Instead of receiving such support, Black people were incarcerated for drug offenses. As Michelle Alexander notes, "[m]ore African American adults are under correctional control today—in prison or jail, on probation or parole—than were enslaved in 1850, a decade before the Civil War began."[28]

The war on drugs met its goal; the number of people incarcerated for drug offenses increased from 40,900 to 430,926 between 1980 and 2019.[29] The United States now has the highest incarceration rate in the world,[30] with people of color and individuals with other

C.Agnello   SE 0416

marginalized identities disproportionately represented in this population.[31] Today, the incarcerated population includes the most vulnerable amongst individuals with opioid use disorder ("OUD") because they are blocked from the rest of society and, in fact, from the most effective forms of medical treatment.

Although medication-assisted treatment ("MAT") is a proven effective treatment for OUD,[32] as of 2018 only 20% of those with OUD received specialty addiction treatment like MAT.[33] People of color have historically had even less access to MAT, with one study finding Black patients had a 77% lower chance of receiving buprenorphine, a specific type of MAT, compared to White patients.[34] Instead of receiving treatment, many OUD patients are incarcerated,[35] where they are denied access to MAT as a matter of prison policy and without any individualized risk assessment.[36] Upon entering custody, OUD patients who were previously prescribed MAT are often forced to abruptly stop their prescribed medications, which jeopardizes their long-term recovery, health, safety, and lives by increasing the risk of relapse—including overdose deaths—and recidivism upon release.[37] The potential damage from discontinuing treatment is compounded by the other social, health, physical, and emotional factors prevalent within correctional facilities,[38] rendering rehabilitation-focused intervention crucial at such a vulnerable time. Potentially thousands of individuals with OUD in federal custody[39] lack access to prescription medications to treat their OUD or are prohibited from continuing their treatment. These policies fail to account for individuals' disabilities and refuse them the concomitant protections and reasonable accommodations they should be offered.

Many advocates have urged the removal of discriminatory barriers to MAT.[40] This includes the United States Department of Justice ("DOJ"), which created an entire initiative to target disability discrimination against individuals with OUD and "to ensure that individuals who have completed, or are participating in, treatment for [OUD] do not face unnecessary and discriminatory barriers to recovery."[41] Section 504 of the Rehabilitation Act of 1973 ("Rehab Act")[42] was enacted to prevent disability discrimination by the federal government.[43] However, disability discrimination is still widespread against individuals with OUD despite decades of Rehab Act enforcement. The DOJ, and the federal agencies under its control, including the United States Bureau of Prisons ("BOP"), have not lived up to the ideals espoused by their representatives[44] or the legal requirements codified in the Rehab Act.[45]

This Note argues the BOP policies prohibiting the use of MAT for long-term treatment of OUD violate the Rehab Act by depriving inmates of reasonable accommodations for their disabilities. Part I will address the severity of this problem, the prevalence of OUD in correctional facilities, and MAT's availability as an effective treatment method for OUD. Part II will summarize case law under the federal Rehab Act and its state and local counterpart, the Americans with Disabilities Act ("ADA"),[46] addressing some of the counterarguments in response to reasonable accommodations. Finally, Part III will argue that BOP's policies are unlawful as a matter of U.S. federal statutory law under the Rehab Act and that BOP's policies must account for individualized assessments of incarcerated individuals with OUD.[47] With such a high death toll, urgent legal intervention is necessary to hold correctional facilities accountable and to ensure individuals with OUD receive medical care for their disabilities.

1. The Ongoing Failure to Respond to OUD in Correctional Facilities

A.  The Opioid Epidemic and Correctional Facilities

The continuing legacy of the war on drugs is readily apparent in correctional facilities, where the incarcerated population disproportionately exhibits signs of substance use disorder. More than half of the incarcerated population meets the diagnostic criteria for drug dependence. [48] Although the chain of causation is unclear, and a multitude of other factors are at play, there is also a strong correlation between substance use and criminal activity.[49] For example, statistics show that nearly two-thirds of nonviolent offenders discharged from prisons indicated they had been using illegal drugs in the month preceding the offense, and about 40% reported using drugs at the time of the offense.[50] This link between illicit substances and crime is especially pertinent when looking at incarceration for drug offenses in federal correctional facilities. As of December 2017, 46% of the 155,233 federal prisoners in BOP custody were incarcerated for drug offenses.[51] The impact has not been borne equally; in 1999, 46% of individuals charged with a federal drug offense were Latinx, and by 2001 over 80% of federal defendants facing crack cocaine charges were Black.[52] Federal prisoners also generally have longer periods of incarceration than their state counterparts, "reflect[ing] the higher proportion of trafficking offenders and the more serious drug distribution crimes that fall under Federal jurisdiction."[53]

The disproportionate representation of substance use disorder within both state and federal correctional facilities highlights the need for robust institutional changes to address the

medical needs of incarcerated individuals, whatever the circumstances of their offense and the conditions of their incarceration. This disease deserves to be treated like any other chronic medical condition, including through the provision of effective medical treatment where reasonable accommodations so warrant.

B.    Medication-Assisted Treatment

1. MAT Is a Critical Part of the Solution to the Opioid Epidemic

Recent clinical studies have demonstrated that MAT is an effective treatment method for OUD. [54] The two forms of MAT addressed in this Note, methadone and buprenorphine,[55] are "opioid agonists"—opioids that bind to the brain's opioid receptors, preventing the uptake of other opioid particles, such as from heroin or fentanyl.[56] These medications allow patients to pursue normal activities of daily living without the debilitating drug cravings or negative repercussions of illicit drug use.[57] An overwhelming consensus in the medical community endorses MAT as an effective treatment method for OUD, and several renowned organizations and government officials have recommended its use in correctional facilities.[58]

Regulations and guidelines governing MAT recognize that the best practices for the treatment of OUD involve individualized assessments into each patient's needs, including their medical histories, other medications, and complicating factors.[59] As such, a "formulaic policy generically applied to all patients meeting specific criteria or in specific situations without evaluation by a physician or other qualified healthcare provider" is unacceptable.[60] This individualized assessment suggests certain individuals may be on MAT for several years or indefinitely, "just as persons with other chronic medical conditions, like diabetes, may need to take medication regularly throughout their lives."[61] Longer-term MAT treatment also renders successful treatment outcomes more likely.[62] However, despite this guidance, correctional facilities often categorically prohibit MAT as a long-term treatment method for incarcerated individuals.

2. Correctional Facilities Fail to Provide MAT for OUD

a.    Institutional Policies

Despite evidence suggesting that methadone and buprenorphine are some of the most effective treatment methods for OUD in correctional facilities,[63] treatment programs for incarcerated individuals rarely include MAT. Rather, out of the nation's 5,100 jails and prisons, "fewer than 30, according to the federal Bureau of Justice Assistance, offer opioid users the most proven method of recovery: administering methadone or buprenorphine."[64] BOP facilities provide substance use treatment through drug education courses, nonresidential "drug abuse treatment,"[65] residential "drug abuse treatment,"[66] and community transition treatment.[67] More than half of BOP facilities[68] operate a residential drug treatment program, in which eligible incarcerated individuals are separated from the general prison population and provided a therapeutic model of treatment based on cognitive behavioral therapy.[69] However, for the most part, MAT is not offered as part of this treatment program.[70]

BOP policies only enumerate "three approved uses" in which methadone is permitted within federal correctional facilities[71]: (1) longer-term treatment of opiate addicted pregnant inmates,[72] (2) short-term detoxification of opiate addicted inmates,[73] and (3) treatment of severe pain.[74] Correctional facilities that administer methadone for opioid treatment, including pregnancy and detoxification, must abide by federal standards.[75] On a positive note, BOP has recently launched a MAT trial program for incarcerated individuals, and recent litigation against BOP has forced its hand in settlement agreements.[76] However, this piecemeal and defensive response fails to move the needle toward protecting all individuals with OUD incarcerated in its prisons.

b.   Obstacles to Policy Change

Courts have also been slow to make changes affecting incarcerated individuals' medical needs and substance use disorder in particular, and several obstacles impede challenging correctional facilities' prohibitions of MAT as disability discrimination. Section II of this Note addresses legal issues that disability discrimination claims under the Rehab Act face.[77] However, there are several nonlegal obstacles that render policy change more difficult.

First, there is a cultural view that prisoners should be punished and lose their rights during incarceration. In this view, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."[78] Second, courts often defer to prison administrations to formulate

policies within correctional facilities,[79] as the "complex and intractable" problems in correctional facilities are "not readily susceptible of resolution by decree."[80] This means that "courts will accept patently absurd justifications for practices like isolation, and will give medical evidence far less weight in prison cases than in cases outside the prison context."[81] Lastly, MAT is a relatively new area of research, and there is widespread misunderstanding about MAT and the nature of OUD as a disease.[82] Accordingly, prison officials at various levels of the institution often harbor misguided stereotypes[83] about MAT and its role in treating OUD.[84] These individuals may be averse to MAT out of principle.

### 3. 3.   Recent Shifts in Thinking About MAT

#### a.   In Prisons

MAT is "inching its way into jails and prisons,"[85] although this change is slow and with significant limitations. For example, state prisons and jails have paved the way for MAT programs treating incarcerated individuals with OUD[86]—including individuals who were previously prescribed MAT and who first received MAT during incarceration. Additionally, Massachusetts launched a pilot program to provide MAT in select jails and prisons across the state.[87] Massachusetts is also home to the first jail to become a licensed opioid treatment program ("OTP") in the country[88]: "I think it's working," correctional officer Lee Terrell said about the in-jail OTP program.[89] "I think violence in the facility has gone down. We used to get a lot [of medication] through the mail; there used to be a lot of contraband. That has come to minimal, if anything."[90] Initial research looking at some of these state initiatives demonstrates its success.[91]

Outside of its approved uses, BOP has begun to explore the use of MAT for longer-term treatment. BOP began this inquiry by providing naltrexone[92] as an inmate is transitioned back to the community.[93] In fiscal year 2018, BOP planned to expand this trial MAT program for approximately 160 offenders released in the Boston, Massachusetts area,[94] and BOP officials have said that, as of January 2020, "eligible inmates incarcerated in all of BOP's institutions have access to naltrexone."[95] However, naltrexone has traditionally had lower success rates than buprenorphine and methadone,[96] and, despite the importance of providing MAT in a "patient-centered" manner,[97] BOP's inquiry into other forms of MAT has been far too late, limited, and slow to implement. Fortunately, in fiscal year 2019, BOP implemented a new voluntary MAT program for incarcerated individuals with OUD,[98] which

combines cognitive behavioral therapy with methadone, buprenorphine, and naltrexone treatment.[99] However, despite goals to expand the program, BOP "lacks key planning elements to ensure this significant expansion is completed in a timely and effective manner."[100] Accordingly, the author operates under the assumption that BOP facilities will not see a widespread MAT program for several years.

b.   In Courts

Recent litigation and investigative efforts under the ADA[101] and Rehab Act evidence shifts in legal thought, suggesting that the failure to provide MAT in correctional facilities may constitute disability discrimination. Although enacted later, the ADA was modeled after the Rehab Act and is interpreted in similar ways.[102] Therefore, legal shifts under both disability discrimination statutes evidence the likelihood of success in future Rehab Act litigation, even though none have yet to affirmatively recognize a violation of the ADA or Rehab Act.

First, at least two trial courts have granted preliminary injunctions requiring correctional facilities to provide MAT where plaintiffs brought ADA claims for disability discrimination based on refusal to provide the medication.[103] Importantly, the legal standard for preliminary injunction requires a sufficient likelihood of success on the merits of the claim, combined with both a strong balance of harms and a public interest in favor of the plaintiff. [104] Both courts found a sufficient likelihood of success on the merits of the disability discrimination claim.[105]

Second, the DOJ launched an initiative to remove discriminatory barriers to treatment for individuals with OUD, under which "[t]he [ADA] provides one of the many tools that the [DOJ] can and does use to expand access to recovery for individuals addicted to opioids."[106] Under this initiative, the DOJ reached successful settlement agreements against employers and businesses that discriminated against individuals using MAT.[107] As part of these agreements, the facilities adopted nondiscrimination policies, agreeing "not [to] deny services on the basis of disability, including opioid use disorder, or apply standards or criteria that screen out individuals with disabilities."[108] Although both agreements settled claims under Title III of the ADA in the context of public accommodations, these agreements provide important examples of disability discrimination against MAT users and show the DOJ's explicit position on this issue.

In 2018, the U.S. Attorney's Office for the District of Massachusetts also began an investigation into whether the Massachusetts Department of Corrections' failure to provide MAT was a possible ADA violation.[109] The investigation noted that "all individuals in treatment for OUD, regardless of whether they are inmates or detainees, are already protected by the ADA, and that the [Massachusetts Department of Corrections] has existing obligations to accommodate this disability."[110] Although the U.S. Attorney's Office has not concluded whether the Massachusetts Department of Corrections violated the ADA, the mere existence of this investigation suggests movement in the legal landscape surrounding disability discrimination against MAT users.

Third, lawsuits alleging disability discrimination for a correctional facility's failure to provide MAT have resulted in favorable settlements requiring the defendant to provide MAT. In *Smith v. Fitzpatrick*,[111] the plaintiff had been in recovery using physician-prescribed MAT for over five years prior to his incarceration, and the correctional facility's policy prohibiting MAT would have forced him into acute withdrawal when he reported to prison.[112] Under the settlement agreement, the Maine Department of Corrections agreed to continue providing Smith with medication while in state custody.[113]

BOP has not been immune from disability discrimination litigation. BOP recently settled three separate lawsuits to provide MAT to incarcerated individuals and allowed the plaintiffs to continue MAT while incarcerated.[114] Although settlements do not necessarily admit to a statutory violation, BOP officials acknowledged that its new MAT program began in part as a response to "several lawsuits regarding the provision of MAT to federal inmates."[115] Clearly, disability discrimination litigation has spurred policy shifts that will continue to benefit more incarcerated individuals with OUD as the MAT program is expanded. However, until every eligible incarcerated individual with OUD can receive MAT, BOP is discriminating on the basis of disability and jeopardizing the lives and well-being of its incarcerated population.

C.   MAT in Correctional Facilities Is Crucial

BOP has a "responsibility to provide inmates with opportunities to participate in programs that can afford them the skills they need to lead crime-free lives after release. The BOP's philosophy is that release preparation begins the first day of imprisonment."[116] Policymakers on both sides of the ideological spectrum embrace successful prisoner reentry as a "rational policy goal" for decision-making within correctional facilities.[117] However,

C.Agnello   SE 0423

BOP's current treatment programs for substance use disorder fail to live up to this responsibility.[118] BOP's failure to provide MAT renders an incarcerated individual further vulnerable to recidivism and overdose death upon release,[119] among other risks.[120] This also affects the broader community; because substance use disorder devastates communities everywhere,[121] albeit in different ways,[122] adequate medical care within prisons will lead to better health outcomes in the community.[123] As such, "we cannot speak of the health of the nation without also addressing the health of individuals in prisons, jails and other institutions."[124] It is crucial to intervene in the correctional facility context and treat OUD using scientifically proven pharmacological treatment methods.[125]

Failure to provide MAT in correctional facilities reduces incarcerated individuals' potential to successfully reintegrate into the community and renders them more likely to relapse to illicit substance use and criminal activity. Incarcerated individuals already exhibit high recidivism rates.[126] However, given the large proportion of incarcerated individuals with substance use disorder or dependence and the correlation between illicit substance use and criminal activity, [127] there is likely a connection between relapse to substance use and recidivism after release. This is especially apparent where an individual was already on the path to recovery through the use of MAT prior to their incarceration but was forced to stop their prescribed medication.[128] On the other hand, providing MAT within correctional facilities would allow the most effective treatment method to reach those in need and would give them the opportunity to build upon a period of recovery prior to release. This medical intervention places an individual in a position to most successfully reenter the community without returning to criminal activity after release.[129]

The failure to provide MAT in correctional facilities also increases an incarcerated individual's likelihood of overdose death. Overdose is already the leading cause of death for individuals recently released from prison.[130] Recently released individuals are significantly more likely to die from an overdose or related fatality in the first two weeks following release from prison, compared to the general population.[131] This is because, after a period of forced abstinence without adequate medical treatment, an incarcerated individual who returns to the community will have a significantly lower tolerance to substances and be susceptible to other factors affecting overdose risk. On the other hand, MAT is correlated with a reduced risk of mortality in the weeks following release,[132] and prisoners who continue their previously prescribed MAT throughout incarceration have better outcomes than those who are forced to discontinue MAT

during incarceration.[133] Providing MAT in jails and prisons saves lives. Fortunately, the movement to offer MAT in correctional facilities is only growing stronger.[134]

1. II.   Disability Discrimination Under the Rehab Act

A.   The Rehab Act

The Rehab Act protects against disability discrimination in a range of contexts. It states that "[n]o otherwise qualified individual with a disability" shall, "solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination" by any program receiving federal funding or conducted by a federal Executive agency.[135] To establish a claim under the Rehab Act, an individual must establish that they are (1) an "individual with a disability," (2) who is "otherwise qualified," (3) and "excluded from the participation in, . . . denied the benefits of, or . . . subjected to discrimination," (4) "solely by reason of her or his disability."[136] In assessing the elements of this legal claim, case law "under the Rehab[] Act [is] precedent for cases under the ADA, and vice-versa,"[137] because the statutes are interpreted in similar ways and generally provide the same statutory rights, procedures, and remedies to covered individuals.[138] These rights, procedures, and remedies are available for "prisoners who bring litigation concerning access to medical care . . . ."[139]

For purposes of the Rehab Act, an individual has a disability if he or she "has a physical or mental impairment that substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment."[140] Although individuals currently engaging in illegal drug use are excluded,[141] an individual is still entitled to protection under the Rehab Act if they are no longer engaging in illegal drug use, including if they participate in a supervised rehabilitation program.[142] Additionally, an argument can be made that individuals currently engaging in illicit drug use should still qualify for reasonable accommodations for medical treatment. The Rehab Act specifically prohibits discrimination on the basis of current illegal drug use for purposes of programs and activities providing health services if the individual is otherwise entitled to such services.[143]

An individual with a disability is otherwise qualified for a program, service, or activity "who is able to meet all of a program's requirements in spite of his [disability]."[144] The DOJ's regulations reinforce this holding by articulating that an otherwise qualified individual is one "who meets the essential eligibility requirements [with respect to any DOJ program, service, or

activity] and who can achieve the purpose of the program or activity" without "fundamental alteration[s]."[145] The ADA and Rehab Act apply to correctional facilities,[146] and this guarantee of indiscriminate service includes medical care provided to the incarcerated population.[147]

There appears to be a circuit split as to whether an individual can bring a claim for reasonable accommodation for medical services, where the medical services would be for the disabling condition itself.[148] Second, Seventh, and Tenth Circuit cases suggest an individual cannot bring such a claim; in this view, they are not "otherwise qualified" because they would not be eligible for the medical services absent the disability.[149] However, these cases invoke the disavowed idea that a person with a disability can only demonstrate discrimination through comparison to a person without a disability,[150] and they predate the Supreme Court's important decision in *United States v. Georgia*.[151]

In *Georgia*, a paraplegic prison inmate alleged disability discrimination based on the state prison's deliberate refusal to accommodate his disability-related needs.[152] The Court said that "it is quite plausible that the alleged deliberate refusal of prison officials to accommodate [plaintiff's] disability-related needs in such fundamentals as . . . medical care . . . constituted [an ADA violation]."[153] However, the issue was whether the plaintiff's claims under Title II of the ADA against the state prison could abrogate state sovereign immunity. The Court held that abrogation of state sovereign immunity was valid, because the Title II claims alleged deliberate indifference to accommodate the plaintiff and would independently violate the Eighth Amendment, as incorporated against the states by the Fourteenth Amendment.[154] However, the Court also noted in dicta that the plaintiff could potentially assert Title II claims "premised on conduct that does *not* independently violate the Fourteenth Amendment" by rising to the Eighth Amendment's deliberate indifference standard.[155] Although abrogation of state sovereign immunity is not at issue when challenging BOP practices, *Georgia* is important because the Court explicitly voiced that an ADA violation may be based on discrimination in a prison's medical care.[156]

In *Kiman v. New Hampshire Department of Corrections*,[157] the First Circuit took a different approach from the aforementioned circuits and cited *Georgia* to reach its conclusion.[158] In *Kiman*, a former state inmate alleged that prison officials had violated the ADA by failing to properly treat his amyotrophic lateral sclerosis or provide reasonable accommodations for his disability.[159] The First Circuit found there was a triable issue of fact as to the ADA claim

where the prison officials failed to provide prescription medication on a regular basis, suggesting the denial of medical services or medication may constitute a plausible legal claim for discrimination.[160]

Thus, *Kiman* likely demonstrates that failure to provide medical care post-*Georgia* is a legitimate basis for a disability claim under the ADA.[161] Accordingly, a prisoner bringing a reasonable accommodation claim based on medical services to treat the prisoner's underlying disability should be "otherwise qualified" for such services. Because "[a]ccess to prescription medications is part of a prison's medical services," it is a service covered by the ADA.[162]

An otherwise-qualified individual with a disability may be discriminated against in a number of ways,[163] including through intentional discrimination, disparate impact, and failure to make a reasonable accommodation.[164] An entity discriminates by failing to make a reasonable accommodation if they know of an individual's disability[165] and they fail to implement reasonable accommodations to their policies, practices, and procedures that otherwise deprive an individual of "meaningful access" to the program or activity.[166] For example, an individual may be deprived of meaningful access to prison medical services if they lack access to effective treatment, including if they are denied access to "the only form of treatment shown to be effective at managing [the individual's] disability."[167] An ADA or Rehab Act claim based on the failure to provide a reasonable medical accommodation must go beyond mere disagreement with a particular course of treatment or inadequate medical care but must demonstrate that the policy amounts to discrimination.[168] With regards to prescription medications, some courts have indicated that the complete denial of access to medications is not "a medical 'judgment' subject to differing opinion—it is an outright denial of medical services."[169]

Lastly, discrimination may be based on an individual's disability if it rests on stereotypes about the disabled and is not based on "an individualized inquiry into the patient's condition."[170] *Pesce v. Coppinger*[171] highlights that per se rejections of treatment options may violate the ADA because they lack the requisite individualized analysis.[172] In *Pesce*, the plaintiff had achieved two years of recovery from his OUD using methadone and sought an injunction to continue this medication during incarceration at Essex County Jail. Prior to methadone, Pesce had unsuccessfully tried other treatment methods for his OUD,[173] and his physician warned that he was not yet ready to taper off of his medication.[174] The court found the jail's policy prohibiting opioids like buprenorphine and methadone precluded an individualized assessment

or consideration of Pesce's specific medical needs.[175] Therefore, the court found Pesce was likely to succeed on the merits of his disability discrimination claim and granted a preliminary injunction allowing Pesce to continue MAT in jail.[176]

This is distinguishable from *Kiman*, where the court found defendants' decisions regarding Kiman's medical treatment did not violate the ADA because "prison medical staff sought [Kiman's] medical records" and "arranged an outside specialist consultation" before determining the "types of treatment and physical therapy that they thought were appropriate in his case."[177] Accordingly, prison officials did conduct an individualized assessment into Kiman's medical needs, and they had latitude to decide how to treat his conditions. Thus, both *Pesce* and *Kiman* highlight the need for an individualized assessment when a reasonable accommodation request pertains to medical services.

B.   Affirmative Defenses to a Rehab Act Claim

A covered entity does not need to take any and all actions to accommodate individuals with disabilities. For example, a covered entity is required only to make accommodations that are reasonable, depending on the specific individual, context, and type of accommodation requested. Additionally, a covered entity does not need to make changes that would cause a "fundamental alteration in the nature of a program or activity."[178]

*Southeastern Community College v. Davis*[179] first interpreted the Rehab Act and articulated an entity's obligation to modify policies, practices, or procedures through a reasonable accommodation.[180] *Davis* dealt with whether the Rehab Act's prohibition on discrimination against an otherwise qualified individual with a disability forbade a professional school from imposing physical qualifications for admission to its clinical training programs.[181] The Court found that, due to the nature of the respondent's disability, "nothing less than close, individual attention by a nursing instructor would be sufficient to ensure patient safety if respondent took part in the clinical phase of the nursing program."[182] Further, respondent's absence from the clinical program would require the College to implement vast curricular changes, with little benefit to respondent.[183] Accordingly, the Court held that "[s]uch a fundamental alteration in the nature of a program is far more than the 'modification' the regulation requires."[184]

Therefore, the Rehab Act's prohibition of disability discrimination against an otherwise qualified individual with a disability by a federally funded program does not extend to an individual who, in order to meet reasonable eligibility standards, needs program or policy modifications that would fundamentally alter the nature of the entity's program. Although institutions are still required to make reasonable accommodations based on an individualized inquiry,[185] drawing a line before changes cause fundamental alterations preserves the "balance between the statutory rights of the [individual with a disability] to be integrated into society and the legitimate interests of federal grantees in preserving the integrity of their programs."[186]

A covered entity is also spared from making accommodations that would pose "undue financial and administrative burdens."[187] The entity must demonstrate the expected financial and administrative burdens render an accommodation unreasonable, rather than merely speculating about foreseeable challenges.[188]

Lastly, a covered entity does not need to make accommodations for an individual that poses a "direct threat" or "significant health and safety risks" to others, because an individual who poses a direct threat would not be otherwise-qualified for the service or activity.[189] This direct threat analysis must be individualized and grounded in current medical or other objective scientific knowledge, rather than generalizations or stereotypes about the disability. [190] In the prison context, prison administrators undoubtedly face "unique circumstances and challenges" that contribute to overall safety and security considerations.[191] Pertinent security concerns include fear of drug diversion and prisoner safety.[192]

Because of these unique safety and security concerns, prison officials may infringe on prisoners' *constitutional* rights as long as the discriminatory policies are "reasonably related to legitimate penological interests" in safety and security.[193] *Turner v. Safley*[194] examined these circumstances to determine whether two prison policies infringing prisoners' constitutional rights were permissible or whether they represented an "exaggerated response to the claimed security objectives."[195] Although striking down a regulation infringing the fundamental right to marry, the Court upheld a regulation prohibiting correspondence between inmates that was logically connected to the prison's security concerns.[196] The Court deferred to prison officials' implementation of such a policy, paying particular attention to the balance between prisoners' rights and corresponding threats to the prison's core functions.[197]

*Turner* focused on constitutional rights, and the scope of statutory rights were not at issue. It is unclear whether *Turner*'s analysis for balancing legitimate penological interests applies to statutory rights like those under the Rehab Act in the same way as constitutional rights.[198] However, some courts have still considered variables from *Turner* in determining whether infringement of prisoners' statutory rights are permissible in furtherance of safety and security interests.[199] These variables include "security and cost"[200] and "maintaining . . . order[,] and operating an institution in a manageable fashion."[201]

At the very least, the direct threat analysis in the correctional facility context must identify "specific" security concerns that arise when an individual requests an accommodation.[202] This analysis cannot rely on past instances of concern, "generalizations or scientifically unsupported assumptions about MAT or persons who receive MAT for [OUD]."[203] Where there are no "medical or individualized security considerations underlying the decision to deny access to medically necessary treatment," a discriminatory policy is either "'arbitrary or capricious-as to imply that it was the pretext for some discriminatory motive' or 'discriminatory on its face.'"[204]

III.  The BOP's Current Practices Violate the Rehab Act

The Rehab Act applies to BOP because DOJ regulations expressly prohibit disability discrimination in programs or activities conducted by the DOJ.[205] Because there is uncertainty about the long-term plans for BOP's new MAT program, the precise contours of a Rehab Act claim are unclear.

BOP purports that its MAT program will provide MAT "based on individuals' needs" and as clinically determined by a health care professional,[206] presumably affording individualized assessments to incarcerated individuals with OUD. However, while BOP has provided naltrexone to all eligible incarcerated individuals in BOP institutions as of December 2019, its expansion to include methadone and buprenorphine is far too slow and underinclusive. The number of individuals receiving methadone and buprenorphine[207] still drastically trails the number of incarcerated individuals in need of this medication. Accordingly, BOP's current and foreseeable failure to provide reasonable accommodations for incarcerated individuals violates the Rehab Act.

Additionally, while BOP is taking steps to provide methadone and buprenorphine, it is uncertain who will be eligible to receive it. BOP officials expect these medications to be provided "on a case-by-case basis—generally, if an inmate is already receiving either medication upon entering BOP custody."[208] This limitation seems to be a practical response to the liability BOP has faced through its categorical denial of medical care, and, as of January 2020, BOP had not finalized draft clinical guidance for the MAT program. Accordingly, while the author is encouraged by BOP's policy shifts and its apparent recognition that OUD is a disease deserving of—and requiring—adequate medical care, litigators in this space may soon need to refocus their attention. Future advocacy must include the urgent need for BOP to provide MAT to *all* incarcerated individuals with OUD who want the treatment, regardless of whether they were previously prescribed MAT prior to incarceration.

A.   Challenging BOP Policies Under the Rehab Act

Federally incarcerated individuals with OUD are clearly individuals with a disability under the Rehab Act.[209] As additional evidence, the aforementioned trial court cases and settlement agreements alleging discrimination against MAT users do not contest that the plaintiffs are qualified individuals under the ADA.[210] Although individuals are not covered on the basis of "psychoactive substance use disorders resulting from current illegal use of drugs,"[211] individuals fall within the Rehab Act's protection once they are no longer using illegal drugs. [212]

Incarcerated individuals who were not previously prescribed MAT will have to overcome the statutory hurdle to establish that they are not currently using illegal substances. The Rehab Act excludes from its protections only individuals who are currently using illegal substances "*when a covered entity acts on the basis of such use.*"[213] Circuits differ as to how long a plaintiff must abstain from substance use to regain the protection of disability discrimination statutes—in other words, how much time is needed to believe that the plaintiff is no longer using illicit substances and is thus worthy, in the legislature's view, of statutory protection. [214]

It is worth considering the various options: (1) an individual may seek MAT immediately upon entering the facility, or (2) they may wait a period of time and seek MAT during the term of their incarceration. The first option would prevent the needless pain and suffering that results from forced withdrawal from substances. However, the individual may have a harder time

establishing that they have "been rehabilitated successfully and [are] no longer engaging in such use."[215] An individual's progress toward achieving sobriety, if any, may suffice to show they have made efforts at drug rehabilitation,[216] but many individuals with OUD will likely use illicit substances up until the point of incarceration. For those individuals, the Rehab Act provides that, notwithstanding the exception for individuals currently engaging in illegal drug use, "an individual shall not be excluded from the benefits of such programs or activities [providing health services and services provided under Titles I, II, and III] on the basis of his or her current illegal use of drugs if he or she is otherwise entitled to such services."[217] Courts have not yet interpreted how this provision will apply when individuals with OUD seek medical care.[218]

Incarcerated individuals with OUD are otherwise qualified for medical services, including prescription medication.[219] Although the existing circuit split may lead to different outcomes,[220] the First Circuit's approach in *Kiman* suggests an individual with OUD can bring a Rehab Act claim when they are denied medical treatment for their disability.[221] This need is particularly acute when an individual with OUD is completely denied access to prescription medications they otherwise would have received in the community,[222] and when MAT has been shown to be the only effective treatment method.[223] An incarcerated individual's MAT prescription should be treated like other prescription medications in a correctional facility[224]: "If they're sick with kidney or heart disease, we give them the treatment and medication. If they're sick with addiction, we should give them the treatment and medication for that."[225] Just like other inmates receive necessary treatment for their medical conditions, eligible incarcerated individuals with OUD should receive MAT as a reasonable accommodation during their incarceration, regardless of their treatment status prior to incarceration.

However, BOP precludes "meaningful access" to a prison's medical services when it fails to conduct an individualized inquiry into a reasonable accommodation to provide MAT.[226] For individuals who were previously prescribed MAT, BOP becomes aware of their disability upon intake into the prison at which time BOP learns about the individual's prescription medications.[227] Although BOP does allow MAT prescription for short-term detoxification, [228] BOP's policies largely deny medication for long-term treatment of OUD for nonpregnant individuals.[229] These individuals would otherwise be able to receive long-term MAT treatment in the community, and this may be the only effective treatment method for their OUD.[230] A request for a reasonable accommodation to receive MAT while incarcerated does

not suggest mere disagreement with BOP's substance treatment programs; it challenges the complete denial of this scientifically proven treatment method for incarcerated individuals. [231] This is especially crucial for incarcerated individuals, like the plaintiff in *Pesce*, who have previously tried, unsuccessfully, other treatment methods for their OUD.[232] For other incarcerated individuals, it is crucial to provide meaningful access to BOP's medical services in order to intervene in the cycle of relapse, recidivism, and overdose death.[233]

BOP's policies discriminate on the basis of an incarcerated individual's OUD because, while other individuals are provided necessary medical care, those who suffer from OUD potentially lack any opportunity to treat their disease while incarcerated, and BOP fails to make an individualized assessment into whether an accommodation to provide MAT is reasonable. [234] This need for individualized assessment applies to whether MAT is allowed, the proper dosage, the duration of treatment, the types of medication, and other factors inherent in a complicated medical decision. BOP's failure to conduct an individualized inquiry precludes individual consideration of an inmate's specific medical needs[235] and indicates that BOP likely bases this policy decision on stereotypes about MAT and individuals with OUD. As such, BOP's policy—without an individualized assessment for all incarcerated individuals with OUD— constitutes discrimination on the basis of disability.[236]

B.    Affirmative Defenses to Rehab Act Claim Do Not Justify BOP Policies

BOP's progress toward a MAT program demonstrates that reasonable accommodations are feasible. However, the slow rollout of BOP's MAT program and its uncertain future mean that BOP's current practices continue to categorically deny MAT to incarcerated individuals. BOP must also expand the scope of its individualized assessments to include individuals who were not previously prescribed MAT prior to incarceration to avoid future disability discrimination litigation.

An accommodation to provide MAT to incarcerated individuals would not cause a fundamental alteration to BOP medical services. One of the most common reasons that correctional facilities do not provide MAT is preference for "drug-free treatment."[237] However, BOP's policy requiring MAT for pregnant incarcerated individuals, allowing facilities to provide MAT for detoxification, and its plans to provide MAT for longer-term treatment demonstrate that drug-free treatment is not a core aspect of BOP's program. Further, the requisite individualized inquiry into whether an accommodation is reasonable tends to screen out cases

where the requested accommodation would fundamentally alter the nature of the prison program.[238] Therefore, accommodations to allow MAT treatment in BOP correctional facilities would not fundamentally alter the nature of BOP's programs or services. To the contrary, such treatment would actually advance BOP's purposed policy goals to promote rehabilitation and reentry into the community.[239]

Additionally, an accommodation to provide MAT to incarcerated individuals would not cause an undue financial or administrative burden. MAT is a cost-efficient method to treat OUD.[240] This treatment method also reduces recidivism, which will lead to reduced prison populations and costs associated with incarceration.[241] Programs with a smaller number of inmates receiving MAT will have higher per-patient costs.[242] However, BOP has a large number of federal inmates who will qualify for reasonable accommodations, which is already motivating large-scale policy changes to ensure staff training, proper medication storage, and a streamlined process. Additionally, BOP's approved uses of methadone suggest there are likely policies and procedures already in place to guarantee its safe storage and registration requirements,[243] and BOP is taking steps to further streamline its procedures to dispense MAT. BOP's MAT program is possible in part because of recent legislative and policy initiatives that provide funds to implement MAT programs.[244] The continuing availability of these funds moving forward will alleviate any short-term financial burden for BOP to implement the policies and practices to provide MAT to all incarcerated individuals with OUD. Overall, while providing MAT will involve an upfront investment, this necessary shift will pay off in the long run as recidivism decreases and widespread policies become more normalized.

Lastly, incarcerated individuals do not pose a sufficient direct threat to safety and security that would justify this failure to make a reasonable accommodation. One of the biggest counterarguments in response to MAT is fear of diversion—passing on prescription medication to other individuals—within the correctional facility.[245] However, this fear underlying BOP's prohibitory policy is not realistic and is often based on stereotypes about MAT and those with substance use disorder. For example, in *Cudnik v. Kreiger*,[246] an illicit market for methadone in the jail was "at best highly remote" because the jail administered methadone according to strict regulations and in liquid form, under the supervision of a licensed clinician.[247] Additionally, the plaintiff's request in *Smith v. Aroostook County*[248] to continue MAT during her incarceration "was not unreasonable, as evidenced by the fact that the Defendants previously provided the same accommodation to a pregnant inmate without issue and by the Defendants' acknowledgement that they could grant the requested exemption in a way that

would obviate any security concerns."[249] Additionally, correctional facilities around the country demonstrate that MAT treatment programs are feasible without significant safety concerns.[250]

BOP provides MAT to pregnant incarcerated individuals and for extended periods to treat severe pain, and now to treat certain incarcerated individuals with OUD. These medications may be stored in bulk with other controlled substances,[251] or incarcerated individuals may continue to be driven outside of the correctional facility to receive MAT. As such, proper security measures will prevent the diversion of prescription medications.[252] Even where there are legitimate concerns, assessment of risks undercutting an accommodation request must be made on an individualized basis for all incarcerated individuals affected by this disease.[253]

Conclusion

BOP's violation of the Rehab Act directly conflicts with the DOJ's stated initiative to combat discriminatory barriers to treatment for OUD.[254] BOP's discriminatory barriers to treatment "[u]nlawfully deny[] services to individuals with disabilities because of their medical conditions" and "subject[] these individuals to unwarranted stigma and harm."[255] Although Assistant Attorney General Eric Dreiband said these discriminatory barriers "will not be tolerated by the Department of Justice,"[256] DOJ's complicity in discriminatory practices against federally incarcerated individuals with OUD suggests otherwise.

Even with BOP's new MAT program in the works, the legal community should effectuate the purpose underlying the Rehab Act by recognizing widespread disability discrimination against incarcerated individuals with OUD. Many state and local correctional institutions still prohibit MAT as a matter of policy. Additionally, the future of BOP's MAT program is uncertain. It is unclear who will receive MAT under BOP's new MAT program and when they will receive it. If the legal community does not enforce the Rehab Act in this context, we also run the risk that BOP may, at some point in the future, walk back its policies and practices with changing leadership. Fortunately, for now, it appears that BOP is in the process of applying for and receiving certification to dispense MAT at its facilities,[257] although correctional facilities may take several possible routes to provide MAT that differ in the level of planning and licensing requirements.[258]

The failure to provide MAT to incarcerated individuals is disability discrimination. It is also a criminal justice issue, a public health issue, and a racial justice issue. If BOP truly serves a rehabilitative purpose, as purported by its policies, its failure to provide MAT to incarcerated individuals with OUD is far from ideal. Rather, the limited availability of MAT threatens incarcerated individuals' ability to maintain recovery during incarceration and build necessary life skills to maintain post-release recovery. Current substance treatment options in federal prisons fail BOP's mandate to prepare individuals for release by precluding the use of medically effective pharmacological treatment without an individualized assessment.

As we address the effects of the war on drugs, it is especially important to account for the drastically disproportionate burden borne by communities and individuals of color throughout the history of drug use prosecutions. Otherwise, any policy to address the opioid epidemic will continue to marginalize those whose suffering is compounded by other forms of oppression and discrimination. Thus, "the problem of race and opioids cannot stop with expansion of access to treatment."[259] Any policies that only provide reasonable accommodations for individuals who were previously prescribed MAT before incarceration will likely exclude people of color who already face barriers to recovery. Outside of correctional facilities, policymakers can only effectively address the opioid epidemic by considering the ways in which culture, resources, stigma, and interactions with other systems, such as the criminal justice system, affect an individual's experiences with OUD and the pathways to recovery that are available to them.[260]

Any and all improvements to the treatment of incarcerated individuals with OUD are crucial. The author hopes that lawyers and courts will continue to pressure BOP to effectuate policy changes by recognizing the failure to provide MAT as the disability discrimination it is. From there, advocacy must continue to address the vulnerabilities and needs of all individuals with OUD in light of the disproportionate criminalization of people of color for drug offenses, the inequitable access to community-based treatment, and the history of racialized responses to drug crises in this country. The only way to meaningfully address the opioid crisis is to reach those most in need and to specifically account for the multitude of ways substance use disorder is treated differently depending on one's identity, resources, and location. By addressing OUD in correctional facilities, policymakers have the opportunity to reach those who are most physically isolated from community-based treatment and who disproportionately come from underresourced communities. We must urgently shift

perspectives and responses before the death toll continues to climb, leaving in its wake the memory of those whom this country's institutions, laws, and policies have failed.

*J.D., Boston University School of Law, 2021; B.A. International Studies and African Studies, Emory University, 2016. My deepest gratitude goes to Professor Robyn Powell for her guidance throughout the Note process and to Professor Naomi Mann, Kelsey Scarlett, Lexi Weyrick, Muhammad Mustafa, Julia Sakamoto, Sarah Kula, and the *Boston University Law Review* editorial team—especially Kaela Dunn and Emily Rothkin—for their advice, support, and commitment to improving this Note. I am humbled by this opportunity and recognize how many miracles it took to get here. This Note is dedicated to all those who fight the disease of addiction one day at a time and in memory of those for whom social progress comes too late.

[1] Given the "increasing evidence of a close relationship between the use of language and the perpetuation of stigma," the author uses the language "medication-assisted treatment" ("MAT") and "opioid use disorder" ("OUD"), rather than "substance abuse." Daniel Z. Buchman, Pamela Leece & Aaron Orkin, *The Epidemic as Stigma: The Bioethics of Opioids*, 45 J.L. Med. & Ethics 607, 608 (2017). At the time of writing, these terms are generally accepted as medically accurate and nonstigmatizing terms. However, there have been and likely will continue to be significant shifts in acceptable terminology. The author welcomes the continuing progress towards nonstigmatizing, medically accurate, and person-first language when discussing substance use. *See* Sean M. Robinson, *"Alcoholic" or "Person with Alcohol Use Disorder"? Applying Person-First Diagnostic Terminology in the Clinical Domain*, 38 Substance Abuse 9, 9 (2017).

[2] *See* Abby Goodnough, Josh Katz & Margot Sanger-Katz, *Drug Overdose Deaths Drop in U.S. for First Time Since 1990*, N.Y. Times (July 17, 2019), https://www.nytimes.com/interactive/2019/07/17/upshot/drug-overdose-deaths-fall.html. With 68,557 overdose deaths in the United States, 2018 saw the first decline in annual overdose deaths since 1990. *See id.* However, "[t]he decline was due almost entirely to a dip in deaths from prescription opioid painkillers, the medicines that set off the epidemic of addiction that has lasted nearly two decades. Fatal overdoses involving other drugs, particularly fentanyl and methamphetamine, continued to rise." *Id.* Additionally, research shows that official statistics could underrepresent the true opioid death toll by at least 20%,

suggesting these are conservative estimates. *See* Christopher J. Ruhm, *Geographic Variation in Opioid and Heroin Involved Drug Poisoning Mortality Rates*, 53 Am. J. Preventive Med. 745, 745 (2017) (finding corrected opioid and heroin involved mortality rates were 24% and 22% greater, respectively, than reported statistics).

[3]*Understanding the Epidemic*, CDC (Mar. 17, 2020), https://www.cdc.gov/drugoverdose/epidemic/index.html [https://perma.cc/SN6T-PJPP].

[4]*Id.*

[5]*Id.*

[6]Jessica Pishko, *The Repurposing of the American Jail*, Atlantic (Nov. 19, 2019), https://www.theatlantic.com/politics/archive/2019/11/going-jail-substance-abuse-treatment/602206/.

[7]*See* Maria Godoy & Daniel Wood, *What Do Coronavirus Racial Disparities Look Like State by State?*, NPR (May 30, 2020, 6:00 AM), https://www.npr.org/sections/health-shots/2020/05/30/865413079/what-do-coronavirus-racial-disparities-look-like-state-by-state [https://perma.cc/QT2J-H3RC]. Not only are Black, Latinx, and Native people more likely to contract COVID-19, but they are also 2.4, 1.5, and 1.5 times more likely to die from COVID-19 than White people, respectively. *See* Daniel Wood, *As Pandemic Deaths Add Up, Racial Disparities Persist—and in Some Cases Worsen*, NPR (Sept. 23, 2020, 1:01 PM), https://www.npr.org/sections/health-shots/2020/09/23/914407907/as-pandemic-deaths-add-up-racial-disparities-persist-and-in-some-cases-worsen [https://perma.cc/KU2D-XHKS].

[8]Robert Glatter, *Life Expectancy in the U.S. Sees Largest Decline in Decades After Covid-19*, Forbes (Jan. 24, 2021, 12:04 PM), https://www.forbes.com/sites/robertglatter/2021/01/24/life-expectancy-in-the-us-sees-largest-decline-in-decades-after-covid-19/?sh=40719663706f.

[9]Press Release, CDC, Overdose Deaths Accelerating During COVID-19 (Dec. 17, 2020), https://www.cdc.gov/media/releases/2020/p1218-overdose-deaths-covid-19.html [https://perma.cc/6546-6NYY]; *see also* Hilary Swift & Abby Goodnough, *'The Drug Became His Friend': Pandemic Drives Hike in Opioid Deaths*, N.Y. Times (July 14, 2021), https://www.nytimes.com/2020/09/29/health/coronavirus-opioids-addiction.html

(describing impact of COVID-19 pandemic, including isolation, barriers to seeking medication-assisted treatment, lack of social support services, and economic insecurity, as contributing to spike in overdose deaths); Emma Goldberg, *'Relapsing Left and Right': Trying to Overcome Addiction in a Pandemic*, N.Y. Times (Jan. 4, 2021), https://www.nytimes.com/2021/01/04/nyregion/addiction-treatment-coronavirus-new-york-new-jersey.html (describing shutdown of treatment facilities for substance use disorder during COVID-19 pandemic).

[10]*See* Keon L. Gilbert, Ruqaiijah Yearby, Amber Johnson & Kira Banks, Opinion, *For Black Americans, Covid-19 Is a Reminder of the Racism of US Healthcare*, Guardian (Feb. 22, 2021, 4:42 PM), https://www.theguardian.com/commentisfree/2021/feb/22/black-americans-covid-19-racism-us-healthcare. Failures in our healthcare system have contributed to the opioid epidemic. *See* Nicolas P. Terry, *Structural Determinism Amplifying the Opioid Crisis: It's the Healthcare, Stupid!*, 11 Ne. U. L. Rev. 315, 371 (2019) ("[I]t is not difficult to suggest some relevant flaws that rise to the level of structural determinants [of the opioid epidemic]: access and benefit stratification, the changing role of Medicaid, problems associated with fragmentation of care (the lack of behavioral health services integrated into our primary care systems cannot be overemphasized), and the lack of wraparound services.").

[11]*See* Gina Kolata, *Social Inequities Explain Racial Gaps in Pandemic, Studies Find*, N.Y. Times (July 27, 2021), https://www.nytimes.com/2020/12/09/health/coronavirus-black-hispanic.html (noting systemic inequities that contribute to disproportionate impact of COVID-19 pandemic on communities of color include greater workplace exposure in lower-income jobs, multigenerational housing, reduced access to healthcare, and elevated rates of underlying health conditions); Sabrina Strings, Opinion, *It's Not Obesity. It's Slavery.*, N.Y. Times (May 25, 2020), https://www.nytimes.com/2020/05/25/opinion/coronavirus-race-obesity.html (describing how slavery "set in motion" systemic inequities that continue today).

[12]*See* CDC, *supra* note 9. Preliminary data for 2020 as a whole are even more stark; over 93,000 people died from drug overdoses in the U.S. in 2020, a jump of approximately 30% from the preceding year. *See* Bill Chappell, *Drug Overdoses Killed a Record Number of Americans in 2020, Jumping by Nearly 30%*, NPR (July 14, 2021, 6:53 PM), https://www.npr.org/2021/07/14/1016029270/drug-overdoses-killed-a-record-number-of-americans-in-2020-jumping-by-nearly-30 [https://perma.cc/PG36-N3H8].

[13]Chappell, *supra* note 12.

[14]*See* Beth Schwartzapfel, Katie Park & Andrew DeMillo, *1 in 5 Prisoners in the U.S. Has Had COVID-19*, Marshall Project (Dec. 18, 2020, 6:00 AM), https://www.themarshallproject.org/2020/12/18/1-in-5-prisoners-in-the-u-s-has-had-covid-19 [https://perma.cc/P6MQ-M3TX] (noting positive test rate for COVID-19 in prisons is more than four times higher than positive test rate of general population).

[15]*See* Joseph Longley, *As Overdoses Spike During Coronavirus, Treating Addiction in Prisons and Jails Is a Matter of Life and Death*, ACLU: News & Comment. (July 22, 2020), https://www.aclu.org/news/prisoners-rights/as-overdoses-spike-during-coronavirus-treating-addiction-in-prisons-and-jails-is-a-matter-of-life-and-death/ [https://perma.cc/MS7A-TU4G].

[16]*See* Dorothy E. Roberts, *The Social and Moral Cost of Mass Incarceration in African American Communities*, 56 Stan. L. Rev. 1271, 1274-76 (2004). The unique experiences of Black women, who are disproportionately represented in jails and prisons, are often overlooked in conversations about mass incarceration. *See* Priscilla A. Ocen, *Unshackling Intersectionality*, 10 Du Bois Rev. 471, 472 (2013) ("The growth in the prison population has been led by the incarceration of Black women, who are three times as likely as White women to be incarcerated, often for nonviolent, drug-related offenses. The impact wrought by the mass incarceration of Black women cannot be overstated.").

[17]*See A Brief History of the Drug War*, Drug Pol'y All., http://www.drugpolicy.org/issues/brief-history-drug-war [https://perma.cc/JE3Y-793M] (last visited Sept. 1, 2021). Because of war on drugs policies, the total prison population increased from fewer than 300,000 people in the early 1970s to more than 2.2 million incarcerated and 4.5 million more on probation or parole in 2019. *See* Bryan Stevenson, *Slavery Gave America a Fear of Black People and a Taste for Violent Punishment. Both Still Define Our Criminal-Justice System.*, N.Y. Times Mag. (Aug. 14, 2019), https://www.nytimes.com/interactive/2019/08/14/magazine/prison-industrial-complex-slavery-racism.html. The war on drugs has also cost the United States more than $1 trillion. *See* German Lopez, *The War on Drugs, Explained*, Vox (May 8, 2016, 1:21 PM), https://www.vox.com/2016/5/8/18089368/war-on-drugs-marijuana-cocaine-heroin-meth. Additionally, despite probation and parole being viewed as alternatives to incarceration, these "alternative" sentences are feeding mass incarceration. In 2018, 28% of state and federal

prison admissions stemmed from violations of parole and probation. *See Revoked: How Probation and Parole Feed Mass Incarceration in the United States*, Hum. Rts. Watch (July 31, 2020), https://www.hrw.org/report/2020/07/31/revoked/how-probation-and-parole-feed-mass-incarceration-united-states [https://perma.cc/AP9R-WL24]. People of color are disproportionately represented in the population of individuals on probation; in particular, Black people account for 30% of adult probationers, despite comprising only 13% of the U.S. population. *See* Jesse Jannetta, Justin Breaux, Helen Ho & Jeremy Porter, Urb. Inst., Examining Racial and Ethnic Disparities in Probation Revocation 1 (Apr. 2014), https://www.urban.org/sites/default/files/publication/22746/413174-Examining-Racial-and-Ethnic-Disparities-in-Probation-Revocation.PDF [https://perma.cc/PST2-8EXH]. The risk of incarceration through probation revocation directly impacts individuals with OUD, as substance-free probation requirements often view relapse as a violation of their terms. *See, e.g.*, Commonwealth v. Eldred, 101 N.E.3d 911, 921-22, 924-25 (Mass. 2018) (holding that, although "relapse is a part of recovery," trial judge did not abuse discretion by concluding defendant's relapse was "wilful" violation of drug-free probation).

[18]*See* Courtney Lauren Anderson, *Opioids Are the New Black*, 69 DePaul L. Rev. 55, 69-70 (2019) (describing how "mass hysteria over crack cocaine" fueled targeted policies in inner-city Black communities).

[19]*See id.* at 66-68, 70 (describing epidemic of crack and cocaine use in 1980s and racist origins of criminalizing drug use). However, at the same time, these policies did not target a simultaneous rise in cocaine use in affluent White communities. *See* ACLU, Cracks in the System: Twenty Years of the Unjust Federal Crack Cocaine Law i-ii (2006) (discussing stark 100-to-1 sentencing disparity between crack, which was more accessible to poor and Black Americans, and powder cocaine, which was more commonly used by affluent White Americans, despite current scientific understanding that crack is no more harmful than powder cocaine).

[20]*See* German Lopez, *The Federal Drug Scheduling System, Explained*, Vox (Aug. 11, 2016, 9:05 AM), https://www.vox.com/2014/9/25/6842187/drug-schedule-list-marijuana.

[21]*See Opposing Mandatory Minimums*, Equal Just. Under L., https://equaljusticeunderlaw.org/mandatory-minimums-1 [https://perma.cc/X69X-B4V6] (last visited Sept. 1, 2021).

[22]*See Thirty Years of America's Drug War*, PBS: Frontline, https://www.pbs.org/wgbh/pages/frontline/shows/drugs/cron/ [https://perma.cc/7788-GSK2] (last visited Sept. 1, 2021).

[23]*Racial Double Standard in Drug Laws Persists Today*, Equal Just. Initiative (Dec. 9, 2019), https://eji.org/news/racial-double-standard-in-drug-laws-persists-today/ [https://perma.cc/UNB3-QKLN]. The statistics tell the story of the disproportionate impact on communities of color. *See* Aaron Williams, *The Full Story of the 1980's Crack Epidemic Is Still Yet to Be Told*, Uproxx (June 26, 2017), https://uproxx.com/hiphop/snowfall-1980s-crack-epidemic/ [https://perma.cc/8F2A-XHPR] (comparing statistics that, in 1991, 15% of crack users were Black but 79% of sentenced crack offenders were Black, whereas 52% of crack users were White but only 10% of sentenced crack offenders were White); *see also* Keturah James & Ayana Jordan, *Law and the Opioid Crisis: An Inter-Disciplinary Examination: The Opioid Crisis in Black Communities*, 46 J.L. Med. & Ethics 203, 410 (2018) (discussing harsher sentencing penalties for crack use compared to powder cocaine use).

[24]*See* Khiara M. Bridges, *Race, Pregnancy, and the Opioid Epidemic: White Privilege and the Criminalization of Opioid Use During Pregnancy*, 133 Harv. L. Rev. 770, 815-21 (2020) (discussing disproportionate prosecutions of Black women for substance use during pregnancy, which "began in earnest during the crack cocaine scare in the 1980s").

[25]*See* Julie B. Ehrlich, *Breaking the Law by Giving Birth: The War on Drugs, the War on Reproductive Rights, and the War on Women*, 32 N.Y.U. Rev. L. & Soc. Change 381, 387 (2008) ("[T]he War on Drugs became a war on women of color, with prosecutions of pregnant women focusing on those women who used crack cocaine, a drug predominantly found in low-income communities of color."). However, today, arrest and prosecution trends for women who use substances while pregnant track the demographics of the opioid epidemic as a whole: "[A]s white people predominate among those struggling with opioid use, misuse, and dependence, *white women predominate among those who have faced criminal charges for opioid use during pregnancy*." *See* Bridges, *supra* note 24, at 776 (footnote omitted) (arguing that White privilege failed to protect White women who have been prosecuted for opioid use during pregnancy "because these women possess a compromised, marginalized, 'not-quite' whiteness—a corrupted whiteness that has yielded to them a reduced racial privilege").

[26]*See* German Lopez, *The Deadliness of the Opioid Epidemic Has Roots in America's Failed Response to Crack*, Vox (Oct. 5, 2017, 9:45 AM), https://www.vox.com/identities/2017/10/2/16328342/opioid-epidemic-racism-addiction (comparing differences between media response of today and that of the 1980s and 1990s). The current opioid crisis has affected significantly more White and affluent individuals than previous iterations of drug crises, and "the narrative around the opioid epidemic has emphasized th[ese] high numbers of white casualties across the nation" to the detriment of people of color. James & Jordan, *supra* note 23, at 406; *see* Julie Netherland & Helena B. Hansen, *The War on Drugs That Wasn't: Wasted Whiteness, "Dirty Doctors," and Race in Media Coverage of Prescription Opioid Misuse*, 40 Culture Med. Psychiatry 664, 674 (2016) (comparing media portrayal of opioid crisis depicting Black and Latinx individuals as using heroin and White individuals as using prescription opioid painkillers, thus "leav[ing] the [White individuals] blameless or at least sympathetic to the reader"); Jasmine Drake, Creaque Charles, Jennifer W. Bourgeois, Elycia S. Daniel & Melissa Kwende, *Exploring the Impact of the Opioid Epidemic in Black and Hispanic Communities in the United States*, Drug Sci. Pol'y & L., 2020 at 1 (2020) ("Although there have been significant increases in the number of opioid-related overdose deaths in Black and Hispanic communities, the media narrative for this epidemic is often portrayed as a White, Non-Hispanic rural and suburban crisis."). However, the opioid epidemic is still the largest drug epidemic in U.S. history for *all* racial groups. *See* James & Jordan, *supra* note 23, at 405.

[27]*See* Katharine Q. Seelye, *In Heroin Crisis, White Families Seek Gentler War on Drugs*, N.Y. Times (Oct. 30, 2015), https://www.nytimes.com/2015/10/31/us/heroin-war-on-drugs-parents.html ("When the nation's long-running war against drugs was defined by the crack epidemic and based in poor, predominantly black urban areas, the public response was defined by zero tolerance and stiff prison sentences. But today's heroin crisis is different.").

[28]Michelle Alexander, *The New Jim Crow*, 9 Ohio St. J. Crim. L. 7, 9 (2011).

[29]The Sent'g Project, Trends in U.S. Corrections 3 (2021), https://www.sentencingproject.org/wp-content/uploads/2021/07/Trends-in-US-Corrections.pdf [https://perma.cc/SDF6-WQV6]; *see also* Sarah E. Wakeman & Josiah D. Rich, *Addiction Treatment Within U.S. Correctional Facilities: Bridging the Gap Between Current Practice and Evidence-Based Care*, 34 J. Addictive Diseases 220, 220 (2015) ("This epidemic of incarceration is largely due to the 'War on Drugs,' which has resulted in criminalization of the

disease of addiction."); Fed. Bureau of Prisons, U.S. DOJ, FY 2019 Performance Budget 6 [hereinafter Performance Budget] (noting "changes in interdiction and sentencing [in 1980s and 1990s] changed the population's composition" to include greater proportion of drug offenders).

[30]*See* Stevenson, *supra* note 17. Despite accounting for only 4% of the world's population, the United States accounts for 22% of the world's imprisoned population. *Id.*

[31]For information about U.S. incarceration rates by race and ethnicity, see Leah Sakala, *Breaking Down Mass Incarceration in the 2010 Census: State-by-State Incarceration Rates by Race/Ethnicity*, Prison Pol'y Initiative (May 28, 2014), https://www.prisonpolicy.org/reports/rates.html [https://perma.cc/8QDP-NLGP]. For information on incarceration rates of women by race and ethnicity, see Aleks Kajstura, *Women's Mass Incarceration: The Whole Pie 2019*, Prison Pol'y Initiative (Oct. 29, 2019), https://www.prisonpolicy.org/reports/pie2019women.html [https://perma.cc/M8YR-EB7M]. Additionally, transgender people are disproportionately incarcerated at rates double those of the general population, and incarceration rates are even higher for transgender individuals of color and low-income transgender individuals. *See* Nat'l Ctr. for Transgender Equal., LGBTQ People Behind Bars 5 (2018), https://transequality.org/sites/default/files/docs/resources/TransgenderPeopleBehindBars.pdf [https://perma.cc/3VJ4-STAL]. Although this Note considers "incarcerated individuals" without reference to their particular identities, it is essential that policies account for individuals' lived experiences at the intersection of various identities. *See* Kimberle Crenshaw, *Demarginalizing the Intersection of Race and Sex: A Black Feminist Critique of Antidiscrimination Doctrine, Feminist Theory and Antiracist Politics*, 1989 U. Chi. Legal F. 139, 140 (1989) ("Th[e] focus on the most privileged group members marginalizes those who are multiply-burdened and obscures claims that cannot be understood as resulting from discrete sources of discrimination.").

[32]*See* Sally Friedman & Melissa Trent, *Defense Lawyers and the Opioid Epidemic: Advocating for Addiction Medication*, Champion, Aug. 2018, at 21. *See generally Effective Treatments for Opioid Addiction*, Nat'l Inst. on Drug Abuse (Nov. 2016), https://www.drugabuse.gov/publications/effective-treatments-opioid-addiction/effective-treatments-opioid-addiction [https://perma.cc/Z83P-WCTD] ("Medications should be combined with behavioral counseling for a 'whole patient' approach, known as Medication Assisted Treatment.").

[33]Elinore F. McCance-Katz, U.S. Dep't of Health & Hum. Servs., An Update on the Opioid Crisis 2 (2018), https://www.samhsa.gov/sites/default/files/aatod_2018_final.pdf [https://perma.cc/2WJ9-TRRP].

[34]Pooja A. Lagisetty, Ryan Ross, Amy Bohnert, Michael Clay & Donovan T. Maust, Research Letter, *Buprenorphine Treatment Divide by Race/Ethnicity and Payment*, 76 JAMA Psychiatry 979, 979-80 (2019) (finding growth in buprenorphine to treat OUD "is concentrated among white persons and those with private insurance or use self-pay"). Several factors may contribute to disproportionate access to MAT, including cost, access to health care and insurance, implicit bias, and stigma. *See* Drake et al., *supra* note 26, at 8 ("Although each drug is available only by Rx, for the uninsured, costs may be an issue, particularly with buprenorphine, as insurances plans often do not cover this drug for opioid abuse disorder."); John F. Kelly, Sarah E. Wakeman & Richard Saitz, Editorial, *Stop Talking 'Dirty': Clinicians, Language, and Quality of Care for the Leading Cause of Preventable Death in the United States,* 128 Am. J. Med. 8, 8 (2015) (describing impact of stigmatizing language on clinical care); Noa Krawczyk, Kenneth A. Feder, Michael I. Fingerhood & Brendan Saloner, *Racial and Ethnic Differences in Opioid Agonist Treatment for Opioid Use Disorder in a U.S. National Sample*, 178 Drug & Alcohol Dependence 512, 513 (2017) ("[B]lack and Hispanic clients have historically experienced greater barriers to care, less support services and lower quality of care in substance use services than white clients.").

[35]*See* Jennifer Bronson, Jessica Stroop, Stephanie Zimmer & Marcus Berzofsky, U.S. DOJ, Special Report: Drug Use, Dependence, and Abuse Among State Prisoners and Jail Inmates, 2007-2009, at 1 (2017).

[36]*See infra* Parts I.A, B.1-2.

[37]*See infra* Part I.C.

[38]*See, e.g.*, Danielle Wallace & Xia Wang, *Does In-Prison Physical and Mental Health Impact Recidivism?*, SSM—Population Health, Aug. 2020, at 1, 1 (discussing impact of physical and mental health in prison on recidivism rates); Craig Haney, The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment 2 (Dec. 2001) (unpublished manuscript) (available at https://aspe.hhs.gov/basic-report/psychological-impact-incarceration-implications-post-prison-adjustment#III) (describing prisoners' psychological

changes as result of "modern prison life" in which "prisons have become more difficult places in which to adjust and survive over the last several decades"); Nick De Viggiani, *Surviving Prison: Exploring Prison Social Life as a Determinant of Health*, 2 Int'l J. Prisoner Health 71, 85 (2006) ("Attitudes and behaviours of prisoners and prison officers commonly reflected majority values associated with reputation, gender, race and age, which manifested, for instance, through competitiveness, machismo, violence, heterosexism, homophobia and racism.").

[39]As of December 14, 2017, there were 155,233 federal prisoners in BOP custody. *See* Performance Budget, *supra* note 29, at 3.

[40]Some scholars have argued that withholding MAT may even violate the Eighth Amendment's prohibition of cruel and unusual punishment. *See, e.g.*, Michael Linden, Sam Marullo, Curtis Bone, Declan T. Barry & Kristen Bell, *The Opioid Epidemic, Medication-Assisted Treatment, and the Eighth Amendment*, 46 J.L. Med. & Ethics 252, 263 (2018); Melissa Koppel, Note, *Medication-Assisted Treatment: Statutory Schemes & Civil Rights Implications*, 27 Cardozo J. Equal Rts. & Soc. Just. 145, 162 (2020). Other scholars have argued that withholding MAT may violate international human rights norms. *See, e.g.*, Shianne Bowlin, Note, *Resolving the Overlooked Tragedy in Correctional Facilities: Medication Assisted Treatment Access for Inmates*, 8 Lincoln Mem'l U. L. Rev. 358, 360 (2020); R. Douglas Bruce & Rebecca A. Schleifer, *Ethical and Human Rights Imperatives to Ensure Medication-Assisted Treatment for Opioid Dependence in Prisons and Pre-Trial Detention*, 19 Int'l J. Drug Pol'y 17, 19-21 (2008).

[41]Eric Dreiband, Assistant Att'y Gen., U.S. DOJ, Remarks at the Epstein Becker and Green 38th Annual Workforce Management Briefing  (Oct. 7, 2019), https://www.justice.gov/opa/speech/assistant-attorney-general-eric-dreiband-delivers-remarks-epstein-becker-and-green-38th [https://perma.cc/XWR9-8XZF].

[42]29 U.S.C. § 794(a).

[43]*See, e.g.*, Sanders *ex rel.* Sanders v. Marquette Pub. Schs., 561 F. Supp. 1361, 1369 (W.D. Mich. 1983) ("The basic purpose of the Rehabilitation Act is to ensure that handicapped persons are not discriminated against by recipients of federal funds solely on the basis of their handicaps. This is plainly stated in 29 U.S.C. § 794 itself.").

[44]*See supra* note 41 and accompanying text.

[45]29 U.S.C. § 794(a).

[46]42 U.S.C. §§ 12101-12111.

[47]Fortunately, BOP is developing and implementing new policies to provide more federally incarcerated individuals with MAT. *See infra* notes 92-100 and accompanying text. However, there are serious concerns with the timing and effectiveness of such a program. U.S. Gov't Accountability Off., GAO-20-423, Improved Planning Would Help BOP Evaluate and Manage Its Portfolio of Drug Education and Treatment Programs  31-34 (2020) [hereinafter Improved Planning]. Accordingly, the author operates under the assumption that a widespread MAT program in BOP facilities is still several years away, if at all, and that BOP's current policies violate the Rehab Act.

[48]Bronson et al., *supra* note 35, at 1 (finding 63% of sentenced jail inmates and 58% of state prisoners met criteria specified in *Diagnostic and Statistical Manual of Mental Disorders* for drug dependence or substance use disorder, whereas approximately 5% of adults in general population met criteria) (citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (4th ed., text rev. 2000)).

[49]*See* Matthew R. Durose & Christopher J. Mumola, U.S. DOJ, Profile of Nonviolent Offenders Exiting State Prisons 3 tbl.5 (2004) (noting 55.1% of nonviolent offenders had used either alcohol or drugs at time of offense in 1997). The greater percentage of individuals with substance use disorder within correctional facilities is not meant to suggest these individuals are particularly prone to criminal activity or less worthy of protection from disability discrimination. Rather, these statistics raise questions about whether greater proportions of incarcerated individuals with substance use disorder suggest that more individuals are using drugs and committing crimes, or that law enforcement efforts disproportionately target, or inadequately respond to, individuals with substance use disorder. *See* Shayla Love, *Police Are the First to Respond to Mental Health Crises. They Shouldn't Be*, Vice (June 23, 2020, 10:00 AM), https://www.vice.com/en/article/3azkeb/police-are-the-first-to-respond-to-mental-health-crises-they-shouldnt-be; Joseph Goldstein, *Undercover Officers Ask Addicts to Buy Drugs, Snaring Them but Not Dealers*, N.Y. Times (Apr. 4, 2016), https://www.nytimes.com/2016/04/05/nyregion/undercover-officers-ask-addicts-to-buy-

drugs-snaring-them-but-not-dealers.html. It is also worth mentioning that, despite many Good Samaritan laws, individuals can face criminal charges for seeking medical care for an overdose, or, conversely, for fearing criminal charges and not seeking medical care. *See Drug Overdose Immunity and Good Samaritan Laws*, Nat'l Conf. State Legislatures (June 5, 2017), https://www.ncsl.org/research/civil-and-criminal-justice/drug-overdose-immunity-good-samaritan-laws.aspx [https://perma.cc/RZA4-X2LM]; Tommy Simmons, *Case of Ada Man Who Reported Friend's Overdose Shows Limits of Idaho's Good Samaritan Law*, Idaho Press (Sept. 10, 2019), https://www.idahopress.com/news/local/case-of-ada-man-who-reported-friends-overdose-shows-limits-of-idahos-good-samaritan-law/article_9e495d3b-f8e4-59ce-99b9-d77b3bfd7adb.html (relating anecdote of man sentenced up to ten years in prison after reporting friend's overdose); News Release, U.S. DOJ, Illinois Man Who Removed Evidence from Opioid Overdose Death Scene Instead of Calling 911 Sentenced to Federal Prison (Aug. 28, 2020), https://www.justice.gov/usao-ndia/pr/illinois-man-who-removed-evidence-opioid-overdose-death-scene-instead-calling-911 [https://perma.cc/AY8C-MJGD] (announcing twenty-one-month prison sentence for individual who removed heroin from location of overdose to prevent law enforcement from finding it). Fortunately, organizations like the Police Assisted Addiction & Recovery Initiative are changing perspectives on policing and working with law enforcement to better support, rather than criminalize, individuals with substance use disorder. *See About Us,* Police Assisted Addiction & Recovery Initiative, https://paariusa.org/about-us/ [https://perma.cc/F33Y-FVXD] (last visited Sept. 1, 2021).

[50]Durose & Mumola, *supra* note 49, at 3 tbl.5.

[51]Performance Budget, *supra* note 29, at 3-4. Substance use disorder among federal inmates generally follows the same patterns as state and local counterparts, although drug offenders are only slightly more likely to show signs of drug dependence than those incarcerated for other crimes. *See* Bronson et al., *supra* note 35, at 3, 3 tbl.2.

[52]*See* Fatema Gunja, *Race and the War on Drugs*, ACLU (May 2003), https://www.aclu.org/other/race-war-drugs?redirect=drug-law-reform/race-war-drugs [https://perma.cc/YHK5-RKPD].

[53]Christopher J. Mumola & Jennifer C. Karberg, U.S. DOJ, Drug Use and Dependence, State and Federal Prisoners, 2004, at 4 (2006), https://bjs.ojp.gov/content/pub/pdf/dudsfp04.pdf [https://perma.cc/S6T6-YPJF].

[54] *See* Friedman & Trent, *supra* note 32, at 21 (summarizing research studies and stating "[d]ozens of studies have shown that medication-assisted treatment reduces drug use, disease rates, overdose deaths, and criminal activity among people with opioid use disorder").

[55] *See* 42 C.F.R. § 8.2 (2021) (defining use of MAT for long-term maintenance as "the dispensing of an opioid agonist treatment medication at stable dosage levels for a period in excess of 21 days in the treatment of an individual for opioid use disorder"). Methadone and pharmaceutical products containing buprenorphine are opioid agonists approved by the Food and Drug Administration to treat OUD. *See* Substance Abuse & Mental Health Servs. Admin., Federal Guidelines for Opioid Treatment Programs 4 (2015) [hereinafter Federal Guidelines]. Methadone is usually dispensed in liquid form as a daily dose taken under observation, and it can only be dispensed to treat substance use disorder at a licensed facility. *See* Friedman & Trent, *supra* note 32, at 21. Buprenorphine, commonly referred to by the brand name Suboxone, is usually taken as a sublingual strip that dissolves in the mouth, and an individual usually obtains a thirty-day prescription by specially trained physicians. *See id.* at 20.

[56] *See* Friedman & Trent, *supra* note 32, at 21.

[57] *See, e.g.*, Pesce v. Coppinger, 355 F. Supp. 3d 35, 41 (D. Mass. 2018) (describing improvement in plaintiff's quality of life through use of methadone to maintain recovery from opioid addiction).

[58] *See* Kyle Kampman & Margaret Jarvis, *The American Society of Addiction Medicine (ASAM) National Practice Guideline for the Use of Medications in the Treatment of Addiction Involving Opioid Use*, 9 J. Addiction Med. 358, 365 (2015) (explicitly recommending MAT during incarceration); *Substance Use Disorder Treatment for Adults and Adolescents*, Nat'l Comm'n on Corr. Health Care (Oct. 23, 2016), https://www.ncchc.org/substance-use-disorder-treatment-for-adults-and-adolescents [https://perma.cc/WWL9-58HT] (calling for "continuation of prescribed medications for substance use disorders" within correctional facilities"). In 2017, President Trump's Commission on Combating Drug Addiction and the Opioid Crisis also called for offering MAT in jails and prisons. President's Comm'n on Combating Drug Addiction & the Opioid Crisis, Final Report 73 (2017).

[59] *See, e.g.*, 42 C.F.R. § 8.2 (defining MAT as "use of medication in combination with behavioral health services to provide an *individualized approach* to the treatment of substance

use disorder" (emphasis added)); *Medication-Assisted Treatment (MAT)*, Substance Abuse & Mental Health Servs. Admin. (Jan. 4, 2021), https://www.samhsa.gov/medication-assisted-treatment [https://perma.cc/DZ9W-WPQL] (defining MAT as use of FDA-approved medications "in combination with counseling and behavioral therapies, to provide a *'whole-patient' approach* to the treatment of substance use disorders" (emphasis added)). 42 C.F.R. §§ 8.1-.34 (2021) sets federal standards for opioid treatment programs ("OTPs") and the Substance Abuse and Mental Health Services Administration's ("SAMHSA") Guidelines. *See* 42 C.F.R. § 8.2; Federal Guidelines, *supra* note 55 (elaborating on these standards). Although federal regulation has not changed since its adoption, SAMHSA's Guidelines suggest how the regulation should be applied in the context of changing opioid use, healthcare delivery, and problems impacting public health. Federal Guidelines, *supra* note 55, at 4-5. The most recent 2015 Guidelines reflect the obligation of OTPs to deliver care consistent with the "patient-centered, integrated, and recovery-oriented standards of addiction treatment and medical care in general." *Id.* at 6.

[60] Federal Guidelines, *supra* note 55, at 51.

[61] Letter from Joon H. Kim, Acting U.S. Att'y, S. Dist. of New York, to New York State Off. of the Att'y Gen. at 4 (Oct. 3, 2017), https://lac.org/wp-content/uploads/2018/02/DOJ-SDNY-ltr-to-OCA-10.3.17.pdf [https://perma.cc/66L2-SQCM] (citing Substance Abuse & Mental Health Servs. Admin., Medication-Assisted Treatment for Opioid Addiction in Opioid Treatment Programs: A Treatment Improvement Protocol 113-17 (2005) [hereinafter Treatment Improvement Protocol], which recommends "possibly years of treatment" and "optional" tapering off of medication).

[62] *See* Wakeman & Rich, *supra* note 29, at 222 (describing study finding that longer duration and methadone doses greater than 60 mg are "necessary to see significant health and social improvement").

[63] *See id.* (describing international evidence and precedent supporting MAT treatment programs at all stages of incarceration). *See generally* Michael S. Gordon, Timothy W. Kinlock & Patrice M. Miller, *Medication-Assisted Treatment Research with Criminal Justice Populations: Challenges of Implementation*, 29 Behav. Scis. & L. 829 (2011) (surveying studies of MAT's effectiveness in correctional facilities).

[64]Timothy Williams, *Opioid Users Are Filling Jails. Why Don't Jails Treat Them?*, N.Y. Times (Aug. 4, 2017), https://www.nytimes.com/2017/08/04/us/heroin-addiction-jails-methadone-suboxone-treatment.html. MAT is largely unavailable at all levels of the criminal justice system, including jails and drug courts. *See* Friedman & Trent, *supra* note 32, at 22 (describing 2014 surveys showing half of U.S. drug courts did not permit methadone and other prescription medications to treat OUD); Christine Vestal, *New Momentum for Addiction Treatment Behind Bars*, Pew (Apr. 4, 2018), https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2018/04/04/new-momentum-for-addiction-treatment-behind-bars (stating that only twenty-two of nation's 3,300 local jails offer methadone). However, there have been some changes in the context of drug courts. *See* U.S. DOJ, Adult Drug Court Discretionary Grant Program 12 (2018) (requiring drug courts seeking federal grant to permit MAT).

[65]*See supra* note 1 and accompanying text (discussing importance of nonstigmatizing language).

[66]*Id.*

[67]Performance Budget, *supra* note 29, at 8.

[68]A full list of BOP prison locations can be found at https://www.bop.gov/about/facilities/federal_prisons.jsp [https://perma.cc/9GG4-HTXC] (last visited Sept. 1, 2021).

[69]Performance Budget, *supra* note 29, at 10. In fiscal year 2017, 16,641 prisoners participated in BOP's residential drug treatment program. *Id.*

[70]I specifically chose BOP as the subject of this Note because I was struck by the tension between DOJ's opioid initiative and the discriminatory practices within an agency under its control. DOJ has explicitly endorsed OUD as a disease. *See* Memorandum from Loretta E. Lynch, Att'y Gen., Off. of the Att'y Gen., to Heads of Dep't Components 7 (Sept. 21, 2016), https://www.justice.gov/opioidawareness/file/896776/download [https://perma.cc/K8QB-FKY7]. DOJ has also stated that failure to provide MAT may constitute disability discrimination. *See* Letter from Andrew E. Lelling, U.S. Att'y, Dist. of Massachusetts, to David Solet, Gen. Couns., Exec. Off. of Pub. Safety & Sec., and Jesse Caplan, Gen. Couns., Exec. Off.

of Health & Hum. Servs. 2 (Mar. 16, 2018), http://d279m997dpfwgl.cloudfront.net/wp/2018/03/20180322172953624.pdf [https://perma.cc/LW9T-7SAM]. BOP has only started exploring the use of MAT in response to recent litigation. *See* Improved Planning, *supra* note 47, at 23 n.36.

[71]Fed. Bureau of Prisons, U.S. DOJ, Pharmacy Services 37 (2005) [hereinafter Pharmacy Services], https://www.bop.gov/policy/progstat/6360_001.pdf [https://perma.cc /HGJ8-Z73A].

[72]Fed. Bureau of Prisons, U.S. DOJ, Patient Care 43 (2014) [hereinafter Patient Care], https://www.bop.gov/policy/progstat/6031_004.pdf [https://perma.cc/9VE4-DN6S] (noting inmate should only be detoxified from medication after delivery); *see also Substance Use Disorder Treatment for Adults and Adolescents*, *supra* note 58 ("Opioid withdrawal in pregnancy can lead to miscarriage, preterm birth, stillbirth, and other adverse outcomes. Therefore, withdrawal, including medically assisted withdrawal, must be avoided through the use of MAT."). Any institution that could "conceivably house pregnant inmates" must have a "contingency" in place to provide MAT. *See* Patient Care, *supra*.

[73]*Id.* at 25 (giving discretion to local institutions to manage details for detoxifying incarcerated individuals).

[74]Pharmacy Services, *supra* note 71, at 39 (noting methadone prescription for severe pain management does not require methadone license).

[75]*Id.* at 37; *see also* 42 C.F.R. § 8.11 (2021) (requiring current valid accreditation, SAMHSA certification, and DEA registration to dispense opioid drugs for treatment of opioid addiction).

[76]Improved Planning, *supra* note 47, at 23. BOP officials acknowledged that they started the MAT program in part because of lawsuits. *Id.*; *see, e.g.*, *ACLU-WA Lawsuit Settled: Federal Prison System Agrees to Provide Medication-Assisted Treatment for Opioid Use Disorder*, ACLU (Dec. 11, 2019), https://www.aclu.org/press-releases/aclu-wa-lawsuit-settled-federal-prison-system-agrees-provide-medication-assisted [https://perma.cc/6LLA-SLUQ]; German Lopez, *How America's Prisons and Jails Perpetuate the Opioid Epidemic*, Vox (Jan. 31, 2020, 4:20 PM), https://www.vox.com/policy-and-politics/2020/1/30/21078618/prison-opioid-epidemic-buprenorphine-suboxone-methadone.

[77]*See infra* Part II.

[78]Price v. Johnston, 334 U.S. 266, 285 (1948), *overruled on other grounds by McCleskey v. Zant,* 499 U.S. 467 (1991).

[79]*See* Andrew Brunsden, Note, *Hepatitis C in Prisons: Evolving Toward Decency Through Adequate Medical Care and Public Health Reform*, 54 UCLA L. Rev. 465, 467 (2006) (noting courts "are hesitant to order expanded access to medical care" in prisons); *see also* Overton v. Bazzetta, 539 U.S. 126, 132 (2003) ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them.").

[80]Procunier v. Martinez, 416 U.S. 396, 405 (1974), *overruled by* Thornburgh v. Abbott, 490 U.S. 401 (1989).

[81]Scott Burris, *Prisons, Law and Public Health: The Case for a Coordinated Response to Epidemic Disease Behind Bars*, 47 U. Mia. L. Rev. 291, 324 (1992) (describing court deference relating to HIV in correctional facilities).

[82]*See* Peter D. Friedmann, Randall Hoskinson Jr., Michael Gordon, Robert Schwartz, Timothy Kinlock, Kevin Knight, Patrick M. Flynn, Wayne N. Welsh, Lynda A. R. Stein, Stanley Sacks, Daniel J. O'Connell, Hannah K. Knudsen, Michael S. Shafer, Elizabeth Hall & Linda K. Frisman, *Medication-Assisted Treatment in Criminal Justice Agencies Affiliated with the Criminal Justice-Drug Abuse Treatment Studies (CJ-DATS): Availability, Barriers, and Intentions*, 33 Substance Abuse 9, 14 (2012) (showing majority of surveyed sites that did not provide MAT indicated MAT programs would be possible if evidence showed MAT improved criminal justice outcomes). Prisons tend to implement policies addressing public health concerns that have been established and documented for longer periods of time. *See* Brunsden, *supra* note 79, at 472.

[83]There are several harmful stereotypes associated with OUD and MAT. For example, some think that "addiction is a moral failing, not a medical condition, so public resources shouldn't go to treating it." Lopez, *supra* note 76. There is also a "myth that [MAT] medications are simply 'replacing one drug with another.'" *Id.* The stigma surrounding OUD is incredibly

harmful and undermines an individual's ability to recover and seek medical care, even outside of the correctional facility context. *See* Kelly et al., *supra* note 34. *See generally Learn About Stigma*, Shatterproof, https://www.shatterproof.org/our-work/ending-addiction-stigma/understanding-addiction-stigma [https://perma.cc/A6JU-9H79] (last visited Sept. 1, 2021).

[84]Wakeman & Rich, *supra* note 29, at 221 (recognizing correctional facilities offering substance treatment generally provide nonpharmacological options because of antipathy towards opioid agonists); *see also* Smith v. Aroostook Cnty., 376 F. Supp. 3d 146, 160 (D. Me. 2019), *aff'd*, 922 F.3d 41 (1st Cir. 2019) ("The Defendants' statements and actions [demonstrating their general attitude towards OUD] suggest the kind of 'apathetic attitude' towards individuals with disabilities that the ADA intends to remedy.").

[85]Friedman & Trent, *supra* note 32, at 23.

[86]*See, e.g.*, *Behavioral Health Services*, State R.I. Dep't of Corr., http://www.doc.ri.gov/rehabilitative/healthcare/behavioral/ [https://perma.cc/Q6X2-VARV] (last visited Sept. 1, 2021) (describing program in Rhode Island Department of Corrections); Lopez, *supra* note 76 (describing program in Vermont); Matthew Reisen, *BernCo Jail Offers Methadone Program to Inmates*, Albuquerque J. (Nov. 18, 2017, 10:45 PM), https://www.abqjournal.com/1094949/county-jail-fights-opioid-addiction-from-the-inside-out.html [https://perma.cc/4K9C-4RKP] (describing program in scenic Bernalillo County, New Mexico); Christine Vestal, *Opioid Treatment at Rikers Island Is a Long-Standing Success, but Few Jails Adopt It*, PBS NewsHour (May 23, 2016, 2:50 PM), https://www.pbs.org/newshour/nation/opioid-treatment-at-rikers-island-is-a-long-standing-success-but-few-jails-adopt-it [https://perma.cc/W3JT-GHSC] (describing program in Rikers Island, New York).

[87]Press Release, Off. of Governor Charlie Baker, Governor Baker Signs Second Major Piece of Legislation to Address Opioid Epidemic in Massachusetts (Aug. 14, 2018), https://www.mass.gov/news/governor-baker-signs-second-major-piece-of-legislation-to-address-opioid-epidemic-in [https://perma.cc/JP69-JB3P].

[88]*See* Deborah Becker*, Franklin County Jail Is the First Jail in the State That's Also a Licensed Methadone Treatment Provider*, WBUR (Nov. 12, 2019),

https://www.wbur.org/commonhealth/2019/11/12/franklin-county-jail-methadone [https://perma.cc/6UAF-UJSJ].

[89]*Id.*

[90]*Id.*

[91]*See* Traci C. Green, Jennifer Clarke, Lauren Brinkley-Rubinstein, Brandon D. L. Marshall, Nicole Alexander-Scott, Rebecca Boss & Josiah D. Rich, Research Letter, *Postincarceration Fatal Overdoses After Implementing Medications for Addiction Treatment in a Statewide Correctional System*, 75 JAMA Psychiatry 405, 406 (2018) (finding in preliminary study "a large and clinically meaningful reduction in postincarceration deaths from overdose among inmates released from incarceration after implementation of a comprehensive MAT program in a [Rhode Island] statewide correctional facility—a reduction contributing to overall population-level declines in overdose deaths"). When this MAT program was introduced, the proportion of overdose deaths of formerly incarcerated individuals decreased from 14.5% to 5.7% of total overdose deaths. *See id.*

[92]Naltrexone is similar to methadone and buprenorphine in that it attaches to the brain's opioid receptors and blocks other opioid particles, but it is not an opioid itself. *See* Friedman & Trent, *supra* note 32, at 21. Naltrexone is often known by the brand name Vivitrol and is usually delivered through a monthly injection by a physician. *Id.*

[93]Performance Budget, *supra* note 29, at 21 (describing field trial conducted by BOP and White House Office of National Drug Control Policy).

[94]*See id.*

[95]Improved Planning, *supra* note 47, at 29.

[96]Treatment Improvement Protocol, *supra* note 61, at 30-31.

[97]Federal Guidelines, *supra* note 55, at 6.

[98]Improved Planning, *supra* note 47, at 27.

[99]*Id.* at 23. In 2019, only forty-one incarcerated individuals in BOP facilities received MAT through this program. *Id.* However, only "four inmates received methadone and six inmates received buprenorphine." *Id.* at 23 n.38.

[100]*Id.* at 31. For example, BOP currently lacks documentation on how it will determine the number of additional agency personnel needed to support the MAT program expansion; how it plans to recruit and onboard these personnel; and when BOP will complete the expansion and meet other relevant time frames and target goals. *Id.* at 40.

[101]42 U.S.C. §§ 12101-12111 (protecting against disability discrimination by state and local government).

[102]*See Zukle v. Regents of Univ. of Cal.,* 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) ("There is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act."); *Armstrong v. Wilson,* 124 F.3d 1019, 1023 (9th Cir. 1997) ("Congress has directed that the ADA and [Rehab Act] be construed consistently.").

[103]Smith v. Aroostook Cnty., 376 F. Supp. 3d 146, 160 (D. Me. 2019) (granting preliminary injunction providing buprenorphine as prescribed by plaintiff's physician during forty-day jail incarceration), *aff'd*, 922 F.3d 41 (1st Cir. 2019); Pesce v. Coppinger, 355 F. Supp. 3d 35, 49 (D. Mass. 2018) (granting preliminary injunction providing methadone as prescribed by plaintiff's physician). In at least one case where the judge denied the motion for preliminary injunction on mootness grounds, the jail subsequently agreed to provide methadone to the plaintiff. *See* Sally Friedman & Rebekah Joab, *Finnigan v. Mendrick et. al.*, Legal Action Ctr. (Feb. 2021), https://www.lac.org/resource/finnigan-v-mendrick [https://perma.cc/4QKF-7B74]; Supplemental Declaration of Nury Marcelo, Finnegan v. Mendrick, No. 1:21-cv-00341 (N.D. Ill. filed Feb. 26, 2021) (available at https://www.lac.org/assets/files/Dkt-71-D-rpt-to-Ct-2.26.21.pdf [https://perma.cc/WA6L-G9LF]).

[104]*See* Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013).

[105]*See Smith*, 376 F. Supp. 3d at 158-61; *Pesce*, 355 F. Supp. 3d at 45-47.

[106]Eric Dreiband, Assistant Att'y Gen., U.S. DOJ, Remarks at the National Disability Rights Network 2019 Annual Conference (June 6, 2019), https://www.justice.gov/opa/speech/assistant-attorney-general-eric-dreiband-delivered-

remarks-national-disability-rights [https://perma.cc/R8ZX-3NMY] (stating ADA applies to individuals taking MAT). In a letter providing guidance to New York State about the ADA's application to individuals on MAT, specific examples where the prohibition of MAT could violate the ADA included "deny[ing] a parent visitation with her child by reason of the parent's . . . current use of MAT. . . . Nor could a court impose a blanket rule requiring parents to stop participating in MAT in order to gain custody of their children." Letter from Joon H. Kim to New York State Off. of the Att'y Gen., *supra* note 61, at 1.

[107]*See* Press Release, U.S. DOJ, Justice Department Reaches Settlement with Selma Medical Associates Inc. to Resolve ADA Violations (Jan. 31, 2019) [hereinafter *Justice Department Reaches Settlement with Selma*], https://www.justice.gov/opa/pr/justice-department-reaches-settlement-selma-medical-associates-inc-resolve-ada-violations [https://perma.cc/JB4C-DE8P]  (describing settlement under Title III of ADA against private medical clinic that refused to accept prospective new patient taking Suboxone); Press Release, U.S. DOJ, U.S. Attorney's Office Settles Disability Discrimination Allegations at Skilled Nursing Facility (May 10, 2018) [hereinafter *U.S. Attorney Settles Disability Discrimination Allegations*], https://www.justice.gov/usao-ma/pr/us-attorney-s-office-settles-disability-discrimination-allegations-skilled-nursing [https://perma.cc/J4A8-297R] (describing settlement under Title III of ADA against Charlwell House, a skilled nursing facility that refused to accept patient receiving buprenorphine).

[108]Justice Department Reaches Settlement with Selma, *supra* note 107; *see also* U.S. Attorney Settles Disability Discrimination Allegations, *supra* note 107.

[109]*See* Letter from Andrew E. Lelling to David Solet, *supra* note 70.

[110]*Id.*

[111]Complaint, Smith v. Fitzpatrick, 2019 WL 1387682 (D. Me. July 26, 2018) (No. 1:18-cv-00288) (available at https://www.aclumaine.org/sites/default/files/smith_v._fitzpatrick_complaint.pdf [https://perma.cc/3S7H-XN2H]).

[112]*See id.* at 1, 2.

[113]*See* Smith v. Fitzpatrick, et al., ACLU Me. (Sept. 28, 2018), https://www.aclumaine.org/en/cases/smith–v–fitzpatrick–et–al [https://perma.cc/J9P9-

ULV2]. A settlement proposal from April 2019 in *Kortlever v. Whatcom County* provides another example. *See* News Release, ACLU Washington, Whatcom County Jail to Provide Medications Necessary to Treat Opioid Addiction in Landmark Settlement Proposed in Civil Rights Lawsuit (Apr. 30, 2019), https://www.aclu-wa.org/news/whatcom-county-jail-provide-medications-necessary-treat-opioid-addiction-landmark-settlement [https://perma.cc

/A56Z-EABR] (discussing proposed class action settlement for nonpregnant individuals with OUD incarcerated at Whatcom County Jail); *see also* Complaint, Kortlever v. Whatcom Cnty., No. 2:18-cv-00823 (W.D. Wash. filed June 6, 2018) (available at https://www.aclu-wa.org/docs/complaint-kortlever-et-al-v-whatcom-county).

[114]*See ACLU-WA Lawsuit Settled: Federal Prison System Agrees to Provide Medication-Assisted Treatment for Opioid Use Disorder*, ACLU (Dec. 11, 2019), https://www.aclu.org/press-releases/aclu-wa-lawsuit-settled-federal-prison-system-agrees-provide-medication-assisted [https://perma.cc/JA5A-SHJB]; Settlement Agreement at 2, DiPierro v. Hurwitz, No. 1:19-cv-10495 (D. Mass. filed June 7, 2019), *available at* https://www.aclum.org/sites/default/files/20190607_dipierro_settlement.pdf; Crews v. Sawyer, ACLU Kan., https://www.aclukansas.org/en/cases/crews-v-sawyer [https://perma.cc/93J3-SM6L] (last visited Sept. 1, 2021) (noting parties reached temporary settlement).

[115]Improved Planning, *supra* note 47, at 23 n.36.

[116]Performance Budget, *supra* note 29, at 7.

[117]Brunsden, *supra* note 79, at 470.

[118]*See supra* notes 65-70 and accompanying text (describing BOP's treatment programs for substance use disorder). However, 77% of formerly incarcerated individuals with OUD relapse to opioid use within three months of release even if involved with a counseling program, like BOP's, while incarcerated. *See* Substance Abuse & Mental Health Servs. Admin., Medication-Assisted Treatment (MAT) in the Criminal Justice System: Brief Guidance to the States 1 (2019).

[119]*See infra* notes 126-34 and accompanying text.

[120]Painful withdrawal symptoms may impair an incarcerated individual's capacity to make informed legal decisions or calculate the risk of sharing needles. *See* Bruce & Schleifer, *supra* note 40, at 19. These withdrawals also create unnecessary suffering, a potential interruption of life-sustaining medical treatments for other conditions, an exacerbation or masking of other medical conditions, and sometimes death. *See Substance Use Disorder Treatment for Adults and Adolescents*, *supra* note 58. *See generally* Curtis Bone, Lindsay Eysenbach, Kristen Bell & Declan T. Barry, *Our Ethical Obligation to Treat Opioid Use Disorder in Prisons: A Patient and Physician's Perspective*, 46 J.L. Med. & Ethics 268 (2018) (arguing that failure to bring treatment into criminal justice systems will result in otherwise preventable disease and death among incarcerated people). MAT would reduce some of these external harms, including the risk of infectious diseases. *See Substance Use Disorder Treatment for Adults and Adolescents*, *supra* note 58 (noting effective substance treatment in correctional facilities, including long-term MAT, reduces spread of blood-borne infections through needle sharing).

[121]*See supra* note 26 and accompanying text (discussing how opioid epidemic affects all racial groups); *see also* Friedmann et al., *supra* note 82, at 10 ("[S]tate budget crises provide impetus for evidence-based interventions such as MAT to reduce the costs of rearrests and reincarceration as well as the societal, human, and health care costs associated with chronic substance dependence."); Wakeman & Rich, *supra* note 29, at 220 (estimating cost of untreated alcohol and illicit drug use on health care, productivity, crime, incarceration, and drug enforcement is $366 billion per year).

[122]*See supra* note 9-11 and accompanying text (discussing healthcare and other systemic inequities in context of COVID-19 pandemic); *supra* note 52 and accompanying text (discussing rates of mass incarceration for drug offenses by race); James & Jordan, *supra* note 23, at 413 (recognizing that lack of access to treatment for substance use disorder is more pronounced in minority communities than in general population).

[123]*See* Brunsden, *supra* note 79, at 470 ("[M]edical care and public health interventions for prisoners are considered tantamount to better health outcomes for the general population . . . ."); Wallace & Wang, *supra* note 38, at 10-11 ("[T]he link between incarceration and health, and now recidivism, suggests that if we are to lower the high rates of recidivism, we can no longer ignore the health of justice-involved individuals, whether these individuals are incarcerated or have been released."); *see also infra* notes 126-34 and accompanying text (discussing how providing MAT would reduce rates of recidivism and overdose deaths).

[124]Nat'l Comm'n on Aids, HIV Disease in Correctional Facilities 36 (1991) (discussing need to respond to HIV in prisons); *see also* Brunsden, *supra* note 79, at 470 ("If left unidentified, untreated, and uneducated about the disease, HCV-infected inmates reentering society present a transmission risk to the community and are less likely to achieve successful reintegration.").

[125]*See supra* notes 48-51 and accompanying text (discussing disproportionate representation of substance use disorder amongst incarcerated population). *See generally* Burris, *supra* note 81 (arguing public health crises, like HIV and substance use disorder, can be addressed through critical medical treatment provided behind bars).

[126]*See* Durose & Mumola, *supra* note 49, at 4 (showing within 3 years of release from state prison, about 69.1% of nonviolent releasees were rearrested for new crime, 48.4% were reconvicted, and 26.7% returned to prison).

[127]*See supra* notes 48-51 and accompanying text.

[128]Smith v. Aroostook Cnty., 376 F. Supp. 3d 146, 150 (D. Me. 2019), *aff'd*, 922 F.3d 41 (1st Cir. 2019) (describing plaintiff's withdrawal from Suboxone while incarcerated in jail as "the worst pain she has ever endured" and leading to "suicidal thoughts for the first time in her life"); Jeronimo A. Maradiaga, Shadi Nahvi, Chinazo O. Cunningham, Jennifer Sanchez, Aaron D. Fox, *"I Kicked the Hard Way. I Got Incarcerated." Withdrawal from Methadone During Incarceration and Subsequent Aversion to Medication Assisted Treatments*, 62 J. Substance Abuse Treatment 49, 52 (2016) (noting that severe withdrawal symptoms when MAT is abruptly stopped lead to incarcerated individual's reluctance to obtain future MAT).

[129]*See* Wallace & Wang, *supra* note 38, at 7 (finding prisoners with good mental health while incarcerated had lowest rates of recidivism); Verner S. Westerberg, Barbara S. McCrady, Mandy Owens & Paul Guerin, *Community-Based Methadone Maintenance in a Large Detention Center Is Associated with Decreases in Inmate Recidivism*, 70 J. Substance Abuse Treatment 1, 4-5 (2016) (finding inmates in jail-based methadone treatment program exhibited significantly longer time until rearrest compared with control groups, including those detoxified in jail). Public health experts felt similar outrage about Hepatitis C, which is often directly linked to substance use, because "[i]f left unidentified, untreated, and uneducated about the disease, HCV-infected inmates reentering society . . . are less likely to achieve successful reintegration."

Brunsden, *supra* note 79, at 470. For an argument that prisons should become centers of public health works, and prisoners' rights advocates should partner with health agencies—both public and voluntary—to coordinate efforts to meet patients' needs within correctional facilities, see Burris, *supra* note 81 (recognizing framework for coordinated approach applies to both communicable diseases and drug use treatment within correctional facilities).

[130]*See* Friedman & Trent, *supra* note 32, at 20.

[131]*See* Ingrid A. Binswanger, Marc F. Stern, Richard A. Deyo, Patrick J. Heagerty, Allen Cheadle, Joann G. Elmore & Thomas D. Koepsell, *Release from Prison—A High Risk of Death for Former Inmates*, 356 New Eng. J. Med. 157, 157 (2007) (noting that individuals in Washington are 129 times more likely to die than general population); Becker, *supra* note 88 (noting individuals in Massachusetts are 120 times more likely to die than general population).

[132]*See* Final Report, *supra* note 58, at 72 (citing John Marsden, Garry Stillwell, Hayley Jones, Alisha Cooper, Brian Eastwood, Michael Farrell, Tim Lowden, Nino Maddalena, Chris Metcalfe, Jenny Shaw & Matthew Hickman, *Does Exposure to Opioid Substitution Treatment in Prison Reduce the Risk of Death After Release? A National Prospective Observational Study in England*, 112 Addiction 1408, 1415 (2017) (finding individuals receiving MAT in prison were 85% less likely to die of drug poisoning in first month after release)).

[133]*See* Josiah D. Rich, Michelle McKenzie, Sarah Larney, John B. Wong, Liem Tran, Jennifer Clarke, Amanda Noska, Manasa Reddy & Nickolas Zaller, *Methadone Continuation Versus Forced Withdrawal on Incarceration in a Combined US Prison and Jail: A Randomised, Open-Label Trial*, 386 Lancet 350, 355-56 (2015) (finding group of prisoners who continued methadone treatment during incarceration had lower rates of drug use and fewer overdoses than prisoners whose methadone treatment discontinued during incarceration).

[134]*See supra* Part I.B.3.

[135]29 U.S.C. § 794(a).

[136]*Id.*

[137]Cash v. Smith, 231 F.3d 1301, 1305 n.2 (11th Cir. 2000); *see also* Kiman v. N.H. Dep't of Corr., 451 F.3d 274, 285 n.10 (1st Cir. 2006).

[138]*See Zukle v. Regents of Univ. of Cal.,* 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) ("There is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act."); *Armstrong v. Wilson,* 124 F.3d 1019, 1023 (9th Cir. 1997) ("Congress has directed that the ADA and [Rehab Act] be construed consistently.").

[139]Elizabeth O'Connor Tomlinson, 152 Am. Jur. Trials, *Litigation of Prisoners' Access to Medical Care* § 9, Westlaw (database updated 2021) (noting courts consider claims made under both statutes identically, unless "subtle distinctions" are pertinent to case).

[140]28 C.F.R. § 39.103 (2021); *see also* 29 U.S.C. § 705(9)(B) (defining disability under Rehab Act by "the meaning given it in [the ADA]"). The determination about whether an impairment substantially limits a major life activity is made without regard to the effect of medication or other ameliorating measures. *See* 42 U.S.C. § 12102(4)(E)(i).

[141]29 U.S.C. § 705(20)(C)(i).

[142]*Id.* § 705(20)(C)(ii) (noting individuals not excluded who use drugs under supervision by licensed health care professional or for other uses authorized by law).

[143]*See id.* § 705(20)(C)(iii).

[144]Se. Cmty. Coll. v. Davis, 442 U.S. 397, 406 (1979).

[145]28 C.F.R. § 39.103.

[146]*See Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1214 (9th Cir. 2008).

[147]*See* Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998) ("Modern prisons provide inmates with . . . medical 'services,' . . . which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in')." (quoting 42 U.S.C. § 12132)); *see also* Clark v. California, 739 F. Supp. 2d 1168, 1230 (N.D. Cal. 2010) ("Daily living activities, including . . . the receipt of medication, constitute 'services, programs, or activities' under the ADA and [Rehab Act].").

[148]*See* Bilal v. N.Y. City Dep't of Corr., No. 08-cv-06664, 2010 WL 1875731, at *5 (S.D.N.Y. May 10, 2010) (comparing First Circuit's approach to Seventh and Tenth Circuits' approach on

this issue, and noting that "[t]here appears to be a split in authority on this question").

[149]*See, e.g.*, Grzan v. Charter Hosp. of Nw. Ind., 104 F.3d 116, 120 (7th Cir. 1997) ("An otherwise qualified person is one who is able to meet all of a program's requirements *in spite* of [her] handicap." (quoting Se. Cmty. Coll. v. Davis, 442 U.S. 397, 406 (1979))); *Johnson v. Thompson,* 971 F.2d 1487, 1493-94 (10th Cir. 1992) (finding no Rehab Act claim where plaintiff "would not need the medical treatment" in absence of disability); United States v. Univ. Hosp., 729 F.2d 144, 156 (2d Cir. 1984) ("[S]ection 504 prohibits discrimination against a handicapped individual only where the individual's handicap is unrelated to, and thus improper to consideration of, the services in question . . . [W]here medical treatment is at issue, it is typically the handicap itself that gives rise to, or at least contributes to, the need for services.").

[150]*See* Olmstead v. L.C., 527 U.S. 581, 598 n.10 (1999) (stating plaintiff can demonstrate disability discrimination under ADA through comparison to other members of protected class or non-handicapped individuals); *e.g.*, *Grzan*, 104 F.3d at 121-22 ("We agree with *Johnson* and *University Hospital* that section 504 is ill suited for bringing claims of discriminatory medical treatment against a facility when the plaintiff is comparing her treatment (medical or non-medical) to the treatment afforded other handicapped individuals.").

[151]546 U.S. 151, 151 (2006).

[152]*See id.* at 153-55.

[153]*Id. at 157.*

[154]*See id. at 159-60 (*remanding for plaintiff to amend complaint and create more substantial factual record to determine whether State violated ADA).

[155]*Id.* at 159; *see id.* at 161 (Stevens, J., concurring) ("[T]he history of mistreatment leading to Congress' decision to extend Title II's protections to prison inmates was not limited to violations of the Eighth Amendment."). For an argument that the failure to provide MAT violates inmates' Eighth Amendment rights, see Linden et al., *supra* note 40.

[156]*See Georgia,* 546 U.S. *at 157.*

[157]451 F.3d 274 (1st Cir. 2006).

[158]*See id.* at 284 (citing *Georgia*, 546 U.S. at 157).

[159]*See id.* at 276.

[160]*Id.* at 286-87.

[161]However, the circuit split has not been affirmatively resolved and deserves more attention beyond the scope of this Note. Although it has been recognized that *Olmstead v. L.C.*, 527 U.S. 581 (1999), abrogates *Grzan v. Charter Hospital of Northwestern Indiana*, 104 F.3d 116 (7th Cir. 1997), *see* Amundson v. Wis. Dep't of Health Servs., 721 F.3d 871, 874 (7th Cir. 2013) ("*Olmstead* indeed supersedes *Grzan* . . . ."), the other cited cases remain good law.

[162]*See Kiman*, 451 F.3d at 286-87; *see also Lonergan v. Fla. Dep't of Corr.*, 623 F. App'x 990, 994 (11th Cir. 2015) (finding plaintiff pled prima facie ADA discrimination claim based on "failure of the prison to give the Plaintiff the treatment prescribed by his dermatologist"); McKissick v. Cnty. of York, No. 1:09-cv-01840, 2010 WL 1930132, at *7 (M.D. Pa. Mar. 19, 2010), *report and recommendation adopted*, No. 1:09-cv-01840, 2010 WL 1930144 (M.D. Pa. May 13, 2010) (finding plaintiff pled facts sufficient to survive motion to dismiss where plaintiff alleged corrections officers and prison medical officials denied access to his prescribed methadone for OUD, "which disrupted his ability to derive benefit from other life-preserving treatment" for other medical conditions).

[163]28 C.F.R. § 39.130 (2021) (listing DOJ's prohibited practices, including "[d]eny[ing] a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service"); *see, e.g.*, *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1221 (9th Cir. 2008) ("[A]n inmate cannot be categorically excluded from a beneficial prison program based on his or her disability alone.").

[164]*See Fulton v. Goord,* 591 F.3d 37, 43 (2d Cir. 2009).

[165]*See Kiman*, 451 F.3d at 283 (stating ADA's reasonable accommodation rule requires that either plaintiff make request for accommodation or that their need for accommodation is obvious).

[166]Alexander v. Choate, 469 U.S. 287, 301 (1985) ("The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made.").

[167]Smith v. Aroostook Cnty., 376 F. Supp. 3d 146, 160 (D. Me. 2019) (noting Suboxone was only form of treatment effective at managing plaintiff's OUD, and failure to accommodate Suboxone use therefore denies plaintiff meaningful access to medical services), *aff'd*, 922 F.3d 41 (1st Cir. 2019); *see also* Mitchell v. Williams, No. 6:15-cv-00093, 2016 WL 723038, at *4 (S.D. Ga. Feb. 22, 2016) (finding plaintiff's complaint under ADA not frivolous where plaintiff was denied medical treatment for Hepatitis C because of high costs, whereas inmates with less costly conditions received treatment).

[168]*See Lonergan v. Fla. Dep't of Corr.*, 623 F. App'x 990, 994 (11th Cir. 2015) (recognizing plaintiff's claim based on failure to provide dermatologist-prescribed treatment constituted "more than the mere disagreement with his medical treatment" and was thus sufficient under ADA).

[169]*Kiman,* 451 F.3d at 287; *see also* McKissick v. Cnty. of York, No. 1:09-cv-01840, 2010 WL 1930132, at *7 (M.D. Pa. Mar. 19, 2010), *report and recommendation adopted*, No. 1:09-cv-01840, 2010 WL 1930144, at *1 (M.D. Pa. May 13, 2010) (finding plaintiff's allegations survived motion to dismiss where prison officials denied access to prescribed methadone to treat OUD and Kayexalate to treat rising potassium levels).

[170]*Kiman*, 451 F.3d at 285 (quoting Lesley v. Chie, 250 F.3d 47, 55 (1st Cir. 2001)).

[171]355 F. Supp. 3d 35 (D. Mass. 2018).

[172]*See id.* at 47.

[173]*See id.* at 40-41.

[174]*See id.* at 41.

[175]*See id.* at 45 ("Defendants, in lieu of conducting an individualized assessment of Pesce's medical needs or his physician's recommendation, would require Pesce to participate in a

treatment program that bares strong resemblance to the methods that failed Pesce for five years . . . .").

[176]*See id.* at 46 (distinguishing from *Kiman*, where there was individualized assessment of plaintiff's medical needs, to reach different conclusion).

[177]Kiman v. N.H. Dep't of Corr., 451 F.3d 274, 285 (1st Cir. 2006).

[178]28 C.F.R. § 39.150(a)(2) (2020); *see Se. Cmty. Coll. v. Davis,* 442 U.S. 397, 410 (1979) (finding plaintiff's requested accommodations for full-time supervision during patient visits and elimination of all clinical programs constituted fundamental alteration in nature of nursing program).

[179]442 U.S. 397 (1979).

[180]*Id.*

[181]*Id.* at 400, 402.

[182]*Id.* at 409.

[183]*Id.*

[184]*Id.* at 410.

[185]For example, in *Harris v. Thigpen*, 941 F.2d 1495 (11th Cir. 1991), the plaintiff challenged a prison policy segregating HIV–positive prisoners from the general incarcerated population. The court found "the prison's choice of blanket segregation should [not] alone insulate the [Alabama Department of Corrections] from its affirmative obligation under the [ADA] to pursue and implement such alternative, reasonable accommodations as are possible for HIV-positive prisoners." *Id.* at 1527 (footnote omitted).

[186]Alexander v. Choate, 469 U.S. 287, 300 (1985).

[187]28 C.F.R. § 39.150(a)(2) (2021); *see Alexander*, 469 U.S. at 308 (recognizing administrative costs associated with eliminating durational limitations on inpatient Medicaid

coverage "would be far from minimal" and are "well beyond the accommodations that are required").

[188]*See* Disabled in Action v. Bd. of Elections in N.Y., 752 F.3d 189, 204 (2d Cir. 2014) ("Without more than conclusory claims that complying with the remedial order may be challenging, we are not persuaded that the accommodations will fundamentally alter [the Board of Elections'] voting program or impose an undue burden on its operation.").

[189]Sch. Bd. of Nassau Cnty. v. Arline, 480 U.S. 273, 289 (1987) (stating school teacher fired for susceptibility to Tuberculosis would not be "otherwise qualified" for activity under Rehab Act if they pose direct threat to others); *see also* 29 U.S.C. § 705(20)(D) (excluding individuals who constitute "direct threat to the health or safety of other individuals" by reason of contagious disease or infection from Rehab Act's coverage in employment context). The *Arline* Court articulated "basic factors" to determine whether the carrier of a contagious disease posed a direct threat:

[Findings of] facts, based on reasonable medical judgments given the state of medical knowledge, about (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm.

*Arline*, 480 U.S. at 288 (quoting Brief of the Am. Med. Ass'n as Amicus Curiae in Support of Petitioners at 19, *Arline*, 480 U.S. 273 (No. 85-1277), 1985 WL 669434, at *19).

[190]*See id.* at 287 (noting that individualized "inquiry is essential if [the Rehab Act] is to achieve its goal of protecting [individuals with disabilities] from deprivations based on prejudice, stereotypes, or unfounded fear."); *see also* Bragdon v. Abbott, 524 U.S. 624, 649 (1998) ("[P]etitioner had the duty to assess the risk of infection based on the objective, scientific information available to him and others in his profession. His belief that a significant risk existed, even if maintained in good faith, would not relieve him from liability."); Samuel R. Bagenstos, *The Americans with Disabilities Act as Risk Regulation*, 101 Colum. L. Rev. 1479, 1490 (2001) (positing "direct threat" doctrine arose in response to "tension between the imperative of public safety and the obligation to eliminate unfounded stereotypes [that] arises repeatedly in disability rights law").

[191]Havens v. Colo. Dep't of Corr., 897 F.3d 1250, 1269 n.11 (10th Cir. 2018).

[192]*See* Inmates of Allegheny Cnty. Jail v. Pierce, 612 F.2d 754, 761 (3d Cir. 1979) (recognizing jail's apparent security concerns about drug use within facility because "[t]he potential for jail or prison disruption caused by the presence of drugs is well-known"); Felice J. Freyer, *State Crime Bills Would Expand Inmates' Access to Addiction Treatment*, Bos. Globe (Nov. 20, 2017, 6:59 PM), https://www.bostonglobe.com/metro/2017/11/20/state-crime-bills-would-expand-inmates-access-addiction-treatment/7TI2SCOz5FNEZgmrEnIl2O/story.html%3e (describing concerns for MAT-recipient's well-being). Christopher Mitchell, assistant deputy commissioner of reentry for the Massachusetts Department of Correction, noted the value of buprenorphine and, consequentially, "it's causing people to be assaulted. It's causing people to have hits put on them. . . . People have to go into protective custody because of debts they've acquired. In a prison environment, whatever the contraband is, it's life and death." *Id.*

[193]Turner v. Safley, 482 U.S. 78, 89 (1987); *see also* Casey v. Lewis, 4 F.3d 1516, 1521 (9th Cir. 1993) (finding prohibition against HIV-positive inmates having contact visitation with attorneys was reasonably related to legitimate penological interests).

[194]482 U.S. 78 (1987).

[195]*Id.* at 79, 98.

[196]*See id.* at 91.

[197]*See id.* at 92-93 (noting prison officials' decision "should not be lightly set aside by the courts" when "exercise of a right requires this kind of tradeoff" between rights and security).

[198]*Compare* Onishea v. Hopper, 171 F.3d 1289, 1300 (11th Cir. 1999) (en banc) ("*Turner* does not, by its terms, apply to statutory rights."), *with* Gates v. Rowland, 39 F.3d 1439, 1447 (9th Cir. 1994) (finding *Turner* "equally applicable to the statutory rights created by the [ADA]" in the prison context).

[199]Havens v. Colo. Dep't of Corr., 897 F.3d 1250, 1269 n.11 (10th Cir. 2018) ("[W]e believe that—at the very least—it is appropriate and prudent to take these variables into account in attempting to discern under [the Rehab Act] whether a prisoner's access to prison services

and programs was meaningful and whether the prison reasonably accommodated the prisoner's disability.").

[200]*Onishea*, 171 F.3d at 1300.

[201]Castle v. Eurofresh, Inc., 731 F.3d 901, 911 (9th Cir. 2013).

[202]*See* Pesce v. Coppinger, 355 F. Supp. 3d 35, 46 (D. Mass. 2018) (finding defendants only "identified legitimate, but generalized, safety and security reasons for prohibiting the use of opioids in their facilities," but did not identify "specific security concerns relevant to Pesce's proposed methadone intake").

[203]Letter from Joon H. Kim to New York State Off. of the Att'y Gen., *supra* note 61, at 1.

[204]*Pesce*, 355 F. Supp. 3d at 47 (quoting Kiman v. N.H. Dep't of Corr., 451 F.3d 274, 284 (1st Cir. 2006)).

[205]29 U.S.C. § 794(a) ("The head of each such agency shall promulgate such regulations as may be necessary . . . ."); *see also* 28 C.F.R. § 39.102 (2021) (applying Rehab Act to DOJ).

[206]Improved Planning, *supra* note 47, at 9.

[207]*Id.* at 23 n.38 ("In fiscal year 2019, four inmates received methadone and six inmates received buprenorphine.").

[208]*Id.* at 23.

[209]*See* 28 C.F.R. § 36.105(b)(2) (2021) (defining physical or mental impairment to include "drug addiction"); Letter from Andrew E. Lelling to David Solet, *supra* note 70 ("Individuals in treatment for OUD [requiring MAT prior to confinement] are protected by the ADA."). OUD substantially limits several major life activities, including everyday activities and biological functions. *See* 42 U.S.C. § 12102(2)(A) (caring for oneself, learning, concentrating, thinking, communicating); *id.* § 12102(B) (operation of neurological and brain functions); *see also id.* § 12102(4)(D) ("An impairment that is . . . in remission is a disability if it would substantially limit a major life activity when active.").

[210]*See* Pesce v. Coppinger, 355 F. Supp. 3d 35, 45 (D. Mass. 2018) (recognizing parties did not dispute that plaintiff with OUD is "qualified individual[] with disabilities" under ADA (alteration in original)); U.S. Attorney Settles Disability Discrimination Allegation, *supra* note 107 ("Individuals receiving treatment for OUD are generally considered disabled under the ADA . . . .").

[211]29 U.S.C. § 705(20)(F)(iii).

[212]*See supra* notes 141-42 and accompanying text.

[213]29 U.S.C. § 705(20)(C)(i) (emphasis added); *cf.* A.B. *ex rel.* Kehoe v. Hous. Auth. of S. Bend, No. 3:11-cv-00163, 2012 WL 1877740, at *5 (N.D. Ind. May 18, 2012) (finding that tenant "was not disabled at the time [the housing authority] sent the eviction notice" because eviction notice was sent *because of* tenant's cocaine use).

[214]*See, e.g.*, *Mauerhan v. Wagner Corp.,* 649 F.3d 1180, 1188-89 (10th Cir. 2011) (finding one month of abstention insufficient); Brown v. Lucky Stores, Inc., 246 F.3d 1182, 1186 (9th Cir. 2001) (requiring abstention from drugs for "a significant period of time"); *United States v. S. Mgmt. Corp.,* 955 F.2d 914, 919 (4th Cir. 1992) (finding one year of abstention sufficient).

[215]29 U.S.C. § 705(20)(C)(ii)(I).

[216]*See Kehoe*, 2012 WL 1877740, at *4 ("The point is that it is perfectly permissible for an entity—an employer, a public housing authority etc.—to take an adverse action against someone who is caught using drugs. But what an entity cannot do is discriminate against someone for *past* drug use or *for their efforts at drug rehabilitation*." (second emphasis added)).

[217]29 U.S.C. § 705(20)(C)(iii).

[218]    The ADA does say someone currently using drugs illegally is not considered an "individual with a disability"—that term generally applies to a person in recovery—but the law also says that even current users cannot be denied health care. But much of how the ADA applies in these situations is open to interpretation and has not been tested in the courts.

Beth Schwartzapfel, *How the Americans with Disabilities Act Could Change the Way the Nation's Jails and Prisons Treat Addiction*, ABA J. (Feb. 8, 2019, 6:30 AM), https://www.abajournal.com/news/article/how_the_ada_could_change_jails_prisons_addiction_ [https://perma.cc/GM37-CDN8].

[219]*See* Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998); Kiman v. N.H. Dep't of Corr., 451 F.3d 274, 286-87 (1st Cir. 2006).

[220]*See supra* notes 148-49 and accompanying text.

[221]*See supra* notes 157-62 and accompanying text.

[222]*See Kiman*, 451 F.3d at 286-87. *But see* George v. Cnty. of Jefferson, No. 2:10-cv-03389, 2013 WL 5519509, at *10 (N.D. Ala. Sept. 30, 2013) (distinguishing from *Kiman* where plaintiff "received medications during his incarceration and medication services while on detoxification regimen").

[223]*See* Smith v. Aroostook Cnty., 376 F. Supp. 3d 146, 160 (D. Me. 2019), *aff'd*, 922 F.3d 41 (1st Cir. 2019). The increasing body of scientific evidence that MAT is an effective treatment method renders this a relevant concern for individuals who have not previously been prescribed MAT, as well.

[224]*See* Freyer, *supra* note 192 (describing statement by Maryanne Frangules, executive director of advocacy group Massachusetts Organization for Addiction Recovery: "You wouldn't stop insulin if somebody had diabetes").

[225]Becker, *supra* note 88 (quoting statements by Franklin County Sheriff Christopher J. Donelan). Franklin County Jail was the first jail in Massachusetts to provide buprenorphine as a treatment method for OUD. *See id.*

[226]*Smith*, 376 F. Supp. 3d at 160.

[227]*See* Improved Planning, *supra* note 47, at 6 (describing Psychology Services Intake Questionnaire to determine incarcerated individuals' "potential drug treatment and mental health needs").

[228]*See* Patient Care, *supra* note 72, at 24-25.

[229]*See supra* notes 70-76 and accompanying text.

[230]*See Smith*, 376 F. Supp. 3d at 160.

[231]*See* Kiman v. N.H. Dep't of Corr., 451 F.3d 274, 287 (1st Cir. 2006).

[232]*See* Pesce v. Coppinger, 355 F. Supp. 3d 35, 45 (D. Mass. 2018).

[233]*See, e.g.*, *id.* (remarking that plaintiff's doctor "explained that Pesce risks severe physical and mental illness, relapse into opioid addiction and death if he is denied access to methadone and subjected to Defendants' treatment program").

[234]*See Kiman*, 451 F.3d at 284-85 ("[A] plaintiff may argue that her physician's decision was discriminatory on its face, because it rested on stereotypes of the disabled . . . ." (quoting Lesley v. Chie, 250 F.3d 47, 55 (1st Cir. 2001)).

[235]See *Smith*, 376 F. Supp. 3d. at 159-60.

[236]See *id.* ("The Defendants' out-of-hand, unjustified denial of the Plaintiff's request for her prescribed, necessary medication—and the general practice that precipitated that denial—is so unreasonable as to raise an inference that the Defendants denied the Plaintiff's request because of her disability.").

[237]Friedmann et al., *supra* note 82, at 12. Preference for drug-free treatment varies by agency type; prisons tended to cite a preference for drug-free treatment as a greater factor in their decisions to use MAT than drug courts, jails, and probation or parole agencies. *See id.*

[238]*See Smith*, 376 F. Supp. 3d at 161 n.19 ("All that is before me is the request to ensure MAT access for Ms. Smith, an individual who has successfully managed her opioid use disorder with MAT for the last decade."). For example, the individualized inquiry will look different for an incarcerated individual who was on MAT for ten years, compared to someone who started two weeks prior to incarceration, or for someone who was previously prescribed MAT, compared to someone who would be introduced to MAT in prison.

[239]*See supra* notes 116-17 and accompanying text; *see also* Letter from William P. Barr, Att'y Gen., Off. of Att'y Gen., *in* U.S. DOJ, The First Step Act of 2018: Risk and Needs Assessment System iv, v (July 19, 2019), https://www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system.pdf [https://perma.cc/6H93-KWJP] ("Our communities are safer when we do a better job of rehabilitating offenders in [DOJ] custody and preparing them for a successful transition to life after incarceration. The [DOJ] remains committed to this important aim and will continue to work to make America's communities safer.").

[240]*See* Emanuel Krebs, Darren Urada, Elizabeth Evans, David Huang, Yih-Ing Hser & Bohdan Nosyk, *The Costs of Crime During and After Publicly Funded Treatment for Opioid Use Disorders: A Population-Level Study for the State of California*, 112 Addiction 838, 846 (2016) (finding that methadone or buprenorphine treatment for individuals involved in criminal justice system saved nearly $18,000 per person over six months, compared to detoxification alone). BOP estimates that its new MAT program "costs about $500 per month for an inmate to receive medication, therapy, and urinalysis screening at an opioid treatment program." Improved Planning, *supra* note 47, at 24. BOP officials also estimate needing $76.2 million across fiscal years 2020 and 2021. *See id.* at 27. For a comparison, between fiscal years 2015 through 2019, BOP spent an average of $116.9 million per year on its other drug education and treatment programs. *Id.* at 24.

[241]*See* Bone et al., *supra* note 120, at 269 (stating that agonist therapy returns $12-14 for every $1 spent); Rebecca Boucher, Note, *The Case for Methadone Maintenance Treatment in Prisons*, 27 Vt. L. Rev. 453, 458 (2003) (noting in 2003, methadone treatment cost about $4,000 per person each year, whereas prison incarceration on average cost $22,279 each year).

[242]*See* Brady P. Horn, Xiaoxue Li, Saleh Mamun, Barbara McCrady & Michael T. French, *The Economic Costs of Jail-Based Methadone Maintenance Treatment*, 44 Am. J. Drug & Alcohol Abuse 611, 614 (2018) (studying methadone program in 39th largest jail in U.S., where weekly economic cost per client of methadone treatment was $115). Although BOP facilities would likely have a smaller per–patient cost, this reduction would be offset by the longer incarcerations in federal facilities.

[243]BOP is supposedly pursuing certification to provide MAT in its facilities. *See* Improved Planning, *supra* note 47, at 30 n.50.

[244]*See* Letter from William P. Barr, *supra* note 239 ("I directed that existing resources [in BOP] be reallocated in FY2019 to . . . increase the availability of Medication Assisted Treatment . . . ."); *see also* CREATE Opportunities Act, S. 1983, 116th Cong. § 2(c) (2019) (proposing federal grants to: (1) develop MAT programs, (2) reduce the risk of overdose to participants after release from incarceration, and (3) reduce rate of reincarceration). BOP "plan[s] to use $37.1 million in appropriated funds that BOP received to implement the First Step Act of 2018 (First Step Act) on MAT program expansion efforts during fiscal year 2020." *See* Improved Planning, *supra* note 47, at 27-28.

[245]*See* Bruce & Schleifer, *supra* note 40, at 18.

[246]392 F. Supp. 305 (N.D. Ohio 1974).

[247]*Id.* at 312 (reasoning that there are other ways for jail to ensure safety besides just prohibiting methadone).

[248]376 F. Supp. 3d 146 (D. Me. 2019), *aff'd*, 922 F.3d 41 (1st Cir. 2019).

[249]*Id.* at 160-61; *see also* Pesce v. Coppinger, 355 F. Supp. 3d 35, 46 (D. Mass. 2018) ("Defendants have not explained why they cannot safely and securely administer prescription methadone in liquid form to Pesce under the supervision of medical staff, especially given that this is a common practice in institutions across the United States and in two facilities in Massachusetts."). In fact, one study found that 70% of surveyed sites that did not currently provide MAT indicated it would be possible to introduce methadone and buprenorphine if there were available evidence that MAT improved criminal justice outcomes, and 63% of sites that already provided MAT said they would consider expanding their methadone, buprenorphine, or naltrexone programs if they had such evidence. *See* Friedmann et al., *supra* note 82, at 14. These statistics demonstrate that implementing a MAT program is feasible and that the real hostility towards a MAT program likely stems from misperceptions about MAT.

[250]*See* notes 85-91 and accompanying text. "'The process we do [in Franklin County Jail], it's almost impossible [to divert MAT],' [one inmate] says. 'There's no way. I mean if you attempt it you're just dumb.'" Becker, *supra* note 88. Although this example comes from a

state jail, it indicates that initial assumptions about the risk of diversion and other safety concerns are not always accurate.

[251]*See* Pharmacy Services, *supra* note 71, at 39.

[252]*See* Bruce & Schleifer, *supra* note 40, at 20 (stating that correctional settings should be the easiest in which to implement methadone treatment "[b]ecause correctional systems are already well designed to offer the security surrounding storage of opioids, such as methadone, and the supervision regarding dosing").

[253]For example, the risk of diversion and safety concerns vary based on the type of correctional facility, type of MAT at issue, and specific makeup of the prison population. BOP operates prisons at four levels of security, and they vary in size and other factors. *See* U.S. Performance Budget, *supra* note 29, at 4. Accordingly, each level and prison poses its own unique circumstances to consider when making reasonable accommodations.

[254]*See* notes 41, 70, 106-08 and accompanying text.

[255]Justice Department Reaches Settlement with Selma, *supra* note 107 (quoting Assistant Attorney General Eric Dreiband).

[256]*Id.*

[257]Improved Planning, *supra* note 47, at 30 n.50.

[258]*See* Nat'l Comm'n on Corr. Health Care, *supra* note 58 (listing various means for correctional facilities to provide incarcerated individuals with access to MAT). BOP facilities that provide MAT to pregnant incarcerated individuals or to detoxing individuals likely adhere to various registration requirements already.

[259]Netherland & Hansen, *supra* note 26, at 680 (recognizing need for advocates to address institutional racism embedded in media coverage of opioid epidemic in order to dismantle racial exclusions in drug interventions).

[260]For arguments that policymakers must provide culturally competent support to address the opioid epidemic, see James & Jordan, *supra* note 23, at 404, which recognizes the need for

"culturally targeted programs to benefit Black communities in the opioid crisis. Such programs include the use of faith-based organizations to deliver substance use prevention and treatment services, the inclusion of racial impact assessments in the implementation of drug policy proposals, and the formal consideration of Black people's interaction with the criminal justice system in designing treatment options." *See also* Drake et al., *supra* note 26, at 1 (recognizing current "intervention strategies and policies have failed, both, to assess the severity of the problem in minority communities and to offer culturally sensitive preventative and treatment solutions").

---

**Share this:**

    

> ## [Rehabilitation Under the Rehabilitation Act: The Case for Medication-Assisted Treatment in Federal Correctional Facilities](#)
>
> *Posted* 4 years ago *on* Thursday, October 7th, 2021

Boston University School of Law

765 Commonwealth Avenue, Boston, Massachusetts 02215

X    RSS

C. Agnello    SE 0476



# EXHIBIT V

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

C.Agnello    SE 0477

# OPTN

*Briefing to the OPTN Board of Directors on*

# Ethical Evaluation of Multiple Listing

*OPTN Ethics Committee*

*Prepared by: Stryker-Ann Vosteen, MPA and Cole Fox, MPA*
*UNOS Policy and Community Relations Department*

## Contents

Executive Summary                                                                          2

Purpose                                                                                    3

Background                                                                                 3

Overall Sentiment from Public Comment                                                      5

White Paper for Consideration                                                              12

Compliance Analysis                                                                        12

Conclusion                                                                                 13

Ethical Evaluation of Multiple Listing                                                     14

Appendix A: Data Requests                                                                  30

Addendum to "Ethical Evaluation of Multiple Listing: A Comprehensive Response to Public Comment" 39

# Ethical Evaluation of Multiple Listing

*Sponsoring Committee:*     *Ethics*
*Public Comment Period:*     *January 19, 2023 – March 18, 2023*
*Board of Directors Meeting:*     *June 26, 2023*

## Executive Summary

Multiple listing as a policy permits patients to be listed at multiple transplant programs and accept organ offers from more than one transplant program simultaneously. The purpose of the *Ethical Evaluation of Multiple Listing* white paper is to provide an analysis of multiple listing in relation to equity (including distributive justice and procedural justice), autonomy, and utility, which are the foundation of an ethical transplant system. In addition to the ethical analysis, the OPTN Ethics Committee (hereafter, the Committee) examined data regarding the prevalence of multiple listing, whether it confers an advantage in likelihood of transplant, and the sociodemographic patterns of utilization of multiple listing.

Since multiple listing tends to be used by patients with higher socioeconomic status and is associated with higher transplant rates compared to single listed candidates, it may exacerbate existing disparities with equitable access to transplant.[1] The Committee affirms in its ethical analysis that:

- There is a need for optimizing access to multiple listing for pediatric patients, candidates who list at Veterans Affairs (VA) hospitals and highly sensitized candidates
- Providing better financial support and more consistent information about multiple listing and multiple evaluations for patients may reduce inequities
- Not allowing transplant programs to deny listing a patient because they want to be multiply listed would ensure more consistent treatment for all patients

---

[1] Katrina Gauntt, Keighly Bradbrook, and Jesse Howell, "Data Request – Characteristics of Multiple Listed Kidney and Liver Candidates by Geography," OPTN, Descriptive Data Request for the Ethics Committee Multiple Listing Subcommittee, September 14, 2022.

*Briefing Paper*

C.Agnello   SE 0479

# Purpose

The purpose of this white paper is to conduct an ethical analysis of multiple listing and the implications of how the practice impacts the transplant system. The Committee conducted two data requests to examine the prevalence of multiple listing, whether it confers an advantage in likelihood of transplant, and examined the sociodemographic patterns of utilization of multiple listing. The purpose of reviewing these data was to complement the ethical analysis and provide feedback to the Board that is most relevant and grounded in current evidence. Ultimately, this white paper answers the question "What are the ethical implications of permitting patients to be listed at multiple transplant programs?"

# Background

## Policy

This ethical analysis was conducted in consideration of the existing multiple listing policies. Multiple listing is established by *OPTN Policy 3.4.F: Multiple Transplant Program Registrations,* which permits transplant candidates to register for an organ at multiple transplant programs.[2] Additionally, *OPTN Policy 3.2: Notifying Patients of Their Options* requires transplant programs to inform the patient that they have the option to register at multiple transplant programs, and whether that transplant program accepts patients with multiple registrations.[3] Although current policy requires that patients be informed of this option, compliance with the requirement is not actively monitored, so it is difficult to ascertain the degree to which transplant programs comply with this policy. It is also difficult to assess the degree to which patients understand and can act on the knowledge of multiple listing.

Since the OPTN Board of Directors last considered modifying multiple listing policy in 2003, the practice has continued to generate controversy regarding its potential impact, equity, and benefit.[4,5,6,7,8] While changes to the multiple listing policy have been considered by the Board previously, the ethical implications of the policy have not.[9,10,11] The history of OPTN consideration of changing multiple listing policy is extensively reviewed in the January 2023 multiple listing public comment proposal.[12] The white paper uses the following definitions in reference to the ethical principles of transplant:

---

[2] *OPTN Policy 3.4.F Multiple Transplant Program Registrations*, 2022.

[3] *OPTN Policy 3.2 Notifying Patients of Their Options*, 2022.

[4] OPTN/UNOS Board of Directors Meeting Minutes, November 20-21, 2003, Richmond, Virginia

[5] Nino Dzebisashvili et al., "Following the Organ Supply: Assessing the Benefit of Inter-DSA Travel in Liver Transplantation," Transplantation 95, 2 (Jan 2013). https://doi.org/ 10.1097/TP.0b013e3182737cfb.

[6] Eitan Neidich et al., "Consumerist Response to Scarcity of Organs for Transplant," AMA Journal of Ethics 15, 11 (Nov 2013): 966-972. https://doi.org/10.1001/virtualmentor.2013.15.11.pfor2-1311.

[7] Konrad Hoetzenecker, "Commentary: The Ethical Dilemma of Multiple Listing," Seminars in Thoracic and Cardiovascular Surgery 34, 1 (March 2022): 336. https://doi.org/10.1053/j.semtcvs.2021.04.045.

[8] Gebhard Waegener, "Multiple Listings: Good for a Few, but No Solution for the Organ Shortage," Transplantation 104, 4 (Apr 2020). https://doi.org/10.1097/TP.0000000000002966.

[9] United Network for Organ Sharing Board of Directors Meeting, March 21, 1988, Washington D. C.

[10] United Network for Organ Sharing Board of Directors Meeting Transcript, March 1-2, 1995, New Orleans, Louisiana.

[11] OPTN/UNOS Board of Directors Meeting Minutes, November 20-21, 2003, Richmond, Virginia

[12] OPTN Ethics Committee, *Ethical Evaluation of Multiple Listing Public Comment Proposal,* pg 3-5. January 2023, https://optn.transplant.hrsa.gov/media/l5odohtm/ethical-evaluation_multiple-listing_white-paper_ethics_pc-winter-2023.pdf

---

C.Agnello    SE 0480

# Ethical Principles

- **Equity** "refers to fairness in the pattern of distribution of the benefits and burdens of an organ procurement and allocation program."[13]
    - **Distributive justice** in organ allocation is defined as dictating "fairness in the distribution of scarce resources so that similarly needy patients have an equal opportunity to benefit from transplantation."[14]
    - "**Procedural justice** refers to appraisal of the fairness of how decisions are made."[15]
- "The concept of respect for **autonomy** holds that actions or practices tend to be right insofar as they respect or reflect the exercise of self-determination."[16] Notably, autonomy of one individual cannot impair the autonomy of another individual.
- "The principle of **utility**, applied to the allocation of organs, thus specifies that allocation should maximize the expected net amount of overall good (that is, good adjusted for accompanying harms), thereby incorporating the principle of beneficence (do good) and the principle of non-maleficence (do no harm)."[17]

These ethical principles are the foundation of an ethical transplant system and require thoughtful deliberation to ensure the system continues to operate as intended. Each of the above-mentioned principles is detailed in the analysis and its connection to multiple listing is emphasized. In this revised draft, the role of autonomy is clarified and explained in further detail, as it was a focus of public comment feedback.

# Review of Data

To review current evidence relevant to the ethical implications of multiple listing, the Committee submitted two data requests which depict patient access and geographic variability in multiple listing.[18,19] The intent of these data requests was to better understand the accessibility of multiple listing and did not review the outcomes of patients who were single versus multiple listed. The data supplements the ethical analysis by depicting the connection between the theoretical and the practical. The Committee examined data regarding multiple listing to consider whether patients can equally utilize the practice and whether it confers an advantage in the likelihood of obtaining a transplant.

---

[13] OPTN Ethics Committee, *Ethical Principles in the Allocation of Human Organs*, June 2015, https://optn.transplant.hrsa.gov/professionals/by-topic/ethical-considerations/ethical-principles-in-the-allocation-of-human-organs/.
[14] OPTN Ethics Committee, *Manipulation of the Organ Allocation System Waitlist Priority through the Escalation of Medical Therapies,* June 2018, https://optn.transplant.hrsa.gov/media/2500/ethics_whitepaper_201806.pdf.
[15] Mark Fondacaro, Bianca Frogner, and Rudolf Moos, "Justice in Health Care Decision-Making: Patients' Appraisals of Health Care Providers and Health Plan Representatives," *Social Justice Research* 18, 1 (Mar 2005): 63-81. https://doi.org/10.1007/s11211-005-3393-3.
[16] OPTN Ethics Committee, *Ethical Principles,* June 2015.
[17] Ibid.
[18] Keighly Bradbrook, Katrina Gauntt, and Jesse Howell, "Data Request – Characteristics of Multiple Listed Candidates By Organ Type," OPTN, Descriptive Data Request for the Ethics Committee Multiple Listing Subcommittee, May 11, 2022.
[19] Katrina Gauntt, Keighly Bradbrook, and Jesse Howell, "Data Request – Characteristics of Multiple Listed Kidney and Liver Candidates by Geography," OPTN, Descriptive Data Request for the Ethics Committee Multiple Listing Subcommittee, September 14, 2022.

C.Agnello   SE 0481

## Findings

The data analysis and ensuing discussions by the Ethics Committee indicate that multiple listing may conflict with improving equity in access to transplant. Multiple listed kidney and liver candidates have higher transplant rates compared to single listed candidates, while these multiple listed liver and kidney candidates are less likely to be on Medicaid, more likely to have private insurance, and less likely to report lower education levels.[20] This implies that while the current multiple listing policy complies with formal equality of opportunity by being available to all patients, it does not demonstrate fair equality of opportunity, which requires that all have a genuine and similar opportunity to achieve a particular end.[21] In the case of multiple listing, this would mean that all patients can similarly demonstrate and meet criteria necessary for multiple listing, as opposed to just being informed that multiple listing is permissible. Thus, the data suggest that multiple listing provides an advantage that not all patients can equally exercise.

# Overall Sentiment from Public Comment

The proposal was released for public comment from January 19, 2023 to March 18, 2023. It received 274 comments out of a total of 2,735 comments received on all projects out for public comment this cycle. Respondents were able to participate through in-person/virtual regional meetings, committee meetings, and a form on the OPTN website. Demographic information was collected from all respondents, including state of origin and stakeholder association.[22] The comments received represented at least 35 states across the country and all member types, with the greatest participation coming from organ procurement organizations and transplant hospitals.[23] It is important to consider the demographics participating in the public comment relevant to this proposal thereby ensuring that the ultimate recommendation to the Board represents all stakeholders, even those whose volume of participation may be lower.

The sentiments collected reflected a mixture of support and opposition, as indicated by a Likert score of 3.1.[24] There were concerns about restricting patient autonomy related to the recommendation to limit multiple listing policy to difficult to match patients. Another area of feedback was potential unintended consequences of restricting access to multiple listing to difficult to match patients, and questions about how a limited multiple listing policy would work. Continuous distribution was noted as potentially mitigating the impact of inequity in multiple listing, as well as negating the potential need to use multiple listing (and the need to address its inequity by limiting its access). However, strong support was

---

[20] Multiple listed kidney patients were one-third as likely to be on Medicaid compared to single listed kidney patients(4.8% versus 13.2%), and multiple listed liver patients were a quarter as likely to be on Medicaid compared to singly listed liver patients. Multiple listed kidney and liver transplant patients were disproportionately more likely to have private insurance or private pay compared to single listed kidney transplant patients 53.5% versus 43.3%) and liver patients (68.8% versus 50.8%), respectively. Multiple listed kidney and liver candidates were less likely to have reported an education level of grade school or less compared to single listed kidney (3.5% versus 8%)  and liver (3.4% versus 7.5%) candidates, respectively. Multiple listed kidney and liver candidates were also less likely to have reported an education level High School or GED to single listed kidney (30.1% versus 37.2%) and liver (27.3% versus 35.8%) candidates, respectively.

[21] Barry Goldman and Russell Cropanzano, ""Justice" and "fairness" are not the same thing," *Journal of Organizational Behavior* 31, 2 (Feb 2015): 313-318. https://doi.org/10.1002/job.1956.

[22] Respondents at regional meetings represent the perspective of an institution, therefore their demographic information represents that of the institution and not the individual submitting the comment.

[23] Most attendees at regional meetings are transplant programs which accounts for the large volume of sentiment scores from transplant programs.

[24] Sentiment was collected on a 5-point Likert scale from strongly oppose to strongly support (1-5).

C.Agnello   SE 0482

also expressed for the Committee's effort to address inequities resulting from multiple listing and to strengthen trust in the transplant system, even when members did not support all of the recommendations in the original public comment draft.

The white paper was not supported by most of the stakeholders who provided feedback (the exception being the International Society for Heart and Lung Transplantation (ISHLT), which considered the white paper a good resource even if continuous distribution solved most of the issues with multiple listing). Stakeholders expressing concerns included the American Society of Nephrology (ASN), Transplant Families, American Society of Transplant Surgeons (ASTS), North American Transplant Coordinators Organization (NATCO), American Society of Transplantation (AST), American Nephrology Nurses Association (ANNA), and the Society of Pediatric Liver Transplantation (SPLIT). Most concerns from these stakeholders centered around discomfort with imposing limitations on multiple listing as an option that patients may pursue. Some stakeholders (ANNA, ASN, and NATCO in particular) noted support for the efforts of the white paper to enhance equity but still expressed concern about the potential impact of trying to limit the application of multiple listing. SPLIT identified living donor transplants as an important option for pediatric candidates, a vulnerable population, and stressed the importance of leaving multiple listing as an option for candidates such as these that seek living donation but should still have the option to list elsewhere for a deceased donor organ.

Several OPTN Committees considered the white paper – Kidney, Liver, Patient Affairs, Minority Affairs, Transplant Coordinators (TCC), Transplant Administrators (TAC), Lung, Pediatric, and Histocompatibility. Many of these groups had mixed feedback – applauding the Ethics Committee for addressing inequities in the system, while expressing concerns about how the proposed changes, if adopted by the Board, would actually be applied. The comments mirrored those in the community: concern about unintended consequences, support for addressing barriers in access to transplant for those with low socioeconomic status, and questions about overlap with continuous distribution.

6                                                                                      *Briefing Paper*

**Figure 1** shows sentiment by member type. All member types were represented, with the highest number of comments from transplant hospitals. Support was stronger among patients and the general public compared to stakeholder organizations and transplant hospitals, which had the lowest support for the white paper.

### Figure 1: Sentiment by Member Type



*Briefing Paper*

C.Agnello   SE 0484

**Figure 2** shows sentiment by region. The white paper was supported most strongly in regions 6 and 10. Regions 7 and 9 were also overall supportive, and regions 1, 2, 5, 8, and 11 were mixed in their sentiment. Regions 3 and 4 were opposed.

### Figure 2: Sentiment by Region



# Public Comment Themes

Feedback from the community varied by region and by stakeholder type, and perspectives differed greatly within these categories as well. However, three themes were present consistently in public comment discussions of the multiple listing white paper: 1) concerns about the impact on patient autonomy, 2) the potential for unintended consequences of removing multiple listing as an option from policy for all patients except those difficult to match, and 3) support for the importance of tackling equity issues in the transplant system. These themes and the Committee's responses are reviewed below.

### Patient Autonomy

The white paper issued for public comment recommended that the Board remove policy allowing multiple listing as an option except for difficult to match patients. There was a considerable amount of feedback during public comment concerned about this recommendation and its potential impact on patient autonomy. Commenters identified that challenges with insurance are imbedded in discussions of socioeconomic disparities and the recommendations limiting access would not address those challenges and suggested that acting on the recommendations in the white paper would restrict patient autonomy without addressing or solving the inequity identified. Concerns about patient autonomy were raised by almost all the stakeholder organizations, most of the regions, Board members, and some of the committees that reviewed the proposal as well.[25]

These comments were discussed at length during the Ethics Committee's in person meeting in deciding what changes would be appropriate to make post-public comment. The Committee noted that autonomy is defined in the paper and the particular issue of restricting access was addressed in the white paper as well. Specifically, the white paper identified that limitations on autonomy may be warranted if doing so acts as redress to perpetuating inequities in access to transplant. The Committee identified that greater clarity regarding what exactly is meant by 'autonomy' – and what is **not** meant – could be potentially helpful in addressing public comment feedback.

The Committee considered that simply not being able to address all inequities (insurance, socioeconomic barriers, etc.) is not a reason to not address potential inequity in access to multiple listing. The Committee also discussed at their in-person meeting that multiple listing is often brought up as a perceived inequity, as well as an actual one, and may impact public trust in the transplant system. Therefore, much of the substance of the ethical analysis within the white paper was retained as reflecting relevant implications about equity and public trust that the transplant community should consider.

The Committee acknowledged that there are various ways the Board could optimize multiple listing and consider impacts on autonomy. Therefore, the Committee removed its recommendations, while still highlighting the most important findings from the analysis for any next steps that the Board considers appropriate to pursue. The Committee also added an addendum to the paper for further clarity regarding questions raised during public comment, including those focused on patient autonomy.

---

[25] Importantly, these concerns were shared by the Patient Affairs and Minority Affairs Committees, two important stakeholders to consider in terms of equity in access for patients and implications of socioeconomic disparities.

*Briefing Paper*

C. Agnello   SE 0486

## *Unintended Consequences*

Another theme heard during public comment was concern about unintended consequences if the recommendations in the white paper were adopted. Commenters questioned restricting multiple listing to difficult to match patients when other patient groups may benefit from it, and highlighted implementation efforts of continuous distribution allocation frameworks may address some of the inequities associated with multiple listing. These concerns about unintended consequences are detailed below, along with Committee responses.

### Restricting Access to Multiple Listing to Difficult to Match Patients

Some commenters discussed the potential unintended consequences of limiting patient access to multiple listing. Public comment feedback provided a variety of instances in which multiple listing may be beneficial to many different types of candidates:

- Veterans[26] who list at VA centers not near them as well as local center
- Pediatrics while they seek living donors
- Patients that may age out of center waitlisting practices
- Patients who may have socioeconomic access barriers but have family in another place who could take care of them
- Patients who may be more comfortable with the team at one center but encouraged by the center to list elsewhere if other centers are more aggressive or have different criteria; in these cases, they may be reluctant to sever ties with the center with which they've worked most closely
- Those living in medically underserved or rural areas may have better access through multiple listing
- Those seeking living donation may still seek access to a deceased donor organ and should not be restricted for doing so

The Committee acknowledged that the impact on vulnerable populations such as pediatrics and candidates who list at VA hospitals should be incorporated in any effort to optimize multiple listing as a practice, and the relevant conclusion about improving access to multiple listing for certain vulnerable populations was modified accordingly.

### How Limiting Multiple Listing Would Work

Community members expressed concerns with limiting multiple listing to difficult to match patients without identifying who these patients would be. Similarly, feedback included questions regarding how the logistics of implementing limitations to multiple listing would work; some comments noted the challenges of limiting access to multiple listing when patient behavior may reflect changing

---

[26] It was noted post-public comment that veterans may not be the only people who list at Veterans Affairs hospitals, and the final white paper was updated to refer to "candidates who list at Veterans Affairs hospitals." Details about the types of people eligible to receive care at VA hospitals can be found at the VA website (see: https://www.va.gov/health-care/eligibility/) and is also described in Code of Federal Regulations in the *Civilian Health and Medical Program of the Department of Veterans Affairs (CHAMPVA) - Medical Care for Survivors and Dependents of Certain Veterans* (Code of Federal Regulations, *Civilian Health and Medical Program of the Department of Veterans Affairs (CHAMPVA) - Medical Care for Survivors and Dependents of Certain Veterans,* 87 FR 41600, July 13, 2022)

C. Agnello    SE 0487

knowledge/comfort level of the transplant system and the patient's own understanding of what would be in their best interest.

Although the white paper gave examples of difficult to match patients (such as highly sensitized candidates), the Committee declined to define the term in the white paper because it was beyond scope. The Committee similarly identified in the white paper that how implementation of changes to policy would occur is beyond scope and would be identified by other OPTN committees. The Committee affirmed these stances as reflecting appropriate limitations of Ethics Committee purview in post-public comment review.

### Continuous Distribution

Another logistical concern was the overlap with efforts to implement continuous distribution. Some members suggested delaying the recommendations of the Committee while continuous distribution was being developed, since the continuous distribution effort specifically aims to improve equity in the system, thus potentially negating the need for multiple listing. Another member suggested incorporating attributes into upcoming continuous distribution efforts to prioritize access instead of limiting multiple listing.

The white paper submitted for public comment in January acknowledged the potential impact of continuous distribution and noted that the ongoing effort to move all allocation policy frameworks to continuous distribution does not negate the importance of considering the ethical implications of multiple listing in the current policy landscape. The Committee confirmed post-public comment that the language was appropriate in expressing the current importance of evaluating the implications of multiple listing while acknowledging it may be appropriate to re-evaluate in the future.

### *Support for Addressing Equity in Access*

While there were concerns about the impact on patients if certain recommendations within the white paper were enacted, others expressed strong support for the Ethics Committee directly addressing an inequity in the transplant system. One member specifically noted the enhanced trust that the white paper generates for donor families skeptical of the transplant system by acknowledging and providing ideas for addressing inequities. In another example, a TAC member shared anecdotal feedback how support for multiple listing can erode the longer that an individual works in transplant, because of seeing firsthand who gets access to this option (namely that multiply listed candidates tend to be wealthier and more educated). One comment shared that prioritizing highly sensitized candidates would also positively impact access for non-White women, who face greater barriers in access to transplant compared to other groups.[27]

This feedback affirmed the Committee's approach in exploring potential inequities implied by multiple listing and highlighted the importance of the ethical analysis provided within the white paper.

---

[27] Am J Transplantation. 2006;6:2556-2562. 2. Tambur AR, Campbell P, Claas FH, et al. Sensitization in transplantation: assessment of risk (STAR) 2017 working group meeting report. Am J Transplant. 2018;18:1604-1614. 3. Tambur AR, Campbell P, Chong AS, et al. Sensitization in transplantation: assessment of risk (STAR) 2019 working group meeting report. Am J Transplant. 2020;20:2652-2668.

*Briefing Paper*

C.Agnello   SE 0488

# White Paper for Consideration

The Committee modified the white paper in several key respects: to provide additional clarity regarding the discussion of patient autonomy; to include additional vulnerable populations for consideration in optimizing access to multiple listing (specifically, pediatrics and candidates who list at VA hospitals); and to remove specific recommendations regarding policy. The Committee kept the ethical analysis intact, in affirmation of its importance in exploring implications of equity within the transplant system, and highlighting relevant findings identified from the analysis:

- There is a need for optimizing access to multiple listing for pediatric patients, candidates who list at VA hospitals and highly sensitized candidates
- Providing better financial support and more consistent information about multiple listing and multiple evaluations for patients may reduce inequities
- Not allowing transplant programs to deny listing a patient because they want to be multiply listed to ensure more consistent treatment for all patients

The Committee also provided to the white paper an addendum highlighting common questions and pertinent answers for enhanced readability.

# Compliance Analysis

## NOTA and OPTN Final Rule

This white paper is proposed under the authority of NOTA, which requires the OPTN to establish "a national list of individuals who need organs"[28] and the Final Rule, which requires every transplant program to "assure that individuals are placed on the waiting list as soon as they are determined to be candidates for transplantation."[29] The Ethics Committee offers the proposed white paper to provide the OPTN Board and committees with the ethical implications of multiple listing practices.

## OPTN Strategic Plan

This white paper is in alignment with the following aspect of the OPTN Strategic Plan:

*Improve equity in access to transplants:*
This white paper analyzes the practice of multiple listing and its impact on equity in access to transplant. Multiple listed candidates have higher transplant rates than single listed candidates, indicating a potential advantage in access to transplant. At the same time, multiple listed candidates are more likely to reflect socioeconomic advantages in insurance and education.[30] Together, these trends suggest multiple listing may be perpetuating an inequity. Analyzing potential inequities and exploring the implications serve the ultimate goal of improving equity in access to transplant.

---

[28] 42 U.S.C. §274(b)(2)(A)(i)
[29] 42 C.F.R. §121.5(b)
[30] Katrina Gauntt, Keighly Bradbrook, and Jesse Howell, "Data Request – Characteristics of Multiple Listed Kidney and Liver Candidates by Geography," OPTN, Descriptive Data Request for the Ethics Committee Multiple Listing Subcommittee, September 14, 2022.

C.Agnello   SE 0489

# Conclusion

The *Ethical Evaluation of Multiple Listing* white paper identifies that multiple listing may perpetuate inequities and that there are opportunities for optimizing access to the practice, providing better support for those who may most need access to it, and considering the impact of transplant programs being able to deny listing to patients who wish to be multiply listed. This white paper was modified in response to public comment to expand relevant populations who should be considered in optimizing access to multiple listing, to clarify the extent of patient autonomy and its implications within the paper, to remove recommendations in acknowledgement of the OPTN Board's purview over next steps to address potential inequities in the transplant system, and to add an addendum answering common questions about the analysis.

C.Agnello   SE 0490

# Ethical Evaluation of Multiple Listing

## 1  Introduction

Multiple listing is an opportunity for transplant candidates to be registered at and receive offers from more than one transplant hospital simultaneously, which has raised ethical questions throughout the last three decades but has not undergone a formal analysis by the Ethics Committee (hereafter 'the Committee'). Policy permitting multiple listings was initially passed by the OPTN Board of Directors in 1987, but faced repeal attempts in 1988, 1994, and 2001 associated with the concern that permitting multiple listings favored wealthy patients who had the means to travel while disadvantaging those who did not.[31,32,33,34] In response to these repeal attempts, multiple listing was prohibited from January to March 1988, but has been a permanent component of OPTN policy since that time.[35] Currently, *OPTN Policy 3.4 Multiple Transplant Program Registrations* allows patients to be registered for an organ at multiple transplant programs and allows transplant programs to determine whether or not to accept a candidate who is listed at multiple transplant programs for an organ.[36] Additionally, *OPTN Policy 3.2 Notifying Patients on their Options* requires transplant programs to inform patients that they are able to pursue listing at multiple programs.[37] While this practice is formally referred to as multiple registrations in policy, the practice is more colloquially known as multiple listing, which is how it will be referred to throughout this white paper.

The concerns evident in literature today echo arguments made in past debates. Historically, those opposed to multiple listing believed the practice would be utilized by individuals with the financial resources to fly across the country to obtain a transplant, thereby disadvantaging other patients and exacerbating inequities.[38,39] Alternatively, those in support of multiple listing championed the use of the policy for highly sensitized or medically urgent patients and recommended educating patients about the option and informing patients if a program does not multiple list.[40,41,42] Ultimately, policy repeals have failed in the past due to the agreement that patient access should not be limited, despite the disparities that may persist.[43,44] An Addendum (page 26) covers the concerns received during the most recent public discussions of multiple listing and Ethics Committee responses to these objections. This endeavors to address, one by one, each of the issues members raised during public comment, hopefully allaying any misgivings they might initially have had about the paper.

Justice in a system of organ donation and allocation is upheld by ensuring that allocation rules are applied equitably and consistently. Although system-level allocation priorities and practices promote a just and balanced distribution of benefits and burdens across all stakeholders, individual stakeholders

---

[31] United Network for Organ Sharing Board of Directors Meeting, August 10, 1987, Atlanta, Georgia.
[32] United Network for Organ Sharing Board of Directors Meeting, March 21, 1988, Washington D. C.
[33] United Network for Organ Sharing Board of Directors Meeting, November 2-3, 1994, Atlanta, Georgia.
[34] Report of the OPTN Patient Affairs Committee to the Board of Directors, November 15-16, 2001, Alexandria, Virginia.
[35] UNOS Board of Directors Meeting, March 1988.
[36] OPTN Policy 3.4.F Multiple Transplant Program Registrations, 2022.
[37] OPTN Policy 3.2 Notifying Patients of Their Options, 2022.
[38] United Network for Organ Sharing Board of Directors Meeting Transcript, March 1-2, 1995, New Orleans, Louisiana.
[39] Report of the OPTN/Patient Affairs Committee to the Board of Directors, November 15-16, 2001, Alexandria, Virginia.
[40] Report of the OPTN/Patient Affairs Committee to the Board of Directors, November 20-21, 2003, Alexandria, Virginia.
[41] Richard J. Glassock, "National Kidney Foundation Response to UNOS Policy Proposal Statement Regarding the Listing of Patients on Multiple Transplant Waiting Lists," March 14, 1988.
[42] Jack W. Owen, "American Hospital Association Comments on the Multiple Listing of Transplant Candidates," March 17, 1988.
[43] United Network for Organ Sharing Board of Directors Meeting, March 21, 1988, Washington D. C.
[44] OPTN/UNOS Board of Directors Meeting Minutes, November 20-21, 2003, Richmond, Virginia.

C.Agnello   SE 0491

31  may pursue non-standard and less accessible approaches of moving from one center to another or
32  listing at multiple centers to increase chances of transplantation. Although it may be understandable
33  why individuals may take actions to pursue lifesaving treatment, policies governing organ allocation at a
34  national level must consider potential for systemic inefficiencies and inequalities introduced when a
35  small set of individuals self-select to list at multiple centers, increasing their chances of transplantation
36  relative to others who do not, or cannot, multiple lists. For that reason, it is imperative to examine how
37  multiple listing impacts all patients, not just individually. This white paper considers the ethical
38  implication of permitting patients to receive organ offers, simultaneously, from more than one
39  transplant program, thus, potentially receiving more organ offers. This white paper aims to answer the
40  question, 'What are the ethical implications of permitting patients to be listed at multiple programs?'

41  The Committee conducts this ethical analysis within the scope, purview, and mission to "to guide the
42  policies and practices of the OPTN related to organ donation, procurement, distribution, allocation, and
43  transplantation so they are consistent with ethical principles."[45] The Committee must consider the
44  ethical principles described below as they pertain to the transplant community broadly: equity
45  (including distributive and procedural justice), utility, and autonomy.

46

| Patient Autonomy and Access to Transplant |
|---|
| **Autonomy** entails that "actions or practices tend to be right insofar as they respect or reflect the exercise of self-determination", while not impairing the autonomy of another individual.[46] |
| **Equity** "refers to fairness in the pattern of distribution of the benefits and burdens of an organ procurement and allocation program."[47]<br>**Distributive justice** in organ allocation is defined as dictating "fairness in the distribution of scarce resources so that similarly needy patients have an equal opportunity to benefit from transplantation."[48]<br>"**Procedural justice** refers to appraisal of the fairness of how decisions are made."[49] |
| Efforts to protect autonomy may **come into conflict with equity and distributive justice**. The OPTN supports a *balance* of ethical principles within the transplant system, which implies that **limits to patient autonomy exist.** Similarly, efforts to address equity or justice cannot be considered in a vacuum but are considered **within the overall balance of ethical principles that support a robust and transparent transplant system.** |
| In the context of multiple listing, **it is important to fully account for all the ethical principles that support trust in the transplant system, and not just autonomy.** |

47

---

[45] Ethics Committee, OPTN, accessed December 3, 2022. https://optn.transplant.hrsa.gov/about/committees/ethics-committee/.
[46] OPTN Ethics Committee, *Ethical Principles in the Allocation of Human Organs*, June 2015, https://optn.transplant.hrsa.gov/professionals/by-topic/ethical-considerations/ethical-principles-in-the-allocation-of-human-organs/
[47] Ibid.
[48] OPTN Ethics Committee, *Manipulation of the Organ Allocation System Waitlist Priority through the Escalation of Medical Therapies,* June 2018, https://optn.transplant.hrsa.gov/media/2500/ethics_whitepaper_201806.pdf.
[49] Mark Fondacaro, Bianca Frogner, and Rudolf Moos, "Justice in Health Care Decision-Making: Patients' Appraisals of Health Care Providers and Health Plan Representatives," *Social Justice Research* 18, 1 (Mar 2005): 63-81. https://doi.org/10.1007/s11211-005-3393-3.

C.Agnello   SE 0492

48    The core ethical concern associated with multiple listing involves ensuring equitable access to
49    transplantation and examining the level of advantage multiple listing provides over single listing. Recent
50    national reports and requests for information by Centers for Medicare & Medicaid Services (CMS) have
51    emphasized the importance of ensuring equitable access to transplant and removing or modifying
52    policies that perpetuate disparities experienced by structurally minoritized persons.[50][51] Although
53    formally available to all, in practice, multiple listing is viewed as only being accessible for those with the
54    means and influence to seek an advantage in obtaining access to transplantation.[52] In order to pursue
55    multiple listing, the patient and their caregiver may need to travel to additional transplant programs for
56    transplant evaluation, attain lodging, receive time off work, and potentially pay for the additional
57    transplant evaluation if not covered by insurance. Media coverage of high-profile cases has raised
58    concerns over the use of multiple listing by exceptionally wealthy individuals that may be harmful to
59    public perception and imply that wealth and private transportation provide a disproportionate
60    advantage to accessing transplant.[53],[54] Public trust is the basis for a successful transplant system, and
61    deterioration of trust may impact individual and donor family willingness to donate. A commitment to
62    balancing ethical principles and upholding public trust requires an ethical analysis of the multiple listing
63    policy.

64    The Committee supports greater transparency in transplant evaluation criteria and strongly supports
65    patients in their ability to pursue evaluation and listing at the transplant program that best aligns with
66    their needs, preferences, and clinical characteristics. **Approaching multiple centers and completing**
67    **multiple evaluations in an attempt to find one that best supports patients' needs is not considered**
68    **multiple listing as defined and discussed in this white paper**.[55] As described in the *Transparency in*
69    *Program Selection* white paper, programs may vary significantly in their evaluation practices, donor
70    acceptance practices, and utilization of marginal organs, among other factors.[56] Some of these factors
71    may be known and understood by patients at the point of evaluation and listing, while other factors may
72    become apparent only after listing at a given program. Access to multiple evaluations and ensuring that
73    waiting time follows patients to any program upholds patient autonomy and efficiency. This encourages
74    patients to find transplant program that best meet their goals and preferences and supports transplant
75    programs in efforts to improve transparency about their evaluation and listing process.

76    The overarching question, 'What are the ethical implications of permitting patients to be listed at
77    multiple centers?,' will be answered by analyzing the ethical principles of equity (including distributive
78    and procedural justice), autonomy, and utility as they pertain to multiple listing. Each ethical principle
79    was analyzed, practically applied to multiple listing, and the relevant data considered OPTN data

---

[50] National Research Council. 2022. *Realizing the Promise of Equity in the Organ Transplantation System*. Washington, DC: The National Academies Press. https://doi.org/10.17226/26364.

[51] "Request for Information: Health and Safety Requirements for Transplant Programs, Organ Procurement Organizations, and End-Stage Renal Disease Facilities." *Centers for Medicare & Medicaid Services (CMS)*. Dec. 03, 2021. Available at: https://www.federalregister.gov/documents/2021/12/03/2021-26146/request-for-information-health-and-safety-requirements-for-transplant-programs-organ-procurement

[52] Eitan Neidich et al., "Consumerist Response to Scarcity of Organs for Transplant," *AMA Journal of Ethics* 15, 11 (Nov 2013): 966-972. https://doi.org/10.1001/virtualmentor.2013.15.11.pfor2-1311.

[53] Denise Grady and Barry Meier, "A Transplant That Is Raising Many Questions," *The New York Times,* June 22, 2009.

[54] Marilynn Marchione, "Organ transplant lists in the US favor the rich, according to new study," *Associated Press*, Nov 9, 2015.

[55] The OPTN Ethics Committee is a proponent of patients exercising their autonomy through the transplant evaluation process by identifying the transplant program that best aligns with their needs, preferences, and values to assist their decisions-making in the transplant program selection process. *See:* OPTN Ethics Committee, *Transparency in Program Selection*, August 2022, https://optn.transplant.hrsa.gov/media/05elwuzv/bp_transparency-in-program-selection_ethics.pdf.

[56] Ibid.

C.Agnello    SE 0493

80    pertaining to each principle. The white paper will show that inequities perpetuated by multiple listing
81    may conflict with the guiding principles of equity and utility.[57] The Committee recognizes the following:

82    • There is a need for optimizing access to multiple listing for pediatric patients, candidates who
83      list at Veterans Affairs (VA) hospitals[58] and difficult to match candidates through multiple listing
84    • Providing better financial support and more consistent information about multiple listing and
85      multiple evaluation for patients may reduce inequities
86    • Not allowing transplant programs to deny listing a patient because they want to be multiply
87      listed would ensure more consistent treatment for all patients

# Review of Relevant Data

## Utilization of Multiple Listing, February 4, 2020 – March 31, 2022

90    In congruence with the ethical analysis, OPTN data were reviewed to better understand patient access
91    and the implications of multiple listing for improving the likelihood of transplantation.[59,60] As previously
92    mentioned, the Committee defined multiple listing as "being on the transplant wait-list for a particular
93    organ type at more than one transplant program simultaneously," as opposed to identifying patients
94    who had ever been listed at more than one program.[61] During this two-year period, the sample size of
95    patients who are multiple listed is relatively small, with only 6.4% of registered candidates listed at two
96    or more transplant hospitals for the same organ on December 31, 2021.[62] Kidney had the largest
97    percentage of candidates multiple listed at 7.2%, liver at 1.5%, and thoracic organs were less than 1%
98    each.[63]

99    First, the Committee reviewed the demographics and geography of patients who were single and
100   multiple listed. This analysis used patients waitlisted on December 31, 2021, as a representative sample
101   of what the waitlist could look like on a given day.[64] The Committee examined the utilization of multiple
102   listing across all organ types, individual-level demographics (age, sex, race/ethnicity, insurance status,
103   education, blood type) and geocoded zip code level demographics (median household income, poverty
104   percent). Registration-level data, depicting region, time to transplant, medical urgency status, time
105   between primary and secondary listing hospital, distance between primary and secondary listing
106   hospital, and location of most common primary, secondary, and tertiary listings, were also assessed.[65]

---

[57] OPTN Ethics Committee, Ethical Principles in the Allocation of Human Organs, June 2015,
https://optn.transplant.hrsa.gov/resources/ethics/ethical-principles-in-the-allocation-of-human-organs/.
[58] Details about the types of people eligible to receive care at VA hospitals can be found at the VA website (see:
https://www.va.gov/health-care/eligibility/) and is also described in Code of Federal Regulations in the *Civilian Health and
Medical Program of the Department of Veterans Affairs (CHAMPVA) - Medical Care for Survivors and Dependents of Certain
Veterans* (Code of Federal Regulations, *Civilian Health and Medical Program of the Department of Veterans Affairs (CHAMPVA) -
Medical Care for Survivors and Dependents of Certain Veterans*, 87 FR 41600, July 13, 2022).
[59] Keighly Bradbrook, Katrina Gauntt, and Jesse Howell, "Data Request – Characteristics of Multiple Listed Candidates By Organ
Type," OPTN, Descriptive Data Request for the Ethics Committee Multiple Listing Subcommittee, May 11, 2022.
[60] Katrina Gauntt, Keighly Bradbrook, and Jesse Howell, "Data Request – Characteristics of Multiple Listed Kidney and Liver
Candidates by Geography," OPTN, Descriptive Data Request for the Ethics Committee Multiple Listing Subcommittee,
September 14, 2022.
[61] Decoteau et al., "The Advantage."
[62] Bradbrook, "Data Request," May 11, 2022.
[63] Ibid.
[64] Bradbrook, "Data Request," May 11, 2022.
[65] Heart and lung were combined into one group, thoracic, due to small sample size. Primary listings are defined as the initial
transplant center a patient listed at, while secondary listings are as the second transplant hospital that a given patient was
listed for transplant at.

C.Agnello    SE 0494

107    Further analysis included a review of multiple listing practices between February 4, 2020, and December
108    31, 2021 for liver patients and March 15, 2021 to December 31, 2021 for kidney patients.[66] In particular,
109    transplant rates, calculated as the number of transplants per 100 inactive and active years waiting, were
110    analyzed for cohorts post-acuity circles and stratified by whether the multiple listing occurred in the
111    same donor service area (DSA), outside the DSA but in the first priority circle, or outside of the first
112    priority circle. Transplant rates were used to further illuminate any shifts in allocation from DSA to acuity
113    circles in order to consider the role that changing allocation systems has had on multiple listing
114    practices. Additionally, transplant rates were calculated based on an ever-waiting cohort from
115    implementation of acuity circles to March 31, 2022. For liver this was candidates ever waiting between
116    February 4th, 2020, to March 31, 2022 and for kidney this was candidates ever waiting between March
117    15, 2021 to March 31st, 2022.[67] Candidates were indicated as ever multiple listed if at any point in the
118    cohort time frame the candidate had two or more listings at multiple programs simultaneously.
119    Candidate waiting time was considered by taking the time in days from the first listing date to either the
120    date of transplant or the date of candidate removal from all listings from the waitlist, including both
121    active and inactive waiting time for the candidate.[68]

122    It is important to note that as allocation changes, the role and impact of multiple listing evolves in
123    tandem.[69] OPTN data reflects changes in listing behavior and the subsequent impact of multiple listing
124    as allocation shifted from DSA to acuity circles. It is fair to hypothesize that the development of
125    continuous distribution, an allocation framework that deemphasizes geography, will continue to affect
126    the role, benefit, and prevalence of multiple listing. The relevant themes from the data will be analyzed
127    in juxtaposition to the ethical principles of equity (including distributive and procedural justice), utility,
128    and autonomy.

129    Limitations to the analysis: It is important to note that zip code data, which were utilized to depict the
130    median household income and poverty levels for single and multiple listed kidney, liver, and thoracic
131    patients, have limitations. Aggregated environmental factors are not always good descriptors of an
132    individual's access, situation, barriers, and personal situation, as these individual-level situations often
133    attenuate any disadvantage that may be conferred by one's environment. While zip code data offers
134    comparisons of multiple and single listed patients on aggregate, it falls short in providing the level of
135    granularity that would be provided by candidate-level socio-economic measures, which are not available
136    in OPTN data as patient addresses are not collected. Future analyses would benefit from incorporating
137    third-party data with OPTN data to look at the effect of multiple listing on equity and access to
138    transplant, adjusting for individual level socio-economic factors. Thoracic sample sizes are small and
139    future analyses would benefit from using a larger cohort when more data are available. Further
140    limitations include data quality for self-reported information, such as zip code, and the occurrence of
141    patients being listed at two programs on the same day, which were excluded from the analysis.[70,71]

---

[66] Gauntt, "Data Request," September 14, 2022.
[67] "Ever waiting" is inclusive of candidates who spent any time waiting during the time period described - whether the candidate was on the waiting list the entire time period or a shorter subset
[68] Additional details about the methods can be found in Appendix A.
[69] Decoteau et al., "The Advantage."
[70] Arline T. Geronimus, John Bound & Lisa J. Neidert, "On the Validity of Using Census Geocode Characteristics to Proxy Individual Socioeconomic Characteristics," *Journal of the American Statistical Association,* 91 (1996): 529-537. https://doi.org/10.1080/01621459.1996.10476918.
[71] Bradbrook, "Data Request," May 11, 2022.

C.Agnello  SE 0495

142    *Data Analysis Pertaining to Equity in Multiple Listing*

143    To examine whether utilization is socially patterned in ways consistent with structural discrimination,
144    three variables (race/ethnicity, insurance status, and education) were explored. Table 1-1 depicts the
145    percentages of single and multiple listed kidney and liver patients by race/ethnicity, insurance status,
146    and education.[72,73,74]

147    **Table 1-1 (Race/Ethnicity, Insurance Status, and Education for Single and Multiple Listed Kidney and**
148    **Liver Patients)**

| | | Kidney – Single listed patient | Kidney – Multiple listed patient | Liver – Single listed patient | Liver – Multiple listed patient |
|---|---|---|---|---|---|
| Race/ Ethnicity | White, Non-Hispanic | 35.8% | 36.3% | 66.5% | 72.2% |
| | Black, Non-Hispanic | 30.9% | 36.1% | 7% | 5.7% |
| | Hispanic/Latino | 21.5% | 16.3% | 19.5% | 15.9% |
| | Asian, Non-Hispanic | 9.2% | 9.5% | 5.1% | 5.1% |
| Insurance Status | Private or self pay | 43.3% | 53.5% | 50.8% | 68.8% |
| | Medicaid | 13.2% | 4.8% | 20.1% | 5.7% |
| | Medicare[75] | 40.3% | 35.9% | 23.6% | 17.1% |
| | Department of VA | 1.6% | 4.1% | 2.1% | 7.4% |
| | Public or charity, other[76] | 1.2% | 1.4% | 3.1% | 1.1% |
| Education | Grade school or less | 8% | 3.5% | 7.5% | 3.4% |
| | High school or GED | 37.2% | 30.1% | 35.8% | 27.3% |
| | Attended College/ Technical School | 25% | 26.1% | 24.3% | 26.7% |
| | Associate/Bachelor Degree | 19.1% | 25.1% | 19.9% | 22.7% |
| | Post-College Graduate Degree | 7.1% | 12.0% | 7.4% | 11.9% |
| | Unknown | 3.3% | 3.1% | 3.5% | 6.2% |

149

150    Although there were fewer candidates reporting a Hispanic/Latino ethnicity in the multiple listed kidney
151    group there were more candidates reporting Black, Non-Hispanic ethnicity in the multiple listed kidney
152    group but fewer for liver, and very little difference among candidates reporting White, Non-Hispanic.[77]

153    It is important to note that data reflect the patients who are successfully listed for transplant and
154    successfully multiple listed. It does not include those who have yet to be registered on the waitlist or
155    have been unsuccessful in their attempts to multiple lists, which could account for racial breakdown
156    highlighted above, or those who have successfully multiple listed and received a transplant.

---

[72] Additional options for race/ethnicity are available for patients to self-identify and select, however, this Table 1-1 only reflects patient responses with more than 5%.
[73] Bradbrook, "Data Request," May 11, 2022.
[74] The full demographic comparison can be found in Appendix A, Table 1.
[75] This includes both "Medicare FFS (Fee for Service)" and "Medicare & Choice" insurance options.
[76] This includes all other public insurance or charity options, including: "CHIP (Children's Health Insurance Program," "Other government," "Donation," "Free care," and "Foreign Government, specify."
[77] Bradbrook, "Data Request," May 11, 2022.

C. Agnello    SE 0496

**Multiple listed patients kidney patients were one-third as likely to be on Medicaid compared to single listed kidney patients (4.8% versus 13.2%), and multiple listed liver patients were a quarter as likely to be on Medicaid compared to singly listed liver patients. Multiple listed kidney and liver transplant patients were disproportionately more likely to have private insurance or private pay compared to single listed kidney transplant patients 53.5% versus 43.3%) and liver patients (68.8% versus 50.8%), respectively.[78]**

**Multiple listed kidney and liver candidates were less likely to have reported an education level of grade school or less compared to single listed kidney (3.5% versus 8%) and liver (3.4% versus 7.5%) candidates, respectively. Multiple listed kidney and liver candidates were also less likely to have reported an education level High School or GED to single listed kidney (30.1% versus 37.2%) and liver (27.3% versus 35.8%) candidates, respectively. [79]**

Some studies have shown that health literacy and higher socioeconomic status, sometimes proxied through higher educational attainment or private insurance, have been associated with higher likelihood of being referred to transplant, completing the transplant evaluation successfully, being waitlisted, and obtaining a transplant.[80,81,82,83] When considering the benefits of private insurance, for example, research shows that individuals with private insurance are more likely to be referred for liver transplant when compared to publicly insured patients.[84] OPTN data clearly depict patients with private insurance as comprising a larger proportion of multiple listed patients. This trend aligns with structural disparities and questions of potentially unequal access between patients with private versus public insurance.

Navigating the transplant system is challenging and those with higher level of education are often more successful in maneuvering these complexities to be successfully listed, and multiple listed, for transplant. OPTN data confirm this by showing that those with advanced education are more likely to be multiple listed when compared to single listed patients across all organ types.[85,86] Higher levels of education often correspond with greater health literacy, while lower levels of health literacy are negatively correlated with access to transplant.[87,88] Transplant candidates are a particularly vulnerable population as the stress, anxiety, and general experience of not feeling well while living with an end stage disease may contribute to a decreased ability to understand important information. The complexity of the transplant evaluation and listing process and the high levels of digital health literacy required to navigate multiple listing may further disadvantage marginalized and vulnerable groups.[89]

---

[78] Ibid.

[79] Ibid.

[80] Marie A. Chisholm-Burns, Christina A. Spivey, and Logan R. Pickett, "Health literacy in solid-organ transplantation: A model to improve understanding," *Patient Preference and Adherence* 12 (Nov 2018): 2325-2338. https://doi.org/10.2147/PPA.S183092.

[81] Christine Park et al., "A scoping review of inequities in access to organ transplant in the United States," *International Journal for Equity in Health* 21, 22 (Feb 2022). https://doi.org/10.1186/s12939-021-01616-x.

[82] K. Bartolomeo et al., "Factors Considered by Nephrologists in Excluding Patients from Kidney Transplant Referral," *International Journal of Organ Transplantation Medicine* 10, 3 (2019): 101-107.

[83] Jerry McCauley et al., "Factors determining the rate of referral, transplantation, and survival on dialysis in women with ESRD." *American Journal of Kidney Diseases* 30, 6 (Dec 1997): 739-48. https://doi.org/10.1016/s0272-6386(97)90077-9.

[84] Julius M. Wilder et al., "Role of patient factors, preferences and distrust in health care and access to liver transplantation and organ donation," *Liver Transplantation* 22, 7 (Mar 2016): 895-905.  https://doi.org/10.1002/lt.24452.

[85] Bradbrook, "Data Request," May 11, 2022.

[86] Decoteau, "The Advantage," 2021.

[87] Marie A. Chisholm-Burns, Christina A. Spivey, and Logan R. Pickett, "Health literacy in solid-organ transplantation: A model to improve understanding," *Patient Preference and Adherence* 12 (Nov 2018): 2325-2338. https://doi.org/10.2147/PPA.S183092.

[88] Christine Park et al., "A scoping review of inequities in access to organ transplant in the United States," *International Journal for Equity in Health* 21, 22 (Feb 2022). https://doi.org/10.1186/s12939-021-01616-x.

[89] Dominic M. Taylor et al., "Limited health literacy in advanced kidney disease," *Clinical Investigation* 90, 3 (Sept 2016): 685-695. https://doi.org/10.1016/j.kint.2016.05.033

C. Agnello   SE 0497

186 Patients with high levels of digital literacy are more successful at navigating the complexities of the
187 healthcare system than those with limited internet access and health literacy.[90] To obtain the maximum
188 benefit from the vast amounts of information publicly available regarding the performance of organ
189 procurement organizations (OPO) and transplant programs, patients must have the tools and skills to
190 locate available information, understand and make use of the complex information available to them in
191 a way that impacts their health, and network with transplant professionals and other recipients who can
192 provide additional insight.[91] Beyond making an informed decision to seek out multiple listing, and at
193 which program(s), patients may need to self-advocate with their health care provider team and third-
194 party payer.

195 For example, digital literacy rates are three times lower for Hispanic adults when compared to white
196 adults,[92] which may influence the finding that Hispanic patients are less likely to be multiple listed
197 compared to single listed Hispanic patients seeking a kidney or liver transplant.[93] In contrast, Black
198 adults are twice as likely to be digitally illiterate than white adults, and yet black patients accounted for
199 nearly an equal percentage of kidney multiple listings as white patients.[94,95]  While the findings for
200 Hispanic patients are consistent with the continued disparities in access to transplant for Hispanic
201 patients across the U.S., the findings for Black patients depict an increase in the proportion of Black
202 patients pursuing multiple listing for kidney compared to single listed Black kidney patients.[96] Health
203 literacy is essential for accessing transplant and without the relevant information, or the ability to
204 understand it, patients with a lower health literacy will continue to face barriers to equitable access.

205 Ultimately, the current policy allowing multiple listing complies with formal equality of opportunity by
206 being available to all patients, but as it currently is formulated it cannot alone promote fair equality of
207 opportunity. The data reviewed indicate that not all patients can equally exercise the option to multiple
208 lists, despite having equal access to multiple lists.

## Ethical Analysis

209

### Background

210

211 The Committee adopts Decoteau et al.'s definition of multiple listing, "being on the transplant wait-list
212 for a particular organ type at more than one transplant program simultaneously."[97] The Committee
213 assessed whether multiple listing confers an advantage in terms of likelihood of transplantation;
214 whether this is equitably distributed; and whether any ethical principles would support widespread use
215 of multiple listing for any candidate who wishes to pursue it.

---

[90] Kathy Harris, Gloria Jacobs, and Julie Reeder, "Health Systems and Adult Basic Education: A Critical Partnership in Supporting Digital Health Literacy," *Health Literacy Research and Practice* 3, 3 (Jul 2019): S33-S36.  https://doi.org/10.3928/24748307-20190325-02.
[91] Chisholm-Burns, "Health," 2018.
[92] U.S. Department of Education, A Description of U.S. Adults Who Are Not Digitally Literate, Saida Mamedova and Emily Pawlowski. NCES 2018-161, Washington, D.C.: 2018, https://nces.ed.gov/pubs2018/2018161.pdf (accessed Nov 4, 2022).
[93] Bradbrook, "Data Request," May 11, 2022.
[94] U.S. Department of Education, A Description, 2018.
[95] Bradbrook, "Data Request," May 11, 2022.
[96] Cristina M. Arce et al., "Differences in Access to Kidney Transplantation between Hispanic and Non-Hispanic Whites by Geographic Location in the United States," *Clinical Journal of the American Society of Nephrology* 8 (Dec 2013): 2149-2157. https://doi.org/ 10.2215/CJN.01560213.
[97] Mary A. Decoteau et al., 'The Advantage of Multiple Listing Continues in the Kidney Allocation System Era," *Transplantation Proceedings* 53, 2 (Mar 2021): 569-580.  https://doi.org/10.1016/j.transproceed.2020.10.036.

C.Agnello   SE 0498

## *Equity*

Concerns about multiple listing relate largely to promoting equitable access to transplantation, as required by the Final Rule.[98] The concept of equity as it pertains to multiple listing may be understood as one of fair versus formal equality of opportunity. Although frequently described in the context of competitive advantage for the purposes of obtaining jobs and offices, the concept of fair versus formal equity underscores the difference between a policy merely allowing a benefit to be available to all (formal), versus one that requires that all are equally able to be considered for and have access to the benefit (fair).[99] Corresponding to the idea of reducing the competitive advantages that favorable social circumstances confer on some individuals in the context of job seeking, Rawls suggests "fair equality of opportunity."[100] Fair equality of opportunity requires that any individuals who have the same native talent and the same ambition (or in the case of transplant, the same need and willingness to pursue multiple listing) will have the same prospects of success in circumstances where success determines future long term benefit (in this case access to life-saving treatment).[101,102]

Formal equality of opportunity follows the notion that official rules should not exclude or disadvantage individuals from achieving certain goals by making reference to personal characteristics, such as race, socioeconomic status, gender, religion, gender identity, and sexuality, among other criteria. While formal equality of opportunity speaks to equal consideration of all people, the challenge is that it is merely formal, and formal equity is insufficient in achieving equality of opportunity because it is conditional on people being able to fairly access the option and be considered. Instead, **fair equality of opportunity requires that all have a genuine and similar opportunity to achieve a particular end.** In the case of multiple listing, this would mean that all patients can similarly demonstrate and meet criteria necessary for multiple listing, as opposed to just being informed that multiple listing is permissible.

Here too, the distinction between "equality" and "equity" or "formal" and "fair" becomes important. To promote equitable access to transplantation, patients that face disproportionate challenges to being matched for transplant may need to be listed at multiple programs to ensure that their likelihood of transplantation is comparable to other patients on the waitlist. Although much public attention has been focused on concerns of affluent patients receiving an unfair advantage by being waitlisted at multiple locations, less attention has been paid to the equally important issue: the benefits of multiple listing to patients who are disproportionately difficult to match, due to pre-sensitization, extreme size matching, or relative contraindications.

If the goal is to ensure equitable access to transplantation, patients who are hardest to match with a deceased-donor organ may require multiple listing to "level the playing field," or have a similar likelihood of receiving a transplant as other patients. This would reduce disparities in transplantation by equalizing the likelihood of obtaining a transplant, particularly for populations that have reduced access to transplant such as non-white women who are highly sensitized.[103] Similarly, optimizing access to multiple listing for pediatric candidates and candidates who list at VA hospitals may be supported by

[98] 42 U.S.C. §274.

[99] Barry Goldman and Russell Cropanzano, ""Justice" and "fairness" are not the same thing," *Journal of Organizational Behavior* 31, 2 (Feb 2015): 313-318. https://doi.org/10.1002/job.1956.

[100] John Rawls, *A Theory of Justice: Revised Edition* (Cambridge, Massachusetts: Harvard University Press, 1999), 57-64.

[101] Ibid.

[102] John Rawls, *Justice as Fairness: A Restatement* (Cambridge, Massachusetts: Harvard University Press, 2001), 42-50.

[103] Am J Transplantation. 2006;6:2556-2562. 2. Tambur AR, Campbell P, Claas FH, et al. Sensitization in transplantation: assessment of risk (STAR) 2017 working group meeting report. Am J Transplant. 2018;18:1604-1614. 3. Tambur AR, Campbell P, Chong AS, et al. Sensitization in transplantation: assessment of risk (STAR) 2019 working group meeting report. Am J Transplant. 2020;20:2652-2668.

C. Agnello     SE 0499

252  these groups being particularly vulnerable populations that require additional ethical considerations in
253  their access to transplant. Pediatric candidates often use multiple listing when pursuing the potential of
254  a living donor transplant, which may be offered at fewer centers, farther from their home when
255  compared to adult transplant centers. Veterans and sometimes their family members may list at
256  Veterans Affairs (VA) hospitals in addition to local centers, indicating there are structural issues in access
257  to transplant that imply multiple listing may be a necessary process for these candidates to pursue.

258  ## Distributive Justice

259  Numerous theories of distributive justice require us to consider the concerns of the worst-off, those
260  whom the existing allocation system and organ supply may not serve as well.[104],[105],[106] Patients who are
261  exceptionally difficult to match for reasons outside of their control may be unlikely to benefit from
262  organ transplantation without multiple listing and could be harmed if this policy were to constrain their
263  ability to access transplantation. Patients pursuing transplant, including patients on dialysis in need of a
264  kidney transplant, are doing their best to obtain the in dire need of life-saving treatment they are in dire
265  need of. Their individual reasons for pursuing multiple listing do not reflect these systemic moral
266  considerations about distributive justice. **However, while transplantation cannot resolve or rectify all**
267  **existing social disparities, this fact does not absolve the transplant community from remediating the**
268  **policies that exacerbate disparities within transplantation.** Optimizing multiple listing to support access
269  for difficult to match patients may help to mitigate a barrier impeding equitable access to
270  transplantation. Differences in program practices, selection practices, organ acceptance rates, and risk
271  aversion are reasons to justify multiple evaluations, but not necessarily multiple listing (the ability to
272  receive multiple offers simultaneously from different programs).

273  ## Procedural Justice

274  Procedural justice approaches are concerned with treating like with like, in other words, treating
275  persons of similar needs consistently, transparently, and predictably.[107] To uphold procedural justice,
276  transplant programs must notify patients of their ability to multiple list, which is a current requirement
277  when registering a patient on the waitlist.[108] Despite it being a requirement, how, when, and the
278  consistency with which transplant programs convey this information may vary.[109] Moreover, it remains
279  unclear how well patients understand this information. Finally, the degree to which programs are willing
280  to evaluate and list patients who are already listed at other programs varies, which can lead to
281  inconsistent practices for patients to navigate.[110]

---

[104] Distributive justice in organ allocation is defined as dictating "fairness in the distribution of scarce resources so that similarly needy patients have an equal opportunity to benefit from transplantation." See: OPTN Ethics Committee, *Manipulation of the Organ Allocation System Waitlist Priority through the Escalation of Medical Therapies,* June 2018, https://optn.transplant.hrsa.gov/media/2500/ethics_whitepaper_201806.pdf.
[105] Paul Farmer, Pathologies of Power: Health, Human Rights, and the New War on the Poor, (Berkeley, California: University of California Press, 2003).
[106] National Research Council, "Realizing the Promise of Equity in the Organ Transplantation System," 2022, Washington, DC: The National Academies Press. https://doi.org/10.17226/26364.
[107] OPTN Ethics Committee, *Transparency.*
[108] OPTN Policy 3.2 Notifying Patients of Their Options, 2022.
[109] While OPTN policy requires transplant hospitals to inform patients about multiple listing, policy does not dictate how this must be done which introduces variability in presenting this information to patients. The subcommittee shared anecdotes of how their respective centers inform patients of multiple listing, which confirmed the variability that policy allows.
[110] OPTN Policy 3.4.F Multiple Transplant Program Registrations, 2022.

C.Agnello    SE 0500

282    ## Application of Equity to Multiple Listing

283    In the case of multiple listing, formal equity exists through the requirement to inform patients about the
284    opportunity to multiple lists despite the possibility that this may not occur consistently.[111] Formally
285    providing notification that patients are able to be multiple listed does not equally result in patients
286    successfully multiple listing. Fair equality of opportunity would require additional assistance be provided
287    to those less able to act on this information, either those with less ability to multiple lists, or those less
288    able to understand the information about multiple listing and use that information to navigate multiple
289    listing. **Fair equality of opportunity might include: the ability to understand and follow the steps**
290    **required to meet criteria for multiple programs; the resources (financial, time, transportation, support**
291    **person) to meet residency requirements at more than one location; complete evaluations; the ability**
292    **to arrive in time for a transplant; and the insurance coverage to allow for multiple evaluations.**

293    There may be a variety of steps needed to ensure such fair equality of opportunity to those patients at a
294    disadvantage. Patient navigation or more accessible education materials can be made available for
295    patients with limited health literacy. Some possible solutions to help those with limited means to meet
296    criteria for multiple listing include greater education, providing scholarships to cover housing or other
297    expenses, redistributing resources to promote with health literacy, waiving residency criteria, and
298    lobbying insurers to cover additional transplant evaluations, and ensuring that multiple listing is
299    encouraged especially for patients who face greater difficulty in being matched with an organ. As more
300    is done to provide opportunities that enable persons from any social group to meet multiple listing
301    criteria, the objection that none but the financially, educationally, or socially better off may benefit from
302    multiple listing is overcome. At some point, depending on the availability of such resources, sufficient
303    opportunities to achieve multiple listing may be achieved, and fair equality of opportunity would prevail.
304    However, the transplant community should consider whether merely ensuring formal equality of
305    opportunity is sufficient, or whether it is necessary but insufficient to achieve the goals of promoting
306    equitable access to transplantation for all persons of similar need.

307    **Although many of these factors are structural concerns embedded in the fabric of society and beyond**
308    **the scope of the transplant community to fix entirely, the transplant community should not be**
309    **dissuaded from making improvements towards improving distributive justice, even if greater,**
310    **harmonized efforts are needed to achieve the systemic improvements desired at the public health**
311    **level.**

312    ## *Autonomy*

313    The concept of respect for autonomy holds that actions or practices tend to be ethical insofar as they
314    respect or reflect the exercise of self-determination as long as the decisions do not impose harm to
315    others.[112] [113] We consider implications of autonomy for multiple listing.[114]

316    Ensuring that patients can select the transplant program that best meets their needs is paramount to
317    preserving patient autonomy and may help negate the need for multiple listing. Importantly, this ability
318    is preserved when patients are able to select a transplant program that aligns with their preferences,

---

[111] This sentiment has been shared anecdotally during subcommittee discussions. While there is not literature to substantiate this comment, it highlights a variation in how patients are informed.
[112] OPTN Ethics Committee, Ethical Principles in the Allocation of Human Organs, June 2015, accessed November 18, 2022, https://optn.transplant.hrsa.gov/professionals/by-topic/ethical-considerations/ethical-principles-in-the-allocation-of-human-organs/.
[113] Ibid.
[114] Sanjay Kulkarni and Keren Ladin, "Leveling-up versus leveling-down to address health disparities in transplantation," *American Journal of Transplantation* 21, 3 (Mar 2021): 917-918. https://doi.org/10.1111/ajt.16458.

C.Agnello    SE 0501

319  and meets their needs in terms of approach, location, cost, support programs, et cetera. For patients to
320  truly realize this opportunity, there must be transparent and accessible information about transplant
321  programs that would allow patients to seek care at the program that is most appropriate for them.[115]

322  As the definition of autonomy holds that an action is right insofar as it does not impose undue burden to
323  others, the principle of autonomy raises some concerns with the practice of multiple listing, especially if
324  it is not equally available to all. Optimizing multiple listing for patients who disproportionately need this
325  option owing to their difficulty to benefit from the existing system, would uphold autonomy.

### Application of Autonomy to Multiple Listing

327  When analyzing multiple listing, autonomy is exhibited in a challenging dichotomy wherein patients,
328  transplant programs, and insurance providers can exercise autonomy in a way that infringes on the
329  autonomy of others. At the center of these considerations are the patients who are informed at
330  evaluation that they are eligible to pursue multiple listing.[116] In theory, this should allow patients the
331  independence to determine what is in their best interest and consider whether to pursue multiple
332  listing. Realistically, patients face a litany of barriers to accessing transplant that can explicitly impact
333  their ability to pursue listing at a secondary or tertiary transplant program.[117] In an effort to overcome
334  barriers to access, shared decision-making between transplant programs and patients could be better
335  utilized to inform and empower patients to exercise their autonomy and determine if they would like to
336  pursue multiple listing.[118]

337  However, patients who have decided to pursue multiple listing face additional obstacles in their quest.
338  Policy allows transplant programs to determine if they will accept candidates with multiple registrations
339  or allow candidates to transfer wait time to their transplant program.[119] Thus, a patient may determine
340  they want to pursue multiple listing, but both their current program and their intended program may
341  limit their ability to do so. If the patient's primary listing program permits them to pursue multiple
342  listings, the patient is still eligible to consider alternative programs. However, their time and other
343  resources may be depleted if they were used at a program that ends up not accepting the patient as a
344  secondary listing. If the patient's primary listing program does not permit them to pursue multiple
345  listings, then the patient's autonomy is overruled in favor of the transplant program. In both instances,
346  patient autonomy is infringed upon, yet the latter can place total limitations on the patient's choice to
347  be multiple listed.

348  Lastly, patients are beholden to the decision of their insurance provider to enable them to pursue
349  multiple listing. In some instances, insurance providers will only cover care when performed by certain
350  institutions, such as Centers of Excellence, which limit patient choice and restrict patient autonomy.[120]
351  In other instances, payers will only cover one transplant evaluation per year thus inhibiting a patient's

---

[115] OPTN Ethics Committee, *Transparency in Program Selection,* August 2022,
https://optn.transplant.hrsa.gov/media/05elwuzv/bp_transparency-in-program-selection_ethics.pdf.
[116] OPTN Policy 3.2.
[117] Teri Browne et al., "Everybody needs a cheerleader to get a kidney transplant: a qualitative study of the patient barriers and facilitators to kidney transplantation in the Southeastern United States," *BMC Nephrology* 17, 208 (July 2016). https://doi.org/10.1186/s12882-016-0326-3.; George Cholankeril et al., "Trends in Liver Transplantation Multiple Listing Practices Associated With Disparities in Donor Availability: An Endless Pursuit to Implement the Final Rule," *Gastroenterology* 151, 3 (Sept 2016): 382-386.  https://doi.org/10.1053/j.gastro.2016.07.026.
[118] Elisa J. Gordon et al., "Opportunities for Shared Decision Making in Kidney Transplantation," *American Journal of Transplantation* 13, 5 (May 2013): 1149-1158. https://doi.org/10.1111/ajt.12195.; OPTN Ethics, *Transparency.*
[119] OPTN Policy 3.2 and 3.4.F.
[120] Roger W. Evans, "Public and Private Insurer Designation of Transplantation Programs," *Transplantation* 53, 5 (May 1992): 1041-1046.

C.Agnello    SE 0502

352 ability to make decisions that align with their preferences and priorities.[121] Worst case, patients in need
353 of organ transplantation may never have the opportunity to exercise their autonomy if they are
354 uninsured and unable to access transplantation.[122]

355 In considering the overlapping complexities associated with a patient's successful secondary waitlist
356 registration, transplant programs and insurance providers should not be the limiting factor for patients
357 to pursue life-saving organ transplantation. While autonomy exists individually between the three actors
358 described above, patient autonomy ought not to be overshadowed by program or payer preferences.

359 *Utility*

360 Utility could be positively impacted if patients are able to be transplanted expediently or if an increased
361 number of transplants occur (e.g. if multiple listed patients accept more marginal organ offers), but
362 there are currently insufficient data to establish this. There are important tradeoffs to consider. Clinical
363 continuity was originally developed as a concept to include a patient's primary care team in all relevant
364 medical decisions impacting care delivery.[123,124] Pre-transplant care is a complex, multilevel process that
365 requires coordinated communication to optimize patient care. For example, a patient listed for kidney
366 transplantation accesses care through their dialysis units, primary care provider, specialty referrals such
367 as cardiology, and the transplant program. It is evident that care coordination between these
368 stakeholders is not optimal at baseline and there are several proposed care and reimbursement models
369 to improve care coordination of the pre-transplant kidney patient.[125] The challenge of clinical continuity
370 and care coordination is clearly increased by multiple listing, where several of the key elements
371 providing pre-transplant care are susceptible to fracture by geography, differing care pathways, and
372 suboptimal communication. If a waitlisted patient experiences an ER visit for chest pain, it is unclear if
373 this will effectively be communicated to all transplant programs at which they are listed. By negatively
374 impacting clinical continuity, the ability for patients to receive optimum care can decrease as their care
375 is managed in a disjointed way.

376 Multiple listing can provide challenges for transplant programs as their list management strategies focus
377 on patient preparedness to accept an organ for transplantation. In circumstances where a listed patient
378 may choose to list at multiple transplant programs, the patient may be subject to different testing
379 requirements, waitlist clinical pathways, and potential duplicate testing. These factors have the
380 potential to increase costs prior to transplant, causing the patient, transplant program, and payer to all
381 incur a cost thus increasing the overall healthcare cost.

382 Because organ transplantation is a zero-sum situation, increasing the chances of any given patient by
383 allowing them multiple chances in different regions by definition decreases the relative chances of
384 another patient in the regions in which they list, yet it improves the chances of a patient in the region
385 they left.

---

[121] Rachel E. Patzer et al., "A population Health Approach to Transplant Access: Challenging the Status Quo," *American Journal of Kidney Disease* 80, 3 (Feb 2022): 406-415. https://doi.org/ 10.1053/j.ajkd.2022.01.422.

[122] Andrew A. Herring, Steffie Woolhandler, and David U. Himmelstein, "Insurance Status of U.S. Organ Donors and Transplant Recipients: The Uninsured Give, but Rarely Receive," *International Journal of Health Services* 38, 4 (Oct 2008): 641-652. https://doi.org/10.2190/HS.38.4.d.

[123] Michael D. Cabana and Sandra H. Jee, "Does continuity of care improve patient outcomes?" *Journal of Family Practice* 53, 12 (Dec 2004): 974-980.

[124] Martin Gulliford, Smriti Naithani, and Myfanwy Morgan, "What is 'continuity of care'?" *Journal of Health Services Research & Policy* 11, 4 (Oct 2006).  https://doi.org/10.1258/135581906778476490.

[125] Marie Dirix et al., "Timing of the pre-transplant workup for renal transplantation: is there room for improvement?" *Clinical Kidney Journal* 15, 6 (Jan 2022): 1100-1108. https://doi.org/10.1093/ckj/sfac006.

*Briefing Paper*

C.Agnello   SE 0503

386  On par, the principle of utility is inconclusive and highlights a number of considerations related to
387  multiple listing, including systemic concerns related to efficiency. Although sometimes in tension, in this
388  case, the principles of equity and utility both suggest that multiple listing, if broadly used, would violate
389  the basic premises of justice and efficiency. However, using multiple listing to address the
390  disproportionate needs of potentially underserved groups would allow both equity and utility to occur.

391  ## Data Analysis Pertaining to Utility in Multiple Listing

392  While multiple listing may appeal to patients with the possibility of decreased time to transplant, OPTN
393  data found that multiple listed kidney and liver recipients had a higher median waiting time when
394  compared to single listed kidney and liver recipients.[126] Despite the benefits of early transplant
395  described above, it is not clearly shown that multiple listing leads to a decreased time on the waitlist. It
396  is possible that the increased wait time accounts for patients who are hard to match or pre-sensitized;
397  however, additional research is needed to establish those conclusions.

398  **OPTN data found that most often patients are multiple listed at locations that are within driving**
399  **distance of their home. However, kidney candidates who listed closer to home (under 250 nautical**
400  **miles) were less likely to be benefit from multiple listing compared to those listing outside of the 250**
401  **NM range.**[127] This finding expands upon prior literature, and differs by analyzing the role of multiple
402  listing within the same acuity circle as the primary listing program.[128,129,130,131] For kidney transplant
403  candidates, 77% of the secondary listing programs were located within 250 nautical miles, the initial
404  acuity circle used to allocate kidneys, of the primary transplant program, compared to 52% of multiple
405  listed liver candidates who pursued their secondary listing at a program that was within 150 nautical
406  miles, the initial acuity circle used to allocate livers, from the primary transplant program.[132]

407  While the close proximity of the secondary listing program makes the case for increased access to
408  multiple listing, the close proximity calls into question what the added benefit of multiple listing may be.
409  The current allocation framework prioritizes patients within a given nautical mile radius and by only
410  minimally expanding the radius one is eligible to receive offers from, the benefit of multiple listing is
411  likely reduced. The practice of multiple listing inside the initial circle suggests that some of the benefits
412  may be more attributable to program practices such as offer acceptance patterns rather than
413  geographic differences in donor availability.

414  Since acuity circles are a relatively newer allocation model, multiple listing within acuity circles has not
415  been reviewed, thus this analysis differs from contemporary literature, which considers instances of a
416  patient pursuing secondary listing outside of their primary transplant program's acuity circle.[133]  The
417  Committee hypothesized that the prevalence of patients multiple listed close to their primary listing
418  program is likely a lingering result of the transition from allocating within donor service areas (DSAs) to
419  acuity circles.

---

[126] Gauntt, "Data Request," September 14, 2022.
[127] Gauntt, "Data Request," September 9, 2022.
[128] Sara Brown et al., "Multiple Regional Listing Increases Liver Transplant Rates for Those With Model for End-stage Liver Disease Score <15," *Transplantation* 104, 4 (Apr 2020):762-769. https://doi.org/10.1097/TP.0000000000002965.
[129] Decoteau, "The Advantage," 2021.
[130] Zahara Gharibi and Michael Hahsler, "A Simulation-Based Optimization Model to Study the Impact of Multiple-Region Listing and Information Sharing on Kidney Transplant Outcomes," *International Journal of Environmental Research and Public Health* 18, 873 (Jan 2021). https://doi.org/10.3390/ijerph18030873.
[131] Appendix A, Figures 1-3 Distances Between Primary and Secondary Listing Transplant Hospitals for Multiple Listed Kidney, Liver, and Thoracic Candidates on December 31, 2021.
[132] Bradbrook, "Data Request," May 11, 2022
[133] Decoteau et al., "The Advantage."

C. Agnello   SE 0504

420 Additionally, recent allocation changes impact transplant wait times with differences noted between
421 organs. Kidney allocation changed from DSA to acuity circles and has seen a decrease in kidney multiple
422 listings, while liver patients experienced the inverse.[134] However, it is important to note that the sample
423 size for multiple listed liver patients was much smaller than kidney patients and covered a shorter length
424 of time since the transition from DSA to acuity circles. Additionally, due to the difference in wait time
425 between kidney and liver patients, it may be fair to assume that the proportion of liver patients seeking
426 multiple listing has not increased, but the liver patients who had multiple listed prior to the change in
427 allocation were transplanted. The overall trend after allocation change from DSAs to acuity circles was a
428 net decline in organ multiple listings.[135]

429 Lastly, the myriad of regional variation in transplant rates for patients who are multiple listed cannot be
430 clearly captured in the data analysis but requires consideration. Potential contributors to regional
431 variation include density and practices of organ procurement organizations (OPOs) and transplant
432 programs, regional practice differences (regional practice of splitting livers), population density,
433 population health, and attitudes towards transplant.[136,137] These factors, some of which are not clearly
434 known by patients seeking transplant, can lead to longer wait times based on transplant center
435 selection. As such, multiple listing could help to correct disparities caused by differences in program
436 practices that may inadvertently lengthen a patient's time to transplant. Examples of program practices
437 that affect wait time include offer acceptance patterns, such as DCD organ utilization, HCV positive
438 organ utilization, and pulsatile preservation utilization to maximize transplantable organs.

## Conclusions

440 Multiple listing has an extensive history in transplant policy, but not without controversy both within the
441 transplant community and in the public at large. Any future project to revise this longstanding policy
442 would require significant empirical analysis to review utilization patterns, as well as ethical analysis to
443 inform whether the policy is justified, given the patient access and usage. It is with humility,
444 compassion, and a commitment to uphold the goals of the OPTN that the Committee approaches the
445 ethical analysis of multiple listing. Because transplant is a zero-sum system, our analysis provides
446 concerning evidence about the legitimacy of being able to simultaneously receive multiple organ offers
447 for some people, while others in the same system are unable to exercise that benefit.

448 Data analyzed for this paper demonstrates a nuanced picture, one of existing disparities by payer,
449 education, and race/ethnicity, mirroring existing disparities in health access and a less clear picture by
450 geocoded level income and poverty level. Moreover, removing the practice of multiple listing overall
451 may resolve some disparities, but could exacerbate others, particularly for patients with medical
452 complexity, those who are already sensitized to potential donors, or otherwise difficult to match; also,
453 for pediatric candidates and candidates who list at VA hospitals. Although multiple listing is narrowly
454 utilized, in the context of the transplant community's commitment to equity, policies governing access
455 to transplantation should ensure and promote the transplant community's commitment to equitable

---

[134] Gauntt, "Data Request," September 14, 2022.

[135] Ibid.

[136] Kristen L. King et al., "Major Variation across Local Transplant Centers in Probability of Kidney Transplant for Wait-Listed Patients," *Journal of the American Society of Nephrology* 31, 20 (Dec 2020): 2900-2911. https://doi.org/10.1681/ASN.2020030335.

[137] George Cholankeril et al., "Disparities in Liver Transplantation Resulting From Variations in Regional Donor Supply and Multiple Listing Practices," *Clinical Gastroenterology and Hepatology* 15, 2 (Feb 2017): 313-315. https://doi.org/10.1016/j.cgh.2016.08.036.

C. Agnello    SE 0505

456 access to care. Although the transplant community cannot resolve all public health disparities, it must
457 strongly consider revising policies that entrench them and continue efforts to rectify these.

458 Ethical principles, including equity and utility, validate concerns over the widespread use of multiple
459 listing, however, they uphold the import of multiple listing in certain cases, including patients who are
460 difficult to match. As such, multiple listing should be retained and used to increase equitable access to
461 transplantation for patients that are difficult to match.

462 The Committee notes that multiple listing is different from multiple evaluation, wherein a patient can be
463 evaluated at multiple programs if they are dissatisfied with their treatment at a given program at any
464 time. Increased transparency at the outset would help minimize patients selecting programs that do not
465 align with their goals.

466 The transplant community cannot by itself resolve the socioeconomic factors that contribute to inequity
467 in healthcare. While true, this fact does not absolve the community from remediating the policies that
468 exacerbate disparities within transplantation that are consistent with social patterning of privilege.

469 The ethical analysis of multiple listing strongly supports the use of this policy for patients that are
470 difficult to match, pediatric candidates and candidates who list at VA hospitals. The Committee also
471 recognizes that the multiple listing policy is valued by many, and many centers and patients are
472 accustomed to having this option. **Although recommendations are beyond the scope of this analysis,
473 greater efforts ensuring that all patients are informed of this option and have the ability to exercise
474 are crucial to ensuring that it promotes the goals of the OPTN.** These may include improving patient-
475 centered education about multiple listing; financial support such as scholarships or other resources to
476 support multiple listing for patients in need where possible; prohibiting programs from refusing multiple
477 listed patients; and increasing transparency in evaluation, listing, and organ acceptance practices to help
478 patients choose a primary program that best fits their needs.

*Briefing Paper*

C.Agnello   SE 0506

# Appendix A: Data Requests

479  Appendix A details the methods of the two data requests performed at request of the Ethics
480  Committee.[138, 139]

## Methods – 1st Data Request

482  The first data request borrowed the definition of multiple listing used in the Decoteau et al. article.[140]
483  Multiple listing was defined as any candidate who is on the transplant waitlist for a particular organ at
484  more than one program simultaneously. A candidate was be considered multiple listed regardless of the
485  time between first listing and subsequent listing. In this way, the multiple listing definition captured all
486  candidates who both intended to multiple lists from the outset and those who for whatever reason
487  made the decision further into their waitlist tenure (potentially due to frustration or inability to secure a
488  quality offer). All of the following metrics were be calculated based on a recent snapshot of candidates
489  waiting on the heart, liver, lung and kidney waitlist as of December 31, 2021. All metrics were presented
490  by organ type (kidney, liver, and thoracic – heart and lung were combined due to small sample size) and
491  compare multiple listed and single listed candidates, unless otherwise stated. Note that candidates
492  could have been listed for multiple organs. Candidates, for example, who were listed for a heart and
493  kidney appeared in both the heart and kidney counts but are only counted once in overall totals.

494  Candidate Demographics: The following candidate demographics are summarized by organ type for
495  multiple and single listed candidates:

496  • Age at snapshot date (years)
497  • Race/Ethnicity (American Indian or Alaska Native, Black or African American, Native Hawaiian or
498    other Pacific Islander, Asian, Hispanic or Latino, White)
499  • Insurance Status (private/public) at registration
500  • Education level (None, Grade School or less, High School or GED, College or Technical, Associate
501    or Bachelor Degree, Post-College Graduate Degree)
502  • Blood Type (AB, A, B, O)
503  • MELD/PELD (Liver Only)
504  • Heart Status (Heart Only)
505  • LAS (Lung Only)
506  • Medically Urgent (Kidney Only)
507  • Annual Household Income* (based on candidate zip code and using census data)
508  • Annual Household Income* by Insurance level
509  • Poverty Percent (based on candidate zip code and using census data)
510  • Region (11 OPTN regions)

511  Note: The committee expressed interest in looking at indicators of socioeconomic status and correlates
512  of social determinants of health, such as annual household income. In order to do this OPTN data was
513  linked to Census data via candidate's primary zip code at listing, which was found on the transplant
514  candidate registration (TCR) form. It is important to note that there are several limitations in the use of

---

[138] Keighly Bradbrook, Katrina Gauntt, and Jesse Howell, "Data Request – Characteristics of Multiple Listed Candidates By Organ Type," OPTN, Descriptive Data Request for the Ethics Committee Multiple Listing Subcommittee, May 11, 2022.
[139] Katrina Gauntt, Keighly Bradbrook, and Jesse Howell, "Data Request – Characteristics of Multiple Listed Kidney and Liver Candidates by Geography," OPTN, Descriptive Data Request for the Ethics Committee Multiple Listing Subcommittee, September 14, 2022.
[140] Mary A. Decoteau et al., 'The Advantage of Multiple Listing Continues in the Kidney Allocation System Era," *Transplantation Proceedings* 53, 2 (Mar 2021): 569-580.  https://doi.org/10.1016/j.transproceed.2020.10.036.

C.Agnello   SE 0507

candidate zip codes from OPTN data and the usage of environment level factors like annual household income in describing patient level determinants of health. Candidate zip codes are not validated in OPTN data and so data entry problems are likely to exist, and the linkage is not perfect and can often result in zip codes that do not link to census data. Further, research shows that family income or annual household income at the aggregated geography level (county, state) are not always good descriptors of an individual's access, situation, or barriers. Often, for individuals who may be better off than what the aggregated data would suggest, their own personal situation attenuates any disadvantage that might be conferred by their environment.

Poverty percent is the percent of people living in poverty within a ZCTA within a year (zip code tabulation areas) and is based on the Census data.

Demographics were summarized as count and percent for categorical variables and mean and standard deviation for continuous covariates, in tabular form. Distributions of candidate characteristics were plotted by organ type.

**Metrics for Multiple listed candidates only:** The subcommittee was also interested in describing characteristics of multiple listed candidates at the time of first multiple listing. The following metrics describe the distribution of time between primary listing and secondary listing where primary listing is defined as the first registration to occur in time and secondary listings those occurring after the primary (i.e. the second, third, fourth or fifth listing locations). Only first and secondary listings were considered. The following metrics were calculated using a subset of multiple listed candidates from December 31, 2021, snapshot data by organ type:

- Distribution of age, medical urgency status and hospitalization at secondary listing
- Distribution of time between initial listing and secondary listing for multiple listed candidates
- Distance from primary transplant program to secondary (or additional transplant programs)

These metrics will be presented in tabular form as min, max, median, mean and IQR and graphed.

**Geography:** The subcommittee was also interested in looking at the geography of multiple listings. All secondary listings were included in these analyses. Results were de-identified with regard to transplant program. The following metrics were calculated using a subset of multiple listed candidates from the December 31, 2021, snapshot data by organ type:

- The percent of multiple listed candidates at each program – do a majority of multiple listings occur at a handful of programs?
- Percent of multiple listings by state and OPTN region (based on transplant program location, not candidate location)

# Methods – 2nd Data Request

## Methods

Similar to the first data request, this follow-up request borrowed the definition of multiple listing used in the Decoteau et al. article. Multiple listing was defined as any candidate who is on the transplant waitlist for a particular organ at more than one program simultaneously. A candidate was considered multiple listed regardless of the time between first listing and subsequent listing. In this way, the multiple listing definition captured all candidates who both intended to multiple lists from the outset and those who for whatever reason made the decision further into their waitlist tenure (potentially due to frustration or inability to secure a quality offer). All of the following metrics were calculated based on waitlist data. A recent snapshot of candidates waiting on December 31, 2021, was used for all metrics with the

C.Agnello    SE 0508

557 exception of transplant rates. The metrics focused on liver and kidney candidates unless otherwise
558 stated. Thoracic was excluded at the request of the subcommittee.

559 The committee requested the median time to transplant by listing status, due to limitations in data the
560 median time to transplant could only be provided for those that had received a transplant. In order to
561 provide more insight to the question of equity in access the workgroup sought to evaluate, the
562 transplant rate was provided calculated as transplant per 100 inactive and active patient-years. The
563 transplant rates were calculated based on an ever-waiting cohort from implementation of acuity circles
564 to March 31, 2022. For liver this was candidates ever waiting[141] between February 4th, 2020, to March
565 31, 2022, and for kidney this was candidates ever waiting between March 15, 2021 to March 31st, 2022.
566 Candidates were indicated as ever multiple listed if at any point in the cohort time frame the candidate
567 had two or more listings at multiple programs that overlapped. Candidate waiting time was considered
568 by taking the time in days from the first listing date to either the date of transplant or the date of
569 candidate removal from all listings from the waitlist, including both active and inactive waiting time for
570 the candidate.

571 *Additional Metrics*

572 • Number/percent of candidates listed (primary listing) before the removal of DSA policy on
573 March 15, 2021, by organ type
574 • Number/percent of Kidney and Liver multiple listed candidates whose (first) secondary listing
575 was outside of the DSA from primary listing
576 • Number/percent of Kidney and Liver multiple listed candidates whose (first) secondary listing
577 was outside of the priority circle (250NM for Kidney and 150 NM for Liver)
578 • Number/percent of Kidney and Liver multiple listed candidates who had any secondary listing
579 outside of the DSA from primary listing
580 • Number/percent of Kidney and Liver multiple listed candidates who had any secondary listing
581 outside of the priority circle (250NM for Kidney and 150 NM for Liver)
582 • Transplant rate per 100 patient-years by multiple listing status, geography (pending sample
583 size), and multiple listing and geography for Kidney and Liver candidates, separately

584

---

[141] "Ever waiting" is inclusive of candidates who spent any time waiting during the time period described - whether the candidate was on the waiting list the entire time period or a shorter subset

C.Agnello    SE 0509

585    Table 1

| | Overall | Single Listed Kidney | Multiple Listed Kidney | Single Listed Liver | Multiple Listed Liver | Single Listed Thoracic | Multiple Listed Thoracic |
|---|---|---|---|---|---|---|---|
| n | 106647 | 83058 | 6625 | 11435 | 176 | 4516 | 37 |
| **Age at Snapshot (%)** | | | | | | | |
| <18 | 1890 (1.8) | 1056 (1.3) | 14 (0.2) | 340 (3.0) | 2 (1.1) | 456 (10.1) | 1 (2.7) |
| 18-34 | 8414 (7.9) | 6799 (8.1) | 536 (8.2) | 596 (5.2) | 16 (9.1) | 461 (10.2) | 6 (16.2) |
| 35-49 | 22934 (21.5) | 18623 (22.2) | 1615 (24.8) | 1882 (16.3) | 26 (14.8) | 801 (17.7) | 7 (18.9) |
| 50-64 | 46125 (43.3) | 35767 (42.6) | 2883 (44.2) | 5441 (47.6) | 95 (54.0) | 1926 (42.6) | 13 (35.1) |
| 65+ | 27306 (25.6) | 21713 (25.9) | 1477 (22.6) | 3196 (27.9) | 37 (21.0) | 872 (19.3) | 10 (27.0) |
| Sex = Male (%) | 65935 (61.8) | 51709 (61.6) | 4192 (64.2) | 6917 (60.5) | 99 (56.2) | 2991 (66.2) | 27 (73.0) |
| **Race/Ethnicity (%)** | | | | | | | |
| White, Non-Hispanic | 42759 (40.1) | 30023 (35.8) | 2366 (36.3) | 7609 (66.5) | 127 (72.2) | 2609 (57.8) | 25 (67.6) |
| Black, Non-Hispanic | 30209 (28.3) | 25935 (30.9) | 2355 (36.1) | 795 (7.0) | 10 (5.7) | 1105 (24.5) | 9 (24.3) |
| Hispanic/Latino | 21983 (20.6) | 18072 (21.5) | 1061 (16.3) | 2235 (19.5) | 28 (15.9) | 584 (12.9) | 3 (8.1) |
| Asian, Non-Hispanic | 9097 (8.5) | 7730 (9.2) | 622 (9.5) | 587 (5.1) | 9 (5.1) | 149 (3.3) | 0 (0.0) |
| Amer Ind/Alaska Native, Non-Hispanic | 889 (0.8) | 751 (0.9) | 29 (0.4) | 92 (0.8) | 1 (0.6) | 16 (0.4) | 0 (0.0) |
| Native Hawaiian/other Pacific Islander, Non-Hispanic | 571 (0.5) | 521 (0.6) | 20 (0.3) | 20 (0.2) | 1 (0.6) | 8 (0.2) | 0 (0.0) |
| Multiracial, Non-Hispanic | 1139 (1.1) | 925 (1.1) | 72 (1.1) | 97 (0.8) | 0 (0.0) | 45 (1.0) | 0 (0.0) |
| **Insurance Status (%)** | | | | | | | |
| Not Reported | 403 (0.4) | 315 (0.4) | 23 (0.4) | 44 (0.4) | 0 (0.0) | 21 (0.5) | 0 (0.0) |
| Private or Self | 47892 (44.9) | 36370 (43.3) | 3463 (53.5) | 5686 (50.8) | 121 (68.8) | 2076 (46.0) | 24 (64.9) |
| Public or Charity | 58352 (54.7) | 47273 (56.3) | 3009 (46.1) | 5583 (48.8) | 55 (31.2) | 2419 (53.6) | 13 (35.1) |
| **Education (%)** | | | | | | | |
| <5 Yrs Old | 698 (0.7) | 269 (0.3) | 4 (0.1) | 187 (1.6) | 3 (1.7) | 235 (5.2) | 0 (0.0) |
| Associate/Bachelor Degree | 20793 (19.5) | 16045 (19.1) | 1640 (25.1) | 2270 (19.9) | 40 (22.7) | 778 (17.2) | 11 (29.7) |
| Attended College/Technical School | 26690 (25.0) | 20995 (25.0) | 1705 (26.1) | 2773 (24.3) | 47 (26.7) | 1068 (23.6) | 12 (32.4) |
| Grade School or Less | 8116 (7.6) | 6711 (8.0) | 230 (3.5) | 856 (7.5) | 6 (3.4) | 311 (6.9) | 2 (5.4) |
| High School or GED | 38907 (36.5) | 31215 (37.2) | 1961 (30.1) | 4095 (35.8) | 48 (27.3) | 1580 (35.0) | 8 (21.6) |
| Post-College Graduate Degree | 7892 (7.4) | 5027 (7.1) | 783 (12.0) | 846 (7.4) | 21 (11.9) | 313 (6.9) | 2 (5.4) |
| Unknown | 3641 (3.4) | 2796 (3.3) | 202 (3.1) | 399 (3.5) | 11 (6.2) | 231 (5.1) | 2 (5.4) |
| **Blood Type (%)** | | | | | | | |
| A | 30503 (28.6) | 23303 (27.8) | 1434 (22.0) | 4377 (38.3) | 81 (46.0) | 1299 (28.8) | 9 (24.3) |
| AB | 2926 (2.5) | 2202 (2.6) | 113 (1.7) | 236 (2.1) | 3 (1.7) | 72 (1.6) | 5 (13.5) |
| B | 16502 (15.5) | 13644 (16.3) | 1182 (18.1) | 1201 (10.5) | 11 (6.2) | 463 (10.3) | 4 (10.8) |
| O | 57016 (53.5) | 44809 (53.4) | 3796 (58.2) | 5621 (49.2) | 81 (46.0) | 2682 (59.4) | 27 (73.0) |
| **OPTN Region (%)** | | | | | | | |
| 1 | 6522 (6.1) | 4836 (5.8) | 206 (3.2) | 1146 (10.0) | 9 (5.1) | 335 (7.4) | 0 (0.0) |
| 2 | 13369 (12.6) | 10409 (12.4) | 935 (14.3) | 1555 (13.6) | 32 (18.2) | 455 (10.1) | 5 (13.5) |
| 3 | 12465 (11.7) | 9783 (11.7) | 1059 (16.2) | 1045 (9.1) | 10 (5.7) | 554 (12.3) | 4 (10.8) |
| 4 | 10600 (9.9) | 7256 (8.6) | 1387 (21.3) | 1411 (12.3) | 51 (29.0) | 405 (11.0) | 0 (0.0) |
| 5 | 23502 (22.0) | 19405 (23.1) | 990 (15.2) | 2559 (22.4) | 24 (13.6) | 518 (11.5) | 6 (16.2) |
| 6 | 2920 (2.7) | 2437 (2.9) | 60 (0.9) | 294 (2.6) | 5 (2.8) | 124 (2.7) | 0 (0.0) |
| 7 | 8098 (7.6) | 6476 (7.7) | 426 (6.5) | 700 (6.1) | 14 (8.0) | 480 (10.6) | 2 (5.4) |
| 8 | 4399 (4.0) | 3419 (4.1) | 142 (2.2) | 520 (4.5) | 7 (4.0) | 218 (4.8) | 3 (8.1) |
| 9 | 8311 (7.8) | 6823 (8.1) | 368 (5.6) | 692 (6.1) | 11 (6.2) | 409 (9.1) | 8 (21.6) |
| 10 | 6434 (6.0) | 4933 (5.9) | 201 (3.1) | 749 (6.6) | 4 (2.3) | 541 (12.0) | 6 (16.2) |
| 11 | 10097 (9.5) | 8181 (9.7) | 751 (11.5) | 766 (6.7) | 9 (5.1) | 387 (8.6) | 3 (8.1) |
| Poverty Percent (mean (SD)) | 14.66 (9.14) | 14.38 (9.24) | 12.83 (8.14) | 11.42 (6.79) | 11.41 (6.79) | 13.62 (8.58) | 12.11 (8.60) |
| Median Household Income (mean (SD)) | 66919.13 (27968.90) | 66913.33 (27401.04) | 70712.11 (27728.19) | 74816.64 (29624.40) | 67400.22 (27271.61) | 73365.00 (28741.55) | |

*Briefing Paper*

C. Agnello   SE 0510

# Figure 1

Figure 1, below, shows the distribution in nautical miles (NM) between first listing hospital and second listing hospital for multiple listed kidney candidates. The media distance between listing hospitals for kidney candidates that multiple listed was 89 NM.

**Figure 1. Distance Between Primary and Secondary Listing Transplant Hospitals for Multiple Listed Kidney Candidates on December 31, 2021**



Distance (NM) Between Primary and Second Listing

*There were 193 Multiple Listed candidates that had secondary regiatrations at a transplant hospital that exceeded 1,250 NM in distance from the hospital they were primarily listed at.

The red line shows the median distance from primary to secondary listing.

| Candidates | Minimum | 25th-Quantile | Mean | Median | 75th-Quantile | Maximum |
|---|---|---|---|---|---|---|
| 6525 | 0 | 32 | 213.65 | 89 | 199 | 4186 |

*Briefing Paper*

C.Agnello   SE 0511

## Figure 2

Figure 2, below, shows the distribution in nautical miles (NM) between first listing hospital and second listing hospital for multiple listed liver candidates. The media distance between listing hospitals for liver candidates that multiple listed was 103.5 NM.

**Figure 2. Distance Between Primary and Secondary Listing Transplant Hospitals for Multiple Listed Liver Candidates on December 31, 2021**



Distance (NM) Between Primary and Second Listing

*There were 10 Multiple Listed candidates that had secondary regiatrations at a transplant hospital that exceeded 1,250 NM in distance from the hospital they were primarily listed at.

The red line shows the median distance from primary to secondary listing.

| Candidates | Minimum | 25th-Quantile | Mean | Median | 75th-Quantile | Maximum |
|---|---|---|---|---|---|---|
| 176 | 0 | 29 | 300.77 | 103.5 | 362.5 | 3378 |

C.Agnello   SE 0512

## Figure 3

Figure 2, below, shows the distribution in nautical miles (NM) between first listing hospital and second listing hospital for multiple listed thoracic candidates. The media distance between listing hospitals for liver candidates that multiple listed was 161 NM.

**Figure 3. Distance Between Primary and Secondary Listing Transplant Hospitals for Multiple Listed Thoracic Candidates on December 31, 2021**



Distance (NM) Between Primary and Second Listing

*A single Multiple Listed candidate that had a secondary regiatrations at a transplant hospital that exceeded 1,250 NM in distance from the hospital they were primarily listed at.

The red line shows the median distance from primary to secondary listing.

| Candidates | Minimum | 25th-Quantile | Mean | Median | 75th-Quantile | Maximum |
|---|---|---|---|---|---|---|
| 37 | 11 | 75 | 300.86 | 161 | 273 | 2129 |

C.Agnello   SE 0513

## Figure 4

Figure 4 shows the transplant rate by listing status and secondary listing location for both kidney and liver candidates every waiting from circle allocation implementation to March 31, 2022 broken out by organ. For kidney, singly listed candidates had a lower transplant rate than both of the multiple listing categories, with multiple listed outside of the circle having the highest transplant rate. Single listed kidney candidates had a transplant rate of 20.01 per 100 patient-years vs. 30.07 per 100-patient years for multiple listed kidney candidates inside of the circle and 36.01 per 100 patient-years for multiple listed kidney candidates outside of the circle. For liver, multiple listed liver candidates outside of the circle had the lowest transplant rate at 57.27 transplants per 100 patient-years, and multiple listed liver candidates inside of the circle had the highest transplant rate at 95.24 transplants per 100 patient-years.

**Figure 4. Transplant Rate by Listing Status and Secondary Listing Location for Kidney and Liver Candidates Ever Waiting from Circle Allocation Implementation by Organ to March 31, 2022**



C.Agnello   SE 0514

645 ## Table 2

646 **Table 2. Transplant Rate by Listing Status for Kidney and Liver Candidates Ever Waiting from Circle**
647 **Allocation Implementation by Organ to March 31, 2022**

| Organ | Listing Status | Candidates | Transplants | Total Years Ever Waiting | Transplants Per 100 Patient-Years (Active and Inactive) | 95% CI |
|---|---|---|---|---|---|---|
| Kidney | Single Listed | 118180 | 17074 | 85346 | 20.01 | (19.71, 20.31) |
| | Multiple Listed - Inside Circle | 8287 | 1996 | 6637 | 30.07 | (28.77, 31.42) |
| | Multiple Listed - Outside Circle | 2481 | 716 | 1989 | 36.01 | (33.42, 38.74) |
| Liver | Single Listed | 38955 | 17606 | 25196 | 69.88 | (68.85, 70.92) |
| | Multiple Listed - Inside Circle | 524 | 310 | 325 | 95.24 | (84.93, 106.46) |
| | Multiple Listed - Outside Circle | 409 | 218 | 381 | 57.27 | (49.92, 65.4) |

C. Agnello   SE 0515

# Addendum to "Ethical Evaluation of Multiple Listing: A Comprehensive Response to Public Comment"

648    Public Comment Overview

649    The Ethics Committee deeply values feedback shared during the public comment period, which exists in
650    service of giving stakeholders in the transplantation community the opportunity to share their
651    perspectives. In response, the committee offers this addendum to "Ethical Evaluation of Multiple
652    Listing" in hopes of responding thoughtfully and thoroughly to the well-taken objections that have been
653    shared with us.
654
655    The Ethics Committee would first like to note that the public comment period revealed that overall,
656    there was **considerable support** for the white paper, and in particular for its attempt to uphold an
657    equitable and efficient system of organ allocation. This support was displayed even by members who
658    raised concerns. Indeed, many in public comment acknowledged that candidates who multiply list tend
659    to be individuals of more means, education, and resources with which to travel, having family, friends,
660    and other forms of support in more than one geographic region that make them more likely to receive a
661    transplantation than others on the waiting list who lack these resources.
662
663    This noted, there were seven general categories of criticism the Ethics Committee felt merited focused
664    responses. These include: (1) The white paper singles out organ transplantation as inequitable, but our
665    whole healthcare system suffers from inequity, something we will not solve simply by calling attention
666    to organ allocation policy. Why, then, single out inequity in organ allocation in this particular instance?
667    (2) Despite equity concerns, doesn't the principle of autonomy provide a larger justification for the
668    practice of multiple listing? (3) An ethic of care not only permits, but also requires, us to do every and
669    anything in our power to help our loved ones who are desperate for a bodily organ. Should not anybody
670    similarly circumstanced do whatever they could to help find their loved ones the organ they needed? (4)
671    Does the effort to undo the practice of multiple listing sufficiently take into account the logistical
672    realities of transplantation in different regions of the country? (5) The Ethics Committee supports the
673    practice of multiple listing in the case of difficult to match patients, but how does it propose to establish
674    thresholds which separate difficult to match patients? And (6) is the Ethics Committee acting within its
675    scope?
676
677    The Ethics Committee is grateful for the opportunity to respond to each of these thoughtful objections.
678
679    **(1) We are not likely to fix disparities in the whole healthcare system. Why should we focus**
680    **exclusively on one practice, multiple listing, within one facet of healthcare, organ**
681    **transplantation? And why problematize multiple listing while still allowing for multiple**
682    **evaluations?**
683
684    The Ethics Committee acknowledges that there is no shortage of examples of inequitable treatment in
685    the United States, where those with means experience disproportionate benefit and access to care.
686    However, that a large system is problematic doesn't alleviate the burden of trying to fix some part of it.
687    In focusing on the practice of multiple listing, the Ethics Committee examined what was proposed to be
688    the legitimate rationale for this policy, and to question, if that rationale could not be clearly identified,

C. Agnello   SE 0516

689    whether it could continue to be supported. Thus, the Ethics Committee did not seek to "single out" the
690    practice of multiple listing for attention. The Committee reviews all policies to assess their ethical
691    implications and how they balance ethical principles underpinning the organ transplant system. The
692    multiple listing policy has been scrutinized for many years and has never undergone ethical analysis. As
693    such, this was a priority for the OPTN and the Committee.
694
695    Under the assumption that organ transplantation is zero-sum, when it comes to those on the waiting
696    list, if one person receives an organ, then that is one organ another does not receive. Ensuring fairness
697    as a value in itself, and also promoting the utility end of preserving the perception of fairness of the
698    transplant system is imperative. For these reasons, the Ethics Committee felt that our attention to
699    decreasing disparities in multiple listing was worth our attention and effort, particularly in light of the
700    recently issued National Academies of Sciences, Engineering and Medicine (NASEM) report which
701    instructs all stakeholders in the transplantation community to try to make organ allocation more
702    equitable.[142]
703
704    Some members additionally raised the issue that by calling attention to the practice of multiple listing,
705    but not multiple evaluation, we were essentially deferring the problem of inequity within
706    transplantation, not solving it. In response, the Ethics Committee notes, as described in the
707    "Transparency" white paper, seeking evaluations at multiple centers supports patient-centered care and
708    autonomy, without negatively impacting others. In contrast, when one multiply lists, at that moment in
709    time one becomes the beneficiary of having more than one avenue towards transplantation, accruing an
710    advantage well beyond determining what transplant center represents the right fit.
711

712    **(2) Why would the Ethics Committee try to curtail patient autonomy, which would seem to**
713        **permit multiple listing?**
714

715    Autonomy is a critical principle in medical ethics, and in transplantation ethics specifically, but autonomy
716    is not an absolute right, absolved from the burden of being placed in balance with other ethical
717    principles. In addition, a tacit but indispensable constraint on the autonomy of one person is that it can't
718    lead to the curtailment of the autonomy (and flourishing) of another. But retaining a policy of multiple
719    listing across the board would do just this. In specific, it would curtail the autonomy of marginalized and
720    structurally disadvantaged individuals among us. Lower levels of insurance, education, and at times
721    race/ethnicity (particularly in the case of liver) limit access to transplant. Since it is also true that
722    multiple listing is associated with higher likelihood of transplant, in the status quo the privileged would
723    be gaining an advantage at the expense of the underprivileged.
724
725    Currently, multiple listing is not a practice that all patients are able to exercise or utilize. The use of
726    multiple listing is patterned in a way that exacerbates existing disparities in access to transplant and
727    healthcare. For example, patients with less than a high school education are 50% less likely to be
728    multiple listed for a kidney or liver transplant, while those with a post-college graduate degree are 60%
729    more likely to be multiple listed for liver and kidney transplant. Patients with Medicaid are at least three
730    times less likely to be multiple listed than those with private insurance for kidney and liver transplant.[143]
731

---

[142] National Research Council. 2022. *Realizing the Promise of Equity in the Organ Transplantation System*. Washington, DC: The National Academies Press. https://doi.org/10.17226/26364.

[143] Katrina Gauntt, Keighly Bradbrook, and Jesse Howell, "Data Request – Characteristics of Multiple Listed Kidney and Liver Candidates by Geography," OPTN, Descriptive Data Request for the Ethics Committee Multiple Listing Subcommittee, September 14, 2022.

C.Agnello  SE 0517

Limiting multiple listing would reduce an advantage that aligns with socioeconomic disparities in access to transplant, thereby creating more of a level playing field with regard to ensuring everyone's ability to exercise their autonomy. This calls attention to one of the ways in which organ transplantation is perhaps distinctive, for unlike other areas of healthcare, as mentioned above, transplant is a zero-sum game. When one patient is able to accept an organ offer from multiple centers simultaneously, another patient's likelihood to receive an organ decreases. In this respect, the Ethics Committee sees itself in the end as upholding the principle of autonomy, despite that an analysis undertaken without taking into account social disparities might lead one to draw the opposite conclusion.

**(3) Why would the Ethics Committee get in the way of individuals doing whatever they can to help the ones they love? Shouldn't we support policies that defend the loving impulses of the families of those in desperate situations?**

The Ethics Committee acknowledges and has a great deal of sympathy for this objection, which is compelling because we can all imagine how we would feel if we were in the shoes of one, or those of a family member of one, who needed an organ. In responding, it is critical to make a distinction between the perspective from the ethics of care, which operates at the level of the individual, and the ethics of systems of allocation, which must always consider justice at the population-level. The Ethics Committee acknowledges explicitly in our white paper that on an individual level the current policy on multiple listing can open up a precious extra option for those facing desperate circumstances. However, this individual level of analysis does not easily translate into a policy meant to determine the fair allocation of scarce resources, which by definition is a public enterprise. There are many actions (e.g. paying for organs) that, although they may promote the benefit of an individual in pursuing an organ transplant, are not permissible at the population/societal-level.

**(4) Does the Ethics Committee's attention to the practice of multiple listing fully capture the logistical realities of transplantation in different regions of the country, and does it cohere with concurrent initiatives underway of Continuous Distribution?**

Some present a compelling objection by stating that multiple listing solves a larger disparity in organ transplantation by shifting patients from areas with long waitlists to areas with shorter waitlists. They acknowledge that, while this may lengthen the waitlist in areas where patients are secondarily listed, it relieves the burden from regions disproportionately experiencing long waits. Moreover, they note that allowing patients to retain their primary listing, which is most commonly near their primary residence, allows patients to keep relationships with transplant teams, which patients and centers value highly.

The Committee acknowledges that use of multiple listing as a workaround to smooth differences in waiting times is appealing and understandable at the individual level. However, the Committee notes that organ allocation policies are created to ensure a balance of ethical principles of utility, justice, and respect for persons for all stakeholders and operate at the health-system level. Geographic differences in waiting times should be resolved by policies governing the system as a whole, including new initiatives to continuous distribution, and not through individual workarounds which are likely to benefit some but not all. Similar to arguments made in the white paper on manipulating waitlist priority, individual-level manipulation of waitlist priority through interventions or multiple listing increases a transplant candidate's priority on the waitlist relative to others, undermines the legitimacy and balance of ethical principles of the organ allocation system as a whole.

C.Agnello   SE 0518

779  **(5)  The Ethics Committee supports the ethical justification for multiple listing in the case of**
780  **difficult to match patients, but how can we distinguish these patients?**

781

782  The Ethics Committee is aware that in response to our white paper members seek more specific
783  guidance regarding medically complex or difficult to match patients. What is the definition, some asked,
784  of "medically complex?"

785

786  Our response is that simply in acknowledging that there is a category of prospective organ recipients
787  who are biologically uncommonly difficult to match, we do not at the same time fail to recognize that
788  physicians and other clinical staff at specific transplant centers are the ones best positioned to make the
789  determinations about who falls into this category on a case-by-case basis. By identifying the category of
790  patients who are difficult to match, the Ethics Committee is merely staking out a weaker position than
791  might be suggested in other analyses which recommend the abolishment of the practice of multiple
792  listing altogether. The Ethics Committee leaves it to organ-specific committees and other committees to
793  arrive at standards for what constitutes "difficult to match," and hopes only that these might be applied
794  consistently and transparently across the board. Significantly, the Ethics Committee acknowledges a
795  qualitative difference between non-medical criteria like privilege and material advantage, which should
796  not bear on one's place on the waiting list, and sensitization, which arguably should. That the Ethics
797  Committee acknowledges this category as exceptional does not imply that the Ethics Committee sees
798  itself as the adjudicator of eligibility for it.

799

800  **(6)  Is the Ethics Committee out of scope?**

801

802  The concern that the Ethics Committee has somehow veered out of its proverbial lane is one we are
803  pressed to address in different contexts from time to time. We want to emphasize that we serve only in
804  a guidance capacity to transplantation policy. The mission and scope of the Ethics Committee is:

805

806  *"The Ethics Committee aims to guide the policies and practices of the OPTN related to organ donation,*
807  *procurement, distribution, allocation, and transplantation so they are consistent with ethical principles.*
808  *The Committee makes recommendations to Board of Directors for changing, creating, or eliminating*
809  *policies if warranted by ethical concerns. The Committee also provides written guidance pertaining to*
810  *ethical considerations to OPTN members, after approval by the Board of Directors. The Committee does*
811  *not address individual patient issues or disputes."[144]*

812

813  The Ethics Committee leaves it to others to make actionable recommendation that might be inferred
814  from our analysis. The Ethics Committee hopes that stakeholders bear in mind the mandate issued in
815  the NASEM report to improve equity in transplantation policy, which implies improving access for
816  patients to match who have the least means at their disposal. This noted, this white paper does not
817  change the existing policies allowing multiple listing. It reviews the ethical considerations and
818  preliminary data of the practice of multiple listing and undertakes an ethical analysis based on these
819  findings.

#

---

[144] "Ethics Committee." OPTN: Organ Procurement and Transplantation Network - OPTN. Accessed April 7, 2023. https://optn.transplant.hrsa.gov/about/committees/ethics-committee/. Charter is listed at the top of this webpage.

C.Agnello   SE 0519



# EXHIBIT W

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

CRIMINAL DETERRENCE AND SENTENCE SEVERITY: AN ANALYSIS OF RECENT RESEARCH, A. von Hirsch, A. E. Bottoms, E. Burney and P-O. Wikström (Portland, Oregon: Hart, 1999)

## I. INTRODUCTION

One of the most used and most abused terms in the law and practice of sentencing in criminal cases is "deterrence." The basic idea behind the invocation of the term is that persons may be induced to choose not to undertake particular activities because of the consequences that are likely to accompany or follow those activities.[1] We find deterrence referred to as one of the objectives of sentencing in s. 718 of the *Criminal Code*:

> The fundamental purpose of sentencing is to contribute, along with crime prevention initiatives, to respect for the law and the maintenance of a just, peaceful and safe society by imposing just sanctions that have one or more of the following objectives:
>
> ...
>
> (b)   to deter the offender and other persons from committing offences.[2]

Sentencing judges routinely refer to "deterrence" as a factor to be considered in setting penalties, typically when a relatively severe sentence is contemplated.[3] Politicians often advocate harsh sentences to enhance the deterrent effects of sentencing. Unfortunately, the concept of deterrence is seldom analyzed and purported deterrence effects are seldom measured. Fortunately, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research*[4] provides a brief, clear, and sensible review of the concept of deterrence and of recent literature exploring its predictive value. The work is short enough so that those concerned with sentencing have no excuse not to read it; it is rich enough so that the time spent by those who do read it will be an excellent investment.

*CDSS* has four main elements — (A) a sketch of the type of human motivation that must exist for deterrence to have any sort of grip; (B) outlines of a grammar of deterrence; (C) a review of recent deterrence research; and (D) some overall (tentative) conclusions.[5]

---

[1]   A. von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (Portland, Oregon: Hart, 1999) [hereinafter *CDSS*], following Beyleveld's account of deterrence at 5.

[2]   *Criminal Code*, R.S.C. 1985, c. C-46, s. 718 [hereinafter *Criminal Code*].

[3]   See, for example, *R.* v. *Campbell* (1981), 64 C.C.C. (2d) 336 (B.C.C.A.), Nemetz C.J.; *R.* v. *Johnas* (1982), 2 C.C.C. (3d) 490 (Alta. C.A.), *per curiam*.

[4]   *CDSS*, *supra* note 1.

[5]   *CDSS* also has a brief appendix concerning mandatory minimum penalties and deterrence. *CDSS* sets out some conditions that must be met for such penalties to be effective: (i) the penalties must be more certain or severe than penalties that are already imposed by the courts; (ii) the penalties must apply to "reasonably common instances of the offence"; (iii) the penalties "must apply to those most likely to commit the offences" (*e.g.*, if a type of offence is primarily committed by young offenders, the mandatory minimum penalty must apply to young offenders); (iv) the penalty must in fact be imposes by the courts (*e.g.*, cases to which the penalty might have applied cannot be chronically avoided through plea bargains); and (v) potential offenders must be aware of the penalties, and the

C.Agnello   SE 0521

## II. AN OVERVIEW OF *CDSS*

### A.    SKETCH OF HUMAN MOTIVATION

*CDSS* founds the possibility of deterrence on a sensible account of "bounded rationality," which may be explained as follows: From a highly schematic, highly simplified perspective, future human behaviour may be controlled externally or internally. External controls, generally, do not depend on target individuals' motivations to be effective. External controls stop or hinder individuals from performing activities, regardless of their choices, preferences, or motivations. These controls incapacitate. External controls may be imposed on potential actors (*e.g.*, through chains, prison cells, or chemical castration) or on potential targets of action (the strategy of "target hardening" — *e.g.*, security measures at airports and anti-theft equipment on vehicles).[6] Internal controls, in contrast, depend on choice and motivation, rather than on physically preventing an actor from doing what he or she wants to do. Internal controls may be non-instrumental or instrumental.[7] Non-instrumental controls appeal to the individual's sense of good or right, regardless (at least primarily) of whether doing the act or refraining from doing the act would maximize the benefits to the individual in the circumstances. The individual is motivated to do what is good or right (whether to perform an action or to refrain from some action) because that is what the individual "should" do, not because of any particular anticipated benefit or detriment associated with performing or refraining from performing the action.[8] In legal contexts, an individual's non-instrumental decision to follow a legal rule would be determined by the fact that a rule is a "law," even though following that rule in the circumstances may be inconvenient or otherwise prejudicial to the individual.[9] Non-instrumental controls appeal to individuals as "moral" agents, in the words of *CDSS*.[10] Individuals, however, are not fully or always moral agents. Moral appeals may be backed up by prudential or instrumental controls.[11] Instrumental controls appeal to the individual's wish to avoid anticipated harms or to achieve benefits associated with performing an action or refraining from performing an action. Instrumental controls may be incentive-based (conduct is elicited through the promise of benefits, *e.g.*, "time off for good behaviour" or payment for turning in prohibited weapons) or disincentive-based (conduct is rendered undesirable through the attachment of risks of harm to the conduct).

---

penalties must represent significant subjective threats (*ibid.* at 51). *CDSS* finds little evidence that mandatory minimum sentences have deterrent effects (*ibid.* at 52).

[6]   *Ibid.* at 3-4. Target hardening can involve deterrence as well, as when the "hardening" is accomplished through manifest surveillance, which encourages the belief by potential offenders that they are likely to be observed and apprehended, which may discourage the commission of offences.

[7]   In particular cases, the two may overlap — I may do what I believe is right in the circumstances, and I may also believe that doing the right thing will benefit me.

[8]   *CDSS, supra* note 1 at 3.

[9]   Non-instrumental decisions based on the law depend on an acceptance of the legitimacy or authority of the law.

[10]  *CDSS, supra* note 1 at 39.

[11]  *Ibid.*

C.Agnello  SE 0522

Deterrence depends on the existence of instrumental disincentive-based reasoning. For deterrence through criminal sentencing to have any effect on individuals' conduct, at least some of us, at least some of the time, in relation to specific types of conduct, must engage in calculations of the anticipated costs and benefits of the conduct. To a degree, in some circumstances, we are rational utility maximizers. This is the modest psychological assumption of deterrence.[12] No claim is made that we are always or only rational utility maximizers. We sometimes act impulsively; we sometimes act for non-instrumental, rather than instrumental reasons.

## B.    THE GRAMMAR OF DETERRENCE

*CDSS* draws distinctions that usefully clarify our thinking about deterrence.

To begin with, deterrence is but one of a variety of mechanisms to induce persons to obey the law.[13] As indicated above, incapacitation measures and their effects must be distinguished from deterrence measures and their effects.[14]

Deterrence may be "formal" or "informal." Informal deterrence is the product of anticipated peer or social group responses to actions, or even the anticipated response of a single individual who is significant to the actor. Formal deterrence is the type of deterrence that figures in the penal system. It involves officially endorsed "risks" posed by state agencies pursuant to state-created rules.

Formal deterrence may be "specific" ("special") or "general."[15] Specific deterrence is aimed at regulating the conduct of a particular individual, the offender who is the subject of a sentence. He or she is to be deterred from engaging in prohibited behaviour in the future. General deterrence — the type of deterrence usually promoted and envisaged in sentencing — is aimed at regulating the conduct of a more or less extensive set of potential offenders other than the individual sentenced. All of these potential offenders are to be deterred from engaging in the prohibited behaviour in the future. General deterrence may be targeted at particular groups or types of offenders (*e.g.*, first offenders or drug traffickers) or it may have no particular targets. General deterrence may aim at eliminating a type of criminal conduct entirely, or it may seek to cause offenders to engage in less severe types of criminal conduct.

The deterrence mechanism has two main components — the certainty of punishment and the severity of punishment.[16] Certainty of punishment concerns the likelihood that an offender will be caught, arrested, convicted, and punished by the sanction in question. Severity concerns the degree or type of sanction in question.[17] In theory, either or both variables may be modified to induce changes in future behaviour.

---

[12]    *Ibid.* at 6.

[13]    *Ibid.* at 3.

[14]    Section 718 of the *Criminal Code*, *supra* note 2, properly distinguishes incapacitation from deterrence by giving incapacitation its own paragraph (c): "to separate offenders from society, where necessary."

[15]    *CDSS*, *supra* note 1 at 5.

[16]    *Ibid.* at 5-6.

[17]    *Ibid.* at 6.

The "initial" effects of general deterrence must be distinguished from its "marginal" effects.[18] "Initial" effects occur when conduct is first prohibited under threat of penal sanction. The "marginal" effects concern the increase or decrease in offence-commission rates caused by a particular alteration of an existing deterrence mechanism.

"Short-term" and "long-term" deterrent effects should be distinguished. A change in penal policy may, in the short term, be correlated with reduced criminal activity. That short-term result, however, does not necessarily entail that over the longer term offence rates will remain at that short-term level (the rates may go up or down).

The "intended" and "unintended" effects of a deterrence policy should be distinguished. An intended effect of a deterrence policy is, of course, to reduce the incidence of criminal activity. An unintended effect of a deterrence policy, however, may be a decrease in conviction rates or a decrease in the imposition of relatively severe sentences. Another unintended consequence might be an increase in more serious offences accompanying a decrease in less serious offences. If the penalty for less serious offences approaches the penalty for more serious offences, an offender may have little enhanced marginal risk in choosing the more serious offence.[19] Expanded penalties for less severe offences may even be correlated with an increase in the crime rate: if too many types of conduct are prohibited and punished, punishment may come to appear normal; criminal conduct becomes "destigmatized," and the inducement not to offend is reduced.

A distinction must be drawn between deterrence policies themselves (a set of penalties attaching to convictions for a set of offences) and the perception of those policies by individuals. *CDSS* rightly emphasizes the subjective aspect of deterrence. Deterrence involves perception, findings of relevance, and evaluation and assessments of prospective costs and benefits of contemplated actions.[20] If no one knows that a set of penalties exists, the penalties can have no deterrent effect. Deterrence also has an "intersubjective" aspect. If, within a particular subgroup, penalties are not perceived as injurious — for example, if serving time in prison is looked on as a rite of passage and not as a grievous blemish on one's personal history — then the penalties will have no deterrent effect. The meaning or significance of deterrence measures cannot be understood in the abstract, or from the perspective of only one social group.

These reflections lead to an important set of comments in *CDSS*. A deterrence policy must be set in a "normative" or moral framework. *CDSS* appeals to H.L.A. Hart's famous observation — obedience induced by a threatening gunman is not the same as obedience induced by law.[21] Legal deterrence, at least for a significant portion of the population, cannot be founded on merely instrumental reasoning. Within a moral framework, penalties may have normative effects, in addition to their direct physical or financial effects on an individual. A penalty may express "censure" or "disapprobation" by the punitive agent on

---

[18]   *Ibid.*
[19]   *Ibid.* at 8.
[20]   *Ibid.* at 6.
[21]   *Ibid.* at 39.

behalf of society as a whole.[22] In response to a penalty, an individual may experience "shame" if he or she accepts the censure implicit in the penalty.[23] In response to the penalty, third parties may judge the individual adversely; the individual thereby suffers "stigma" from the penalty.[24] These normative effects of penalties should be distinguished from the deterrent effects of penalties.

The distinctions made by *CDSS* help clarify the questions that empirical research must answer: Can "target groups" susceptible to deterrence be identified? Can a deterrence policy reduce the severity of types of crimes committed, while not reducing the overall crime rate? May incapacitative effects of a penal policy be distinguished from its deterrent effects? What are the "marginal" effects of a change in deterrence policy? Which factor has the greatest marginal deterrent effect — changes in sentence severity or changes in the certainty of punishment? What are the long-term effects of changes in deterrence policy? What unintended consequences follow changes in deterrence policy? What types of state behaviours reinforce the normative effects of deterrence? To what extent is legal compliance induced by normative responses to offending, rather than by instrumental deterrent effects? To what extent do informal responses to offences induce legal compliance? Armed with its distinctions and questions like the foregoing, *CDSS* turns to an assessment of the research literature concerning deterrence.

## C.   ASSESSMENT OF RESEARCH

*CDSS* provides a brief history of the deterrence literature from the 1960s to 1980. It provides a detailed review of major studies published between 1980 and early 1998. It reviews association studies and perceptual/contextual studies.

## 1.   ASSOCIATION STUDIES

Association studies consider the statistical association between changes in judicial sentencing policy and crime rates.[25] These studies are beset by a variety of dangers. The relationship between the purported cause (deterrence policy) and purported effect (rise or fall in crime rate) may be problematic. A mere correlation may be mistaken for causality.[26] Effects may be the result of other causes. Socio-economic or cultural factors may have higher predictive values than deterrence policies.[27] Association studies must control for causal influences other than deterrence policy.

Association studies rely on statistical information, yet this information is notoriously suspect. Often the data for gross political units, such as provinces or countries, are lumped

---

[22]   *Ibid.* at 40. Note that the penal objective listed first in s. 718(a) of the *Criminal Code* is "to denounce unlawful conduct" (*supra* note 2).

[23]   *CDSS, ibid.* Paragraph 718(f) of the *Criminal Code* provides that one of the objectives of sanctions is "to promote a sense of responsibility in offenders, and acknowledgment of the harm done to victims and the community" (*supra* note 2).

[24]   *CDSS, ibid.*

[25]   *Ibid.* at 17.

[26]   *Ibid.*

[27]   *Ibid.* at 18.

together, obscuring significant local variations. Much of the data is initially collected by police agencies, which subjects the data to policing politics and practices.[28] In any event, the police can measure only reported crime and crime detected by policing agencies. The actual quantity of crime is thought to vastly exceed the quantity of reported crime, but since it is unmeasured, the actual quantity of crime (which may or may not be influenced by a deterrence policy) can only be guessed at. Data collected from prisons is also suspect, since imprisonment figures may depend on a host of factors other than deterrence policies, including the availability of space in prisons, the viability of release programs, patterns in plea bargaining, and sentencing policies. Prison data tends not to permit discrimination on the basis of certainty as opposed to severity; it often does not disclose how offenders were caught and convicted.[29]

These difficulties aside, association studies face problems cast into relief by the grammar of deterrence. Studies must be designed to distinguish incapacitative effects from deterrence effects;[30] short-term from long-term effects;[31] the effects of context or culture as opposed to the effects of penal policy; and, most importantly, the effects of changes in certainty of punishment from changes in penal severity.[32] These studies must also be sensitive to the communication of sentencing policies (if deterrence policies are not well known, they cannot be effective), to the interpretation of sanctions in particular social contexts, and to the role of normative consequences of punishment.[33]

*CDSS* finds that most association studies respecting the effects of deterrence ignored these dangers. The studies were methodologically flawed. Nonetheless, the studies tend to show that there is only a weak link between increases in sentencing severity and the reduction of crime.[34] A stronger link appears to exist between certainty of punishment and the reduction of crime.[35]

2.    PERCEPTUAL/CONTEXTUAL STUDIES

Perceptual or contextual studies are studies of offender decision-making. They examine links between perceptions and choices.[36] These studies are of two major types — survey-based studies and offender decision-making studies.

Survey-based studies select subgroups of the general population and poll members of these subgroups respecting their perceptions. Survey-based studies may be "cross-sectional," covering a cross-section of a population at a given time; "longitudinal," following a particular group of individuals over a period of time and surveying the group

---

[28]    *Ibid.* at 3. See also J. Miller, *Search and Destroy: African-American Males in the Criminal Justice System* (Cambridge: Cambridge University Press, 1996) at 27, 41.

[29]    *CDSS, supra* note 1 at 29.

[30]    *Ibid.* at 8, 46.

[31]    *Ibid.* at 7.

[32]    *Ibid.* at 18.

[33]    *Ibid.* at 21-22.

[34]    *Ibid.* at 27.

[35]    *Ibid.* at 45.

[36]    *Ibid.* at 33.

C.Agnello  S€ 0526

at timed intervals; or scenario-based, in which survey subjects are asked to decide how they would act in scenarios simulating real-life situations.[37]

Studies of offender decision-making involves interviews with actual offenders, whether in prison or on the street.[38] Interviewers probe the reasoning of offenders in relation to offences they committed and offences they did not commit.[39]

Perceptual/contextual studies may correct and complement association studies. Like association studies, though, perceptual/contextual studies are beset by dangers. The studies depend on the accuracy of reports — and since the self-reporting concerns criminal activity, there is no substantial assurance of reliability. Persons are apt to rationalize their behaviour and to adapt their responses to what they believe the questioner wants to hear.[40] "Experiential effects" may play a role in responses. If, for example, offenders are asked about their perceptions of risk in relation to past offences, their perceptions at the time of questioning may influence their reports of their estimations of risk at the time of offending. Furthermore, offending causes a change in the perception of risk. (The perception of risk after offending may not be the same as the perception of risk before offending.)[41] If persons are asked about hypothetical future offences, the type of offence (*e.g.*, sexual assault as opposed to tax evasion) may be a factor in whether the persons would be inclined to claim that they would commit the offence, regardless of the penal risk.[42] Studies must be designed to distinguish between effects attributable to changes in the certainty of punishment as opposed to changes in severity of punishment.

*CDSS* finds that most of the contextual/perceptual studies it reviewed were not attuned to these dangers and were methodologically flawed. Nonetheless, the perceptual/contextual studies have provided some useful insights. They have emphasized the impulsivity of many persistent offenders — and impulsivity makes deterrence difficult.[43] These studies tend to confirm the "80/20 rule": "[I]n any cohort of identified offenders, a relatively small percentage of active violators are responsible for a high percentage (usually, over half) of the offences reported for the group as a whole."[44] The studies have provided some evidence that risks of punishment affect more the manner in which offences are committed than whether offences are committed at all.[45] The studies also tend to confirm the suggestions arising from the association studies — that reductions in crime are only weakly associated with increases in penal severity but are more strongly associated with increases in the certainty of punishment.

---

[37]   *Ibid.* at 34.
[38]   An excellent work in this genre, which doubtlessly due to the timing of its publication was not mentioned in *CDSS*, is R.T. Wright & S.H. Decker, *Armed Robbers in Action: Stickups and Street Culture* (Boston: Northeastern University Press, 1997). Wright and Decker's earlier work, *Burglars on the Job: Streetlife and Residential Break-ins* (Boston: Northeastern University Press, 1994) is discussed in *CDSS* (*ibid.* at 36).
[39]   *CDSS*, *ibid.* at 33.
[40]   *Ibid.* at 35-36.
[41]   *Ibid.* at 34.
[42]   *Ibid.*
[43]   *Ibid.* at 36.
[44]   *Ibid.*
[45]   *Ibid.*

Perceptual/contextual studies provide an important contribution to the deterrence literature by drawing attention to the actual contexts of offending[46] and the interaction between deterrence and normative perspectives — between the "objective" penal risk and the significance of that risk for particular groups. The studies highlight the importance of social controls and relationships to deterrence policy.[47] They suggest that members of groups with reduced social bonds, or who have nothing to lose, are not easily deterred. Moreover, these studies provide some valuable indications that the perceived authority and legitimacy of the penal system, which affect its normative potential for affecting conduct, significantly depend on the perceived fairness of particular processes and punishments. Hence, one might surmise, adequate funding for Legal Aid and fair trials support deterrent effects and contribute to the maintenance of a peaceful and safe society. This is probably an unexpected lesson for many deterrence advocates.

## D.   CONCLUSIONS

*CDSS* can offer no grand conclusions, no recommendations supported by incontrovertible science. The research, such as it is, permits only some modest and humble conclusions. Deterrence does work, for some people, at some times, for some offences.[48] The key factor on which deterrence depends appears to be certainty of punishment and *not* severity of punishment. Deterrent effects must be understood in the social and normative contexts of those who are to be deterred. More and better research is required. What is not required is a large-scale increase in penal severity. Contrary to the intuitions and electioneering of too many politicians, increased penalties have little proven efficacy as deterrence measures.

*CDSS* has offered a reasoned and entirely useful intervention in the deterrence debate. One may only hope that it will not be ignored.

> Wayne N. Renke
> Associate Professor
> Faculty of Law
> University of Alberta

---

[46]   *Ibid.* at 37.
[47]   *Ibid.* at 35.
[48]   *Ibid.* at 47.

C.Agnello   SE 0528



# EXHIBIT X

**Metcalf & Metcalf, P.C.**

99 Park Avenue, Suite 810
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

C.Agnello    SE 0529

# THE MISSING LINK IN GENERAL DETERRENCE RESEARCH*

**GARY KLECK**
Florida State University
**BRION SEVER**
Monmouth University
**SPENCER LI**
**MARC GERTZ**
Florida State University

KEYWORDS: deterrence, punishment, perception of risk

*Research on the deterrent effects of punishment falls into two categories: macro-level studies of the impact of aggregate punishment levels on crime rates, and individual-level studies of the impact of perceived punishment levels on self-reported criminal behavior. For policy purposes, however, the missing link—ignored in previous research—is that between aggregate punishment levels and individual perceptions of punishment. This paper addresses whether higher actual punishment levels increase the perceived certainty, severity, or swiftness of punishment.*

*Telephone interviews with 1,500 residents of fifty-four large urban counties were used to measure perceptions of punishment levels, which were then linked to actual punishment levels as measured in official statistics. Hierarchical linear model estimates of multivariate models generally found no detectable impact of actual punishment levels on perceptions of punishment. The findings raise serious questions about deterrence-based rationales for more punitive crime control policies.*

The deterrence doctrine asserts that some people will refrain from some acts because they perceive a risk of punishment. Research on the general deterrent effect of punishment on criminal behavior has largely fallen within two broad categories: (1) macro-level research using official

---

* This research was supported by a grant from the Charles E. Culpeper Foundation, Stamford, CT (later merged with the Rockefeller Brothers Fund).

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

624                    KLECK ET AL.

crime statistics to assess the links between objective levels of punishment, such as the ratio of arrests to offenses or the average length of prison sentences, to crime rates; and (2) individual-level research using survey methods to assess the links between perceptions of punishment (for example, its certainty or severity) and self-reported criminal behavior.

The first   assumes, but does not demonstrate, links between actual punishment levels and perceptions of punishment. If there were no such link, of course, there would be no deterrence, for the deterrence doctrine assumes perceptual effects. Thus the underlying model proposes that increases in actual punishment levels cause increases in perceptions of punishment, which in turn cause reduced rates of criminal behavior (Paternoster, 1987).

The second typically uses individual-level survey research to assess the effect of perceptions of punishment on self-reported criminal behavior. It therefore addresses the scientific question of whether the former affects the latter, but does not resolve the policy issue that commonly lurks behind the scientific debate: do higher levels of punishment produce lower rates of criminal behavior? It is possible that, even if the individual-level research suggests an effect of punishment perceptions on criminal behavior, higher levels of punishment may still not increase the deterrence of criminal behavior because punitive policy efforts fail to intensify perceptions of risk in the first place. Complicating things still further, higher punishment levels may reduce crime rates, but not by increasing general deterrence. For example, crime may be reduced through incapacitation effects, that is, the physically restraining effects of criminals being incarcerated, or a host of other mechanisms (see Andanaes, 1952 for a classic listing). Incapacitation effects could well explain most of the past macro-level findings of an apparent negative effect of certainty of arrest, conviction, or imprisonment on crime rates.

This paper presents evidence on the missing link between these two bodies of research, testing the effect of actual punishment levels on individuals' perceptions of punishment.

## DETERRENCE RATIONALE FOR PUNISHMENT

Punishment can be justified solely on moralistic grounds as retribution: suffering is inflicted on the wicked because it is right to do so. It is likely that many people favor the punishment of criminals due mainly to this moralistic rationalization, whereas others may rely on entirely different justifications. In culturally diverse societies where consensus on moral issues is often far from complete, many advocates prefer to justify punishment as a rational means to the end of crime reduction. As one scholar has argued, deterrence-based arguments for crime control policies

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

allow advocates to avoid passionate and "illiberal" confrontations over irresolvable cultural conflicts by providing rationales grounded in the anticipated practical consequences of the policies. Further, this style of justification may be a socially beneficial way to debate contentious public issues. "By muting expressive controversy, deterrence arguments make it easier for citizens of diverse moral and cultural commitments to agree on policy outcomes.... Deterrence theory secures the goals of liberal public reason, which enjoins us to disclaim privileged moral insight when we engage in public deliberations" (Kahan, 1999:498–99).

One simple utilitarian justification for imprisoning convicted criminals is the assertion that incarceration produces incapacitative effects—that is, crime-reducing effects due to the fact that criminals physically isolated and restrained in prisons and jails cannot victimize members of the public. While incapacitative effects of incarceration undoubtedly operate, their magnitude is unclear and depends heavily on how successful the criminal justice system is in identifying high-frequency offenders and selectively sentencing them to prison or jail terms (Spelman, 1994).

Another utilitarian rationale for punishment, however, is its potential to deter crime. Punishment can make some, who otherwise would have been willing to commit crimes, fearful enough of punishment to avoid it by refraining from crime. There are two types of deterrence. Punishment of a person that causes him or her to subsequently refrain from crime is called special deterrence, and punishment of criminals in general causing people in general, unpunished or unpunished, to refrain from crime is known as general deterrence (Zimring and Hawkins, 1973: 72–73). Special deterrence, like incapacitation, can restrain the behavior only of the relatively small share of criminals who have been caught and convicted. General deterrence, on the other hand, can potentially influence anyone, noncriminals and both uncaught and caught criminals. (From this point on, we use deterrence to refer to general deterrence.) For this reason, deterrent effects are potentially far more potent sources of social control than incapacitative effects.

But unlike incapacitative effects, which occur regardless of how criminals perceive their punishment, deterrence can occur only to the extent that prospective offenders perceive a risk of punishment. Without this perception, there can be no deterrent effect (Zimring and Hawkins, 1973; Spelman, 1994: 294). The dimensions of punishment that influence its deterrent impact on criminal behavior have been summarized in the proposition that "the greater the certainty, severity, and swiftness (celerity) of punishment, the lower the crime rate will be" (for example, Gibbs, 1975: 5). However, a more precise restatement of this proposition, which stresses the essential role of perceptions, would be: "The greater the

C.Agnello  SC 0532

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

perceived certainty, severity, and swiftness of punishment, the lower the crime rate will be."

Of course, the abstract possibility of punishment for crime is perceived by virtually everyone. Nearly all people are aware that at least some criminals suffer legal punishments for at least some crimes. Some may believe that these risks are low, or that they are unlikely to be caught and punished for any crimes they might commit, but almost everyone recognizes at least the theoretical possibility that they might suffer legal punishment if they violate the law.

Nevertheless, this does not imply that increases in punishment levels (that is, increases in actual certainty, severity or swiftness of legal punishment) will increase deterrent effects and thereby reduce crime, since variations in actual punishment levels may or may not cause variations in the average perceived level of punishment among prospective offenders. Indeed, critics of deterrence as crime control, such as Leslie Wilkins, have long pointed to this reality-perception gap as a key weakness in deterrence-based crime control policies (cited in Zimring and Hawkins, 1973: 45). More recently, in a review of the deterrence literature, Nagin placed research on the policy-perception link as one of the three top priorities for future deterrence research (1998).

Because punishment for crime is to a great degree justified on moralistic grounds, some level of punishment will persist regardless of its utility for controlling crime. The answer to the simple yes or no question "Can punishment deter crime?" is almost certainly "Yes," because at least a few people almost certainly refrain from some crimes out of fear of legal punishment. But this is obviously an irrelevant question from a policy standpoint since no policy makers are asking the simple yes or no policy question "Shall we punish crime?"

In contrast, it is a very real policy question to ask, "Shall we have, as a means to crime reduction, more punishment than we have now?" It is not obvious that more punishment produces a stronger deterrent effect. Even if one were willing to assume that there are no deviance-amplifying effects of punishment (for example, labeling or stigmatizing effects) to counterbalance deviance-suppressing effects, it would still be unclear whether more punishment would reduce crime via deterrence. This is because it would be uncertain whether increased punishment levels would cause increases in the perceived risk of punishment. Even if one could assume that there is some prevailing baseline deterrent effect attributable to the existence of legal punishment, this would still not resolve the policy question of whether higher punishment levels would increase the deterrent effect of punishment beyond its current baseline level.

This way of framing the issue is pertinent because much of contemporary debate over crime control in policy-making circles is confined to variations

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

on the theme of increasing legal punishments, and a great deal is even more narrowly confined to strategies for increasing the severity and certainty of punishment. Thus legislators debate bills that would mandate minimum sentences for certain crimes, third-strike penalties for repeat offenders, enhanced penalties for crimes committed with guns or in connection with drug trafficking, and many other strategies for increasing the severity of punishment. Law enforcement officials lobby for increased budgets and enforcement authority so that they can arrest more criminals, thereby increasing the certainty of arrest for crime, and thus the likelihood of legal punishment. Prosecutors make similar appeals for resources that would enable them to increase the certainty of conviction, and thus the certainty of punishment. And many advocates argue for building more prisons so that both the probability and severity (length) of prison sentences can be increased. In sum, advocates strive to increase punishment levels above existing levels.

These policy proposals are frequently, and perhaps even usually, justified at least partly on the grounds that they will reduce crime through increased deterrence, by "sending a message," "getting the word out" that crime will not be tolerated, that criminals will be "taught a lesson" that crime will not be "coddled," and that punishment will surely follow crime. The assertion, then, is that policy changes producing increases in punishment levels will reduce crime by deterrence, that is, by an increased perception among prospective offenders of legal risk.

## PERCEPTION-REALITY CORRESPONDENCE AND THEORIES OF CRIMINAL BEHAVIOR

Leaving public policy aside, many scientific explanations of criminal behavior, and indeed human behavior in general, rely heavily on assumptions of a reality-perception correspondence. Legal punishments are, of course, but one class of contingencies that can affect criminal behavior. Many explanations stress the role of a wide array of costs and benefits, punishments and reinforcements, undesirable and desirable consequences of potential courses of action. Criminological theories such as Beccaria's classical criminology, social learning theory, economic theory of crime, the routine activities perspective and rational choice theory all rely on an assumption of some correspondence between contingencies and perceptions of those contingencies among prospective offenders (Beccaria, 1764/1963; Akers, 1973; Becker, 1968; Hindelang, Gottfredson and Garofalo, 1978; Cornish and Clarke, 1986). The validity of rational decision-making theories does not require a perfect correspondence between contingencies and perceptions of them, but does require some correspondence if the theories are to have any explanatory or predictive power.

C.Agnello   SC 0534

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Deterrence theorists have routinely hypothesized about variations in the strength of deterrent effects across individuals, suggesting that various attributes of humans moderate the impact of punishment threats on criminal behavior. For example, legal threats are thought to have stronger effects on persons with greater stakes in conformity and stronger social bonds to conventional others who would ostracize them as a result of legal sanctions being imposed (Zimring and Hawkins, 1973: 96–128; Paternoster, 1987; Nagin, 1998). One might extend this reasoning to the link between actual and perceived punishment levels—perhaps the degree to which the former affects the latter is likewise moderated by some of the same variables. But no version of deterrence theory has ever proposed or even implicitly assumed that actual punishment levels have a negative effect on perceived punishment levels. Thus, even though the effect of actual punishment levels on perceived levels might vary across individuals, all theories of general deterrence nevertheless assume that the average effect is a significant positive one.

For example, Zimring and Hawkins devoted several dozen pages to suggestions for improving macro-level tests of general deterrence theory (1973). Thus, though recognizing the need for improvement, they clearly accepted the validity of macro-level tests, in which aggregate levels of actual punishment are effectively used as proxies for aggregate perceived levels of punishment risk. But such tests would be meaningless if one did not believe that actual punishment levels, averaged across the entire population, have a significant positive effect on perceived risks. Likewise, after reviewing numerous theoretical issues in the recent deterrence literature, Nagin was quite unambiguous as to the central significance of punitive policies affecting perceptions of risk: "The conclusion that crime decisions are affected by sanction risk perceptions is not a sufficient condition for concluding that policy can deter crime. Unless the perceptions themselves are manipulable by policy, the desired deterrent effect will not be achieved" (1998: 5). Likewise, in an earlier review of deterrence research, Cook stated that the deterrence doctrine could be defended by noting that even though "public perceptions [of legal sanction threat] are not accurate, [they] do tend to be systematically related to criminal justice activities" (1980: 222)—that is, public perceptions of legal risk are positively correlated with actual punishment activities. To our knowledge, all varieties of general deterrence theory that assert a deterrence-based impact of punitive policies on crime rates assume a net positive effect of punitive activities on average perceptions of legal risk among prospective offenders.

No matter how inclined and able people may be to rationally weigh information and to consider potential costs and benefits of various courses of action, they cannot decide and act rationally unless their perceptions of

C. Agnello  SC 0535

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

those costs and benefits are to some degree accurate, that is, unless reality and their perceptions of reality correspond to some degree.

In some realms of human activity, it is perfectly reasonable to assume a fairly close correspondence between perceptions and the realities of costs and benefits. In the sphere of economic behavior, narrowly construed, the assumption is particularly plausible, mainly because there is such a large volume of relevant information available to actors, and a relatively high degree of accuracy to that information. Consumers generally know the exact prices of different brands of goods, and investors know not only the price of a share of stock in any given business firm, but also a great deal about the assets, liabilities and past profit performance of that company (the Enron accounting scandal notwithstanding).

Relevant information in the sphere of market behavior is comparatively voluminous, accurate and easily accessible. Rational behavior, and predictable responses to changes in costs and benefits, are to be expected in such information-rich environments. Shaped by research experiences in this context, it is not surprising that some economists appear to consider it self-evident that there must be at minimum a significant positive, albeit imperfect, correlation between actual risks and perceived risks (Becker, 1968; Ehrlich, 1973).

Criminal behavior, on the other hand, may be quite different, especially with regard to one of the main risks associated with it, punishment. If information about legal risks was limited, often inaccurate, and hard to obtain, the correlation of actual risks and perceptions of those risks would be considerably weaker than in the realm of market behavior. And if prospective offenders' perceptions of punishment risk bore no systematic relationship to punishment reality, variations in that reality would have no effect on deterrence of criminal behavior. People might well be deterred by the possibility of punishment, but this would be no more likely in settings where risks were higher than where they were lower. Under such circumstances investment in policies increasing punishment levels would be wasted, at least from a deterrence standpoint.

## PRIOR RESEARCH ON CRIME AND DETERRENCE

As noted, most deterrence studies fall into one of two broad categories: one the macro-level studies of the relationship between punishment levels and measured crime rates, and the other the individual-level survey studies of the relationship between perceived punishment levels and hypothetical willingness to commit crimes or self-reported criminal or delinquent behavior. The main concepts addressed by these studies are illustrated in Figure 1. Brackets denote the concepts that were not measured.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

**Figure 1. Body of Research**

| | | | |
|---|---|---|---|
| *Macro-level* | Punishment → | [Perception → | Crime Rates |
| | Levels | of Punishment] | |
| *Individual-level* | [Punishment → | Perception → | Criminal Behavior |
| | Levels] | of Punishment | |

The perceptual deterrence studies using survey data on individuals address the scientific issue of whether perception of legal risks affects criminal behavior, but not the policy issue of whether policies that change actual punishment levels, such as increasing the share of convicted persons who are sentenced to prison, affect crime rates via deterrence. It is the first causal link in each of the Figure 1 diagrams that is the focus of the present research, that is, the link between actual punishment levels (levels of certainty, severity, or swiftness of punishment) and perceptions of those levels.

Although a positive association between actual and perceived levels of punishment might seem self-evident, there is good reason to question the linkage. A fair amount of research on related topics casts doubt on the assumption that the link is strong.

Few people, whether criminals or noncriminals, are consumers of criminal justice statistics, and even criminals have only limited personal experience with crime and punishment. Further, depending on hearsay and gossip among criminal associates may not be a reliable basis for forming even approximately accurate notions of levels or trends in CJS punishment activities.

Similarly, the news media provide neither criminals nor noncriminals with much reliable information on levels of either crime or punishment. At the macro-level, the amount of news coverage of legal punishment is unlikely to bear a very strong relation to the general level of actual punishment, because studies of the relationship between the volume of news coverage of crime and actual rates of crime find the relationship to be close to nonexistent (Garofalo, 1981; Marsh, 1989). If common punishment events such as court sentencings or admissions to prison receive even less publicity than the crimes that gave rise to them, it is unlikely that people could formulate even minimally accurate perceptions of punishment risks from news media coverage.

Indeed, various documented news media biases in coverage of crime and punishment could cause, in an irregular fashion, either overstated or understated perceptions of punishment risk. For example, some scholars have found that newspapers exaggerate the certainty of arrest by over-reporting solved crimes (Roshier, 1973: 37; Parker and Grasmick, 1979: 371). On the other hand, some studies indicate that news stories about suspects who "got off on a technicality" or who got a "slap on the wrist" sentence from a judge leads to the public perceiving the severity of sentences to be lower than it really is (see review in Roberts, 1992).

C.Agnello    SC 0537

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

Further, because estimates of the certainty of punishment necessarily reflect perceptions of the volume of criminal acts relative to punishments, the lack of correspondence between the volume of news media coverage of crime and actual crime rates should weaken reality-perception correlations regarding the certainty of punishment.

On the other hand, active criminals might draw on their experiences and those of close associates to formulate perceptions of punishment risk. To the extent that they accurately stored these experiences when they occurred, and then accurately retrieved the information later, these experiences could improve both perceptions of past legal risks and forecasts of future risks. The research on personality traits common among known offenders, however, does not encourage a view of criminals as disciplined and careful processors of information, likely to systematically recall and assess such past experiences. Indeed, within a population of persons who already evince tendencies towards risk-taking, past experience of punishment could even lead to a variant of the *gambler's fallacy:* "My string of bad luck in getting caught is due to end; my chances of avoiding arrest are bound to improve because I've exhausted my share of bad luck." And of course the information situation is far worse for the noncriminals, precisely those whom deterrence-based policies are supposed to keep law-abiding. Noncriminals have no personal experience of criminal behavior leading to either punishment or no punishment, and thus no individual information base to use in formulating perceptions of legal risk.

It is unnecessary here to review in detail the findings of deterrence research. Nagin summarizes the individual-level survey research as follows: "I believe that a consensus has emerged among perceptual deterrence researchers that the negative association between sanction risk perceptions and offending behavior or intentions is measuring deterrence" (1998:15). Concerning the macro-level research, findings are both mixed and, due to uncertainty about how to deal with simultaneity of the punishment-crime relationship, inconclusive (1998).

The salient implication of Figure 1 is that neither macro-level nor *individual research has addressed the main issue considered here*—the effect of actual punishment levels on perceived punishment levels. The individual-level studies address whether perceptions of punishment, however arrived at, influence criminal behavior, but say nothing about whether actual macro-level punishment levels and crime control policies influence those perceptions in the first place. On the other hand, macro-level studies address whether actual punishment levels somehow affect crime rates, but do not address intervening causal mechanisms and thus can say little of a persuasive nature about whether any alleged effects actually involved deterrence.

𝕮.𝖆𝖌𝖓𝖊𝖑𝖑𝖔  𝖘𝕰 0538

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Some self-report studies have treated perceptions of punishment as a dependent variable (for example, Cohen, 1978; Parker and Grasmick, 1979; Richards and Tittle, 1981; 1982; Paternoster, Saltzman, Waldo and Chiricos, 1985; Horney and Marshall, 1992). None, however, have assessed the impact on those perceptions of actual punishment levels prevailing in the person's area. Coming closest to our concerns, a single study did examine—in a limited way—the association between actual and perceived punishment levels. Erickson and Gibbs surveyed a random sample of Phoenix residents, asking them to estimate the probability of arrest for ten offenses (1978). Comparing their collective estimates with police statistics on arrest probabilities, they found a 0.55 Pearson correlation (rho=.39) between objective and perceived certainty of arrest, across ten offenses (259).

Their study addressed variation in perceptions across offense types rather than across individuals, and in arrest certainty across offense types, rather than across areas or time periods. The authors stated that a study examining variation across areas would be desirable, but asserted that it would be prohibitively expensive (Erickson and Gibbs, 1978: 255, fn. 6). Using offense types as the unit of analysis was problematic because perceived certainty of punishment, though it varied considerably across individuals, varied little across offenses within the population as a whole (260). Using this unit of analysis also meant that the study was limited to a sample of just ten cases (offense types), potentially producing unstable findings. Further, the study was limited to a single jurisdiction, addressed only certainty of punishment, and examined only the police contribution to certainty.

## PRESENT STUDY

Our study, by contrast, is designed to address perceived and objective levels of severity and swiftness of punishment as well as its certainty, and to consider the contributions of courts and correctional institutions to perceptions of those aspects of punishment levels. The general strategy was to interview a large probability sample of urban residents, measure their perceptions of punishment risks prevailing in their area, and then relate these perceptions to actual punishment risks as measured in official criminal justice system data.

### METHODOLOGY

To properly address this topic, it was necessary to identify aspects of punishment for which we could measure both actual and perceived levels. Because it would have been ideal to be able to generalize our findings to the entire U.S. population, we would have preferred to study objective measures of actual punishment-related CJS activities that are available

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

nationwide. Unfortunately, there are no systematic national data on the swiftness of punishment, and data on severity of punishment, such as mean lengths of prison sentences imposed or served, are available only for varying subsets of the states or for selected local areas.

A much richer set of measures of actual punishment risk, however, is available for a smaller set of local, primarily urban, jurisdictions. Approximately 300 counties participate in the Bureau of Justice Statistics' National Judicial Reporting Program (NJRP). The counties are selected to be representative of all U.S. counties but disproportionately cover larger urban counties (Bureau of Justice Statistics, 1999). Within each sampled county, NJRP staff select a representative sample of criminal convictions from court records. NJRP data permit analysts to estimate, for each county, the number of convictions (allowing the computation of conviction rates, that is, adults convicted or who plead guilty per 100 charged or arrested), the number of convicted adults who received prison sentences (allowing computation of prison sentencing rates, that is, adults sentenced to prison per 100 adults convicted), the average maximum sentence imposed, and the average number of days between arrest and sentencing. Objective measures can thus be obtained for actual levels of certainty, severity and swiftness of punishment in these counties.

The number of felony convictions is too low in the smaller of the counties participating in the NJRP to yield stable estimates for specific crime types in individual counties, even when aggregated across multiple years. We therefore used data only from the fifty-four largest NJRP counties. *Because these were selected to be representative of the seventy-five largest counties (by population), results based on our urban sample are generalizable to the nation's seventy-five biggest urban counties. In 1998, these seventy-five accounted for 50.2 percent of the nation's murders, 61.9 percent of its robberies, and 51.4 percent of all violent crimes known to the police (analysis of Federal Bureau of Investigation, 2000).* In sum, our results can be generalized to the large urban counties that account for most of the nation's crime problem.

Combining county-level Uniform Crime Reports (UCR) data on crimes and arrests with these NJRP data on convictions and sentences allowed us to measure the following kinds of punishment levels for each of four offense types. The actual punishment variables pertain to the county in which the respondent resides:

*Certainty of punishment*
- total arrests per 100 offenses known to the police
- adults convicted per 100 adults arrested

*Severity of punishment*
- adults sentenced to prison per 100 adults convicted
- average maximum sentence imposed

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

634                KLECK ET AL.

*Swiftness of punishment*
- average number of days from arrest to sentencing

## MEASUREMENT

To measure perceptions of punishment levels, we interviewed representative samples of adults (age 18 and over) in each of the fifty-four urban counties in 1998. For each county-level measure of actual punishment levels (whether a measure of certainty, severity or swiftness of punishment), we devised closely matching questions for the survey, which measured respondents' perceptions of risk levels.

These perceptions were measured by asking questions concerning what the respondent thought the average certainty, severity or swiftness of punishment was in their county. In each case, to put all respondents (Rs) on an equal footing, interviewers provided a simple nontechnical definition of the offense type being asked about. Respondents were asked about the preceding 10-year period from 1988 to 1998. This was done to ensure a close correspondence between the period to which perceptions pertained and the period for which reliable data on actual punishment levels could be obtained.

The exact wording of questions measuring perceived punishment levels are shown below. These examples pertain to robbery, but identically worded questions were also asked about criminal homicides, aggravated assaults and burglaries. Each set of questions concerning a measure of punishment was preceded by a reminder to respondents that they were being asked about their county for the preceding 10 years, and were provided with a brief nontechnical explanation of the punishment measure being asked about. For example, before asking about the average maximum sentence length, interviewers told respondents that judges sometimes impose a single flat sentence but at other times impose sentences in the form of a range such as 1 to 5 years in prison.

*Arrest Certainty*: "In the past 10 years in your county, out of every 100 robberies known to the police, about how many do you think resulted in the arrest of the robber?"

*Conviction Certainty*: "And how about robbery? In your county, out of every 100 persons arrested for robbery, about how many do you think are convicted of that crime?"

*Percent Sentenced to Prison*: "How about people convicted of robbery? Out of every 100 persons convicted of this crime in your county, about how many do you think are given a jail or prison sentence?"

*Average Maximum Sentence Length*: "How about the average person given a prison or jail sentence for committing a robbery?

C. Agnello    SC 0541

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

What do you think is the average maximum sentence length imposed by judges in your county?"

*Swiftness of Punishment*: "For persons convicted of robbery, what do you think is the average amount of time that passes between the day the offender is arrested and the day they were sentenced in court?"[1]

It was necessary to go back as far as 1988 to ensure enough sample convictions to have reliable estimates of actual punishment levels in individual counties for each offense type. The NJRP data are gathered only for even-numbered years, and the most recent NJRP data available at the time data were gathered were for 1996. Thus, we used NJRP data on representative samples of convictions obtained in 1988, 1990, 1992, 1994 and 1996.

We obtained data on actual punishment levels for as much of the 1988 to 1998 period as were available. Data on crimes and arrests for counties were available for all 5 years from 1994 through 1998; pre-1994 county UCR data are unusable because they have not been adjusted for nonreporting agencies (Federal Bureau of Investigation, 2000, and preceding years). *Due to this limitation, conviction rates could likewise be* measured only for 1994 and 1996. Data for all other actual punishment measures were available for even-numbered years from 1988 through 1996 (Bureau of Justice Statistics, 1999, and preceding years).

We asked respondents about punishment of criminal homicide, robbery, aggravated assault and burglary. These four offenses are all serious and include both violent and property crimes. They encompass most of the offenses that are likely to be publicized, and respondents are probably more likely to hear about punishment for these offenses than almost any other crime types. We were confined to using the seven traditional FBI-UCR Crime Index offenses because these were the only offenses for which data were available on crimes known to the police. The only two serious Index crimes we could not study were rape and motor vehicle theft. We could not include rape because sexual assault statutes are so different from one state to another that NJRP data on actual punishment levels were not likely to be comparable across states. We could also not cover motor vehicle theft because some states do not have a separate statutory category for this crime, which is lumped in with other grand larcenies. Thus there are no separate data on auto theft punishment from the NJRP for some states.

## SAMPLING

The survey sample consisted of 1,500 adult respondents (Rs) selected using random digit dialing procedures. This sampling method allows access

---

1. A complete copy of the survey instrument is available from the senior author.

C. Agnello SC 0542

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

636                          KLECK ET AL.

to the 95 percent of the U.S. households that have a telephone, including those with unlisted numbers. The sample was drawn exclusively from the fifty-four largest NJRP counties, with sample sizes for each county proportionate to the population size of the county. Numbers were randomly generated for each county, using its area codes and residential prefixes. Within each household contacted, an adult respondent was randomly selected by the interviewer, who asked to speak to the resident age 18 or older who had most recently celebrated a birthday.

Telephone interviews were conducted by Research Network of Tallahassee, Florida, a professional polling firm that has conducted hundreds of telephone surveys, including many concerning crime. The interviews were conducted in April and May 1998.

## CONTROL VARIABLES

We controlled for a number of individual-level attributes we thought might affect perceptions of punishment. These are listed in Table 1. First, we speculated that people who believe in the crime-control effectiveness of punishment may infer low punishment levels from crime rates that they perceive as high or increasing, based on the assumption that low punishment levels must be at least partly to blame. Thus we controlled for whether the respondent (R) believed that crime in his or her county was higher than the national average, whether the respondent considered it to be their community's most important problem, and whether they thought that crime rates in their county were increasing. Following a similar line of reasoning, we hypothesized that persons who had been personally victimized would be more likely to think that punishment levels were inadequately low. We therefore controlled for whether the respondent had been a victim of robbery, assault or burglary, and for whether the respondent personally knew someone who had recently been a victim of crime.

The effects of exposure to news media were difficult to predict. Certainly the media may exaggerate the impression of high crime rates and give an impression that too few criminals are being punished. Yet the news media and entertainment outlets may also exaggerate the effectiveness of criminal justice personnel, especially police, by reporting morally satisfying tales of criminals being brought to justice. Given the potential for news media effects, we controlled for how often the respondents watched local and national television news.

We hypothesized that employees of criminal justice system (CJS) agencies, as well as members of their families, would be especially cynical about system effectiveness, and perceive lower punishment levels than other people. Therefore, we controlled for whether the respondent or a member of the respondent's family worked in the CJS.

C. Agnello      SC 0543

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

THE MISSING LINK    637

Many scholars have hypothesized that engaging in criminal behavior could itself affect perceptions of punishment, just as perceptions could affect behavior (for example, Saltzman, Paternoster, Waldo and Chiricos, 1982). Criminals who have escaped punishment many times, as is the case for the vast majority of crimes, may come to perceive punishment as unlikely. Conversely, being arrested (and possibly punished) may encourage perceptions of CJS effectiveness, especially regarding law enforcement agencies. We did not ask a battery of questions asking the respondents to self-report various criminal acts that they had committed, but instead asked simply whether they had ever been arrested. This is a mixed measure in that it is both an indicator of past criminal behavior and of punishment experiences.

We also controlled for the usual background variables of age, sex, race, education and region. Because this research does not focus on them, however, they will not be discussed further.

## SENSITIVITY TO PUNISHMENT LEVELS AMONG CRIMINALS AND NONCRIMINALS

It might be argued that deterrence is not relevant to the general population, because most people would remain largely noncriminal regardless of perceived or actual punishment levels. According to this view, a more relevant subset of the population for present purposes would be criminals, because they are those who most need to be deterred. This argument is questionable because the deterrence doctrine asserts that the prospect of punishment is precisely why many noncriminal persons remain noncriminal. Thus it is high perceptions of punishment risk among noncriminals that would provide the most critical support for the deterrence doctrine.

Alternatively, it might be argued that perceptions of punishment should correspond more closely to reality among criminals because they are the ones most likely to know about actual punishment levels. Active criminals have both the strongest incentives to acquire information on punishment risks and more information derived from their own and their associates' experiences.

On the other hand, research on the personality of known offenders portrays them as impulsive, impatient, easily distracted, narrowly focused on the short-term consequences of their actions and biased towards behaviors that are immediately gratifying, regardless of long-term risks (summarized in Vold, Bernard and Snipes, 2002: 77–81). Because the risks of punishment for crime are fairly low in the short term and substantial only in the long term, such persons should be especially unresponsive to legal risks. Further, despite strong incentives to acquire

C.Agnello    SE 0544

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

and retain accurate information about legal risks, people with such personality traits may be especially unlikely to exercise the patience and forethought to do so.

If this view of criminals is accurate, to focus solely on active criminals would bias results against finding a reality-perception association, by examining only those least inclined and able to acquire reasonably accurate information about punishment levels. Nevertheless, it was possible to empirically address this issue. We roughly distinguished criminals from noncriminals by asking Rs whether they had ever been arrested for a nontraffic offense (using a question asked in seven national General Social Surveys between 1973 and 1984). This allowed us to estimate the associations between actual and perceived punishment levels separately for self—reported arrestees and for nonarrestees. Our sample of the general urban population included 182 admitted arrestees, and thus included many significantly criminal individuals, as well as noncriminals.

HYPOTHESES

The validity of the deterrence doctrine does not depend on an assumption that people are able to accurately estimate the absolute levels of actual punishment levels. It depends instead only on a positive association between actual and perceived punishment levels, such that higher actual levels lead to higher perceived levels. For example, people might on average misperceive the average prison sentence for robbery to be only half of what it really is, but the deterrence doctrine would still be supported if people in areas with longer sentences generally provided higher estimates of sentence length, however inaccurate in absolute terms they might be, than those in areas with shorter actual sentences.

Thus the null hypothesis was that there is no statistically significant association between actual and perceived punishment levels. This was tested with respect to each of four specific types of crime for which punishment data are gathered, for each of the five measures of certainty, severity and swiftness described. We further hypothesized that criminals' perceptions of punishment would not correspond any more closely to reality than those of noncriminals.

ESTIMATION PROCEDURES

We sought to estimate the effects of actual local punishment levels on the perceptions of punishment levels of the residents of large U.S. cities. We therefore needed a multivariate estimation technique that would allow us to separate the effects of punishment levels from other factors that might affect perceptions of punishment. Using ordinary least squares regression (OLS), however, would have a potential drawback. The

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

individuals included in this study were clustered by county, so it is likely that errors in predicting their perceptions of punishment would not be independent, thereby violating one of the assumptions of OLS. We instead used hierarchical linear modeling (HLM) techniques (Raudenbush and Bryk, 2002). The regression coefficients in the following tables are estimated using a two-level, intercepts-as-outcomes model with individuals as the level-1 units and counties as the level-2 units.[2]

The independent variables entered in the level-1 equation are listed in Table 1. All of these variables are grand-mean centered when entered into the equation. The Level-2 model is specified for a coefficient in the level one model that varies across counties. In this study, only the intercept is assumed to vary across the level-2 units. The effects of all of the individual-level independent variables are assumed to be fixed. The level-2 independent variables used to predict the level-1 intercept include actual punishment for the offense in the perceived punishment category and county-level index crime rate. The two variables were entered into the equation as uncentered variables.

The proportional reduction in level-2 variance associated with the HLM models was assessed by comparing variance computed from the fitted model with variance computed from a base model. The base model and the fitted model differ with regard to the two level-2 independent variables. These were included in the fitted model but not the base model. The numbers in the last row of each of the HLM tables show the amount of reduction in level-2 variance between the two models (see Tables 3-7). *The following formula is used to compute the proportion of reduction.*

---

2. The first step in our regression analysis was to test whether there is sufficient level-2 variance that warrants a hierarchical model. The test was performed using a two-level ANOVA model, which partitions the total variance in the dependent variable, $Y_{ij}$, into two separate components: variance component at level 1 ($\sigma2$) and variance component at level 2 ($\tau00$). The intraclass correlation ($\rho$) was computed to measure the extent to which differences in the responses exist between level-1 units (counties). The intraclass correlation is used to assess the existence or nonexistence *of meaningful differences in responses between the level-2 units — differences that* determine the degree to which the data are hierarchically differentiated. The variance components and interclass correlations are listed in Appendix 1. As shown in the table, the intraclass correlations for the models are all quite small, indicating that only a small portion (less than 10 percent in any case) of the total variance in the dependent variables is associated with counties as opposed to individuals. However, chi-square tests of these correlations are all statistically significant. On the basis of these results, we rejected the null hypothesis that the mean response scores for all counties are equal and conclude that significant variability in means exists cross counties. The results demonstrated that there was sufficient variability to proceed with the multilevel analysis.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

**Table 1. Variables in the Analysis**

| NAME | DESCRIPTION | MEAN | STD |
|------|-------------|------|-----|
| *Perceived probability* | | | |
| PPAHOM | Arrest, homicide(%) | 51.92 | 25.78 |
| PPAROB | Arrest, robbery(%) | 43.30 | 23.77 |
| PPAASLT | Arrest, aggravated assault(%) | 48.55 | 24.67 |
| PPABURG | Arrest, burglary(%) | 37.97 | 23.74 |
| PPCHOM | Conviction, homicide(%) | 53.47 | 26.42 |
| PPCROB | Conviction, robbery(%) | 50.73 | 25.82 |
| PPCASLT | Conviction, aggravated assault(%) | 50.19 | 26.23 |
| PPCBURG | Conviction, burglary(%) | 46.21 | 26.54 |
| PPPHOM | Prison/jail sentence, homicide(%) | 63.95 | 28.87 |
| PPPROB | Prison/jail sentence, robbery(%) | 52.33 | 26.63 |
| PPPASLT | Prison/jail sentence, agg. assault(%) | 47.69 | 27.03 |
| PPPBURG | Prison/jail sentence, burglary(%) | 44.12 | 26.85 |
| *Perceived average maximum sentence* | | | |
| PMSLHOM | Homicide (months) | 318.32 | 191.80 |
| PMSLROB | Robbery (months) | 84.97 | 85.05 |
| PMSLASLT | Aggravated assault (months) | 69.58 | 76.84 |
| PMSLBURG | Burglary (months) | 57.14 | 74.23 |
| *Perceived average days from arrest to sentencing* | | | |
| PSWHOM | Homicide | 491.57 | 597.35 |
| PSWROB | Robbery | 303.63 | 391.76 |
| PSWASLT | Aggravated assault | 288.19 | 448.59 |
| PSWBURG | Burglary | 269.76 | 462.46 |
| *Total arrests per 100 offenses known to police* | | | |
| ARMURD | Homicides | 90.12 | 36.42 |
| ARROB | Robberies | 27.04 | 9.89 |
| ARASLT | Aggravated assaults | 53.94 | 25.52 |
| ARBURG | Burglaries | 14.17 | 5.52 |
| *Adult convictions per 100 adult arrests* | | | |
| CRMURD | Homicide | 88.02 | 46.39 |
| CRROB | Robbery | 49.06 | 27.21 |
| CRASLT | Aggravated assault | 19.79 | 14.52 |
| CRBURG | Burglary | 46.23 | 29.70 |
| *Prison/jail sentences per 100 adults convicted* | | | |
| PRMURD | Homicide | 98.13 | 11.42 |
| PRROB | Robbery | 93.15 | 7.65 |
| PRASLT | Aggravated assault | 82.14 | 13.67 |
| PRBURG | Burglary | 86.77 | 11.72 |

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

JJC    Document 24-1    Filed 03/11/26    Page

Table 1. Variables in the Analysis (continued)

| NAME | DESCRIPTION | MEAN | STD |
|---|---|---|---|
| *Average maximum prison sentence* | | | |
| PSLMURD | Homicide | 288.12 | 50.62 |
| PSLROB | Robbery | 90.42 | 44.44 |
| PSLASLT | Aggravated assault | 51.52 | 24.91 |
| PSLBURG | Burglary | 51.54 | 31.54 |
| *Average days from arrest to sentencing* | | | |
| DAYSMURD | Homicide | 417.38 | 119.27 |
| DAYSROB | Robbery | 223.50 | 268.39 |
| DAYSASLT | Aggravated assault | 231.19 | 83.75 |
| DAYSBURG | Burglary | 180.55 | 78.49 |
| *Index rate* | | | |
| INDXRATE | County rate per 100,000 population | 2,108.06 | 2,019.50 |
| *Views on crime* | | | |
| CRIMPROB | Crime most important problem (1/2) | 1.51 | 0.50 |
| CRIMRELA | County lower-same-higher natl avg (1-5) | 2.96 | 1.10 |
| CRIMTRND | Decreasing/stable/increasing (1-3) | 2.17 | 0.77 |
| *Victimization* | | | |
| ROBVICT | Robbery victim in past year (1/2) | 1.04 | 0.20 |
| ASLVICT | Assault victim in adult life (1/2) | 1.25 | 0.43 |
| BURGVICT | Burglary victim in past year (1/2) | 1.06 | 0.24 |
| KNOWVICT | Knows victim in past year (1/2) | 1.35 | 0.48 |
| *Number of times news watched* | | | |
| NEWSLOCL | Local in average week | 5.97 | 4.12 |
| NEWSNATL | National in average week | 4.57 | 3.44 |
| *Respondent characteristics* | | | |
| CJSWORK | R or family member worked in CJS (1/2) | 1.22 | 0.41 |
| AGE | R's age in years | 44.28 | 17.42 |
| MALE | R is male (1/2) | 1.46 | 0.50 |
| BLACK | R is African-American (1/2) | 1.12 | 0.33 |
| SOUTH | R resides in South (1/2) | 1.25 | 0.43 |
| EDUC | Schooling completed (1-7) | 4.72 | 1.60 |
| ARREST | R has been arrested (1/2) | 1.12 | 0.33 |

Note: Homicide=murder and nonnegligent manslaughter. Perceptions of punishment pertain to preceding ten years in the respondent's (R's) county. Variables with (1/2) are binary, where 2 indicates that R possesses the trait, and 1 indicates the absence of the trait.

Proportion variance explained

$$(R^2) = 1 - \frac{\text{var}(\overline{Y}_j - \overline{Y}_j \beta)}{\text{var}(\overline{Y}_{.j})},$$

which represents the proportional reduction in mean squared prediction error for the prediction of

$$\overline{Y}_{.j}$$

C.Agnello    SC 0548

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

for a randomly drawn level-2 unit J (Snijders and Bosker, 1994). Some reduction in level-2 variance is expected when the level-2 variables are entered. However, as the last rows of the tables show, some of the reductions carry negative signs, meaning that level-2 variance increased after the level-two variables were introduced. This is likely a statistical artifact. Raudenbush and Bryk have pointed out that "it is mathematically possible under maximum likelihood estimation for the residual variance to increase slightly if a truly nonsignificant predictor is entered into the equation" (2002: 150).

FINDINGS

The means of the various actual and perceived punishment variables are of some substantive interest in their own right in that some scholars believe that Americans favor more severe sentences because they misperceive the sentences imposed by their local courts as less severe than they really are (Tonry, 2004: 158; Roberts, 1992: 112–113). This belief is contradicted by our evidence on average maximum sentence length, but supported by our data on the share of the convicted that get prison. The urban public's estimates of the average sentence length are surprisingly accurate in the aggregate, and to the extent they deviate from reality, they are slightly more severe than actual sentence lengths, for three of four offense types (robbery being the weak exception). On the other hand, the public greatly underestimates the percent of convicted criminals who are given a jail or prison sentence.

These observations about means, however, tell us nothing about whether individuals in areas with higher actual punishment levels also perceive higher levels. The simple bivariate correlations between perceived and actual punishment levels are shown in Table 2. They are all extremely weak to nonexistent. None reached 0.13 in the full sample, only two exceeded 0.05, and they averaged a negligible 0.02. Many were even negative. Only four of twenty correlations were even statistically significant, despite the fairly large sample sizes, which ranged from 1,142 to 1,330, depending on missing data. Even the largest correlation of .122, pertaining to swiftness of punishment for robbery, implies that variation in actual punishment levels accounts for less than 1.7 percent of the variation in perception of punishment levels. Further, there was no clear pattern, regarding either crime type or dimension of punishment, among the four correlations that were statistically significant.

It is possible that though criminals might not directly perceive overall punishment levels prevailing in their local areas, they might be indirectly influenced by those levels via their and their close associates' experiences with crime and punishment. Criminals are familiar with their own rate of

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

NJC     Document 24-1     Filed 03/11/26     Page

**Table 2. Correlations of Perceived and Actual Punishment Levels**
Pearson's r, 1—tailed significance
(Correlations in bold are significant at .05 level, one-tailed)

| | Total Sample (n=1142-1330) | | Arrestees (n=150-182) | | Nonarrestees (n=910-1251) | |
|---|---|---|---|---|---|---|
| **Certainty** | r | p | r | p | r | p |
| *Arrest rates*[a] | | | | | | |
| Murder | **.048** | .04 | -.030 | .35 | .071 | .01 |
| Robbery | .011 | .34 | -.043 | .29 | .004 | .45 |
| Aggrvtd. assault | .006 | .42 | -.120 | .06 | .028 | .18 |
| Burglary | .015 | .29 | -.145 | .03 | .047 | .06 |
| *Conviction rates*[b] | | | | | | |
| Murder | -.030 | .14 | .072 | .18 | -.042 | .08 |
| Robbery | .020 | .24 | .107 | .08 | .019 | .26 |
| Aggrvtd. Assault | .040 | .07 | **.130** | .05 | .019 | .27 |
| Burglary | **.053** | .03 | .084 | .14 | .046 | .06 |
| **Severity** | | | | | | |
| *Prison rates (%)*[c] | | | | | | |
| Murder | -.027 | .15 | -.074 | .16 | -.017 | .27 |
| Robbery | .026 | .16 | -.014 | .43 | .041 | .07 |
| Aggrvtd. assault | .026 | .16 | .028 | .35 | .028 | .16 |
| Burglary | **.058** | .01 | -.068 | .18 | **.079** | .00 |
| *Average max. sentence* | | | | | | |
| Murder | -.000 | .50 | -.023 | .38 | .008 | .40 |
| Robbery | .009 | .37 | -.008 | .46 | .020 | .26 |
| Aggrvtd. assault | -.011 | .35 | -.027 | .37 | -.006 | .42 |
| Burglary | .006 | .41 | .095 | .12 | -.002 | .48 |
| **Swiftness** | | | | | | |
| *Average time, arrest to sentencing* | | | | | | |
| Murder | .026 | .21 | -.013 | .44 | .039 | .14 |
| Robbery | **.122** | .00 | .016 | .44 | **.144** | .00 |
| Aggrvted. assault | .025 | .23 | -.045 | .32 | .037 | .16 |
| Burglary | -.013 | .35 | .001 | .50 | -.015 | .35 |
| Average correlation | .020 | | -.004 | | .027 | |

a. Number of persons arrested per 100 offenses known to police.
b. Percent of adults arrested who were convicted.
c. Percent of adults convicted who received a prison or jail sentence.

criminal behavior and experiences with legal punishment, and have at least some knowledge of such experiences among associates. Thus, if the *personal experiences of any one criminal tend to reflect, on average, the* aggregate experiences of all criminals in an area, perceptions of punishment risk might correlate well with actual punishment risk. This presupposes, however, that criminals reasonably accurately recall their criminal behavior and punishment experiences, have reasonably accurate perceptions of the experiences of associates, and take account of these experiences when deciding whether to commit crimes.

C.Agnello    SC 0550

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

In any case, the hypothesis that criminals are more closely attuned to actual punishment risks than noncriminals is clearly not supported by the evidence in Table 2, which shows that correlations between perceived and actual punishment levels were even weaker among self-reported arrestees (middle two columns) than among nonarrestees (last two columns). Indeed the average perception-reality correlation among arrestees is slightly negative, though not significantly different from zero. Evidently, urban criminals' perceptions of punishment risks prevailing in their areas have virtually no systematic correspondence with reality. Only one of the twenty correlations estimated was statistically significant at the .05 level, one-tailed. Thus the notion that perceptions correspond to reality more strongly among criminals, and that deterrence therefore works best in shaping the perceptions of those who most need to be influenced, is not supported by the bivariate evidence.

The multivariate HLM estimates are presented in Tables 3 through 7, each table being devoted to a different measure of punishment. The predictors are individual-level attributes of the survey respondents (Rs), measured through interviewing, and the county-level punishment variable whose effect is being estimated.

Tables 3 and 4 concern measures of the certainty of punishment of criminal behavior. In Table 3, the dependent variable is the perceived arrest rate. The focus is on the effect of the actual county arrest rate for a given crime type on the arrest rate for that crime type as perceived by county residents. One seemingly counterintuitive finding is that persons who have personally been arrested perceive a lower probability of being arrested than nonarrestees, perhaps because this variable also serves as an indicator of frequent past criminal behavior, little of which resulted in arrest. The finding is actually common in the literature (for example, see Horney and Marshall, 1992). The result, in any case, does not support a special deterrent effect. Also those who believed that crime was increasing tended to perceive low arrest rates, perhaps because they believed that low arrest rates were partly responsible for the rising crime problem.

The main findings concern the effects of actual arrest rates on perceptions of arrest rates. Estimates can be found in the lower section of the table labeled Level-2 predictors. The actual likelihood of being arrested for a crime in a given county appears to have no effect on perceptions of this likelihood among residents of the county. Whether for homicide, robbery, aggravated assault or burglary, actual arrest rates show no evidence of an effect on perceived arrest rates.

Table 4 reports findings concerning the effects of actual conviction rates on perceived conviction rates. Paralleling the arrest rate results, these findings generally indicate that actual conviction rates appear to have no effect on perceived conviction rates. The sole exception is a slight, albeit

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

statistically significant, effect for assault: one more conviction per 100 arrests is associated with a perception of 0.08 more convictions per 100 arrests.

---

**Table 3. Effects of Actual Arrest Rates on Perceived Arrest Rates (HLM Estimates)**

|  | Dependent Variable (perceived arrests per 100 known offenses for) | | | |
|---|---|---|---|---|
|  | Homicide | Robbery | Assault | Burglary |
| Level-1 predictors |  |  |  |  |
| Crime most important problem | -1.94 | -0.89 | -2.00 | -0.13 |
| Crime in county relative to nation | 0.78 | -0.63 | -0.75 | -0.70 |
| Crime trend in county | -3.76** | -1.49* | -1.81** | -2.46** |
| Robbery victim in past year | -1.77 | 1.07 | -1.64 | 0.34 |
| Assault victim as adult | -0.05 | -2.42 | 0.84 | -0.91 |
| Burglary victim in past year | -2.49 | -4.79 | -2.16 | -3.05 |
| Knows victim of serious crime | -1.38 | -1.01 | -0.98 | -1.47 |
| Times per week watching local news | -0.13 | 0.29 | 0.02 | 0.16 |
| Times per week watching natl. news | 0.11 | -0.13 | 0.01 | 0.15 |
| R or R's family worked in CJS | 2.14 | 1.94 | 0.50 | 0.94 |
| Age | -0.03 | 0.01 | -0.04 | -0.04 |
| Male | 2.02 | -0.77 | 0.07 | -2.38* |
| Black | -6.78 | -3.01 | -2.41 | -3.00 |
| South | -2.48** | -1.59 | -0.88 | -0.80 |
| Education | 0.86* | -0.68* | 0.10 | -1.33** |
| Non-traffic arrest | -3.43 | -4.87** | -5.09** | -3.97* |
| Level-1 modeled variance (R²) | 0.07 | 0.05 | 0.04 | 0.05 |
| Level-2 predictors |  |  |  |  |
| Total arrests/100 reported murders | 0.02 |  |  |  |
| Total arrests/100 reported robberies |  | -0.08 |  |  |
| Total arrests/100 reported agg. assaults |  |  | -0.02 |  |
| Total arrests/100 reported burglary |  |  |  | -0.11 |
| County-level index crime rate | -0.00 | -0.00 | -0.00 | -0.00* |
| Level-2 Modeled Variance (R²) | -0.02 | -0.05 | -0.03 | 0.01 |

\* Significant at 0.05 confidence level
\** Significant at 0.01 confidence level

---

Tables 5 and 6 address measures of the severity of punishment for crime. Table 5 presents findings concerning the perceived percent of convicted offenders who received a prison sentence in the respondent's county. *The results for all four offenses indicate no positive effect of actual prison sentence rates on individual perceptions of those rates.* The results for murder actually suggest a perverse, and significant, negative effect on the perceived rate. This could, however, be nothing more than a chance finding attributable to the large number of hypothesis tests performed.

**C.Agnello   SE 0552**

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

**Table 4. Effects of Actual Conviction Rates on Perceptions of Conviction Rates (HLM Estimates)**

|  | Dependent Variable (perceived conviction rates for) | | | |
|---|---|---|---|---|
|  | Homicide | Robbery | Assault | Burglary |
| **Level-1 predictors** |  |  |  |  |
| Crime most important problem | -0.17 | -0.50 | -0.84 | -1.38 |
| Crime in county relative to nation | 0.34 | 0.56 | 0.15 | -0.01 |
| Crime trend in county | -2.76** | -2.28** | -1.69* | -1.44 |
| Robbery victim in past year | -4.76 | -5.51 | -5.87 | -5.63 |
| Assault victim as adult | 0.90 | 1.23 | 1.04 | 0.34 |
| Burglary victim in past year | -2.93 | -1.63 | -0.44 | -3.63 |
| Knows victim of serious crime | -0.34 | -0.63 | -0.77 | -1.21 |
| Times per week watching local news | 0.02 | -0.08 | -0.03 | -0.16 |
| Times per week watching natl. news | -0.19 | 0.12 | -0.15 | -0.20 |
| R or R's family worked in CJS | -0.59 | -0.32 | -0.84 | -1.66 |
| Age | -0.07 | -0.06 | -0.07 | -0.03 |
| Male | 2.01 | 4.35** | 3.99** | 3.18** |
| Black | -0.99 | -0.47 | -2.83 | -4.88 |
| South | -4.64** | -5.29* | -3.33 | -2.31 |
| Education | 1.04* | 0.35 | 0.21 | -0.17 |
| Non-traffic arrest | -0.05 | -6.21** | -1.65 | -2.86 |
| Level-1 modeled variance ($R^2$) | 0.05 | 0.04 | 0.04 | 0.04 |
| **Level-2 predictors** |  |  |  |  |
| Adult convictions/100 murder arrests | -0.01 |  |  |  |
| Adult convictions/100 robbery arrests |  | 0.03 |  |  |
| Adult convictions/100 agg. assault arrests |  |  | 0.08* |  |
| Adult convictions/100 burglary arrests |  |  |  | -0.01 |
| County-level index crime rate | -0.00 | -0.00 | -0.00* | -0.00 |
| Level-2 modeled variance ($R^2$) | -0.02 | -0.01 | 0.14 | -0.01 |

\* Significant at 0.05 confidence level
\*\* Significant at 0.01 confidence level

Table 6 presents the multivariate findings regarding the average length of prison sentences imposed in the respondent's county. These estimates uniformly indicate no significant effect of actual sentence lengths on perceived sentence lengths.

Table 7 reports multivariate findings concerning the swiftness of punishment, measured as the average number of days from arrest to sentencing. For three of four offense types, the association between actual and perceived swiftness was not significantly different from zero, the exception being robbery.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

**Table 5. Effect of Actual Prison Sentence Rates on Perceptions of Prison Sentence Rates (HLM Estimates)**

| | Dependent Variable (perceived prison sentences per 100 adults convicted for) | | | |
|---|---|---|---|---|
| | Homicide | Robbery | Assault | Burglary |
| Level-1 predictors | | | | |
| Crime most important problem | -1.05 | 0.51 | 0.20 | 0.15 |
| Crime in county relative to nation | 0.08 | -0.32 | -0.80 | -0.43 |
| Crime trend in county | -1.63* | -1.80** | -1.40 | -1.07 |
| Robbery victim in past year | -4.31 | -4.79 | -4.53 | -1.80 |
| Assault victim as adult | 2.89 | 0.10 | -1.61 | -1.99 |
| Burglary victim in past year | -3.41 | -1.16 | -1.06 | -3.30 |
| Knows victim of serious crime | -1.86 | -1.34 | -1.32 | -2.28 |
| Times per week watching local news | -0.03 | -0.10 | -0.21 | -0.23 |
| Times per week watching natl. news | -0.36 | -0.18 | 0.14 | 0.04 |
| R or R's family worked in CJS | 3.78* | 2.28 | 3.23* | 2.46 |
| Age | -0.04 | 0.01 | -0.02 | -0.01 |
| Male | 3.02** | 2.84** | 0.68 | 2.86* |
| Black | -3.72 | -2.29 | -1.69 | -3.16* |
| South | -4.42 | -7.69** | -3.74* | -3.33 |
| Education | 2.34** | 1.18** | 0.65 | 0.35 |
| Non-traffic arrest | 2.39 | -0.38 | -3.42 | -3.03 |
| Level-1 modeled variance ($R^2$) | 0.08 | 0.05 | 0.04 | 0.04 |
| Level-2 predictors | | | | |
| Prison sentences, murders/100 convictions | -0.08* | | | |
| Prison sentences, robberies/100 convictions | | 0.08 | | |
| Prison sentences, assaults/100 convictions | | | 0.03 | |
| Prison sentences, burglaries/100 convictions | | | | 0.02 |
| County-level index crime rate | -0.00* | -0.00 | -0.00 | -0.00 |
| Level-2 modeled variance ($R^2$) | 0.05 | -0.02 | 0.03 | 0.05 |

\* *Significant at 0.05 confidence level*
\** *Significant at 0.01 confidence level*

To summarize, none of the five measures of punishment, whether measures of certainty, severity or swiftness of punishment, showed consistent indications of an effect of actual punishment levels on perceived punishment levels. Across four crime types, there were twenty estimates of this effect. Two were positive and significant, supporting the deterrence doctrine, one was significant and negative, and the remaining seventeen were not significantly different from zero. With a large number of tests of the same basic hypothesis, one would expect one or two coefficients to be significant by chance alone, suggesting that little importance can be attributed to the two supportive results. This view is strengthened by the lack of any pattern in the signs of the significant coefficients (two positive,

C.Agnello    SC 0554

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

**Table 6. Effect of Actual Sentence Lengths on Perceptions of Sentence Length (HLM Estimates)**

|  | Homicide | Robbery | Assault | Burglary |
|---|---|---|---|---|
| **Level-1 predictors** | | | | |
| Crime most important problem | 6.07 | -0.15 | -0.65 | 2.71 |
| Crime in county relative to nation | -5.02 | -0.03 | 2.56 | 1.46 |
| Crime trend in county | -1.41 | -5.13 | -3.54 | -4.07 |
| Robbery victim in past year | 11.19 | -8.13 | -6.78 | -3.80 |
| Assault victim as adult | -14.97 | -8.10 | -11.57** | -7.05 |
| Burglary victim in past year | 6.14 | 1.32 | 6.52 | -3.46 |
| Knows victim of serious crime | 3.03 | -2.55 | 0.96 | -2.11 |
| Times per week watching local news | -1.02 | -1.47** | -0.48 | -0.34 |
| Times per week watching natl. news | 0.42 | 0.79 | -0.09 | 0.15 |
| R or R's family worked in CJS | 6.72 | -5.42 | -1.36 | 1.98 |
| Age | 0.02 | 0.17 | -0.07 | 0.15 |
| Male | 3.27 | -2.65 | -4.40 | 1.78 |
| Black | -45.92** | 9.51 | -6.09 | 5.44 |
| South | -8.20 | 0.34 | 6.32 | -1.12 |
| Education | 3.71 | -0.72 | 0.82 | -0.72 |
| Non-traffic arrest | 17.84 | -0.21 | -2.20 | -3.91 |
| Level-1 modeled variance ($R^2$) | 0.03 | 0.04 | 0.03 | 0.03 |
| **Level-2 predictors** | | | | |
| Mean max prison sentence, murder | 0.02 | | | |
| Mean max prison sentence, robbery | | 0.02 | | |
| Mean max prison sentence, agg. assault | | | -0.04 | |
| Mean max prison sentence, burglary | | | | -0.02 |
| County-level index crime rate | 0.00 | 0.00 | 0.00 | 0.00 |
| Level-2 modeled variance ($R^2$) | 0.06 | -0.03 | -0.02 | -0.05 |

* Significant at 0.05 confidence level
** Significant at 0.01 confidence level

one negative), and the lack of any pattern, either by crime type or punishment type, concerning which estimates appeared to support the deterrence doctrine.

More generally, expressed perceptions of punishment appear to have little relationship with any of the variables measured in this study. Tables 3 through 7 report the level-1 variance explained in the dependent variables, that is, the $R^2$ for the individual-level variables, and these figures are uniformly low. Either these perceptions are being formed largely at random, or they are produced by factors, perhaps very individualistic and idiosyncratic, that we did not measure.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

**Table 7. Effect of Actual Swiftness of Punishment on Perceptions of Swiftness (HLM Estimates)**

| | Dependent Variable (perceived number of days from arrest to sentencing for) | | | |
| | Homicide | Robbery | Assault | Burglary |
|---|---|---|---|---|
| Level-1 predictors | | | | |
| Crime most important problem | 0.02 | 20.43 | 28.32* | 39.25** |
| Crime in county relative to nation | -7.88 | -0.27 | -5.75 | -3.46 |
| Crime trend in county | 10.30 | -7.27 | -12.46 | -22.59 |
| Robbery victim in past year | -98.42* | -0.97 | -9.12 | 39.32 |
| Assault victim as adult | 47.71 | -2.26 | -40.67 | -16.40 |
| Burglary victim in past year | -32.86 | 8.64 | -27.54 | -14.69 |
| Knows victim of serious crime | 45.23 | 17.01 | 32.71 | 24.52 |
| Times per week watching local news | -3.42 | 1.25 | 1.95 | 0.34 |
| Times per week watching natl. news | 4.75 | 0.55 | -2.25 | -2.49 |
| R or R's family worked in CJS | -20.63 | 14.18 | 59.95* | -33.79 |
| Age | 3.30** | 1.68* | 2.21 | 3.06** |
| Male | -33.97 | -22.70 | -21.96 | -38.78 |
| Black | -29.24 | -41.86* | -48.74* | -33.64 |
| South | -8.95 | 10.39 | -15.56 | -10.02 |
| Education | 18.84* | 12.07* | 16.48** | 13.91** |
| Non-traffic arrest | 53.90 | 37.07 | 38.04 | 55.53 |
| Level-1 modeled variance (R²) | 0.04 | 0.02 | 0.03 | 0.05 |
| Level-2 predictors (mean days between arrest and sentence) | | | | |
| Murder | 0.17 | | | |
| Robbery | | 0.15** | | |
| Assault | | | 0.20 | |
| Burglary | | | | 0.14 |
| County-level index crime rate | 0.01 | -0.00 | 0.03 | 0.03 |
| Level-2 modeled variance (R²) | 0.00 | 0.14 | -0.06 | -0.06 |

* Significant at 0.05 confidence level
** Significant at 0.01 confidence level

Finally, Tables 8 and 9 report multivariate HLM results pertaining to the issue of whether the correspondence of perception and reality of punishment is any closer for criminals than for noncriminals. Table 8 summarizes the key findings for arrestees. Table 9 does so for nonarrestees. The models generating the estimates in Tables 8 and 9 included all independent variables shown in Tables 2-7, but their coefficients are not shown to save space. Because the multivariate estimates require valid data for many variables, they are based on considerably fewer cases due to missing data. The multivariate results, however, confirm the bivariate findings of Table 2. There is no significant

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

650                              KLECK ET AL.

association between perceptions of punishment and its reality among either arrestees or nonarrestees, and there is no evidence that the correspondence of the two is any closer among criminals than among noncriminals.

**Table 8. Effects of Actual Punishment on Perceived Punishment among Arrestees (HLM Estimates)**

| Dependent Variable | Level-2 Explanatory Variables | | Level-2 Variance & Sample Size | |
|---|---|---|---|---|
| | Actual Punishment ($\gamma 01$) | Index Crime Rate ($\gamma 02$) | Modeled Variance ($R^2$) | Sample Size (N) |
| A. *Perceived arrests per 100 known offenses for:* | | | | |
| Homicide | 0.03 | -0.00 | -0.16 | 37 |
| Robbery | -0.35 | -0.00 | -0.00 | 37 |
| Assault | -0.21** | -0.00 | 0.12 | 37 |
| Burglary | -0.54 | -0.00 | -0.01 | 37 |
| B. *Perceived conviction rates for:* | | | | |
| Homicide | 0.06 | -0.00 | -0.02 | 37 |
| Robbery | 0.04 | -0.00 | -0.30 | 37 |
| Assault | 0.47** | -0.00* | 0.16 | 37 |
| Burglary | -0.03 | -0.00** | 0.02 | 37 |
| C. *Perceived prison sentences per 100 adults convicted for:* | | | | |
| Homicide | -0.05 | -0.00 | -0.08 | 37 |
| Robbery | 0.52* | -0.00* | 0.37 | 37 |
| Assault | -0.09 | -0.00* | 0.13 | 37 |
| Burglary | 0.10 | -0.00* | 0.20 | 37 |
| D. *Perceived average maximum sentence for:* | | | | |
| Homicide | -0.23 | 0.01 | -0.06 | 37 |
| Robbery | -0.03 | -0.01 | -0.00 | 37 |
| Assault | -0.11 | -0.01 | -0.02 | 37 |
| Burglary | 0.05 | -0.01 | 0.06 | 37 |
| E. *Perceived number of days from arrest to sentencing for:* | | | | |
| Homicide | -0.08 | 0.01 | -0.02 | 30 |
| Robbery | -0.35 | 0.03 | -0.34 | 30 |
| Assault | -0.52 | 0.01 | -0.27 | 30 |
| Burglary | -0.01 | 0.01 | -0.26 | 30 |

*   Significant at 0.05 confidence level
**  Significant at 0.01 confidence level

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

**Table 9. Effects of Actual Punishment on Perceived Punishment among Non-Arrestees(HLM Estimates)**

| Dependent Variable | Level-2 Explanatory Variables | | Level-2 Variance & Sample Size | |
|---|---|---|---|---|
| | Actual Punishment ($\gamma 01$) | Index Crime Rate ($\gamma 02$) | Modeled Variance ($R^2$) | Sample Size (N) |
| A. *Perceived arrests per 100 known offenses for:* | | | | |
| Homicide | 0.03 | -0.00 | -0.02 | 54 |
| Robbery | -0.10 | -0.00 | -0.03 | 54 |
| Assault | 0.00 | -0.00 | -0.05 | 54 |
| Burglary | 0.02 | -0.00 | -0.04 | 54 |
| B. *Perceived conviction rates for:* | | | | |
| Homicide | -0.02 | -0.00 | -0.02 | 54 |
| Robbery | 0.02 | -0.00 | -0.04 | 54 |
| Assault | 0.04 | -0.00 | 0.06 | 54 |
| Burglary | -0.01 | -0.00 | -0.05 | 54 |
| C. *Perceived prison sentences per 100 adults convicted for:* | | | | |
| Homicide | -0.04 | -0.00 | 0.04 | 54 |
| Robbery | 0.05 | 0.00 | -0.05 | 54 |
| Assault | 0.05 | -0.00 | -0.02 | 54 |
| Burglary | 0.03 | -0.00 | 0.00 | 54 |
| D. *Perceived average maximum sentence for:* | | | | |
| Homicide | 0.04 | 0.01[*] | 0.09 | 54 |
| Robbery | 0.03 | 0.00 | -0.01 | 54 |
| Assault | -0.03 | 0.00 | -0.05 | 54 |
| Burglary | -0.02 | 0.00 | -0.05 | 54 |
| E. *Perceived Number of Days from Arrest to Sentencing for:* | | | | |
| Homicide | 0.20 | 0.02 | 0.06 | 38 |
| Robbery | 0.17[**] | -0.01 | 0.23 | 38 |
| Assault | 0.28 | 0.03 | -0.06 | 38 |
| Burglary | 0.17 | 0.03 | -0.04 | 38 |

[*] Significant at 0.05 confidence level
[**] Significant at 0.01 confidence level

## CAVEATS

In at least three important ways, these are generous estimates of the reality-perception association. First, in all of our analyses we had to exclude the 15 to 20 percent of respondents who were not willing to even guess at punishment levels in their area. Thus, by excluding what were presumably less knowledgeable respondents, we biased results in favor of finding a higher correspondence between reality and perception, yet still found virtually no association. Second, we asked Rs for these perceptions in a context favoring accuracy. Rs were in the relative comfort and security of their homes, and could calmly reflect on punishment risks. In

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

contrast, prospective offenders, at the moment when they consider committing a criminal act, especially a violent act, are often under considerable emotional stress and thus less likely to make reasonable assessments of legal risks. Third, because samples of the general household population exclude incarcerated criminals, our sample excluded those undeterred by, and thus least responsive to, threats of legal punishment. Likewise, if nonincarcerated criminals also tend to be unavailable for survey interviews, the same sample bias would be expected. Thus, one could view our sample as excluding those whose perceptions of punishment risks were the most weakly correlated with actual risks (compare the arrestee correlations with nonarrestee correlations in Table 2).

It might be speculated that prospective offenders might be more aware of the statutory penalties "on the books" than the severity of sentences actually imposed, so the former might affect perceptions of severity even if the latter did not. This speculation is, however, undercut by empirical evidence on public knowledge of statutory penalties. Roberts' summary of the evidence indicates that the public is widely ignorant of statutory maxima and minima, even for well-publicized offenses (1992: 112–113). This ignorance should tend to weaken the link between actual and perceived punishment levels. Further, to the extent that people misestimate penalty severity, they underestimate it, which should weaken deterrent effects of the penalties.

It might be argued that some of the variables we controlled were intervening variables mediating the effect of actual punishment levels on perceived punishment levels. For example, punishment levels might affect crime rates (whether through deterrent effects or by other means), and thus the likelihood of the individual respondent being victimized or the respondent's perceptions of the relative level or trends in crime in his or her area. If this were true, we might have "controlled away" some of the indirect effects of actual punishment levels on perceived punishment levels. This speculation, however, is contradicted by the fact that introducing the controls into the analysis had virtually no effect on the APL/PPL associations. The simple bivariate associations were essentially zero to begin with (average r=0.02) (Kleck, 2003: 305).

The correspondence of actual and perceived punishment levels might have been assessed using an alternative, longitudinal approach. We believe that our cross-sectional approach is likely to be more supportive of the deterrence hypothesis, based on the assumption that the average person is more likely to be aware of the approximate levels of punishment prevailing in their local area than of the generally rather small changes in those levels that occurred in the recent past. For example, in the early 1990s, the nation's judges grew rapidly and increasingly harsh in their

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

sentencing. Yet the share of the American public that thought that judges in their area were too lenient actually increased from 1990 to 1994, from 83 percent to 85 percent; perceptions of harshness certainly did not *increase in accord with actual changes*. Likewise, when judges' actual sentences rapidly declined in harshness from 1994 to 2002, trends in the public's perceptions of judges' harshness moved in precisely the opposite direction. The percent perceiving judges as not harsh enough actually declined, from 85 percent in 1994 to 67 percent in 2002 (Bureau of Justice Statistics, 2002, 2004). If people are even less aware of changes in punishment than of its levels, a longitudinal approach, other things being equal, would be even less likely to find a close reality-perception correspondence than our cross-sectional approach.

On the other hand, no measurements are perfect, and to the extent that ours are affected by random error, the associations will be attenuated, favoring the null hypothesis. Perhaps perfect measurement of the variables would have resulted in strong associations, but the attenuation due to measurement error would have to be substantial indeed to suppose that the near-zero associations observed between the measured variables are concealing strong associations between the true variables.

More broadly, it is impossible to prove a negative and thus to prove the null hypothesis. The most precise way to summarize these findings is to say that they consistently fail to support the hypothesis that higher actual punishment levels lead to higher perceived punishment levels.

CONCLUSIONS AND POLICY IMPLICATIONS

There is generally no significant association between perceptions of punishment levels and actual levels that CJS agencies work hard to achieve, implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms. Increases in punishment might do so through incapacitative effects, the effects of treatment programs linked with punishment, or other mechanisms, but are not likely to do so in any way that depends on producing changes in perceptions of risk.

These findings do not, on the other hand, imply that punishment does not exert any deterrent effect. Rather, they support the view that any deterrent effect, however large or small it may be, does not covary with actual punishment levels to any substantial degree, because the perceptions of risk on which deterrent effects depend generally do not covary with punishment levels. There may be some baseline deterrence that the punishment-generating activities of the criminal justice system generate, but apparently one that does not consistently increase with increased punishment levels or diminish with decreased levels. Thus,

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

654                              KLECK ET AL.

increased punishment levels are not likely to increase deterrent effects, and decreased punishment levels are not likely to decrease deterrent effects.

For those seeking ways to improve existing levels of ability to control crime, these findings suggest a need for either (1) a shift in crime control resources towards strategies whose success does not depend on general deterrence effects, or (2) different, nonroutine methods for generating effective deterrence messages. One approach in the latter category is to more narrowly target very specific deterrence messages at audiences who are at especially high risk of committing crimes in the near future. This was the main idea behind a program implemented in Boston and aimed at reducing youth gang violence. Rather than using apprehension, prosecution and punishment to send "wholesale" deterrence messages aimed at the general population, the Ceasefire program delivered direct and explicit "retail" messages to a relatively small target audience of gang members and potential members. Unfortunately, there has been no rigorous evaluation of this program or any similar one, so it remains to be seen whether more narrowly targeted delivery of deterrence messages works any better than traditional methods (Kennedy, 1997).

It is also possible that unusually highly publicized punishment events may generate deterrent effects that the routine, largely unpublicized punitive activities of the criminal justice system ordinarily do not. For example, it has been asserted that highly publicized executions exert an effect, albeit a possibly temporary one, on homicidal behavior (Phillips, 1980; Stack, 1987), and the same might be true of events linked with less extreme punishments such as incarceration, if sufficiently publicized. There is, however, no persuasive evidence bearing on publicized punishment events other than executions or death sentencings. Further, there is a severe upper limit on how much publicity-dependent deterrent effects could be increased, given that the very newsworthiness essential for gaining publicity would, in the absence of direct state control over news media, decline as soon as a given type of punishment event became more commonplace.

Criminals' awareness of legal risks may be largely confined to the most conspicuous features of their immediate environments at the time a crime is contemplated. They are aware of the presence of a police officer, patrol car or bystander who might intervene but are not sensitive to, directly or indirectly, the overall likelihood of arrest in their areas. These localized perceptions, however, may do little more than displace offenders to other places and times rather than deterring offenses altogether—for example, an offender can simply wait a few minutes until the patrol car passes or the bystander leaves, then commit the crime. In light of the present study's evidence of even worse reality-perception correlations among arrestees

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

than among nonarrestees, the data support the conclusion that neither news media information, nor personal experiences of the actor and his associates, nor any other sources of information of which we are aware provide an adequate foundation for forming even minimally accurate perceptions of the certainty, severity or swiftness of punishment.

It may therefore be useful to view prospective offenders' responses to punishment levels as characterized by a severely constricted rationality. Although many people are capable of weighing perceived risks and rewards when deciding whether to commit crime, they typically have so little accurate information about key risks and rewards that this capacity for rational decision making remains to a great extent inoperative.

These findings suggest that conventional efforts to increase general deterrent effects beyond their current level are so unpromising that policymakers should consider more productive alternatives beyond merely increasing punishment levels. Punishment-generating activities will, of course, be continued regardless of the evidence bearing on general deterrence, either for the sake of justice and retribution, or for the sake of crime control via incapacitation, the treatment associated with apprehension and conviction, and whatever continuing, though perhaps hard-to-increase, baseline general deterrent effects that punishment may produce. Our findings indicate that no deterrent effects would be lost if punishment levels were reduced from their current levels, so resources could be safely redirected from punitive activities of the criminal justice system to other ways of reducing crime. Thus, investment could be increased in alternatives to deterrence-based crime control, such as generating a larger supply of stable, good-paying jobs in high crime areas, and delivering job training, daycare and health services to enable more young people to enter the job market, hold onto jobs, and form and maintain stable families, to reduce crime among the next generation.

## REFERENCES

Akers, Ronald L.
    1973   *Deviant Behavior: A Social Learning Approach.* Belmont, CA: Wadsworth.

Beccaria, Ceasare
    1764/1963  *On Crimes and Punishments.* Translated by Henry Paolucci. Indianapolis, IN: Bobbs-Merrill.

Becker, Gary S.
    1968   Crime and punishment: An economic approach. *Journal of Political Economy* 76:169–217.

C.Agnello   SC 0562

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Cohen, Larry
    1978    Sanction threats and violation behavior: An inquiry into perceptual variation. In Charles Wellford (ed.), *Quantitative Studies in Criminology.* Beverly Hills: Sage Publications.

Cook, Philip J.
    1980    Research in criminal deterrence. In Norval Morris and Michael Tonry (eds.), *Crime and Justice,* vol. 2. Chicago: University of Chicago Press.

Cornish, Derek B. and Ronald V. Clarke (eds.)
    1986    *The Reasoning Criminal.* New York: Springer-Verlag.

Ehrlich, Isaac
    1973    Participation in illegitimate activities. *Journal of Political Economy* 81:521–565.

Erickson, Maynard L. and Jack P. Gibbs
    1978    Objective and perceptual properties of legal punishment and the deterrence doctrine. *Social Problems* 25:253–264.

Garofalo, James
    1981    Crime and the mass media. *Journal of Research in Crime and Delinquency* 18:319–350.

Gibbs, Jack
    1975    *Crime, Punishment, and Deterrence.* New York: Elsevier.

Hindelang, Michael J., Michael R. Gottfredson and James Garofalo
    1978    *Victims of Personal Crime.* Cambridge, MA: Ballinger.

Horney, Julie and Ineke Haen Marshall
    1992    Risk perceptions among serious offenders: The role of crime and punishment. *Criminology* 30:575–592.

Kahan, Dan M.
    1999    The secret ambition of deterrence. *Harvard Law Review* 113:413–500.

Kennedy, David
    1997    Pulling levers: getting deterrence right. *National Institute of Justice Journal* 236:2–8.

Kleck, Gary
    2003    Constricted rationality and the limits of general deterrence. In Thomas G. Blomberg and Stanley Cohen (eds.), *Punishment and Social Control,* 2nd ed. New York: Aldine de Gruyter.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

Marsh, H. L.
1989 Newspaper crime coverage in the U.S., 1983–1988. *Criminal Justice Abstracts* 21:506–514.

Nagin, Daniel S.
1998 Criminal deterrence research at the outset of the twenty-first century. In Michael Tonry (ed.), *Crime and Justice: A Review of Research*, vol. 23. Chicago: University of Chicago Press.

Parker, Jerry and Harold G. Grasmick
1979 Linking actual and perceived certainty of punishment. *Criminology* 17:366–379.

Paternoster, Raymond
1987 The deterrent effect of the perceived certainty and severity of punishment: a review of the evidence and issues. *Justice Quarterly* 4:173–217.

Paternoster, Raymond, Linda E. Saltzman, Gordon P. Waldo and Theodore G. Chiricos
1985 Assessments of risk and behavioral experience: an exploratory study of change. *Criminology* 23:417–436.

Phillips, David P.
1980 The deterrent effect of capital punishment: New evidence on an old controversy. *American Journal of Sociology* 86:139–148.

Richards, Pamela, and Charles R. Tittle
1981 Gender and perceived chances of arrest. *Social Forces* 59:1182–1199.
1982 Socioeconomic status and perceptions of personal arrest probabilities. *Criminology* 20:329–346.

Roberts, Julian V.
1992 Public opinion, crime, and criminal justice. In Michael Tonry (ed.), *Crime and Justice: A Review of Research*, vol. 16. Chicago: University of Chicago Press.

Roshier, Bob
1973 The selection of crime news by the press. In Stanley Cohen and Jock Young (eds.), *The Manufacture of News*. London: Constable.

Saltzman, Linda E., Raymond Paternoster, Gordon P. Waldo and Theodore G. Chiricos
1982 Deterrent and experiential effects: The problem of causal order in perceptual deterrence research. *Journal of Research in Crime and Delinquency* 19:172–189.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Spelman, William
    1994    *Criminal Incapacitation.* New York: Plenum.

Stack, Steven
    1987    Publicized executions and homicide, 1950–1980. *American Sociological Review* 52:532–540.

Tittle, Charles R.
    1980    *Sanctions and Social Deviance: The Question of Deterrence.* New York: Praeger.

Tonry, Michael
    2004    *Thinking About Crime: Sense and Sensibility in American Penal Culture.* New York: Oxford University Press.

U. S. Department of Justice [Bureau of Justice Statistics]
    1999    *National Judicial Reporting Program, 1996.* [United States] [Computer file]. Compiled by U.S. Department of Commerce, Bureau of the Census. ICPSR ed. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [producer and distributor].
    2002    *Sourcebook of Criminal Justice Statistics.* Online version available at http://www.albany.edu/sourcebook/.
    2003    *Felony Sentences in State Courts, 2002.* Bureau of Justice Statistics Bulletin, December, 2004. Washington, D.C.: U.S. Government Printing Office.

U.S. Department of Justice [Federal Bureau of Investigation]
    1999    *Crime in the United States 1998.* Washington, D.C.: U.S. Government Printing Office.
    2000    *Uniform Crime Reporting Data.* [United States]: County-level Detailed Arrest and Offense Data, 1998 [Computer file]. 2nd ICPSR ed. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [producer and distributor].

Vold, George B., Thomas J. Bernard and Jeffrey B. Snipes
    2002    *Theoretical Criminology,* 5th ed. New York: Oxford University Press.

Zimring, Franklin and Gordon Hawkins
    1973    *Deterrence: The Legal Threat in Crime Control.* Chicago: University of Chicago Press.

Gary Kleck is professor of criminology and criminal justice at Florida State University. His research has focused on the topics of the impact of firearms and gun control on violence, deterrence, crime control and violence. He is the author of *Point Blank: Guns and Violence in America,*

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

which won the 1993 Michael J. Hindelang Award of the American Society of Criminology. More recently, he is the author of *Targeting Guns* (1997) and, with Don B. Kates, Jr., *The Great American Gun Debate* (1997) and *Armed* (2001).

Brion Sever received his Ph.D. in criminology in 1999 from Florida State University. He currently is an associate professor of criminal justice at Monmouth University, where he has taught more than twenty different courses. His areas of research include social control, policing and corrections, and his most recent publications are found in *The Journal of Criminal Justice Education, Police Quarterly, Criminal Justice Studies: A Critical Journal of Crime, Law and Society,* and *The Justice System Journal.*

Spencer De Li until recently was an assistant professor in the College of Criminology and Criminal Justice at Florida State University, and now works for Westat in Rockville, Maryland. His research focuses on the prevention of juvenile delinquency and crime through informal social control. He has published a number of articles examining the relationship between religion and crime and exploring the gender-specific and race-specific effects of social bonds on antisocial behavior. His current research efforts concentrate on theoretical understanding of the impact of religion on deviance and crime.

Marc Gertz is professor of criminology and criminal justice at Florida State University. His current research interests include comparative criminal justice systems, courts and social policy and the consequences of the fear of crime. His recent publications include the ninth edition of *The Criminal Justice System: Politics and Policies* (edited with George F. Cole and Amy Bunger).

C.Agnello    SC 0566

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.